Kenneth H. Brendel (#019003)
Thomas E. Dietrich (#031299)
MANGUM, WALL, STOOPS & WARDEN, PLLC
100 N. Elden St.
Flagstaff, AZ 86001
Tel. 928.779.6951
kbrendel@mwswlaw.com
tdietrich@mwswlaw.com

*Attorneys for Plaintiff Jason Scott Collection, Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| JASON SCOTT COLLECTION, INC., an Arizona corporation,<br><br>Plaintiff,<br><br>v.<br><br>TRENDILY FURNITURE, LLC, a Texas limited liability company, TRENDILY HOME COLLECTION, LLC, a Texas limited liability company, RAHUL MALHOTRA, an individual, JOHN DOE CORPORATIONS 1-10, and JOHN DOES 1-10,<br><br>Defendants. | Case No. 2:17-cv-02712-JJT<br><br>**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiff Jason Scott Collection, Inc. ("Jason Scott") submits its proposed findings of fact and conclusions of law regarding its motion for preliminary injunction (Doc. 9).

**I.    PROPOSED FINDINGS OF FACT**

1.    Jason Scott seeks a preliminary injunction barring Defendants Trendily Furniture, LLC, Trendily Home Collection, LLC, and Rahul Malhotra (together, "Defendants") from manufacturing, offering to sell, and selling copies of furniture pieces in which Jason Scott holds registered copyrights and common law trade dress rights.

### A. The Parties

2. Jason Scott is an Arizona corporation with its principal place of business in Phoenix, Arizona. Jason Scott is wholly-owned by Jason Scott Forsberg ("Forsberg"), a resident of Flagstaff, Arizona.

3. Trendily Furniture, LLC and Trendily Home Collection, LLC are Texas limited liability companies with their principal place of business in Dallas, Texas. Both companies are wholly-owned by Defendant Malhotra, a Texas resident.

### B. Jason Scott's Background

4. Jason Scott began manufacturing and selling furniture made of reclaimed Indonesian teak in 1998. [Doc. 9, Ex. 1 ¶¶ 3-4]

5. Forsberg independently creates all of the furniture designs for pieces manufactured and sold by Jason Scott. [Doc. 9, Ex. 1 ¶ 5]

6. Today, Jason Scott employs over 200 Indonesian craftsmen and has three factory warehouses in Indonesia, all directed towards crafting recycled teak furniture using original designs created by Forsberg. Forsberg and his team developed unique methods of treating and weathering reclaimed teak using a 10-step process of wire brushing, scraping with broken glass, burning, waxing, rubbing with empty bottles, and state-of-the-art kiln drying. [Doc. 9, Ex. 1 ¶ 4]

7. Jason Scott sells only to furniture retailers, not to the general public. Jason Scott does not license its designs or the right to manufacture, distribute, or sell Jason Scott furniture to anyone else. Jason Scott is the sole manufacturer of Jason Scott furniture and sells only to a carefully-selected network of authorized retailers. Jason Scott maintains this structure in order to retain total control of the quality of its furniture and to avoid geographic overlap between retailers' sales areas. [Doc. 9, Ex. 1 ¶ 10]

8. Jason Scott furniture has had significant success in the marketplace. Over 100 authorized furniture showrooms throughout the United States have carried Jason Scott

pieces. Jason Scott has frequently displayed its furniture at industry trade shows, and furniture news, design, and lifestyle magazines have covered Jason Scott numerous times. Jason Scott's furniture is collectable, and some collectors have acquired many different pieces of Jason Scott furniture over the years. [Doc. 9, Ex. 1 ¶ 8, 11]

9. Forsberg independently created the designs for the Iron Star Desk, Borgota Buffet, and Sacred Heart Dining Table (the "JSC Pieces") in 2003. Jason Scott started selling each of the JSC Pieces in or about 2004, and has been selling the JSC Pieces continuously since then. [Doc. 9, Ex. 1 ¶¶ 5]

10. Jason Scott is a small company with two employees in the United States, Forsberg and his wife, and 250 workers in Indonesia who rely on Jason Scott for their livelihoods. [Doc. 9, Ex. 1 ¶ 33]

C. **Jason Scott's Rights in the JSC Pieces**

11. The U.S. Copyright Office awarded Forsberg copyrights for the designs consisting primarily of ornamental carvings on each of the three JSC Pieces, U.S. Copyright Registration Nos. VA 2-050-752, VA 2-050-753, and VA 2-050-754 (the "Copyrights"). [Doc. 1, Exs. 3-5; Doc. 9, Ex. 1 ¶ 6]

12. Forsberg assigned all right, title, and interest in each of the Copyrights to Jason Scott. [Doc. 9, Ex. 1 ¶ 7]

13. Jason Scott has sold each of the JSC Pieces for over 13 years. Furniture retailers have averred they closely identify the unique design and appearance of the JSC Pieces as originating from Jason Scott. These designs are different from those used by any other manufacturer in the furniture industry. The designs of the JSC Pieces incorporate highly ornate carvings and decorative design elements that customers have come to associate with Jason Scott. [Doc. 9, Ex. 1 ¶¶ 5, 8, 10, 32; Ex. 2 ¶¶ 3-7; Ex. 3 ¶¶ 3-7; Ex. 4 ¶¶ 3-7]

///

### D. Copying by Defendants

14. In or about late 2016, Defendants began advertising, marketing, and selling imitations of the JSC Pieces through the Trendily website and showroom. Defendant referred to the imitations as the "MJ Collection" (the "Accused Products"). [Doc. 9, Ex. 1 ¶¶ 14-26]

15. Defendants' "MJ Office Desk" is a copy of Jason Scott's Iron Star Desk. Defendants' "MJ Dining Table" is a copy of Jason Scott's Sacred Heart Dining Table. Defendants' "MJ Sideboard" is a copy of Jason Scott's Borgota Buffet. [Doc. 9, Ex. 1 ¶ 17]

16. Defendants' Accused Products visually appear to be identical copies of the JSC Pieces, with the same carvings and decorative designs in the same placement and arrangement as the JSC Pieces. [Doc. 9, Ex. 7 ¶ 6]

17. From the period when Defendants' began selling the Accused Products to the time Jason Scott filed its lawsuit in August 2017, Defendants have admitted to manufacturing at least 18 Accused Products, and selling at least 15 Accused Products to furniture retailers. [Doc. 12, Ex. 1 ¶ 12]

18. Defendants currently are in possession of three Accused Products, which are in storage in Texas. [Doc. 12, Ex. 1 ¶ 13]

19. Defendants sold the Accused Products for prices between $200 to $1,100 less than the price for the corresponding JSC Piece. [Doc. 9, Ex. 1 ¶ 28]

20. Defendants sold Accused Products to retailers who are not authorized to sell Jason Scott furniture, but are located near authorized dealers. The parties' furniture travels in the same marketing channels to furniture retailers in close proximity. The result has been that unauthorized retailers displayed and sold Defendants' Accused Products—for a lower price—in the same geographic area as authorized retailers of the JSC Pieces. [Doc. 9, Ex. 1 ¶¶ 18, 28]

21. In or about early July 2017, Malhotra offered to sell the Accused Pieces to Shawn Beach, the owner of a retail store, saying repeatedly that the Accused Products were "exactly like" and "identical" to the JSC Pieces. Malhotra described how Defendants were copying features of Jason Scott furniture and were planning to offer knockoffs of other Jason Scott pieces in the future. [Doc. 9, Ex. 7 ¶ 4]

22. On or about July 20, 2017, a representative of Defendants again offered to sell the Accused Products to Ms. Beach, stating Defendants were selling "Jason Scott look-alikes" and that Defendants could make anything in Jason Scott's catalog within eight to ten weeks. The representative further stated Defendants had additional shipping containers coming in with more Jason Scott copies in them. [Doc. 9, Ex. 7 ¶ 5]

23. On August 15, 2017, two sales representatives for Defendants met with the owner and staff from a retail store, and pitched the Accused Products. The store owner, Bonita Runyon, recorded the meeting. The sales representatives showed photographs of Defendants' Accused Products and stated a cargo container was coming in on September 15, 2017, that may be carrying some of the Accused Products. The representatives acknowledged that the retailer may have trouble with Jason Scott if found to be selling Defendants' Accused Products. The representatives further made statements indicating demand for the Accused Products was very high, and Defendants had increased production to meet demand. [Doc. 23, Exs. 1, 2; Doc. 25 (audio recordings)]

     **E.**    **Cease-and-Desist Letters**

24. On May 24, 2017, Jason Scott's counsel sent a cease-and-desist letter to Defendants informing them of Jason Scott's rights in the JSC Pieces and asking them to immediately cease manufacturing and selling the Accused Products. Trendily never responded to that letter. [Doc. 1, Ex. 8]

25. On June 27, 2017, Jason Scott's counsel sent a second cease-and-desist letter to Defendants, which included copies of Jason Scott's Copyrights, and again

demanded that Defendants immediately cease manufacturing and selling the Accused Products. Defendants never responded to the second letter, and they continued to sell and offer to sell Accused Products after receiving that letter. [Doc. 1, Ex. 9; Doc. 9, Ex. 1 ¶¶ 17, 24, Ex. 7 ¶ 5; Doc. 23, Exs. 1, 2; Doc. 25]

### F. The Lawsuit

26. On August 11, 2017, Jason Scott filed suit against Defendants alleging copyright infringement, trade dress infringement, and unfair competition. [Doc. 1]

27. The same day, Jason Scott moved for a preliminary injunction on grounds of copyright and trade dress infringement. [Doc. 9]

28. Defendant Malhotra has alleged that Defendants ceased manufacturing, selling, or offering to sell the Accused Products after Jason Scott filed the lawsuit. [Doc. 12, Ex. 1 ¶¶ 14-15]

## II. PROPOSED CONCLUSIONS OF LAW

### A. Preliminary Injunction Standard

29. Section 502(a) of the Copyright Act, 17 U.S.C. § 502(a), authorizes a federal court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." Likewise, the Lanham Act, 15 U.S.C. § 1116, allows courts to grant injunctions "upon such terms as the court may deem reasonable" to prevent a violation under subsection 1125(a). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

///

///

///

**B.     Plaintiff is Entitled to a Preliminary Injunction on the Copyright Infringement Claim**

**1.     Plaintiff's claim is likely to succeed on the merits**

30.     To prevail on a copyright infringement claim, "a plaintiff must establish ownership and unauthorized copying of protected expression." *Amini Innov. Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1368 (9th Cir. 2006). To claim a valid copyright, Jason Scott must show its designs are (1) original, and (2) conceptually separable from the utilitarian aspects of the furniture. *See Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S.Ct. 1002, 1008 (2017); *Univ. Furniture Int'l v. Collezione Europa USA, Inc.*, 618 F.3d 417, 429 (4th Cir. 2010). The submission of a valid certificate of copyright registration creates a presumption of originality for five years from the registration date. *Swirsky v. Carey*, 376 F.3d 841, 851 (9th Cir. 2004).

31.     Jason Scott has submitted copies of the certificates of registration for the copyrights in question. Jason Scott's designer and owner, Forsberg, independently created original designs for each of the JSC Pieces. This is sufficient evidence of originality.

32.     With regard to separability, "a feature of the design of a useful article is eligible for copyright if, when identified and imagined apart from the useful article, it would qualify as a pictorial, graphic, or sculptural work either on its own or when fixed in some other tangible medium." *Star Athletica*, 137 S.Ct. at 1012.

33.     The copyright registration certificates explicitly cover "decorative sculptural designs on furniture" for each of the JSC Pieces. Considering the ornate design elements of the JSC Pieces, one can easily imagine the carvings and decorative metalwork—if separated from the furniture and applied to another medium, such as a painter's canvas—qualifying as two-dimensional works of art. *See id*. The design elements are therefore separable and eligible for copyright protection. *Id.*; *see also Univ. Furniture*, 618 F.3d at 434; *Amini*, 439 F.3d at 1368-69. The carvings and decoration on the JSC Pieces are

1  "wholly unnecessary to the furniture's utilitarian function." *Universal*, 618 F.3d at 434
2  (internal citation omitted). Jason Scott's Copyrights are therefore valid.

3        34.    Turning to copying, "[c]opying requires evidence that a defendant literally
4  copied the designs or, alternatively, that a defendant had access to the protected designs
5  before creating the accused designs with an additional showing of substantial similarity
6  not only of the general ideas but of the expression of those ideas as well." *Amini*, 439 F.3d
7  at 1368. The Ninth Circuit uses "an inverse-ratio rule that allows a lesser showing of
8  substantial similarity if there is a strong showing of access." *Id*.

9        35.    There is substantial evidence of literal copying by Defendants. The Accused
10 Products identically copy the JSC Pieces, including all protected design aspects. The
11 ornamental features of the JSC Pieces include intricate carvings of flowers, leaves,
12 scrollwork, and other details, all of which are included in the Accused Pieces. Further,
13 several furniture retailers reported that Malhotra and his agents approached them seeking
14 to sell "Jason Scott look-alikes," and claiming that the Accused Products were "identical"
15 to the JSC Pieces.

16       36.    There is also evidence that Defendants had access to Jason Scott's designs.
17 Defendants are located very near to several authorized Jason Scott retailers. Jason Scott's
18 designs have also been featured in industry publications and are displayed on the company
19 website and other home design websites.

20       37.    With regard to substantial similarity, the Ninth Circuit uses a two-part
21 extrinsic/intrinsic test to determine whether two works are substantially similar. *Amini*,
22 439 F.3d at 1369. The extrinsic test "is an objective comparison of specific expressive
23 elements." *Id*. Courts may "even find a combination of unprotectable elements to be
24 protectable under the extrinsic test because 'the overall impact and effect indicate
25 substantial appropriation.'" *Id*. at 1370 (quoting *Three Boys Music Corp. v. Bolton*, 212
26 F.3d 477, 485 (9th Cir. 2000)); *see also Amini*, 439 F.3d at 1370 (comparing specific

design elements that were "virtually identical" between plaintiff's furniture and defendant's copies).

38. Here, Defendants have misappropriated every decorative design element of the JSC Pieces. As compared to Jason Scott's Iron Star Desk, Defendants' MJ Office Desk has identical embedded metal cross designs on the back and sides, curvilinear carved legs with scrollwork, and carvings along top and bottom of the desk. Defendants' MJ Dining Table has the same carved legs, carved tabletop, and decorative studs as Jason Scott's Sacred Heart Dining Table. Defendants' MJ Sideboard copies exactly the curvilinear front facing, all carvings, and the decorative hinges contained in Jason Scott's Borgota Buffet.

39. Defendants made no effort to depart from Jason Scott's designs. By any objective measure, Defendants' Accused Products copy Jason Scott's copyrighted designs, and the overall impact and effect clearly indicate substantial appropriation. The objective-extrinsic test is thus satisfied.

40. The intrinsic test "is a subjective comparison that focuses on whether the ordinary reasonable audience would find the works substantially similar in the total concept and feel of the works." *Amini*, 439 F.3d at 1369 (internal citation omitted). Judge Learned Hand described the test as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960).

41. An ordinary observer of Defendants' Accused Products would find the designs are, for all practical purposes, identical to the JSC Pieces. The striking similarity of the total concept and feel of each of the works cannot be overlooked—they are essentially the same. *See, e.g.*, *Thimbleberries, Inc. v. C&F Enters., Inc.*, 142 F.Supp. 2d 1132, 1140 (D. Minn. 2001) (applying intrinsic test to identical wreath designs). The

subjective-intrinsic test is thus satisfied. It is inconceivable that Defendants could have created the Accused Products without copying the JSC Pieces. Jason Scott has therefore carried its burden of showing it is likely to succeed on the merits of its copyright infringement claim.

### 2.     Jason Scott has suffered irreparable injury

42.    In a copyright case, the Court looks to harm to the plaintiff's "legal interests as an author." *Garcia v. Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015). "By establishing a marketable right to use one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Id*. The "justification of the copyright law is the protection of the commercial interest of the author . . . to stimulate creation by protecting its rewards." Id. at 744-45 (internal citations omitted). In addition, disparities in price have been recognized as a "sufficient indicator of irreparable harm to [a copyright] plaintiff's reputation . . . to warrant [a preliminary injunction]." *Judscott Handprints, Ltd. v. Wash. Wall Paper Co., Inc.*, 377 F.Supp. 1372, 1380 (E.D.N.Y. 1974).

43.    "The Court's power to grant injunctive relief survives discontinuance of the illegal conduct." *Barnes v. Healy*, 980 F.2d 572, 579 (9th Cir. 1992). "The burden of demonstrating mootness is a heavy one." *Id*. In the Ninth Circuit, it is "well-settled that an action for an injunction does not become moot merely because the conduct complained of was terminated, *if there is a possibility of recurrence*, since otherwise the defendants would be free to return to their old ways." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) (internal quotation marks and brackets omitted); *see also Friends of the Earth, Inc. v. Laidlaw Env. Serv., Inc.*, 528 U.S. 167, 189 (2000) (explaining the "stringent" standard for determining if a case has been mooted by defendant's voluntary conduct: "A case might become moot if subsequent events made it *absolutely clear* that the allegedly wrongful behavior *could not reasonably be expected to recur*") (emphasis added).

44. In an infringement case, "[t]he fact that the defendant has stopped infringing is generally not a reason for denying an injunction against future infringement unless the evidence is very persuasive that further infringement will not take place." *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1281-82 (Fed. Cir. 1988) (abrogated on other grounds by *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)). As the Federal Circuit explained: "The argument in such circumstances is very simple. If the defendant be honest in his protestations [to have ceased infringing activities], an injunction will do him no harm; if he be dishonest, the court should place a strong hand upon him." *Garlock*, 842 F.2d at 1282 (quoting *Gen. Elec. Co. v. New England Elec. Mfg. Co.*, 128 F. 738, 740 (2d. Cir. 1904)). Likewise, the Second Circuit found, where a defendant claimed to have ceased manufacturing an infringing article, "[t]he probability is that [the court] would follow the practice, so frequently adopted, where the defendant admits past infringement and is shown to be in a position where he can at any time resume, namely, issue the injunction." *New England Elec.*, 128 F. at 740; *see also Kanga Care LLC v. GoGreen Enters. LLC*, No. 13-cv-02770, 2014 WL 5889815, *4 (D. Colo. 2014) (issuing a permanent injunction where defendant appeared to have stopped selling infringing products since plaintiff initiated the litigation, but "it is not clear that [defendant] would not begin its infringing activities anew if the Court were to close this case without issuing an injunction against future infringement.").

45. Voluntary cessation is especially unlikely to moot an injunctive remedy "when the practices are discontinued subsequent, rather than prior, to commencement of the litigation." *State ex rel. Babbitt v. Goodyear Tire & Rubber Co.*, 128 Ariz. 483, 486 (App. 1981) (citing *United States v. Oregon State Med. Soc.*, 343 U.S. 326 (1952)). Further, a copyright defendant's disregard of plaintiff's cease-and-desist letters evidences a substantial threat of future infringement and supports issuance of an injunction. *Broadcast Music, Inc. v. McDade & Sons, Inc.*, 928 F.Supp. 2d 1120, 1136 (D. Ariz.

2013).

46. Defendants misappropriated Jason Scott's copyrighted designs and used them to undercut Jason Scott on pricing for imitations. Even experienced furniture retailers have been confused by the similarity of the Accused Products to the JSC Pieces. This has caused lost sales and threatens to weaken Jason Scott's relationships with important customers.

47. Defendants allege they have voluntarily ceased manufacturing and selling the Accused Products and have "permanently discontinued" that product line. But Defendants do not dispute that they received two cease-and-desist letters from Jason Scott's counsel and continued to sell and market the accused knockoffs after receiving those letters. Defendants offer no defense to their copying or any explanation for how they could possibly have independently developed designs identical to those created long before by Forsberg. They do not dispute misappropriating Jason Scott's copyrighted designs, using them to manufacture knockoffs, and then competing with Jason Scott at cut-rate prices in the very same marketplace. Failing to issue an injunction would leave Defendants "free to return to their old ways." *Affordable Media*, 179 F.3d at 1236. Defendants already ignored two cease-and-desist letters telling them, in no uncertain terms, to stop infringing. Defendants had the chance to cease before facing litigation. Instead, they proved incapable of stopping voluntarily. Without a preliminary injunction, the Court has no confidence that Defendants will not begin their infringing activities anew the second the Court looks away.

### 3. The balance of hardships favors Jason Scott

48. In balancing the equities, "[a] preliminary injunction will not cause Defendants to suffer any legitimate harm, because they are simply being prevented from selling a product that they are not legally entitled to sell." *Callaway Golf Co. v. Golf Clean, Inc.*, 915 F.Supp. 1206, 1215 (M.D. Fla. 1995); *see also Helene Curtis Indus. v.*

*Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977) (finding "[a]dvantages built upon a deliberately plagiarized [product] do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed"); *Caterpillar, Inc. v. Nationwide Equip.*, 877 F.Supp. 611, 617 (M.D. Fla. 1994) (finding "Defendants will suffer no harm from being restrained from doing that which is illegal."). The Court therefore will not consider harm Defendants claim they may suffer by being required to stop its infringing activities.

49. By contrast, as explained above, if Defendants' continue to infringe or restart sales of Accused Products, Jason Scott is likely to suffer more lost sales, competitive disadvantage in the marketplace, and damage to its reputation and goodwill. Defendants' actions have undermined Jason Scott's business and flagrantly disregarded the U.S. copyright system. Even if enjoined, Defendants can continue selling and distributing its non-infringing products. The balance of equities tips sharply in favor of entering a preliminary injunction.

### 4. A preliminary injunction serves the public interest

50. It "is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *Warner Bros. Ent., Inc. v. WTV Sys., Inc.*, 824 F.Supp. 2d 1003, 1015 (C.D. Cal. 2011) (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983)). "The public receives a benefit when the legitimate rights of copyright holders are vindicated." *Apple Inc. v. Psystar Corp.*, 673 F.Supp. 2d 943, 950 (N.D. Cal. 2009). The public interest is also served by avoiding confusion to consumers. *Internet Specialties West, Inc. v. Milon-Digiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir. 2009).

51. A preliminary injunction prohibiting Defendants' infringing conduct serves the public interest by protecting the economic incentive of the copyright system and

avoiding confusion to customers.

52. For the foregoing reasons, every factor in the *Winter* test heavily favors granting Jason Scott's request for a preliminary injunction on its copyright claims.

### C. Plaintiff is Entitled to a Preliminary Injunction on the Trade Dress Infringement Claims

#### 1. Plaintiff's claims are likely to succeed on the merits

53. "A plaintiff seeking to recover for trade dress infringement under section 43(a) must show that its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987). Trade dress "may be protected if it is nonfunctional and has acquired secondary meaning and if its imitation creates a likelihood of confusion." *Id*. at 842; *see also Alphaville Design, Inc. v. Knoll, Inc.*, 627 F.Supp. 2d 1121, 1128-29 (N.D. Cal. 2009) (involving furniture design trade dress). While individual functional aspects of a design are not protectable, trade dress "can protect a combination of visual elements that, taken together, may create a distinctive visual impression." *Fuddruckers*, 826 F.2d at 842. (internal quotation marks omitted). The "ultimate inquiry in functionality analysis is whether protecting a feature will hinder competition." *Id*. (citation omitted).

54. Jason Scott has alleged the protectable trade dress in the JSC Pieces is comprised solely of their ornate carvings and decorative design elements. Examples include the curving carved legs and embedded iron stars on the Iron Star Desk, the ornate carvings and multi-curving frontpiece of the Borgota Buffet, and the intricately carved table legs of the Sacred Heart Dining Table. Whereas the functional aspects of the JSC Pieces include the desk or table top and legs, or the buffet top, sides, and feet, the carvings and ornamentation are clearly separable from those utilitarian aspects. *See, e.g. Universal*, 618 F.3d at 434 (explaining that "[a] carved scroll of leaves on a nightstand post, for

1  example, does nothing to improve the utilitarian aspect thereof."). It would not hinder competition at all to prohibit competitors from copying those decorative, ornamental elements. Jason Scott's claimed trade dress is therefore nonfunctional.

55. With regard to secondary meaning, trade dress "attains secondary meaning when the purchasing public associates the dress with a particular source." *Fuddruckers*, 826 F.2d at 843. "[E]vidence of deliberate copying is relevant to a determination of secondary meaning." *Id*. at 844. In addition, "[c]onsumer confusion can serve as an indirect indication that a design has secondary meaning." *Alphaville*, 627 F.Supp. 2d at 1129.

56. Jason Scott's customers are furniture retailers. Jason Scott has submitted declarations of furniture retailers with substantial experience in the furniture industry averring that they identify the trade dress of the JSC Pieces as originating from Jason Scott and no other manufacturer. Jason Scott maintains total control over its trade dress by not licensing any design or manufacturing rights to any other entity. As explained above, Defendants have plainly deliberately copied Jason Scott's trade dress. This has caused confusion amongst several retail customers. This evidence is sufficient at this stage to show Jason Scott's trade dress has acquired secondary meaning.

57. Jason Scott has also shown that Defendants' copying has caused a likelihood of confusion. Elements to consider in this analysis include "evidence of actual confusion, the defendant's intent in adopting the mark, similarity of the marks, similarity of the goods and marketing channels, and the strength of the mark." *Fuddruckers*, 826 F.2d at 845. "The factors are not weighted evenly." *Id*. "A showing that the defendant intended to adopt the plaintiff's trade dress is . . . entitled to great weight because a defendant is presumed able to accomplish this purpose." *Id*. at 846. "[C]ourts almost unanimously presume a likelihood of confusion based on a showing of intentional copying." *Id*. (citing *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 448 n.24 (4th

Cir. 1986)). Further, "[e]vidence of actual confusion is persuasive proof that future confusion is likely." *Id*.

58. Defendants have clearly intentionally adopted Jason Scott's trade dress and used the "identical" nature of the competitors' pieces as a selling point. That in itself supports a finding of likelihood of confusion. There is also evidence that experienced retail customers have been confused by Defendants' knockoffs of the JSC Pieces. In addition, the parties' goods are nearly identical and travel in the same marketing channels, to furniture retailers in close proximity.

59. Jason Scott has met its burden of showing its trade dress is nonfunctional and has acquired secondary meaning, and that Defendants' infringement has created a likelihood of confusion. Jason Scott is therefore likely to succeed on the merits of its trade dress infringement claims.

### 2. Other preliminary injunction factors favor Jason Scott

60. For the same reasons explained above in the Court's copyright analysis, the other relevant factors also favor issuing a preliminary injunction to bar Defendants from continuing to infringe Jason Scott's trade dress. Without an injunction, Defendants would be free to resume infringing, which would cause Jason Scott to continue to suffer injury in the form of lost sales and tarnished reputation. The public also has a significant interest in preventing confusion of consumers. *See Internet Specialties*, 559 F.3d at 993.

61. For the foregoing reasons, each factor in the *Winter* test favors granting Jason Scott's request for an injunction barring further infringement of its trade dress rights.

### D. Bond

62. Rule 65(c) of the Federal Rules of Civil Procedure requires posting of security by a plaintiff. However, the Ninth Circuit recognizes that Rule 65(c) invests trial courts "with discretion as to the amount of security required, if any." *Barahona-Gomez v.*

*Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). A high likelihood of success on the merits on an infringement claim may be a reason to reduce a bond. *See Montana Silversmiths, Inc. v. Taylor Brands, LLC*, 850 F.Supp. 2d 1172, 1189 (D. Mont. 2012).

63. Defendants' copying of Jason Scott's Copyrights and trade dress was willful and intentional, and Jason Scott has demonstrated a high likelihood of success on the merits of its infringement claims.

64. Further, Jason Scott is a small company solely owned by Forsberg, whose only employees in the U.S. are Forsberg and his wife. Forsberg has requested that the Court set a low bond so that Jason Scott does not have to devote a significant portion of its resources to stopping Defendants from intentionally copying Jason Scott's designs. Jason Scott has requested that the Court set a bond of $5,000.00, and Defendants have not objected. The Court therefore will set Plaintiff's bond at $5,000.00.

RESPECTFULLY SUBMITTED this 18th day of October, 2017.

By /s/ Thomas E. Dietrich

Kenneth H. Brendel
Thomas E. Dietrich
Mangum, Wall, Stoops & Warden, PLLC
100 N. Elden St.
Flagstaff, AZ 86001

*Attorneys for Plaintiff Jason Scott Collection, Inc.*

I hereby certify that on October 18, 2017, I electronically submitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Sim Israeloff, Esq.
COWLES & THOMPSON, P.C.
901 Main St., Ste. 3900
Dallas, TX 75202
tel. 214.672.2000
sisraeloff@cowlesthompson.com

*Counsel for Defendants*