CV17-02712-PHX-JJT, October 25, 2017

1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3

**Jason Scott Collection,**          )
4 **Incorporated, an Arizona**        )
**corporation,**                     )
5                                    )
                    Plaintiff,      )
6                                    )
            vs.                      )  CV17-02712-PHX-JJT
7                                    )
**Trendily Furniture, L.L.C., a**     )
8 **Texas limited liability company, et**)
**al.,**                              )
9                                    )  Phoenix, Arizona
                 Defendants.       )  October 25, 2017
10 _____)  9:04 a.m.

11

12          **BEFORE:   THE HONORABLE JOHN J. TUCHI, JUDGE**

13          <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14          <u>**PRELIMINARY INJUNCTION HEARING**</u>

<u>**APPEARANCES**</u>
15 For the Plaintiff:
          **THOMAS E. DIETRICH, ESQ.**
16        Magnum, Wall, Stoops & Warden, P.L.L.C.
          P.O. Box 10
17        Flagstaff, AZ  86002

18 For the Defendants:
          **SIM D. ISRAELOFF, ESQ.**
19        Cowles & Thompson, P.C.
          901 Main St., Ste. 3900
20        Dallas, TX 75202

21 Official Court Reporter:
   **Elaine Cropper, RDR, CRR, CCP**
22 Sandra Day O'Connor U.S. Courthouse
   401 West Washington Street
23 Suite 312, SPC 35
   Phoenix, Arizona  85003-2150

24

   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription


                 United States District Court

CV17-02712-PHX-JJT, October 25, 2017

**I N D E X**

**TESTIMONY**

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JASON SCOTT FORSBERG | | 10 | 27 | |
| BRIAN FORSBERG | | 29 | | |
| BONITA RUNYON | | 39 | 50 | 54 |
| RAHUL MALHOTRA | | 57 | 74 | |
| | | | 87 | |

**MISCELLANEOUS NOTATIONS**

| Item | Page |
|---|---|
| Court's ruling | 86 |
| Plaintiff's argument | 89 |
| Defendants' argument | 103 |
| Court's ruling | 111 |

**RECESSES**

| | Page | Line |
|---|---|---|
| (Recess at 11:14; resumed at 11:31.) | 83 | 22 |
| (Recess at 12:17; resumed at 12:32.) | 111 | 8 |

United States District Court

CV17-02712-PHX-JJT, October 25, 2017

1                    P R O C E E D I N G S

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings begin at 9:04.)

4              THE COURT:  Good morning, everyone.  Please be

5     seated.                                                    09:04:26

6              COURTROOM DEPUTY:  This is civil case 17-2712, *Jason*

7     *Scott Collection*, *Incorporated* v. *Trendily Furniture, LLC*, *et*

8     *al.*

9              This is the time set for preliminary injunction

10    hearing.                                                   09:04:37

11             Counsel, please announce.

12             MR. DIETRICH:  Good morning, Your Honor.  Tom

13    Dietrich from Mangum, Wall, Stoops & Warden for the plaintiff,

14    Jason Scott Collection.  And with me today is the owner of

15    plaintiff, Jason Forsberg.                                 09:04:48

16             THE COURT:  Good morning.  Welcome.

17             MR. ISRAELOFF:  Good morning, Your Honor.  Sim

18    Israeloff with the law firm of Cowles & Thompson in Dallas,

19    Texas.  With us on the line is my client, Mr. Rahul Malhotra.

20             THE COURT:  All right.  Good morning and welcome.  09:05:05

21             MR. ISRAELOFF:  Thank you.

22             THE COURT:  This is the time set for your

23    presentation on the application for preliminary injunction.

24    I'm going to give both sides a couple of minutes to -- although

25    you may have rest assured that I have read and internalized the  09:05:19

United States District Court

CV17-02712-PHX-JJT, October 25, 2017

1   materials that you have given to me, both the direct moving          09:05:22

2   papers and response and all of the supporting materials and

3   affidavits.  I'm going to give you a few minutes to summarize

4   or give me a roadmap of what I'm going to hear this morning.

5   You understand that as a matter of efficiency, we are treating      09:05:38

6   the affidavits as if they were direct testimony and so the

7   parties will proceed to cross-examination of the witnesses who

8   essentially been deemed to have appeared and testified through

9   the affidavits.

10          I'll start with the plaintiff.                               09:05:56

11          MR. DIETRICH:  Thank you, Your Honor.

12          THE COURT:  Let me just -- I'm sorry.  I should have

13   said this before.  When we do not have the lens of a jury in

14   here, I am fine with counsel making their presentation however

15   and from wherever they are comfortable, so if that's seated at     09:06:20

16   counsel table, if it's at the podium, it doesn't matter to me.

17          MR. DIETRICH:  Okay.  I appreciate that.  This is

18   just fine.

19          From the perspective of Jason Scott Collection, the

20   defendants carried out what was essentially a smash and grab in    09:06:36

21   an IP sense.  They made knock-off furniture and got it on the

22   market as quickly as they could and tried to sell as much as

23   possible before they got hit with a lawsuit.

24          Jason Scott moved with this preliminary injunction

25   along with filing a complaint back in August, on August 11.  It    09:06:54

United States District Court

1    was critical to get defendants to stop making their knock-offs    09:06:59
2    to ensure that they continue to restrain themselves from making
3    the knock-offs, to require defendants to produce the sales and
4    shipping records relating to those products, and to make sure
5    defendants didn't destroy any evidence relating to those    09:07:15
6    products as well.

7            We are here, defendants have refused to agree to an
8    injunction.  It's somewhat unclear why.  We have -- defendants
9    have claimed they have stopped making the infringing products
10   after getting served with a lawsuit.  They claim they have    09:07:34
11   provided all sales and shipping documents and under their
12   obligations in the litigation, they should already be
13   preserving evidence.  But, nonetheless, defendants have refused
14   to agree to entry of an injunction; and in their briefing, they
15   haven't disputed three out of the four factors to support a    09:08:00
16   preliminary injunction.  They haven't disputed likelihood of
17   success on the merits.  They haven't disputed that the balance
18   of harms tips in favor of Jason Scott, and they haven't
19   disputed that the public interest favors entry of an
20   injunction.    09:08:15

21           The only thing they disputed is that Jason Scott, in
22   their eyes, can't prove irreparable harm and argue that's based
23   on a misguided mootness argument.  They have tried to flip the
24   burden of mootness onto the plaintiff.  Even the Ninth Circuit
25   and Supreme Court has said mootness is a stringent burden on    09:08:33

1    the defendant.  And given the circumstances where we have          09:08:37
2    defendants who received two cease and desist letters where we
3    tried to get them to stop their infringing activity before the
4    lawsuit was filed and they ignored them.

5           This isn't an instance where Jason Scott can rely on       09:08:52
6    the defendant's word to have stopped their infringing
7    activities.  They had the chance to stop voluntarily.  They
8    disregarded it and we are here today to ask the Court to issue
9    an order to ensure that they continue to prevent and for the
10   Court to prevent and restrain further infringements along with    09:09:12
11   preserving records and other evidence.

12          Otherwise, without such an order, the defendants can
13   turn to their own factory in India tomorrow and start cranking
14   out knock-offs again, and that's what we're here to avoid.
15   Thank you.                                                        09:09:32

16          THE COURT:  Thank you, Mr. Dietrich.

17          Obviously for both counsel, I will have questions for
18   you; but since this is just your roadmap, I'll wait until after
19   the presentation of evidence.

20          MR. DIETRICH:  Understood, Your Honor.  Thank you.        09:09:45

21          THE COURT:  Mr. Israeloff.

22          MR. ISRAELOFF:  Thank you, Your Honor.

23          May it please the Court, evidence we believe will
24   show that the defendants Trendily are a long-term manufacturer
25   and seller of wholesale furniture products.  They make            09:09:56

CV17-02712-PHX-JJT, October 25, 2017

1   hundreds, literally hundreds of different kinds of pieces and          09:10:01

2   lines and designs of furniture and have for a number of years.

3   They have never been accused in the past of being a smash and

4   grab IT infringer of any kind.  This is the first time that has

5   ever happened to them.                                                09:10:18

6          The case before the Court involves three pieces of

7   furniture and a grand total worldwide production of only 18

8   pieces?  It's not a matter of making sure that quickly as

9   possible make as many as possible, et cetera, et cetera.

10         The defendant did not know or believe that he was              09:10:41

11  infringing on anyone's rights much less this particular

12  plaintiff.  When the information about a claim of IP protection

13  came along, the evidence will show that all production and all

14  sales ceased before this lawsuit was filed.  And as evidenced

15  by some last-minute stealthy attempts by the plaintiff or folks       09:11:09

16  that are friendly to the plaintiffs to purchase pieces just

17  before this litigation commenced, those requests for sales were

18  turned down flat because all production had ceased, all sales

19  had ceased.

20         And so before this case was even filed, there was no           09:11:35

21  need for an injunction and we believe the evidence will show

22  that there is no threat of imminent harm in the absence of an

23  injunction.  Thank you.

24         THE COURT:  All right.  Mr. Israeloff, thank you.  So

25  it's time for the Court to hear and consider the evidence.            09:11:55

United States District Court

1    And, obviously, because the evidence that has been deemed to be    09:11:57

2    put forward in the affidavits, this is a bit unconventional in

3    the ordinary sense of a hearing but it is more efficient.

4            And so having deemed the plaintiff's witnesses to

5    have testified, we are going to, in the order that has been    09:12:15

6    specified, we are going to now hear any cross-examination of

7    those witnesses.

8            Since really they are plaintiff's witnesses, you

9    control the order, Mr. Dietrich.  Who are we going to hear from

10   first in terms of cross-examination?  Is it Mr. Forsberg?    09:12:29

11           MR. DIETRICH:  I guess my understanding was that the

12   defendant's counsel would conduct cross-examination of our

13   witnesses.

14           THE COURT:  Exactly.

15           MR. DIETRICH:  As far as determining the order, I    09:12:46

16   believe he had put it in his list as Mr. Forsberg.

17           MR. ISRAELOFF:  Thank you, Your Honor.

18           As a preliminary matter, I would like to note and

19   re-urge as objections to much of the direct testimony.  The

20   objections are contained in our joint prehearing statement and    09:13:03

21   we do re-urge them now because much of the direct testimony

22   contains such things as double hearsay and things of that sort.

23   It's up to the Court's discretion as to how you wish to proceed

24   on the objections.

25           THE COURT:  All right.  This is what I'll do    09:13:19

United States District Court

1   Mr. Israeloff.  I did note in my reading of the sort of point          09:13:21

2   by point in terms of testimony and exhibits, objections the

3   defendant produced, note that the one that was present as to

4   every piece of material was hearsay and so I'm going to start

5   there and that is simply to note that the law is clear in the        09:13:37

6   Ninth Circuit that in preliminary injunction hearings, hearsay

7   is permitted and the Court will permit it.

8           As to the others, I will treat this the same way I

9   treat any bench trial which is that where we don't have the

10  filter of a jury and the court is able to filter out the           09:13:55

11  evidence, I want to hear it all because this is your one

12  opportunity and then I will apply the filtered based on my

13  application of the Rules of Evidence and also the weights to be

14  given as a result.

15          So you may proceed.                                         09:14:12

16          MR. ISRAELOFF:  Thank you, Your Honor.  At this time

17  we will call for cross-examination of Mr. Jason Scott Forsberg.

18          THE COURT:  Mr. Forsberg, if you would step up to my

19  courtroom deputy, she will swear you in and then we'll have you

20  sit in the witness box.                                            09:14:23

21          If I understand it correctly, there is a moderator on

22  the line and when it's time for somebody to appear

23  telephonically, he or she will facilitate that; is that

24  correct?

25          MR. DIETRICH:  Correct.                                     09:14:39

United States District Court

JASON SCOTT FORSBERG - Cross

1    COURTROOM DEPUTY:  Please state your name and spell                09:14:41

2    your last name for the record.

3    THE WITNESS:  Jason Scott Forsberg.  Last name,

4    F-O-R-S-B-E-R-G.

5    COURTROOM DEPUTY:  Thank you.  Please raise your                   09:14:51

6    right hand.

7    (JASON SCOTT FORSBERG, a witness herein, was duly sworn or

8    affirmed.)

9    **CROSS - EXAMINATION**

10   BY MR. ISRAELOFF:                                                  09:15:19

11   Q.   Mr. Forsberg, good morning.

12   A.   Good morning.

13   Q.   We met briefly just outside in the hall.  Again, my name

14   is Sim Israeloff.  I'm representing the defendants and

15   Mr. Malhotra in this case.                                         09:15:28

16        Sir, I would like to start with you on the subject of

17   exactly what is copyrighted, what aspect of the furniture

18   pieces that your company makes are actually copyrighted.

19        You will acknowledge, and I'm sure you have been

20   explained in this matter, have you not, that the furniture        09:15:51

21   itself, the shapes, the sizes, the colors of the furniture that

22   you or anyone else manufactures is not copyrighted.  Is that

23   correct?

24        MR. DIETRICH:  Objection, Your Honor.  Calls for a

25   legal conclusion from the witness.                                 09:16:06

United States District Court

11

JASON SCOTT FORSBERG - Cross

1      THE COURT:  He's asking for his -- for the witness's          09:16:07

2  understanding.  The objection is overruled.

3      You can answer, Mr. Forsberg.

4      THE WITNESS:  I guess I'm not 100 percent sure.  I

5  think it's up to the copyright courts when you file for a       09:16:16

6  copyright for their decision if it's granted the copyright or

7  if it's not.  And these pieces were granted that they are

8  copyright protected.

9  BY MR. ISRAELOFF:

10 Q.  Yes, sir.  And in this particular case, the copyright       09:16:31

11 registrations that you obtained on these three pieces of

12 furniture have this description, and I'll quote, but they are

13 in evidence in case I miss a word.  Quote, sculptural features

14 identified separately from and capable of existing

15 independently of the utilitarian aspects of a useful article,  09:16:57

16 close quote.

17      Do you recall that language being in your copyright

18 registrations?

19 A.  That kind of goes over my head.  I really don't.  I left

20 it up to the lawyers and we -- when we filed the copyrights.  I  09:17:15

21 don't really know what all that just meant.

22 Q.  All right, sir.  Well, in your -- all right.

23      Do you claim that you are the exclusive person with

24 authority to make a dining table?

25 A.  Not a dining table but my dining table, yes.                09:17:52

United States District Court

JASON SCOTT FORSBERG - Cross

| | | |
|---|---|---|
| 1 | Q.   Do you claim to be the only person with authority to make | 09:17:56 |
| 2 | a dining table with pedestal legs? | |
| 3 | A.   My design I am the only one.  My copyright and design, | |
| 4 | yes, I'm the only one that can make that. | |
| 5 | Q.   So you are asserting what constitutes your design.  Please | 09:18:13 |
| 6 | explain. | |
| 7 | A.   The design on it. | |
| 8 | Q.   That's correct.  The design on it, for example, your | |
| 9 | table, contains a number of carvings on the table; correct? | |
| 10 | A.   Yes, it does. | 09:18:33 |
| 11 | Q.   And it has I believe iron studs, for want of a better | |
| 12 | word, some iron work on it as well? | |
| 13 | A.   Correct. | |
| 14 | Q.   And you claim to be the only company with the exclusive | |
| 15 | right to put those specific particular designs on a dining | 09:18:48 |
| 16 | table; correct? | |
| 17 | A.   On my design of a dining table.  It's kind of like I can | |
| 18 | write a song.  I can have guitar in my song.  I can have drums | |
| 19 | in my song but the song that I would write and copyright, it's | |
| 20 | protected.  Of course I can't copyright any song with just a | 09:19:11 |
| 21 | guitar or drums in it; but the song that I would write and if | |
| 22 | it's copy-written and protected, that song you can't make it. | |
| 23 | Q.   Well -- | |
| 24 | A.   Same with my furniture.  It's not easy getting copyrights | |
| 25 | and there's a reason for it.  It's a long process and these | 09:19:25 |

JASON SCOTT FORSBERG - Cross

1  pieces were granted copyright protections.                        09:19:28

2  Q.   Yes, sir.  And I won't argue with you.  But the copyright

3  protection came with the description I just read to you a

4  moment ago.  But let's not argue about that.

5        Do you claim to be the only company allowed to make      09:19:44

6  furniture out of reclaimed teak wood?

7  A.   No.

8  Q.   Do you claim to be the only company allowed to make

9  furniture of the color that your pieces come out in?

10 A.   No.                                                        09:20:03

11 Q.   Lots of different furniture companies make dining tables

12 with pedestal bases, do they not?

13 A.   Yes, just like lots of musicians have drums in their

14 music.

15 Q.   Do you believe that Trendily could make the table that was  09:20:24

16 the same size and shape as yours with the same pedestal bases

17 as yours but which did not contain any of the carvings or iron

18 work that marks your furniture designs?

19        MR. DIETRICH:  I would object.  Calls for

20 speculation.                                                    09:20:48

21        THE COURT:  He's simply asking what the witness's

22 belief is.  I'll overrule the objection.

23        You may answer, Mr. Forsberg.

24        THE WITNESS:  My understanding is the table that he

25 made is an exact copy of mine.                                  09:21:01

United States District Court

JASON SCOTT FORSBERG - Cross

BY MR. ISRAELOFF:                                                    09:21:03

Q.   Yes, sir.  Please listen to my question.  Do you

believe -- do you contend that Trendily cannot make a table the

same size and shape as your table with the same base even if it

did not contain any carvings or any iron work?                      09:21:21

A.   You're asking can he make the table and remove the

carving, is that what you're asking?

Q.   Yes, sir.

A.   I don't know how that files under copyright laws.

Q.   All right.  Fair enough.                                       09:21:41

     The carvings on your table, again, to use that same

example, consist largely of ornamental designs that I would

describe as vines, would that be a fair way to describe the

curlicues and lines that are on your table legs?

A.   You could call it that, yeah.                                  09:22:06

Q.   Are those designs taken from anything, for example, in

nature or in Indonesia?

A.   Vines, flowers, I didn't have a flower in front of me when

we drew up the -- when I sketched the carving but influenced

probably.                                                           09:22:30

     THE COURT:  All right.  I just was curious if there

was any part of the carvings on your pieces that are for

example unique to Indonesia or taken from Indonesian culture or

history or religion.

     THE WITNESS:  No.                                              09:22:43

United States District Court

JASON SCOTT FORSBERG - Cross

1   BY MR. ISRAELOFF:                                                09:22:44

2   Q.   All right.  The edge of your table part way down each edge

3   is carved and I would describe it perhaps as rope carving.

4   Does that sound familiar?

5   A.   On the table?                                              09:23:02

6   Q.   Yes, sir.

7   A.   On the top or where are you talking?

8   Q.   Along the edge where the top ends in from each corner

9   there are some grooves which, at least to my eye, look roughly

10  like rope.                                                      09:23:16

11  A.   I have hundreds of furniture that I design so I'm not sure

12  if there's rope carving on that dining table.

13  Q.   All right.  Many other furniture companies make furniture

14  with vines carved on the furniture in which they fashion, do

15  they not?                                                       09:23:40

16  A.   Yep, in their own ways, people do.

17  Q.   Similar, one of your other pieces involved in this case, I

18  believe it's a buffet, has a wavy front.  Do you recall that?

19  A.   Yes.

20  Q.   Many other furniture companies make furniture pieces with  09:23:55

21  a wavy front, do they not?

22  A.   Yep.  There's all shapes and sizes of furniture.

23  Q.   All right.

24       You started selling -- I believe you've testified

25  that you started selling these particular three pieces that are 09:24:10

United States District Court

JASON SCOTT FORSBERG - Cross

| | | |
|---|---|---|
| 1 | involved today, back in the year 2004; is that right? | 09:24:14 |
| 2 | A.   Approximately, yes. | |
| 3 | Q.   At that point in time, you did not copyright those | |
| 4 | designs; right? | |
| 5 | A.   I did not. | 09:24:26 |
| 6 | Q.   All the way up until May of 2017 those designs were out | |
| 7 | there in the world being sold without a copyright registration; | |
| 8 | is that correct? | |
| 9 | A.   Correct. | |
| 10 | Q.   Next, you testified I believe in paragraph 13 of your | 09:24:46 |
| 11 | declaration that you learned that somebody was making copies of | |
| 12 | your designs somewhere around November or December of 2016. | |
| 13 | My question is, how did you learn of that? | |
| 14 | A.   Well, I was first hearing rumors of it from my brother. | |
| 15 | He delivers the furniture and he started telling me that he was | 09:25:12 |
| 16 | hearing that there's somebody knocking off the furniture.  He | |
| 17 | didn't know who and he didn't want to disclose who was telling | |
| 18 | him that.  So it was not much information I could go off of. | |
| 19 | But I went and did a furniture event with one of my | |
| 20 | big furniture dealers in Ft. Worth, Texas, and they advertised | 09:25:31 |
| 21 | my picture in "Cowboys and Indians" magazine and said, "Come | |
| 22 | meet Jason Scott," and a lot of people came there.  And she had | |
| 23 | me come to a rodeo and they advertised for that and made big | |
| 24 | posters and they spent lots of money.  So I flew in to meet and | |
| 25 | greet with people that liked my furniture. | 09:25:54 |

JASON SCOTT FORSBERG - Cross

1          After that the owner, Sally Brumbaugh, pulled me          09:25:57

2    aside and asked me, "Why are you" -- we have an agreement

3    with -- I don't sell anyone around them to protect exclusive

4    agreements and she said, "Why are you selling to the store down

5    the street?"          09:26:14

6          And I said, "What?  I don't know what you're talking

7    about."  And she opened up her laptop computer and she jumped

8    on a furniture company's website and there was my table and she

9    said, "Why are you selling the table to this?"

10         And I was like, "Sally, I don't know how they got my          09:26:30

11   table," and I honestly thought it was my table looking at it

12   and that's how the whole thing started.

13         And she was, like, "Come on Jason.  What's going on

14   here?"

15         I said, "Sally, I have no idea."  I said, "I don't          09:26:44

16   know if they got this an e-Bay or Craig's list," because I do

17   see stuff on Craig's list that will say, "Hey, an exclusive

18   Jason Scott piece.  It's original.  It's this.  It's that," and

19   it will tell a story about it and they try to resell it.  And I

20   thought they must have got it like that.          09:27:00

21         And she kind of was like, "Come on Jason.  Really?"

22   And she made the comment about, "It looks like you're trying to

23   slide it in through the back door or sell it to them and put a

24   cheaper, shinier finish on it."

25         And I was standing up and she was sitting on the          09:27:14

United States District Court

JASON SCOTT FORSBERG - Cross

| | | |
|---|---|---|
| 1 | table and it was a small laptop.  So I said, "Can I look at | 09:27:16 |
| 2 | this?"  And I sat down and I felt like the biggest liar that | |
| 3 | I've ever felt like talking to her.  This is the woman that | |
| 4 | flew me in, spending advertising.  She's got probably 50 of my | |
| 5 | pieces on her floor at all times which is over $100,000 and now | 09:27:32 |
| 6 | I'm being questioned why am I trying to sell pieces to her | |
| 7 | neighbor and I'm feeling, like, "Oh, my God.  What is going on | |
| 8 | here?"  And I'm having to tell her, "Look, there's no way my | |
| 9 | rep would have done this.  Everything comes out of my | |
| 10 | warehouse.  Please believe me I'm not selling to them." | 09:27:52 |
| 11 | Q.   Thank you.  Let me pause you there for a minute and ask | |
| 12 | you, when was that event in Ft. Worth? | |
| 13 | A.   That was in late of last year. | |
| 14 | Q.   Late 2016? | |
| 15 | A.   Yes. | 09:28:05 |
| 16 | Q.   So at that time you learned again first with rumors and | |
| 17 | then with this dramatic event in Ft. Worth, you learned that | |
| 18 | there were other pieces that looked like your furniture out | |
| 19 | there being sold in the market? | |
| 20 | A.   Yep.  That's when I first saw the picture of it and I | 09:28:23 |
| 21 | realized how serious the situation was. | |
| 22 | Q.   Now, let me change subjects on you a little bit and direct | |
| 23 | you to your discussions with a man named Mr. Holland.  Do you | |
| 24 | recall those discussions about these copycat products and you | |
| 25 | had some discussions and some emails sent to you by | 09:28:44 |

JASON SCOTT FORSBERG - Cross

1    Mr. Holland?                                                    09:28:47

2    A.    Yep.

3    Q.    Are you with me so far?

4    A.    Yes.

5    Q.    That was some time I believe in your direct testimony you   09:28:54

6    said some time -- it would have been before June 24 of 2017.

7    We'll look at your declaration for the exact dates.

8    Mr. Holland told you this according to your testimony:  That he

9    had had a discussion with Mr. Malhotra and that he had asked

10   Mr. Malhotra about, "How can you do this?  How can you make    09:29:21

11   these look-alike pieces of furniture?"  And what Mr. Holland

12   told you was that Mr. Malhotra said he believed there was no

13   legal protection on furniture.  Do you recall Mr. Holland --

14   A.    I should elaborate.  There was actually more to that, what

15   he said.  He actually said that the gentleman, sorry, I forget   09:29:48

16   his name from Trendily, kind of laughed it off and said,

17   "Nobody can do anything.  Nobody ever does anything."

18   Q.    Yes, sir.  All right.  I appreciate that addition.

19            Let me change subjects on you once again and ask how

20   you do business.  You sell to furniture retailers; correct?   09:30:10

21   A.    Correct.

22   Q.    Some furniture retailers do business with multiple

23   furniture manufacturers, not just yourself; right?

24   A.    Correct.

25   Q.    They are free to stock whatever brands of furniture they   09:30:24

1  choose?                                                      09:30:28

2  A.   Correct.

3  Q.   Some of your retailers also sell Trendily Furniture, do

4  they not?

5  A.   Yes.                                                    09:30:38

6  Q.   Do you know how long that has been the case?

7  A.   I do not.

8  Q.   Were you aware of this company out there in the market

9  called Trendily and that they made furniture that was sold by

10 some of your customers?                                      09:30:52

11 A.   I was not.

12 Q.   You have, in the course of this lawsuit, indicated that

13 you have looked at the Trendily website to see what products

14 they offer; is that right?

15 A.   Yes.  I have looked at their website and your previous  09:31:10

16 question, I was not aware of Trendily before all of this

17 happened.  Of course after it happened, I have been aware of

18 them.

19 Q.   All right.

20      When you looked at the Trendily website, you saw the    09:31:21

21 kinds of furniture lines and furniture products that they

22 offered for sale, did you not?

23 A.   Yes, but I focused on the copies they were making of mine.

24 I didn't pay too much attention to all of the other stuff that

25 had nothing related to my furniture.                         09:31:40

JASON SCOTT FORSBERG - Cross

1   Q.   Of course.  My only question to you is, you did note that          09:31:43

2   there was all of that other stuff also being offered for sale;

3   correct?

4   A.   Correct.

5   Q.   You don't have any challenge or objection to Trendily          09:31:53

6   selling all kinds of other furniture that doesn't look like any

7   of your pieces, do you?

8   A.   No.

9   Q.   You don't have any objection to them being a competitor of

10  yours in the world of furniture manufacturing, do you?          09:32:08

11  A.   No.

12  Q.   You're not trying to put them out of business by way of

13  this lawsuit, are you?

14  A.   No.

15  Q.   On August 5, very, very shortly before this lawsuit was          09:32:30

16  filed on August 11, you went to a furniture store called

17  Extravagance Design and Home Furnishings in Scottsdale;

18  correct?

19  A.   Yep.

20  Q.   Or did you communicate with them by email or phone instead          09:32:46

21  of in person?

22  A.   I talked to her on the phone after but what you're talking

23  about was email.

24  Q.   All right.  Now, in your communications with that

25  furniture retailer, are they a dealer that sells Jason Scott          09:33:03

United States District Court

JASON SCOTT FORSBERG - Cross

1   furniture as well?                                                  09:33:07

2   A.   No, but they are down the street of one of my dealers.

3   Q.   All right.  Have you had previous discussions or dealings

4   with that company or sales efforts?

5   A.   I have not.                                                    09:33:18

6   Q.   When you communicated with Extravagance Design on August

7   5, you used a fake name; correct?

8   A.   Correct.

9   Q.   James Haroldson?

10  A.   Well, my father's name is James Harold so I am James          09:33:34

11  Harold's son.

12  Q.   Is that how you came up with the name?

13  A.   That is because I can say that I am James Harold's son,

14  clever.

15  Q.   You didn't tell Extravagance Designs that you were really    09:33:50

16  Jason Scott Forsberg?

17  A.   No.  Because they would have known who I was.

18  Q.   Why didn't you tell them who you were?

19  A.   Because they would have known who I was and if I would

20  have said, "Are you selling this table?"                            09:34:02

21       If they were selling a knock-off, they would have

22  definitely not said, "Oh, yes, we're selling that Jason Scott

23  copy," because everybody that has my furniture knows that --

24  everyone that sells the Trendily knock-offs are 100 percent

25  aware that it's Jason Scott knock-off furniture.  So if I          09:34:18

United States District Court

JASON SCOTT FORSBERG - Cross

 1  called up and said, "Hi, I'm Jason Scott.  Do you sell this        09:34:21
 2  Trendily knock-off furniture?"  The answer probably would not
 3  be an honest one.
 4  Q.   At any rate, while you were communicating under this
 5  clever name with Extravagance Design, one of the things you        09:34:33
 6  asked them was whether or not they could buy from Trendily and
 7  sell to you or to James Harold's son an MJ Dining Table; right?
 8  That's what you were asking about?
 9  A.   I believe that was the piece, yes.
10  Q.   And you were asking for that?  And, again, you know that      09:35:00
11  Extravagance Design doesn't have anything to do with Trendily
12  other than selling their product.  They are an independent
13  furniture retailer; right?
14  A.   Well, that would mean they have a lot to do with Trendily.
15  They sell Trendily's product and they carry it on their website    09:35:17
16  and they deal with their rep from Trendily who is an authorized
17  sales rep for Trendily.
18  Q.   I understand that.
19         But you understand that Extravagance Design is not
20  Trendily?                                                          09:35:30
21  A.   Yeah, they represent Trendily sales in their store.
22  Q.   Just like your retailers are not Jason Scott?
23  A.   Yes.  They are authorized to sell my product.
24  Q.   Fair enough.  All right.  You asked her to purchase or to
25  order for you an MJ Dining Table and bring it in to the State      09:35:51

United States District Court

JASON SCOTT FORSBERG - Cross

1    of Arizona.  Why were you trying to do that?                    09:35:55

2    A.   I was trying to see if they sell it.

3    Q.   She told you, according to your direct testimony, that

4    that dining table was currently not in stock; right?

5    A.   She gave me a price and I think she gave me a lead time    09:36:16

6    when she could get it and said it's actually coming in on the

7    next container or something like that.  I could be wrong but it

8    was coming in.

9    Q.   I think you're wrong on that.

10   A.   I could be.                                                09:36:28

11   Q.   But your direct testimony states in part that she told you

12   it was currently not in stock and further, that she was waiting

13   to see if it was going to be in the new shipping containers.

14   Do you recall that?

15   A.   I also am positive I have a price from her.  She gave me a  09:36:45

16   price and you can't get a price without calling and getting it.

17   Q.   Yes, sir.  We'll get to that.

18   A.   Okay.

19   Q.   We'll get to that.  But you recall her saying she was

20   waiting to see if it was coming in any of the new shipping      09:36:54

21   containers; right?

22   A.   Something like that.  She was waiting to see if it was

23   coming in the shipping container, yeah, that's what I said

24   earlier I thought.

25   Q.   And she gave you a price of $4,399 for this dining table?  09:37:06

United States District Court

JASON SCOTT FORSBERG - Cross

1    A.    Sounds about right.                                    09:37:13

2    Q.    Jason Scott sells its own Sacred Heart dining table for

3    $2,700; right?

4    A.    It's actually 2800.  I did notice that it says 27 but it

5    has been 2800 since be 2017, June 1.                         09:37:33

6    Q.    Okay.  Appreciate that contribution.  In the end after all

7    of these discussions that you had with Extravagance Design

8    within a week or two before this lawsuit was filed, in the end

9    they did not take an order from you or give you a sales order

10   for any of those tables, did they?                           09:37:56

11   A.    No, because I backed off.

12   Q.    No sale was made; correct?

13   A.    No, because I would have had to move forward to present

14   the sale.

15   Q.    You weren't able to place an order, were you?          09:38:13

16   A.    Actually, I was able if I was willing to.  She told me the

17   price.  If I would have went down there and gave her a credit

18   card or something, yes, the sale would have went through.

19   That's why she gave me the price.

20   Q.    Isn't that what you were trying to show, that this      09:38:33

21   furniture retailer would sell you a piece of this accused

22   furniture; right?  That's what you were trying to show for this

23   lawsuit for these purposes?

24   A.    I was trying to find out if they have sold it and do sell

25   it.  That's why I asked her, "Do you sell this table?"  I    09:38:49

 1  wanted to know if they sell it.                                    09:38:56

 2  Q.   At any rate, you, at your own choice, decided not to

 3  really see if they would take your order because you backed

 4  off, as you put it, and didn't place an order; right?

 5  A.   I believe all the pieces were in place.  She told me the   09:39:11

 6  price and that means if you're willing to order it, it's $4399.

 7  The next step would be I would have to actually do that and

 8  there's no need for me to go buy the knock-off piece of

 9  furniture.

10       MR. ISRAELOFF:  Your Honor, I object as nonresponsive     09:39:27

11  and ask that the witness be admonished to listen to the

12  question, please.

13       THE COURT:  I am going to admonish the witness to

14  listen to the question and answer the precise question that is

15  asked.                                                           09:39:37

16       Mr. Scott, I will give your attorney an opportunity

17  to follow up on what's called redirect to clear up anything or

18  make any points that he feels are fair points to make in

19  response to the cross.  But right now not just you but all

20  witnesses who will testify will be required just to answer just 09:39:53

21  the questions that are being asked of them.

22       You can go ahead and reask the question,

23  Mr. Israeloff.

24       MR. ISRAELOFF:  Thank you, Your Honor.

25  \\\

United States District Court

JASON SCOTT FORSBERG - Redirect

1   BY MR. ISRAELOFF:                                                    09:40:05

2   Q.   Mr. Forsberg, in the end, you yourself backed off and

3   chose not to place an order and see for sure if an order could

4   be placed; right?

5   A.   Correct.                                                        09:40:22

6   Q.   And all of this activity and your choice not to place an

7   order happened shortly before the suit was filed on August 11;

8   right?

9   A.   I believe so.

10           MR. ISRAELOFF:  No further questions.                        09:40:48

11           THE COURT:  All right.  Mr. Israeloff, thank you.

12           And Mr. Dietrich, do you have any redirect?

13           MR. DIETRICH:  Just very briefly, Your Honor.

14                      **REDIRECT EXAMINATION**

15   BY MR. DIETRICH:                                                    09:40:57

16   Q.   Mr. Forsberg, you quoted $2800 as the price on the Sacred

17   Heart dining table.  Is that the wholesale price or retail

18   price?

19   A.   That is the wholesale price.

20   Q.   And the price that Extravagance quoted you, around $4300,     09:41:10

21   that's the retail price, isn't it?

22   A.   Correct.  That would have been the retail.

23   Q.   So if a retailer is selling your Sacred Heart dining

24   table, it would be some amount higher than $2800?

25   A.   Yes.  The average is about a three time markup and then       09:41:24

United States District Court

JASON SCOTT FORSBERG - Redirect

1  they can put it on sale for two and a half.  That's usually                09:41:28
2  what markups are on furniture.
3  Q.  So do you know what about the retail price on average
4  would be for a Sacred Heart dining table?
5  A.  $7,000 maybe.  Maybe $8,000.                                            09:41:41
6  Q.  Mr. Israeloff asked if you backed off on the order from
7  Extravagance.  Did you back off because you didn't want to put
8  more money in the defendant's pocket?
9  A.  Correct.
10         MR. DIETRICH:  I don't have any more questions.                    09:41:59
11         MR. ISRAELOFF:  No further questions.
12         THE COURT:  All right.  Thank you both, counsel.
13         Mr. Forsberg, you may step down.  Thank you, sir.
14         All right.  Mr. Israeloff, who will the defense cross
15  next?                                                                     09:42:12
16         MR. ISRAELOFF:  Mr. Brian Forsberg, please.
17         THE COURT:  All right.
18         Mr. Forsberg, if you would step forward to the
19  courtroom deputy, she'll swear you in.
20         COURTROOM DEPUTY:  If you can please state your name               09:42:28
21  and spell your last name for the record are.
22         THE WITNESS:  Brian Forsberg.  F-O-R-S-B-E-R-G.
23     (BRIAN FORSBERG, a witness herein, was duly sworn or
24  affirmed.)
25         THE COURT:  All right.  Whenever you're ready,                     09:43:09

United States District Court

BRIAN FORSBERG - Cross

```
 1   Mr. Israeloff.                                            09:43:12
 2           MR. ISRAELOFF:  Thank you, Your Honor.
 3                    CROSS - EXAMINATION
 4   BY MR. ISRAELOFF:
 5   Q.   And good morning, Mr. Forsberg.                      09:43:16
 6   A.   Good morning, sir.
 7   Q.   I understand you deliver much of the Jason Scott
 8   furniture.
 9   A.   Yes.
10   Q.   What is your area or zone?                           09:43:22
11   A.   Southwest.  I mean . . .
12   Q.   What states have you delivered in?
13   A.   In 12 and a half years that I have been doing this, I've
14   traveled -- in the last 12 months I have been in Montana, Utah,
15   Seattle, Washington, Nevada, Colorado, Oklahoma, Texas, New    09:43:36
16   Mexico and Arizona, of course, but haven't gone to California
17   recently.  So it's pretty much that southwest.
18   Q.   When you do your deliveries, do you take any extra steps
19   to try and keep your brother apprized of what is going on out
20   there in the furniture industry?                         09:44:01
21   A.   A little bit.  Not very much.  He has sales reps and a lot
22   smarter people.  I'm a truck driver.  So I know my job.  It's
23   to handle the items and take care of them and I bring them to
24   homes and businesses.
25   Q.   According to your direct testimony, you heard about a  09:44:27
```

United States District Court

BRIAN FORSBERG - Cross

1  company that was making knock-offs of Jason Scott furniture in          09:44:30
2  early 2017.  Can you tell us how that came about?
3  A.    Yes.  I have a friend that I have been delivering to which
4  sells Jason's furniture.
5  Q.    Who is that?                                                      09:44:51
6  A.    His name is Ben and he's the owner of Coyote Candle out of
7  Lubbock, Texas.
8  Q.    I'm sorry.  Can you speak up just a little?
9  A.    Ben, he owns the company Coyote Candle Furniture and he
10 has been in Lubbock, Texas, for as long as I have been driving         09:45:07
11 through there.
12 Q.    And when was it that you heard about the company making
13 knock-offs?  All your previous testimony simply used the words
14 earlier 2017.  Can you pin it down at all?
15 A.    Yes, sir.  I can look at exact dates in my Wells Fargo           09:45:26
16 banking and my texts of when I was there, et cetera.  But I'm
17 going to give you my off the top of my head answer, okay?
18        I go there every month, month and a half, with a load
19 of furniture so I know that I was there in January and
20 February, in March, and April and May.  I believe that I was          09:45:49
21 first hinted at or told about what's kind of going on and I
22 ignored it and I believe that was in March.  And I stay out of
23 my brother's business, trust me.  I am a truck driver.  I do
24 that job.  I don't tell Jason how to design -- I simply serve
25 the customers and serve Jason.  He wouldn't use me unless -- if       09:46:15

BRIAN FORSBERG - Cross

1    I told him what to do.  I'm just a truck driver.                09:46:20

2    Q.    Fair enough.

3          So were you aware of the hints and dramatic episode

4    that your brother just testified to, were you aware of those?

5    A.    I started all of this.  I am the one that -- he may have  09:46:35

6    heard from other people before because I don't know his

7    business at all.  I don't deal with what show he went to or any

8    of that.  I hear like, "Oh, you were in Dallas, had a show,

9    great."  But I see furniture out there every day.  I'm the one

10   that handles it.  I'm the one that touches it and goes in every 09:46:53

11   store and everything so I'm the one that is, like, out in the

12   field.

13         I've seen stuff like wow this piece kind of looks

14   like yours.  A little bit over my lifetime.  Nothing has ever

15   scared me until I walked into Western Heritage and saw those    09:47:06

16   items that day and that was after when Ben told me.  The reason

17   I went into Western Heritage was because I stay in a hotel

18   right near there on my delivery schedule right before I go to

19   Brumbaugh's and it was just coincidence.  It was a lucky thing.

20   I don't know why I ended up in Western Heritage but Ben is very 09:47:29

21   good friends with the owner of Western Heritage.  Ben was

22   reluctant to tell me about this because he knew Jason is my

23   brother.  I'm very good friends with Ben.  We would go to races

24   together, go have a beer, go to Mexican restaurant, have -- we

25   were friends.                                                   09:47:45

United States District Court

BRIAN FORSBERG - Cross

1    So I had -- he's seen me home school my child in my    09:47:47

2   truck.  I carried my disabled son in my truck with me for two

3   years and home schooled him.  Ben loved me.

4    But he could hurt his very good friendship with the

5   owner of Western Heritage if he told me this but he hinted at    09:48:01

6   it in March and April.  "Brian, I have to tell you something."

7   And I don't want to hear things because you're disclosing

8   information to me.  Now I'm going in a bad spot because I have

9   to tell this stuff to my brother.  I don't want to.  I can't.

10   I have a faithfulness to my customer who is paying me a check    09:48:19

11   to deliver furniture and then my brother, who doesn't pay me

12   any money, is my brother.

13    So I had to make the decision.  So I came up with

14   someone is -- I am hearing this stuff from a reliable source

15   and I'm not telling you who it is.  I didn't tell him it was    09:48:35

16   Ben at Coyote Candle.  There is someone out there.  I hear

17   there is some very serious knock-off; and at that point, March

18   April, I was, like, yeah, whatever.  I didn't care.

19    Here's what I look at.  My brother is the Picasso.

20   People are always going to try to make something like this so    09:48:50

21   it doesn't scare me.

22    And when I got to Western Heritage, like, I think it

23   was Aprilish and I saw those two or three items, I immediately

24   took photographs, went out to the parking lot, sent them to

25   Jason.  We had the same exact reaction.  Oh, my God.  This is    09:49:09

United States District Court

33

BRIAN FORSBERG - Cross

1  your furniture.  This is exact.  This is Jason Scott.                    09:49:13

2  There's -- and I see the stuff all the time.  There's nothing

3  like that until that day.  That's why all of a sudden he better

4  patent.  Wholly -- this is serious.  Someone is copying you.

5  Q.    All right.  Thank you for that explanation.                        09:49:29

6  A.    You're welcome.

7  Q.    You indicated that over the years that you have delivered

8  Jason Scott furniture you had seen other pieces that looked

9  somewhat similar.  Tell us about those.

10  A.    People make things in Mexico and people in the furniture         09:49:46

11  business get ideas from other people.  That's normal.  So when

12  you see something like a carving that is similar no, big deal.

13  Or a little this, no dig deal.  But when you see an -- exact

14  dimensions, like the exact size, the drawers in the same

15  location, the carvings as close as they can get, you are, like,         09:50:10

16  they are trying to do a good job or they are -- you know.  It's

17  just like we -- you see kind of attempted people to make a

18  similar knock-off of Jason and they are -- they are not able to

19  because of the uniqueness of the carvings and it's teak wood.

20  It's so beautiful and hard and dense.  You can't carve in the           09:50:35

21  cheap Mexican wood, whatever kind of wood that is, mahogany, I

22  don't know.

23  Q.    How many times over the years do you recall seeing

24  attempted knock-offs, as you put it, of Jason's furniture?

25  A.    I saw one in a store outside of San Antonio and then there        09:50:50

BRIAN FORSBERG - Cross

1    was -- let me think.  In the number of 12 years I saw another       09:51:00

2    similar in San Antonio.  I saw something one time that was

3    in -- excuse me, Dallas-Ft. Worth.  I mean, there's got to be

4    half a dozen places in my life in last 12 years that I've seen

5    stuff that they must be getting some ideas from my brother.       09:51:26

6    They are attempting to.  You know, it's like the stretcher

7    underneath the table of his Cadillac.  That's unique.  That is

8    patented.  There's a stretcher with carvings and all of this

9    stuff.  This is Jason's stuff.

10           And so I've seen attempts to do this but they don't       09:51:45

11   have it yet.  They don't have this figured out.  This was --

12   this is completely different.  No one -- I stood up when I saw

13   this at Western Heritage.  This is somebody's buying it to copy

14   it or they are -- they are go -- they have good people --

15   Q.   Let me interrupt you there.  I think you are getting a       09:52:11

16   little bit beyond where I had asked you about --

17   A.   Oh, I'm sorry.

18   Q.   -- how many times you had seen these similar pieces --

19   A.   Okay.  Thank you.

20   Q.   -- when you saw the pieces that you are describing at       09:52:19

21   Western Heritage.

22   A.   Yes.

23   Q.   According to your direct testimony, which is in your

24   signed declaration, you said they were lighter in color than

25   the Jason Scott pieces; is that right?                           09:52:41

United States District Court

BRIAN FORSBERG - Cross

1   A.   Yeah.  It's a little -- it wasn't the dark walnut.  It        09:52:44
2   looked like a lighter walnut.
3   Q.   All right, sir.  You also said the pieces that you saw,
4   the finish on them was shinier than the finish on the Jason
5   Scott pieces; correct?                                           09:52:57
6   A.   Yeah.  It looks like there's a polyurethane on there like
7   a glass coating.  It's smooth like this surface you've got
8   here.
9   Q.   I understand.
10       When you saw these pieces at Western Heritage, the         09:53:13
11  ones that you described on July 26, I guess that may be the
12  last time you went back to Western Heritage?
13  A.   On what day?
14  Q.   Your testimony refers to July the 26th you saw some more
15  at Western Heritage.                                             09:53:32
16  A.   Yeah.  I don't know if it's the same but they have moved
17  things around and darkened the color now so it's even closer
18  looking now at Western Heritage.
19  Q.   Hang on.  Let me ask you specific questions.
20  A.   Okay.  Yes.                                                 09:53:44
21  Q.   You saw some more at Western Heritage on July 26 -- well,
22  you've testified to that.  That will be in the record already.
23       Do you know when Western Heritage purchased any of
24  the Trendily pieces?
25  A.   No, because the first day that I went into that store was   09:54:03

United States District Court

1    like that -- the day I sent my brother the photo was like in     09:54:06

2    early May.  I hadn't been in there.  I used to deliver in that

3    area a long time ago.

4    Q.   Thank you, sir.  I believe you've answered the question.

5    A.   Okay.     09:54:18

6    Q.   Thank you, sir.

7            MR. ISRAELOFF:  No further questions.

8            THE COURT:  All right.  Thank you, Mr. Israeloff.

9            Mr. Dietrich, any redirect?

10           MR. DIETRICH:  No.  I don't have any follow-up     09:54:25

11   questions.  Thank you.

12           THE COURT:  All right.  Thank you.  That means,

13   Mrs. Forsberg, I can excuse you and you can step down.

14           THE WITNESS:  Thank you, sir.

15       (Witness excused.)     09:54:34

16           THE COURT:  All right.  And Mr. Israeloff, I presume

17   your next witness is Ms. Runyon by telephone; is that right?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  All right.  So we'll ask the moderator to

20   make that connection for us.     09:54:47

21           THE MODERATOR:  Yes.  One moment while we call the

22   witness.

23           THE COURT:  Thank you, ma'am.

24           MR. ISRAELOFF:  Your Honor, as we are doing that, I

25   would liked to address an issue.  In the affidavit from     09:54:54

1   Ms. Runyon that was attached to the motion for preliminary      09:55:01

2   injunction and is being received by the Court, I would have no

3   cross.

4          After briefing was closed on the preliminary

5   injunction, the plaintiff filed something called Notice of      09:55:14

6   Supplemental Evidence to which we have objected as being

7   untimely and not properly before the Court.  I need to

8   determine, before examining Ms. Runyon, whether or not that

9   supplemental information will be received.  It was received

10  with no opportunity on our side to respond.                     09:55:35

11         THE COURT:  Right.  And I understand the notice issue

12  which is significant.  I want to hear from Mr. Dietrich on

13  that.

14         MR. DIETRICH:  Yes, Your Honor.  We didn't have the

15  ability to file that at the time that we filed the motion for   09:55:45

16  preliminary injunction.  I believe we had referred to it in

17  possibly the response to the motion to dismiss.  I believe that

18  it's appropriate to -- for the Court to consider items that are

19  on file at the time the motion is heard and given the

20  substantial delay before having the motion heard, Mr. Israeloff 09:56:03

21  certainly has had time to consider the recording and the

22  additional declaration of Ms. Runyon which was filed I believe

23  around a month ago or so.

24         THE COURT:  All right.  Give me just a moment.

25         THE MODERATOR:  Pardon me.  This is the operator.  We    09:56:22

38

1    do have Bonita Runyon on the line.                                09:56:23

2            THE COURT:  All right.  Thank you, ma'am.  If we can

3    just hold on one minute, please.

4            MS. RUNYON:  All right.  I'm having a hard time

5    hearing.                                                          09:56:38

6            THE COURT:  Ms. Runyon, this is Judge Tuchi.  Are you

7    able to hear me now?

8            MS. RUNYON:  Okay.  Yes, sir.

9            THE COURT:  There is a motion or an objection pending

10   right now that I need to rule on before we're going to start      09:56:46

11   asking you questions.  If you give me just a moment.

12           MS. RUNYON:  Okay.

13           MR. DIETRICH:  Your Honor, may I add something as

14   well?

15           THE COURT:  Go ahead, Mr. Dietrich.                       09:56:55

16           MR. DIETRICH:  The recording was actually made a few

17   days after we filed the motion for preliminary injunction.  It

18   was made August 15 and we filed the motion on August 11.

19           MS. RUNYON:  Hello?

20           THE COURT:  Hold on for one moment more, Ms. Runyon.      09:57:18

21           All right, counsel.  With regard to the supplemental

22   issue here, I am going to allow that into the record and I will

23   allow Mr. Israeloff to widen his cross-examination to encompass

24   that.

25           The Court always has concerns of fairness and both       09:59:17

                        United States District Court

1   parties having the same opportunity and so my concern,   09:59:23

2   obviously, was piqued a little bit by the fact that this came

3   in later; but I think a sufficient amount of time, as has been

4   pointed out, has elapsed wherein no party is unfairly

5   prejudiced by that and has had time to prepare.   09:59:40

6           So that's the basis of my ruling and with that,

7   Mr. Israeloff, you may go ahead and commence your cross and if

8   you would keep close to the microphone because our audio system

9   is delicate at times and Ms. Runyon has already indicated to me

10  she's having a little trouble hearing.   09:59:57

11          MR. ISRAELOFF:   Thank you, Your Honor.

12          THE COURT:   Hang on for just a second.

13          Before we do that, we need to put you under oath,

14  Ms. Runyon.   My courtroom deputy is going to come on the line

15  and administer the both.   10:00:09

16          MS. RUNYON:   Okay.

17      (BONITA RUNYON, a witness herein, was duly sworn or

18  affirmed.)

19                      **CROSS - EXAMINATION**

20  BY MR. ISRAELOFF:   10:00:26

21  Q.   Thank you, Ms. Runyon.   My name is Sim Israeloff.   I'm the

22  attorney for Trendily.   Can you hear me okay?

23  A.   Yes, sir.

24  Q.   All right.   Your supplemental affidavit or declaration

25  discussed a sales call that was made to you I believe on August   10:00:40

BONITA RUNYON - Cross

1  15, 2017.  Do you recall that?                              10:00:48

2  A.   Yes.

3  Q.   And in particular two individuals, Chris Sanders and Derra

4  Dykes came to, in essence, pitch you to possibly purchase some

5  furniture that they were representing; right?                10:01:06

6  A.   Yes.

7  Q.   All right.  Now, as I understand it from your testimony,

8  you secretly recorded that sales call.  Is that right?

9  A.   Yes.  I didn't tell them I was recording it.

10  Q.   Well, is it fair to say then that you secretly recorded   10:01:33

11  it?

12  A.   Yes.

13  Q.   Why on earth would you secretly record a sales call?

14  A.   I was asked.

15  Q.   Who asked you?                                          10:01:45

16  A.   Jason Scott.

17  Q.   What did he ask you to do?

18  A.   If I could record my meeting with Chris and Derra.

19  Q.   What else did he tell you about why he was interested in

20  having you record meetings?                                 10:02:06

21  A.   For the furniture that they were showing and representing

22  to me.

23  Q.   What else did Jason Scott -- and are we talking about

24  Jason Scott Forsberg?

25  A.   Yes.                                                    10:02:26

United States District Court

BONITA RUNYON - Cross

1   Q.    When did he ask you to make these secret recordings?        10:02:27

2   A.    I don't recall the date.

3   Q.    How many times did you discuss that with him?

4   A.    A couple of times.

5   Q.    How long before the meeting of August 15 did you have        10:02:47

6   these couple of discussions?

7   A.    A day or two before the meeting.

8   Q.    How did that come about?  Can you explain what it was that

9   brought both of your attention to the idea that you were going

10  to have a call and then Mr. Forsberg had these discussions with   10:03:05

11  you?  How did all of that come about?

12  A.    Because of the product they were showing me was -- it

13  looked just like the furniture that he makes.

14  Q.    Was that something that had already happened before August

15  15?  How did you know they were going to do that?                 10:03:29

16  A.    Is what happened?

17  Q.    How did you know in advance that these two people were

18  going to show you furniture that looked like Jason Scott

19  furniture?

20  A.    Because they told me that they had some Jason Scott          10:03:50

21  look-alike furniture and the pictures that they sent me was

22  furniture that looked like Jason Scott's furniture.

23  Q.    Tell me everything else you can recall about your

24  discussions with Mr. Jason Scott Forsberg in advance of this

25  secret recorded sales call?  What else did he tell you about      10:04:17

United States District Court

BONITA RUNYON - Cross

1  it?                                                        10:04:23

2  A.   I was interested because they -- because the pieces -- I

3  called Jason and told him, "Hey, you have got a vendor who is

4  showing and making furniture that looks exactly like what

5  you're doing."                                             10:04:39

6  Q.   What did Mr. Forsberg say back to you when he heard that.

7  A.   I'm sorry?

8  Q.   What did he say in response?

9  A.   Well, he had filled me in on what was happening, what was

10 going on.                                                  10:04:59

11 Q.   Well, be more specific, please.  What did he say about

12 what was going on?

13 A.   That Trendily was making furniture, knocking off his

14 furniture to sell to all the stores.

15 Q.   What else?                                            10:05:17

16 A.   I'm sorry.  What do you mean?

17 Q.   What else did he tell you?

18 A.   He told me that Trendily was knocking off his furniture

19 and several of his pieces and that he was -- and he was showing

20 it to all the furniture stores and that concerned me, because  10:05:36

21 what is special about Jason Scott's product is he picks and

22 chooses who he sells his product to.

23 Q.   Is there anything else he told you?

24 A.   Not that -- not that I recall.

25 Q.   Well, tell me what he told you about making a recording of  10:05:57

BONITA RUNYON - Cross

1   this sales call.  What was said?                                    10:06:03

2   A.   Well, I informed him that I was meeting with Trendily,

3   with Chris and Derra, to look at the product and get pricing on

4   it and availability and what pieces they were going to be

5   showing and selling and he asked if I could record whenever I    10:06:20

6   met with them and I said absolutely.

7   Q.   Did you ever talk with anybody else about this upcoming

8   meeting and your plan to record it?  Did you talk to any

9   lawyers?

10  A.   No.                                                          10:06:47

11  Q.   How did you make the recording?

12  A.   On my cell phone.

13  Q.   How?

14  A.   I'm sorry?

15  Q.   How did you do that on your cell phone?                      10:06:59

16  A.   I have an iPhone and it has a recording icon.

17  Q.   So in advance of this meeting with Mr. Sanders and

18  Ms. Dykes, you knew that there was a subject that you in

19  particular wanted them to talk about and that was these pieces

20  of furniture; right?  You knew that was something that you       10:07:32

21  specifically want to do record; right?

22  A.   Yes.

23  Q.   Did you tell Mr. Forsberg that you were going to record

24  it?

25  A.   I did.                                                       10:07:48

BONITA RUNYON - Cross

1  Q.   But the idea of making this recording was his?   `10:07:48`

2  A.   Yes.

3  Q.   All right.   When Mr. Sanders and -- it's a woman, right,

4  Ms. Dykes?

5  A.   Yes.   `10:08:08`

6  Q.   That's a lady?

7  A.   Yes.

8  Q.   When they came to you to show furniture, they showed a lot

9  of different pieces of Trendily Furniture, did they not?

10 A.   Yes.   `10:08:20`

11 Q.   In fact, you --

12 A.   But I was very interested in the knock-offs of Jason

13 Scott.

14 Q.   I understand and you've explained why.

15        But when they came to you, they showed a very large   `10:08:31`

16 range of Trendily Furniture; right?

17 A.   Not a very large.   Just a few dining room sets and --

18 dining room sets and the Jason Scott knock-off.

19 Q.   Yes.   And you turned them to the Jason Scott knock-offs

20 because that was the subject you were most interested in   `10:08:58`

21 recording, isn't that fair?

22 A.   Yes.   Yes, sir.

23 Q.   So it wasn't so much that they came and specifically

24 talked about the knock-offs alone, it was you that asked them

25 to talk about these knock-offs; right?   `10:09:17`

BONITA RUNYON - Cross

1   A.   They called me and they mentioned that -- when they called

2   and told me that -- yes.  Sorry.                              10:09:25

3   Q.   All right.  Now, in the discussions about whether or not

4   there was any of these pieces and I believe they are called the

5   MJ pieces, is that right, the Trendily pieces?                10:09:44

6   A.   I believe so.

7   Q.   All right.

8   A.   I believe so.

9   Q.   Now, I believe you testified in your declaration, your

10  written sworn document, that what Mr. Sanders said to you is    10:09:55

11  that MJ pieces may be in a shipping container on the way to

12  this country, may be; correct?

13  A.   They were in shipping and they should be arriving like

14  four to eight weeks I believe but they were on the water.

15  Q.   Well, in fact, your testimony, and it's in writing, your   10:10:27

16  sworn testimony, what you said Mr. Sanders told you is that MJ

17  pieces may be in the shipping container.  In other words, he

18  didn't know.  They may be?

19  A.   No.  He did know.  No, he did know that they were on the

20  water.                                                         10:10:50

21  Q.   Well, we'll check our testimony.

22  A.   I don't have it in front of me.

23  Q.   How many different furniture pieces did Trendily show you?

24  Your testimony referred to several hundred photos.  Do you

25  recall that?                                                   10:11:08

United States District Court

BONITA RUNYON - Cross

1  A.   I don't recall.                                              10:11:10

2  Q.   Well, do you now recall that they showed you and you have

3  so testified in sworn testimony that they showed you several

4  hundred photos; correct?

5  A.   I don't recall it being several hundred.  There weren't     10:11:26

6  several hundred.  I didn't have time to look at several hundred

7  but we did look at several photos.

8  Q.   Okay.  One of your questions to them, according to your

9  testimony, you told them you saw something for sale on Wayfair.

10 Do you recall that?                                               10:11:50

11 A.   Yes.

12 Q.   What was it that you saw for sale on the Wayfair Internet

13 site?

14 A.   Dining room chairs.

15 Q.   Are those MJ design pieces?                                  10:12:04

16 A.   No.

17 Q.   Those are other kinds of furniture designs that Trendily

18 makes; correct?

19 A.   Yes.

20 Q.   So you had a discussion about other kinds of Trendily       10:12:20

21 Furniture pieces and you had that particular discussion about

22 whether or not Trendily was selling them on the Wayfair

23 website; right?

24 A.   Yes.

25 Q.   And they assured you that they were not doing that;         10:12:38

United States District Court

BONITA RUNYON - Cross

| | | |
|---|---|---|
| 1 | correct? | 10:12:43 |
| 2 | A.   Yes.   Yes. | |
| 3 | Q.   Now, in the end, with all of this discussion you had, you | |
| 4 | did not place any order for any Trendily Furniture of the MJ | |
| 5 | pieces, did you? | 10:13:03 |
| 6 | A.   No. | |
| 7 | Q.   Did you order any other Trendily Furniture pieces? | |
| 8 | A.   No. | |
| 9 | Q.   Have you sold other Trendily Furniture pieces in the past? | |
| 10 | A.   Yes. | 10:13:19 |

Q.   Are you a retailer that sells, among others, Trendily
Furniture pieces?

A.   Yes.

Q.   In your testimony, you talked about these MJ design
pieces.  I think this was kind of you leading this discussion,
according to the transcript, and you were saying these are like
Jason Scott pieces and according to your testimony, what
Mr. Sanders replied was, "They are similar."  Do you recall
that?  That was the word that he used, they are similar?

A.   Yes.

Q.   All right.  Do you ever see pieces of furniture in your
business that are similar to other pieces of furniture made by
other companies?  Is that something that you see from time to
time?

A.   Time to time but nothing like Jason Scott's.

United States District Court

BONITA RUNYON - Cross

1  Q.   I understand that.                                    10:14:34

2  A.   Except for the Trendily.

3  Q.   In terms of the words that Mr. Sanders sold you, the word

4  he chose to use was "similar," and that's what you testified.

5  A.   Yes.                                                  10:14:49

6  Q.   All right, sir.

7        In your line of business, do you deal with other

8  sales representatives like Mr. Sanders and Ms. Dykes from other

9  companies?

10 A.   I'm sorry.  Repeat the question, please.              10:15:06

11 Q.   Do you deal with sales representatives of many different

12 furniture makers?

13 A.   Yes.

14 Q.   For example, who do you deal with in order to purchase

15 Jason Scott pieces of furniture?  Do you have a sales rep?   10:15:26

16 A.   Yes.

17 Q.   Who is the sales rep you deal with on behalf of Jason

18 Scott?

19 A.   Mark.

20 Q.   Do you know his last name?                            10:15:45

21 A.   I'm sorry, I don't know -- I don't recall the last name.

22 Q.   In your experience --

23 A.   I'm terrible with names.

24 Q.   Okay.  In your experience, do pretty much all of the

25 furniture makers send out sales reps to try and sell their   10:16:01

United States District Court

BONITA RUNYON - Cross

| | | |
|---|---|---|
| 1 | furniture to retailers like you? | 10:16:08 |

1  furniture to retailers like you?                                     10:16:08
2  A.   Yes.
3  Q.   Do you know how those sales reps are paid?  Do you
4  actually know yourself how they are paid?
5  A.   I do not.                                                       10:16:24
6  Q.   Do you know if any of the sales reps that you deal with
7  are what you would call independent, that is, self-employed?
8  A.   I do not, no.  I'm assuming they are employed by the
9  manufacturers.
10 Q.   All right.  But you don't really know one way or the           10:16:46
11 other, do you?
12 A.   No, sir.
13 Q.   All right.  And you don't know one way or the other
14 whether Chris Sanders or Derra Dykes are employees of Trendily,
15 do you?                                                              10:17:04
16 A.   I believe they are -- they work for Trendily direct.
17 Q.   Well, I'm not sure what that means.
18 A.   They don't represent any other lines.  They don't
19 represent any other line, just Trendily.
20 Q.   All right.  But you don't know if they are employees or        10:17:19
21 independent sales reps, that is independent contractors,
22 somewhere?
23 A.   I do not know for sure.
24 Q.   Thank you.
25      Thank you, ma'am.                                              10:17:33

United States District Court

BONITA RUNYON - Redirect

```
 1          MR. ISRAELOFF:  Your Honor, no further questions.    10:17:34

 2          THE COURT:  All right, sir.  Thank you,

 3   Mr. Israeloff.

 4          Mr. Dietrich, any redirect?

 5          MR. DIETRICH:  I do.                                  10:17:39

 6                    REDIRECT EXAMINATION

 7   BY MR. DIETRICH:

 8   Q.   Good afternoon, Ms. Runyon.  This is Tom Dietrich, counsel

 9   for Jason Scott Collection and Mr. Forsberg.

10   A.   Yes, good afternoon.                                    10:17:49

11   Q.   I just have a few follow-up questions for you on questions

12   that Mr. Israeloff asked.  Can you hear me okay?

13   A.   Yes.

14   Q.   You referred to a call from the Trendily reps regarding

15   the Jason Scott knock-offs; right?                           10:18:12

16   A.   Yes.

17   Q.   And was that the first contact you had with Trendily about

18   the MJ Collection?

19   A.   Yes.

20   Q.   And --                                                  10:18:28

21   A.   I believe so, yes.

22   Q.   And the Trendily rep called you and said they had Jason

23   Scott look-alikes; right?

24   A.   Yes.

25   Q.   And you didn't initiate that call, did you?            10:18:39
```

United States District Court

BONITA RUNYON - Redirect

| | |
|---|---|
| 1 | A.    No.   I don't believe so. I get kind of crazy busy | 10:18:43 |
| 2 | sometimes and they will come by and show their catalogs or send |
| 3 | me pictures and then if I'm interested, I will inquire then. |
| 4 | I'll ask them to come and show me more, tell me more. |
| 5 | Q.   But was the first time you heard about Jason Scott | 10:19:10 |
| 6 | look-alikes from a Trendily rep? |
| 7 | A.    Yes. |
| 8 | Q.   And in other words, you didn't bring that up to them |
| 9 | first? |
| 10 | A.    No. | 10:19:24 |
| 11 | Q.   And Runyons is an authorized Jason Scott dealer, isn't it? |
| 12 | A.    Yes. |
| 13 | Q.   And do you have Jason Scott pieces in your show room right |
| 14 | now? |
| 15 | A.   Many, yes. | 10:19:40 |
| 16 | Q.   Can you say about how many? |
| 17 | A.   About 60 percent of my store is Jason Scott. |
| 18 | Q.   So what, there have been Jason Scott pieces on the floor |
| 19 | when the Trendily reps came into your store? |
| 20 | A.    Yes. | 10:20:03 |
| 21 | Q.   Is there any way they could have avoided seeing those? |
| 22 | A.   No, not at all. |
| 23 | Q.   And in fact, they knew you were an authorized Jason Scott |
| 24 | dealer before that meeting, didn't they? |
| 25 | A.    Yes. | 10:20:17 |

United States District Court

BONITA RUNYON - Redirect

1   Q.   And they still pitched the knock-offs to you?          10:20:18

2   A.   Yes.

3   Q.   Do you carry the Sacred Heart dining table from Jason

4   Scott?

5   A.   I do, yes.                                              10:20:31

6   Q.   How about the Borgota Buffet?

7   A.   Yes.

8   Q.   And how about the Iron Star desk?

9   A.   Yes.

10  Q.   You said in response to Mr. Israeloff's question that you   10:20:46

11  haven't seen anything else similar on the market to Jason

12  Scott's; is that right?

13  A.   No, not at all.  Not until Trendily.

14  Q.   How close are the Trendily pieces to Jason Scott's pieces?

15  A.   Incredibly close.                                       10:21:06

16       If I didn't know any better, I would have thought it

17  was a Jason Scott piece.

18  Q.   How many years of experience do you have in the furniture

19  industry?

20  A.   Over 20.                                                10:21:28

21  Q.   In your view, are the Jason Scott designs unique to Jason

22  Scott?

23  A.   Absolutely.

24  Q.   Do you recognize the three pieces I mentioned -- the

25  Sacred Heart dining table, the Borgota Buffet, and the Iron   10:21:47

United States District Court

BONITA RUNYON - Redirect

1    Star desk -- as coming from Jason Scott?                          10:21:50

2    A.   Yes.  Oh, I'm sorry.  Repeat the question.

3    Q.   Do you recognize those pieces as coming from Jason Scott?

4    A.   Yes.

5    Q.   How so?  Can you explain?                                    10:22:05

6    A.   His furniture and pieces have a very distinctive look.

7    The craftsmanship is amazing and the carving, the color.  Just

8    the wood.  I mean, they are just -- I've never seen his type of

9    furniture in the industry until Trendily approached me with

10   their knock-off of his pieces.                                    10:22:35

11   Q.   As an authorized Jason Scott dealer, does the presence of

12   knock-offs like Trendily's on the market concern you?

13   A.   Yes.

14   Q.   Why?

15   A.   Because Jason -- Jason Scott only -- he picks and chooses    10:22:58

16   who he sells to.  So which makes his product even more valuable

17   whereas Trendily, they are wanting to sell it everywhere and

18   that is -- that concerned me.

19   Q.   Would you be less likely to invest in Jason Scott pieces

20   if there were knock-offs everywhere else?                         10:23:31

21   A.   Would I be less interested in purchasing Jason Scott

22   pieces if there were knock-offs everywhere?  No.  Because I

23   would still buy from Jason Scott.

24   Q.   I don't have any more questions.

25   A.   Even though Trendily -- I was going to say Trendily is       10:23:57

United States District Court

BONITA RUNYON - Recross

1  selling theirs for less but I would still buy from Jason Scott.  10:24:01

2  Q.   Understood.

3        Thank you.

4        MR. ISRAELOFF:  One or two if I may, Your Honor, in

5  recross.  10:24:11

6        THE COURT:  You may.

7                  **RECROSS - EXAMINATION**

8  BY MR. ISRAELOFF:

9  Q.   You indicated that Jason Scott is very choosey about who

10 he chooses to sell to and that his brand represents about 50  10:24:20

11 percent of your store.  Did I have that right?

12 A.   Yes.

13 Q.   Did you feel when he asked you to record this sales call,

14 did you feel like you really had to in order to keep that

15 important of a supplier happy with you?  10:24:44

16 A.   No.  No.

17 Q.   Lastly, you said Trendily, unlike Jason Scott, Trendily

18 sells everywhere.  Isn't it actually true that Trendily will

19 not sell their furniture to a retail furniture store that is

20 close to you just as a matter of their ordinary business  10:25:09

21 practice?

22 A.   Not true. they sell to everyone.

23 Q.   But not anyone near you; right?  You have a --

24 A.   Yes.  No, they -- they do sell to a store that is probably

25 five minutes from my store.  10:25:30

United States District Court

1   Q.   All right.                                                          10:25:31

2          Thank you.

3          MR. ISRAELOFF:  No further questions.

4          THE COURT:  All right.  Thank you, Mr. Israeloff.

5          Ms. Runyon, I can excuse you now as a witness.  The    10:25:38

6   attorneys have exhausted the questions that they wanted to ask

7   of you and so we can let you hang up now with the thanks of the

8   parties and the Court.

9          MS. RUNYON:  I'm so sorry.  Did you say that I'm

10  excused?                                                        10:25:55

11         THE COURT:  Yes.  You are.  Thank you, ma'am.

12         MR. ISRAELOFF:  Thank you.

13         MS. RUNYON:  Okay.  So I can hang up?

14         THE COURT:  You may.

15         MR. DIETRICH:  Thank you, Ms. Runyon.                    10:26:03

16         MS. RUNYON:  All right.  You're welcome.  Thank you.

17  Bye-bye.

18      (Witness excused.)

19         THE COURT:  All right.  So I want to make sure I

20  understand, that exhausts the cross-examination of witnesses by  10:26:10

21  telephone.  Are there any other live witnesses that

22  Mr. Israeloff wishes to cross-examine?

23         MR. ISRAELOFF:  No, sir.

24         THE COURT:  All right.  And I guess the negative

25  implication of that or the corresponding implication is that    10:26:26

United States District Court

| | | |
|---|---|---|
| 1 | the plaintiff has no further witnesses to present on behalf of | 10:26:30 |
| 2 | the motion; correct? | |
| 3 | MR. DIETRICH:  Correct, Your Honor. | |
| 4 | THE COURT:  All right.  Thank you. | |
| 5 | So now we'll switch sides and I have the declaration | 10:26:36 |
| 6 | of Mr. Malhotra and that's the only name I have on the list for | |
| 7 | cross-examination. | |
| 8 | Is that correct, counsel? | |
| 9 | MR. DIETRICH:  Correct, Your Honor. | |
| 10 | THE COURT:  All right.  So let me confirm, | 10:26:49 |
| 11 | Mr. Malhotra, this is Judge Tuchi.  Are you still with us? | |
| 12 | MR. MALHOTRA:  Yes, sir. | |
| 13 | THE COURT:  All right.  Very good. | |
| 14 | Mr. Dietrich, you may commence your examination | |
| 15 | whenever you're ready. | 10:27:00 |
| 16 | MR. DIETRICH:  Thank you. | |
| 17 | THE COURT:  Oh.  That's right.  I guess I need to put | |
| 18 | the witness under oath.  Thank goodness for my courtroom | |
| 19 | deputy.  She saved me twice. | |
| 20 | Mr. Malhotra, my courtroom deputy is going to come on | 10:27:16 |
| 21 | the line now to put you under oath. | |
| 22 | Go ahead, please, Julie. | |
| 23 | (    , a witness herein, was duly sworn or affirmed.) | |
| 24 | THE COURT:  All right.  Thank you.  And I'm sorry to | |
| 25 | interrupt, Mr. Dietrich.  Now you may proceed. | 10:27:34 |

United States District Court

## CROSS - EXAMINATION

1                       10:27:36

2 BY MR. DIETRICH:

3 Q.   Good morning, Mr. Malhotra, or good afternoon.  My name is

4 Tom Dietrich.  I'm counsel for plaintiff Jason Scott

5 Collection.  Can you hear me okay?          10:27:45

6 A.   Yes, sir, good afternoon.

7 Q.   Good afternoon.  Are you the controlling owner of Trendily

8 Home Collection, LLC?

9 A.   Yes.

10 Q.   And are you the controlling owner of Trendily Furniture   10:28:00

11 LLC?

12 A.   Not fully but I do have a Trendily collection.  I have 80

13 percent and Trendily Home Collection I have 50 percent.

14 Q.   Could you speak up just a little bit, sir?  I can't quite

15 hear you.                      10:28:17

16 A.   I said Trendily Home Collection is 50 percent and Trendily

17 Furniture is 80 percent.

18 Q.   Did you say 80 percent on Trendily Furniture?

19 A.   Yes.  Yes.  The ownership I'm saying, yes.

20 Q.   Do you receive a direct financial benefit from the    10:28:40

21 Trendily company sales?

22 A.   Yes.

23 Q.   Trendily manufactures the furniture pieces that it sells,

24 doesn't it?

25 A.   Yes.                       10:29:06

RAHUL MALHOTRA - Cross

1  Q.   Is that at the factory in Jaipur, India?                    10:29:07

2  A.   The factory is in Jaipur, India, yes.

3  Q.   Is that where the pieces that Trendily sells are

4  manufactured?

5  A.   Yes.                                                         10:29:22

6  Q.   And that factory is operated by your father; is that

7  correct?

8  A.   That is correct.

9  Q.   Who makes the decisions on what products Trendily

10 manufactures and sells?                                           10:29:36

11 A.   Really our customers, our designers.

12 Q.   So customers will direct you to make a product?

13 A.   Yes.

14 Q.   And then do you submit that request to the factory?

15 A.   Yes.                                                         10:30:00

16 Q.   So do you have authority to oversee what product

17 decisions -- the product decisions for Trendily?

18 A.   Are you talking about a new products or the existing

19 products?

20 Q.   I'm sorry.  Can you say again, sir?                          10:30:20

21 A.   Is that existing products you're talking or the new

22 products that we send to India?

23 Q.   Well, either one.  Do you have authority to stop

24 production of an existing product?

25 A.   Yes, m'hum.                                                  10:30:37

United States District Court

RAHUL MALHOTRA - Cross

1  Q.   Do you have authority to start production of a new                    10:30:37

2  product?

3  A.   Yes, I do.

4  Q.   Trendily usually sells to retail stores; right?

5  A.   Yes, and designers.                                                   10:30:51

6  Q.   And do you have sales representatives working for Trendily

7  that meet with those potential buyers?

8  A.   Yes, in the shows.  They have their own companies, yes.

9  Q.   Is Chris Sanders one of those sales representatives?

10  A.   Yes.                                                                  10:31:10

11  Q.   And is Derra Dykes one of those sales representatives?

12  A.   Yes.  She's not -- yes.  She's no longer with us.

13  Q.   Is Chris Sanders still with you?

14  A.   Yes.

15  Q.   Now, somebody like Chris has a Trendily email address,              10:31:29

16  doesn't he?

17  A.   Some does.  Some does not but he doesn't have an email.

18  He uses the company email address, yes.

19  Q.   Did you know about the Jason Scott Collection company

20  prior to being served with a lawsuit?                                     10:31:52

21  A.   Yes, in May.

22  Q.   Before the lawsuit, were you familiar with the three

23  furniture pieces that are at issue in this case, the Sacred

24  Heart dining table, Borgota Buffet, and Iron Star desk?

25  A.   Not until I received the second notice when I came back            10:32:16

United States District Court

RAHUL MALHOTRA - Cross

1    from vacation, the first of July.  The notice was outside my                  10:32:20
2    door.  That is when I got the copies of the copyright, that
3    it's copyrighted.
4    Q.    Did you say the second of July when you got that letter?
5    A.    First of July when I came back from vacation.  I was on                 10:32:33
6    vacation end of June, last week of June to first of July.
7    Q.    So that was the first that you learned about those three
8    pieces of furniture existing?
9    A.    No.  Like I said, in May when I got the first letter but
10   there was no copies of the copyright included so I didn't know                10:32:58
11   how feeded (phonetic) that is so I didn't do anything.  And
12   then the second notice when I came back from vacation, I saw
13   that outside my door and then I learned the copyright copies
14   were there.  The registrations were there.
15   Q.    But my question isn't about whether you knew about the                  10:33:19
16   copyright notices themselves.  It's about whether you knew
17   about those three pieces of furniture existing.  Did you know
18   about that before receiving the cease and desist letter?
19   A.    Yes, because, like I said, one of our customers gave me
20   those photos.  I didn't know who those photos were and we send              10:33:41
21   those to India for production.  That is how I came to know
22   those pictures.
23   Q.    So you got photos from a customer?
24   A.    Yes.
25   Q.    What customer was that?                                                 10:33:56

United States District Court

RAHUL MALHOTRA - Cross

1   A.   Western Heritage.                                          10:34:00

2   Q.   Can you say that again, sir?

3   A.   Western Heritage.

4   Q.   Okay.  I'm having a little trouble hearing you.

5           THE REPORTER:  Western Heritage.                       10:34:14

6           THE WITNESS:  Can you hear me now, sir?

7   BY MR. DIETRICH:

8   Q.   Did Western Heritage ask you to make copies of those

9   pieces of furniture?

10  A.   Not the copies.  They gave me those pictures and I send  10:34:26

11  those to India.  They were similar.

12  Q.   And you agreed to manufacture those pieces of furniture

13  requested by Western Heritage?

14  A.   Yes, I did.

15  Q.   And the design of those pieces was based on the          10:34:48

16  photographs of Jason Scott furniture?

17  A.   I didn't know that.  I didn't know that back then, no.

18  Q.   Didn't you just say you received photographs from Western

19  Heritage?

20  A.   Right, but they didn't have the name on it.  They were   10:35:06

21  just a photograph, a picture of a piece.

22  Q.   Understood.

23  A.   There was no name on it.  No name on it.

24  Q.   So you received a photograph.  You sent it to India and

25  had India manufacture --                                      10:35:18

United States District Court

RAHUL MALHOTRA - Cross

A.   Yes.                                                           10:35:23

Q.   -- copies of those -- the furniture in those photographs;
is that right?

A.   Yes.  The pictures were sent to India, yes, that is
correct.                                                           10:35:32

Q.   Did you tell the factory in India to copy those furniture
pieces as closely as possible?

A.   No, I didn't.

Q.   Did you do anything to distinguish the furniture that was
being manufactured in India from the furniture in the             10:35:58
photographs?

A.   When I saw those pictures, the first thing I thought is
what we are going to do, is the shape is the design.

Q.   Did you do anything differently in your pieces to make
them appear different from the furniture in the photographs?      10:36:21

A.   Not really.

Q.   So you would agree, then, that you had your factory in
India intentionally copy the furniture that was in those
photographs; right?

A.   Similar -- I again say similar.  They are two different       10:36:55
copies, copy and similar.

Q.   What are the differences -- let's start with the --

A.   Similar means --

Q.   Let's start with the Sacred Heart dining table.  Sir, can
you explain the differences between the furniture in the          10:37:12

United States District Court

RAHUL MALHOTRA - Cross

1   photograph and the copy that Trendily made?                              10:37:16

2   A.   The differences is they are made in different countries.

3   I come from India and it's made in India.   First thing.   Then

4   it's a different wood species.   And then if you look at the

5   design, if you look at overall design, if you look at overall   10:37:37

6   size, if you look if the finish.   Everything is different

7   because it's not the same crafts man who did that and who did

8   ours.   They are different.   They look alike.   They are similar.

9   But they are not the same.

10  Q.   After you had the copies produced, you had them shipped to  10:37:58

11  the U.S. for sale, didn't you?

12  A.   Yes.   Yes.

13  Q.   When was the first shipment of those copies received in

14  the U.S.?

15  A.   The first three pieces came in March shipped from India in  10:38:18

16  December and we generally received it sometime end of January,

17  somewhere in there.   The container came and those went to

18  Western Heritage.

19  Q.   And you called these pieces the MJ Collection; right?

20  A.   MJ Collection, yes.                                                  10:38:43

21  Q.   Trendily advertised the MJ Collection on its website,

22  didn't it?

23  A.   Back then, yes.

24  Q.   Didn't the website have multiple photos of each of the MJ

25  Collection pieces on it?                                                  10:39:01

RAHUL MALHOTRA - Cross

1   A.   Only three.  Only three items.               10:39:08

2   Q.   No.  I understand that.  But the website had photographs

3   of each of those three items on it; right?

4   A.   Yes.  At one point, yes.

5   Q.   And Trendily sold each of the MJ Collection pieces to    10:39:21

6   retailers, didn't it?

7   A.   Repeat the question, please.

8   Q.   Trendily sold each of the MJ Collection pieces to

9   retailers in the U.S., didn't it?

10   A.   In Texas.  Only to four or five if I recall.      10:39:41

11   Q.   How many total pieces of the MJ Collection did Trendily

12   sell?

13   A.   18.  18 came total.  Three in the beginning and then we

14   did five of each second time so we got 15 pieces.  So we have

15   in possession three never sold, one -- we requested all our   10:40:08

16   customers to give the pieces back.  I got one piece back from

17   the customer.  Now I have four in my custody and there were a

18   total of 18.  Four in my custody, 14 -- 14 pieces sold.

19   Q.   Now, is it your testimony that you didn't know that the

20   furniture Trendily had copied was made by Jason Scott until   10:40:37

21   July 2017?

22   A.   No.

23   Q.   When did you first learn that furniture was made by Jason

24   Scott?

25   A.   In May.                                         10:40:54

65

RAHUL MALHOTRA - Cross

1  Q.   May 2017?                                              10:40:58

2  A.   Yes, sir.

3  Q.   Did you try to sell that furniture to a retailer on the

4  basis that it was a look-alike for Jason Scott?

5  A.   That was not the trend to copy anyone, you know, to     10:41:18

6  infringe anyone's legal rights.  No.  That was not the plan.

7  Everyone has their own niche.  Everyone has their own market

8  and like I said before, they are a different product.  They

9  look alike.  They are similar but they are not the same.

10       So we -- everyone, you know, out there tries to sell   10:41:39

11  products and that is what we do.  And when we learned that this

12  is -- there's a registration they have, there's a copyright on

13  it, we stopped.  Everything is on hold since then.

14  Q.   I don't know that that answered my question.  My question

15  was, did you try to sell Trendily's MJ Collection to a retailer 10:41:59

16  by telling the retailer that they were Jason Scott look-alikes?

17  Did you refer to Jason Scott in your sales pitch to any

18  retailer?

19  A.   No.  No.  Customers -- I never said that.  Customer did.

20  They compared -- they compared that to someone but I never said 10:42:19

21  that.  None of our sales reps, nobody.

22  Q.   So are you familiar with Bill Holland from Hill Country

23  Interiors?

24  A.   I do.  I do, yes.

25  Q.   If he said that you referred to Jason Scott in discussing 10:42:36

United States District Court

RAHUL MALHOTRA - Cross

1   the Trendily MJ Collection with him, is he telling the truth?    10:42:41

2   A.   If he is taking those names -- I cannot comment on him.

3   But if he took those names, that is his -- you know, voice.  I

4   didn't say that.  I never said that.  I never pitched this is a

5   knock-off of Jason Scott or this is something.  I always said    10:43:05

6   this is my product.  This is Trendily product, MJ Collection.

7   I never pitched that this is Jason Scott knock-off, never.  If

8   customer assumes, that's their wish and will.

9   Q.   Did you make any pitches of the MJ Collection after May of

10  2017?  Did you try to sell it to any retailers after that date?   10:43:28

11  A.   After which date?

12  Q.   After May 2017.

13  A.   May 2017.  We -- okay.  The first letter -- are you -- ask

14  me the question again, please.  I lost it.  I'm sorry.

15  Q.   Can you speak a little closer to the phone if possible?  I    10:43:50

16  can't hear you very well.

17  A.   Yes.  I am close to the phone, yes, I am.

18       THE COURT:  Mr. Malhotra, we're hearing you well at

19  the beginning of a phrase and then it's tailing off, so I'm

20  going to --                                                       10:44:08

21       THE WITNESS:  Yes.  There was a call that came in in

22  between.  I'm sorry.  There was a call that came in in between,

23  please.  Repeat the question again, please.

24  BY MR. DIETRICH:

25  Q.   Sure.  Mr. Malhotra, my question was, did you personally     10:44:19

United States District Court

RAHUL MALHOTRA - Cross

1  make any sales pitches for the MJ Collection to retailers after     10:44:21
2  May 2017?
3  A.   I don't remember but if I did, I did for my product.
4  Q.   And after that date, you knew that the furniture you were
5  selling was copied from the Jason Scott Collection you              10:44:42
6  testified; right?
7  A.   In May like I said, yes.  I learned in May that these
8  pieces belong to Jason Scott.  Yes.
9  Q.   Mr. Malhotra, isn't it true that Trendily sold pieces of
10  the MJ Collection to dealers that compete with Jason Scott's       10:45:36
11  authorized dealers?
12  A.   That is not true.
13  Q.   Are you familiar with a retailer named Brumbaugh's?
14  A.   Yes.
15  Q.   Where are they located?                                       10:45:55
16  A.   In Aledo, Texas.
17  Q.   Are you familiar with a retailer named Adobe Interiors?
18  A.   I do.
19  Q.   In fact, you sold some MJ collection pieces to Adobe,
20  didn't you?                                                        10:46:13
21  A.   I did.
22  Q.   Do you know how far Adobe is from Brumbaugh's?
23  A.   About 10 to 12 miles.
24  Q.   10 miles?
25  A.   10 to 15 miles, yes.                                          10:46:29

United States District Court

RAHUL MALHOTRA - Cross

1   Q.   And you said that you actually created this furniture at      10:46:35
2   the request of Western Heritage; right?
3   A.   Yes.
4   Q.   Isn't Western Heritage relatively close to Brumbaugh's as
5   well?                                                              10:46:44
6   A.   About 10 miles, again.
7   Q.   Did you know Brumbaugh's is one of Jason Scott's biggest
8   accounts?
9   A.   Say that again?
10  Q.   You sold the MJ Collection, the copied furniture, to two     10:47:00
11  retailers in the same area, didn't you?
12  A.   Sir, I am having a call.  Give me one second.  This call
13  has to -- I cannot hear you, every other word.  There's a
14  second call coming on my phone.
15  Q.   And you can you ignore it for a little while.                 10:47:21
16  A.   It should drop.  It's dropped.  Yes, repeat the question.
17          THE COURT:  Let's give him a minute.  I don't think
18  he was planning on taking the call.  I think he was just trying
19  to clear the line.
20          All right, sir.  Mr. Malhotra, is the line clear now?     10:47:39
21          THE WITNESS:  Yes, sir.
22          THE COURT:  All right.  Mr. Dietrich, you may resume.
23  Thank you.
24  BY MR. DIETRICH:
25  Q.   Mr. Malhotra, you agree you sold MJ Collection pieces to     10:47:46

RAHUL MALHOTRA - Cross

| | | |
|---|---|---|
| 1 | Adobe and Western Heritage; right? | 10:47:50 |
| 2 | A.   I offered to every customer.  I offered to Country | |
| 3 | Interiors, Bill Holland, I offered to Sally Brumbaugh.   I | |
| 4 | offered to -- | |
| 5 | Q.   Sir, my question is a yes-or-no question.  Did you sell MJ | 10:48:06 |
| 6 | Collection pieces to Western Heritage and Adobe? | |
| 7 | A.   Yes, sir.  Yes, I did. | |
| 8 | Q.   And those are both located within around 10 miles from | |
| 9 | Brumbaugh's, aren't they? | |
| 10 | A.   10 to 15 miles. | 10:48:22 |
| 11 | Q.   Are you familiar with a retailer named Calamity Jane's | |
| 12 | Trading Post? | |
| 13 | A.   I do. | |
| 14 | Q.   And do you know Shawn Beach, the owner of Calamity Jane's. | |
| 15 | A.   Yes, I do. | 10:48:42 |
| 16 | Q.   Did you ever meet with her about Calamity Jane's buying | |
| 17 | the MJ Collection? | |
| 18 | A.   Normally I don't go in the field because we have people to | |
| 19 | do that for us.  But I went with Chris if I'm not wrong.  I did | |
| 20 | went with Chris to Calamity.  I was in the area and I think I | 10:49:05 |
| 21 | did. | |
| 22 | Q.   You kind of tailed out again at the end of your answer. | |
| 23 | Could you state that again, sir? | |
| 24 | A.   I said -- I said I think I did with Chris, yes.  I think I | |
| 25 | did. | 10:49:22 |

United States District Court

RAHUL MALHOTRA - Cross

1  Q.   Did you know at the time that Calamity Jane's is an          10:49:26

2  authorized Jason Scott dealer?

3  A.   She alerted that.  Like I said, we were in the area and we

4  called.  We don't go without a notice to the dealer that we are

5  coming, so we called and she invited us and we went there, me    10:49:44

6  and Chris.

7  Q.   You said that you received our second cease and desist

8  letter around July 4, 2017; is that right?

9  A.   July 1 when I came back from vacation.  I was on vacation

10 for the last week of June, yes, sir.                             10:50:09

11 Q.   And isn't it true that whether it was you or Trendily,

12 reps tried to sell MJ Collection pieces to retailers after you

13 have received that letter?

14 A.   You say after July?

15 Q.   After you got the cease and desist letter.                  10:50:36

16 A.   We actually -- like I said, when the second notice came

17 with the copyright registration, that is when we stopped, yes.

18 Q.   I mean, we have a recording on August 15 of Trendily reps

19 trying to sell MJ pieces to Runyons.  Have you listened to

20 that?                                                            10:51:01

21 A.   I did.

22 Q.   Do you deny that they were pitching MJ Collection pieces

23 to that Runyon's?

24 A.   If you -- if you -- I read that transcript, sir, and if

25 you -- if you read that, you can tell what was going on there.   10:51:14

RAHUL MALHOTRA - Cross

| 1 | They said nothing about anything.   Somebody was putting words | 10:51:20 |

 1   They said nothing about anything.   Somebody was putting words        10:51:20

 2   and -- like I said, these are sales guys and they have to do

 3   the sales talk.   So if you read that, the whole conversation,

 4   we said nothing about copy or Jason Scott or nothing.   She was

 5   putting -- look like Jason's stuff.   Is this similar.   Is it      10:51:45

 6   this?   Is it that?   That's -- not really.

 7           And I was not there so I don't know what actually

 8   they did, they did talk about.

 9   Q.   Sir, do you know somebody named Tanner at Adobe Interiors?

10   A.   Yes, I know Tanner, yes.                                       10:52:08

11   Q.   Didn't you text message with Tanner on August 3 about

12   selling copies, selling MJ Collection pieces to Adobe?

13   A.   When, sir, again?

14   Q.   I'm sorry.   Yes, I didn't hear you.   Can you say that

15   again?                                                             10:52:28

16   A.   Back when?   What dates were those?

17   Q.   On August 3.

18   A.   August 3.   Are you referencing a text message that we

19   shared?   Is that what you are talking about?

20   Q.   Yes, sir.   We provided it to your attorney yesterday.       10:52:47

21   Isn't it true that you text messaged with Tanner at Adobe on

22   August 3 offering to sell or actually saying you would sell an

23   additional desk and a table in the MJ Collection?

24   A.   Did I say somewhere Jason Scott?   I'm going to say that

25   because I didn't say that.                                        10:53:20

RAHUL MALHOTRA - Cross

1    Q.   You didn't send those text messages?                    10:53:22

2    A.   No.  I did.  It was not sent -- received and sent.  Like I

3    said before, there are some sales pitches.  There are some

4    sales talk we have to do because we are in a business where we

5    have a competition.  We have other people selling to the same   10:53:44

6    retailers so different manufacturer from the demands.  He asked

7    me something and I said yes.  It was a sales call.

8    Q.   So you agree that on August 3 -- sir, do you agree that on

9    August 3 you were agreeing to sell MJ Collection pieces to

10   Tanner at Adobe?                                              10:54:07

11   A.   For sales call pitch, yes, I said that, yes.  But did that

12   happen?  We need to find out.

13   Q.   But that was well after you had received the second cease

14   and desist letter; right?

15   A.   Yes.                                                     10:54:26

16   Q.   You were planning on making and selling other copies of

17   other Jason Scott pieces of furniture, weren't you?

18   A.   That never happened.

19   Q.   But wasn't that -- didn't you have other pieces in

20   production that were copies of Jason Scott furniture?         10:54:40

21   A.   No, not really.

22   Q.   Didn't you tell Tanner at Adobe on August 3 that you had

23   several other pieces in production at the factory in India?

24   A.   I didn't have several.  I didn't use the word "several."

25   Like I said, that was merely a sales pitch, a sales call.  He's  10:55:05

United States District Court

RAHUL MALHOTRA - Cross

1    not active customer.  He doesn't buy a lot of Trendily pieces          10:55:13

2    so he asked me and I was in the warehouse and it was a quick

3    text.  He text me, I texted him back.

4    Q.   Didn't he send you a picture of a Jason Scott piece, a

5    buffet, and ask if you were making it and you said "in            10:55:30

6    production"?

7    A.   Yes, I said that, yes.  Like I said -- I said that, sales

8    call.

9    Q.   Didn't he send you a picture of a Jason Scott console

10   table and ask you if you were making it and you said in            10:55:44

11   production for that as well?

12   A.   Yes.  They happened same time.  So these two texts came,

13   same time.  And like I said, it was merely a sales call.  Was

14   my mistake.

15   Q.   Didn't you actually invoice --                                10:56:00

16   A.   But that never happened.

17   Q.   Sir, didn't you actually invoice Adobe for the console

18   table, called the MJ console table?

19   A.   In the big name, yes, but if you look at the copies you

20   submitted, that console is crossed because we told them that we   10:56:20

21   cannot do anything in MJ production and MJ is gone.

22          So he called me on the phone.  It was not a text.  He

23   called me on the phone and he questioned me to make him

24   something similar to that.  I cannot do that.

25   Q.   Wasn't it only actually -- wasn't it only actually when      10:56:40

74

RAHUL MALHOTRA - Redirect

1    you got served -- go ahead, sir.                        10:56:43

2    A.   Yeah.

3    Q.   Sir, wasn't it only actually when you were served with the

4    lawsuit that you stopped production of the copies?

5    A.   Before.  No.  Before.  This is before.             10:57:02

6    Q.   Isn't it true that you had copies to copy at least 15

7    other Jason Scott furniture pieces?

8    A.   No.  No.

9    Q.   But you agree you had plans to -- and you had in

10   production copies of several other Jason Scott furniture pieces   10:57:21

11   in August 2017?

12   A.   I did said that but like I said, these were sales calls,

13   sales pitches.  Physically we have to verify that, if really

14   there is something exists.  Nothing happened.  We couldn't sell

15   it.                                                      10:57:43

16              MR. DIETRICH:  I don't have any other questions.

17              THE WITNESS:  Thank you.

18              THE COURT:  Thank you, Mr. Dietrich.

19              And Mr. Israeloff?

20              MR. ISRAELOFF:  Thank you, Your Honor.        10:57:49

21                     **REDIRECT EXAMINATION**

22   BY MR. ISRAELOFF:

23   Q.   Mr. Malhotra, can you hear me?

24   A.   Yes, sir.

25   Q.   All right.  Please make sure you keep your phone very   10:57:55

                     United States District Court

RAHUL MALHOTRA - Redirect

```
1   close to your mouth.  We are having difficulty hearing        10:57:59
2   everything so please be careful and speak loudly.
3           Sir, could you please provide a little information
4   about how your company started and what they do?
5   A.   We are based out of India and we produce things in India.  10:58:24
6   We also have upholstery we do here which is all made in USA.
7   Q.   Wait.  I'm sorry.  You said upholstery is done here in the
8   United States?
9   A.   Yes.  Upholstery is done here in the United States and the
10  creative pieces, they come from India.                        10:58:47
11  Q.   When was the company started?
12  A.   Back in 2004.
13  Q.   2004?
14  A.   Yes, sir.
15  Q.   We're having trouble hearing you.  Please speak loudly.   10:59:07
16          How many different --
17  A.   2004.
18  Q.   Oh.  Thank you.
19          How many different kinds of furniture does Trendily
20  make approximately?                                           10:59:23
21  A.   Several hundred.
22  Q.   Until this lawsuit, had anyone ever accused Trendily of
23  making copies of their furniture?
24  A.   Never.
25  Q.   You've already said this a little bit but please tell us,  10:59:53
```

United States District Court

RAHUL MALHOTRA - Redirect

1    again, why you made, how was it that you came to make pieces          10:59:57

2    that were similar to the three Jason Scott pieces?  How did

3    that start?

4    A.   Like I said earlier, Western Heritage, a customer, gave me

5    those photos to start and I didn't have any name on it.  There    11:00:23

6    was no name on it, just a picture, just a photo and we send

7    that to India to make them.

8    Q.   In your experience, is it common in the furniture business

9    for one company to make pieces that are similar to pieces made

10   by another company?                                                11:00:54

11   A.   Yes, sir.  It's very common.  There's a line we have in

12   our industry, furniture industry.  I'm sure a lot of people in

13   the furniture industry understand that in this you see a line

14   and says everyone copies everybody.  Every store you go to,

15   every place you talk to, they have this line.  Everyone copies   11:01:12

16   everybody because there is no set law on the furniture.

17   Q.   All right.  When you sent these photos to India to make

18   similar pieces, did you believe you were going to violate

19   anyone's legal rights?

20   A.   No, sir.                                                      11:01:40

21   Q.   Why did you not respond to the letter of May 2017?

22   A.   Because I didn't took it seriously.  There was no copies

23   of the copyright.  It was a letter and I didn't respond to it.

24   I guess my mistake.

25   Q.   All right.  You got another letter, I think you said, in    11:02:16

United States District Court

RAHUL MALHOTRA - Redirect

1  the first of July with copies of the copyright.  Why did you                    11:02:19

2  not respond to that letter?

3  A.   Like I said, it's a mistake.  I would have -- I would have

4  done that.  We should not be here if I would have done that so

5  it was a mistake that I didn't respond to their letters.        11:02:47

6  Q.   I did not understand that.  Why did you not respond to the

7  second letter?

8  A.   It was a mistake, sir.  I should have.  I should have

9  responded.  I didn't respond.

10 Q.   Okay.                                                       11:03:06

11        Now, this lawsuit was filed August 11.  When did you

12 stop producing any of these similar pieces of furniture?

13 A.   Back in May.

14 Q.   I'm sorry.  Say again?

15 A.   Back in May when I received the first letter.               11:03:30

16 Q.   Okay.  Production stopped in May?

17 A.   Yes.

18 Q.   Did you stop selling any of these pieces before the

19 lawsuit was filed?

20 A.   Yes.                                                        11:03:53

21 Q.   We have heard testimony that Mr. Forsberg talked to

22 Extravagance Designs about possibly ordering some of these MJ

23 pieces.  Did you, in fact, receive a request to order pieces by

24 Extravagance Designs in early August 2017?  Did they try to

25 order --                                                         11:04:38

United States District Court

RAHUL MALHOTRA - Redirect

1    A.   I remember Extravagance is not a customer.  We have never          11:04:40
2    sold any pieces in last ten years or more to Extravagance.
3    This was a cold call from this customer asking us the product.
4    We told them there is no MJ Collection.  We cannot do that.
5    Q.   I'm sorry.  You told them there is no MJ Collection.  We          11:05:02
6    cannot do that.
7    A.   That is correct.
8    Q.   In August 2017?
9    A.   Yes, when they tried, yes.
10   Q.   Now, have you had customers tell you anything about              11:05:21
11   whether there are copyrights on furniture designs?  What did
12   they tell you?
13   A.   Like I said, what I heard in the market.  I'm not a big
14   fish.  I'm a very small fish in this industry but I heard the
15   people talking that there is no such copyright in this             11:05:48
16   industry.  Like I said the first letter.  The second letter,
17   that is the reason we made that mistake.  We would have
18   responded but we thought there's nothing.
19   Q.   We heard testimony about a sales representative named
20   Chris and you were here when we heard about that testimony.  Is     11:06:12
21   Chris an employee of Trendily?
22   A.   No, he's not.
23   Q.   Who does he work for?
24   A.   He works for CTT & Associates.  CTT & Associates.
25   Q.   CTT & Associates, who are they?                                 11:06:38

RAHUL MALHOTRA - Redirect

1  A.   Yes.  That is a neutral company.  He -- a lot of

2  salespeople in this industry, they are multi-line rep and they

3  have multi lines in their bag, at least three, four different

4  lines, and that's how they make their living, by selling

5  different products to the same customer and make commission.

6       So he is not my employee.  He owned his own company.

7  He works for his own company.  He is given invoice for work he

8  did and we write him a check to his company.

9  Q.   Now, after this sales call that Chris made, I think on

10 August 15, did you know that he was going to have a sales call

11 and talk about MJ design pieces before he did that?

12 A.   No.

13 Q.   Did you tell him or ask him to promote MJ design pieces on

14 August 15?

15 A.   No.  No, I didn't.

16 Q.   When you found out that he had been promoting MJ design

17 pieces, what did you do?

18 A.   We stopped him.

19 Q.   How did you stop it?

20 A.   I think August 16 we received a lawsuit delivered by

21 Falcon Delivery, document delivery company, and Chris was --

22 luckily, he was in the field but he was in the office that day

23 to collect his check for the commission and I -- and when I

24 received that package, I told Chris that, "Chris we cannot talk

25 about this product, no.  So you have to stop talking about it."

United States District Court

RAHUL MALHOTRA - Redirect

Q.   All right.   Let me ask you a different topic now.   Do you
still have the records of the MJ design pieces that were made
and were sold before this lawsuit?   Do you still have records?

A.   Yes, I do.

Q.   Are they safe?

A.   Repeat, sir.

Q.   Are those records safe?   Are you holding onto them and
keeping them safe?

A.   Yes.   Yes.   They are safe.

Q.   You understand they might be important in this lawsuit,
don't you?

A.   Yes, I do.

Q.   Now, the four pieces of furniture that you said you have
on hand, I think you said three of them were never sold and one
of them was returned; is that right?

A.   That's correct.

Q.   Are those -- where are those four pieces of unsold
furniture now?

A.   They are now warehoused in Dallas.

Q.   Are they going to be retained so that they might be
important to this lawsuit?

A.   Yes.

Q.   You're not planning to do anything with them, are you,
without permission of the Court?

A.   No.

United States District Court

RAHUL MALHOTRA - Redirect

1    Q.   And finally --

2    A.   That's true.

3    Q.   -- we heard some testimony about people saying that there

4    might be more MJ furniture in a shipping container.  Do you

5    remember hearing about those statements?  You heard the people

6    testify about that; right?

7    A.   I heard, yeah.  I heard through the papers that there was

8    somebody in the court, yes.

9    Q.   All right.

10   A.   I did learn it from that.

11   Q.   All right.  Did you look at the shipping container packing

12   lists to see if there were any MJ design pieces on those

13   shipping containers?  Did you look at the packing list?

14   A.   Yes, I did.

15   Q.   Were -- were there any MJ design pieces in those shipping

16   containers?

17   A.   No, sir.

18           MR. ISRAELOFF:  Your Honor, I have no further

19   questions.

20           Thank you, sir.

21           THE COURT:  All right.  Thank you, Mr. Israeloff.

22           MR. DIETRICH:  If I may ask a couple of questions?

23           THE COURT:  You may.  About how much do you need

24   because I need to give the court staff a break.  They have been

25   at it for two hours and ten minutes but if it's just a few

11:10:21
11:10:35
11:10:55
11:11:12
11:11:29
11:11:38

RAHUL MALHOTRA - Redirect

1    minutes.  We'll do it.                                          11:11:42

2              MR. DIETRICH:  Let's take a break now.

3              THE COURT:  How much do you have?

4              MR. DIETRICH:  Just less than five minutes.

5              Given the difficulty of having Mr. Malhotra on by    11:11:56

6    phone, I had sent a small set of documents to Mr. Israeloff

7    yesterday and said that we would only use these documents for

8    impeachment purposes only if necessary and it seems that time

9    has come.

10             I would like to offer these documents to you and I   11:12:13

11   believe that Mr. Malhotra has a copy of them.  He referred to

12   them earlier and I referred to them earlier.

13             THE COURT:  So Mr. Malhotra has already seen them?

14             MR. DIETRICH:  I believe so.

15             MR. ISRAELOFF:  Your Honor, I got some documents at   11:12:30

16   the airport while I was at the airport yesterday, the first

17   time I had ever seen them.  I did not ask Mr. Malhotra about

18   that just now in my redirect.

19             So I do object to using documents.  They are beyond

20   the scope of redirect and they are not timely because I have   11:12:51

21   not even seen paper copies.  I got them on my telephone

22   yesterday.

23             THE COURT:  My first issue is they are not really

24   impeachment if Mr. Malhotra has seen them.  Secondly, pass them

25   up.  I want to see what they are.  And then I am -- we are      11:13:04

83

RAHUL MALHOTRA - Redirect

1  going to take a break now.  I can sort this out.  Let's take 15   11:13:07

2  minutes.  We'll wrap this up.  I'll give you my ruling on the

3  documents.

4          We're going to need to leave the witness on the phone

5  because I haven't excused him yet.   11:13:19

6          So, Mr. Malhotra, if you would stay on the line,

7  please, and I know we still have the monitor as well.  Please

8  pass them up for me, Mr. Dietrich.

9          MR. DIETRICH:  Yes, Your Honor.  Can I just say

10  quickly that they are relevant to the fact that Mr. Malhotra   11:13:33

11  said that production of knock-offs stopped in May of 2017 in

12  his answer to Mr. Israeloff.

13          THE COURT:  So do you have a copy for me and do you

14  also have a copy for counsel, Mr. Israeloff?

15          MR. DIETRICH:  I do, Your Honor.   11:13:58

16          THE COURT:  All right.

17          MR. ISRAELOFF:  Your honor, may I run to the restroom

18  during our break?

19          THE COURT:  I intended that as a comfort break.  So

20  we're going to mute the microphones until we come back on.  It   11:14:14

21  will be 15 minutes precisely.  Thank you.

22      (Recess at 11:14; resumed at 11:31.)

23          THE COURT:  All right.  Thank you.  Please be seated.

24          Mr. Malhotra, this is Judge Tuchi.  Are you still on

25  the line, sir?   11:31:39

United States District Court

84

RAHUL MALHOTRA - Redirect

1        THE WITNESS:  Yes, sir.

2        THE COURT:  All right.  Thank you.  If you can be

3   patient for a moment.  We have one issue to work out.

4        Mr. Israeloff, have you had an opportunity to look

5   over the hard copies of the papers that were discussed just

6   before the break?

7        THE WITNESS:  I have.

8        MR. DIETRICH:  And can you give me your position

9   again, please, sir.

10        MR. ISRAELOFF:  Well, number one, they are beyond the

11   scope of the redirect.  On the original cross, Mr. Malhotra was

12   asked about this set of text messages and he acknowledged them.

13   There was no contradictory testimony.  He acknowledged that he

14   had them and it's a sales call.  That's what you do or he tried

15   to explain it.  So it is nothing in the way of impeachment,

16   number one.

17        Number two, they are beyond the scope of the

18   redirect; and, number three there's apparently some reference

19   to other pieces, something about a console table, those are not

20   one of the accused pieces the issue today.  The accused pieces

21   at issue today are the MJ office desk, dining table, and side

22   board, so references to other pieces not really germane to what

23   is before this Court.

24        THE COURT:  All right.

25        Mr. Dietrich, your response, please.

United States District Court

11:31:41
11:31:50
11:32:00
11:32:21
11:32:41
11:33:00

RAHUL MALHOTRA - Redirect

1      MR. DIETRICH:  Yes, Your Honor.  Mr. Malhotra          11:33:03

2  responded to Mr. Israeloff's question that production of the

3  knock-off pieces had stopped in May be 2017.  We have invoices

4  here that are from Trendily showing that they were invoicing

5  for the MJ pieces in June 29, 2017, and even much later, August   11:33:18

6  7 of 2017.  There's an invoice for the MJ office desk showing

7  that Adobe paid with a check.  There's a number of invoices in

8  August and specifically the text message from Mr. Malhotra,

9  it's on the third page of the text messages, states -- there's

10  a question, do you have another MJ Dining Table in stock?      11:33:46

11  Mr. Malhotra says, "Not at this minute.  I'm getting soon,

12  though.  If you need now, I will order now and save," and

13  that's on August 5, 2017.  So it certainly contradicts the

14  position that the statements from Mr. Malhotra with regard to

15  stopping proceedings.  Again, I know it is not complete        11:34:07

16  impeachment evidence provided that we have provided it in

17  advance.  We didn't see any alternative to doing that since

18  Mr. Malhotra is on the phone.

19      THE COURT:  I understand there is a logistical issue

20  because the Court has allowed telephonic testimony, but I guess   11:34:28

21  my greater global question is, why didn't you just go into this

22  in your cross-examination?  If it proves the point one way or

23  the other, why was it held for recross?

24      MR. DIETRICH:  Right.  I didn't -- I didn't know that

25  they were claiming that they had stopped production of the     11:34:43

United States District Court

RAHUL MALHOTRA - Redirect

1    furniture as earlier as Mr. Malhotra said in his response to          11:34:46

2    Mr. Israeloff.  It appears from all of the documentation that

3    we had that there was no question that they continued

4    production up to at least August and possibly to the time they

5    got the lawsuit.  So it wasn't -- it was beyond my scope of        11:35:01

6    knowledge.

7              THE COURT:  All right.  This is my ruling.

8              Part of the information is before me -- the

9    information itself, not necessarily the documents that harken

10   to the information is already before me in terms of some of the   11:35:15

11   questions that have been asked and in that sense -- well, not

12   in that sense.  That information is already something that the

13   Court is considering.  I'm going to go ahead and allow the

14   introduction of the information and that is the documents here.

15   One, because it's relevant and, two, because these are           11:35:43

16   Trendily's invoices.  There is no surprise here but I don't

17   need to hear any additional examination on the point.  So I'm

18   going to cut off the recross unless there's some other topic

19   that you needed to go into that is not this.

20             MR. DIETRICH:  No, Your Honor.                          11:36:00

21             MR. ISRAELOFF:  Your Honor, may I question

22   Mr. Malhotra on the basis of these newly introduced documents?

23             THE COURT:  You may.

24

25


United States District Court

RAHUL MALHOTRA - Redirect

**REDIRECT EXAMINATION**                                            11:36:06

BY MR. ISRAELOFF:

Q.    Mr. Malhotra, have you seen the invoice to Adobe Interiors

dated June 29, 2017?

A.    Give me the day, sir, one more time.                         11:36:33

Q.    June 29.

A.    There's one June 26.

Q.    All right.  Let me ask it this way:  Are the invoices in

June to Adobe Interiors part of the 15 pieces that you

testified earlier have been sold?                                  11:37:02

A.    Yes.

Q.    Were these some of the 15 pieces?

A.    Yes.  These three pieces -- I'm still looking at the

invoice now.  Yes.  These three pieces are part of those 15.

Q.    All right.  Next there is an invoice dated August -- it     11:37:19

says ship date August 7 and it says paid with check number.  Do

you see that sales order?

A.    Yes.  I'm looking at it, yes.

Q.    Were these items sold or shipped or canceled or what?

What happened to these sales orders?                               11:37:47

A.    Okay.  There's an MJ Dining Table.  You can look at that

sales order from 8-7.  That has been crossed by the customer.

That means somebody called them that this order is canceled.

So they crossed it.  But there was an MJ office desk which we

already submitted papers that we had that in talking, yes, that   11:38:09

United States District Court

RAHUL MALHOTRA - Redirect

1  was given to him.  It was the check number 1007.                    11:38:14

2  Q.   All right.  On the next page there is a sales order dated

3  ship date, August 3.  Can you explain if that MJ console table

4  was ordered or produced?

5  A.   Okay.  How I fill orders, we receive the customer's          11:38:39

6  inquiry.  Then from inquiry it goes to customer purchase order.

7  They send the purchase order in, then the staff in the company

8  order -- put that on a sales order.  Then the sales order was

9  created.

10       I saw that and I -- I canceled it.  And if you see          11:39:01

11  the paper they submitted in the court, that console has been

12  crossed and the value has been changed by the customer from

13  2199 to 1200.  That means someone from Trendily called them and

14  said, "This paper is not good.  You have to cancel this

15  console.  We cannot do this console so we canceled it."  That's  11:39:23

16  how the customer canceled it and changed the amount.  I didn't

17  change the amount.  That is his handwriting.  He changed the

18  amount.

19  Q.   All right.  Thank you, sir.

20  A.   Okay.  Thank you.                                           11:39:36

21  Q.   Thank you, sir.

22       MR. ISRAELOFF:  No further questions, Your Honor.

23       THE COURT:  All right.  Thank you.

24       Mr. Malhotra, I'm going to excuse you as a witness

25  now.  Of course you can stay on the line as a party.  Thank you  11:39:46

89

1    u sir.                                                                    11:39:49

2         (Witness excused.)

3         THE COURT:  All right.  Counsel, I would like to hear

4    your concluding arguments now and I may have questions for one

5    or both counsel and we'll start with the movant.              11:40:02

6         MR. DIETRICH:  Thank you, Your Honor.  Now, as I

7    said, we filed this injunction back at the same time we filed

8    the complaint and the defendant's motion to dismiss delayed

9    things for a few months but there's no reason not to issue the

10   requested injunction now.                                     11:40:28

11        In their briefing, defendants haven't even disputed

12   three out of the four factors supporting issuance of an

13   injunction.  They haven't disputed the Jason Scott copyright or

14   trade secret claims are likely to succeed on the merits.

15        THE COURT:  Did you say trade secret?                    11:40:45

16        MR. DIETRICH:  Trade dress, my apology.  Trade dress

17   claims on the merits.  Mr. Malhotra admitted to copying Jason

18   Scott furniture.  He may not have known at the time the copying

19   began that it was Jason Scott.  But clearly they intended to

20   copy those furniture pieces.  He admitted to continuing sales  11:41:04

21   after knowing in May 2017 that it was Jason Scott who made the

22   original pieces.

23        And he actually admitted to his attorney,

24   Mr. Israeloff, just a minute ago that he only told the Trendily

25   sales representative to stop pitching the knock-off furniture   11:41:21

United States District Court

11:41:25
11:41:41
11:41:58
11:42:16
11:42:34
11:42:54

1    after getting served with the lawsuit.

2         Now, while Mr. Malhotra claims he didn't know the

3    designs were protected, that is not particularly relevant, but

4    he did know they were protected.  He admitted he received the

5    cease and desist letters.  He has not disputed receiving either

6    cease and desist letter, one sent in May and one sent in

7    July -- or June which makes the infringements willful.  He knew

8    about the copyright registrations and continued to go ahead and

9    sell the knock-offs.

10        Now, defendants haven't disputed that the balance of

11   harms tips sharply in favor of Jason Scott.  We stated in our

12   brief, but being barred from selling knock-offs isn't a

13   legitimate harm.  So there's really no harm to Trendily in

14   issuing an injunction here.  They have made many statements

15   about how they sell hundreds of different pieces of furniture.

16   We're talking about three pieces here.  So they can continue

17   going ahead and selling their hundreds of pieces of furniture

18   minus the three that we're talking about if an injunction

19   issues.

20        If, in contrast, the injunction doesn't issue, then

21   Trendily is free to go ahead and continue making knock-offs,

22   free toll go ahead to continue to undercut Jason Scott's market

23   to attempt to steal his customers, and to threaten his and his

24   dealers' investments.  Defendants haven't disputed an

25   injunction would serve the public interest and I think it's

United States District Court

11:42:56

1    pretty clear under the case law that it would.  The public

2    interest favors upholding the rights of copyright and trade

3    dress holders and protecting the creative energies that go into

4    those designs and so the public interest would be served by

5    entering an injunction here.

11:43:12

6            Now, the only place where a dispute lies is over

7    irreparable harm and we have demonstrated that Jason Scott has

8    suffered irreparable harm here.  You had Mr. Forsberg up here

9    testifying about how he was facing down one of his -- if not

10   his biggest authorized dealer who was saying, "Why are you

11   selling stuff to our competitors down the street?"  You had

12   even his -- his authorized dealer was confused about who was

13   making the knock-off products and thought it was Jason

14   Forsberg.  And Mr. Forsberg himself was confused and thought

15   they are his own products.  In reality, they were Trendily's

16   knock-offs.  You had Ms. Runyon testify that she makes an

17   investment in Jason Scott.  She's made a tremendous investment

18   in Jason Scott and show would be concerned if there were

19   knock-offs everywhere out there.

11:43:32

11:43:52

20           Jason Scott's product is a high dollar product and

21   what Trendily did was target that specifically.  They have

22   admitted to both targeting dealers who are not authorized to

23   sell Jason Scott furniture and targeting dealers that were

24   authorized to sell Jason Scott furniture to try to take them

25   away --

11:44:14

11:44:34

United States District Court

1      In copying cases, the Ninth Circuit and other courts      11:44:39

2  have found irreparable harm in situations before there's harm

3  to business reputation, loss of goodwill, loss of customers and

4  market share, harm to competitive position, customer

5  relationships or negotiating positions.      11:44:53

6      Now, the case law says that this harm is by

7  definition difficult to calculate and difficult to compensate.

8      Plaintiff actually doesn't even need to prove an

9  actual loss of business reputation.  The Central District of

10  California, and this is cited in our brief, but in *Warner*      11:45:13

11  *Brothers v. WTV Systems,* quote, evidence of threatened loss of

12  perspective customers or goodwill certainly supports a finding

13  of the possibility of irreparable harm, end quote.

14      In addition, the disparity of pricing, which we have

15  here with Trendily coming into the market, with lower cost      11:45:33

16  knock-offs, has been recognized as a cause of harm to

17  reputation.

18      It's not a particularly high burden to show

19  likelihood of irreparable harm and *Apple v. Psystar* says that

20  that burden should not be particularly difficult to establish      11:45:55

21  in a copyright case such as this one.

22      Now, we've cited a few cases in our briefs that are

23  on point.  Probably the closest is just fact wise is *Montana*

24  *Silversmiths v. Taylor Brands* and that related to a finding of

25  irreparable harm when a defendant was making knock-offs of a      11:46:18

United States District Court

1    plaintiff's belt buckle design.  The plaintiff had averred that       11:46:22

2    it had devoted years of hard work and investment to the product

3    development.  It had significant consumer goodwill, brand

4    recognition and the defendant came into the market selling

5    knock-offs at a 30 percent discount in the exact same market.          11:46:41

6    The Court found that the harm to business reputation and

7    goodwill was established there.

8         We have *Apple v. Franklin* where the Ninth Circuit

9    found irreparable harm where a defendant was copying Apple's

10   software and they found that Apple had invested time, effort,          11:46:59

11   and money into developing its programs and the copying

12   jeopardized Apple's investment and competitive position.

13        *Apple v. Psystar* is similar.  Psystar actually

14   specifically talks about exclusivity and the importance of

15   Apple being the exclusive producer of certain software and            11:47:21

16   thereby being able to provide customer support for its

17   customers and having a good reputation for doing that and

18   quality control.

19        Here we have Jason Scott who has a long history of

20   selling these three pieces of furniture, over 13 years, Jason          11:47:38

21   Scott is careful to maintain exclusivity over those designs,

22   does not license those designs to anyone else, does not allow

23   anyone else to manufacture the Jason Scott furniture, keeps

24   that exclusive so he can maintain total quality control over

25   his products.  That is completely undercut when we have a lower        11:48:02

1    priced knock-off that you've heard the testimony is almost                11:48:07

2    undistinguishable from the original Jason Scott pieces coming

3    into the market.

4            The only case that the defendants really rely on in

5    their support of a lack of irreparable harm is *LA Coliseum v.*            11:48:25

6    *NFL*.  It's completely in apposite to the situation here.  It

7    has nothing to do with copying trade dress, copyrights.  It had

8    to do with the LA -- with the Oakland Raiders potentially

9    moving to LA and the Coliseum sought an injunction to restrain

10   the use of a contract clause to potentially bar the Raiders               11:48:50

11   from moving but there was no concrete harm at all.  The

12   Coliseum and Raiders never even asked the NFL to vote.  They

13   didn't know if the contract clause was going to be asserted or

14   if there was a three quarter majority necessary to block the

15   move, but they deliberately avoided having such a vote.  And               11:49:10

16   the Court said with regard to that issue, that they are

17   claiming an unreasonable obstacle without first determining

18   whether that perceived barrier was shadow or substance.

19           Here we have proven substantial irreparable harm to

20   Jason Scott's reputation, good will with customers and                     11:49:32

21   competitive position in the marketplace caused by Trendily

22   bringing its knock-offs to market.  That's where the analysis

23   of irreparable harm stops.  We have met our burden of proof.

24   What defendants are trying to do is trying to get the Court to

25   tack on the burden of disproving mootness to Jason Scott as                11:49:54

United States District Court

1   well and that would be erroneous.   They argue that Jason Scott      11:49:59

2   can't prove irreparable harm because defendants voluntarily

3   ceased making the knock-offs.

4            But that's a mootness argument.   They are saying

5   defendant's conduct mooted the injunction request.   But the      11:50:13

6   burden of proof in a mootness argument, is stringent, to quote

7   the Supreme Court and the Ninth Circuit, and it falls on the

8   defendant.   Arizona court, this is *Babbitt v. Goodyear*, held

9   that the voluntary cessation of a questioned practice rarely

10  moots a request for injunctive relief and is extremely unlikely      11:50:36

11  to do so where the voluntary cessation happened after the

12  lawsuit was filed.

13           Now, we have the admission from Mr. Malhotra that he

14  continued to sell these products up through August and the

15  final admission that he didn't tell his sales rep to stop      11:50:57

16  pitching the MJ Collection until after he got the lawsuit.   So

17  I think it's clear that it was the litigation that caused

18  Trendily to pull their products off the market and it never

19  happened beforehand.

20           Now, the Arizona rule is an echo of the Ninth Circuit      11:51:13

21  ruling and this is in *FTC v. Affordable Media*.   And I apologize

22  to the court reporter, I don't think this was in the list of

23  cases to you.   It's 179 F.3d 1228, Ninth Circuit, 1999.

24           The case is very close fact-wise to the case here.

25  The defendants were running an illegal telemarketing operation      11:51:42

United States District Court

1   and the FTC sought an injunction.  The defendants argued that         11:51:46

2   they had voluntarily stopped and there was no need for an

3   injunction.  The Ninth Circuit disagreed, stated that it's

4   well-settled that an injunction isn't mooted because conduct

5   complained of is terminated if there's a possibility of            11:52:07

6   recurrence because otherwise the defendant could just return to

7   their old ways.

8        The test for mootness in such cases, the Ninth

9   Circuit said, is a stringent one and while the Ninth Circuit

10  said a victim potentially could moot the injunctive request on    11:52:23

11  their own, it's extremely difficult for a defendant to make an

12  injunctive request moot.

13       The defendant must show, and this is a quote, must

14  show that subsequent events have made it absolutely clear that

15  the allegedly wrongful behavior cannot be expected to recur.      11:52:42

16       And as I said, the Ninth Circuit rejected the

17  defendant's argument that because they said it wasn't going to

18  recur, it, therefore, wasn't going to recur.

19       There was nothing in place, no court order in place

20  to enforce the defendant's word and it is in infringement cases   11:53:00

21  and we've cited these in our brief, but *W.L. Gore v. Garlock,*

22  and *General Electric v. New England Electric* from over 100

23  years ago where they found even then that it was

24  well-established that if an infringer just said, "I'm not going

25  to make the infringing product any more," that wasn't good        11:53:22

United States District Court

11:53:24

1    enough.  They said if they say that, then it supports an

2    injunction rather than detracting from one because if the

3    infringer is going to be true to his word, then there's no harm

4    to the infringer by entering an injunction.

11:53:40

5        If the infringer not going to be true to his word,

6    then, as *General Electric* says, the Court should put a heavy

7    hand on them.  This is the kind of case where that would apply.

8    We have Mr. Malhotra claiming that he doesn't have plans or

9    desires to restart manufacturing the accused products and we

10   have nothing else.  He's admitted that he owns and operates or

11:54:01

11   has direct access to a factory in India, that we have seen can

12   clearly crank out almost identical knock-offs at the mere

13   request from Mr. Malhotra.

14       He had the chance to stop infringing before we filed

15   the lawsuit.  He admits to getting two cease and desist letters

11:54:27

16   that didn't have any effect.  His response was, well, I should

17   have replied to the second one.  Why not the first one?  Would

18   your reply have been, "I'll stop.  Fine," maybe we wouldn't be

19   here but he didn't.  He kept on selling the knock-offs.  As we

20   said, this is essentially a smash and grab with getting

11:54:48

21   everything out on the market, selling it as fast as he can and

22   then just facing the lawsuit when it comes.

23       There's nothing that makes this clear that the

24   wrongful behavior can't be expected to recur.  Without an

25   injunction, he could turn to his factory tomorrow and say,

11:55:09

 1    "Hey, start up making the knock-offs again."  It would flip the          11:55:12
 2    burden of mootness on its head to lump it in with irreparable
 3    harm.

 4           We have proven on behalf of Jason Scott irreparable
 5    harm.  It's not Jason Scott's burden to disprove mootness.               11:55:23

 6           For these reasons, we request that the Court issue
 7    the proposed injunction to restrain and prevent further
 8    infringements, to require production of the sales records
 9    relating to the knock-off products and to ensure that evidence
10    isn't destroyed in the course of the case.                              11:55:47

11           THE COURT:  All right.  Thank you, Mr. Dietrich.  The
12    first question goes to what you spent the lion's share of the
13    time on which is the fact of irreparable harm.  If the Court
14    were to take everything that you said as true, it would have no
15    trouble concluding that harm has occurred.  What makes it               11:56:03
16    irreparable?

17           MR. DIETRICH:  Irreparable harm has been defined as
18    damaged reputation, damaged to business, goodwill.  It's
19    difficult to calculate and plaintiff does not need to calculate
20    it with specificity but --                                              11:56:21

21           THE COURT:  No.  And I'm sorry to interrupt you.

22           MR. DIETRICH:  Sure.  No, that's okay.

23           THE COURT:  I want to keep this efficient.  It
24    doesn't have to calculate with specificity but I take it, then,
25    it's your position that this is not something that can be               11:56:35

United States District Court

1       addressed with money damages?                                    11:56:37

2                MR. DIETRICH:  Correct, Your Honor.

3                THE COURT:  Because if plaintiff prevails at trial,

4       that is where this goes is damages.  So why can't the

5       confusion -- why can't the goodwill issues be addressed by a     11:56:49

6       quantifiable number even if you can't quantify it now?

7                MR. DIETRICH:  I don't know that it is quantifiable

8       which is the definition of irreparable harm.  We have dealers

9       out there who bought from Jason Scott, who invested in Jason

10      Scott and who now, as our declaration has made clear that, one,  11:57:07

11      it's possible that Trendily is putting this product out there

12      for a price much lower than Jason Scott's price.  They know

13      that they are no longer exclusive.

14               If they are facing the possibility that knock-offs

15      are out there, the dealers lose all of the exclusivity that      11:57:26

16      they have and they invest heavily in Jason Scott's product as

17      Mr. Forsberg said.  They advertise it.  We have included in our

18      declaration a copy of the Brumbaugh advertisement with some of

19      the original pieces in it.  The likelihood that they are going

20      to do that if there are cheaper knock-offs out there, is lower   11:57:45

21      and --

22               THE COURT:  So you're not saying I have to be

23      concerned about any losses to them?  They are not plaintiffs in

24      this case.  What you're getting to is the net effect --

25               MR. DIETRICH:  Right.                                    11:57:56

                        United States District Court

1       THE COURT:  -- of their decreased efforts on Jason

2  Scott's brand and profits?

3       MR. DIETRICH:  Right.  And the effect on Jason

4  Scott's reputation in the marketplace is going to decline, his

5  competitive position is absolutely going to decline when there

6  are cheaper knock-offs out there that everybody has said are

7  very, very, very close to the originals.

8       Now, it was in the *Montana Silversmiths* case that I

9  referred to where the Court found a very similar product came

10  on the market at a 30 percent discount.  And just the evidence

11  of that significant discount was enough to show that it was

12  damaging to consumer -- to the business reputation to

13  constitute irreparable harm.

14       THE COURT:  Doesn't that all ultimately translate to

15  dollars in the following way:  Plaintiff knows what his

16  business does right now.  And if the status quo or some trend

17  that has been demonstrated doesn't continue, you know what the

18  dollars are, don't you?

19       MR. DIETRICH:  I think that falls in the definition

20  of being difficult to calculate.  I don't know that -- I mean,

21  there's a lot of business trends together.  Tying one directly

22  and coming up with dollar amount to that, I suppose if you

23  engaged in complicated regression analyses, maybe an expert

24  could come up with something by canceling out other factors.

25  But that would be I think the extremely difficult to calculate

11:57:56

11:58:10

11:58:25

11:58:43

11:58:58

11:59:21

101

 1   analysis that supports a finding of irreparable harm.                    11:59:27

 2              THE COURT:  All right.  Thank you, sir.

 3              My next question would be this.  If I have it correct

 4   from the attachments to the complaint, the copyrights for the

 5   Iron Star desk, Sacred Heart dining table, and the Borgota        11:59:43

 6   Buffet were effective the middle of May of 2011; is that right?

 7              MR. DIETRICH:  That is correct, Your Honor.

 8              THE COURT:  May 15.

 9              MR. DIETRICH:  Sounds right.

10              THE COURT:  Does the Court correctly understand the     12:00:01

11   allegation of infringement to apply only to those MJ Collection

12   pieces that were offered for sale after that date or is -- or

13   should I understand otherwise?

14              MR. DIETRICH:  I believe lost profits are recoverable

15   in relation to copies that are sold even before that date.        12:00:15

16              THE COURT:  All right.  So I guess that's not really

17   a germane question for purposes of a preliminary injunction

18   hearing?

19              MR. DIETRICH:  I agree with that, yes.

20              THE COURT:  All right.  The next question I have for    12:00:32

21   you is, if you are to prevail here, you are suggesting that a

22   $5,000 bond is sufficient to afford the protection, that is the

23   bond is intended to.  In the Court's experience in having

24   granted past injunctive relief, that is by far and by a small

25   fraction the smallest bond that anybody has requested.  And I      12:01:01

                        United States District Court

1    read what you said about it, essentially, and I don't want to    12:01:06

2    paraphrase too tightly; but for purposes of understanding, the

3    legal justification for that is the case law that indicates

4    that there's sort of a sliding -- almost an inverse sliding

5    scale there which is that the more likely the success on the    12:01:23

6    merits, the smaller the bond can be.

7            Is that your argument or is there more to it?

8            MR. DIETRICH:  There's a little bit more to it.  I

9    think you were accurate in that statement but there's also the

10   fact -- we said in our declaration Jason Scott is a very small    12:01:40

11   company with two employees in the U.S., Mr. Forsberg and his

12   wife.  And requiring them to put up a larger bond would be very

13   burdensome to do -- and that in part goes to the merits.

14   But --

15           THE COURT:  But what's the purpose of the bond?    12:02:01

16           MR. DIETRICH:  I believe it's to compensate the

17   defendant if the injunction is wrongfully issued and I guess

18   you going to go into the idea that we also have the fact that

19   defendants have claimed they only have four pieces of furniture

20   I believe still in their possession or possibly -- I believe it    12:02:17

21   was four, that they are keeping those -- that they sell

22   hundreds of other furniture products so I don't believe that

23   the damage to the defendant from the issuance of an injunction

24   would be significant.

25           THE COURT:  All right.    12:02:35

                    United States District Court

1          Next question I have for you, the suggestion or the          12:02:36

2    request that if the Court were to grant the injunctive relief,

3    one of the elements of that would be to impound furniture.  I

4    know I've heard evidence from the defense about the volume of

5    furniture involved at issue now, it's four pieces.  I know that     12:02:53

6    the plaintiff's position is it may well be four but it may well

7    be a lot more than four.  My question to you is, as a practical

8    matter, how would the Court impound?  As you can see, we have

9    limited room in here but, candidly, the Jason Scott Collection

10   doesn't really match what we've got in the courtroom.              12:03:10

11         What would you be proposing?

12         MR. DIETRICH:  Your Honor, we're willing to withdraw

13   our request to impound the furniture given defendant's

14   statement that they only have four pieces and are not going to

15   be reselling them.                                                 12:03:23

16         THE COURT:  I think that might be all I have for you

17   right now, Mr. Dietrich.  Thank you.

18         MR. DIETRICH:  Thank you, Your Honor.

19         THE COURT:  And Mr. Israeloff?

20         MR. ISRAELOFF:  Thank you, Your Honor.  First a             12:03:41

21   preliminary note.  As the Court can assess from today's

22   testimony there, is a dispute as to whether or not these pieces

23   do, in fact, cross the line between, quote/unquote, similar

24   furniture and, quote unquote, improper copies of what is

25   designed, of what is protected.  Even Mr. Forsberg's own           12:04:05

1    brother said everybody copies everything.  It wasn't just

2    evidence from the defendants.

3         Mr. Forsberg himself admitted that his particular

4    designs are simply, vines, flowers, and that they are not

5    unique vines or unique flowers.  They are not a religious

6    symbol from Indonesia or anything that is totally unique to

7    him.  Understand there is an overall design and look and feel

8    to furniture.  I'm not discounting that.  But there is a very

9    good faith dispute over whether or not these pieces crossed the

10   line so to speak.

11        One note about proportionality and that is at least

12   it overlays the rest of what this Court is deciding this

13   morning and that is we are talking about a company that makes

14   hundreds and hundreds of pieces of furniture.  It's not, as the

15   opening comments alluded to, it's not a knock-off artist that

16   just runs around making knock-offs of furniture pieces that

17   sell for $7,000 apiece.

18        It is a legitimate 13-, 14-year-old company that

19   makes hundreds and hundreds of products, never been accused of

20   being a knock-off artist.  The proportionality comes in that

21   this was three pieces of furniture that were requested by a

22   customer with photos and a grand sum total in the world of only

23   18 pieces were ever made total.  We're not talking about

24   100,000 or anything at all.  So the proportionality of a

25   preliminary injunction, and indeed this whole lawsuit, is

United States District Court

12:04:12

12:04:28

12:04:51

12:05:08

12:05:29

12:05:51

12:05:58
12:06:18
12:06:44
12:07:05
12:07:28
12:07:48

1   really seriously in question.

2           But getting more to the injunction issue, I would

3   submit that the proof is in the pudding in terms of whether or

4   not there is a likelihood, not just a fear but a likelihood

5   that the plaintiff will suffer irreparable harm in the absence

6   of preliminary relief.  Mr. Malhotra testified that there was

7   no other production and that is even confirmed with the

8   shipping containers.  All of that sales talk, if you will, is

9   not in actuality -- everybody said, "Well, I'll have to check.

10  I'll have to look.  I'll have to say I don't know," and it

11  turns out there were no mass quantities of this kind of

12  furniture on shipment.

13          But more to the point, this injunction request was

14  not needed before the lawsuit was every filed.  And when I say

15  the proof is in the pudding, I'm referring to the two overt

16  attempts just before this lawsuit was filed to order some more

17  pieces.  I mean clearly to create evidence or create

18  jurisdiction or create whatever, Mr. Forsberg himself tried to

19  get Extravagance Designs to place an order.  And as

20  Mr. Malhotra said, they did try and they were turned down.

21  That was before this lawsuit was ever filed.  That was despite

22  a very, very urgent attempt to buy, Mr. Forsberg using a phony

23  name.

24          The other one was this late last-minute information

25  from Adobe Tanner of Adobe Interiors where there was an invoice

United States District Court

or a sales order perhaps generated late, just before this    12:07:57

lawsuit, in August I believe and, lo and behold, it was

canceled.  Proof is in the pudding.  This wasn't just a promise

that something is not happening.  There's proof with two pieces

of concrete evidence that what Mr. Malhotra says is accurate,    12:08:15

no more production, long before this lawsuit.  No more sales

before this lawsuit was filed.

Getting on to the Court's questions about irreparable

injury, I was going to argue the same point and I think the key

piece of evidence for that point is the testimony of Ms. Runyon    12:08:39

in response to counsel's question about, well, if you get these

cheaper almost identical knock-offs, then aren't you going to

quit doing business with Jason Scott?  And her answer surprised

everybody and she said, "No, no.  I'm going to stick with Jason

Scott."  Even knowing that there are these knock-offs out there    12:09:05

for less money, "I will not change my habit."

There is no other evidence of a loss of a single customer

or confusion by a single customer or a loss of revenue even at

this early stage

THE COURT:  Let me ask you a question about that    12:09:28

particular contention, Mr. Israeloff, because I think one of

the first things that Mr. Forsberg, that is Jason Forsberg,

said in his testimony today was in relating the story of the --

not Ms. Runyon but another retailer who approached him in

somewhat urgent or I might even characterize as irate fashion    12:09:50

1    who seems to have a different reaction to this.                    12:09:55

2            MR. ISRAELOFF:  Certainly.

3            THE COURT:  And so I guess since you're arguing now,

4    I want to hear why the Court should conclude that the majority,

5    if not everybody, is going to react the way Ms. Runyon did as    12:10:06

6    opposed to -- and I can't remember the other person's name.

7            MR. ISRAELOFF:  Yeah.  I recall the testimony and

8    that was all it was.  It was an irate inquiry.  Is this

9    happening?  Can you explain yourself, whatever it is?  And that

10   is it.  That is not an irreparable injury.  It's an inquiry.     12:10:23

11   There was no testimony of any lost souls, lost sales, lost

12   customers.  All it is is supposition and worry and concern

13   coupled with the fact that it's all stopped now anyway.

14           The standard of course was cited in the motion itself

15   and that is plaintiff must establish that he is likely to        12:10:52

16   suffer irreparable harm in the absence of injunctive relief,

17   the *Winter v. Natural Resources Council, Inc.,* Supreme Court

18   case with the highlighted quote or the pinpoint cite saying:

19   Our frequently reiterated standard requires plaintiffs seeking

20   preliminary relief to demonstrate that irreparable injury is     12:11:19

21   likely, emphasized word, in the absence of an injunction.

22           Everything in terms of this injury from the testimony

23   today always comes back to dollars.  What you are selling these

24   knock-offs for, less than I am, and that is, by definition,

25   something capable of reparations in the form of a monetary       12:11:44

United States District Court

1    judgment should you get one.                                    12:11:50

2          One note quickly on the bond amount, Your Honor, I

3    acknowledge Mr. Malhotra saying they are not doing it any more.

4    But on the other hand, the request for a reduced bond contains

5    no evidence of finances whatsoever.  A two-person company would  12:12:09

6    have $100 in revenue, it could have $10 billion in revenue.  No

7    evidence of how much money they have made.  We have heard only

8    that they are a hugely successful company.  They have 200

9    employees in Indonesia.  They sell all over the southwest.

10   They have done so for years and years and some of their pieces  12:12:31

11   sell for up wards of $7,000 -- retail, I'm sorry, a couple

12   thousand dollars at the wholesale level.

13         There is no evidence to support the idea that they

14   should be treated any differently for financial reasons because

15   they introduced no evidence of their finances.                  12:12:53

16         Thank you.

17         THE COURT:  All right.  Thank you.

18         I have one more question for you, at least one more

19   question for you, Mr. Israeloff, and the first is this:  Given

20   the position that the defendants have taken, which is we had     12:13:08

21   three pieces that we hadn't sold, we're not selling.  We went

22   and got one back and we're not going to sell that one and we

23   don't intend to go forward with the manufacture or the selling

24   or the offers to sell in the future.  Why not just enter a

25   consent decree on the issue and say without -- you know, we      12:13:36

                    United States District Court

1  will vigorously defend the issue of willful infringement and   12:13:40

2  save everybody the headache and having you having to travel

3  here from Texas and all the other?  I'm not trying to get into

4  the strategy of a party but I'm curious as to -- I mean, what

5  is the -- another way to ask this is, what is the hardship to   12:13:56

6  the defendants?

7          MR. ISRAELOFF:  Well, it boils down to simply impact

8  and weight and strategy in a litigation.

9          In my experience in intellectual property matters,

10  whenever a plaintiff wants to sweep in with, you know, a   12:14:15

11  blitzkrieg style lawsuit and get everything up front they put

12  it in the form of a preliminary injunction, puts the defendant

13  immediately on the defensive.  Immediately running up a lot of

14  money.  Immediately having to try a mini-trial on an

15  evidentiary-based motion, all on a hurry-up basis in a few   12:14:37

16  weeks solely to obtain leverage and that is all it is.

17          In this case, we respectfully say there is no need

18  for that and there is no real purpose served other than giving

19  a plaintiff a win so to speak, preliminary win, and, therefore,

20  leverage further as it comes to settlement negotiations.  It's   12:15:04

21  really not much more complicated than that.

22          THE COURT:  All right.  I understand the argument

23  that you're making and as a member of the Court and sensitive

24  to sort of the inappropriate leveraging by a party of a

25  position, but there is one factor here that is sort of left out   12:15:25

1   of that analysis and that was the fact that there were not one          12:15:29

2   but two cease and desist letters that went out and were met

3   with silence.  And so what is the plaintiff to think when they

4   can't get a response and they don't know that the universe may

5   only be 18 pieces and they don't know whether things are coming   12:15:39

6   in in container ships?

7            MR. ISRAELOFF:  Well, it's understandable to bring

8   the lawsuit.  I might add on the flip side, they have tried to

9   buy one through Extravagance Designs and it was only after that

10  was turned down that they brought this lawsuit with the          12:15:53

11  injunction request.

12           But be that as it may, understandable as the lawsuit

13  itself may be, the request for a preliminary injunction is not,

14  and the evidence as it turns out in our view, wouldn't support

15  it.                                                               12:16:12

16           THE COURT:  All right.  Thank you, Mr. Israeloff.

17  Let me just check my notes to make sure I haven't missed any

18  more questions I have for either of you.

19           MR. ISRAELOFF:  We'll be happy to answer as many

20  questions as the Court might have.                               12:16:25

21           THE COURT:  All right.  Counsel, I think that does

22  exhaust the questions that I have for you.  If you can be

23  patient with me for a few moments, I'll step off, organize my

24  thoughts and determine whether I can give you a ruling right

25  now or whether I'm going to have to commit it completely to      12:17:13

111

1   writing.                                                    12:17:17

2          If anybody needs to take a comfort break or a

3   restroom break, please feel free.  We won't resume until

4   everyone is back.  I'll be at least eight minutes.

5          MR. DIETRICH:  Thank you, Your Honor.                12:17:29

6          COURTROOM DEPUTY:  I'm going to mute the phone call

7   at this time.

8      (Recess at 12:17; resumed at 12:32.)

9          THE COURT:  Please remain seated everyone.  Thank

10  you.                                                        12:32:44

11         All right.  Gentlemen, thank you for your patience.

12  I am able to render a ruling today.  There will be a hard copy

13  of an order coming out later that references this but I want to

14  make sure that there is on the record today as fulsome as

15  possible a justification for the Court's decision.  I want to   12:33:22

16  start by making a couple of general observations that govern

17  the ruling essentially.

18         The Court, obviously, wants to observe that the

19  purpose of a preliminary injunction, if justified, is to

20  maintain the status quo and nothing else until a fulsome       12:33:45

21  decision on the merits can be made after an actual trial.

22         And while the Court understands or recognizes that a

23  finding in a preliminary injunction motion has no bearing on

24  the ultimate determination by the finder of fact after the

25  trial, the exercise of the Court's authority to enjoin actions  12:34:09

United States District Court

112

1   by a respondent, nonetheless, is an extraordinary measure          12:34:14

2   unlike almost anything else the district court does, which is

3   not to be taken lightly.

4          Turning to the elements, I'm going to start with the

5   issue of likelihood of success on the merits and not a          12:34:29

6   surprise, the Court simply notes, this was not the focus of

7   defendant's argument.  The defendant did not contest seriously

8   or otherwise the issue of likelihood of success as a strategic

9   matter, nothing wrong with that.  As a result of that, under

10  the local rules, Court is entitled to take that non-opposition   12:34:50

11  as acquiescence as to the point.

12         But even if I didn't have that situation, the

13  presumption of validity of the copyrights duly issued in May of

14  this year starts down that road and the Court would also find

15  with regard to any infringement of a copyright a couple of      12:35:17

16  things.  First, another preliminary observation which is that

17  several witnesses, primarily plaintiff's witnesses, or maybe

18  all of plaintiff's witnesses had testified today to their

19  understanding and their expectations as to what is protected by

20  copyright or trade dress.                                        12:35:34

21         The Court of course bases its ruling on what is

22  actually protected, as a matter of law, by copyright, not such

23  understanding and expectations.

24         When I look at it and apply the objective and

25  subjective test that is required and recognizing that it is the 12:35:54

United States District Court

113

1    design itself and not the furniture or any physical features or          12:36:00
2    functionality of the furniture that can be protected by
3    copyright, it is my conclusion that the objective and
4    subjective branches of the test are both likely to be
5    satisfied.                                                                12:36:16

6           And so the first factor, likelihood of success on the
7    merits, falls in favor of granting a preliminary injunction.

8           The balance of harms or equities likewise falls in
9    favor of granting injunctive relief here.  That was really the
10   point of my last question to Mr. Israeloff because if the tests          12:36:35
11   are -- let me start with the plaintiffs.  If the plaintiffs are
12   entitled to injunctive relief and they don't get it, much of
13   the hearing was focused on the fact that there would be
14   hardship to the plaintiff.  Whether it is directly translatable
15   to dollars or it is not, Court has no trouble making that                12:36:59
16   finding.

17          On the other side of the equation, the defendants
18   have already indicated we had three pieces.  We're not selling
19   them.  We had a fourth piece we brought back, we're not selling
20   it.  That represents the universe of materials that potentially          12:37:12
21   infringe and we're not planning on taking any action on
22   anything that is protected by the copyrights.  So, again, it
23   begged the question what would the harm be to the defendants?
24   And the Court doesn't see any.  And so that factor falls in
25   favor of injunctive relief.  And for similar reasons, the                12:37:34

United States District Court

| | |
|---|---|
| 1 | public interest factor also falls in favor of protecting valid | 12:37:36 |
| 2 | copyrights if that's the case. | |
| 3 | So this really comes down to the issue of whether or | |
| 4 | not irreparable injury has been demonstrated for purposes of | |
| 5 | this hearing by plaintiff.  I want to start by observing that | 12:37:51 |
| 6 | the plaintiff had the law exactly right on the mootness issue. | |
| 7 | That burden falls on the defendant and I don't have my notes | |
| 8 | uniformly in front of me now, but one of the last cases that | |
| 9 | Mr. Dietrich referenced that essentially go through the logic | |
| 10 | diagram, the Venn diagram on both sides, that where a defendant | 12:38:13 |
| 11 | has unilaterally ceased to take action, which is the basis of | |
| 12 | the complaint, if that person never moves forward again with | |
| 13 | such potentially infringing actions, then we don't have an | |
| 14 | issue.  But if they do, there's nothing to stop them and that | |
| 15 | is -- that's the problematic area and unilateral cessation of | 12:38:37 |
| 16 | potentially infringing actions is not adequate under the law. | |
| 17 | So the mootness is really not where the issue lies. | |
| 18 | The Court spent most of its time considering the | |
| 19 | issue of whether the harm is truly irreparable and that's why I | |
| 20 | spent so much time questioning you in particular, Mr. Dietrich, | 12:38:58 |
| 21 | on the issue along the lines of can't this really be reduced to | |
| 22 | dollars? | |
| 23 | What I have -- backing up a little bit, the evidence | |
| 24 | in front of the Court presents the -- again, more than the | |
| 25 | possibility that infringing conduct could go on without | 12:39:26 |

United States District Court

1    injunctive relief and the evidence that backs that up is the                    12:39:34

2    conduct of the defendants and/or their agents after May 15 and

3    then again after July 1, which is the easier date to deal with,

4    because at that point, Mr. Malhotra's testimony is at that

5    point, "I knew exactly what I was dealing with.  I had copies          12:39:54

6    of the copyright certificates and I had drawn a line at that

7    point and said we aren't going to take any actions that might

8    potentially result in infringement."  Yet we had a couple of

9    instances of Mr. Malhotra having communications with people

10   where they were still discussing the MJ line.                          12:40:15

11          I would note that Mr. Malhotra testified he did not

12   use the Jason Scott name after July 1 or mention similarities

13   after July 1 when that second cease and desist letter came out

14   but that, of course, is not the issue.  The issue is whether

15   the defendants had and tried to sell MJ Collection materials or        12:40:38

16   items after the copyright issued and certainly after they knew

17   of the copyright.  And the Court has, at a minimum, the August

18   15, 2017, recording of Mr. Sanders and Ms. Dykes trying to sell

19   MJ Collection materials that day and beyond that, actually

20   talking about similarities with the Jason Scott Collection.           12:40:59

21          Based on the testimony that the Court heard, Sanders

22   may or may not work for the defendant.  There is a very good

23   chance that it pans out that he works for a contractor.  That

24   may be relevant to the ultimate liability issue for defendants.

25          But for purposes of the preliminary injunction                 12:41:21

1   hearing now, his status as an agent of the defendant, either as          12:41:23

2   a direct employee or as a contractor acting under directions

3   and for the benefit be of Trendily, is a live issue for

4   infringement.

5           A similar and related issue is that Sanders and Dykes            12:41:48

6   may not be authorized to peek into or bind Trendily and at a

7   trial that may be fleshed out more fully than here.  But the

8   Court finds evidence that is presented is sufficient to create

9   a substantial question as to whether the infringing items were

10  imminently arriving based on things that they discussed with            12:42:05

11  Ms. Runyon and in significant numbers.

12          The testimony seemed to narrow down on a number and

13  it is defendant's position, which may bear out that there were

14  only 18 pieces in the universe of MJ Collection, four of which

15  at least Trendily has now because it never sold or because it           12:42:52

16  got it back.  The defendant argues there's no imminent --

17  irreparable harm because no more pieces will be sold and that

18  may be true.  But in these circumstances, the plaintiff is

19  entitled to conduct discovery to determine the extent of that

20  production and the preliminary injunction in that case would do         12:43:10

21  exactly what it's supposed to do, which is to maintain the

22  status quo while that happens.

23          The Court of course assumes respondent's compliance

24  and has no reason to doubt that respondents would comply which

25  would maintain that status quo.                                         12:43:28

United States District Court

1       Back to the issue of whether or not the harm                    12:43:31

2   highlighted and argued by plaintiff is irreparable here.   The

3   Court finds that the harm is irreparable because the evidence

4   was that it affected plaintiff's reputation, goodwill, and

5   exclusivity, none of which are easily quantifiable.   It reminds    12:43:53

6   me of a quote from a no-too-long-ago movie:   "When everyone is

7   special, no one is."   And the exclusivity of the collection is

8   part of the calling card and it may have a direct market --

9   translatable market effect that can be quantified by sales and

10  it may not.   In some aspects, it's a psychic value beyond that     12:44:20

11  which is very default to quantify.   The same, probably more so,

12  with things like goodwill and reputation.   And for all of those

13  reasons, I find that the four factors for the granting of

14  injunctive relief here to maintain the status quo only are met

15  and so a preliminary injunction will issue.                         12:44:42

16      With regard to the question of the bond, the Court

17  will require an $8,000 bond, the math is simple.   If there

18  really are four pieces and that's the universe and the sales

19  price is somewhere in the neighborhood of $2000, that should be

20  adequate.                                                            12:45:02

21      I am not going to order impoundment and so those are

22  the features of the contours of the injunctive relief that will

23  issue.

24      I want to make the note on the record that the matter

25  was not only ably argued on both sides but professionally as        12:45:27

United States District Court

1   well, and that is very important to this Court for obvious   12:45:30

2   reasons, that the lawyers understand they must and they do and

3   they have here remembered that they are not their clients and

4   they have different duties to the Court.  And those duties also

5   run to their clients to maintain that professionalism and   12:45:47

6   collegiality and open line of communication between opposing

7   counsel so that no opportunity to resolve parts of an issue or

8   all of an issue to their client's benefit is ever missed due to

9   a lack of communication or professionalism.  I just want to say

10  it one more time.  I appreciate it, both counsel.  Thank you.   12:46:09

11          I end by asking to ensure that both parties

12  understand the ruling and then the order will follow, but it

13  will address only what the injunction is.  I'll start with

14  Mr. Dietrich.  Do you believe you understand the ruling.

15          MR. DIETRICH:  Yes, Your Honor.   12:46:33

16          THE COURT:  And Mr. Israeloff, same question?

17          MR. ISRAELOFF:  Yes, sir.

18          THE COURT:  Thank you very much.  It was a pleasure

19  having you in the court this morning.

20          And we are adjourned.  Good day.   12:46:40

21          MR. DIETRICH:  Thank you, Your Honor.

22          MR. ISRAELOFF:  Thank you, Your Honor.

23      (Whereupon, these proceedings recessed at 12:46 p.m.)

24                      * * * * *

25

United States District Court

1                    C E R T I F I C A T E                                    12:46:44

2

3           I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of       12:46:44

6    Arizona.

7

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled     12:46:44

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15          DATED at Phoenix, Arizona, this 15th day of January,     12:46:44

16   2018.

17

18

19

20                        s/Elaine M. Cropper                        12:46:44

21                        _____

22                         Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                   12:46:44

                        United States District Court