Kenneth H. Brendel (#019003)
Thomas E. Dietrich (#031299)
MANGUM, WALL, STOOPS & WARDEN, PLLC
100 N. Elden St.
Flagstaff, AZ 86001
Tel. 928.779.6951
kbrendel@mwswlaw.com
tdietrich@mwswlaw.com

*Attorneys for Plaintiff Jason Scott Collection, Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Scott Collection, Inc., an Arizona corporation,<br><br>Plaintiff,<br><br>v.<br><br>Trendily Furniture, LLC, a Texas limited liability company; Trendily Home Collection, LLC, a Texas limited liability company; Rahul Malhotra, an individual; John Doe Corporations 1-10; and John Does 1-10,<br><br>Defendants. | Case No. 2:17-cv-02712-JJT<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(ORAL ARGUMENT REQUESTED)** |

Jason Scott Collection, Inc. ("Jason Scott") moves for summary judgment against Trendily Furniture, LLC, Trendily Home Collection, LLC, and Rahul Malhotra ("Defendants" or "Trendily") on all claims. Defendants deliberately copied Jason Scott's original designs then pitched knockoffs at cutrate prices to Jason Scott's authorized retailers and their competitors. Jason Scott's customers—retailers with decades of experience—could not tell Defendants' copies from Jason Scott originals. Defendants ignored two cease-and-desist letters and then tried to sell knockoffs of even more Jason

Scott pieces. Jason Scott was forced to sue to protect its business. The undisputed evidence supports judgment for Jason Scott and an award of damages and attorneys' fees.

This motion is based on the following Memorandum of Points and Authorities, the attached Separate Statement of Facts and exhibits thereto, pleadings on the record, and any other pleadings, evidence, or arguments as may be submitted to the Court.

RESPECTFULLY SUBMITTED this 11th day of January, 2019.

By /s/ Thomas E. Dietrich

Kenneth H. Brendel
Thomas E. Dietrich
Mangum, Wall, Stoops & Warden, PLLC
100 N. Elden St.
Flagstaff, AZ 86001

*Attorneys for Plaintiff Jason Scott Collection, Inc.*

## MEMORANDUM OF POINTS AND AUTHORITIES

I. **Statement of Facts**

A. **Jason Scott Designs and Sells Unique Furniture**

Jason Scott has made and sold original furniture since 1998, when its owner, Jason Forsberg ("Forsberg") moved to an Indonesian island and began designing pieces from local reclaimed teak. [Separate Statement of Facts ("SSF") ¶ 1] Forsberg creates all of Jason Scott's designs. [*Id*.]

Jason Scott's first furniture line was named the "Jason Scott Collection." [SSF ¶ 3] Forsberg designed pieces in that line to maintain a cohesive overall look and feel, which includes: numerous detailed carvings and ornate metalwork; finishing with a process that creates a certain range of coloration; and a large-scale appearance from the use of thick pieces of reclaimed teak. [*Id*.] Jason Scott's designs and overall look are unique and recognizably Jason Scott. [SSF ¶¶ 5-7] Jason Scott furniture does not fit into a particular

style; it has its own style. [SSF ¶ 8] Jason Scott's designs have received unsolicited media attention. [SSF ¶ 29]

Jason Scott carefully maintains its network of authorized retailers, restricting the geographic territories of dealers to maintain exclusivity and avoid cannibalizing sales. [SSF ¶¶ 2, 16] This territorial protection is extremely important to Jason Scott retailers and is critical to Jason Scott's business. [SSF ¶ 17]

**B.     The JSC Pieces Key Products for Jason Scott**

Forsberg designed the Sacred Heart Dining Table, Iron Star Desk, and Borgota Buffet (the "JSC Pieces") for the Jason Scott Collection line. [SSF ¶ 9] The designs are original and not based on any prior common source. [*Id*.] Jason Scott owns copyright registrations for the decorative sculptural designs on each of the JSC Pieces (the "JSC Copyrights"). [SSF ¶ 11]

Forsberg designed the JSC Pieces to have the same overall look and feel as other pieces in the Jason Scott Collection line. [SSF ¶ 9] The JSC Pieces have the unique look that Jason Scott customers recognize as originating from Jason Scott. [SSF ¶ 14]. Jason Scott holds protectable trade dress (the "JSC Trade Dress") in the appearance of the JSC Pieces. [SSF ¶ 13] The JSC Pieces are among Jason Scott's best-selling pieces. [SSF ¶ 10]

**C.     Defendants Intentionally Copied Photos of JSC Pieces**

Defendants are located in Dallas, Texas. [SSF ¶ 18] Defendants had broad access to the JSC Pieces via national, regional, and local print ads; TV ads; and online and trade show displays. [SSF ¶¶ 22-29] The parties also are direct competitors. Two of Jason Scott's largest dealers—Brumbaugh's Fine Furnishings ("Brumbaugh's") and Hill Country Interiors ("Hill Country")—are Trendily's largest customers. [SSF ¶ 23] Many other Jason Scott dealers buy from Defendants. [*Id*.] Malhotra and Trendily sales rep Chris Sanders ("Sanders") regularly visited those stores and saw Jason Scott pieces there. [*Id*.]

In late 2016, Defendants manufactured the MJ Dining Table, MJ Desk, and MJ

Sideboard (the "Accused Products") by copying pieces from photographs. [SSF ¶ 30] Defendants copied the pieces in the photos as closely as possible, without any modification. [*Id.*] The result was Trendily pieces that were identical imitations of the JSC Pieces. [SSF ¶¶ 30-34]

Sanders recognized the Accused Products looked like Jason Scott when he first saw them, and so did Defendants' customers. [SSF ¶¶ 35-36] Retailers testified the Accused Products were visually identical to the JSC Pieces. [SSF ¶¶ 37-38, 41] Multiple Jason Scott retail customers could not identify any elements of the Accused Products that distinguished them from the JSC Pieces and, on seeing photos of the Accused Products, believed them to be real Jason Scott pieces. [SSF ¶ 37] Even Trendily's sales rep could not distinguish the knockoffs from the originals. [SSF ¶ 39]

Defendants initially sold Accused Products to Western Heritage and Adobe Interiors ("Adobe"), DFW-area competitors of Brumbaugh's. [SSF ¶ 43] Adobe put a photo of the MJ Table on its website, where it was seen by Sally Brumbaugh. [SSF ¶ 45] She thought the table was a real Jason Scott piece and accused Forsberg of violating their exclusivity agreement. [*Id.*] When she showed Forsberg the photo, even he believed Defendants' table was his own. [*Id.*] So did Jason Scott's Texas sales rep. [*Id.*]

### D. Defendants Destroyed Jason Scott's Exclusivity

Defendants displayed Accused Products in their Dallas showroom and on their website. [SSF ¶ 44] They pitched the Accused Products to about 60 retailers, making 15 sales overall. [SSF ¶ 43] Defendants' wholesale pricing for the Accused Products was significantly lower than Jason Scott's pricing, enabling dealers to set lower retail prices. [SSF ¶ 50] Defendants and their agent, Sanders, pitched the Accused Products to authorized Jason Scott dealers, claiming the Accused Products were "identical" to Jason Scott but cheaper and could be delivered faster. [SSF ¶¶ 46-49] They made pitches to retailers on their sales floors where JSC Pieces were on display. [*Id.*] Malhotra told the

owner of Hill Country—a major customer of both parties—that he did not believe Jason Scott could enforce any protections over its furniture designs in the U.S. [SSF ¶ 47]

Defendants' pitches created intense concern among Jason Scott's retail customers. [SSF ¶ 51] Jason Scott retailers felt the presence of Accused Products on the market would have forced them to purchase the copies and cut back buying Jason Scott. [*Id.*] At least twice, a customer looked at a JSC Piece in a retailer's store then purchased the Trendily knockoff from a competitor. [SSF ¶ 52] The pieces looked so much alike this also worked once in reverse—Adobe palmed off a real Jason Scott table as the Trendily version when the latter was unavailable. [SSF ¶ 53]

### E. Defendants Knew They Were Infringing and Doubled Down

Not later than June 1, 2017, on receiving Jason Scott's first cease-and-desist letter, Defendants knew the Accused Products were direct copies of the JSC Pieces. [SSF ¶ 56] In fact, Malhotra had an inkling he was copying Jason Scott even earlier. [SSF ¶ 57] Yet Defendants ignored that initial letter and a second letter in early July 2017. [*Id.*]

In August 2017, Defendants were still selling Accused Products. [SSF ¶¶ 49, 56] Via text messages—which he subsequently deleted—Malhotra even promised a customer Trendily would be copying other Jason Scott pieces. [SSF ¶ 56] Sanders made similar promises in a pitch in August 2017 to a Jason Scott dealer. [*Id.*] Defendants did not stop selling Accused Products—or pitching copies of other Jason Scott pieces—until after Jason Scott served its complaint on August 16, 2017. [*Id.*] After being sued, Malhotra started checking for protections on furniture designs before copying them. [SSF ¶ 60]

## II. Summary Judgment Standard

On summary judgment, the moving party bears the initial burden of establishing there is no genuine issue of material fact in the pleadings, affidavits, and other evidence in the case. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once that initial burden is met, the nonmoving party must go beyond the pleadings and identify

1  specific facts that show a genuine issue for trial. *See id*. at 323–34; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party "must present significant probative evidence tending to support its claim or defense." *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323.

**III.   Defendants are Liable to Jason Scott for Copyright Infringement**

Defendants infringed Jason Scott's registered copyrights. To prove copyright infringement, a plaintiff must show "(1) ownership of the allegedly infringed work and (2) copying of the protected elements of the work by the defendant." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 984 (9th Cir. 2017).

**A.   Jason Scott Owns Valid Copyrights in the JSC Pieces**

There is no dispute that Jason Scott owns copyright registrations in the ornamental elements of the JSC Pieces, which include carvings and decorative metalwork. [SSF ¶ 11] To claim copyright in those elements, JSC must show its designs are (1) original, and (2) conceptually separable from the utilitarian aspects of the furniture. *See Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S.Ct. 1002, 1008 (2017). A valid certificate of copyright registration creates a presumption of originality for five years from the registration date. *Swirsky v. Carey*, 376 F.3d 841, 851 (9th Cir. 2004). Forsberg created original designs for each of the JSC Pieces. [SSF ¶ 9] That is sufficient to show originality.

With regard to separability, the Copyright Act "expressly protects two- and three-dimensional 'applied art,'" which "is art 'employed in the decoration, design, or execution of useful objects.'" *Star Athletica*, 137 S.Ct. at 1014. The Supreme Court has "abandon[ed] the distinction between 'physical' and 'conceptual' separability"; the test for

copyrightability is whether the feature can "exist as its own pictorial, graphic, or sculptural work as defined in § 101 once it is imagined apart from the useful article." *Id*. at 1010. It does not matter whether a useful article remains after the design feature is imaginatively separated. *Id*. at 1013-14.

Even before *Star Athletica*, courts consistently held decorative sculptural designs on furniture were copyrightable. *See Univ. Furniture Int'l v. Collezione Europa USA, Inc*., 618 F.3d 417, 434 (4th Cir. 2010); *Amini Innov. Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1368-69 (9th Cir. 2006). As here, *Universal* involved "highly ornate collections of furniture" adorned with detailed carvings. 618 F.3d at 434. The designs were "superfluous nonfunctional adornments for which the shape of the furniture (which is not copyrightable) serves as the vehicle." *Id*. The Fourth Circuit found "the designs are wholly unnecessary to the furniture's utilitarian function [as] [a] carved scroll of leaves on a nightstand post, for example, does nothing to improve the utilitarian aspect thereof." *Id*.

This case involves a table, a desk, and a buffet. Their functional aspects are legs, tops, doors, and drawers. Like the ornate furniture in *Universal*, the protectable elements on the JSC Pieces [*see* SSF ¶ 12] are "wholly unnecessary to the furniture's utilitarian function." 618 F.3d at 434. Each piece's shape serves as a vehicle for its ornament. One can easily imagine the decorative elements qualifying as two-dimensional works of art if applied to another medium, such as a painter's canvas. *See Star Athletica*, 137 S.Ct. at 1010. Those elements are thus copyrightable, and the JSC Copyrights are valid.

**B.    Defendants Copied the Protected Elements of the JSC Pieces**

Copying can be proven by establishing (1) a striking similarity between the works, or (2) the defendant had access to the works plus substantial similarity between the copyrighted work and defendant's work. *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987); *see also Gracing Inc. v. E.K. Blue, Inc.*, No. CV-16-5107, 2017 WL 5640516, *2 (C.D. Cal. June 28, 2017) (granting summary judgment to plaintiff). Under either test,

Jason Scott is entitled to judgment against Defendants.

### 1. The works are strikingly similar

"A finding of striking similarity is appropriate when 'the works are virtually identical' or 'are so strikingly similar as to preclude the possibility of independent creation.'" *Gracing*, 2017 WL 5640516, at *2 (quoting *Unicolors*, 853 F.3d at 988; *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010)). The Ninth Circuit recently upheld a district court's grant of summary judgment to a plaintiff on striking similarity where two fabric designs were "virtually identical," making it "unnecessary to consider the possibility that [defendant's work] was the product of independent creation, coincidence, a prior common source, or any source other than copying." *Unicolors*, 853 F.3d at 987-88. Where works are that close, "there is simply 'no genuine dispute as to any material fact.'" *Id*.

Striking similarity may be determined by the Court alone on summary judgment by comparing the two works side by side. 3 Nimmer on Copyright § 12.10 [B][2][a], n.62 ("summary judgment should lie in favor of plaintiff on the issue of striking similarity when an aural or visual examination shows two complex works to be virtually identical"). Comparing the Accused Products to the JSC Pieces, they are nearly identical in all aspects. The carvings, metalwork, and positioning of those elements are all the same. [SSF ¶ 32] Highly experienced retailers and Defendants' own sales rep could not tell the pieces apart. [SSF ¶¶ 4, 37-39] The similarity cannot be coincidence, and there is no evidence it is due to a prior common source. *Cf. Gracing*, 2017 WL 5640516 at *3 (conducting similar analysis); *Unicolors*, 853 F.3d at 987 (same). Summary judgment is therefore proper. *See id*.

### 2. There is substantial similarity and strong evidence of access

If the Court finds striking similarity, it need go no further. *See Gracing*, 2017 WL 5640516 at *3. However, the undisputed evidence also proves substantial similarity and

access. "Where the extrinsic similarity is so strong that the works are near duplicates save for superficial differences, the court may properly conclude that no reasonable jury could find that the works are not substantially similar in their overall concept and feel." *Unicolors*, 853 F.3d at 987. "In such a case, the court need not delve into a complex subjective analysis of the works to assess substantial similarity and does not risk supplanting the jury's subjective interpretation with its own." *Id.* As explained above, Defendants copied every protected design element of the JSC Pieces. [SSF ¶ 32]

Proof of access requires only "an opportunity to view or to copy plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000). Defendants had broad access to the JSC Pieces—at retailers, via print ads, on TV, and online. [SSF ¶¶ 22-29] Given strong evidence of substantial similarity and access, any reasonable jury would be compelled to conclude Defendants' Accused Products infringe the JSC Copyrights, thus warranting summary judgment for Jason Scott. *See Unicolors*, 853 F.3d at 987; *Gracing*, 2017 WL 5640516 at *3.

### C. Jason Scott Suffered Damages from Defendants' Infringements

Jason Scott is entitled to recover "[t]he actual damages suffered . . . as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages." 17 U.S.C. § 504(b). In establishing an infringer's profits, a plaintiff need only present proof of the infringer's gross revenue. 17 U.S.C. § 504(b). Defendants made $25,185.00 in gross revenue on sales of the Accused Products. [SSF ¶ 61] Jason Scott is entitled to damages in that amount.

## IV. Defendants Intentionally Copied Jason Scott's Trade Dress

Jason Scott asserted a count of trade dress infringement regarding each JSC Piece. "Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). To prove

trade dress infringement, a plaintiff must show: (1) the trade dress is nonfunctional; (2) the trade dress has acquired secondary meaning; and (3) the defendant's imitation of the trade dress creates a likelihood of customer confusion. *Id.*; *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987).

### A. Jason Scott's Trade Dress is Nonfunctional

Trade dress does not protect functional features, i.e., those "that enhance the utility of the product." *Millennium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1126-27 (9th Cir. 2015). A "functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage." *Id.* at 1128. However, "functional elements that are separately unprotectable can be protected together as part of trade dress." *Id.* at 1130. Thus, the "inquiry is not addressed to whether individual elements of the trade dress fall within the definition of functional, but to whether the whole collection of elements taken together are functional." *Fuddruckers*, 826 F.3d at 842. Relevant factors include "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Millennium*, 817 F.3d at 1130.

Jason Scott's protectable trade dress lies in the overall look of the JSC Pieces, which combines decorative carvings and hardware, coloration, and massive, large-scale appearance (the "JSC Trade Dress"). [SSF ¶ 13] Forsberg chose those designs because they were unique and fit the Jason Scott Collection aesthetic. [SSF ¶ 15] "That the design decisions were made for aesthetic reasons—and not, for example, because they were the only, the cheapest, or the most efficient way to design a [product]—is evidence of nonfunctionality." *Clicks Billiards*, 251 F.3d at 12620. There are innumerable alternative designs for a table, desk, or buffet, and Defendants manufacture many such pieces in a variety of non-infringing designs. [SSF ¶ 21] Ads featuring Jason Scott do not tout

1  utilitarian advantages of the JSC Trade Dress—the unique look is what sells Jason Scott.
2  [SSF ¶ 25] And the JSC Trade Dress is not the result of a simple or inexpensive method of
3  manufacture. It would be simpler and cheaper to *not* include carvings and ornate
4  metalwork and other elements of JSC Trade Dress. [SSF ¶ 15] Granting Jason Scott
5  protection would not prevent competitors from utilizing functional features in their own
6  designs. The JSC Trade Dress does not enhance the pieces' utility and is nonfunctional.

**B. The JSC Trade Dress Has Secondary Meaning**

Secondary meaning is "a mental recognition in buyers' and potential buyers' minds that the products connected with the [trade dress] are associated with the same source." *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009). "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Id.* "[W]hen, as here, the relevant market includes both distributors and ultimate purchasers, the state of mind of dealers is important in determining if secondary meaning exists." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 295 (7th Cir. 1998); *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F.Supp. 2d 1245, 1252 (S.D. Cal. 2013).

**1. Evidence of copying strongly supports secondary meaning**

"Proof of exact copying, without any opposing proof, can be sufficient to establish secondary meaning." *Transgo, Inc. v. Ajac Trans. Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985) (citing *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 557-58 (9th Cir. 1960)); *see also adidas America, Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 755 (9th Cir. 2018) ("Proof of copying strongly supports an inference of secondary meaning."); *Clicks Billiards*, 251 F.3d at 1264 (same). In *Audio Fidelity*, the Ninth Circuit found undisputed evidence of copying established secondary meaning. 283 F.3d at 557-58

(explaining no reasonable person could *not* find secondary meaning in such circumstances and reversing trial court's decision not to rely on an inference of secondary meaning) "When that fact [of copying] has been established, the inference is usually plain that the imitator intends such a result." *Id*. "There is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Id*. at 558.

The undisputed evidence here is that Defendants copied photos as closely as possible to make the Accused Products. [SSF ¶ 30] Those photos had to have been of the JSC Pieces, as those designs are unique to Jason Scott. [SSF ¶ 9] Defendants admittedly copied the JSC Trade Dress, not merely functional features. [SSF ¶¶ 30-34] The unrefuted evidence of copying establishes secondary meaning. And there is other evidence, too.

### 2. Customer testimony supports secondary meaning

Unrefuted evidence that retailers and end consumers associate designs with a plaintiff "is strong proof of secondary meaning." *Cosmos Jewelry Ltd. v. Po Sun Hon Co.*, 470 F.Supp. 2d 1072, 1086 (C.D. Cal. 2006). Jason Scott sells to authorized retailers. [SSF ¶ 2] Every retailer deposed in this case—even those not authorized to sell Jason Scott—testified Jason Scott furniture has a unique look coming from the carvings, metalwork, and overall appearance. [SSF ¶¶ 5-7]; *cf. Brighton*, 923 F.Supp. 2d at 1252 (finding secondary meaning where "[i]ndustry participants, including Brighton employees and neutral sales representatives, testified they recognize a Brighton bag when they see one."). Testimony establishes the JSC Pieces are consistent with the Jason Scott look and recognizable as originating from Jason Scott. [SSF ¶ 14] Retailers also testified that end consumers recognize Jason Scott pieces by their distinctive look. [SSF ¶ 7]

### 3. Other factors support secondary meaning

Other factors relevant to secondary meaning are the length of time trade dress is in use, exclusivity, number of customers, and place in the market. *Art Attacks*, 581 F.3d at 1145; J. Thomas McCarthy, *Trademarks and Unfair Competition* § 15:53. Jason Scott has

sold the JSC Pieces for over 13 years to more than 100 retailers throughout the U.S. [SSF ¶¶ 2, 10] Retailer testimony shows Jason Scott has a well-established place in the market. [SSF ¶¶ 5-8] Retailers spend many thousands of dollars each year advertising Jason Scott to the public, and Jason Scott has received unsolicited media attention. [SSF ¶¶ 25, 29] Jason Scott has strictly maintained exclusivity of its designs and carefully controls its dealer network. [SSF ¶ 16] It has never licensed its designs to others. [*Id.*] And—until Defendants—Jason Scott's designs were never successfully copied. [SSF ¶ 40]. These undisputed facts all support a finding of secondary meaning.

    **C.**  **There is Undisputed Evidence of Customer Confusion**

A likelihood of confusion exists when customers are likely to assume a product is associated with a source other than its actual source because of similarities between the two sources' trade dress. *Fuddruckers*, 826 F.2d at 845. "This factor turns on whether a reasonably prudent consumer would be confused about the source of the goods bearing the marks." *adidas*, 890 F.3d at 755. "[C]ourts almost unanimously presume a likelihood of confusion based on a showing of intentional copying." *Fuddruckers*, 826 F.2d at 846.

Every factor used by courts in this analysis supports Jason Scott: (1) The JSC Trade Dress is strong, as explained above; (2) the Accused Products are nearly identical to the JSC Pieces [SSF ¶¶ 30-36]; (3) retailers were actually confused between the competing designs and testified end consumers could not tell the difference [SSF ¶¶ 37-39]; (4) the parties' furniture is highly related and sold in the same market, often to the same customers [SSF ¶ 23]; and (5) Defendants intentionally copied the JSC Trade Dress to create products that looked as similar as possible to the JSC Pieces [SSF ¶¶ 30-34]. *See adidas*, 890 F.3d at 755 (setting out factors); *Cosmos Jewelry*, 470 F.Supp. 2d at 1086-87 (conducting similar analysis and finding substantial likelihood of consumer confusion); *Fuddruckers*, 826 F.2d at 845-46 (same). Consumer confusion is plain here. The undisputed evidence shows the JSC Trade Dress is nonfunctional and has acquired

secondary meaning and that Defendants' copying created a likelihood of customer confusion. JSC is thus entitled to summary judgment on its trade dress claims.

### D. Jason Scott is Entitled to Damages, Enhancement, and Fees

Jason Scott should be awarded actual damages, a double damages enhancement, and an award of attorneys' fees and costs under § 1117 of the Lanham Act.

#### 1. Defendants' profits and damages sustained by Jason Scott

A plaintiff who proves trade dress infringement is entitled "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). To establish Defendants' profits on trade dress infringement, Jason Scott need only present proof of Defendants' gross revenues. *Cosmos*, 470 F.Supp. 2d at 1087. As noted above, Defendants' gross revenues on sales of Accused Products were $25,185. [SSF ¶ 61] That amount should be awarded to Jason Scott.

"The district court assesses 'any damages sustained by the plaintiff' in the same manner as in tort damages: the reasonable foreseeable harms caused by the wrong." *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012). "Upon proving causation, the plaintiff's evidentiary burden relaxes considerably." *Id*. A plaintiff must present substantial evidence to "draw *reasonable inferences* and make a *fair and reasonable assessment*." *Id*. "Section 1117 demands neither empirical quantification nor expert testimony to support a monetary award of actual damages . . . ." *Id*. at 1113. Here, the undisputed evidence shows Defendants' sale of knockoffs caused Jason Scott to sustain damages of: (1) $132,741 from the loss of a long-time retail customer; and (2) $59,203 from being forced to forego a planned price increase scheduled for June 1, 2017. [SSF ¶¶ 62-63]

#### 2. A damages enhancement is warranted

The Court has discretion under § 1117(a) to award up to treble damages. "Consistent with the principles of equity, courts have exercised broad discretion to address

a variety of undercompensated harm, including where there is difficulty assessing damage, and where lost profits are insufficient to address the on-going harm." *OmniGen Research, LLC v. Yongqiang Wang*, No. 6:16-cv-268, 2017 WL 5505041, at *17-18 (D. Or. Nov. 16, 2017); *see also Taco Cabana Int., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991) (an enhancement "provide[s] proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice"); *Binder v. Disability Group, Inc.*, 772 F.Supp. 2d 1172, 1182-83 (C.D. Cal. 2011) (doubling damages where "there is a potential harm from lingering misimpressions that is unlikely to be fully captured by lost profits."). It "is proper to also consider that enhancing damages would advance the cause of deterring Defendants and others similarly situated from repeating the type of unfair and deceptive behavior." *OmniGen*, 2017 WL 5505041 at *18; *Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1274-75 (9th Cir. 1982) (explaining "an award of little more than nominal damages" would encourage infringers); *PepsiCo v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999) (§ 1117 "confers authority on the court to treble defendant's profits in the event that compensatory damages are inadequate to deter future infringing conduct.").

Defendants here intentionally copied Jason Scott's trade dress. [SSF ¶¶ 30-34] They displayed and sold Accused Products knowing they looked like Jason Scott pieces. [SSF ¶¶ 35-36, 46-49] They continued after receiving *two* cease-and-desist letters. [SSF ¶ 56] Defendants caused a substantial impact on Jason Scott's customers, threatened to severely distort the market for Jason Scott furniture, and gained esteem as the only other manufacturer capable of making quality copies of Jason Scott. [SSF ¶¶ 40, 64] The monetary value of those impacts is difficult to calculate, and there is value in deterring such blatant infringement. Jason Scott therefore requests a double damages enhancement.

### 3. This is an "exceptional case" warranting a fees award

The Lanham Act allows for an award of costs and reasonable attorneys' fees "in

exceptional cases." 15 U.S.C. § 1117(a). An exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1180-81 (9th Cir. 2016). This is a "case-by-case exercise of [the Court's] discretion, considering the totality of the circumstances" based on a preponderance the evidence. *Id*. A defendant's continued infringement after receiving cease-and-desist letters strongly supports finding a case "exceptional." *See San Diego Comic Convention v. Dan Farr Prod.*, No. 2018 WL 4078639, *8 (S.D. Cal. Aug. 23, 2018) (defendant's continued use of mark after receipt of cease-and-desist letter and failure to reach out to the mark owner were "factually and legally unreasonable"); *Craters & Freighters v. Daisychain Enters.*, No. C-09-04531, 2010 WL 11484728, *11 (N.D. Cal. March 3, 2010) (defendant's failure to take corrective action in response to multiple cease-and-desist letters supported fees award); *see also Horgan v. Iragorri*, No. CV 13-06099, 2014 WL 12607675, *4 (C.D. Cal. Jan. 7, 2014); *Gucci Am., Inc. v. Guerrero*, No. CV 07-07898, 2008 WL 11336190, *8 (C.D. Cal. Nov. 5, 2008).

The Court recognized the strength of Jason Scott's litigation position in its order denying Defendants' motion to dismiss. [Dkt. 35 at 5-6] Defendants' counsel admitted they fought Jason Scott's motion for preliminary injunction—when the facts even made the Court ask why—merely as a litigation tactic. [10/25/17 Trans. at 108:17-109:21] Discovery has not changed the facts. Defendants intentionally copied Jason Scott designs; tried to steal away Jason Scott customers; ignored cease-and-desist letters; told a Jason Scott retailer that Jason Scott could not do anything to stop the copying; then they offered to copy even more Jason Scott pieces. Malhotra admitted what they did was "copyright infringement." [SSF ¶ 59] And he destroyed evidence, deleting texts with customers about

Jason Scott. [SSF ¶ 58]

Defendants left Jason Scott no choice but to file suit. Their actions warrant an award of fees and costs. *See, e.g.*, *Cosmos*, 470 F.Supp. 2d at 1088 ("Defendants' awareness of the Plaintiff's market strength and subsequent exploitation of that strength represents a deliberate and willful use of the Plaintiff's trade-dress, thus making this case 'exceptional'"). Public policy favors such an award, as small companies could not otherwise afford litigation to protect their intellectual property. Any other outcome would reward an egregious infringer for forcing Jason Scott to sue to protect its business.

## V.    Summary Judgment on Unfair Competition is Also Warranted

The Court should also grant summary judgment on Jason Scott's unfair competition claim. The undisputed evidence described above shows customers identify the JSC Pieces as Jason Scott's and confusion has resulted from Defendants' copying causing damage to Jason Scott. *See Kaibab Shop v. Desert Son, Inc.*, 135 Ariz. 487, 490 (App. 1982).

## VI.   The Court Should Grant a Permanent Injunction

Given the undisputed evidence, the Court can and should grant an injunction to permanently bar Defendants from making or selling Accused Products or otherwise infringing Jason Scott's copyrights and trade dress, and requiring Defendants to destroy any Accused Products in their possession, custody, or control. *See* 17 U.S.C. § 502(a); 15 U.S.C. § 1116(a).

## Conclusion

Defendants took a tack utterly at odds with U.S. law—ripping off another's designs to directly compete with the designer. They did so blatantly and knowingly and refused to stop, leaving Jason Scott no choice but to file suit. The undisputed evidence supports summary judgment on all claims for Jason Scott, an award of damages, fees, and costs, and a permanent injunction.

///

1  RESPECTFULLY SUBMITTED this 11th day of January, 2019.

By /s/ Thomas E. Dietrich

Kenneth H. Brendel
Thomas E. Dietrich
Mangum, Wall, Stoops & Warden, PLLC
100 N. Elden St.
Flagstaff, AZ 86001

*Attorneys for Plaintiff Jason Scott Collection, Inc.*

I hereby certify that on January 11, 2019, I electronically submitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Brandon Leavitt
Eldredge Law Firm
4204 SW Green Oaks Blvd., Ste. 140
Arlington, TX 76017
tel. 214.727.2055
brandon@dfwpatentlaw.com

*Attorneys for Defendants*