```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ARIZONA


JASON SCOTT                    )
COLLECTION, INC.               )
                               )
                               ) CIVIL ACTION NO.
VS.                            ) 2:17-CV-02712-JST
                               )
TRENDILY FURNITURE, LLC,       )
ET AL                          )
```

**************************************************************

ORAL DEPOSITION OF

SHAWN KELLEEN BEACH

JULY 24, 2018

**************************************************************

ORAL DEPOSITION of SHAWN KELLEEN BEACH, produced
as a witness at the instance of the Plaintiff, and
duly sworn, was taken in the above-styled and numbered
cause on the 24th day of July, 2018, from 10:25 a.m.
to 12:12 p.m., before Monique M. Hinchcliff, CSR in
and for the State of Texas, reported by machine
shorthand, at the office of REGUS, 1100 NW Loop 410,
Suite 700, San Antonio, TX  78213, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

**Shawn Kelleen Beach**                                             7/24/2018

Page 2

APPEARANCES

FOR THE PLAINTIFF:
BY:  Mr. Thomas Dietrich
MANGUM, WALL, STOOPS & WARDEN, P.L.L.C.
112 N. Elden Street
Flagstaff, AZ  86001

FOR THE DEFENDANT:  (Present by telephone)
BY:  Mr. Charles Green
COWLES & THOMPSON
901 Main Street, Suite 3900
Dallas, TX  75202

* * * * * *

Page 3

INDEX

Appearances .........................................2
                    FIRST
                  REFERENCE

SHAWN KELLEEN BEACH
   Examination By Mr. Dietrich: ....................4
   Examination By Mr. Green: ......................39
   Further Examination By Mr. Dietrich: ..........104
   Further Examination By Mr. Green: ..............109

           EXHIBITS
1     Copies of photographs .......................15
2     Declaration by Shawn Beach ..................34
3     Website info on Calamity Jane's ............40
4     Copies of photographs .......................49

Changes and Signature ..............................113
Reporter's Certificate .............................115

-o-O-o-

Page 4

            SHAWN KELLEEN BEACH,
Having been first duly sworn, testified as
follows:
               EXAMINATION
BY MR. DIETRICH:
     Q.   Good morning.
     A.   Good morning.
     Q.   Can you -- can you please
state your full name for the record?
     A.   Shawn Kelleen Beach.
     Q.   So we just met a minute ago.
My name's Tom Dietrich.  I'm an
attorney for Jason Scott Collection.
And have you ever had your deposition
taken before?
     A.   I have not.
     Q.   So I'll just go over a couple
ground rules for that.
          This is the court reporter.
She's taking down everything that we
say, so if you can try to speak loud
enough to be heard, I don't think it's
going to be a problem here.
     A.   Okay.
     Q.   And when you're answering a

Page 5

question, say yes or no, rather than
uh-huh or huh-uh, and no head nods or
shakes.  It's hard to --
     A.   Got it.
     Q.   -- hard to get on the record.
If you don't understand something I
asked, please just let me know and I'll
try to ask a better question.  If you
remember something five or ten minutes
down the line and it goes to something
I asked back before, just let me know
and we can get that on the record.
          And is there any reason you
can think of that you can't testify
fully and truthfully today?
     A.   No.
     Q.   So what do you do for a
living, Ms. Beach?
     A.   I have retail stores in
Boerne, Texas.  I've had them for 14
years.
     Q.   You said stores, plural.  Do
you have more than one?
     A.   I have a women's boutique
three doors down from the other on Main

**Shawn Kelleen Beach**                                                7/24/2018

---

Page 6

1    Street.  And I do interior design
2    decorating also.
3          Q.   So you have a women's
4    boutique.  And what is your other
5    store?
6          A.   Calamity Jane's.  It's a
7    furniture store.
8          Q.   How long have you -- you
9    said -- is it 14 years that you have
10   had the furniture store, too?
11         A.   Fourteen years, yes, that I
12   have had the retail store.
13         Q.   Were you involved in the
14   furniture business before that?
15         A.   I was involved in decorating
16   many years before that.
17         Q.   How many years of experience
18   do you have in interior decorating?
19         A.   I probably -- close to 30
20   years that I've done homes and worked
21   with people and all that.
22         Q.   What -- what kind of things
23   do you do as part of your interior
24   decoration job?
25         A.   Oh, I go in there and consult

Page 7

1    with the homeowners from earlier
2    construction to just filling the home
3    with furniture, consult with them.  And
4    some homes, you know, are just a few
5    times visit before we get it right, and
6    then other homes, like I say, we can do
7    start to finish.  And we customize the
8    whole place.
9          Q.   And you've been doing that
10   for 30 years?
11         A.   Correct.
12         Q.   And how long have you been in
13   furniture retail overall?
14         A.   Fourteen years.
15         Q.   That's all with Calamity
16   Jane's?
17         A.   Correct.
18         Q.   So what do you do as part of
19   your job at Calamity Jane's?
20         A.   Pretty much I'm there every
21   day.  We're open seven days a week.
22   I'm there six days a week running it,
23   consulting with people, all of the
24   above, maintenance man, you name it.
25         Q.   Are you selling furniture?

Page 8

1          A.   Yes.
2          Q.   Do you meet with customers to
3    sell furniture?
4          A.   Yes.
5          Q.   And do you meet -- the folks
6    that you're working with with your
7    interior decorating side, are they
8    buying furniture from Calamity Jane's?
9          A.   Correct.
10         Q.   Are you a buyer?
11         A.   Yes.  I do buy -- I'm the
12   sole buyer for the store also.
13         Q.   What does being a buyer
14   entail?
15         A.   What does it intend?
16         Q.   Entail.
17         A.   Entail.  I have -- well, I
18   purchased for the store from the very
19   beginning, but it's going to places
20   trying to go find different items for
21   the entire store.  I mean, we do from
22   small accessories to large furniture to
23   drapes.  Everything.
24         Q.   How big is Calamity Jane's?
25         A.   It's about 4,800 square feet.

Page 9

1          Q.   And what kind of furniture
2    overall would you say you carry?
3          A.   We basically put on the
4    floor, hill country furnishings to
5    western to Mediterranean style.
6          Q.   As a buyer, do you go to
7    furniture markets?
8          A.   Yes, I go to furniture
9    markets year-round.
10         Q.   What locations?  Where do you
11   go to furniture markets?
12         A.   I go from High Point, North
13   Carolina to Las Vegas every other year,
14   to Dallas, to Arizona, to anywhere that
15   there might be a good place for unique
16   items.
17         Q.   And in your typical day at a
18   furniture market, can you tell us what
19   that's like?
20         A.   I usually, from start to
21   finish, I'll be there from 8:00 to
22   7:00, going all day long searching for
23   items, placing orders, customizing
24   things.  I mean, it's a constant
25   nonstop process.

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                         NATIONWIDE SERVICES                    (800) 246.4950

**Shawn Kelleen Beach**                                    7/24/2018

---

Page 10

1    Q.  And throughout a whole day,
2  you're looking at different furniture
3  pieces?
4    A.  Correct.  Furniture and
5  accessories.
6    Q.  Can you estimate about how
7  many pieces of furniture you might look
8  at on a typical day at a market?
9    A.  Oh, gosh.  I'm probably in
10  and out of 50, 60 showrooms in a day.
11  Some I stay longer, some I don't.
12    Q.  Is a showroom -- like, is it
13  set up with kind of furniture on
14  display?
15    A.  Yes.  Yes.  It's set up
16  almost like a, I want to say a store,
17  but it's not like a retail store.  And
18  they have catalogs you go through.
19  Depends on what you're looking for,
20  what catches my eye, you know.
21    Q.  Are you familiar with the
22  Jason Scott Collection?
23    A.  Yes, I am.
24    Q.  How?
25    A.  I have carried it

---

Page 11

1  approximately six years.  I first saw
2  it and fell in love with it because it
3  was so unique.
4    Q.  Where did you first -- or how
5  did you first learn about Jason Scott?
6    A.  I believe somebody told me
7  about it.  I don't remember that, but I
8  remember after that, searching it and
9  then trying to get ahold of Mark, the
10  rep, and then he came and met with me
11  after that.
12    Q.  And when was the first time
13  that you actually saw Jason Scott
14  furniture, do you recall?
15    A.  Oh, probably six, seven,
16  eight years ago.
17    Q.  And what was your reaction to
18  seeing Jason Scott?
19    A.  Oh, I loved it.  It was one
20  of my favorite things ever, still to
21  this day.  It's the type of furniture
22  that I wanted to have in my store and
23  have for my customers.
24    Q.  So you said you started
25  selling Jason Scott furniture about six

---

Page 12

1  years ago?
2    A.  I believe so.  I don't know
3  the exact date off the top of my head.
4    Q.  And do you have Jason Scott
5  furniture on the floor at Calamity
6  Jane's now?
7    A.  I do.
8    Q.  Is Jason Scott an important
9  line for Calamity Jane's?
10    A.  It's one of my best lines.
11  It's -- it's not flooded everywhere so,
12  you know, the stores that I feel -- I
13  mean, I feel very lucky to be able to
14  carry it.  It's that type of furniture
15  to me and to a lot of customers that
16  come in and are searching for something
17  like that.
18    Q.  Do you speak with customers
19  about Jason Scott furniture?
20    A.  Oh, yes.  I'm there trying to
21  sell it.
22    Q.  What's their reaction?
23    A.  They love it.  I mean, they
24  know it's almost a collector's item,
25  just the way it's made.  It's a forever

---

Page 13

1  piece.
2    Q.  And --
3      MR. GREEN:  Excuse me.  I'm
4  going to object to the form of the
5  last question and the
6  responsiveness of the answer.
7    Q.  (BY MR. DIETRICH) So Chuck
8  may state an objection.
9    A.  Okay.
10    Q.  And he's just getting that on
11  the record.
12    A.  Okay.
13    Q.  And then you can go back and
14  answer the question afterwards.  You
15  already did at that point, but if he
16  objects before you answer, you can go
17  ahead and answer after.
18      You said that Jason Scott
19  isn't flooded?
20    A.  Well, he's -- I mean not
21  everybody carries it.  You know, he's
22  very particular.  I don't want to say
23  particular, but not every -- like,
24  Boerne is a small town.  There's not
25  five stores carrying it.

---

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com              NATIONWIDE SERVICES          (800) 246.4950

**Shawn Kelleen Beach**                                      7/24/2018

Page 14

1    Q.  To your knowledge, does Jason
2  Scott limit his dealer network?
3    A.  Oh, I have no idea.  No, not
4  at all.
5    Q.  You don't know if he does or
6  not?
7    A.  I have no idea.
8    Q.  But is Calamity Jane's an
9  approved dealer?
10   A.  Yes.
11   Q.  And are there any other
12 approved dealers near by Calamity
13 Jane's?
14   A.  Not that -- well, I mean in a
15 ten-mile radius, no.  After that, he
16 has several in San Antonio here.
17   Q.  Does Calamity Jane's
18 advertise Jason Scott furniture?
19   A.  Yeah, I put it some of my
20 ads, in pictures.
21   Q.  And where do you place those
22 ads?
23   A.  They go into a couple
24 magazines around the Boerne area and
25 that's about all I advertise in

Page 15

1  anymore.
2    Q.  And do you put Jason Scott
3  furniture in pictures?
4    A.  Sometimes.
5    Q.  Do you use the Jason Scott
6  name in your ads?
7    A.  No, I don't put labels -- or
8  vendors in the ad.  Just mainly the
9  picture and my logo and things like
10 that.
11   Q.  Is there a reason you don't
12 put vendor names in your ads?
13   A.  No.  People that see Jason
14 Scott usually know what it is.
15     (Exhibit No. 1 marked.)
16   Q.  (BY MR. DIETRICH)  I'm
17 showing you what's been marked Exhibit
18 1.
19     MR. DIETRICH:  Chuck, this is
20 the photographs of the furniture
21 with the desk as the first page.
22     MR. GREEN:  Okay.
23   Q.  (BY MR. DIETRICH)  I'm
24 showing you what's been marked Exhibit
25 1 to your deposition.

Page 16

1    Can you take a look through
2  these pages, and then my question to
3  you is whether you recognize these
4  furniture pieces.
5    A.  Yes, I do.
6    Q.  Who made these pieces?
7    A.  These look like Jason Scott
8  pieces.  I mean, they are Jason Scott
9  pieces unless there's something else.
10   Q.  You believe them to be Jason
11 Scott pieces?
12   A.  I would -- off the top of my
13 head, I would say that.
14   Q.  Are you familiar -- does
15 Calamity Jane's sell the Jason Scott
16 desk?
17   A.  Yes.  We have had the desk.
18 We've had the table, and we've had the
19 other buffet.
20   Q.  So you're personally familiar
21 with each of these pieces?
22   A.  Uh-huh.
23   Q.  In your experience, does
24 Jason Scott furniture have a unique
25 look?

Page 17

1    A.  Yes.  Definitely.
2    Q.  Can you explain that a little
3  bit?
4    A.  Well, it's the reclaimed
5  teak, it's the metal work, it's the
6  carving.  It's just the different style
7  of pieces.
8    Q.  And do you see that style
9  frequently?
10   A.  No.  Nothing -- nothing has
11 looked like Jason Scott.  There's
12 nothing out there that has that unique
13 look, in my mind.
14   Q.  And these pieces in Exhibit 1
15 are consistent with that Jason Scott
16 look?
17   A.  I believe so.  Yes.
18   Q.  Are you familiar with a
19 company called Trendily?
20   A.  Yes.
21   Q.  How do you know of Trendily?
22   A.  I have purchased from
23 Trendily probably, oh, seven years ago,
24 something like that.  Seven, eight
25 years ago.  Maybe longer.

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES                  (800) 246.4950

**Shawn Kelleen Beach**                                    7/24/2018

Page 18

1     Q.   Was that the last time you
2  purchased from Trendily for Calamity
3  Jane's?
4     A.   No.  I still purchase
5  upholstered items from them.
6     Q.   Okay.  I wasn't sure if you
7  meant you had bought one --
8     A.   Oh, yeah.
9     Q.   -- seven or eight years ago
10 or --
11    A.   No.
12    Q.   -- or you still do?
13    A.   Yeah.
14    Q.   So you still have a
15 relationship with Trendily?
16    A.   Yes.
17    Q.   And how did you first come to
18 find out about Trendily?
19    A.   Actually, Rahul came in my
20 store.
21    Q.   Is that Rahul Malhotra?
22    A.   Yes.
23       MR. DIETRICH:  And just for
24 the record, that's R-A-H-U-L.
25       THE REPORTER:  What's the

Page 19

1  last name?
2        MR. DIETRICH:  M-A-L-H-O-T-R-
3  A.
4     Q.   (BY MR. DIETRICH)  So how
5  long have you known Rahul?
6     A.   Like I say, close to seven
7  years maybe.  I don't know the exact
8  date, but when he walked in the store
9  was the first time I'd met him.
10    Q.   And since that time, Calamity
11 Jane's has done business with Trendily?
12    A.   Yes.  A small amount.
13    Q.   And is that upholstered goods
14 or other things as well?
15    A.   Upholstered goods and then he
16 has case goods also.
17    Q.   Did Calamity Jane's buy case
18 goods from Rahul?
19    A.   Uh-huh.
20    Q.   And can you just explain what
21 case goods are?
22    A.   Case goods are more like the
23 hard pieces, buffets mainly is what
24 I've bought from him, different kinds
25 of buffets with glass and things like

Page 20

1  that that were different from, you
2  know, any other.
3     Q.   And has Calamity Jane's
4  bought case goods from Trendily the
5  whole seven years?
6     A.   Off and on.
7     Q.   Do you know somebody named
8  Chris Sanders?
9     A.   Yes, I do.
10    Q.   Who is Chris Sanders?
11    A.   He is a rep for Trendily, and
12 he's come in the store a few times, you
13 know, when he makes his rounds.  And
14 I've seen him in the showroom at
15 market.
16    Q.   So you've met him in person?
17    A.   Correct.
18    Q.   At some point, did you become
19 aware that Trendily was offering copies
20 of Jason Scott furniture for sale?
21       MR. GREEN:  Objection; form.
22       THE WITNESS:  The only
23 time -- the first time was when
24 they came in the store would be
25 Rahul and Chris, and Rahul had --

Page 21

1  was trying to sell it to me and
2  had pictures of the pieces in a
3  catalog.
4     Q.   (BY MR. DIETRICH)  So let's
5  talk about that instance.
6     A.   Okay.
7     Q.   So you had -- is it correct
8  you had a meeting with Rahul and Chris?
9     A.   Well, they just come in and
10 drop in the store every once in a
11 while.
12    Q.   So --
13    A.   Sometimes they will call
14 ahead, sometimes they won't.  And that
15 time I believe they just dropped in,
16 but I was there.
17    Q.   So it was a face-to-face
18 discussion?
19    A.   Correct.
20    Q.   And they came into Calamity
21 Jane's?
22    A.   Correct.
23    Q.   And do you recall when that
24 was?
25    A.   A year ago.

email@tobyfeldman.com                    Toby Feldman, Inc.                         Certified WOB
tobyfeldman.com                        NATIONWIDE SERVICES                        (800) 246.4950

**Shawn Kelleen Beach**                                    7/24/2018

Page 22

1    Q.   So about --
2    A.   Around this time a year ago,
3    July.
4    Q.   2017?
5    A.   That would be '17, yes.
6    Q.   And so they came into
7    Calamity Jane's and let's go from
8    there.  What happened next?
9    A.   They came into Calamity
10   Jane's and Rahul kind of took me to the
11   side and showed me this catalog and
12   said I'm making all these pieces now,
13   they're identical, they're wonderful.
14   We can get them in in a faster rate
15   than what Jason Scott is quoting, and
16   we have -- he showed me the pictures
17   then and then he said we're starting
18   with this and then we're bringing in
19   anything your customer would want to
20   have made.
21   Q.   So let me ask you, you said
22   he showed you a catalog?
23   A.   Well, it was just like a
24   thing with three laminated pictures.
25   Q.   And what were those laminated

Page 23

1    pictures of?
2    A.   They were the desk and the
3    table and a buffet.
4    Q.   The -- and you -- did you
5    look at those pictures?
6    A.   Uh-huh.
7    Q.   Did you recognize them?
8    A.   Oh, yeah.  I was floored.
9    Q.   What did you recognize them
10   as?
11   A.   Well, they were just
12   completely copies of Jason Scott
13   pieces, in my mind.
14   Q.   And what specifically did
15   Rahul tell you about them?
16   A.   Well, he was -- he told me
17   that he can completely make them to
18   look identical and the ironwork also,
19   and he could -- the ironwork that's on
20   the pieces, and he could bring them
21   in -- the best thing is he could bring
22   them in at a faster timeframe than
23   Jason Scott.
24   Q.   Did Rahul reference Jason
25   Scott?

Page 24

1    A.   Yeah.
2    Q.   He did?
3    A.   Oh, yes.
4    Q.   And how did you respond?
5    A.   Well, when I saw them, I was
6    floored and then I just kind of shut
7    down after that.  I was just kind of
8    bothered by it in a way, in a big way.
9    I hated that he was doing that, and I
10   just -- I was shocked.  Being a Jason
11   Scott dealer myself, being on the
12   other, you know, I just -- it just was
13   awful.
14   Q.   Did you set this meeting up?
15   A.   No.  No.  They just dropped
16   in.
17   Q.   You didn't contact them ahead
18   of time?
19   A.   No.  No, they -- they have a
20   good -- they just drop in most of the
21   time.  Sometimes they will let me know
22   they're coming, sometimes they just
23   drop in.
24   Q.   And was Chris participating
25   in this meeting at that point?

Page 25

1    A.   I believe Chris was at the
2    counter talking to one of my girls when
3    Rahul was doing this.  He wasn't
4    hovered over Rahul or anything like
5    that.
6    Q.   So it was just you and Rahul
7    talking?
8    A.   Uh-huh.
9    Q.   Did Rahul say anything else
10   about these furniture pieces?
11   A.   Not that I recall other than
12   the things I remember was the timeframe
13   and they would be identical.
14   Q.   And you said that bothered
15   you?
16   A.   Yes.
17   Q.   Did that -- why did that
18   bother you?
19   A.   It bothered me in a way
20   because for people like that to copy
21   other people, I have a problem with
22   that.  I've always done my business to
23   try to be different than other people.
24   You know, we get the same issues a lot
25   even though I'm not a maker, but it's

email@tobyfeldman.com          Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES                  (800) 246.4950

**Shawn Kelleen Beach**                                              7/24/2018

Page 26

1   just wrong.  It's just -- and for
2   somebody to be so -- what Jason Scott
3   has done and then to have somebody like
4   that completely copy him and try to
5   replicate him, and selling it the way
6   he was was just wrong.
7        Q.   Did you have Jason Scott
8   pieces on the floor when that meeting
9   took place?
10       A.   Oh, definitely.
11       Q.   Did -- to your knowledge, did
12  Rahul know that you carried Jason
13  Scott?
14       A.   Oh, definitely.  He's been in
15  the store --
16            MR. GREEN:  Form.
17            THE WITNESS:  -- a number of
18  times.
19       Q.   (BY MR. DIETRICH)  Had you
20  ever before told him that you carried
21  Jason Scott?
22       A.   I don't believe the
23  conversation ever came up as far as why
24  I would have -- you know.
25       Q.   But he had been in your

Page 27

1   store?
2        A.   Oh, yes.
3        Q.   And you had had Jason Scott
4   on the floor?
5        A.   Definitely.
6        Q.   Did you talk pricing at all
7   about this furniture with Rahul?
8        A.   No.
9        Q.   Did he say anything about
10  pricing to you?
11       A.   Not that I remember, no.
12       Q.   Did he say anything about how
13  these copies were selling?
14       A.   No, I don't know if he even
15  had any in yet.  I'm not sure.  I did
16  not go that far with him when I -- I
17  just was not interested.
18       Q.   In your six years carrying
19  Jason Scott, have you seen other Jason
20  Scott knockoffs?
21       A.   No.
22       Q.   Do you recall whether Rahul
23  mentioned plans to make other types of
24  furniture?
25       A.   Oh, yes.  He did tell me that

Page 28

1   if I had a customer wanting any other
2   kind of piece, that they could do it.
3        Q.   And "any other kind of
4   piece"?
5        A.   Jason Scott piece.
6        Q.   Did he say where or how they
7   would do that?
8        A.   No.
9        Q.   So how did that meeting with
10  Rahul end?
11       A.   It didn't last real long and,
12  you know, I didn't ask many questions
13  once I saw it.  I believe he just said
14  if you're interested, let me know.
15       Q.   So after your meeting with
16  Rahul there, did you have another
17  meeting following that with someone
18  from Trendily?
19       A.   Chris, I think, came in a few
20  days later, they were in town again or
21  something, and he dropped by, but that
22  was, gosh, a week later or something
23  like that.
24       Q.   So Chris came into Calamity
25  Jane's a week later?

Page 29

1        A.   Uh-huh.
2        Q.   Did you contact Chris to ask
3   him to come in?
4        A.   No.  No.  He always -- they
5   always call -- they don't always call.
6   When they do call, they say we're in
7   town, can we stop by?  But he was by
8   himself that time.
9        Q.   Is that what happened here?
10       A.   Uh-huh.
11       Q.   He just dropped in?
12       A.   Correct.  As a lot of vendors
13  do.
14       Q.   Did you ever text message him
15  and ask him to come in?
16       A.   Not that I'm aware of.  Now,
17  I might have, you know, two months
18  earlier or a year earlier.  If I have a
19  customer there wanting something and he
20  has fabrics, maybe so, but nothing
21  pertaining to anything else.
22       Q.   So not relating to these
23  Trendily copies?
24       A.   Oh, no.
25       Q.   So Chris came in and that was

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES          (800) 246.4950

**Shawn Kelleen Beach**                                    7/24/2018

Page 30

1   in July 2017?
2       A.  Uh-huh.
3       Q.  Yes?
4       A.  Yes.  I'm sorry.
5       Q.  It's okay.  It happens.  It's
6   easy to lapse into that.
7           So tell us what happened in
8   that meeting.
9       A.  Well, when he came in he had
10  these same pictures that Rahul had
11  shown me and was, you know, telling me
12  the same thing, and they were waiting
13  on, I don't know, I guess, a container
14  to come in and I didn't say a whole lot
15  about it.  He pretty much could tell I
16  wasn't interested.  But he kept saying
17  if you have a customer that wants a
18  piece and wants it faster, call me.
19      Q.  Did he have the laminated
20  pictures, or how did he show you the
21  pictures?
22      A.  Yeah, the same way that Rahul
23  did.
24      Q.  And he said they were waiting
25  on a container?

Page 31

1       A.  Yes.
2       Q.  So Trendily was waiting on a
3   container?
4       A.  And he wasn't sure exactly
5   what was in it as far as what pieces,
6   but he was -- they were waiting on one
7   to get there -- to arrive.
8       Q.  And did he say it might have
9   some of these pieces in it?
10      A.  Yes, it definitely had some
11  of those pieces in it.
12      Q.  Do you know if Chris at that
13  point represented any other furniture
14  companies besides Trendily?
15      A.  I honestly don't know.
16      Q.  Did he ever try to sell you
17  any other furniture besides Trendily?
18      A.  I don't believe he did until
19  this last year.  He came in and had --
20  started repping another company.
21      Q.  But at this point he was just
22  selling Trendily, to your knowledge?
23      A.  Yes.  Uh-huh.
24      Q.  So Chris, he showed you the
25  photographs.  Did he say anything else

Page 32

1   about those pieces?
2       A.  No.
3       Q.  And were those photographs
4   again of the three pieces, the desk,
5   the buffet and the table?
6       A.  Correct.
7       Q.  Did you ever say anything to
8   Chris about that furniture looking like
9   Jason Scott?
10      A.  Oh, yes, I did.  I remember
11  saying that in my reaction and then
12  that was all.
13      Q.  How did he respond?
14      A.  I don't believe he said
15  anything.
16      Q.  At the time Chris came in,
17  did you have Jason Scott furniture on
18  the floor?
19      A.  Yes.
20      Q.  To your knowledge, did Chris
21  know that you carried Jason Scott?
22          MR. GREEN:  Objection; form.
23          THE WITNESS:  I'm sure he
24      did.  I mean, he always walked
25      around the store.

Page 33

1       Q.  (BY MR. DIETRICH)  He did
2   walk around the store?
3       A.  Oh, yes.
4       Q.  Did he look at your other
5   pieces while he was doing that?
6       A.  No, he never stopped at -- I
7   mean stopped at any one.  You know, he
8   just took a cruise around.
9       Q.  Did Chris ever talk about
10  pricing of these Trendily pieces with
11  you?
12      A.  No.  I never asked.  I never
13  wanted to know.
14      Q.  Did Chris say anything else
15  in this meeting about those pieces?
16      A.  That's all I recall.
17      Q.  Are you aware whether
18  Trendily has copied any other Jason
19  Scott pieces besides these three?
20      A.  No.  Not that I'm aware of.
21      Q.  To your knowledge, has
22  Trendily copied anyone else's furniture
23  besides Jason Scott?
24      A.  No.  Not that I'm aware of.
25      Q.  Do you recall signing a

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES                  (800) 246.4950

Page 34

1    declaration in support of Jason Scott
2    in this case?
3        A.   Yes.
4            (Exhibit No. 2 marked.)
5        Q.   (BY MR. DIETRICH)  I'm
6    showing you what's been marked Exhibit
7    2.
8            MR. DIETRICH:  Chuck, this is
9        Ms. Beach's declaration.
10           MR. GREEN:  Okay.
11       Q.   (BY MR. DIETRICH)  Is this a
12   copy of the declaration you signed in
13   this case?
14       A.   Yes.
15       Q.   And is that your signature on
16   the second page?
17       A.   Yes, it is.
18       Q.   Did you review this
19   declaration for accuracy before you
20   signed it?
21       A.   I did.
22       Q.   Did you make sure everything
23   in it was true and correct?
24       A.   I did.
25       Q.   And in Paragraph 4, you refer

Page 35

1    to Rahul coming in and the meeting
2    regarding his offer to sell copies of
3    the Jason Scott furniture.  Do you see
4    that?
5        A.   Uh-huh.
6            MR. GREEN:  Leading.
7        Q.   (BY MR. DIETRICH)  And you
8    state, "Mr. Malhotra said over and over
9    again that Trendily's pieces were
10   'exactly like Jason Scott pieces.'"
11           MR. GREEN:  Objection;
12       leading.
13       Q.   (BY MR. DIETRICH)  Do you see
14   that?
15       A.   Uh-huh.
16       Q.   Is that an accurate
17   recollection of your conversation with
18   Rahul?
19       A.   Yes.
20           MR. GREEN:  Leading.
21       Q.   (BY MR. DIETRICH)  You state
22   he called the pieces identical and
23   talked about how Trendily was making
24   its own ironwork and hardware to copy
25   those features of Jason Scott's

Page 36

1    furniture?
2        A.   Correct.
3            MR. GREEN:  Objection;
4        leading.
5        Q.   (BY MR. DIETRICH)  Is that
6    accurate?
7        A.   Correct.
8            MR. GREEN:  Leading.
9        Q.   (BY MR. DIETRICH)  What did
10   Mr. Malhotra say with regard to
11   Trendily making ironwork and hardware?
12       A.   That he was making the iron
13   and hardware just like Jason Scott did.
14       Q.   On these pieces?
15       A.   Yes.  The hinges, the
16   handles, everything.
17       Q.   And then in Paragraph 5, it
18   refers to the meeting, and you said the
19   representative is the "right-hand man
20   of Mr. Malhotra."  Does that refer to
21   Chris Sanders?
22           MR. GREEN:  Leading.
23           THE WITNESS:  Yes, he's the
24       rep.
25       Q.   (BY MR. DIETRICH)  And you

Page 37

1    state in your declaration that Mr.
2    Sanders stated Trendily could make
3    anything in Jason Scott's catalog
4    within eight to ten weeks --
5        A.   Correct.
6        Q.   -- and they're taking
7    preorders now?
8        A.   Yes.
9            MR. GREEN:  Objection;
10       leading.
11       Q.   (BY MR. DIETRICH)  Is that an
12   accurate recollection of your
13   conversation with Mr. Sanders?
14       A.   Yes, it is.
15           MR. GREEN:  Leading.
16       Q.   (BY MR. DIETRICH)  What
17   specifically did Mr. Sanders say with
18   regard to Jason Scott's catalog?
19       A.   That they could pretty much
20   make anything in there if I had a
21   customer wanting it and he could get it
22   in faster.
23       Q.   Did it sound like he had a
24   copy of Jason Scott's catalog?
25           MR. GREEN:  Objection;

email@tobyfeldman.com              Toby Feldman, Inc.              Certified WOB
tobyfeldman.com                   NATIONWIDE SERVICES            (800) 246.4950

Shawn Kelleen Beach                                        7/24/2018

Page 38

```
1    leading.
2        THE WITNESS:  I honestly
3    don't know.
4        Q.  (BY MR. DIETRICH)  But he
5    said they could make anything in the
6    catalog?
7        A.  Correct.
8        MR. GREEN:  Objection;
9    leading.
10       Q.  (BY MR. DIETRICH)  And then
11   you state just below that, "The
12   representative further said Trendily
13   has more shipping containers coming in
14   with Jason Scott copies in them."
15       A.  Correct.
16       Q.  Do you see that?
17       MR. GREEN:  Leading.
18       Q.  (BY MR. DIETRICH)  And you
19   already stated before that was what
20   Chris told you?
21       A.  Yes.
22       MR. GREEN:  Leading.
23       MR. DIETRICH:  I don't have
24   any more questions for you.  Thank
25   you.  I'm sure Chuck has a few.
```

Page 39

```
1        THE WITNESS:  Okay.
2        MR. GREEN:  Yeah, I do.
3    Look, can we go off the record a
4    second so we can make sure that we
5    have our exhibits ready?
6        MR. DIETRICH:  Sure.
7        (Passed the witness at
8    10:59.)
9        (Recess from 10:59 to 11:01.)
10          EXAMINATION
11   BY MR. GREEN:
12       Q.  Back on the record.  Ms.
13   Beach, I'm Chuck Green, and we have
14   only met over the phone, right?
15       A.  Correct.
16       Q.  And that's during this
17   deposition.  And I'm in Dallas, we're
18   on conference call, and you can hear me
19   okay, right?
20       A.  Correct.
21       Q.  Okay.  Well, nice to meet
22   you.  I'm sorry I'm not there
23   personally, but I think we can take
24   care of this just as we're doing
25   because I can hear you well as well.
```

Page 40

```
1        You said that you had been
2    involved in the furniture business for
3    about 14 years as a operator of a
4    retail furniture store, right?
5        A.  Correct.
6        Q.  But before that, as an
7    interior designer, you had been dealing
8    with furniture your entire career?
9        A.  Correct.
10       Q.  Because as you're helping
11   customers with their design ideas and
12   so forth, you have to know what is in
13   the market furniture-wise that might be
14   available for that customer?
15       A.  Correct.
16       (Exhibit No. 3 marked.)
17       Q.  (BY MR. GREEN)  Okay.  If you
18   could look at Exhibit No. 3.  Do you
19   recognize that?
20       A.  Sure.  It's on my website.
21       Q.  Okay.  Yeah.  It's a copy of
22   the "about" description on your
23   website, right?
24       A.  Yes.
25       Q.  And in it, on the first part
```

Page 41

```
1    about the store, at the top of the
2    page, it says like the name Calamity
3    Jane's Trading Company -- like the -- I
4    didn't read that right.
5        Let me start again.  "Like
6    the name implies, Calamity Jane's
7    Trading Company offers an exclusive
8    selection of home furnishings," right?
9        A.  Correct.
10       Q.  And so can you describe
11   generally the kind of furniture that
12   you -- that you sell in your store,
13   what's the style or the look that you
14   offer?
15       A.  It's hill country to western
16   to Mediterranean style.
17       Q.  Okay.  In this case, we've
18   heard a lot of general descriptions of
19   furniture styles, but that -- the hill
20   country look that you're talking about
21   some have described as kind of a heavy
22   solid wood look.  Does that -- do you
23   agree with that?
24       A.  Correct.
25       Q.  And then some have described
```

11 (Pages 38 to 41)

Shawn Kelleen Beach                                          7/24/2018

Page 42

1   it as a southwestern style?
2       A.  Correct.
3       Q.  Or some as a Spanish style?
4       A.  Correct.
5       Q.  You mentioned Mediterranean
6   already.  How about old world style?
7       A.  Correct.
8       Q.  Tuscan?
9       A.  Yes.
10      Q.  Rustic?
11      A.  Yes.
12      Q.  And the last one, "rich
13  rancher," have you heard it called that
14  before?
15      A.  Yes.
16      Q.  Really?  I hadn't heard that
17  before yesterday, the "rich rancher"
18  style.
19          Now, the Jason Scott
20  furniture that you carry falls into
21  many of those general descriptive
22  styles?
23      A.  Yes.
24      Q.  Like the other furniture that
25  you carry?

Page 43

1       A.  Correct.
2       Q.  How many different
3   manufacturers of furniture do you
4   represent or that you sell their
5   pieces?
6       A.  Of furniture or are you
7   talking the whole store?
8       Q.  No.  I'm only talking
9   furniture.
10      A.  Probably six to eight.
11      Q.  Okay.  And of those six to
12  eight, that includes Jason Scott and it
13  includes Trendily furniture?
14      A.  Correct.
15      Q.  Okay.  In the second
16  paragraph of the first page of Exhibit
17  3, it says, "Calamity Jane features a
18  one of a kind and custom-made furniture
19  from India, Peru, Brazil, Argentina,
20  Mexico, and of course our own local
21  Texas artists."
22          Do you see that?
23      A.  Uh-huh.
24      Q.  The "one of a kind"
25  description, of the six or eight

Page 44

1   furniture manufacturers that you offer
2   their pieces, are you the only one who
3   offers those pieces?
4       A.  Am I the only one in the
5   state of Texas that offers those pieces
6   or the only one in town?
7       Q.  Well, okay, let's take it --
8   are you the only one in town in Boerne,
9   Texas?
10      A.  No.  I'm sure I'm not.  I'm
11  the only one that carries that style --
12  I mean, not that style.  I'm sorry.
13  From that one vendor that are all one
14  of a kind pieces because they're all
15  made from old pieces.  I do not know if
16  anybody else carries any other kind of
17  pieces that are made similar, that they
18  can one of a kind.  Because they're --
19  on those kind of pieces, there's no two
20  identical because they're made from old
21  moldings, et cetera.
22      Q.  Okay.  So -- okay.  Clearly,
23  you're not the only furniture store
24  that sells furniture from the six or
25  eight manufacturers that you represent?

Page 45

1       A.  No, I'm sure not.
2       Q.  Yeah, okay.  You mentioned,
3   as we go down in that second paragraph,
4   on that last sentence, an ever
5   changing -- and you're talking about
6   your collection, "an ever-changing
7   collection from travertine, copper,
8   wrought iron and wood, to leather," and
9   it goes on.
10          Did I read that much of it
11  correct?
12      A.  I believe so.  Yes.
13      Q.  With regard to the wrought
14  iron, I mean, and wood, I take it that
15  all of the six or eight furniture
16  manufacturers, you're buying case goods
17  from them?
18      A.  No.  There's a couple in
19  there that I'm not, but.
20      Q.  Okay.  Some of them you just
21  buy upholstered furniture from?
22      A.  Correct.
23      Q.  Yeah, okay.  Any others
24  besides Jason Scott that use wrought
25  iron in their furniture?

email@tobyfeldman.com                  Toby Feldman, Inc.                  Certified WOB
tobyfeldman.com                       NATIONWIDE SERVICES                (800) 246.4950

Page 46

1      A.   Of course there is.
2      Q.   Okay.  And you say of course
3   because in your years as an interior
4   designer and then as a retail furniture
5   store operator and having gone to
6   numerous furniture trade shows around
7   the country, there are many many
8   manufacturers who use wrought iron as
9   decorative elements in their furniture?
10     A.   Correct.
11     Q.   And then on the second page
12  of Exhibit 3, what's the picture on the
13  second page?
14     A.   My logo.
15     Q.   That's your logo?
16     A.   Correct.
17     Q.   How did you get Calamity Jane
18  as your logo, as the name of your
19  company?
20     A.   Actually, it was just a
21  random, something that we loved the
22  name and we kind of were going to make
23  the store just catchy.  I mean the name
24  was catchy, we thought, and we just
25  thought it was going to fit the store.

Page 47

1      Q.   Okay.  But you thought it
2   would -- using that name would convey a
3   certain image in the buying public?
4      MR. DIETRICH:  Objection to
5   form.
6      THE WITNESS:  Maybe not
7   image, but it was just -- it was a
8   catchy name.  That's what we
9   wanted.
10     Q.   (BY MR. GREEN)  How about
11  emotion?
12     A.   I guess if you want to use
13  emotion, you can.  I mean.
14     Q.   I mean, you chose to use the
15  Calamity Jane name and you chose it
16  because it was catchy and would grab
17  the attention --
18     MR. DIETRICH:  Objection to
19  form.
20     Q.   (BY MR. GREEN)  -- of the
21  buying public; is that right?
22     A.   I guess.  I mean, I'm not
23  going to -- I don't know.  You kind of
24  threw me off on this.
25     Q.   Well, I'm not trying to

Page 48

1   necessarily put words in your mouth.
2   I'm trying to understand why -- why you
3   picked -- you chose to use Calamity
4   Jane as the name of your company?
5      A.   Because we liked it and we
6   thought -- because we liked it.  It was
7   a name.  We thought we could do a good
8   logo with it.  And it was a catchy name
9   for people to identify with and want to
10  come in.  Basically, that's it.
11     Q.   And looking back at your --
12  at the picture of the logo, it has a
13  buffalo?
14     A.   Correct.
15     Q.   Where did the buffalo come
16  from?
17     A.   Well, it goes along with
18  Calamity Jane's.
19     Q.   Yeah.
20     A.   The name.
21     Q.   And just -- you have
22  obviously seen buffaloes used to convey
23  images of the old west, correct?
24     A.   Correct.
25     Q.   Okay.  And you chose to use a

Page 49

1   buffalo image?
2      A.   We did.
3      (Exhibit No. 4 marked.)
4      Q.   (BY MR. GREEN)  Okay.  Let's
5   turn for a second to Exhibit No. 4.
6   The one that you're looking at, how
7   many pages does it have?
8      A.   Apparently 27.
9      MR. DIETRICH:  Wait.  I think
10  you've got two there.
11     THE WITNESS:  Oh.
12     MR. DIETRICH:  I see 23 in
13  mine.
14     THE WITNESS:  Twenty-three.
15     Q.   (BY MR. GREEN)  Okay.  I was
16  worried if I didn't have what you have.
17     Okay.  I'm going to represent
18  to you that in compiling the 23 pages
19  of pictures of furniture in here, that
20  I took these and copied these from your
21  website.
22     A.   Okay.
23     Q.   As you look through them,
24  does that sound correct?
25     A.   Yep.  Yes, it does.

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES                  (800) 246.4950

Shawn Kelleen Beach                                                    7/24/2018

Page 50

1      Q.   Let's talk about the -- let's
2  go through and just look at the
3  different furniture.
4      A.   Okay.
5      Q.   On the first page, what kind
6  of piece of furniture is it that's
7  shown, the wood piece, the case good
8  that's shown there?
9      A.   It's a Peruvian bookcase
10 sideboard.
11     Q.   Okay.  Is that a Jason Scott
12 piece?
13     A.   No, it's not.
14     Q.   Okay.  And the piece has
15 carving -- a lot of intricate carving
16 on it?
17         MR. DIETRICH:  Objection;
18 leading.
19         THE WITNESS:  It does have
20 carving on it, yes, it does.  It's
21 like old molding -- carving.  This
22 is another piece -- I used to buy
23 these pieces.  I did buy these
24 from SilkRoute and then Rahul
25 started making them, to be honest.

Page 51

1  This is a replica of a SilkRoute
2  piece.
3      Q.   (BY MR. GREEN)  Is it at
4  Trendily piece?
5      A.   That's a Trendily piece.
6      Q.   Okay.  And so it has
7  intricate carvings on the face of the
8  furniture?
9      A.   Correct.
10     Q.   Based on the picture, right?
11     A.   Correct.
12     Q.   At the top of the -- of the
13 sideboard piece on either corner, how
14 would you describe -- you're going to
15 be better at describing this than the
16 lawyers are -- how would you describe
17 the way the top is done where it looks
18 like it has stair steps up to the
19 widest piece at the top?  How do you
20 describe that?
21     A.   Well, you've got your surface
22 top and then you have your crown
23 molding draping it down to the face of
24 the piece.
25     Q.   Okay.  Okay.  And do you see

Page 52

1  that commonly in different kinds of
2  furniture?
3      A.   Yes.
4      Q.   And the other direction,
5  sometimes -- sometimes it stair steps
6  down, right?
7      A.   Yes, it does.
8      Q.   The chair that is
9  shown, is that a Jason Scott chair?
10     A.   No, it's not.
11     Q.   Is it a Trendily chair?
12     A.   It is not.
13     Q.   Okay.  It has, looks like, a
14 nail head design on the -- at the
15 bottom of the upholstered portion of
16 it?
17     A.   Those are upholstery nail
18 heads.  They are made of antique --
19 they're made to look like antique
20 brass.  They're on 90 percent of the
21 furniture I have in the store.
22     Q.   Okay.
23     A.   They're used for the
24 upholstery reasons of keeping
25 everything and covering up seams.

Page 53

1      Q.   Okay.  Let's look at the
2  second page.
3      A.   Okay.
4      Q.   And do you recognize the
5  furniture that is shown on the second
6  page?
7      A.   I do.
8      Q.   It shows a chair, right?
9      A.   Correct.
10     Q.   Looks like it's got leather
11 upholstery on it, correct?
12     A.   Correct.
13     Q.   Is that a Jason Scott piece?
14     A.   No, it's not.
15     Q.   And then what is the --
16 there's a piece of furniture -- a
17 wooden piece of furniture in the middle
18 of it, what is that?
19     A.   It's a large candlestick.
20 There's a candle sitting -- a large
21 candle sitting on top.
22     Q.   Okay.  Well, there's two
23 pieces.  On the far right of the
24 picture, there's what looks to me like
25 a candlestick and then it has some kind

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                         NATIONWIDE SERVICES                  (800) 246.4950

Shawn Kelleen Beach                                                    7/24/2018

Page 54

1    of wood holder to it, right?
2        A.  It's a one-of-a-kind piece.
3    It is the top of a column that we got
4    and we used to put a candle on.
5        Q.  Okay.  Got to help me
6    understand a little bit.  The middle
7    piece, is that part of the candle
8    holder?
9        A.  That is a complete separate
10   candlestick, yes.
11       Q.  Okay.  It's a completely
12   different -- and the picture cuts off
13   the top so we can't see that there
14   might be a candle up there as is
15   displayed, I suppose?
16       A.  Correct.
17       Q.  Okay.  And then these
18   candlesticks, are they -- the holders,
19   are they made of wood?
20       A.  Yes.  They're made of wood.
21   They're made in Mexico.
22       Q.  And one of them has -- the
23   one in the middle, I'm going to call it
24   a pedestal, but it's got the -- it's
25   got intricate carvings on the pedestal

Page 55

1    portion of the holder?
2        MR. DIETRICH:  Objection;
3    leading.
4        THE WITNESS:  It does.
5        Q.  (BY MR. GREEN)  And it's got
6    intricate carvings on the base?
7        A.  It does.
8        Q.  On the pedestal portion of
9    it, it looks like there's some rounded,
10   bulbular areas, right?
11       A.  I believe so.  It sits on
12   legs.
13       Q.  Yeah, and that's -- I'm
14   talking about the top portion -- the
15   top half of that middle piece of
16   furniture.  Do you see what I'm talking
17   about?
18       MR. DIETRICH:  Objection;
19   form.
20       THE WITNESS:  I do.
21       Q.  (BY MR. GREEN)  Okay.  And I
22   used the word bulbular-shaped portions
23   of that pedestal.  Do you have a
24   different description for those, or is
25   that reasonably accurate?

Page 56

1        A.  That -- that will work.
2        Q.  Okay.  And those bulbular
3    portions of that have intricate carving
4    on them, correct?
5        A.  Correct.
6        Q.  And as it works down to the
7    piece that is -- eventually comes down
8    to a squared piece, do you see the --
9    that doesn't have carving.  Do you see
10   that?
11       A.  Yes.
12       Q.  Okay.  And then below that
13   is -- is -- is that just the base of
14   it?  What do you call that bottom
15   portion?
16       A.  The bottom portion.
17       Q.  Okay.  That's good enough for
18   me.  It has carving on it too, right?
19       A.  Correct.
20       Q.  And the one on the right that
21   we do see a candle on, that holder
22   portion at the bottom is wood as well?
23       A.  Correct.
24       Q.  And it has -- and it has
25   intricate carving on that wood piece at

Page 57

1    the bottom?
2        A.  Correct.
3        Q.  Okay.  Is it common to see
4    intricate carving on arms and legs of a
5    chair for instance?
6        MR. DIETRICH:  Objection;
7    form.  Foundation.
8        THE WITNESS:  You have your
9    standard carving that you see on
10   all wood chairs that are normal
11   every day.  That's pretty much
12   standard.  You don't see this kind
13   of carving everywhere.  These are
14   all like handmade pieces.  You do
15   not see those -- this kind of
16   carving on everything, no.
17   There's two different -- different
18   styles.
19       Q.  (BY MR. GREEN)  Of the
20   furniture that you carry, because you
21   like the look, I assume, many of the
22   items you have have intricate carving
23   on them, right?
24       A.  Yes.
25       Q.  And that includes, like, the

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                          NATIONWIDE SERVICES                   (800) 246.4950

**Shawn Kelleen Beach**                                                  7/24/2018

---

Page 58

1  chair that we're looking at has
2  intricate carvings on the arms, right?
3      A.   Correct.
4      Q.   It has intricate carvings on
5  the legs, correct?
6      A.   Correct.
7      Q.   And then if you look at it,
8  it's easier to see it on the leg on the
9  right side of chair, what do you call
10  that general shape of that leg, where
11  it's almost -- it's like an inverted S?
12  Do you see what I mean?
13      A.   There is no name, to my
14  knowledge of it.
15      Q.   Okay.  Is it a common shape
16  of a leg where -- in furniture?
17      A.   If there was no carving on
18  it, yes, and the carving is just added
19  on.
20      Q.   Right.  Right.  But I guess
21  that's the point I'm trying to make, is
22  the shape of that leg is common, right?
23      A.   Correct.
24      Q.   And -- and -- but the carving
25  on it does distinguish it?

---

Page 59

1      A.   Correct.
2      Q.   Okay.  Do you know who the
3  manufacturer of the chair we're looking
4  at is?
5      A.   Yes, I do.
6      Q.   And who is that?
7      A.   Sonoran Range.
8      Q.   And the same thing with the
9  other two pieces, the two candlestick
10  holders?
11      A.   Candlestick is from Sonoran
12  Range also.  The bottom column -- top
13  is a one of a kind.  It's from Peru.
14      Q.   Okay.  And just so I'm sure
15  which one we're talking about, that's
16  the one that has the yellow candle on
17  it?
18      A.   Correct.
19      Q.   Okay.  And let's go to the
20  next page, Page 3.  And what is this
21  piece?
22      A.   This is a teak bench.
23      Q.   Is this a Jason Scott piece?
24      A.   It is not.
25      Q.   So there are other furniture

---

Page 60

1  makers who make teak furniture, right?
2      A.   Yep.
3      Q.   Is this reclaimed teak?
4      A.   Yes, I believe it is.  It's a
5  big slab of teak.
6      Q.   So there are multiple
7  manufacturers who make furniture using
8  reclaimed teakwood?
9      A.   Not so much reclaimed.
10  They're a little harder to find, you
11  don't find them every day.
12      Q.   Right.
13      A.   But there's a lot of makers
14  that make, you know, anything out of,
15  to my knowledge, anything out of Peru,
16  you can find some teak, or India, or
17  any places like that.
18      Q.   Okay.  Okay.  And there are
19  manufacturers that make furniture using
20  that wood?
21      A.   Yes.  Not all the time, but
22  yes, they do use it.
23      Q.   Right.  And sometimes they
24  use it, it's reclaimed teak, other
25  times it's not?

---

Page 61

1      A.   Correct.
2      Q.   Okay.  Let's go over to --
3  and before we turn from Page 3, it
4  looks like there is carving on the
5  sides of that bench, of the wood top of
6  the bench, right?
7      A.   Correct.
8      Q.   Looks like a salamander or
9  some kind of lizard, the one closest to
10  us, right?
11      A.   Looks like it.
12      Q.   Let's turn to Page 4.  And
13  what kind of furniture are we looking
14  at there?
15      A.   That is an old vanity made
16  out of old pieces of molding and old
17  doors, and the piece was made from --
18  that's what your -- the old carving is
19  old molding from homes, churches, et
20  cetera, teakwood.
21      Q.   What kind of -- is this a
22  buffet?
23      A.   It's a vanity.
24      Q.   A vanity?
25      A.   Yes.

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES               (800) 246.4950

Shawn Kelleen Beach                                      7/24/2018

Page 62

1    Q.  Okay.  Is this a Jason Scott
2  piece?
3    A.  No, it is not.
4    Q.  Okay.  And so the -- the
5  intricate carving taken from, you said
6  an old --
7    A.  Yes.  Something old.  Old
8  church, old home, old buildings.  This
9  piece is from somewhere in India.
10   Q.  From where?
11   A.  India.
12   Q.  Oh, India.  And it's teak.
13 Is it reclaimed teak?
14   A.  Yes, it is.  The molding is,
15 I'm not sure about the doors.  I would
16 say it was --
17   Q.  Who is the manufacturer of
18 this piece of furniture?
19   A.  SilkRoute.
20   Q.  I noticed it has an iron
21 drawer pull on it.
22   A.  Yes, that drawer pull is
23 common in 90 percent of buffets that I
24 get from them.
25   Q.  Okay.  And not just from

Page 63

1  them.  When you're talking about
2  furniture that has this heavy, rustic,
3  old world, hill country, Mediterranean,
4  Spanish style, the use of iron hardware
5  is very common?
6    MR. DIETRICH:  Objection;
7    form.
8    THE WITNESS:  It's common,
9    but not always seen.  They use
10   both.
11   Q.  (BY MR. GREEN) I'm sorry, I
12 didn't hear your answer.  Can you say
13 it again?
14   A.  They use both wood and iron
15 handles.
16   Q.  So the use of iron hardware
17 on those types of pieces is very
18 common, correct?
19   MR. DIETRICH:  Objection;
20   form as to which types of pieces.
21   Q.  (BY MR. GREEN) Go ahead and
22 answer.
23   A.  Well, you were telling me
24 what kind of pieces you were talking
25 about.

Page 64

1    Q.  I know, and I wanted to make
2  sure our record is clear.  Did you hear
3  my previous question about it?
4    A.  I believe so.  You were
5  asking me if this kind of iron hardware
6  is common.
7    Q.  Yes.  Is it?
8    A.  It's common, I guess.  It's
9  very thin -- I mean, this -- yes.
10   Q.  Yeah.  I just want -- you
11 know, it's -- many different furniture
12 manufacturers, when they're
13 manufacturing furniture of this general
14 style that we're talking, use iron
15 hardware, correct?
16   A.  Correct.  Correct.
17   Q.  For drawer pulls, correct?
18   A.  Correct.
19   Q.  For the door openers that you
20 grab on to open a door of, like, a
21 buffet, right?
22   A.  Correct.
23   Q.  The hinges?
24   A.  Correct.
25   Q.  Common to use iron for all of

Page 65

1  those, right?
2    A.  It's a metal.  I don't know
3  if it's really iron, but it is a metal,
4  correct.
5    Q.  Okay.  Whether it's iron,
6  that same look is what we're talking
7  about?
8    A.  Correct.
9    Q.  And it's very common, right?
10   A.  Correct.
11   Q.  And it's a decorative
12 feature?
13   A.  Not always, no.  It's for --
14 that's how you open and close the
15 doors.
16   Q.  Okay.  It has both a
17 function --
18   A.  Correct.
19   Q.  -- and it's decorative?
20   A.  Correct.
21   Q.  It's both, right?
22   A.  Yes.
23   Q.  Let's go ahead and turn to
24 Page 5.  Is that a Jason Scott?
25   A.  It is not.

17  (Pages 62 to 65)

Shawn Kelleen Beach                                    7/24/2018

Page 66

```
 1          Q.  Actually, either piece, is
 2   the chair a Jason Scott chair?
 3          A.  No.
 4          Q.  And the piece you looked at
 5   first is the tall piece of furniture,
 6   right?
 7          A.  Correct.
 8          Q.  And that's the one you said
 9   no, it's not a Jason Scott piece,
10   right?
11          A.  Correct.
12          Q.  And then on the right-hand
13   side of the photograph, there's part of
14   a piece of furniture that is -- is
15   shown, right?
16          A.  Correct.
17          Q.  Is that a Jason Scott piece?
18          A.  No, it is not.
19          Q.  So none of the furniture in
20   this picture is a Jason Scott piece of
21   furniture, correct?
22          A.  Correct.  This was pre Jason
23   Scott, but no, it is not a Jason Scott
24   piece.
25          Q.  This was pre Jason Scott?
```

Page 67

```
 1          A.  Yes.
 2          Q.  So in other words, you've had
 3   this piece of furniture in your store
 4   for more than six or seven years?
 5          A.  I don't have it in my store.
 6   I had it in my store years ago.
 7          Q.  Okay.  But you had them on
 8   your website?
 9          A.  Correct.
10          Q.  Okay.  Can you still get it?
11          A.  To my knowledge, yes.
12          Q.  And what is that piece of
13   furniture, the tall one?
14          A.  It's a --
15          Q.  What kind of piece are we
16   talking about?
17          A.  It's an armoire, it's a pine,
18   from Jorge Kurczyn.  Pine, carved
19   armoire.
20          MR. DIETRICH:  You might need
21   to spell that for the record, if
22   you can.
23          THE WITNESS:  I'm not sure.
24          MR. DIETRICH:  Sorry to put
25   you on the spot.
```

Page 68

```
 1          THE WITNESS:  K-R-U-Z-E-N?
 2   He's a manufacturer of furniture.
 3          Q.  (BY MR. GREEN)  Jorge
 4   Kurczyn?
 5          A.  Correct.  The chair is from
 6   Old Hickory Tannery.
 7          Q.  Okay.  And how about the
 8   piece on the right?
 9          A.  It's from SilkRoute.
10          Q.  And does that have
11   decorative -- it is --
12          A.  No, that's -- what you see is
13   all the way across.  It just had those
14   iron panels placed in the doors.
15          Q.  Okay.  On the tall armoire
16   that's shown --
17          A.  Uh-huh.
18          Q.  -- up towards the top, and
19   this kind of has the same shape at the
20   top corner as that very first piece we
21   looked at.
22          A.  Correct.
23          Q.  And then it looks like
24   there's some carving below the top that
25   is in the -- it looks like a bunch of
```

Page 69

```
 1   little balls, is the way I'm seeing it.
 2   How do you describe it?
 3          A.  That's just like a
 4   rope-twisted molding.
 5          Q.  Okay.  Rope twisted?  And
 6   then below that, there's different
 7   kinds of carving.  There's carving on
 8   the doors as well, right?
 9          A.  Correct.
10          Q.  Let's go to the next page,
11   Page 6.  And what kind of piece of
12   furniture are we looking at there?
13          A.  This is an entertainment
14   center.  It's made of old teak doors,
15   one of a kind.
16          Q.  Who is the manufacturer of
17   that?
18          A.  Indus Design.
19          Q.  I'm sorry?
20          A.  Indus -- Indus Designs,
21   I-N-D-U-S.
22          Q.  Thank you.  But it's not a
23   Jason Scott piece?
24          A.  Correct.
25          Q.  And this piece, where does
```

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES                   (800) 246.4950

Shawn Kelleen Beach                                    7/24/2018

Page 70

1    Indus make their furniture, is it
2    India?
3        A.  He goes all over.
4        Q.  Okay.  And is this made from
5    reclaimed teak?
6        A.  Well, I don't know if it's
7    made from reclaimed teak.  I know the
8    doors are teak, they're original, the
9    molding is original, and the rest of --
10   I'm not sure if the rest of the piece
11   is made of teak or not.
12       Q.  Okay.  But the doors have
13   intricate carving on them, right?
14       A.  Correct.
15       Q.  And they have iron door pulls
16   like we talked about earlier?
17       A.  Correct.
18       Q.  In fact, they look almost
19   exactly like the ones we talked about
20   earlier over on Page 4?
21       A.  Correct.
22       Q.  Let's go ahead and turn to
23   Page 7.  This piece of furniture was
24   photographed outdoors, it looks like?
25       A.  Yes.  This is a piece from

Page 71

1    Sonoran Range.  It was made from just
2    reclaimed wood.
3        Q.  Is it reclaimed teak?
4        A.  No.
5        Q.  Do you know what kind of wood
6    it is?
7        A.  I do not.  Some kind of pine.
8        Q.  And it's not a Jason Scott
9    piece, I don't think, right?
10       A.  Correct.
11       Q.  The pieces that are on top of
12   it, the iron scrolling pieces on top of
13   it?
14       A.  They're iron candleholders.
15       Q.  Is that part of the piece of
16   furniture, or is that just how you're
17   displaying it?
18       A.  How it's displayed.
19       Q.  Okay.  And who made those?
20       A.  Sonoran Range.
21       Q.  Pardon me?
22       A.  Sonoran Range also.
23       Q.  Okay.  They're not made by
24   Jason Scott?
25       A.  Correct.

Page 72

1        Q.  And they have decorative iron
2    that is used to make the base of the
3    candlestick holders, right?
4        A.  Correct.
5        Q.  Talking about this piece of
6    furniture, what do you call that piece,
7    is that a --
8        A.  It's a buffet.  It's a
9    credenza.
10       Q.  Okay.  It looks like it
11   has -- are those drawers that pull out
12   or -- that have the big iron?
13       A.  Yes, they're drop-down
14   drawers, and those are old conchos that
15   I do not know what they were used for
16   prior to this.
17       Q.  And our picture is limited.
18   And so is there something on there that
19   you can grab hold of and pull the
20   drawer open?
21       A.  You can see the latch above
22   it.  If you undo the latch, you can
23   pull the metal part and it will come
24   down.
25       Q.  Okay.  There -- there's

Page 73

1    something that protrudes on the metal
2    part that you can grab hold of?
3        A.  Correct.
4        Q.  Okay.  And then towards the
5    bottom of it, it looks like there's
6    decorative metal nailing -- nail heads?
7        A.  Yes, clavos.  Those are just
8    nail heads used on everything from
9    Mexico.
10       Q.  Okay.  And those nail heads,
11   they're not just used on things from
12   Mexico, they're used on a great variety
13   of the furniture that you sell, right?
14       A.  Yes, but they're all
15   different kinds.  Some are made for
16   upholstery, some are made for woodwork
17   and things like that.
18       Q.  Right.  They're used on --
19   frequently with the type of furniture
20   that we've been discussing, correct, as
21   a decorative feature?
22       A.  Correct.
23       Q.  But by many different
24   manufacturers?
25       A.  Correct.

19  (Pages 70 to 73)

Page 74

1          Q.  Let's go to the next page,
2     Page 8.  It's a repeat of the first
3     page, so we won't talk about that.  But
4     Page 9.
5          A.  Okay.
6          Q.  What -- what kind of piece of
7     furniture is this one?
8          A.  That's a Jason Scott piece.
9          Q.  Okay.  Is it an end table for
10    a bedroom?
11         A.  It's a sanatorium -- it's
12    a -- I mean, I'm sorry, it's a
13    nightstand.  I have had people do them
14    for vanities, a hallway piece,
15    multipurpose.
16         Q.  Okay.  And if you look over
17    at the -- on the right-hand side, shows
18    the shape of the leg of the bed, right?
19         A.  Correct.
20         Q.  And that shape is similar to
21    the shape we saw on that other piece of
22    furniture that has kind of the inverted
23    S shape to it?
24         A.  Yeah, but it's a completely
25    different deal.  That's a chair, this

Page 75

1     is a piece of furniture.
2          Q.  Right.  I understand.  But
3     the shape of that part of it is
4     similar?
5          A.  Yes.
6          Q.  And remember you said that
7     it's common on chairs, it's also common
8     on desks or other pieces of furniture
9     as well?
10             MR. DIETRICH:  Objection;
11    form.  Leading.
12             THE WITNESS:  You see it from
13    time to time, yes, you see it.
14         Q.  (BY MR. GREEN)  And sometimes
15    it's not carved, correct?
16         A.  Correct.
17         Q.  Sometimes it is?
18         A.  Correct.
19         Q.  And in this instance, it is
20    carved, right?
21         A.  Yes.
22         Q.  And then the -- it looks like
23    there are, I'm going to say metal or
24    iron, I can't really tell for sure,
25    drawer pulls on this piece of

Page 76

1     furniture, right?
2          A.  Correct.
3          Q.  Do you know offhand -- you've
4     seen it -- so is that -- are they iron,
5     or do you know?
6          A.  They're iron.
7          Q.  Okay.  And then if you go in
8     between the two, the two iron drawer
9     pulls, there's several round decorative
10    carving areas, do you see those, maybe
11    one, two, three, four, five of them in
12    between the two?
13         A.  I do.
14         Q.  How do you describe that?
15    What is that?
16         A.  Carving.
17         Q.  Okay.  If you turn over to
18    Page 4, on this piece of furniture on
19    Page 4, in the middle, it looks like
20    there's kind of a round carving area as
21    well, right?
22         A.  Right.  But they're not even
23    similar.
24         Q.  They're not the same, right?
25         A.  Right.

Page 77

1          Q.  And then if you look at the
2     next page, on Page 5, the tall hutch,
3     there's a round carved area that's
4     bigger.  Do you see that?
5          A.  It's a flower.
6          Q.  Right.  The round carved area
7     I'm talking about?
8          A.  I see it.
9          Q.  And it's got kind of a big,
10    I'm going to say, dot or a blank area
11    in the middle, right?
12         A.  It's supposed to be a flower.
13         Q.  A part of the flower?
14         A.  That's the center of the
15    flower.
16         Q.  And -- but it does have what
17    I described, a blank area, I'm going to
18    call it a dot --
19         A.  Correct.
20         Q.  -- in the middle, right?
21         A.  Correct.
22         Q.  And then if we go back to
23    Page 9, on the circular design here is
24    what we're talking about, the Jason
25    Scott piece, it also has that dot in

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES                  (800) 246.4950

Shawn Kelleen Beach                                    7/24/2018

Page 78

1    the middle, right?
2        A.  It does.
3        Q.  On the top edge of the piece
4    of furniture shown here on Page 9, the
5    Jason Scott piece, there's intricate
6    carving around the top edge of the
7    table top?
8        A.  There is.
9        Q.  And then what did you call --
10   along the leg of the table, the end
11   table, there's what looks like some
12   rope-looking carving.  Do you see that?
13       A.  I do.
14       Q.  Okay.  And I can't tell from
15   this picture what the rest of the
16   carving is intended to represent.  Can
17   you?
18       A.  Say that again.
19       Q.  I really can't tell from the
20   picture what the rest of the carving on
21   the leg, for instance, is intended to
22   represent.  Do you know, or can you
23   tell?
24       A.  No, it's just carving.  I
25   mean, he's got carving throughout the

Page 79

1    whole piece.
2        Q.  Right.  He does, yes.  Got
3    lots of carving, right?
4        A.  Yep.  Yes.
5        Q.  Turn over to Page 10.  What
6    piece of furniture are we looking at
7    here?
8        A.  This is a Taracea piece made
9    in Mexico, armoire.  That is not
10   teakwood.  That is a mixture of several
11   different kinds of wood.
12       Q.  Is it reworked wood?
13       A.  It's -- excuse me?
14       Q.  Is it reclaimed wood?
15       A.  No, it is not.
16       Q.  And you said the manufacturer
17   was Taracea?
18       A.  Yes, T-A-R-A-C-E-A.
19       Q.  Okay.
20       A.  It's a very high-end
21   furniture maker.
22       Q.  And they use, looks like,
23   iron hardware on it?
24       A.  I believe there is, yes.
25   Yes.

Page 80

1        Q.  Let's go ahead and turn to
2    Page 11.  What are we looking at in the
3    photograph on Page 11?
4        A.  This was a parade house I
5    did.  The bed, I honestly, gosh, this
6    was ten, 12 years ago.  It was just a
7    bed as far as nothing old or anything.
8    The nightstands, those are nightstands
9    from Trendily, I believe.  Not sure.
10       Q.  Okay.  The bed, you don't
11   know who the manufacturer is, but it's
12   not Jason Scott, right?
13       A.  No, it is not Jason Scott.
14   It's just something that we purchased
15   for the Parade of Homes.
16       Q.  On the -- the headboard of
17   the bed, it looks like there's a
18   decorative area in the middle that
19   protrudes up.  Do you see what I'm
20   talking about?
21       A.  Yeah, but it was just put on
22   there.  I mean, it was screwed on.
23       Q.  Okay.  Is it wood?  Is it
24   iron?
25       A.  It's wood.

Page 81

1        Q.  Okay.  And then the Trendily
2    piece, that's a nightstand?
3        A.  I believe it is.  It is a
4    nightstand, yes.  And I'm not sure if
5    that's -- he had some pieces like this,
6    but I'm not sure if that was from
7    somebody else first and then he started
8    making these pieces.
9        Q.  You don't know the history of
10   it, right?
11       A.  I do not.  I'd have to look
12   it up.
13       Q.  Now, this bed, you said, the
14   photograph, it dates back many years
15   you said, right?
16       A.  As far as when this was done,
17   no, the bed was new.  I mean...
18       Q.  Right.  Right.  So the
19   picture was taken when the bed was new?
20       A.  Correct.
21       Q.  And so this table, or the end
22   table that's next to it, whether it's
23   Trendily or whoever made that table,
24   you bought it about the same time or
25   had it about the same time as the bed?

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES              (800) 246.4950

Shawn Kelleen Beach                                    7/24/2018

Page 82

```
1        A.  Correct.
2        Q.  Both of those predate your
3   offering any Jason Scott furniture?
4        A.  Correct.
5        Q.  And the end table has
6   intricate carvings on the -- across
7   the -- on the top itself, but across --
8        A.  Yes, it does.
9        Q.  -- below the top, right?
10       A.  Correct.
11       Q.  Down each leg of it or each
12  corner of it, correct?
13       A.  Correct.
14       Q.  And then intricate carving on
15  the drawers of the end table?
16       A.  Correct.
17       Q.  And it looks like it has
18  decorative iron pulls on the drawers?
19       MR. DIETRICH:  Objection;
20       form.  Foundation.  I don't know
21       if we can see that here.
22       THE WITNESS:  Yeah, I don't
23       recall.
24       Q.  (BY MR. GREEN)  Do you
25  remember offhand?
```

Page 83

```
1        A.  Pardon me?
2        Q.  Do you remember?
3        A.  No, sir, I don't.
4        Q.  We're just looking at
5   photographs, but you've seen it, right?
6        A.  Oh, yes.
7        Q.  Let's go to the next page,
8   Page 12.  And is the furniture you see
9   there, is that a Jason Scott?
10       A.  No, it is not.
11       Q.  Who makes that piece?
12       A.  That piece is from Classic
13  Home.
14       Q.  The iron work on it, does
15  that come from the same folks?
16       A.  Yeah.  It was -- yes, I mean
17  from the manufacturer of the bed.  It
18  was all --
19       Q.  It's all part of it?
20       A.  Correct.
21       Q.  Okay.  Let's go to Page 13.
22  And tell us, can you identify that
23  piece of furniture?
24       A.  It's a Jason Scott buffet.
25       Q.  Okay.  And does it have the
```

Page 84

```
1   heavy iron drawer pulls that we talked
2   about earlier?
3        A.  Correct.
4        MR. DIETRICH:  Objection;
5        form.
6        THE WITNESS:  It does.
7        Q.  (BY MR. GREEN)  Similar to
8   what we talked about earlier, right?
9        MR. DIETRICH:  Objection;
10       form.  Foundation.
11       THE WITNESS:  No, these are
12       totally different from the ones
13       that we have seen earlier.
14       Q.  (BY MR. GREEN)  They're
15  decorative iron, but the hinge itself
16  is different?
17       A.  Yes.
18       Q.  Okay.  And there's, looks
19  like rope carving, at the top corners
20  of the console?
21       A.  Correct.
22       Q.  And carving on the doors
23  themselves?
24       A.  Correct.
25       Q.  And this piece of furniture,
```

Page 85

```
1   is it teak?
2        A.  Correct.
3        Q.  Do you know whether it's
4   reclaimed teak?
5        A.  Of course it is.
6        Q.  Let's go ahead and turn to
7   the piece of furniture on Page 14, of
8   the bed, right?
9        A.  Correct.
10       Q.  Is it a Jason Scott bed?
11       A.  No.
12       Q.  And this piece of furniture
13  has carvings on the footboard?
14       A.  Yes.
15       Q.  And the headboard?
16       A.  Yes.
17       Q.  So it's a four-post bed and
18  there's carving at the tops of each
19  post?
20       MR. DIETRICH:  Objection;
21       leading.
22       THE WITNESS:  Correct.
23       Q.  (BY MR. GREEN)  Can you
24  identify the piece of furniture to the
25  left of the bed, I guess the end table
```

22  (Pages 82 to 85)

Shawn Kelleen Beach                                          7/24/2018

Page 86

1    or the --
2         A.   Yes, that is a nightstand
3    from Indus.
4         Q.   I keep calling it an end
5    table, but the proper nomenclature
6    would be nightstand, right?
7         A.   Yes, but it's okay.
8         Q.   What about the lamps?
9    There's -- you have lamps on each of
10   the nightstands?
11        A.   I do.  They are made in
12   Mexico.
13        Q.   Decorative iron?
14        A.   Yes.
15        Q.   That has scrolls and so
16   forth, right?
17        A.   Right.
18        Q.   The end tables have -- have
19   wood carving on the fronts of them,
20   right?
21        A.   I wouldn't call that -- it's
22   open.  It's like a laser cut.  It's all
23   open.  It's not really carving.  It's
24   cut out.
25        Q.   Okay.  It shows the

Page 87

1    limitation of our photographs?
2         A.   Right.
3         Q.   Is that -- is that metal?
4         A.   No, it's wood.
5         Q.   Wood, okay.  But it's open so
6    that you can see into it?
7         A.   Right.
8         Q.   Let's turn to the picture on
9    Page 15.  And we have another bed,
10   right?
11        A.   A Jason Scott bed and a Jason
12   Scott nightstand.
13        Q.   Okay.  The Jason Scott bed,
14   across the top part of the foot piece
15   on the bed, the end piece on it has the
16   decorative nailing that we talked about
17   earlier?
18        A.   Correct.
19        Q.   There's hand carving on the
20   headboard.  Same is true with regard to
21   the end table, right?
22        A.   Correct.
23        Q.   Turn to Page 16.  Another bed
24   and end table.  Who is the manufacturer
25   of these?

Page 88

1         A.   The manufacturer of these was
2    SilkRoute.  The bed is an old door bed
3    made out of an old door, headboard and
4    footboard.
5         Q.   What did you call the -- I
6    don't know how to ask this really.
7    What do you call the style in furniture
8    making where they take old -- you said
9    doors in this case, or old pieces from
10   houses or whatever, and turn it into a
11   furniture piece?  What do you call
12   that?
13        A.   Well, we call them one of a
14   kind because there's no two exactly
15   alike.
16        Q.   Right.
17        A.   That's what we call them.
18        Q.   Okay.
19        A.   Because if somebody comes in
20   and wants two pieces, they will never
21   get two identical.  The molding will be
22   different, doors will be different, et
23   cetera.
24        Q.   Who is the manufacturer of
25   the end table that's shown on Page 16?

Page 89

1         A.   I believe that's from
2    SilkRoute also.
3         Q.   Okay.  And is -- do you know
4    what kind of wood that is?
5         A.   I do not know what kind of
6    wood that is.  I know it's not teak,
7    it's not reclaimed, but I do not know
8    what that wood was.
9         Q.   Okay.  And it looks like it
10   has the iron hardware that we've been
11   talking about.
12             MR. DIETRICH:  Objection;
13   form.  Foundation.
14             THE WITNESS:  Yes, it has
15   some on it.
16        Q.   (BY MR. GREEN) Let's go
17   ahead and turn to Page 17.  The big
18   piece of furniture that's shown in the
19   picture, what is that?
20        A.   The big piece of furniture is
21   an entertainment center.  It was made
22   out of some sort of pine.  The
23   manufacturer is not in business
24   anymore.  It was made in Mexico.
25        Q.   Okay.

23  (Pages 86 to 89)

Shawn Kelleen Beach                                                7/24/2018

Page 90

1       A.  I can't think of the name of
2  it off the top of my head right now.
3       Q.  I'm sorry, I interrupted you
4  there.  It's not a Jason Scott piece,
5  right?
6       A.  Correct.
7       Q.  What about the table that is
8  shown in the foreground?
9       A.  The table was an old Chinese
10 bed that -- on iron legs.
11      Q.  Is that a Jason Scott piece?
12      A.  No.  It's from Indus.
13      Q.  What about the chairs, the
14 chair that's in there on the right-hand
15 side?
16      A.  The chair on the right-hand
17 side is Old Hickory Tannery.  The sofa
18 is Paul Roberts.
19      Q.  The name again of the sofa?
20      A.  It's Paul Roberts.
21      Q.  Okay.  Both the chair and the
22 sofa have decorative nailing on them,
23 right, different types, but both have
24 decorative nailing?
25      A.  Well, the sofa just has the

Page 91

1  nail heads on the trim.  It's, I mean,
2  standard with any sofa that we get.
3       Q.  It's standard to have the
4  decorative nailing as shown on that
5  sofa?
6       A.  Correct.
7       Q.  And then the chair has a
8  little bit different type of nailing,
9  but --
10      A.  Correct.
11      Q.  -- you see that frequently
12 also in the furniture that you offer?
13      A.  Yes.
14      Q.  Of these styles that we've
15 been talking about, right?
16      A.  Correct.
17      Q.  If you go to Page 18.
18      A.  That is a mesquite table from
19 Mexico.
20      Q.  And this table has -- is that
21 heavy rope carving on the sides of the
22 tabletop?
23      A.  It does.
24      Q.  And that's a --
25 rectangular-shaped table?

Page 92

1       A.  Yes.  Yes, it is.
2       Q.  Is it a dining table?
3       A.  Yes, it is.
4       Q.  And, you know, over the
5  years, you've offered many, many, many
6  types of those dining tables for sale
7  at your store?
8       A.  Correct.
9       Q.  Have some of them had
10 rectangular-shaped tops like this one?
11      A.  Ninety percent of them do.
12      Q.  Okay.  That's a very common
13 shape for the tabletop of a dining room
14 table, right?
15      A.  Correct.
16      Q.  Some of them have carved
17 edges?
18      A.  Yep.
19      Q.  And then some don't?
20      A.  Correct.
21      Q.  Okay.  Who makes the --
22 there's two different chairs, two
23 different kinds of chairs, it looks
24 like, in the picture?
25      A.  Yes.  The chairs on the end

Page 93

1  are made from Sonoran Range.  And the
2  mesquite chairs on the sides are --
3  they're mesquite, also made in Mexico.
4       Q.  Okay.  And those have
5  decorative iron, it looks like, on the
6  back of the --
7       A.  Yes, they do.
8       Q.  -- at the top and on the back
9  of it and the front of it, across the
10 top, right?
11      A.  Correct.
12      Q.  Go to Page 19.  Can you tell
13 us about this table?
14      A.  This table is mesquite inlaid
15 with copper.  It's made by Jorge Trejo,
16 which has since passed.  And he had a
17 patent on all these.
18      Q.  Pardon me?
19      A.  He had a patent on all of his
20 inlay work.
21      Q.  Okay.  This -- I can't tell
22 for sure where the copper is on this,
23 the inlaid copper, is it on the apron?
24      A.  It's on the top.
25      Q.  On the top, okay.

24  (Pages 90 to 93)

Shawn Kelleen Beach                                      7/24/2018

Page 94

1        A.   And you can see a little bit
2   in the legs -- pedestals.  The end
3   chairs are Old Hickory Tannery.  The
4   side chairs are Paul Roberts.
5        Q.   The table has a type of rope
6   carving?
7        A.   Correct.
8        Q.   And it has an apron
9   underneath it?
10       A.   Correct.
11       Q.   And then the pedestal base,
12  it's a two-pedestal-base table, right?
13       A.   Correct.
14       Q.   And the -- when you look at
15  the pedestal, it has a kind of a
16  bulbular area that is squared, right?
17       A.   Yes.
18       Q.   And below that are various
19  levels of square pieces of wood.  It
20  may all be one piece of wood, but the
21  shape of it has several levels of
22  square pieces, right, different sizes?
23       A.   Yes.
24       Q.   And it comes down to a -- the
25  footing of it is a -- has four

Page 95

1   different legs that extend from the
2   pedestal base?
3        A.   Yes.
4        Q.   On each side, right?
5        A.   Yes.
6        Q.   The chair, the two chairs on
7   the end have intricate carving on the
8   chairs, right?
9        A.   They do.
10       Q.   How do you describe the
11  carving on those?
12       A.   On the end chairs?  It's just
13  a twisted-turn-leg-type piece.
14       Q.   And let's go to the next
15  page, pedestal table, right?
16       A.   Correct.
17       Q.   Is that a dining table?
18       A.   It is.
19       Q.   And -- and the pedestal base
20  is round -- this type of bulbular area
21  is completely round, right?
22       A.   It is.
23       Q.   And there's no carving on it?
24       A.   Correct.
25       Q.   As the design of it stair

Page 96

1   steps down.  Instead of being square
2   stair steps like we were looking at
3   earlier, these are round?
4        A.   Correct.
5        Q.   Did I ask, is this a Jason
6   Scott piece of furniture?
7        A.   It is not a Jason Scott
8   piece.
9        Q.   Okay.  What about the chairs?
10       A.   No, not Jason Scott.  Sonoran
11  Range.  The banquette is from Asad.
12       Q.   Okay.  Which one is from
13  Asad?
14       A.   The piece with the decorative
15  back.
16       Q.   The chair in the middle?
17       A.   Correct.
18       Q.   Okay.  And both the chairs,
19  the two that are alike and then the one
20  in the middle, those are different
21  manufacturers, right?
22       A.   Correct.
23       Q.   They each have used the nail
24  head designs on the chairs?
25       A.   Yes.

Page 97

1        Q.   Let's go ahead and turn to
2   Page 21.  Tell us about this table.
3        A.   It's a Mesquite-top table
4   from Mexico.
5        Q.   Uh-huh.
6        A.   With an iron base.
7        Q.   It's got an iron base to it?
8        A.   It does.
9        Q.   Hard to see from the
10  photograph.  That's not a Jason Scott
11  piece, right?
12       A.   It is not.  Nothing in this
13  picture is a Jason Scott piece.
14       Q.   Okay.  The chair -- the
15  leather chairs have the nail head
16  decoration around them, right?
17       A.   Correct.
18       Q.   Different kinds on the backs
19  of the chairs.  The nail heads are
20  actually touching each other, and then
21  along the side of the seat, it looks
22  like there's a gap between them.
23       A.   Correct.  Just a different
24  way of making it.
25       Q.   Yeah.  Yeah.  Let's go ahead

25  (Pages 94 to 97)

Shawn Kelleen Beach                                                7/24/2018

Page 98

1    and turn to Page 22.  And it looks like
2    there's --
3         A.   Mesquite top -- or mesquite
4    table with iron pedestal base and
5    chairs from Mexico.
6         Q.   Okay.  Different
7    manufacturers on the chairs, or two
8    different types of chairs?
9         A.   No, same manufacturer on the
10   chairs.  Just two different types.
11        Q.   Okay.  Chairs had carving on
12   the legs?
13        A.   Correct.
14        Q.   The table itself has a heavy
15   look to it, right?
16        A.   Yes.
17        Q.   A thick top to it?
18        A.   Yes.  No carving.
19        Q.   Right.  No carvings on it?
20        A.   No.
21        Q.   A heavy look to the table?
22        A.   Yes.
23        Q.   A lot of the furniture -- a
24   lot of the type of furniture we've been
25   talking about has that heavy

Page 99

1    substantial look.
2         A.   Correct.
3         Q.   And let's turn to the last
4    page.  Tell us about the table on this
5    last page.
6         A.   It's a Jason Scott iron base
7    table, 60-inch.
8         Q.   So that whole base has an
9    iron base to it?
10        A.   No, it's got a wood pedestal
11   in the middle and iron scrolls, and
12   then another wood base.
13        Q.   Okay.  Our picture doesn't
14   show the wood base then, I take it?
15        A.   Correct.
16        Q.   And then the tabletop is a
17   round table, right?
18        A.   Reclaimed teak.
19        Q.   Reclaimed teak, right?  Okay.
20   What about the chairs?
21        A.   Chairs are from IDS Company
22   out of Dallas.
23        Q.   Okay.  When Rahul came into
24   your store in July and was showing you
25   Trendily furniture and it included

Page 100

1    the -- the pieces that looked like
2    Jason Scott pieces?
3         A.   Correct.  He was showing
4    me -- he just showed me those pieces.
5         Q.   Okay.  Do they frequently, I
6    say frequently, from time to time,
7    either Rahul or Chris Sanders might
8    stop by your store to -- to show you
9    items that they sell?
10        A.   Yes.  Randomly.
11        Q.   And then also I think you
12   said you saw Chris at least once at
13   a -- I guess one of the furniture
14   showings at the market?
15        A.   Right.  Right.  You mean
16   that's -- he's always in the showroom
17   during market.
18        Q.   Okay.  So Trendily was -- do
19   they have a showroom at the market?
20        A.   They do.
21        Q.   We're talking about Dallas?
22        A.   Correct.
23        Q.   Anywhere else?
24        A.   I have no idea.
25        Q.   Okay.  Not that -- not that

Page 101

1    you've seen, right?
2         A.   Right.
3         Q.   Is that market open just at
4    certain times?
5         A.   It's -- no.  They have it two
6    times a year.  Two or more times a
7    year.
8         Q.   Okay.  Two or more times a
9    year.  And I take it that furniture
10   manufacturers bring their furniture and
11   display it so that buyers like you can
12   go through and look and see what pieces
13   and preview them and try to make sales,
14   right?
15        A.   Correct.
16        Q.   Okay.  Before Rahul came in
17   this day that he showed you the
18   Trendily pieces that looked like the
19   Jason Scott pieces, did he tell you
20   what the name of that line was that he
21   had -- that Trendily was making?  Did
22   he mention the MJ Collection?
23        A.   No.
24        Q.   Okay.  Before that, did you
25   have any knowledge, or had you heard

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                         NATIONWIDE SERVICES                   (800) 246.4950

Shawn Kelleen Beach                                    7/24/2018

Page 102

1    anything about Trendily offering these
2    pieces?
3         A.   No.
4         Q.   After they left, what did you
5    do?
6         A.   I was -- nothing.  Just shook
7    my head in disbelief and...
8         Q.   When did you contact Jason
9    Scott or his representative?  I think
10   his name is Mark?
11        A.   Mark, yes.
12        Q.   You called him, right?
13        A.   No, I did not call him.
14   Maybe I -- I can't -- I e-mailed him
15   possibly.  I'm not sure.  I think it
16   was stirring around or he got word that
17   something was happening.  Something was
18   going on.  And then I kept hearing
19   about it and hearing about it.  And I'm
20   not sure how long after that that --
21        Q.   So after -- after Rahul and
22   Chris left that first time, when did
23   you communicate with Mark or anyone
24   else, whether it's by text, by e-mail,
25   by phone call, in person, when did you

Page 103

1    next communicate with them?
2         A.   Probably a month or six weeks
3    later when I had gotten wind of it
4    again, as far as that it was really
5    happening.
6         Q.   And was it Jason Scott, or
7    was it Mark that asked you to inquire
8    about whether or not Trendily would
9    make other pieces?
10        MR. DIETRICH:  Objection;
11   form.  Foundation, leading.
12        THE WITNESS:  They didn't ask
13   me.  I offered it.  I told them
14   what I was told.
15        Q.   (BY MR. GREEN)  Did you
16   inquire of Chris about whether or not
17   Trendily could make other Jason Scott
18   pieces?
19        A.   No, with what he told me --
20   no, I did not ever contact them to try
21   to get any pieces or ever want any
22   pieces.
23        Q.   Did you tell Chris that you
24   had a customer that wanted a Jason
25   Scott piece, but Jason Scott couldn't

Page 104

1    get it to you quick enough and you were
2    asking Trendily if they could do it?
3         A.   No.
4         Q.   And the reason I ask those is
5    that there have been other dealers of
6    Jason Scott pieces that were asked by
7    Jason Scott to contact Trendily and see
8    if they could make other pieces, and
9    you're saying that didn't happen to
10   you?
11        A.   No.
12        MR. GREEN:  Okay.  I believe
13   that's all the questions I have
14   now, Ms. Beach.
15        Thank you very much.
16        THE WITNESS:  All right.
17   Thank you.
18        (Passed the witness at
19   12:06.)
20        FURTHER EXAMINATION
21   BY MR. DIETRICH:
22        Q.   I just have a couple
23   follow-up questions based on what Chuck
24   asked, but just be a couple more
25   minutes.

Page 105

1         You looked through 23 pages
2    of furniture in Exhibit 4.  Did you
3    have any difficulty identifying which
4    pieces were Jason Scott and which
5    weren't?
6         A.   No.  There's no second
7    looking.  I mean...
8         Q.   You did it right away, right?
9         A.   Yes.
10        Q.   You weren't confused about
11   who made any of these or thought that
12   they might be Jason Scott when they
13   weren't?
14        A.   No.
15        Q.   On that very first one of
16   Exhibit 4, you said that bookcase was
17   originally made by SilkRoute?
18        A.   Yes.  It was originally made
19   from SilkRoute.
20        Q.   Who's SilkRoute?
21        A.   A company out of California.
22   They bring a lot of the one-of-a-kind
23   pieces in and they may have, you know,
24   replicas also, but I've dealt with them
25   for 14 years.

email@tobyfeldman.com                Toby Feldman, Inc.                 Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES               (800) 246.4950

Shawn Kelleen Beach                              7/24/2018

Page 106

1      Q.  And then you said Trendily
2   started making that piece?
3      A.  Correct.
4      Q.  Did -- was -- did Trendily
5   start making it because you asked them
6   to?
7      A.  No.
8      Q.  How did you find out Trendily
9   was making that piece?
10     A.  He -- I remember he had it at
11  market one time.
12     Q.  And did you recognize it?
13     A.  Uh-huh.
14     Q.  Did you recognize it as a
15  copy of SilkRoute's piece?
16     A.  (Witness nods.)
17     Q.  Yes?
18     A.  I did.
19     Q.  Did you see any differences
20  between the Trendily piece and the
21  SilkRoute piece?
22     A.  Yes.  The quality wasn't
23  there.  I mean, it was, you know, that
24  type of difference I saw, not the
25  difference as far as it was the same

Page 107

1   size, it was the same height, made the
2   same way.  Just quality wasn't there.
3      Q.  Did it have the same
4   carvings?
5      A.  As close as he could be.  I'm
6   not going to say it was identical
7   because it's hard to replicate that.
8      Q.  But it had the same design?
9      A.  Oh, definitely.  There was no
10  mistaking of it.  Somebody tried to
11  copy it.
12     Q.  And I believe it was actually
13  Chuck that said this to you, if you
14  recall.  He said the carvings
15  distinguish, referring to furniture?
16         MR. GREEN:  Objection; form.
17     Q.  (BY MR. DIETRICH)  Is that
18  accurate to you?
19     A.  I'm sorry?
20     Q.  Do carvings distinguish
21  furniture?
22     A.  You mean the different types
23  or as far as --
24     Q.  Sure.
25     A.  Well, yes.  I mean, you've

Page 108

1   got your leg types, you've got your
2   sofa-type legs.  Yes, it all has a
3   certain type.  And then some add
4   carvings, some add a little more
5   design.
6      Q.  And would you say adding
7   certain carvings might distinguish one
8   piece of furniture from another?
9      A.  Yes.
10         MR. GREEN:  Leading.
11     Q.  (BY MR. DIETRICH)  Even where
12  the underlying shapes might be similar?
13     A.  Right.
14         MR. GREEN:  Leading.
15     Q.  (BY MR. DIETRICH)  You talked
16  about -- I think you don't need to go
17  there.  This was Page 3, that it was a
18  teak -- a reclaimed slab of teak.  And
19  you said you have seen teak from Peru,
20  from India, and obviously from
21  Indonesia, and Jason Scott.
22     A.  Uh-huh.
23     Q.  To your knowledge, is there
24  any difference in the appearance of
25  teak based on what country it comes

Page 109

1   from?
2      A.  I don't have that knowledge,
3   no.  No.
4      Q.  So you don't know one way or
5   the other?
6      A.  But you've got reclaimed, you
7   know, your reclaimed, your carved, and
8   then you've got, you know, smooth
9   surfaces.  It all looks a little
10  different.
11     Q.  But you don't know if there's
12  any difference based on whether it
13  comes from India or Indonesia?
14     A.  Honestly, I don't.  I don't
15  know that answer.
16         MR. DIETRICH:  I don't have
17  any other questions.
18         (Passed the witness at
19  12:10.)
20         FURTHER EXAMINATION
21  BY MR. GREEN:
22     Q.  Ms. Beach, with regard to
23  that picture on Page 1.
24     A.  Yes.
25     Q.  You've never compared the

28  (Pages 106 to 109)

**Shawn Kelleen Beach**                                                  7/24/2018

---

Page 110

```
1    Trendily piece next to the SilkRoute,
2    is that what you said?
3        A.  Yes.
4        Q.  You've never compared them
5    side by side, have you?
6        A.  No.  But I have had them both
7    in the store.  I mean, this is the only
8    piece of Trendily's that I purchased
9    like that.
10       Q.  Okay.  The -- on Page 3, you
11   looked at the teak piece of furniture.
12       A.  Yes, the bench.
13       Q.  Teak furniture is like any
14   other kind of wooden furniture in that
15   it can be finished in many different
16   ways?
17       A.  Correct.
18       Q.  You could have rough
19   finishes, you could have smooth
20   finishes, right?
21       A.  Correct.
22       Q.  You could have reclaimed teak
23   just like you could have reclaimed
24   other wood, right?
25       A.  Correct.
```

Page 112

```
1        MR. DIETRICH:  All right.
2    That's it.
3        (Deposition concluded at
4    12:12.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 111

```
1        Q.  It could have carvings, no
2    carvings.  There's nothing magic about
3    teak furniture that makes it uniquely
4    just one style, one look, correct?
5        A.  No, not in that sense.  You
6    know, teak -- teak furniture is nice to
7    have because it's going to last you
8    forever.  It's that density wood just
9    like mesquite.  But as far as -- you
10   can do anything to it, I guess, like
11   any other wood.
12       Q.  The reasons you're talking
13   about, about being -- it's a good piece
14   of furniture is why teak is used a lot
15   in furniture?
16       A.  Correct.
17       Q.  And that's especially true in
18   Asia, correct?
19       A.  Correct.
20       MR. GREEN:  Okay.  I think
21   that's all I have.  Thank you.
22       (Passed the witness at
23   12:12.)
24       (Continued on next page.)
25
```

Page 113

```
1        CHANGES AND SIGNATURE
2    RE:  CIVIL ACTION NO. 2:17-CV-02712-JST
     JASON SCOTT COLLECTION, INC.
3    VS.
     TRENDILY FURNITURE, LLC ET AL
4
     PAGE   LINE   CHANGE        REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

---

email@tobyfeldman.com                  **Toby Feldman, Inc.**                **Certified WOB**
tobyfeldman.com                       **NATIONWIDE SERVICES**              **(800) 246.4950**

**Shawn Kelleen Beach**                                                    7/24/2018

Page 114

1    I, SHAWN KELLEEN BEACH, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6    _____
7          SHAWN KELLEEN BEACH, Witness
8  ------------------------------------------------------------
9  THE STATE OF _____)
10 COUNTY OF _____)
11
12    Before me, _____, on this day
13 personally appeared SHAWN KELLEEN BEACH, known to me
14 (or proved to me under oath or through
15 _____ (description of identity card or
16 other document) to be the person whose name is
17 subscribed to the foregoing instrument and
18 acknowledged to me that they executed the same for the
19 purposes and consideration therein expressed.
20    Given under my hand and seal of office this
21 _____ day of _____, _____.
22
23
      _____
24          NOTARY PUBLIC IN AND FOR THE
          STATE OF _____
25        COMMISSION EXPIRES:_____

Page 115

1       IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF ARIZONA
2
  JASON SCOTT              )
3  COLLECTION, INC.        )
                           )
4                          ) CIVIL ACTION NO.
   VS.                     ) 2:17-CV-02712-JST
5                          )
   TRENDILY FURNITURE, LLC, )
6  ET AL                   )
7
           CERTIFICATE FROM THE
8
      ORAL DEPOSITION OF SHAWN KELLEEN BEACH
9
              July 24, 2018
10
11    I, MONIQUE M. HINCHCLIFF, a Certified Shorthand
12 Reporter in and for the State of Texas, do hereby
13 certify that the foregoing deposition is a full, true
14 and correct transcript;
15    That the foregoing deposition of SHAWN KELLEEN
16 BEACH, the Witness, hereinbefore named was at the time
17 named, taken by me in stenograph, on July 24, 2018,
18 the said Witness having been by me first duly
19 cautioned and sworn to tell the truth, the whole
20 truth, and nothing but the truth, and the same were
21 thereafter reduced to typewriting by me or under my
22 direction.  The charge for the completed deposition is
23 $_____ due from Plaintiff;
24    ( ) That pursuant to the Federal Rules of Civil
25 Procedure, the Witness shall have 30 days after being

Page 116

1  notified by certified mail, return receipt requested,
2  by the deposition officer that the original deposition
3  transcript is available in her office for review and
4  signature by the Witness and if any corrections made
5  are attached hereto;
6    ( ) That by agreement of counsel, a reading
7  condensed copy of the deposition transcript along with
8  the full-size original Changes and Signature Sheet has
9  been sent to _____ on _____
10 for review and signature within 30 days and if any
11 corrections returned are attached hereto;
12    ( ) That by agreement of counsel, the deposition
13 officer is instructed to release the original
14 deposition transcript to _____ on
15 _____, for review and signature, and
16 the deposition officer is thereafter released of any
17 further responsibility with regard to the original.
18    ( ) That the Witness shall have thirty (30) days
19 for review and signature of the original transcript
20 and if any corrections returned are attached hereto.
21    ( ) That the signed transcript ( ) was ( ) was not
22 received from the Witness within 30 days.
23    ( ) That the examination and signature of the
24 Witness is waived by the Witness and the parties;
25    That the amount of time used by each party at the

Page 117

1  deposition is as follows:
2    Mr. Thomas Dietrich  - 00:38
3    Mr. Charles Green - 01:07
4    I further certify that I am neither counsel for,
5  related to, nor employed by any of the parties or
6  attorneys in the action in which this proceeding was
7  taken, and further that I am not financially or
8  otherwise interested in the outcome of the action.
9    WITNESS MY HAND, this the _____ day of
10 _____, A.D., 2018.
11
12
      _____
13        MONIQUE M. HINCHCLIFF
          Texas CSR 6199
14        Expiration Date: 12/31/19
15        Firm Registration No. 631
16
17
18
19
20
21
22
23
24
25

                                    30  (Pages 114 to 117)



EXHIBIT

Beach 7/24/18

depobook.com











