IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

JASON SCOTT COLLECTION,        §
INC.,                          §
                               §
        Plaintiff,             §
VS.                            §    CIVIL ACTION NO.
                               §    2:17-cv-02712-JJT
TRENDILY FURNITURE, LLC        §
et al.,                        §
                               §
        Defendants.            §


ORAL DEPOSITION OF
SALLY BRUMBAUGH
Fort Worth, Texas
Tuesday, June 26, 2018
10:08 a.m.


Reported By:
Janice McMoran, CSR, RDR, CRR
Job No.: 11364

**Sally Brumbaugh**                                                                        6/26/2018

---

Page 2

```
 1
 2          ORAL DEPOSITION OF SALLY BRUMBAUGH, produced
 3   at the instance of the Plaintiff, in the above-styled
 4   and numbered cause on the 26th day of June, 2018, at
 5   10:08 a.m., before Janice K.  McMoran, RDR, CRR, and
 6   Certified Shorthand Reporter in and for the State of
 7   Texas, reported by realtime stenographic means, at Law
 8   Offices of Matthew Bobo, PLLC, 4916 Camp Bowie Blvd.,
 9   Fort Worth, Texas, pursuant to notice and subpoena, and
10   in accordance with the Federal Rules of Civil
11   Procedure.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                  I N D E X
 2                                       PAGE
 3   Proceedings.......................5
 4   WITNESS:  SALLY BRUMBAUGH
 5     Examination by Mr. Dietrich...........5
       Examination by Mr. Green................40
 6     Further Examination by Mr. Dietrich........66
       Further Examination by Mr. Green........68
 7     Further Examination by Mr. Dietrich........70
       Further Examination by Mr. Green........71
 8
 9   Reporter's Certification........................94
10   Acknowledgment of Deponent......................95
11
12
13
14               EXHIBIT INDEX
15   EXHIBIT
     NUMBER       DESCRIPTION            IDENTIFIED
16
     EXHIBIT 1 - Brumbaugh's ads.....................25
17
     EXHIBIT 2 - Pictures of Jason Scott Collection
18               furniture pieces....................28
     EXHIBIT 3 - Pictures of Trendily furniture
19               pieces.............................37
20
     EXHIBIT 4 - E-mail to Jason at Jason Scott
21               Collection from Sally Brumbaugh
                 dated July 6, 2017...................44
22
     EXHIBIT 5 - E-mail to Jason at Jason Scott
23               Collection from Sally Brumbaugh
                 dated July 6, 2017 with attached
24               picture of Remington table...........46
25   EXHIBIT 6 - Brumbaugh Declaration................71
```

---

Page 3

```
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4     MANGUM, WALL, STOOPS & WARDEN, PLLC
       112 North Elden Street
 5     Flagstaff, Arizona 86001
       (928) 779-6951
 6     BY:  THOMAS E. DIETRICH, ESQ.
          tdietrich@mwswlaw.com
 7
 8
 9
10   ON BEHALF OF THE DEFENDANTS:
11     COWLES & THOMPSON
       901 Main Street, Suite 3000
12     Dallas, Texas  75202
       (214) 672-2000
13     BY:  CHARLES A. GREEN, ESQ.
          cgreen@cowlesthompson.com
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              P R O C E E D I N G S
 2        THE REPORTER:  Any
 3   stipulations?
 4        MR. DIETRICH:  No, ma'am.
 5        SALLY BRUMBAUGH,
 6   having been first duly sworn, testified as
 7   follows:
 8              EXAMINATION
 9   BY MR. DIETRICH:
10     Q.   Thanks for coming this
11   morning, Ms. Brumbaugh.  I know I just
12   said it, but will you please state your
13   full name for the record.
14     A.   Sally Brumbaugh.
15     Q.   Have you ever had your
16   deposition taken before?
17     A.   Never.
18     Q.   Well, I'll just give you a
19   couple of ground rules about a
20   deposition.  This is the court
21   reporter.  She's taking down everything
22   we say.  So it's helpful to try to talk
23   a little -- not too fast.  Try not to
24   talk over each other.  I'll ask a
25   question.  You can answer it.  Speak
```

---

**Sally Brumbaugh**                                6/26/2018

Page 6

1   loudly and clearly so she can hear us.
2   I don't think it will be a problem
3   since we're all pretty close here.
4          If you don't understand one
5   of my questions, just let me know, and
6   I'll ask a better one.
7      A.  Okay.
8      Q.  And when you're answering a
9   question, use a "yes" or a "no," not an
10  "uh-huh" or an "huh-uh," because it's
11  hard to take -- take those down.
12         And if you need a break -- I
13  don't think we're going to be here all
14  that long, but if you need a break,
15  feel free to say, "I need a break," and
16  we'll take a break.
17     A.  Okay.
18     Q.   Is there any reason you can
19  think of that you can't answer fully
20  and truthfully today?
21     A.  I can't think of a reason.
22     Q.   And also, if you remember
23  anything five or ten minutes later that
24  goes back to one of my earlier
25  questions, just let me know --

Page 7

1      A.  Okay.
2      Q.   -- and we'll go back and you
3   can give your answer.
4          So what do you do for a
5   living?
6      A.  My husband and I are in the
7   furniture business here in Fort Worth.
8   We've been in business for 52 years.
9      Q.  52 years.  That's a long
10  time.
11     A.  It is.  He started the
12  business, so...
13     Q.  And how long have you been in
14  the furniture business?
15     A.  Well, we've been married for
16  31 years.  So I worked in one of our
17  stores when we first married, and then
18  I did not for a period of about 18
19  years because of having the joy and
20  pleasure of being a full-time mom.
21     Q.  And then after that, did you
22  go --
23     A.  Yes.
24     Q.   -- back to the furniture
25  business?

Page 8

1      A.  When my daughter went into
2   college, yes.
3      Q.   And what business is that?
4      A.  We're in the furniture
5   business.
6      Q.  Sure.  What --
7      A.  I'm sorry.
8      Q.  You have a store?
9      A.  Yes.  We have a retail store
10  here in Fort Worth.
11     Q.  And what's the name of that
12  store?
13     A.  Brumbaugh's Furniture.
14     Q.  And is that where you've
15  worked for the last -- how many years
16  would it be now?
17     A.  Well, I'd have to do the
18  math.  Our daughter graduated from high
19  school in '06.  So I started back
20  working in the business full-time from
21  then to present.  Then you'd have to
22  subtract that --
23     Q.  Sure.
24     A.   -- when we first married
25  and -- you know, so...

Page 9

1      Q.  And when you were first
2   married, you said you were working
3   at -- was it at Brumbaugh's then?
4      A.  Yes, uh-huh.
5      Q.  So what were you doing back
6   then before you married, at
7   Brumbaugh's?
8      A.  Well, when Larry and I first
9   married, I worked at -- we had a store
10  here over by the mall, and I worked in
11  that store.
12     Q.  What were you doing in the
13  store at that point?
14     A.  Just managing that store and
15  running that store.
16     Q.  Selling furniture?
17     A.  Yes, sir.  That's all we've
18  done is furniture, carpet, and rugs.
19     Q.  And after your daughter went
20  to college and you started back up,
21  what kind of things do you do for
22  Brumbaugh's?
23     A.  Well, my husband and I do all
24  the buying, exclusively, he and I.  And
25  everything owning a business entails,

3 (Pages 6 to 9)

**Sally Brumbaugh**                                    6/26/2018

Page 10

1  from writing checks to buying
2  merchandise to placing all the
3  advertising, the marketing, et cetera,
4  et cetera.
5      Q.   And do you have an in-depth
6  role in those tasks?
7      A.   Yes.
8      Q.   And does your husband as
9  well?
10     A.   Yes.
11     Q.   And his name is Larry?
12     A.   Yes.
13     Q.   You said you do all the
14  buying?
15     A.   My husband and I do.
16     Q.   What does buying for a
17  furniture business entail?
18     A.   Well, our store is a little
19  bit unique because our store is 50,000
20  square feet.  And we're a very
21  nontypical furniture store.  I dare
22  say, when you walked in our store, it
23  wouldn't look anything like any other
24  store just because of the way we
25  present the Brumbaugh's Furniture

Page 11

1  story.
2      So we have everything from
3  living room furniture, dining room
4  furniture, bedroom furniture, accent
5  furniture, lighting, lamps, area rugs,
6  and carpet.  But the heart of our
7  business is the furniture side.  Carpet
8  is something we have for convenience
9  for our customers, and the rugs, we
10  have a large inventory in.  But in a
11  store that size, there's a lot of --
12  there's a lot of buying.
13     Q.   So let's just focus on the
14  furniture.  You sell to just customers,
15  people off the street come in and buy
16  furniture?
17     A.   Yes, sir.  We don't -- we
18  don't wholesale.  We strictly retail.
19  We're strictly a retail store.
20     Q.   Are there different levels in
21  the furniture industry of --
22     A.   Price points?
23     Q.   No.  What I'm getting to is,
24  there's a retailer, wholesaler,
25  manufacturer?

Page 12

1      A.   I would say that.  I would
2  say you would start with the
3  manufacturing end, then the -- well,
4  the manufacturing, which is also the
5  vendor, and then we purchase from the
6  vendor/manufacturer.
7      Q.   And can you just describe
8  just a regular experience out acting as
9  a buyer for Brumbaugh's?  Do you go to
10  a warehouse, or --
11     A.   Oh, no.
12     Q.    -- how do you decide what to
13  buy?
14     A.   In the furniture industry,
15  there are several major markets and
16  there's several regional markets.  For
17  example, the heart of the furniture
18  industry is in High Point, North
19  Carolina.  So that is a -- that is
20  "the" major market in the furniture
21  industry.
22      Now, Las Vegas is also
23  considered a major market.  So the High
24  Point market is two times a year in
25  October and in April, always.  The Las

Page 13

1  Vegas market is January and July.
2      The Las Vegas market is not a
3  real important market for us because
4  they have a lot more contemporary
5  merchandise.  Brumbaugh's is a very
6  traditional store to transitional.  We
7  don't get into the contemporary.  So
8  that's not our genre.
9      Q.   Okay.
10     A.   And then you've got regional
11  markets, like Dallas has a market.
12  Actually, I think there's one in
13  Scottsdale, a small regional market, or
14  Phoenix.
15     Q.   And those happen at different
16  times of the year?
17     A.   Yes, sir.
18     Q.   I mean, for weeks or days?
19     A.   Well, days.  The major
20  markets, like, for example, High Point,
21  we're there for five days.  The market,
22  I think, goes on for maybe seven days
23  or eight days, but we're -- we're
24  there -- yeah, we're there five days.
25     Q.   So let's take High Point.  If

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES              (800) 246.4950

**Sally Brumbaugh**                                    6/26/2018

Page 14

```
1   you and Larry go to High Point, what do
2   you do there?
3        A.   Ooh.  It's a lot of work.
4   Our days start at 7:30 or 8:00 in the
5   morning and end about 7:00 at night,
6   because it being the primary location
7   for furniture like I just mentioned --
8   living room, dining room, bedroom,
9   lighting, rugs, and all the ancillary
10  items that go in a home, the
11  accessories, the artwork -- we buy all
12  of that.  So the days are very long and
13  very detailed.  But fortunately, when
14  you've been in the business as long as
15  we have, we have a set schedule.
16       Q.   So are there vendors at High
17  Point --
18       A.   Yes.
19       Q.   -- that present all of
20  their --
21       A.   Yes.
22       Q.   -- products?
23       A.   Yes.
24       Q.   And you go around to the
25  vendors and --
```

Page 15

```
1        A.   Yes, sir.
2        Q.   -- decide what to buy?
3        A.   Yes, sir.
4        Q.   Have you been taking these
5   trips to High Point since you got back
6   into Brumbaugh's --
7        A.   Yes.
8        Q.   -- after your daughter went
9   to college?  Yes?
10       A.   Yes, uh-huh.
11       Q.   And so when you're at
12  Brumbaugh's, do you sell as well?  Do
13  you meet with customers?
14       A.   Well, I do.  But I have so
15  many bigger hats to wear, and we have
16  employees that work on commission, and
17  so that's how they make their living.
18  So -- but I'll -- you know, Larry
19  and/or I will take the overflow.  And
20  when you've been in business as long as
21  he has, we're very blessed to have a
22  lot of repeat customers and people
23  that, you know, like to visit with him,
24  you know.  Yes.
25       Q.   Are you familiar with the
```

Page 16

```
1   Jason Scott Collection furniture?
2        A.   Yes.
3        Q.   And how are you familiar with
4   Jason Scott Collection?
5        A.   Well, it's a line that we
6   carry.  And we are either the largest
7   retailer of Jason Scott or maybe the
8   second largest in the entire United
9   States.
10       Q.   How much of your store is
11  comprised of Jason Scott?
12       A.   Well, that -- that would be
13  hard to say in a store that's 50,000
14  square feet.
15       Q.   Do you know about how many
16  different pieces of Jason Scott
17  furniture you carry?
18       A.   Ooh.  It's called SKU, S-K-U,
19  in the industry, how many SKUs.  That's
20  another word for items, specific items.
21  I would say -- I'd say 20 different
22  SKUs.
23       Q.   Is that 20 different pieces
24  of furniture?
25       A.   Yes, sir.  And there could be
```

Page 17

```
1   more.
2        Q.   When did you first learn
3   about Jason Scott Collection?
4        A.   Oh, gosh.  It's almost like I
5   can't remember not having it in the
6   store since I've been active.
7        Q.   Do you think it's been in the
8   store at all times since you've been
9   back to work there?
10       A.   I mean, I would be giving you
11  an erroneous answer if I said it has
12  been because -- but years go by.  But
13  it's been a long time.
14       Q.   Do you know how Brumbaugh's
15  started its relationship with Jason
16  Scott?
17       A.   I believe our rep -- his name
18  is Mark Williamson -- introduced the
19  line to us.
20       Q.   Mark is the Jason Scott rep?
21       A.   Yes, he is, uh-huh.
22       Q.   Do you recall being part of
23  that when he introduced the line?
24       A.   I really don't remember.
25       Q.   How do you feel personally
```

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES              (800) 246.4950

**Sally Brumbaugh**                                            6/26/2018

Page 18

1  about the Jason Scott Collection?
2      A.  Well, I think it's extremely
3  unique.  I think anytime you've got
4  uniquely designed, artisan-type items,
5  like, you see the manifestation of an
6  individual's creativity come to life in
7  a piece of furniture, then -- then you
8  as a retailer are able to capture that
9  uniqueness as you, in turn, market that
10  item to the public.
11      Q.  Have you seen how the public,
12  how customers react to Jason Scott
13  furniture?
14      A.  Yes.
15      Q.  How do they?
16      A.  There's those customers that,
17  similar to artwork and they like a
18  specific artist, there's customers that
19  come in and want to know, "Well, what
20  new have you got from Jason Scott?"
21      Q.  Is Jason Scott an important
22  line --
23      A.  Yes.
24      Q.  -- for Brumbaugh's?
25      A.  Very important.

Page 19

1      Q.  Why would you say it's very
2  important?
3      A.  One, because of repeat
4  customers, but maybe more so than that,
5  a solid wood piece of furniture is
6  becoming less and less seen in the
7  industry.  You'll have veneered --
8  veneered wood, which is very small, and
9  then it might be a particle wood or --
10  but the Jason Scott Collection is a
11  solid, reclaimed teakwood collection
12  with unique carving that just presents
13  its own story, and, therefore, people
14  in that retail bracket, because it's
15  not inexpensive, they see that, they
16  value that.  And coming to us, being,
17  if not the largest retailer, maybe his
18  just second largest retailer in the
19  entire United States, then they -- they
20  come to us for that.
21      MR. GREEN:  I'm going to
22  object as nonresponsive.  You
23  don't have to do anything.
24      MR. DIETRICH:  So he may
25  state an objection.  It just goes

Page 20

1  on the record.  It doesn't -- you
2  can answer the question, and --
3      MR. GREEN:  There's no --
4      MR. DIETRICH:  If he states
5  it before you answer, you can go
6  ahead and answer.  It's just to
7  make a record for later.
8      MR. GREEN:  There's no judge
9  here to rule on it, so we preserve
10  the objection by --
11      THE WITNESS:  Okay.
12      MR. GREEN:  -- by making it,
13  certain ones we have to make.
14      Q.  (By Mr. Dietrich)  Can you
15  estimate how many Jason Scott pieces
16  Brumbaugh's sells in a year?
17      A.  Ooh.  Well, I'm not sure I
18  would want to divulge that because I
19  think that is priority, confidential
20  information at this time.  I'm -- you
21  know, if I may interject that later?
22  I'm just not sure I want to divulge
23  that at this time.
24      Q.  Sure.  And I would just say
25  that we do have a protective order in

Page 21

1  this case that allows us to designate
2  certain information as confidential.  I
3  can certainly do that with this portion
4  of the testimony if you choose.  But I
5  also understand and I can provide that
6  to you outside the deposition, and then
7  if you could provide that information,
8  it might be helpful.  But I can also
9  probably just go to Jason and ask him.
10  So -- but I'll withdraw that question
11  for now.
12      A.  Well, I mean, if it's -- if
13  it's held in confidence and not shared
14  outside this room, then I could give
15  you a probably really close estimate of
16  what we've actually sold to date in
17  2018, or I can give it to you outside.
18      Q.  Let's just hold off.  You
19  can --
20      A.  Okay.
21      Q.  I'll come back to it --
22      A.  Okay.
23      Q.  -- if we do need that.
24  Does -- to your knowledge, does Jason
25  Scott limit its dealer network?

6  (Pages 18 to 21)

**Sally Brumbaugh**                                         6/26/2018

Page 22

1      A.   Yes.
2      Q.   How did it -- how so?
3      A.   Well, I think when you water
4  down your pool of retailers, then you
5  water down the exclusivity of your
6  product.
7      Q.   Is Brumbaugh's an approved
8  Jason Scott?
9      A.   Yes.
10     Q.   Reseller?
11     A.   Yes.
12     Q.   Is that exclusivity important
13 to you at Brumbaugh's?
14     A.   Yes.
15     Q.   Can you explain how?
16     A.   Well, one, we're able to
17 offer a large collection of his
18 product; therefore, the customer is
19 able to come and see a large number of
20 SKUs, items, at our store.
21     Q.   Are there any other approved
22 dealers nearly to Brumbaugh's?
23     A.   No, not that I'm aware of.
24     Q.   Does that help you, help
25 Brumbaugh's business?

Page 23

1      A.   To be -- to have exclusivity?
2      Q.   Sure.
3      A.   Yes, absolutely.
4      Q.   You don't have competitors
5  nearby.
6      A.   Right.
7      Q.   Is that exclusivity by
8  agreement with Jason Scott?
9      A.   Yes.
10     Q.   To your knowledge, has
11 Brumbaugh's also been exclusive in this
12 area, in this geographic area?
13     A.   To my understanding, yes.
14     Q.   Does Brumbaugh's advertise
15 Jason Scott furniture?
16     A.   Yeah.  We spend a lot of
17 money.
18     Q.   Can you tell me an estimate
19 of how much money you spend on a yearly
20 basis advertising Jason Scott?
21     A.   Ooh.  I'd say we'd spend
22 between 30 and $40,000.
23     Q.   And that's just advertising
24 Jason Scott in a year?
25     A.   Yes.  And I, you know, may

Page 24

1  tweak that number because of the
2  avenues in which we advertise.  And
3  that's probably not taking into account
4  what we spend for social media as we
5  put out for that.  That's -- that's
6  just in print advertising.
7      Q.   What avenues of print
8  advertising do you use for Jason Scott?
9      A.   We use two national
10 publications, one to two regional,
11 North Texas publications, and one state
12 publication.  I say state.  Texas
13 Monthly.
14     Q.   What are the two national
15 publications?
16     A.   Cowboys & Indians and Western
17 Art & Architecture.
18     Q.   And so are these all
19 magazines?
20     A.   Yes, sir.
21     Q.   And do you publish ads in the
22 magazines?
23     A.   Yes, sir.
24     Q.   And they have Jason Scott
25 pieces in them?

Page 25

1      A.   Yes, sir.
2          (Exhibit 1 marked.)
3      Q.   So I'm going to show you
4  what's been marked Exhibit 1 to your
5  deposition.  I think you'll probably
6  recognize these pages.  If you would
7  just take a quick look through.
8      A.   Yes, sir.
9      Q.   Do you recognize the pages
10 that are in Exhibit 1?
11     A.   Yes.
12     Q.   And what are these?
13     A.   This is the Dragonfly
14 executive desk on page 1 and page 3.
15 And then on page 2, I believe that's
16 the Borgata console or buffet.
17     Q.   Those are Jason Scott pieces?
18     A.   Yes, sir.
19     Q.   And are these Brumbaugh's
20 advertisements?
21     A.   Yes, they are.
22     Q.   Do you know where these came
23 from?
24     A.   I would say most likely these
25 came from Cowboys & Indians.  This one,

7 (Pages 22 to 25)

**Sally Brumbaugh**                                          6/26/2018

Page 26

1    I can tell you, dates back -- this is
2    an old ad, how long we've advertised.
3    And the reason I know that is because I
4    haven't had that sectional in a long,
5    long time.  They discontinued that
6    fabric.
7        Q.    You said Brumbaugh's has been
8    open 52 years; is that right?
9        A.  52 years, that's right.
10       Q.    So this says "Celebrating 47
11   Years" on it.
12       A.  Well, you can do that, yeah.
13   So this is -- we're in the 52 -- 52nd
14   year now, so...
15       Q.    So the second one is 50
16   years, and the third one is
17   "Celebrating 51 Years"?
18       A.  Yeah, uh-huh.
19       Q.    So you would advertise Jason
20   Scott every year?
21       A.   Oh, yes.
22       Q.    And consistent with what you
23   described earlier, with the different
24   publications --
25       A.   Yes, sir.

Page 27

1        Q.    -- is about the amount that
2    you would spend?
3        A.   Yes, sir.
4        Q.   You kind of described it
5    earlier, but in your experience, does
6    Jason Scott furniture have a certain
7    unique look?
8        A.   Yes.
9        Q.  Can you detail what that look
10   consists of?
11       A.   Well, there literally is, you
12   know, unique carving, the solid
13   teakwood, like in this one, this iron
14   accent on the front of the desk.  And
15   on the second page, the Borgata, of
16   Exhibit 1, page 2, the hardware used --
17   hardware meaning the hinges that open
18   the doors, the drawer pulls -- Jason
19   Scott is a collection that, when you
20   see it, it's really not unlike a
21   Remington and Russell painting.  It's
22   like, oh, you know that's a Remington
23   when you see it.
24          The Jason Scott Collection
25   is -- he's been doing it long enough

Page 28

1    that he's made his stamp in the
2    industry like, yes, that's a Jason
3    Scott piece.
4        Q.    Do you know it's a Jason
5    Scott when you see it?
6        A.   I know if it's on my floor,
7    it's a Jason Scott piece if I see it.
8        Q.    If you were just out at a
9    furniture market or something and you
10   saw a piece, would you be able to --
11       A.   If I saw a piece that looked
12   exactly like this, I would say it was a
13   Jason Scott piece, yes, because his
14   designs are -- are so unique, and he's
15   kept it that way.
16       Q.   I have another set of
17   photographs for you.
18          (Exhibit 2 marked.)
19       Q.   Exhibit 2.  If you can just
20   take a minute to look through.
21          Do you recognize all the
22   pieces --
23       A.   Uh-huh.
24       Q.   -- in this exhibit?
25       A.   I do.

Page 29

1        Q.    And are these Jason Scott
2    pieces?
3        A.   Yes.
4        Q.    Now, we talked about the
5    Dragonfly or the Iron Star desk --
6        A.   Uh-huh.
7        Q.    -- and the Borgata buffet?
8        A.   Uh-huh.
9        Q.    And there's another one in
10   here, the Sacred Heart dining table.
11   Do you see that?
12       A.   Yes.  We've also run national
13   ads on the Sacred Heart dining table.
14   And if you need me to send those to
15   you, I can.
16       Q.   I may ask you for that.
17       A.   Okay.
18          MR. GREEN:  I'm going to
19   object as nonresponsive to the
20   last answer.
21       Q.   (By Mr. Dietrich)  And I'll
22   ask you, have you run ads featuring the
23   Sacred Heart dining table?
24       A.   Yes.
25       Q.    In magazines like Cowboys &

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                   (800) 246.4950

**Sally Brumbaugh**                                6/26/2018

Page 30

1   Indians?
2       A.   Yes, sir.
3       Q.   So Brumbaugh's sells all
4   three pieces that are in this exhibit?
5       A.   Yes, sir.
6       Q.   And do you know how long
7   Brumbaugh's has sold those pieces?
8       A.   Well, I mean, we have sold
9   these pieces as long as Jason has
10  produced them, to my knowledge.  When
11  we were -- when we were shown these to
12  be something to purchase from Jason,
13  then we purchased them.
14      Q.   Are they popular Jason Scott
15  pieces?
16      A.   Very popular.  In fact, I
17  have all of these on my floor right
18  now.
19      Q.   In your experience, are these
20  pieces consistent with what you
21  described as Jason Scott's look?
22      A.   Yes.
23      Q.   Other than the one
24  competitor, who we'll get to in a
25  minute, have you seen anybody else

Page 31

1   making pieces that look similar to
2   these?
3       A.   I have not.
4       Q.   And that's in your whole
5   experience with Jason Scott furniture?
6       A.   Yes.
7       Q.   Are you familiar with a
8   company called Adobe Interiors?
9       A.   Yes.
10      Q.   Are they a competitor of
11  Brumbaugh's?
12      A.   Yes.
13      Q.   How far away from your store
14  is Adobe?
15      A.   Oh, I've never figured it in
16  miles.
17      Q.   Is it relatively close?
18           MR. GREEN:  Objection,
19  leading.
20      A.   I'd say between 10 and 12
21  miles.
22      Q.   (By Mr. Dietrich)  Could
23  customers go from one to the other?
24      A.   Easily.
25      Q.   Do they?

Page 32

1       A.   Yes.
2       Q.   Are you familiar with a
3   company called Western Heritage?
4       A.   Yes.
5       Q.   What's Western Heritage?
6       A.   I've never been in there --
7   I've never been in either store.  I
8   just have seen their ads.  So --
9       Q.   Are they a furniture seller?
10      A.   Yes.
11      Q.   Do you consider them a
12  competitor of Brumbaugh's?
13      A.   Yes.
14      Q.   Do you know if Adobe sells
15  Jason Scott furniture?
16      A.   I was told they do not sell
17  Jason Scott.
18      Q.   And who told you that?
19      A.   Jason Scott.
20      Q.   Do you know if Western
21  Heritage sells the Jason Scott
22  furniture?
23      A.   I was told they do not.
24      Q.   By Jason?
25      A.   Yes.

Page 33

1       Q.   In your experience, do you
2   think it would affect your business if
3   those competitors did sell Jason Scott?
4           MR. GREEN:  Objection,
5   leading.
6       A.   Yes.
7       Q.   (By Mr. Dietrich)  How would
8   it affect your business?
9       A.   It would water down our
10  market share as far as having the
11  quantity of items from Jason that we
12  do.
13      Q.   Are you familiar with a
14  company called Trendily?
15      A.   Yes.
16      Q.   How do you know of Trendily?
17      A.   They produce a line of dining
18  chairs that we used to buy from them.
19      Q.   Do you -- do you buy anything
20  from Trendily today?
21      A.   To my knowledge, we have no
22  orders on file with them as of today.
23      Q.   But you had done business
24  with them in the past?
25      A.   Uh-huh, because they were --

9  (Pages 30 to 33)

Sally Brumbaugh                                                  6/26/2018

Page 34

1  to my knowledge, they were primarily an
2  upholstery manufacturer, which means --
3  upholstery means sofas, upholstered
4  chairs, whether -- it could be
5  upholstered in fabrics or leather, like
6  leather seats like this chair, or
7  fabric back or leather back.  That was
8  my understanding is what they sold is
9  upholstered goods.
10      Q.   And would Brumbaugh's buy
11  chairs from them?
12      A.   Yes, we have, uh-huh.
13      Q.   All right.  Do you know Rahul
14  Malhotra?
15      A.   I've met him one time.  He
16  came into the store with Chris.  And I
17  don't know Chris's last name.
18      Q.   Sanders ring a bell?
19      A.   It may be Sanders.
20      Q.   How long ago did Rahul come
21  in the store?
22      A.   It's been several years.
23      Q.   Was he there about the chairs
24  or something else?
25      A.   About the chairs.

Page 35

1      Q.   At some point did you become
2  aware that Trendily was offering copies
3  of Jason Scott furniture for sale?
4      A.   That was my understanding.
5      Q.   How did you learn that?
6      A.   I believe when my employee
7  saw the Sacred Heart dining table photo
8  on Adobe's website or Facebook page --
9  I'm not sure which it was -- that's
10  when I called Jason.  And I think it
11  was Jason told me that Trendily was
12  copying or knocking his work off.
13      Q.   So you said an employee saw
14  the table on Adobe's website?
15      A.   Yes, sir.
16      Q.   And they told you?
17      A.   Yes.
18      Q.   And then what was your
19  reaction to seeing the table on Adobe's
20  website?
21      A.   Well, I was surprised,
22  because it looked, verbatim, an exact
23  copy of the Sacred Heart dining table.
24  And so I called Jason, and I said, "One
25  of my employees just saw this pop up on

Page 36

1  their news feed or Facebook page,"
2  however it was.  And I said, "I
3  didn't" -- you know, "I wasn't aware
4  you were selling them."  And he said,
5  "I'm not."  He said, "I've heard that
6  Trendily is knocking me off."
7      Q.   So did you think that the
8  table on Adobe's site was a Jason Scott
9  table?
10      A.   Yes, because it looked just
11  like it.
12      Q.   In years before that, had you
13  ever seen copies of Jason Scott pieces?
14      A.   Never.  And with the major
15  markets we go to and the number of --
16  the number of lines we carry in our
17  store, we see a huge volume of
18  merchandise.  When you're the store a
19  size of ours, buying for every room in
20  the home, we see all the premier -- or
21  most of the premier lines or get wind,
22  or one of our reps will say, have you
23  seen this or seen that.
24      So if there was a knockoff of
25  this, we would -- if we were at High

Page 37

1  Point, we would have seen that.
2      Q.   And you hadn't seen something
3  like that up until this time?
4      A.   Never.
5      (Exhibit 3 marked.)
6      Q.   So showing you what's been
7  marked Exhibit 3.  Do you recognize
8  these pieces of furniture?
9      A.   Well, I would say they're the
10  Jason Scott Collection:  the Dragonfly
11  desk, the Sacred Heart dining, and that
12  Borgata buffet.  I mean, same hardware,
13  carving.
14      Q.   Do you recognize these as
15  Jason Scott pieces?
16      A.   Well, I mean, I would say
17  they were.  They look like them.
18      Q.   Do you recall meeting with
19  Jason in person about the Trendily
20  copies where you brought it to his
21  attention?
22      A.   Well, of course, Jason lives
23  in -- outside of Flagstaff, and I
24  believe his distribution center is --
25  or warehouse or manufacturing ships out

10  (Pages 34 to 37)

**Sally Brumbaugh**                                        6/26/2018

Page 38

```
 1   of Phoenix.  We hosted an event at
 2   Brumbaugh's -- actually, it's year
 3   before last; is that right?  2016?
 4   Yes.  In December we have a large event
 5   that we do here in Fort Worth in
 6   connection with this horse show, and --
 7       Q.  Did Jason come out for that?
 8       A.  He did.  He did.  And we
 9   advertised nationally, in national
10   magazines.  And our local -- or not
11   local -- regional magazine, and we had
12   an event at the store and an event at
13   this horse show here in town.  But it's
14   a big national show.
15       Q.  And did you meet with Jason
16   at that show?
17       A.  Oh, gosh, yes.  We spent
18   like, you know, two and a half days.
19   Yeah.
20       Q.  Did you talk to him about the
21   copied pieces?
22       A.  We did.
23       Q.  How did that conversation
24   come about?
25       A.  Well, just that -- you know,
```

Page 39

```
 1   that it looked like his items had been
 2   knocked off, and -- and he was
 3   pursuing, you know, getting to the
 4   bottom of it.
 5       Q.  Do you recall accusing Jason
 6   of selling to a competitor?
 7       A.  Excuse me.  Say that again.
 8       Q.  Do you recall accusing Jason
 9   of selling to a competitor?
10       A.  No.
11       Q.  So you have, I'm going to
12   say, roughly 20 years of experience in
13   the furniture industry, possibly more?
14       A.  Yeah.
15       Q.  And if I told you that
16   Exhibit 3 was the Trendily copies,
17   would that surprise you?
18       A.  Well, it looks exactly like
19   the Jason Scott Collection.  So --
20       Q.  What does that tell you about
21   the quality of these copies?
22       A.  Well, I'm looking at a
23   photograph.  So I would say the copies
24   are an exact replica.
25       Q.  Do you think that customers
```

Page 40

```
 1   could tell the difference between a
 2   Jason Scott and a Trendily piece?
 3       MR. GREEN:  Objection, form.
 4       A.  No.  Those customers that,
 5   shall we say, collect or like a lot of
 6   Jason Scott in their home, then they
 7   would probably ask the question and go,
 8   "Oh, is this a Jason Scott piece?"
 9   They would ask that question.  Because
10   Jason does identify his pieces -- like,
11   on the left front drawer of this desk,
12   he's got a metal stamp, if you will,
13   that says "Jason Scott Collection."  So
14   he labels or marks his pieces.
15       MR. GREEN:  Objection,
16   nonresponsive.
17       Q.  (By Mr. Dietrich)  If -- if
18   there were competitors selling these
19   pieces that we've looked at in Exhibit
20   3 nearby to Brumbaugh's, do you think
21   that would affect Brumbaugh's?
22       A.  I do think it would affect
23   Brumbaugh's because it -- well, one, I
24   don't know what they would be selling
25   it for.  So --
```

Page 41

```
 1       Q.  Pricewise, you mean?
 2       A.  Oh, yeah, pricewise.  So if
 3   they're selling this -- this is just
 4   one example and the answer to your
 5   question.  If they're selling it for
 6   less than what, you know, we're selling
 7   this for, which is, you know, a Jason
 8   Scott piece, then yeah, it would affect
 9   that.
10       Q.  Do you think customers would
11   go buy the less expensive one?
12       MR. GREEN:  Objection --
13       A.  Yes.
14       MR. GREEN:  -- form.
15       Q.  (By Mr. Dietrich)  So having
16   these pieces at a competitor nearby,
17   would that affect Brumbaugh's sales?
18       A.  Yes.
19       Q.  Would it affect your
20   willingness to purchase from Jason
21   Scott?
22       MR. GREEN:  Objection, form.
23       A.  No, I don't think it would
24   affect it in that we have such an
25   excellent reputation in the industry.
```

11 (Pages 38 to 41)

Sally Brumbaugh                                          6/26/2018

Page 42

1   And I say that with all humility.  When
2   you sell the type of products we sell,
3   we have an excellent standard in the
4   industry, and reputation.  Again, I'm
5   repeating that, but we do.
6           Because of the quality of the
7   Jason Scott Collection -- as I stated
8   earlier, the solid wood, the hand
9   carving -- it kind of goes with what
10  the Brumbaugh's story is, you know,
11  high-end, quality furniture.
12          MR. GREEN:  Objection,
13  nonresponsive.
14      Q.  (By Mr. Dietrich)  Did
15  Trendily ever try to sell these
16  knockoffs to you?
17      A.  No.
18      Q.  Do you recall talking to
19  Jason about potentially creating
20  several separate pieces for Adobe to
21  sell?
22      A.  Repeat the question, please.
23      Q.  Do you recall talking to
24  Jason about his creating several pieces
25  out of this line for Adobe Interiors to

Page 43

1   sell?
2       A.  When Jason and I were talking
3   on one occasion about this -- we've
4   talked several -- he said he was trying
5   to, you know, wrap his head around his
6   blood, sweat, and tears he's put into
7   creating his company and the look of
8   his company, the Jason Scott
9   Collection.  And he said, "Well, I
10  wonder if I should, you know, make them
11  something totally different or allow
12  them to buy, you know, a couple of
13  pieces or two or three pieces."
14      Q.  How did you respond to that?
15      A.  Well, my response was, if you
16  start down that road, then it's going
17  to be pressure from the retailer to go,
18  well, now my customer wants this or,
19  well, let me buy that because my
20  customer wants -- because there are a
21  lot of items, SKUs, in his collection.
22      Q.  Did you want to maintain
23  exclusivity?
24      A.  Yes.
25      Q.  Has any other retailer ever

Page 44

1   tried to buy Jason Scott pieces from
2   Brumbaugh's?
3       A.  Yes.
4       Q.  Who -- multiple times or --
5       A.  No.  The only time that's
6   ever happened is one gal from Adobe --
7   and I don't know her name -- came in
8   and asked my husband and I could she
9   buy -- I don't remember what it was, a
10  bed?  I don't remember.  It's been
11  several years ago -- from us to sell to
12  them, and we said no.
13      Q.  So you wouldn't sell Jason
14  Scott to another retailer?
15      A.  No, because we don't -- we
16  don't wholesale.  We're strictly a
17  retailer.
18          (Exhibit 4 marked.)
19      Q.  I'm showing you what's been
20  marked as Exhibit 4.  Do you recognize
21  that e-mail?
22      A.  Yes.  JoNell is my employee.
23      Q.  And that was my next
24  question.  Who is JoNell?
25      A.  Uh-huh.

Page 45

1       Q.  Did you write this e-mail?
2       A.  Yes, I did.
3       Q.  And you sent it to Jason --
4       A.  Uh-huh.
5       Q.  -- Forsberg?
6       A.  Yes, I did.
7       Q.  You state, "Your piece, a
8   dining table (or something made exactly
9   like yours) popped up on our
10  Facebook feed in an ad for Adobe
11  Interiors here in Fort Worth.  Probably
12  in early spring of 2017."
13          Do you see that?
14      A.  Yes.
15      Q.  Do you recall, did JoNell
16  show you this --
17      A.  Yes.
18      Q.  -- dining table?
19      A.  Yes.
20      Q.  Is this what you referred to
21  earlier?
22      A.  Yes, sir.
23      Q.  And you either thought it was
24  Jason's or something made exactly like
25  his?

email@tobyfeldman.com              Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                   NATIONWIDE SERVICES                   (800) 246.4950

**Sally Brumbaugh**                                    6/26/2018

Page 46

1    A.   Right.
2    Q.   Did that concern you?
3    A.   Well, it did, because
4    probably most importantly was I felt a
5    hundred percent sure that the Jason
6    Scott Collection was not at Adobe.  And
7    when this showed up, it was an
8    immediate red flag that something was
9    amiss, and probably that it had been
10   copied.
11   Q.   And follow-up to that.
12        (Exhibit 5 marked.)
13   A.   There you go.
14   Q.   I'm showing you what's been
15   marked as Exhibit 5.  Do you recognize
16   this e-mail?
17   A.   Yes.
18   Q.   Did you write this e-mail?
19   A.   Yes.
20   Q.   And the attachment, is that
21   the Adobe table?
22   A.   Yes, sir.
23   Q.   Did you attach that?
24   A.   I say, "Please see the
25   picture attached."  That was what I

Page 47

1    attached.
2    Q.   And you sent it to Jason?
3    A.   Yes.
4    Q.   Is there any way you could
5    tell that somebody other than Jason
6    Scott made this table?
7    A.   No, I couldn't.  The carving
8    looks exactly the same.  The shape of
9    the pedestal -- that's what that is
10   underneath -- look the same.
11   Q.   Does it have that Jason Scott
12   look?
13   A.   Yes, sir.
14   Q.   Are you aware whether
15   Trendily has copied any other Jason
16   Scott pieces besides the three that
17   we're looking at today?
18   A.   I'm not aware of what they --
19   what they've made or are making or --
20   no.
21   Q.   And you -- High Point just
22   happened recently, didn't it?
23   A.   April.
24   Q.   Did you go?
25   A.   Yes, sir.

Page 48

1    Q.   I figured you did.  Did you
2    see Trendily at High Point?
3    A.   No.  If they're -- if they
4    show there, we don't -- I don't even
5    know if they show there.
6    Q.   I just wondered if you
7    happened to see their products when you
8    were there.
9    A.   I did not.
10   Q.   Do you recall seeing someone
11   from Trendily taking photographs of a
12   Jason Scott piece in your store?
13   A.   I was told by one of my
14   employees that Chris took numerous
15   photos.
16   Q.   Of a Jason Scott piece?
17   A.   That's what I was told.
18   Q.   And that's Chris, the
19   Trendily rep?
20   A.   Uh-huh.
21   Q.   And do you know when that
22   was?
23   A.   I don't know, a year and a
24   half ago?  I would -- I don't know
25   exactly when that would be.

Page 49

1    Q.   Do you know if it was photos
2    of one of the pieces we've talked
3    about?
4    A.   I could -- I could not answer
5    that straightforward.  We carry a lot
6    of Jason Scott --
7    Q.   I understand.
8    A.   -- in our store.
9    Q.   I understand.  So you had an
10   employee who saw that?
11   A.   Yes, sir.
12   Q.   To your knowledge, has
13   Trendily copied anyone else's furniture
14   besides Jason Scott?
15   A.   I am so busy minding just the
16   business of a 50,000-square-foot store
17   that I don't -- I don't know what --
18   what their business profile is as far
19   as all the products they produce.
20        MR. DIETRICH:  Let's take a
21   quick five-minute break, if that's
22   okay with everyone.
23        THE WITNESS:  Yeah, and I
24   need to know because I have
25   another appointment.  So this is

13 (Pages 46 to 49)

Sally Brumbaugh                                                6/26/2018

Page 50

1   going to have to wrap up pretty
2   quick.
3        MR. DIETRICH:  I am probably
4   wrapped up and I will turn it over
5   for any additional questions.
6        THE WITNESS:  Because I have
7   an MRI.  So I -- when I have to
8   leave, I have to leave.
9        MR. GREEN:  What time is your
10  MRI?
11       THE WITNESS:  12:30.
12       MR. DIETRICH:  We can go off
13  the record for this.
14       MR. GREEN:  Yeah.
15       (Recess taken 11:03 a.m. -
16  11:06 a.m.)
17       MR. DIETRICH:  Ms. Brumbaugh,
18  I don't have any more questions.
19  So thank you very much for your
20  time.
21       THE WITNESS:  Yes, sir.
22            EXAMINATION
23  BY MR. GREEN:
24   Q.   I kind of got into the tail
25  end of the conversation y'all were

Page 51

1   having during the break.  How long have
2   y'all been in your current location?
3    A.   Either 18 or 19 years.
4    Q.   Okay.
5    A.   Yeah.
6    Q.   And you have an Aledo
7   address.
8    A.   We have an Aledo address, but
9   we're in Fort Worth city limits.
10   Q.   Okay.  Okay.
11   A.   Yeah.
12   Q.   Aledo is a suburb of Fort
13  Worth, and it's to the west of Fort
14  Worth?
15   A.   Yes, that's true.
16   Q.   And you-all are on the -- I
17  guess, just inside the Tarrant County
18  line?
19   A.   That's correct.
20   Q.   And just inside the Fort
21  Worth city limits?
22   A.   Yes, we're in Fort Worth city
23  limits, yeah.
24   Q.   It's about, what, 10 or 15
25  miles from your location to downtown?

Page 52

1   How long is that?
2    A.   I'd say maybe that far,
3   something like that.
4    Q.   Yeah.  Probably on the longer
5   end, closer to 15 than 10?
6    A.   We'll split the difference,
7   12 and a half.
8    Q.   Somewhere in that ballpark?
9    A.   Somewhere in that ballpark.
10   Q.   And you mentioned that
11  you-all have been a dealer of Jason
12  Scott furniture for a long time, 17, 18
13  years?  I don't know that you mentioned
14  that figure, but I think I saw that
15  figure in an affidavit that your
16  husband had completed on the case.
17   A.   Oh, okay.
18   Q.   Does that sound right?
19   A.   It sounds right.  You know, a
20  long time.
21   Q.   Put it back around 2000 or
22  so, 2001, something like that?
23   A.   Yeah.
24   Q.   Sound roughly correct?
25   A.   Roughly correct.

Page 53

1    Q.   Obviously, they're high
2   quality furniture, right?
3    A.   Yes.
4    Q.   You've carried it for a long
5   time?
6    A.   Yes.
7    Q.   It's a good seller?
8    A.   Yes.
9    Q.   Always has been a good
10  seller?
11   A.   Yes.
12   Q.   Still is a good seller?
13   A.   Yes.
14   Q.   There's been no decrease in
15  your sales volume?
16       MR. DIETRICH:  Objection,
17  form.
18   A.   No.  Well, save and except
19  the 2008-2009 downturn in the economy.
20   Q.   (By Mr. Green)  Right, right.
21   A.   That was -- yeah.
22   Q.   Affected a lot of people in a
23  lot of different ways, right?
24   A.   Yes, it did.  There were days
25  nobody came in the store.

14 (Pages 50 to 53)

**Sally Brumbaugh**                                                6/26/2018

Page 54

1      Q.   But other than that, the --
2      A.   It's been a steady salable
3   item.
4      Q.   Right.  I notice in the
5   Exhibit 1, the advertisement -- and I
6   think you said this was probably from a
7   Cowboys & Indian magazine?
8      A.   I'm going to say.
9      Q.   You're not sure, but this is
10  kind of your best --
11     A.   Right.
12     Q.   -- best guess?  But if it's
13  not there, it would have been -- what
14  was the other one?
15     A.   Western Art & Architecture or
16  Texas Monthly.
17     Q.   Okay.  The Cowboys & Indians,
18  is that a national --
19     A.   Yes.
20     Q.   -- advertising?  And same
21  thing with Western Art?
22     A.   And Architecture, yes, sir.
23     Q.   Western Art & Architecture?
24  And then Texas Monthly, of course, is
25  more local to little Texas.

Page 55

1      A.   Well, no.  I mean, it is a
2   Texas magazine, but they have national
3   distribution.
4      Q.   I was looking at the
5   advertisement that is marked as Exhibit
6   1, and there's three pictures.
7      A.   Yes, sir.
8      Q.   And I think you've kind of
9   identified two of them as being of the
10  desk --
11     A.   Yes.
12     Q.   -- and one of them as being
13  of the --
14     A.   Borgata.
15     Q.   -- Borgata -- is that a
16  console or --
17     A.   Console or buffet.  It can be
18  either one.
19     Q.   Is there any difference in
20  those two terms?  I never had heard or
21  seen console used before.
22     A.   They are very
23  interchangeable.
24     Q.   Okay.  But I notice that you
25  don't advertise it as Jason Scott.  I

Page 56

1   don't see that anywhere on the
2   advertisement.  It carries the name
3   Brumbaugh's, but I don't see that it
4   carries Jason Scott.  Am I correct?
5      A.   That's correct.  I don't have
6   the Jason Scott Collection listed on
7   there.
8      Q.   And then if someone was to
9   look at your website and the furniture
10  you have advertised on your website,
11  it's a similar situation.  You have
12  pictures of different pieces of
13  furniture, but you don't identify the
14  manufacturer of it.
15     A.   No, we don't.  And that's by
16  choice.  And the reason we don't is
17  because when you start putting out all
18  your manufacturers, then your
19  competitors can easily shop, you know,
20  and go, oh, well, I think I'll go and
21  get that, that and that and that and
22  that, and copy Brumbaugh's.
23     Q.   Okay.  So you make that
24  decision to just have it go under a
25  Brumbaugh name rather than the

Page 57

1   manufacturer name because --
2      A.   Because, first and foremost,
3   I want people to come to Brumbaugh's.
4      Q.   Right, right.  And so your --
5   a competitor could go buy furniture
6   from one of your suppliers directly,
7   possibly?
8      A.   Possibly.
9      Q.   Yeah.  And so if you're
10  selling nationally, then that would be
11  a concern.
12     A.   Yes.
13     Q.   Because you're not the only
14  Jason Scott furniture dealer or --
15     A.   And that's the reason I don't
16  put his name, or I don't put Massoud or
17  Hancock & Moore or MotionCraft or
18  Sherrill furniture or a litany of any
19  of the other vendors we carry on our
20  website or on our advertising.
21     Q.   That -- that makes -- that
22  makes perfect sense.
23         High Point, North Carolina,
24  you said, is like the -- that's the --
25     A.   Epicenter.

15  (Pages 54 to 57)

**Sally Brumbaugh**                                    6/26/2018

Page 58

1          Q.   The epicenter.  That's the
2    center of the furniture --
3          A.   Yes.
4          Q.   -- marketing area.  They have
5    a show or something that they put on a
6    couple of times a year?
7          A.   Yes.  But let me -- let me
8    explain that to you.  High Point market
9    is not at all like Dallas World Trade
10   Center, of which I know you're familiar
11   with where the building is.
12         Q.   I know where the building is,
13   yes.
14         A.   Okay.  But you know what the
15   building looks like.
16         Q.   Yes.
17         A.   High Point, North Carolina
18   Market resembles downtown Fort Worth.
19   There are, oh, my gosh, maybe a hundred
20   buildings --
21         Q.   Okay.
22         A.   -- individual buildings,
23   street level, multi-floor, encompassing
24   an entire downtown area that is nothing
25   but showrooms.  So it's not like Las

Page 59

1    Vegas where there's three major
2    buildings 14 stories tall and you look
3    at furniture on every floor if you want
4    to.
5          Q.   Okay.
6          A.   High Point is you've got to
7    drive to a building, take a bus to a
8    building, take a shuttle to a building,
9    and -- I mean, you literally could
10   visit maybe a hundred different
11   buildings.
12         Q.   Because -- because High Point
13   is the epicenter of the furniture
14   business, that's why it's bigger?
15         A.   Yes.
16         Q.   More people are showing stuff
17   there?
18         A.   Yes, sir, because --
19   because -- and it started there because
20   of the proliferation and supply of
21   wood, because the east --
22         Q.   East Coast, yeah.
23         A.   Right, has wood more and --
24         Q.   Yeah.  Now, so you-all will
25   go to High Point twice a year, and the

Page 60

1    reason you go is you're looking for
2    possible furniture that you might want
3    to carry in your store.
4          A.   Yes.
5          Q.   And so you look at hundreds,
6    thousands of different kinds of pieces?
7    Is that --
8          A.   No.  I would say thousands
9    would be an exaggeration.
10         Q.   A hundred?
11         A.   Oh, gosh.  No.  Well, maybe
12   pieces.  Maybe a thousand pieces.
13   Vendors -- a vendor may show us 50
14   pieces.  So your question is a little
15   misleading.
16         Q.   Okay.  Okay.  Well, you're
17   getting to what I was trying to find
18   out is, you look at a lot of different
19   pieces of furniture to decide what you
20   want to carry --
21         A.   Yes.
22         Q.   -- at Brumbaugh's?
23         A.   Yes.
24         Q.   And so over the years, you've
25   certainly seen -- thousands is not an

Page 61

1    exaggeration at all there --
2          A.   Not at all.
3          Q.   -- pieces of furniture.
4          A.   Yes.
5          Q.   And your husband has probably
6    seen even more.
7          A.   Absolutely.
8          Q.   And so you've seen pieces of
9    furniture that have hand carving on
10   them?
11         A.   Yes.
12         Q.   And you've seen pieces of
13   furniture that has ironwork on them?
14         A.   Yes.
15         Q.   You've seen pieces of
16   furniture that have those nails on
17   them?
18         A.   Yes.
19         Q.   And just in different
20   configurations.  And there's been, you
21   know, hundreds of those that you've
22   looked at over the years.
23         A.   Yes.
24         Q.   Do you remember -- I think
25   you said that the Jason Scott rep

**Sally Brumbaugh**                                        6/26/2018

Page 62

1    introduced the line to you-all at some
2    point, probably 17, 18 years ago,
3    right?
4         A.   Yes, uh-huh.
5         Q.   Was that at one of these
6    shows, or was it --
7         A.   I don't think so.  Jason
8    showed, to my recollection -- or the
9    Jason Scott Collection was shown at
10   High Point just a very minimal amount
11   of time.  And that's a little bit of a
12   gray area.  I can't be 100 percent on
13   that.  But we carried it long before
14   that.
15        Q.   You kind of anticipated a
16   question I had, and that was, does
17   Jason Scott display some of his
18   furniture at High Point?
19        A.   No.
20        Q.   Or Las Vegas?
21        A.   No.
22        Q.   At one point you think you
23   said you may have seen it there, but
24   that's not why you got it.  You
25   didn't -- you didn't --

Page 63

1         A.   No, we had it -- no, huh-uh.
2    We had it long before that.
3         Q.   And I think earlier you
4    mentioned that the -- that the Sacred
5    Heart dining table and the Iron Star
6    desk and the Borgata console or buffet,
7    all of those are good selling items for
8    you?
9         A.   Yes.
10        Q.   And have been ever since
11   you've carried those?
12        A.   Yes, uh-huh.
13        Q.   Whether it's five years or
14   ten years?
15        A.   Right.
16        Q.   However long you've had them,
17   they've been good, hot sellers, right?
18        A.   Yes.
19        Q.   On Exhibit Number 4 -- this
20   is the copy of the e-mail -- there's
21   stuff that's blacked out at the top.
22   What is that?
23        A.   I have no idea.
24        Q.   Okay.
25             MR. DIETRICH:  That's the

Page 64

1    redaction from our office.  They
2    were produced as redacted.
3         Q.   (By Mr. Green)  And on
4    Exhibit Number 5, there's also stuff
5    blacked out.  Do you know what that is?
6         A.   I have no idea.
7             MR. DIETRICH:  That's the
8    same thing.
9         Q.   (By Mr. Green)  Now, I'm a
10   little confused about when you first
11   became aware that there was a copy of
12   one of the Jason Scott pieces that you
13   were seeing.  And -- don't get ahead of
14   me.  Let me finish my question.
15        A.   Okay.
16        Q.   You said that you-all had
17   some kind of show that I believe you
18   said was in December of 2016, when you
19   spoke with Jason Scott and you-all
20   discussed the possibility that there
21   was a copy out there.  Did I understand
22   that correctly when you said that?
23        A.   That's -- I mean, that's been
24   a year and a half ago, I guess.  So
25   December 2016.  Jason has been in the

Page 65

1    store since then.  So I can't, you
2    know, say for sure on which date,
3    because there's been a few times that
4    Jason has -- which is good business as
5    an owner -- has come to Fort Worth
6    because we carry so much of his things.
7             So I -- I don't know if it
8    was that December meeting or if it was
9    right after the turn of 2017 when he
10   visited the store a couple of different
11   times.
12        Q.   But it was several months,
13   maybe six months before the time period
14   that's shown in Exhibits 4 and 5?
15        A.   What was -- I'm sorry.  I
16   don't understand.
17        Q.   The -- that first discussion
18   that you had with Jason Scott.
19        A.   The first discussion I had
20   with Jason, to my recollection, I
21   think, would be when I sent the e-mail.
22        Q.   So that's six months'
23   difference.  That's why I'm confused.
24        A.   I'm confused, too.  I don't
25   know.

17 (Pages 62 to 65)

**Sally Brumbaugh**                                                6/26/2018

Page 66

1        Q.   Because I think your
2    testimony about talking with Jason at
3    this show or this event --
4        A.   Well, I mean, we talked about
5    business at the event.  We -- I mean, I
6    don't remember what all we talked about
7    a year and a half ago.
8        Q.   Right.  And I'm not saying
9    that you -- that you would.  But both
10   of you had the recollection that --
11   that this issue was discussed then, in
12   December of 2016.  I mean, is that --
13       A.   I can't say under oath.  I
14   don't know.
15       Q.   And so you don't know for
16   sure if the July of 2017 date, July 6
17   is the date of those two e-mails,
18   right?
19       A.   That's the date we actually
20   saw physical evidence of what appeared
21   to be a knockoff.
22       Q.   Right.  And before that, had
23   you heard or something to the effect
24   that there was some copied pieces?
25       A.   We had heard that there might

Page 67

1    be some copies around, but to -- you
2    know, to nail down, like I said, under
3    oath --
4        Q.   You just don't know.
5        A.   I mean, I can't remember the
6    specifics of a conversation as I can
7    the specifics of an e-mail.
8        Q.   You never went to the
9    Adobe --
10       A.   Sir, I --
11       Q.   -- store?
12       A.   To my understanding Adobe is
13   a fairly small store.  A store with the
14   amount of merchandise that we carry, my
15   days are covered up.  So, no, sir,
16   it's -- I'm -- I'm busy frying my own
17   fish here.
18       Q.   Right.  And I'm not
19   suggesting that you're not -- that
20   you're not busy.  Business keeps you
21   busy, right?
22       A.   Right.
23       Q.   But you've never been over to
24   the Adobe store to look at their
25   furniture?

Page 68

1        A.   That's something I don't do.
2    I don't go and shop competitors.
3        Q.   And so you've never been to
4    the Western Heritage store?
5        A.   I've never been there.
6        Q.   Okay.  And so when you saw or
7    heard about there being a copy of a
8    Jason Scott piece that was at Adobe or
9    at Western Heritage, you didn't go by
10   to look at them, right?
11       A.   No, I don't, because I -- I
12   know for a fact both employee --
13   both -- well, one, a lady, I don't know
14   her name, came in the store when she
15   asked if she could buy -- and she
16   worked for Adobe -- if she could buy a
17   Jason Scott piece from us.  And then
18   the people that own Western Heritage,
19   they'll stop in our store.  I think
20   it's been a while.  And I guess it's a
21   compliment when your competitors -- I
22   guess they're saying we want to be just
23   like Brumbaugh's, we want to copy
24   everything Brumbaugh's is doing, so
25   we'll go and shop them.  I just have a

Page 69

1    higher standard and don't do that.
2        Q.   Okay.  You can understand the
3    sense that if someone says, boy, I
4    really like that piece of furniture at
5    Brumbaugh's, I wish we could offer
6    something like that?
7        A.   No, I really don't understand
8    that.
9        Q.   Okay.
10       A.   Because, you know, create
11   your own -- create your own mousetrap
12   and let -- you know, rather than go and
13   copy somebody else.
14       Q.   When did you last talk with
15   Jason Scott about the issue with the
16   copies of the -- of his pieces?
17       A.   Well, Jason and I have been
18   in contact with -- I guess when I got
19   the e-mail that I was to be here today.
20       Q.   Okay.  Who sent you that
21   e-mail?
22       A.   Tom.
23       Q.   Okay.  And have you talked
24   with Tom before today about what we've
25   been discussing today, generally?

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                         NATIONWIDE SERVICES                   (800) 246.4950

Sally Brumbaugh                                          6/26/2018

Page 70

1       A.   Yeah.
2       Q.   How many times have you
3   talked to Tom about that?
4       A.   I don't know.
5       Q.   Your husband gave a --
6   prepared or signed an affidavit.
7   You're aware of that?
8       A.   Yes.
9       Q.   And were you present when he
10  did it or --
11      A.   Yes.
12      Q.   Okay.  And was anyone else
13  present with y'all when he did it?
14      A.   No, because we're the --
15  we're the ones that run the business.
16      Q.   Right.  I mean, was -- was
17  Mr. Dietrich there?
18      A.   No.
19      Q.   Okay.  Was Jason Scott there?
20      A.   No.
21      Q.   Where did the form of the
22  affidavit come from?
23      A.   Oh, I don't remember.
24      Q.   Did someone send it to you?
25      A.   I don't know.  I need to look

Page 71

1   at the affidavit.  I can pull it up on
2   an e-mail if you want me to.
3       Q.   No, you don't have to do
4   that.  I have it with me someplace.
5   Here we go.
6           (Exhibit 6 marked.)
7       Q.   And the court reporter has
8   handed you Exhibit Number --
9       A.   6.
10      Q.   -- 6.  And what is Exhibit
11  Number 6?
12      A.   Declaration of Brumbaugh's
13  Furniture Store.
14      Q.   Okay.  And when you look at
15  it now, does it refresh your memory
16  about how you came to have possession
17  of this affidavit, the form of the
18  affidavit?
19      A.   I don't -- I don't remember
20  who sent this to me.
21      Q.   Okay.  But -- but your
22  husband didn't -- didn't sit down and
23  type it himself?
24      A.   No.
25      Q.   And you didn't type it?

Page 72

1       A.   No.
2       Q.   You didn't have one of your
3   people -- your employees type it for
4   you?
5       A.   No.
6       Q.   It came to you or you filled
7   in blanks, and he signed it and sent it
8   back to whoever sent it to you, right?
9       A.   Yes.
10      Q.   And it's dated August the --
11  August 1st of 2017, on the second page.
12      A.   Okay.
13      Q.   Correct?
14      A.   Yes.
15      Q.   You said you-all are the
16  second largest dealer of Jason Scott
17  furniture?
18      A.   That's my understanding.
19      Q.   Who is the largest?
20      A.   Oh, I don't know.  I think
21  it's a store, maybe, in Phoenix.
22      Q.   Okay.
23      A.   Which would make sense since
24  they ship out of there.
25      Q.   What other -- do y'all handle

Page 73

1   Tuscan-style furniture manufactured by
2   other -- others other than Jason Scott?
3       A.   Well, I think that's a
4   loosely named term.  What you may say
5   is Tuscan, I might call Old World or
6   Mediterranean or whatever.  But that
7   look we carry, yes.
8       Q.   I mean, is he the only one
9   that manufactures that for you, or are
10  there other manufacturers that
11  manufacture Tuscan or Old World or
12  Mediterranean style furniture?
13      A.   That is not an accurate
14  question because Jason Scott is the
15  only one that manufactures furniture
16  that encompasses the Jason Scott look.
17  That can be deemed Tuscan, Old World,
18  Mediterranean, even Western.
19      Q.   Do you carry furniture that
20  falls in the style of Tuscan, Old
21  World, Mediterranean, or Western that
22  is made by other manufacturers other
23  than Jason Scott?
24          MR. DIETRICH:  I'll object to
25      form.

19 (Pages 70 to 73)

Page 74

1      A.   In upholstery we do, some
2   case goods.  But nothing that looks
3   like the Jason Scott Collection.  It
4   is -- we have nothing that even comes
5   close to that look.
6      Q.   (By Mr. Green) I'm going to
7   object as nonresponsive after you
8   identified the upholstery, and what was
9   the other one?  Case --
10     A.   Case goods?
11     Q.   What is that?
12     A.   Well, case goods is also like
13  wood pieces.
14     Q.   Okay.
15     A.   Does that make sense?
16     Q.   Yeah.  So there's -- there
17  are other wood piece pieces of
18  furniture that are of that general --
19  we're talking about a wide -- a wide
20  range of styles that would fall under
21  the Tuscan, Old World, Mediterranean,
22  or Western styles?
23          MR. DIETRICH:  Objection,
24     form.
25     Q.   (By Mr. Green) That y'all

Page 75

1   carry.
2      A.   Yes.
3      Q.   And who were those
4   manufacturers?
5      A.   Well, in upholstery, it would
6   be Massoud or --
7      Q.   M-A-S-O-D or --
8          THE DEFENDANT:
9      A.   M-A-S-S-O-U-D.  King Hickory,
10  MotionCraft, Sherrill, Jesus Luna,
11  Hacienda Las Puertas.
12     Q.   (By Mr. Green) What was that
13  last one?
14     A.   Hacienda Las Puertas.  Arte
15  De Mexico.  I could go on and on.
16     Q.   Massoud was one of them?
17     A.   Massoud.
18     Q.   Massoud?  M-A-S-S-O-U-D?
19     A.   Yes.
20     Q.   Did you say King Hickory?
21     A.   Uh-huh.
22     Q.   And then --
23     A.   Omnia, O-M-N-I-A; Sherrill,
24  S-H-E-R-R-I-L-L; MotionCraft.
25     Q.   MotionCraft.  That's one I

Page 76

1   couldn't read my own writing.
2      A.   I mean, that's just a few.
3   We carry a lot.  Paul Robert.
4      Q.   Paul Robert.  And then
5   Hacienda Las --
6      A.   -- Puertas.
7      Q.   Puertas.
8      A.   P-U-E-R-T-A-S.
9      Q.   And of those, which ones make
10  case goods, wooden furniture?
11          MR. DIETRICH:  Object to
12     form.  I'm still unclear if case
13     goods are furniture or what a case
14     good is.
15          THE WITNESS:  Case goods are
16     pieces made of wood.  Does that
17     simplify it for you guys?
18          MR. GREEN:  Do you want to go
19     ahead -- do you want to go ahead
20     and ask your questions in the
21     middle of my questioning?
22          MR. DIETRICH:  Oh, no, I was
23     just --
24     A.   It's an industry term.
25  Customers don't come in saying, "Oh,

Page 77

1   I'm looking for case goods."  That's
2   a -- I'm sorry.  That's a retailer term
3   and a vendor term.
4      Q.   (By Mr. Green) It's good.
5   You're educating a couple of lawyers,
6   because I wasn't -- I wasn't familiar
7   with case goods, either.
8      A.   Yeah, I'm sorry.  That's a --
9   that's a retailer question.
10     Q.   (By Mr. Green) So which of
11  those other manufacturers that you
12  mentioned make case goods or wooden
13  furniture?
14     A.   Jesus Luna, Hacienda Las
15  Puertas.  Massoud is upholstery, Paul
16  Robert and MotionCraft is upholstery,
17  Sherrill is upholstery, King Hickory is
18  upholstery.
19     Q.   So I still -- after that
20  list, I missed the ones that make the
21  furniture.  Who are they?
22     A.   Jesus Luna.
23     Q.   Jesus Luna.
24     A.   And Hacienda Las Puertas.
25     Q.   Okay.  Now, in the last --

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                   (800) 246.4950

Sally Brumbaugh                                                6/26/2018

Page 78

1    strike that.  During 2018 or actually
2    since October of 2017, you're not aware
3    and haven't heard about any other
4    furniture retailer offering copied
5    Jason Scott furniture, correct?
6        A.  I can't answer that.
7        Q.   So either -- either you are
8    aware you've heard about it or you
9    haven't.  Have you heard about it?
10       A.   Well, I can't answer to those
11   dates.
12       Q.   Okay.  Well, back to this
13   time period in July, you're aware that
14   a lawsuit got filed.  That's why we're
15   here today, right?
16       A.   Right.
17       Q.   And if I represented to you
18   that -- that Trendily stopped selling
19   those Jason Scott copied pieces, do you
20   know of any information that would be
21   inconsistent with that?
22       A.   I don't know.
23       Q.   Okay.  You don't know -- in
24   other words, you don't know of any
25   information that would be inconsistent

Page 79

1    with that?
2        A.   I'm not aware or aware.  I
3    don't --
4        Q.   Okay.
5        A.   I can't answer that question.
6        Q.   Okay.  I'm -- I think I've
7    got the answer, but -- but I want to
8    make it clearer than that.
9        A.   If another retailer has
10   copied Jason Scott Collection on their
11   floor, I am -- I am not aware --
12       Q.   Okay.
13       A.   -- or nor am I aware.  I
14   don't know.
15       Q.   Okay.
16       A.   I can't answer that question.
17       Q.   So since -- since this
18   communication that you had in July of
19   2006 with Jason, and if you assume that
20   a lawsuit got filed after that and
21   Trendily stopped selling the table that
22   you looked at in an Adobe ad and any
23   other pieces of Jason Scott furniture
24   that was -- that was similar to it or
25   copied from it, you haven't heard from

Page 80

1    any source that, hey, they're out there
2    still selling that?  You don't know of
3    any information that would refute what
4    I've said that they have stopped
5    selling those pieces of furniture?
6            MR. DIETRICH:  Objection,
7        form.  Foundation.
8            MR. GREEN:  That was a
9        terrible question.  It was --
10           MR. DIETRICH:  Pretty long.
11           MR. GREEN:  It was.
12       Q.  (By Mr. Green)  I'll
13   withdrawal the question.
14       A.   Thank you, because I can't
15   really answer that question.
16       Q.   No, no.  You don't need to
17   because I'm going to try it again.  But
18   sometimes you get into a question --
19       A.   Yeah.
20       Q.   -- and it's, like, you get to
21   the end of it, and you think, boy, did
22   I just ask that question?  That's
23   terrible.
24       A.   Let me -- let me say
25   something.  And I don't know if this

Page 81

1    will answer it for you.  If I were a
2    retailer and had purchased -- well,
3    let's just say I'm a retailer and I
4    purchase -- let's say I purchase six
5    Jason Scott tables, and I was told,
6    okay, you can't sell those anymore,
7    then they're either still going to be
8    on my floor or in my warehouse and I
9    have possession of them, even though a
10   court order came down and said cease
11   and desist.  All right?  Then are they
12   still in Adobe's or Western Heritage's
13   possession, and they go, we've got
14   these because we paid for them, but we
15   can't sell them, but they're still in
16   our possession.  I don't know that.  I
17   mean, I -- you're asking a question I
18   don't -- I'm not aware or not aware.  I
19   don't know who's got what or who's
20   been -- who's got inventory.  I don't
21   know.
22       Q.   Okay.  I'm going to object as
23   nonresponsive because there really
24   wasn't a question pending --
25       A.   Okay.

21 (Pages 78 to 81)

Sally Brumbaugh                                    6/26/2018

Page 82

1     Q.   -- at the time you --
2     A.   That's fine.  I just -- I
3  don't --
4     Q.   We're really trying to
5  communicate and make sure we
6  understand.
7          So you have not been made
8  aware of any other retailer who is
9  selling Jason Scott copied furniture
10  during 2018?
11    A.   I'm not aware.
12    Q.   Okay.  And other than the
13  e-mail that has the picture of the
14  Remington table that your employee
15  copied from either a website or a
16  Facebook or something from Adobe
17  Interiors, right?  Other than that,
18  you're not aware of any other Jason
19  Scott furniture that had been copied
20  and was being sold by any retailer?
21         MR. DIETRICH:  Objection,
22  form.
23    A.   I was told that Western
24  Heritage had some copied pieces and
25  that Adobe had some copied pieces.

Page 83

1     Q.   (By Mr. Green) Okay.  And we
2  talked about that already, I think.
3     A.   Right.
4     Q.   Other than that, you're not
5  aware of any other suspicions about
6  that?
7     A.   No.
8          MR. GREEN:  Okay.  Thank you.
9  That's all I have.
10         MR. DIETRICH:  I have a
11  couple of follow-up --
12         THE WITNESS:  Okay.
13         MR. DIETRICH:  -- but I
14  promise I won't make you late.
15         THE WITNESS:  Okay.
16         FURTHER EXAMINATION
17  BY MR. DIETRICH:
18    Q.   You have been asked about the
19  website not having Jason Scott's name
20  on it and the advertising --
21  advertisements not having Jason Scott's
22  name on it.  Is there a sign in your
23  store that says --
24    A.   Yes.
25    Q.   -- this is Jason Scott

Page 84

1  furniture?
2     A.   I have actually the large
3  placard.  It's like a metal -- it's
4  almost just like that TV screen, if you
5  turn it the other way, of Jason
6  Scott -- Jason Scott Collection.  I've
7  got that a couple of different places
8  in the store.  Again, our store is
9  50,000 square feet, and we display our
10  furniture in room settings.
11         So over that
12  10,000-square-foot section, I might
13  have four beds and nightstands and
14  things that complement that, shall we
15  say, vignette or that room setting.  So
16  to have -- we don't have a cordoned-off
17  area with the Jason Scott Collection.
18    Q.   So in your --
19    A.   It's all over the store.
20    Q.   In your experience with a
21  customer who is not a collector, do
22  they buy it by look or by name?
23         MR. GREEN:  Objection,
24  leading.
25    A.   Look.  And some by name

Page 85

1  because they've heard of it.  There was
2  an article in some magazine, and it
3  might have been, like, an American
4  Airlines magazine or something.  I
5  don't remember.  And oddly enough, it
6  was my sister who said, "I saw this.
7  Jason Scott Collection, that's what
8  y'all carry, right?"  And I go, "Yeah,
9  that's us."  So...
10    Q.   (By Mr. Dietrich) So she saw
11  an ad in an airline magazine?
12    A.   I think it was an Arizona
13  magazine, and they were supplying
14  through there and saw something, Jason
15  Scott, a story about him.
16    Q.   And so you were asked about
17  going to High Point and seeing
18  furniture with ironwork carvings and
19  nail heads --
20    A.   Right.
21    Q.   -- for lack of a better word,
22  or hundreds of pieces that had those
23  elements in them.
24    A.   Well, not hundreds of pieces
25  that had those elements in it.  We'd

**Sally Brumbaugh**                                    6/26/2018

Page 86

```
1    see pieces that had those elements in
2    it, but --
3        Q.   And --
4        A.   Yeah.
5        Q.   -- they're fairly common
6    elements in furniture?
7        A.   Yeah.
8        Q.   But you also testified that
9    the Jason Scott look was unique.
10       A.   Very unique.
11       MR. GREEN:  Objection, form.
12       Q.  (By Mr. Dietrich)  So is it       FRE 611c
13   your testimony, then, that Jason Scott
14   is using those elements differently
15   than others?
16       MR. GREEN:  Leading.
17       A.   Yes.
18       MR. DIETRICH:  I don't have
19   any more questions.  Thank you
20   very much for your time.
21       THE WITNESS:  Thank you.
22       MR. GREEN:  Just a couple of
23   more questions.
24       MR. DIETRICH:  You had more
25   than two when you said a couple of
```

Page 87

```
1    more questions, but...
2        FURTHER EXAMINATION
3    BY MR. GREEN:
4        Q.   You said earlier that
5    somewhere there's a plaque?
6        A.   If you pull out that drawer
7    right there, there's a metal or iron or
8    stamped, you know, whatever.  I can't
9    think of the word I want to use --
10       Q.   Okay.
11       A.   -- that says Jason Scott
12   Collection.
13       Q.   For the record, we're looking
14   at Exhibit Number 2 --
15       MR. DIETRICH:  Thank you.
16       Q.   -- right?  And this is the
17   Iron Star desk --
18       A.   Right.
19       Q.   -- with Dragonfly legs,
20   right?
21       A.   Yes.
22       Q.   Which is a Jason Scott piece?
23       A.   Yes.
24       Q.   And you pointed to the
25   upper --
```

Page 88

```
1        A.   Left-hand --
2        Q.   -- left-hand drawer of the
3    desk, right?
4        A.   I believe that's where it is.
5    It's either there or in the pencil
6    drawer.  I don't know.
7        Q.   Okay.
8        A.   They're a little bit
9    different on each piece.
10       Q.   Does each piece of Jason
11   Scott furniture have one of those
12   plaques located on it someplace?
13       A.   Yes.
14       Q.   So -- so if -- if someone is
15   confused, they can -- they can for sure   FRE 611(c)
16   tell whether it's a Jason Scott piece
17   because it's going to have that on
18   there.
19       MR. DIETRICH:  Objection,
20   form.
21       A.   I guess.
22       MR. GREEN:  That's all.
23   Thank you.
24       THE WITNESS:  Okay.
25       MR. DIETRICH:  I have to ask
```

Page 89

```
1    one more question.
2        THE WITNESS:  Okay.
3        FURTHER EXAMINATION
4    BY MR. DIETRICH:
5        Q.   The plaque is inside the
6    drawer?
7        A.   That -- yes.
8        Q.   You can't see it when you're
9    looking at the desk?
10       A.   No, no.
11       MR. DIETRICH:  That's all
12   I've got.
13       A.   Unless Jason has changed
14   where he's putting it.  But that's --
15   on the desk, that's where it's at.
16       MR. GREEN:  Where is -- I'm
17   sorry.  I did what you did.
18       MR. DIETRICH:  I'll ask what
19   you wanted to ask.
20       Q.  (By Mr. Dietrich)  Are there
21   plaques on the table and the buffet?
22       A.   That's my understanding, yes.
23       Q.   Do you know if they're
24   visible when you look at the table or
25   the buffet?
```

23  (Pages 86 to 89)

Page 90

```
 1        A.   They're usually in an obscure
 2   area, you know, like, inside a drawer.
 3        MR. DIETRICH:  That that's
 4   all I have.
 5        FURTHER EXAMINATION
 6   BY MR. GREEN:
 7        Q.   So there's not a drawer on
 8   the table.  So would it be, like,
 9   underneath the table or something like
10   that?
11        A.   Yeah, like, underneath that
12   lip or something.
13        Q.   Yeah.
14        A.   That's called an apron.
15        Q.   Right.  But it's not like --
16   I mean, with the desk, if you just open
17   the drawer, you can see the --
18        A.   It's not like Under Armour
19   and it's -- you know, it's not
20   emblazoned on the front.
21        Q.   Right, right.  You would have
22   to open the drawer to see it.
23        A.   Right.
24        Q.   Wouldn't it be great if it
25   had the -- if it had the name across
```

Page 91

```
 1   the front?
 2        A.   Yeah.
 3        Q.   Okay.
 4        A.   Some people say, I want my
 5   name across the front.
 6        MR. GREEN:  All right.  Thank
 7   you very much.
 8        THE WITNESS:  Okay.
 9        MR. DIETRICH:  That's all.
10        (Discussion off the record.)
11        MR. DIETRICH:  Sally, you
12   have the chance, if you would
13   like, to look over a copy of your
14   deposition testimony and make any
15   changes if you think there's
16   anything that needs to be changed.
17        THE WITNESS:  Can I do that
18   at a later date?
19        MR. DIETRICH:  Oh, yeah,
20   absolutely.
21        THE WITNESS:  Okay.
22        MR. DIETRICH:  You can also
23   just waive that ability to do that
24   and just say, I don't want to, I'm
25   good, and --
```

Page 92

```
 1        THE WITNESS:  No, I would --
 2        MR. DIETRICH:  -- we'll just
 3   go by what the court reporter --
 4        THE WITNESS:  No, I'm kind of
 5   one of those old school girls.
 6   Let me read what I said.
 7        MR. DIETRICH:  Okay.
 8        MR. GREEN:  Always a good
 9   idea.
10        MR. DIETRICH:  Yeah,
11   absolutely.
12        THE WITNESS:  I would agree.
13   I would agree.
14        (Deposition concluded at
15   11:45 a.m.)
```

Page 93

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF ARIZONA
 3
 4   JASON SCOTT COLLECTION,   §
     INC.,                     §
 5                             §
          Plaintiff,           §
 6   VS.                       §   CIVIL ACTION NO.
                               §   2:17-cv-02712-JJT
 7   TRENDILY FURNITURE, LLC   §
     et al.,                   §
 8                             §
          Defendants.          §
 9
10
11
12            REPORTER'S CERTIFICATION
13               SALLY BRUMBAUGH
14                JUNE 26, 2018
15
16
17        I, Janice K. McMoran, RDR, CRR, TCCR, and
18   Certified Shorthand Reporter in and for the State
19   of Texas, hereby certify to the following:
20        That the witness, SALLY BRUMBAUGH, was duly sworn
21   by the officer and that the transcript of the oral
22   deposition is a true record of the testimony
23   given by the witness;
24        I further certify that pursuant to Federal
25   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
```

email@tobyfeldman.com                 Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                   (800) 246.4950

Page 94

1   as well as Rule 30(e)(2), that the signature of the
2   deponent:
3        __X___ was requested by the deponent or a
4   party before the completion of the deposition and
5   is to be returned within 30 days from date of
6   receipt of the transcript.  If returned, the
7   attached Errata contains any changes and the
8   reasons therefor;
9        _____ was not requested by the deponent or a
10  party before the completion of the deposition.
11       I further certify that I am neither counsel
12  for, related to, nor employed by any of the parties or
13  attorneys to the action in which this proceeding was
14  taken.  Further, I am not a relative or employee of any
15  attorney of record in this cause, nor am I financially
16  or otherwise interested in the outcome of the action.
17       Subscribed and sworn to on this the 9th day
18  of June, 2018.
19
20  _____
21       JANICE K. McMORAN, RDR, CRR, TCRR
22       Texas CSR #1959
23       Expiration Date: 12/31/18
24
25

Page 95

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I,_____, do hereby certify
4   that I have read the foregoing pages, and that the
5   same is a correct transcription of the answers given by
6   me to the questions therein propounded, except for the
7   corrections or changes in form or substance, if any,
8   noted in the attached Errata Sheet.
9
10  _____
11  SALLY BRUMBAUGH                 DATE
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Worldwide shipping available.

www.brumbaughs.com

**BRUMBAUGH'S**
FINE HOME FURNISHINGS

651 Camp Bowie West | Fort Worth | 817.244.9377

Brumbaugh
EXHIBIT NO. 6/26/18
Janice McMorah
CSR, RDR, CRR



**Where the West is One**

*Worldwide shipping available.*

www.brumbaughs.com

**BRUMBAUGH'S**
FINE HOME FURNISHINGS

I-30 West at the Linkcrest Exit | Fort Worth | 817.244.9377

CELEBRATING
**51**
YEARS

# Where the West is One

*Worldwide shipping available.*

www.brumbaughs.com

**BRUMBAUGH'S**
FINE HOME FURNISHINGS

I-30 West at the Linkcrest Exit | Fort Worth | 817.244.9377

JASON SCOTT COLLECTION

...it takes a village





# DSK-IRONSTR-DRGN / IRON STAR DESK W/ DRAGONFLY LEGS

## 72" X 36" X 31"

Brumbaugh
EXHIBIT NO. 2
Janice McMoran
CSR, RDR, CRR



JASON SCOTT COLLECTION

...it takes a village



BF-BOR / BORGOTA BUFFET 83"x 24"x40"





JASON SCOTT COLLECTION

...it takes a village



**TBL-SAC / SACRED HEART DINING TABLE / SIZE SHOWN - 120"x 48"x 31"**
(custom sizes available)

JASON SCOTT COLLECTION
...it takes a village



TBL-SAC / SACRED HEART DINING TABLE





Brumbaugh
EXHIBIT NO. 3
6/26/18
Janice McMoran
CSR, RDR, CRR













**Friday, December 1, 2017 at 11:49:26 AM Mountain Standard Time**



-------------------------- Original Message --------------------------
Subject: Knock Off Info
From:   info@brumbaughs.com
Date:   Thu, July 6, 2017 1:55 pm
To:     jason@jasonscottcollection.com
-------------------------------------------------------------------------

Jason,
I just spoke to JoNell here at the office.  Your piece, a dining table (or
something made exactly like your yours) popped up on her Facebook feed in
an ad for Adobe Interiors here in Fort Worth.  Probably in early spring of
2017.
I am sending you what she saw in a separate email.  It is still showing up
on their website.

Hope this helps.

Sally

Thank you,

Jason Scott
Jason Scott Collection



Friday, December 1, 2017 at 11:45:42 AM Mountain Standard Time

**Subject:**      [Fwd: FW: Adobe Remington table]



-------------------------- Original Message --------------------------
Subject: FW: Adobe Remington table
From:    info@brumbaughs.com
Date:   Thu, July 6, 2017 2:04 pm
To:     jason@jasonscottcollection.com
----------------------------------------------------------------------
Jason,

Please see the table picture attached that is on Adobe Interiors Website


Sally



adobeinteriors.com



The Remington Table is hand
crafted form solid teak wood,
accented with beautiful hand
carvings.
Dim: 96" x 48"
Custom Sizing Available.

Want more Information?
Email Us at:
info@adobeinteriors.com
or Call/Text 817-294-0053

Remington Dining Table