Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA


JASON SCOTT COLLECTION,       §
INC.,                         §
                              §
        Plaintiff,            §
VS.                           §    CIVIL ACTION NO.
                              §    2:17-cv-02712-JJT
TRENDILY FURNITURE, LLC       §
et al.,                       §
                              §
        Defendants.           §


ORAL DEPOSITION OF
KYLE TANNER DIPPLE
Fort Worth, Texas
Friday, June 29, 2018
9:51 a.m.


Reported By:
Janice McMoran, CSR, RDR, CRR
Job No.: 11368

Page 2

1
2          ORAL DEPOSITION OF KYLE TANNER DIPPLE,
3    produced at the instance of the Plaintiff, in the
4    above-styled and numbered cause on the 29th day of
5    June, 2018, at 9:51 a.m., before Janice K.  McMoran,
6    RDR, CRR, and Certified Shorthand Reporter in and for
7    the State of Texas, reported by realtime stenographic
8    means, at Law Offices of Matthew Bobo, PLLC, 4916 Camp
9    Bowie Blvd., Fort Worth, Texas, pursuant to notice and
10   subpoena, and in accordance with the Federal Rules of
11   Civil Procedure.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

I N D E X

1
2    WITNESS:  KYLE TANNER DIPPLE                    PAGE
3          Examination by Mr. Dietrich..................6
4          Examination by Mr. Green...................99
5          Further Examination by Mr. Dietrich.......149
          Further Examination by Mr. Green..........154
6          Further Examination by Mr. Dietrich.......157
7    Reporter's Certification.......................159
8    Acknowledgment of Deponent.....................161
     Errata........................................162
10
11        EXHIBIT INDEX
12   EXHIBIT
     NUMBER      DESCRIPTION              IDENTIFIED
13
14   EXHIBIT 1 - Pictures of Trendily furniture
               pieces.............................18
15
     EXHIBIT 2 - Picture and comments from Adobe
16             Interiors' Facebook page of
               Trendily dining table and chairs.....41
17
     EXHIBIT 3 - Picture from Adobe Interiors'
18             Facebook page of Trendily dining
               table and chairs....................45
19
     EXHIBIT 4 - Ad for Remington table from
20             website of Adobe Interiors...........46
21   EXHIBIT 5 - Picture of Remington table made
               by Trendily.........................50
22
     EXHIBIT 6 - Picture and comments from Adobe
23             Interiors' Facebook page of desk
               made by Trendily....................53
24
     EXHIBIT 7 - Picture of desk made by Trendily.....55
25

Page 3

A P P E A R A N C E S

1
2
3    ON BEHALF OF THE PLAINTIFF:
4      MANGUM, WALL, STOOPS & WARDEN, PLLC
       112 North Elden Street
5      Flagstaff, Arizona 86001
       (928) 779-6951
6        BY:  THOMAS E. DIETRICH, ESQ.
             tdietrich@mwswlaw.com
7
8
9    ON BEHALF OF THE DEFENDANTS:
10     COWLES & THOMPSON
       901 Main Street, Suite 3000
11     Dallas, Texas  75202
       (214) 672-2000
12       BY:  CHARLES A. GREEN, ESQ.
             cgreen@cowlesthompson.com
13
14
15   ON BEHALF OF THE WITNESS:
16     DORSETT JOHNSON & SWIFT
       407 Throckmorton Street, Suite 500
17     Fort Worth, Texas  76102
       (817) 900-8202
18       BY:  MR. ANDREW BISHOP ETTER, II
             aetter@dorsettjohnson.com
19
20
21
22
23
24
25

Page 5

EXHIBIT INDEX (CONTINUED)

1
2    EXHIBIT
     NUMBER      DESCRIPTION              IDENTIFIED
3
4    EXHIBIT 8 - Picture and comments from Adobe
               Interiors' Facebook page of desk
               made by Trendily....................56
5
6    EXHIBIT 9 - Picture of desk made by Trendily....59
7    EXHIBIT 10- Invoices from Trendily Furniture
               to Adobe Interiors..................61
8
9    EXHIBIT 11- E-mail to Trendily, Tanner Dipple,
               and Colt Dipple from Colt Dipple
               dated May 28, 2017..................75
10
11   EXHIBIT 12- Text messages between Rahul
               Malhotra and Tanner Dipple..........78
12   EXHIBIT 13- Text messages between Jason
               Forsberg and Tanner Dipple with
13             screenshot.........................85
14   EXHIBIT 14- Sales Order from Trendily to
               Adobe Interiors dated 4/10/2017.....99
15
     EXHIBIT 15- Sales Order from Trendily to
16             Adobe Interiors dated 8/7/2017.....109
17   EXHIBIT 16- E-mail to Jason at Jason Scott
               Collection from Sally Brumbaugh
18             dated July 6, 2017 with attached
               picture of Remington table..........118
19
20
21
22
23
24
25

Kyle Tanner Dipple                                          6/29/2018

Page 6

1          KYLE TANNER DIPPLE,
2    having been first duly sworn, testified as
3    follows:
4              EXAMINATION
5    BY MR. DIETRICH:
6       Q.   Good morning.
7       A.   Hi.
8       Q.   Can you please state your
9    full name for the record?
10      A.   Kyle Tanner Dipple.
11      Q.   And you go by Tanner?
12      A.   Yes.
13      Q.   Thanks for coming this
14   morning, Tanner.  Have you ever had
15   your deposition taken before?
16      A.   Once a long time ago.
17      Q.   Since it was a long time ago,
18   I'll just go through a few ground rules
19   for depositions.
20      A.   Okay.
21      Q.   You may remember some of
22   this.  But this is the court reporter.
23   She's going to take down everything
24   that we say.
25      A.   Okay.

Page 7

1       Q.   So it's helpful to not talk
2    too fast, talk loud enough that she can
3    hear --
4       A.   Okay.
5       Q.   -- and not -- to not talk
6    over each other.  If I ask a question,
7    just let me finish, and then when
8    you're talking, I'll let you finish.
9       A.   Okay.
10      Q.   When you answer, give a "yes"
11   or a "no," not an "uh-huh" or an
12   "huh-uh."
13      A.   Okay.
14      Q.   And no head nods or shakes.
15   And if we get five or ten minutes down
16   the road and you remember something
17   that goes to something we talked about
18   earlier, just let me know --
19      A.   Okay.
20      Q.   -- and we can get that on the
21   record.  Is there any reason to think
22   you can't testify fully and truthfully
23   today?
24      A.   No.
25      Q.   And another thing, sometimes

Page 8

1    Trendily's attorney or your attorney
2    may state an objection to something
3    that I ask or that he asks later on.
4       A.   Okay.
5       Q.   And they will state the
6    objection just to get it on the record,
7    and then you can go ahead and answer
8    the question after that unless your
9    attorney instructs you not to answer
10   it.
11      A.   Okay.
12      Q.   And I've spoken with your
13   attorney about this, but just so you
14   know, we're here just today to get the
15   facts regarding a case against Trendily
16   Furniture.  Jason Scott Collection
17   doesn't have any intent to pursue Adobe
18   Interiors --
19      A.   Okay.
20      Q.   -- in litigation, and it's
21   far past the deadline to add parties in
22   this case, and we're focusing on
23   Trendily.  We're not here to go after
24   Adobe.
25      A.   Okay.

Page 9

1       Q.   I just want to get facts from
2    you about what happened --
3       A.   Okay.
4       Q.   -- that involves this
5    situation.  What do you do for a
6    living, Tanner?
7       A.   Right now I sell furniture.
8       Q.   Where do you sell furniture?
9       A.   At Adobe interiors.
10      Q.   Who owns Adobe?
11      A.   Jerry Dipple.
12      Q.   Is that your father?
13      A.   Yes.
14      Q.   Are there any other owners of
15   Adobe?
16      A.   No.
17      Q.   How long have you worked for
18   Adobe?
19      A.   A little over five years.
20      Q.   Do you have other family
21   members involved in the business?
22      A.   Yes.
23      Q.   Who are they?
24      A.   My brother that does the
25   books, and then my sister does sales

email@tobyfeldman.com          Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES                   (800) 246.4950

**Kyle Tanner Dipple**

6/29/2018

Page 10

1  with me.
2      Q.   What's your brother's name?
3      A.   Colton.
4      Q.   And your sister's name?
5      A.   McKenna.
6      Q.   Both last names Dipple?
7      A.   Yes.  Well, my sister's last
8  name is Caldera.  She got married.
9      Q.   What -- have you worked in
10  the furniture industry before you
11  started selling at Adobe?
12      A.   No.
13      Q.   So you've been there five
14  years?
15      A.   Yes.
16      Q.   In sales the whole time?
17      A.   Yes.  I do other things as
18  well, though.
19      Q.   So that's going to my next
20  question.  What kind of things do you
21  do at Adobe?
22      A.   I do some of the buying, I
23  meet with furniture reps, I manage our
24  website, manage the other sales guys.
25  I do the social media stuff.

Page 11

1      Q.   You said you do some buying?
2      A.   Yes.
3      Q.   What does buying entail?
4      A.   Well, looking at furniture
5  pieces and, you know, ordering them for
6  the floor.
7      Q.   You decide what you want in
8  the store?
9      A.   Yes.
10      Q.   How do you go about buying
11  furniture?
12      A.   Like --
13      Q.   Strike that.  That was a bad
14  question.  If you're going to -- do you
15  go to, say, the furniture markets like
16  High Point or --
17      A.   I've never been to High
18  Point.
19      Q.   Do you go to other furniture
20  markets?
21      A.   I've been to the Dallas World
22  Trade Center a couple of times.
23      Q.   If you're going to -- when
24  you go do a buying trip, for lack of a
25  better word, how do you figure out

Page 12

1  where to go and what to buy?
2      A.   Well, I mostly just do it off
3  the computer.
4      Q.   Okay.  Okay.
5      A.   Or books, catalogs that, you
6  know, people will bring.
7      Q.   Where did you get -- so if
8  you're doing it on the computer, are
9  you going to a manufacturer's website?
10      A.   Yes.
11      Q.   And do they send you books or
12  catalogs?
13      A.   Sometimes.  Some of them do.
14      Q.   All right.  And that's how
15  you do most of your --
16      A.   Yes.
17      Q.   -- buying?  And you said you
18  sell, also?
19      A.   Yes.
20      Q.   You meet with customers?
21      A.   Yes.
22      Q.   Is that common for you?
23      A.   Yes.
24      Q.   And Adobe has a website?
25      A.   Yes.

Page 13

1      Q.   You manage the website?
2      A.   Some aspect of it.  I mean,
3  there's a -- there's a lot of parts to
4  that.
5      Q.   What aspects do you manage?
6      A.   I'll kind of -- you know,
7  I'll put pictures up on there and type
8  text, you know, to the best that I can.
9  I'm not a -- I don't know how to do it.
10  I just kind of learn as I go.
11      Q.   Like ad copy?
12      A.   Yeah, kind of just copy,
13  paste, maybe, and figure it out.
14      Q.   Like text to sell the
15  furniture?
16      A.   Yes.
17      Q.   And social media, you said
18  you do that, too?
19      A.   Yes.
20      Q.   What kind of social media
21  presence does Adobe have?
22      A.   Facebook, Instagram,
23  Pinterest, Yelp, YouTube, and I believe
24  that's it.
25      Q.   For the website, you said you

4  (Pages 10 to 13)

email@tobyfeldman.com
tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES

Certified WOB
(800) 246.4950

**Kyle Tanner Dipple**                                    6/29/2018

Page 14

1  did some things but maybe not
2  everything?
3      A.  Yes, because there's some
4  things that I'm not capable of doing.
5      Q.  Is there somebody else who
6  does the other aspects of it?
7      A.  Yes.  There's a company
8  called web.com that I call and, you
9  know, ask about changes or stuff.
10     Q.  Is that more technical
11 functions you use them for?
12     A.  Yes.
13     Q.  But things like uploading
14 photos, you do that?
15     A.  Yes.
16     Q.  And where is Adobe located?
17     A.  4651 Bryant Irvin Road, Fort
18 Worth, Texas 76132.
19     Q.  How big is Adobe?
20     A.  We're just a little bit under
21 10,000 square feet.
22     Q.  That's your showroom?
23     A.  Yes.
24     Q.  Does Adobe have a warehouse
25 as well?

Page 15

1      A.  Yes.
2      Q.  Is that separate from the
3  10,000 square feet?
4      A.  Yes.
5      Q.  Is it in the same location or
6  somewhere else?
7      A.  Somewhere else.
8      Q.  Where is the warehouse
9  located?
10     A.  3016 Marquita Drive, Fort
11 Worth, Texas 76116.
12     Q.  And how big is Adobe's
13 warehouse?
14     A.  Maybe 15-, 16,000 square
15 feet.  I'm not really sure.
16     Q.  Bigger than the showroom?
17     A.  Yes.
18     Q.  What -- how would you term
19 Adobe with regards to where it sits in
20 the marketplace?  Is it high end?  Low
21 end?  In the middle somewhere?
22     A.  It's mid to high.
23     Q.  Mid to high end?
24     A.  Yes.
25     Q.  What does that mean to you?

Page 16

1      A.  Well, I mean, it's, like,
2  dollar ranges, the price of the
3  furniture compared to other things.
4      Q.  What's kind of a dollar range
5  of mid to high end?
6      A.  Well, I mean, it kind of
7  varies a lot depending on what you're
8  looking at.  I mean, like -- I guess,
9  like, the average sofa is about $6,000,
10 and then it can go up or down a little
11 bit from there.
12     Q.  Who are Adobe's competitors?
13     A.  I'm not sure.  I mean, I
14 don't know how to directly say who's a
15 competitor or not.
16     Q.  Do you -- you talk to
17 customers on a regular basis?
18     A.  Yes.
19     Q.  Do they ever reference going
20 to other places?
21     A.  Yeah, but that doesn't mean
22 that they're a competitor, I mean,
23 because -- I mean, a lot of people
24 buying multiple items from different
25 places.  I mean, we have different

Page 17

1  things.  You know, I have things that
2  other places don't offer, and they have
3  things that I don't offer.
4      Q.  Are there other mid- to
5  high-end stores nearby to Adobe?
6      A.  Yes.
7      Q.  And who are they?
8      A.  I would say Brumbaugh's.  A
9  store called Rios would probably fall
10 into that category.  Western Heritage.
11     Q.  Anyone else?
12     A.  In my area, no.  I mean, I
13 don't know how broad out -- do you want
14 me to make the whole U.S.?
15     Q.  No, no.  I know there's more
16 in the whole U.S.
17     A.  Okay.
18     Q.  I'm just interested in --
19     A.  Well, those would be, like,
20 the closest ones to us that I -- we
21 probably get people that cross over,
22 that shop at both.
23     Q.  That's what I was asking.
24     A.  Okay.
25        MR. DIETRICH:  Andrew, I only

email@tobyfeldman.com                **Toby Feldman, Inc.**                Certified WOB
tobyfeldman.com                    **NATIONWIDE SERVICES**            (800) 246.4950

Kyle Tanner Dipple                                             6/29/2018

Page 18

1  have three copies.  I have to
2  share with Tanner there.
3          MR. GREEN:  Yeah.  Are these
4  the ones that we sent?
5          MR. DIETRICH:  No.
6          MR. GREEN:  Okay.
7          (Exhibit 1 marked.)
8      Q.   (By Mr. Dietrich)  If you
9  can take a look at what's been marked
10 Exhibit 1, now, Tanner.
11     A.   The first one?
12     Q.   Yeah.  Well, all the pages in
13 the document --
14     A.   Okay.
15     Q.   -- I'll ask you about.
16         MR. ETTER:  Take a minute to
17 look through all of them and make
18 sure you're -- you either know
19 what they are or not.
20     A.   Okay.
21     Q.   (By Mr. Dietrich)  Do you
22 recognize the furniture pieces in
23 Exhibit 1?
24     A.   Yes.
25     Q.   Do you know who made them?

Page 19

1      A.   Those are Trendily's.
2      Q.   They're Trendily pieces?
3      A.   Yes.
4      Q.   How can you tell that they're
5  Trendily pieces?
6      A.   Well, because I have the same
7  pieces that I bought from Trendily.
8      Q.   And how do you know they're
9  not Jason Scott pieces?
10     A.   Well, I mean, because -- I
11 mean, well, because I know because I
12 own these same pieces.
13     Q.   Is there a way from looking
14 at the pictures you can differentiate
15 the two?
16     A.   For -- as of now I can.  You
17 know, maybe not from -- I mean, I --
18 it's just -- I've never actually seen a
19 Jason Scott piece in person before all
20 of this.
21     Q.   So all of this meaning the
22 litigation?
23     A.   Yeah.  You know, I've never
24 actually, you know, known everything
25 about it until now, obviously.

Page 20

1      Q.   So you said you had these
2  pieces?
3      A.   Yes.
4      Q.   Adobe had these pieces?
5      A.   Uh-huh.
6      Q.   Each of them?  The desk, the
7  buffet, and the table?
8      A.   Yes.
9      Q.   And they came from Trendily?
10     A.   Yes.
11     Q.   Other than these pieces, has
12 Adobe done business with Trendily?
13     A.   We've bought a couple of
14 pieces from them, some dining chairs
15 and, like, sofas.
16     Q.   How long have you known about
17 Trendily furniture?
18     A.   I guess it would be about two
19 and a half, three years, somewhere in
20 there.
21     Q.   That was after you started
22 with Adobe?
23     A.   What do you mean?  Like --
24     Q.   Your relationship with
25 Trendily started after you had already

Page 21

1  been working for Adobe?
2      A.   Oh, yeah, because I've been
3  there for five years, and I've only
4  known them for about two and a half,
5  three years.
6      Q.   Do you know if Adobe had any
7  relationship with Trendily before --
8      A.   Not at all.  Not at all.
9      Q.   And you said you bought
10 dining chairs and sofas from Trendily
11 as well?
12     A.   Yes.
13     Q.   Has Adobe bought any other
14 items from Trendily?
15     A.   Well, these items.
16     Q.   Other than these and the
17 dining chairs and sofas?
18     A.   I think we did a -- we had
19 them make, like, a custom bookcase, not
20 like anything like that.
21     Q.   Do you know Rahul Malhotra?
22     A.   I do.
23     Q.   Who is he?
24     A.   He's the owner of Trendily.
25     Q.   How long have you known

6  (Pages 18 to 21)

Kyle Tanner Dipple                                                      6/29/2018

Page 22

1    Rahul?
2         A.   About the same time as I've
3    known Trendily.
4         Q.   How did you -- were you
5    involved in the first dealings between
6    Adobe and Trendily?
7         A.   Yes.
8         Q.   How did that come about?
9         A.   From what I remember, I think
10   they just came -- well, they dropped
11   off a catalog, and I kind of flipped
12   through it and wasn't really
13   interested, and then they kept calling.
14   And then they showed up again one day,
15   and I met them, and they kind of
16   explained what they do, and I looked at
17   some of their stuff again.
18        Q.   Do you know who you talked
19   about when they explained what they
20   did?
21        A.   I think I met with Rahul and
22   Chris.
23        Q.   Is that Chris Sanders?
24        A.   Yes.
25        Q.   And what did they tell you as

Page 23

1    far as what Trendily did?
2         A.   They made custom furniture.
3         MR. GREEN:  They did what?
4         THE WITNESS:  Made custom
5    furniture.
6         Q.   (By Mr. Dietrich)  Do you
7    talk with Rahul?
8         A.   Uh-huh.
9         Q.   By phone?
10        A.   Yes, I've talked to him by
11   phone and through text message.
12        Q.   Do you e-mail with Rahul?
13        A.   Very little.  I prefer to do
14   things through text and phone calls.
15   It's just a lot more convenient.
16        Q.   And Chris, you said he came
17   to that kind of initial meeting as
18   well?
19        A.   Yes.
20        Q.   Do you talk regularly with
21   Chris?
22        A.   About the same as I do Rahul.
23        Q.   Text and phone as well?
24        A.   Yes.  I've mostly dealt with
25   Rahul, though, because it was just

Page 24

1    straight to the top, you know.
2         Q.   Straight to the source?
3         A.   Yeah.
4         Q.   And you said Trendily makes
5    custom order furniture?
6         A.   Yes.
7         Q.   And you placed a custom order
8    for a bookcase with him?
9         A.   Yes.  It was just one of the
10   pieces.
11        Q.   Have you custom-ordered other
12   pieces from Trendily?
13        A.   Yeah.  Two sofas and some
14   dining chairs.
15        Q.   How do you go about placing
16   your custom order with Trendily?
17        A.   Well, I send pictures of the
18   piece and I ask if this is something
19   that he can do.  And then I send, you
20   know, like a sketch, measurements,
21   and -- to kind of get a price and, you
22   know, what materials I'm going to put
23   on it.
24        Q.   Do you send those to Rahul?
25        A.   Yes, or Chris.  I think the

Page 25

1    last time -- most times I've sent them
2    to -- I've sent them to Rahul, I mean.
3         Q.   The pictures that you're
4    sending, where do those come from?
5         A.   Well, one of them -- like,
6    the sofa came from -- it was a picture
7    that was in a person's home.  It was
8    just a sofa.  And they wanted -- the
9    customer wanted the same sofa just done
10   in different materials.  So I just took
11   pictures of it and measured it and sent
12   it to them.
13        Q.   And did they make the custom
14   order?
15        A.   Uh-huh, they did.  Twice.
16        Q.   In your experience, what's
17   the quality of Trendily's product?
18        A.   I don't -- I don't care for
19   the upholstery work.  Well, I mean,
20   there's some aspects of it that are
21   nice and some that aren't.  Recently we
22   took apart a piece because we had to
23   use the leather off of it because it
24   was, like, discontinued, and on the
25   insides it was really scrapped together

7 (Pages 22 to 25)

Kyle Tanner Dipple                                              6/29/2018

Page 26

1    and he used -- it was really sloppy
2    work on the inside.
3         Q.   The manufacturing on the
4    inside was sloppy?
5         A.   Yeah.  It looked really nice
6    on the outside, but the inside, it was
7    a hack job.
8         Q.   In your experience, will that
9    affect the durability in the long-term?
10        A.   Oh, yeah.  On that piece,
11   yeah.  Now, I can't speak for every
12   piece that he does, but that particular
13   piece.
14        Q.   Sure, yeah, I'm just curious
15   about that piece.
16        A.   Yeah.  It was bad.
17        Q.   Are you familiar with the
18   term "case goods"?
19        A.   Yes.
20        Q.   What does that mean to you?
21        A.   Wood pieces.
22        Q.   Wood pieces?
23        A.   Yes.  Pieces that don't have
24   upholstery on them -- you know, like,
25   this is an upholstery piece.  This

Page 27

1    would be case goods, this table.
2         Q.   So chairs is an upholstered
3    piece, for the record?
4         A.   Yeah.
5         Q.   The table is a case good,
6    more or less?
7         A.   Yeah.
8         Q.   How about the quality of the
9    case goods Trendily has made?  How do
10   you view that?
11        A.   Actually, pretty good.  I was
12   pretty impressed with their case good
13   quality.
14        Q.   Can you give us detail on
15   that of why you were impressed with it?
16        A.   Well, I mean, it was solid
17   wood or hardwood, hand carved.  He had
18   a great finish, a wood finish.  You
19   know, he used a nice lacquer finish.
20   They were pretty solid pieces.  I mean,
21   heavy, well put together.
22        Q.   Do you know where Trendily
23   makes their furniture?
24        A.   I was told that they make it
25   in India.

Page 28

1         Q.   Who told that you?
2         A.   Rahul.  They have a factory
3    in India or his father has a factory.
4         Q.   And we kind of mentioned them
5    already, but are you familiar with
6    Jason Scott Collection furniture?
7         A.   I am now.
8         Q.   How have -- how have you
9    become -- how did you come to know
10   about Jason Scott furniture?
11        A.   Well, I mean, I've heard the
12   name before, but I've never really
13   known what -- before all this, known
14   what it was and that that was an actual
15   individual.  I just thought it was,
16   like, a line of furniture.  You know,
17   and some people would say, oh, yeah,
18   that's a Jason Scott piece, and it
19   would just be a carved wood piece.  So
20   I kind of put in my mind that if it's
21   carved and -- he had, like, kind of a
22   distinct, you know, look to it, carved
23   and, like -- just carved wood
24   furniture.  So... I couldn't tell you
25   everything that was his because I'm not

Page 29

1    familiar with --
2         Q.   No, I'm not going asking you
3    everything that was his.  Don't worry.
4         Is Adobe authorized to sell
5    Jason Scott furniture?
6         A.   No, no.
7         Q.   Has Adobe ever sold Jason
8    Scott furniture?
9         A.   No.
10        Q.   To your knowledge, what
11   did -- what did Trendily call these
12   pieces that you have the photos of
13   here?
14        A.   When I first got them, there
15   was no names.  It was just a desk, a
16   table, and I believe they called it a
17   credenza or a buffet.  There was no
18   actual name.  And then later on, as I
19   guess the piece came in, he had told me
20   that he referred to it -- he calls it
21   his MJ Collection.
22        Q.   When did you first learn
23   about these pieces?
24        A.   I'd have to look back on my
25   phone to know the exact date, but, I

8  (Pages 26 to 29)

**Kyle Tanner Dipple**                                        6/29/2018

Page 30

1    mean, I guess it would have been
2    maybe -- I know it was sometime in the
3    summer when they first started showing
4    me pictures of them being -- when they
5    were -- pictures of the product.  I'd
6    have to go look back through my text
7    messages to give you more.  I'm going
8    to guess maybe about a year and a half,
9    maybe two years ago.
10       Q.   So when you say summer, do
11   you think that's summer --
12       A.   I think I remember it being
13   when they were first showing me the
14   pictures of them.
15       Q.   Of 2016?
16       A.   I believe so.
17       Q.   So --
18       A.   I'm not --
19       Q.   About two years ago?
20       A.   I think so, yeah.  I can look
21   back and tell you for sure when I first
22   started.
23       Q.   And I might ask you to do
24   that or ask Andrew to ask you to do
25   that.  But -- so you think it was

Page 31

1    summer 2016?
2        A.   I believe so, when I first.
3        Q.   And how -- you said you have
4    pictures in your phone.  How did you
5    first learn about these pieces?
6        A.   Well, they -- they showed us
7    pictures of them, Trendily -- or Rahul
8    and Chris showed me pictures of what
9    they were making.
10       Q.   Did they text you pictures or
11   show you pictures on their own phone?
12       A.   Oh, they showed me pictures
13   on their -- I think it was an iPad, off
14   of Chris's iPad, showed me the
15   pictures.  And then I asked them for
16   them, and he sent me a Dropbox link to
17   the pictures with a lot of other
18   pictures on it from their other
19   products.
20       Q.   Would you still have the
21   e-mail of them sending you the Dropbox
22   link?
23       A.   I did, and I think I gave it
24   to y'all.
25            MR. GREEN:  Yeah, it was in

Page 32

1    the stuff I sent to you.
2        A.   Yeah, the link doesn't work
3    anymore.
4        Q.   But the e-mail --
5        A.   Yeah.
6        Q.   -- with the link, you gave it
7    to us?
8        A.   Yeah.
9        Q.   Okay.  And did you look at
10   the Dropbox link in that e-mail?
11       A.   Yeah, I opened it.
12       Q.   Did it have photos of these
13   pieces in it?
14       A.   Just this piece right here
15   (indicating), just the table.
16       Q.   The table?
17       A.   Yeah.
18       Q.   What became the MJ dining
19   table?
20       A.   Yes.  At the time there was
21   no name to it or anything.
22       Q.   Did you talk to Chris and
23   Rahul about -- well, strike that.
24            When did the desk and the
25   buffet come into the picture for you?

Page 33

1        A.   Shortly after.  I mean,
2    the -- shortly after.  I think --
3    because this was the first piece I saw.
4    And then I would have seen the desk and
5    the buffet after.  And they didn't send
6    me any pictures of those, that I can
7    remember.
8        Q.   How did you find out about
9    them?
10       A.   I think when -- I think he
11   came back when he was showing me the
12   additional pieces and I had bought them
13   at the same time.  I bought the desk
14   and the table and the buffet at the
15   same time, I believe.
16       Q.   So you -- he came back, do
17   you mean Rahul or Chris?
18       A.   I think it was Chris that
19   came back to me.
20       Q.   And then you put an order for
21   all three pieces?
22       A.   Yeah.  And I actually went up
23   there to look at them.  I brought a
24   check, and I went to his warehouse off
25   of -- the one in Dallas.  I can't

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES              (800) 246.4950

**Kyle Tanner Dipple**

6/29/2018

Page 34

```
1   remember what street it's on.  And
2   looked at them, and the guys loaded
3   them up as I looked at them.
4        Q.   Oh, so you took them back to
5   Adobe right that day?
6        A.   Oh, yeah.  I looked at them
7   and I saw that they were nice, and I
8   wanted them, so I gave them a check and
9   had the guys load them up.
10       Q.   And do you think that was in
11  summer of 2016 as well?
12       A.   I think it was more -- that
13  was more into September and November,
14  because the pieces weren't here yet, is
15  what I was told.
16       Q.   So September-November 2016?
17       A.   Yeah.  I think they had told
18  me that they had either sold them all
19  or that they weren't here yet.  I can't
20  remember.
21       Q.   Did you talk to either Rahul
22  or Chris about the designs of the
23  furniture?
24       A.   No.
25       Q.   In your conversations with
```

Page 36

```
1   answer to.
2        Q.   So you said, say, fall 2016,
3   you picked up -- was it one of each
4   piece from Trendily's warehouse?
5        A.   Yes.
6        Q.   And took those back to Adobe?
7        A.   Yes.
8        Q.   Did you put them on the floor
9   at Adobe?
10       A.   Yes.
11       Q.   Did you advertise them on
12  social media?
13       A.   Oh, yeah.  Yeah.  I mean, I
14  thought at the time it was going to be,
15  like, a -- from what it sounded, he was
16  going to be bringing them over, like a
17  lot, so yeah.  I put them into
18  advertisement.
19       Q.   So Facebook?
20       A.   Yeah.  Facebook.
21       Q.   Instagram?
22       A.   No.  I didn't have Instagram
23  at the time.
24       Q.   Anything else besides
25  Facebook?
```

Page 35

```
1   Rahul, did he ever reference Jason
2   Scott?
3        A.   Not that I can remember.  I
4   mean, I don't want to say yes or no to
5   that.  I mean, he could have and it
6   could have just gone right over my head
7   if he did.
8        Q.   You don't recall him saying
9   that?
10       A.   I don't recall him saying
11  that.  I wouldn't feel comfortable
12  giving a yes or no.
13       Q.   That's all I want --
14       A.   Okay.
15       Q.   -- is whether you remember.
16       A.   Okay.
17       Q.   If you don't remember, I want
18  to know that you don't remember.
19       A.   Okay.
20       Q.   So that's fine.
21       A.   All right.
22       Q.   In your conversations with
23  Chris, did he ever reference Jason
24  Scott?
25       A.   Not that I can put a definite
```

Page 37

```
1        A.   Just Facebook and our
2   website, that was it.
3        Q.   And you had all three pieces
4   on your showroom floor?
5        A.   Yes.  This piece I did, but I
6   don't think this piece was ever on
7   social media or the website.  I don't
8   think I ever --
9        Q.   The buffet?
10       A.   Yeah.
11       Q.   But it was on the showroom
12  floor?
13       A.   Yes.  But I definitely put
14  the dining table up, I think, two
15  different times, and then I did the
16  desk as well.
17       Q.   But did Adobe sell those
18  pieces?
19       A.   Yes, they're gone.
20       Q.   Do you know how soon between
21  putting them on the floor for sale and
22  when somebody bought them?
23       A.   I couldn't tell you.  I think
24  it was pretty quick, but I couldn't
25  tell you for sure.
```

email@tobyfeldman.com
tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES

Certified WOB
(800) 246.4950

Kyle Tanner Dipple                                              6/29/2018

Page 38

1    Q.   Did you get more,
2    replacements for them?
3         A.   I think I got one more desk,
4    and that's all they had at the time.  I
5    had put an order in for more, but then
6    all of this blew up and we canceled the
7    order.
8         Q.   When you -- just as a general
9    practice, when you advertise a piece on
10   social media, say --
11        A.   Uh-huh.
12        Q.   -- do you say who the
13   manufacturer of the piece is?
14        A.   No, never.
15        Q.   Why not?
16        A.   Well, because you don't want
17   people, like, price shopping and, like,
18   you kind of want to make it where it
19   feels more exclusive to you when you
20   throw it out there, like you're the
21   only place that they can get it at.
22        Q.   And so when you posted up the
23   Trendily furniture, did you say, "Made
24   by Trendily"?
25        A.   No.

Page 39

1         Q.   So a customer that saw a
2    picture of the table, say, they
3    wouldn't know that Trendily made that
4    table?
5         A.   No.  Not unless they asked,
6    you know.  If they asked where it comes
7    from, we tell them where it comes from.
8    But we try to avoid that to avoid them
9    looking for it elsewhere and stuff.
10        Q.   So in your experience, is it
11   the look that leads them to buy a piece
12   of furniture?
13        MR. GREEN:  Objection, form.
14        A.   Oh, yeah.
15        Q.   (By Mr. Dietrich)  That's
16   okay.  You can answer now.
17        A.   I believe, yeah, the way it
18   looks and the quality of the piece
19   determines whether they're going to buy
20   it or not.  I don't think most people
21   are -- some people are.  Some people
22   are a brand shopper and some people
23   look more for the value, you know, as
24   look over the quality and -- and see if
25   it's worth their money or not.

Page 40

1         Q.   I guess price has something
2    to do with it, too?
3         A.   Well, yeah, absolutely.
4         Q.   If a customer was on your
5    showroom floor and they were looking at
6    any of these pieces, is there any way
7    they could tell just by looking who
8    made it?
9         A.   Oh, I don't think so.  I
10   mean, they're so -- you'd have to be
11   really familiar and know -- you have to
12   be more -- you have to probably be in
13   this business to really know or -- I
14   mean, you would just have to be, or it
15   would be something that you've shopped
16   a lot and you're familiar with.  The
17   average customer does not know.
18        Q.   I'm going to ask you about
19   some of the Facebook posts --
20        A.   Sure.
21        Q.   -- and things.  And this is
22   what's called authentication to get
23   information on each --
24        A.   Okay.
25        Q.   -- record.

Page 41

1    (Exhibit 2 marked.)
2         Q.   If you would take a look at
3    Exhibit 2.  Do you recognize what's
4    shown in this exhibit?
5         A.   Yeah.  I took the picture.
6         Q.   That's one of my questions.
7    So you took this picture?
8         A.   Uh-huh.  That's at our store
9    at Adobe Interiors.
10        Q.   And it's in a place setting,
11   I guess?  What do you call this kind of
12   thing where it's set up like a regular
13   house?
14        A.   I mean, it's just a setup
15   with chairs and rugs.  It just looks
16   better than just a whited out
17   background.
18        Q.   And you actually took this
19   photograph?
20        A.   I did.
21        Q.   And is this from Adobe's
22   Facebook page?
23        A.   Yes.
24        Q.   Did you upload the photo to
25   Facebook?

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES              (800) 246.4950

Page 42

```
 1        A.   Yes.
 2        Q.   Do you know how many
 3   followers Adobe has on Facebook?
 4        A.   Roughly 60,000, I think.
 5        Q.   That's a lot of followers.
 6        A.   Yeah.
 7        Q.   Must have a good page.  Is
 8   this the Trendily dining table in the
 9   photo?
10        A.   Yes, it is.
11        Q.   Do you know when you took
12   this photo?
13        A.   Do you have the date on here?
14   I mean --
15        Q.   It's just a post.  I didn't
16   know what the date of the post was.
17        A.   I'd have to look back through
18   my Facebook feed to figure out the
19   date.  We post a lot of pictures, so...
20   and I don't -- there's no particular
21   order of when I get something and when
22   it -- when it gets posted.
23        Q.   What was Adobe's price that
24   it charged the customers for this
25   table?
```

Page 43

```
 1             MR. GREEN:  Objection, form.
 2        A.   I think $6,000 is what we had
 3   it retailed at.
 4        Q.   (By Mr. Dietrich)  Do you
 5   recall the retail prices of the desk?
 6        A.   I think we had it marked at
 7   6,000 as well, or 5,995, maybe, or
 8   4,995.  Somewhere in there.
 9        Q.   And how about the buffet?
10        A.   That, I don't remember.
11        Q.   In the comments, it looks
12   like there's comments from a lot of
13   people, some asking for price.
14        A.   Uh-huh.
15        Q.   And then it states "Page
16   responded privately"?
17        A.   Yeah.  We did that with a lot
18   of the pieces, we'll respond back.
19   That way you create -- you get a
20   message kind of thing set up, because
21   it gets harder to find when you're
22   working with a customer off of Facebook
23   when it's all out in the public and
24   then you don't want to get their
25   information publicly.
```

Page 44

```
 1        Q.   Sure.
 2        A.   So it's easier to establish,
 3   you know, a rapport doing it that way.
 4        Q.   Is Page a person, or is it
 5   just referring to this Facebook page?
 6        A.   Where at?
 7        Q.   So there's a comment by, say,
 8   Jessica Arroyo, and then right below
 9   that it says, in kind of gray letters,
10   "Page responded privately."
11        A.   That would be us that we
12   responded.  There's an option where you
13   can -- and it might show on some of
14   these.  You have the option to reply as
15   a message or you reply back as a
16   comment.  If we reply back as a
17   comment, it goes where everybody can
18   see it.  If you do a message, it's just
19   a conversation that only you and the
20   recipient can see.
21        Q.   Where it says "Page," is
22   there a person named Page, or is that
23   just --
24        A.   No, that's our Facebook page,
25   yeah.
```

Page 45

```
 1        Q.   That was -- I was curious
 2   about that.  Was this how the table was
 3   set up on the showroom floor at Adobe?
 4        A.   At one point, yeah.  We moved
 5   stuff around, so...
 6        Q.   You took a photo of the
 7   setting at Adobe?
 8        A.   Yes.
 9             (Exhibit 3 marked.)
10        Q.   I'm going to show you what's
11   been marked Exhibit 3.  And I apologize
12   if this is repetitive, but do you
13   recognize this photo?  It's the same --
14        A.   Yes.
15        Q.   -- photo, I believe?
16        A.   Yes, it is.
17        Q.   And this is the photo you
18   took?
19        A.   Yes.
20        Q.   Just kind of blown up on
21   Facebook?
22        A.   Yes.
23        Q.   And this is the Trendily
24   table?
25        A.   Yes.
```

email@tobyfeldman.com     Toby Feldman, Inc.     Certified WOB
tobyfeldman.com     NATIONWIDE SERVICES     (800) 246.4950

Kyle Tanner Dipple                                                    6/29/2018

Page 46

1      (Exhibit 4 marked.)
2      Q.   I'm showing you what's been
3   marked as Exhibit 4.
4      A.   Okay.
5      Q.   Do you recognize this?
6      A.   That's the table that I got
7   off of the picture the very first time
8   I saw the table from Trendily.  This is
9   the one that came through on the
10  Dropbox.
11     Q.   So did you -- where is this
12  post from?  Is it from Facebook or a
13  website?
14     A.   This is off of our website,
15  yeah.
16     Q.   Is this the mobile version of
17  your website?
18     A.   It looks like it would be,
19  because it's got -- this up top would
20  be from a mobile phone.  So that would
21  be --
22     Q.   The AT&T notations?
23     A.   Yes.
24     Q.   Did you write the text down
25  here below the photo?

Page 47

1      A.   Yes, I did.
2      Q.   So you refer to it as the
3   Remington table?
4      A.   Yes.  That's what -- I
5   developed a name for it.  We do that
6   for every piece.  We give it our own
7   unique name.
8      Q.   And that's an Adobe specific
9   name?
10     A.   Oh, I don't know.  I mean,
11  Remington is -- I mean --
12     Q.   Right.  But as far as this
13  I, I mean --
14     A.   I mean, we called it the
15  Remington table, and then I believe we
16  called the desk the Remington desk.
17  They kind of make a -- you know, like a
18  collection, you know.
19     Q.   And you weren't calling it
20  the MJ Collection like Trendily did?
21     A.   No, no.  And I'd do that the
22  same for everything.
23     Q.   Create a separate name?
24     A.   Yes.
25     Q.   It says in the text that you

Page 48

1   wrote "Custom sizing available."  Do
2   you see that?
3      A.   Yes.
4      Q.   Is that accurate?  Could the
5   customer order a custom size?
6      A.   Yeah.  I mean, I was told
7   from Trendily that, you know, they
8   could do it whatever, you know.  Of
9   course, it would take a long time to
10  get it because it was coming from
11  overseas.
12     Q.   So it says the dimensions on
13  this one, it's 8 feet long, 96 inches?
14     A.   Yes.  That's the dimensions
15  of the one picture.
16     Q.   But if the customer wanted a
17  10- or a 12-foot version, they could
18  have ordered it?
19     A.   From what I understood, yes,
20  but I never got to that point.
21     Q.   So you said this photo came
22  over to you from Trendily's Dropbox?
23     A.   Yes.  That's that -- that's
24  their picture that they took.
25     Q.   Do you know where they took

Page 49

1   the picture?
2      A.   No.  And I would -- I would
3   assume that -- that it was taken in
4   India, just because of the fact that I
5   believe when I was shown the pictures,
6   that they weren't here yet.
7      Q.   Was this the first picture of
8   the table that you ever saw?
9      A.   Yes, it was.
10     Q.   And at that point they had
11  told you it's not here in the U.S. yet?
12     A.   I believe so.  It was either
13  that it wasn't here or that they were
14  already sold.  So, I mean, it could be
15  taken at his warehouse.  I don't have
16  the answer to that.
17     Q.   Do you know who took this
18  photo?
19     A.   I do not.
20     Q.   But you took it and uploaded
21  it to the Adobe website?
22     A.   Yeah.  They gave it to me
23  through the Dropbox link, and I pulled
24  it off onto my computer and then
25  uploaded it.

13 (Pages 46 to 49)

Kyle Tanner Dipple                                    6/29/2018

Page 50

1    (Exhibit 5 marked.)
2        Q.   So I'm going to show you
3    Exhibit 5.
4        A.   Okay.
5        Q.   This is a -- looks like the
6    same photograph.  Is it?
7        A.   Yes.
8        Q.   Is this the photograph on
9    Adobe's website?
10       A.   Yes.
11       Q.   And is this the photograph
12   that you got from Trendily's Dropbox?
13       A.   That's correct.
14       Q.   And you took this photograph
15   and put it on Adobe's website?
16       A.   Yes.
17       Q.   If you look at -- in the
18   URL --
19       A.   Uh-huh.
20       Q.   -- it looks like the file for
21   this photograph is called -- it refers
22   to Adobe's website, and then it states
23   "JS dining table-media-edit.jpg."
24       A.   Yes.
25       Q.   Who named this file?

Page 51

1        A.   I did.
2        Q.   You named it?
3        A.   Yes.
4        Q.   What were you referring to JS
5    dining table?
6        A.   As Jason Scott, because in my
7    mind that's what it -- I do it for my
8    own memory to recall, because I have
9    lots of pictures on my computer.  So
10   when I pull something off, I do it to
11   what helps me remember of what I see it
12   as so I can search it easy, because
13   this was at the time before I even came
14   up of the name of the Remington table,
15   or I came up with the name -- before I
16   even knew that they were calling it MJ.
17   So I just did it how I could recall it
18   and find it off my computer.
19       Q.   So before you came up with
20   Remington and before MJ --
21       A.   Yes.
22       Q.   -- you knew that this table
23   was copied from Jason Scott?
24       A.   I did not know it was copied.
25   I just know that it looked like --

Page 52

1    because I didn't know what -- what
2    pieces Jason Scott actually made and
3    what his looks -- I just know it
4    looks -- has the look of it.
5        Q.   So you knew what his dining
6    tables looked like at that point?
7        A.   Not at the time.  I do now.
8    And, you know, I know now that he has a
9    table that looks like this.  But at the
10   time I didn't know there was an exact
11   table to this.  There is things that I
12   didn't know then that I know now, so
13   it's kind of hard to --
14       Q.   No, I understand.
15       A.   I don't know what to really
16   answer, if I answer what I knew at the
17   time or what I know now.
18       Q.   Well, at this point I'm just
19   asking what you knew at the time.
20       A.   Okay.  So at the time I knew
21   it had -- it looked like the same style
22   to what Jason Scott does, from the few
23   pieces that I've seen.
24       Q.   And for that reason, you
25   called it JS dining table?

Page 53

1        A.   Right.  Because I have
2    thousands of picture that I get from
3    people, and I pull off and I save it,
4    because when I go to upload a picture
5    from here, I have to type in what I
6    want or I have to manually scroll
7    through thousands of pictures to find
8    what I want.  So if I label something
9    that I can remember myself, it's easier
10   for me to pull it and upload it to
11   where I want.
12       Q.   And you labeled it Jason
13   Scott dining table because you thought
14   it had the look of Jason Scott?
15       A.   Yes.
16       (Exhibit 6 marked.)
17       Q.   Do you recognize Exhibit 6?
18       A.   I do.
19       Q.   What's shown here?
20       A.   That's the desk.
21       Q.   The Trendily desk?
22       A.   Yes, the Trendily desk.
23       Q.   And is that Adobe's Facebook
24   page?
25       A.   Yes, that is.  I took that

14 (Pages 50 to 53)

Kyle Tanner Dipple                                        6/29/2018

Page 54

1  picture.
2      Q.   And did you take the picture
3  at Adobe?
4      A.   Yes, I did.
5      Q.   And did you upload the photo
6  to Facebook?
7      A.   Yes, I did.
8      Q.   Do you know when you took
9  this photo?
10     A.   I do not.  Looks like it
11 would have been before August 5th.
12     Q.   Yes, I see that date.
13 Unfortunately, it doesn't look like it
14 has a year on it.  But I guess by
15 August 5th in 2016, you wouldn't have
16 even had these pieces yet; is that
17 right?
18     A.   That's right.  So maybe last
19 year.  I can go back and look and tell
20 you exact.
21     Q.   Yeah.
22     A.   I do a lot of pictures, and
23 it's hard to --
24     Q.   And I understand this was a
25 couple of years ago.  I just -- I

Page 55

1  appreciate it.
2          That's all for that one.
3  Like I said, this may get a little
4  repetitive, but it's something we need
5  to do --
6      A.   No, I understand.
7      Q.   -- to figure out who created
8  everything.
9          (Exhibit 7 marked.)
10     Q.   I'm showing you what's been
11 marked Exhibit 7.  It looks like the
12 same photograph we just looked at; is
13 that right?
14     A.   Yes.
15     Q.   And you took this photograph?
16     A.   Yes.
17     Q.   And uploaded it to Adobe's
18 Facebook page?
19     A.   Yes.  Or I think this one
20 looks like it's off of -- no, it's
21 Facebook.
22     Q.   Yeah, it looks like it has
23 the timeline --
24     A.   Yes.
25     Q.   -- and the kind of like

Page 56

1  things from Facebook?
2      A.   Yes.
3      Q.   Taken -- photo taken at
4  Adobe?
5      A.   Yes.
6          (Exhibit 8 marked.)
7      Q.   I'm showing you what's been
8  marked Exhibit 8.  Do you recognize
9  this?
10     A.   Yes.  This is the exact same
11 one as that, that desk.
12     Q.   Same desk?
13     A.   Exact same one.
14     Q.   Different setting?
15     A.   Different setting.  I had
16 taken this with my cell phone, and
17 then -- and then when I had time, I had
18 it moved, you know, in a more better
19 setting, to get like, an actual good,
20 professional photo of it.
21     Q.   So this one in Exhibit 8,
22 this photo came first before the one in
23 Exhibit 7?
24     A.   Yes.  This one was posted
25 first, and then the really good one I

Page 57

1  did later.
2      Q.   And you took this photo?
3      A.   Yes, both of them.
4      Q.   It looks in the background
5  like that's the buffet.  Do you see
6  that?
7      A.   Oh, yeah, it is.  Yes, that's
8  the buffet.
9      Q.   That's the Trendily buffet?
10     A.   Yes, it is.
11     Q.   And this photo, you took it
12 at Adobe?
13     A.   Yes.
14     Q.   Another question on the
15 comments, there's a comment response
16 from Adobe Interiors, and it looks like
17 it's signed "Rick"?
18     A.   Yes.
19     Q.   Do you see that?
20     A.   I do.
21     Q.   Who is Rick?
22     A.   He used to work at our store.
23     Q.   What's Rick's last name?
24     A.   Waymack.
25     Q.   Can you spell that for us and

15  (Pages 54 to 57)

Kyle Tanner Dipple                                                6/29/2018

Page 58

1  the court reporter.
2      A.   W-A-Y-M-A-C-K.
3      Q.   What kind of work did Rick do
4  for Adobe?
5      A.   He was a salesperson.
6      Q.   Do you know if he used to
7  work at The Arrangement?
8      A.   Yes, he did.
9      Q.   Do you know if he used to
10 sell Jason Scott Collection at The
11 Arrangement?
12     A.   At The Arrangement, I think
13 they do sell that collection, so yes.
14     Q.   Did you ever talk to him
15 about that?
16     A.   About selling it there?
17     Q.   About any familiarity he
18 might have with Jason Scott?
19     A.   Oh, yeah.  I mean, he was
20 familiar with it.
21     Q.   Did you talk to him about
22 these Trendily pieces?
23     A.   Yes.
24     Q.   Did Jason Scott come up at
25 all in those conversations?

Page 59

1      A.   Yes, because he had
2  recognized that they were -- they
3  looked like pieces of his.
4      Q.   Do you recall when those
5  conversations happened?
6      A.   I don't.
7      Q.   But Rick said he recognized
8  the Trendily versions as looking like
9  Jason Scott?
10     MR. ETTER:  Objection, form.
11     A.   I believe so.
12     MR. GREEN:  Did you say your
13 Facebook had 60,000 followers?
14     THE WITNESS:  Yes.
15     (Exhibit 9 marked.)
16     Q.   (By Mr. Dietrich)  And you
17 said Rick, is he not with Adobe
18 anymore?
19     A.   No.  He quit.
20     Q.   How long ago was that?
21     A.   I believe it was last year,
22 end of October, beginning of October.
23     Q.   20 -- what are we at now?
24 October 2017?
25     A.   Yes.

Page 60

1      Q.   Did his quitting have
2  anything to do with what we're talking
3  about today?
4      A.   No, not at all.  He was
5  commuting from Dallas, and he was
6  just -- he couldn't do the drive
7  anymore, the traffic and everything,
8  and he just wanted something closer to
9  home.
10     Q.   Now that I've been here for a
11 few days, I understand.
12     A.   Yeah.
13     Q.   Showing you what's been
14 marked Exhibit 9.  This looks like a
15 copy of the same photograph we just
16 talked about in Exhibit 8?
17     A.   Yes.
18     Q.   And you took this photograph?
19     A.   Yes.
20     Q.   And uploaded it to Adobe's
21 Facebook page?
22     A.   Yes.
23     Q.   And it's taken at Adobe?
24     A.   Yes.
25     Q.   And those are both Trendily

Page 61

1  pieces in it?
2      A.   Yes.
3      Q.   What about the chair?  Is
4  that a Trendily chair?
5      A.   That is not.
6      (Exhibit 10 marked.)
7      Q.   So something different.
8      A.   Okay.
9      Q.   I'm showing you what's been
10 marked Exhibit 10.  If you would just
11 take a minute and look through it.
12     Do you recognize Exhibit 10?
13     A.   Yes.
14     Q.   What does this exhibit
15 consist of?
16     A.   That would be our invoice for
17 the -- the MJ desk, the MJ sideboard,
18 and the MJ dining table.
19     Q.   And it has a couple of more
20 pages on it.
21     A.   Oh.
22     Q.   So are these all invoices to
23 Adobe from Trendily?
24     A.   Yes.
25     Q.   For MJ Collection pieces?

16  (Pages 58 to 61)

Kyle Tanner Dipple                                    6/29/2018

Page 62

1    A.   Yes.
2    Q.   Did you provide these to
3  Jason Forsberg?
4    A.   I gave them some things.  I
5  don't know if I gave them -- had these
6  or not.  I can't remember.
7    Q.   But these --
8    A.   I think we gave these to you,
9  though, didn't we?
10    Q.   That may be correct.  These
11  are the invoices that -- that you got
12  from Trendily?
13    A.   Yes.
14    Q.   And you are personally
15  familiar with them?
16    A.   Yes.
17    Q.   Who sent you these invoices?
18    A.   Someone from Trendily.
19    Q.   Rahul, Chris, do you know?
20    A.   It would have been Rahul or
21  maybe someone in his office.  I
22  couldn't tell you for sure because they
23  were e-mailed.
24    Q.   Looking at the second page?
25    A.   Uh-huh.

Page 63

1    Q.   Well, just overall for these
2  invoices, do they accurately reflect
3  what MJ pieces were bought by Adobe?
4    A.   Yes.
5    Q.   Looking at the second page,
6  that top entry for MJ dining table, do
7  you see that?
8    A.   Yes.
9    Q.   It looks like the date of
10  this is a -- this is called a sales
11  order.
12    A.   Yes.
13    MR. GREEN:  Objection,
14  leading.
15    Q.   (By Mr. Dietrich)  Let me ask
16  you some questions about that --
17    A.   Okay.
18    Q.   -- because I want to nail
19  that down.  The first page is called an
20  invoice, the second page is called a
21  sales order, and the third page is
22  called a sales order.  Can you tell me
23  the difference between an invoice and a
24  sales order?
25    A.   Well, I think -- I don't do

Page 64

1  the accounting part of all of this, but
2  from what I -- I think I know you get
3  the invoice, and then we get -- I think
4  when we give them an order, we --
5  it's -- it's a sales order.  And then
6  when we actually pay for the piece is
7  we get an invoice.
8    Q.   Got it.  So on this second
9  page on the sales order, the date is
10  August 7, 2017.
11    A.   Yes.
12    Q.   Do you see that at the top?
13    A.   Yes.
14    Q.   So would that be about the
15  date that you put in an order for these
16  pieces?
17    A.   Yes.
18    Q.   Or I guess if Trendily has
19  generated a sales order for it, maybe a
20  couple of days after you put in an
21  order?
22    A.   Yes.
23    MR. GREEN:  Objection,
24  leading.
25    Q.   (By Mr. Dietrich)  You can

Page 65

1  answer.
2    A.   I'm sorry.  Can you say that
3  again?
4    Q.   Yeah.  Is -- so I guess if
5  you put in an order for a piece to
6  Trendily, how soon afterwards do you
7  get a sales order sheet?
8    A.   I guess it just depends on
9  their end and when I send it, but
10  usually, I mean, within two or three
11  days.
12    Q.   That was my question.
13    A.   Yeah.
14    Q.   So going to this dining table
15  entry here on the second paper, it's
16  crossed out.  Do you see that?
17    A.   Yes, I can tell you about
18  that.
19    Q.   Yeah.  That was my question.
20  What happened there?
21    A.   Okay.  So at the time Rahul,
22  once I started learning everything,
23  what all this was, I had asked if there
24  is a picture in Cowboys & Indians
25  magazine and I could tell it was one of

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES          (800) 246.4950

Kyle Tanner Dipple                                                6/29/2018

Page 66

1    the pieces that looked like this.  So I
2    had asked him if this was a piece he
3    was also going to be in his MJ
4    Collection.  And he said yes, it was.
5    So I asked him the price, and I asked
6    him if I could put in an order, and he
7    said yes.  Well, I did that, and then
8    everything -- all this lawsuit stuff
9    came up.
10        So I canceled the order with
11   him, and I had already taken the money
12   from the customer for the piece.  So I
13   called -- I had called Jason and asked
14   him if I could order this piece from
15   him.  And he said no, but you can buy
16   it through Runyon's, which is a
17   furniture store that he is a dealer.
18        So I contacted her, and she
19   ordered the piece for me through Jason
20   Scott, and then we paid her for the
21   piece.
22        Q.   So this was for a dining
23   table?
24        A.   This was a console table.
25        Q.   So let's get that figured

Page 67

1    out, because on the third page it looks
2    like there's a crossed-out entry for a
3    console table.
4         A.   Yeah.  This right here?
5         Q.   This, the third page?
6         A.   Yeah.
7         Q.   Is that what you were talking
8    about, the console table?
9         A.   Yes.  These are actually
10   the -- I don't know why -- oh, wait.
11   No, this right here is a dining table.
12   Well, the third -- the third page is a
13   console table.
14        Q.   Right.
15        A.   Right.
16        Q.   So which one -- you said a
17   customer had already paid for one of
18   the Trendily --
19        A.   The MJ console, yeah, of the
20   MJ console table, which I had never
21   even seen yet.  He just said -- I sent
22   him a picture of the piece that I was
23   needing and asked if it was something
24   he was making or could make.
25        Q.   And a customer paid Adobe for

Page 68

1    that?
2         A.   Yes, they did.
3         Q.   And then Trendily didn't
4    provide it?
5         A.   They did not.  I got it
6    from -- it was an actual Jason Scott
7    piece that I got, that the customer
8    got.
9         Q.   So in -- in your dealing with
10   a customer, you said you saw a picture
11   in Cowboys & Indians?
12        A.   She did.  She saw a picture
13   in Cowboys & Indians that was an ad
14   from Runyon's that had the console in
15   it, and she -- it was a customer that
16   I've dealt with a lot, and she really
17   liked working with me, and she asked if
18   I could get that piece.  And I said,
19   let me check.
20        So I asked Rahul if this was
21   a piece that he had coming or could
22   make, and he said yes.  So I told the
23   customer yes, and it will be, I think I
24   told her, like, two, three months.
25   And -- yeah.

Page 69

1         Q.   So you -- the Cowboys &
2    Indians Runyon's ad, was that a Jason
3    Scott piece?
4         A.   Yes.
5         Q.   And you sent -- what
6    specifically did you send to Rahul to
7    ask him if he could make this?  The
8    whole ad?
9         A.   Yeah.  I took my phone, and I
10   took a picture of the ad and sent it
11   over.
12        Q.   To him?
13        A.   Yes.
14        Q.   And he responded back to you
15   what?
16        A.   That yes, he could -- I'd
17   have to look back at the messages.  I
18   think he said, yes, either it was
19   already in production or was making it
20   or could make it.
21        Q.   All right.  And -- but then
22   the lawsuit happened and that didn't --
23   you didn't get that piece from Rahul?
24        A.   No, I canceled it when I --
25   when I learned that all of this was

18  (Pages 66 to 69)

Kyle Tanner Dipple                                               6/29/2018

Page 70

1   going on, because I don't know anything
2   about -- I'm not an expert in the
3   furniture industry or anything.  You
4   know, I just see something, we buy it
5   and we sell it.  That's it.
6       Q.   Sure.
7       A.   So when I learned of all
8   this, I didn't want to be involved in
9   any of that.  So I canceled the order
10  and contacted Jason Scott and was,
11  like, I need to buy this piece, I've
12  already taken the money from a
13  customer, and can you help me out.  And
14  he was more than willing to, and he got
15  me in contact with Bo, and -- Bo
16  Runyon, and we got the deal done.
17      Q.   So you ended up buying the
18  console table from Bo?
19      A.   Yes.
20      Q.   From Runyon's?
21      A.   Yes.
22      Q.   And then -- so you had
23  basically a gap with a customer you
24  were able to fill with --
25      A.   Yes.

Page 71

1       Q.   -- the Jason Scott piece?
2       A.   Right.
3       Q.   Did the customer ask for any
4   variations from what she saw in Cowboys
5   & Indians, or was it that exact piece
6   that you asked Rahul to make?
7       A.   It was that exact piece.
8       Q.   And he said he would do it?
9       A.   I believe he said it was
10  already in production or he would do
11  it.  I'd have to go back and look
12  because I'm not sure.
13      Q.   I think we have those texts.
14      A.   Yes.  The answer would be on
15  that.
16      Q.   Okay.  So that's on page 3 of
17  Exhibit 10.  That's the crossed-out
18  console table?
19      A.   Yes.
20      Q.   On page 2 of Exhibit 10,
21  there's the crossed-out dining table.
22      A.   Right.
23      Q.   What's the difference between
24  a console table and a dining table?
25      A.   So a dining table is what you

Page 72

1   would eat at.  A console table is kind
2   of a broad term for like a table that
3   could go behind a sofa, an entryway.
4       Q.   Kind of smaller?
5       A.   Yeah, it's much smaller.  You
6   don't eat off of a console table.
7       Q.   And the Jason Scott console
8   table that was in the ad --
9       A.   This one right here
10  (indicating)?
11      Q.   No.
12      A.   Oh, the console, yeah.
13      Q.   The console table that is in
14  this invoice --
15      A.   Yes.
16      Q.   -- was that similar to that
17  dining table with a carved pedestal
18  base?
19      A.   Oh, yeah.  It was a -- yeah,
20  very similar.
21      Q.   It was like a console table
22  version of that dining table?
23      A.   Yes, you could say that, yes.
24      Q.   So going to the dining table
25  on the second page here, that's crossed

Page 73

1   out.  Do you know why?
2       A.   Canceled it.
3       Q.   Canceled the dining table as
4   well?
5       A.   Yes.
6       Q.   Why did you cancel it?
7       A.   Because it wasn't here and
8   all this was going on.
9       Q.   "All this" meaning the
10  lawsuit?
11      A.   Yeah.
12      Q.   There's a desk on here, too.
13      A.   Yeah, I realize that.  I
14  think I told you that later.
15  There's -- well, I guess we actually
16  bought two desks.  And the reason for
17  that is because he already had it, and
18  it's probably why I bought it at the
19  time, and decided I wasn't going to be
20  involved in this.
21      Q.   It looks like there's a note
22  paid with a check 8/12/17.  Do you see
23  that?
24      A.   Yes.
25      Q.   Is that consistent with what

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                          NATIONWIDE SERVICES                   (800) 246.4950

Kyle Tanner Dipple                                    6/29/2018

Page 74

1    you recall about paying for the desk?
2        A.   Yes.  That's actually my
3    handwriting.
4        Q.   Oh, you wrote that note?
5        A.   Yeah.
6        Q.   Okay.  So you paid for the
7    desk on August 12th, 2017?
8        A.   Yes.
9        Q.   At that point did Rahul ever
10   say anything to you about, oh, I can't
11   sell this to you, or anything along
12   those lines?
13       A.   No.
14       Q.   Other than what's shown in
15   these invoices, did Adobe ever buy any
16   other Jason Scott copies from Trendily?
17       A.   No.
18       Q.   Has Adobe bought any other
19   teak furniture from Trendily?
20       A.   No.  We have not purchased
21   anything from Trendily since all of
22   this, so...
23       Q.   Nothing?
24       A.   No.  I've looked at pieces
25   and they've come by, but I have not

Page 75

1    purchased anything.
2        Q.   No chairs or other
3    upholstered goods, either?
4        A.   No.
5             (Exhibit 11 marked.)
6        Q.   I'll ask you about the second
7    page of this one first.
8        A.   Yes.  The second page first,
9    you said?
10       Q.   Yeah.
11       A.   Okay.
12       Q.   So this looks like an e-mail
13   from -- it looks like from Colt to
14   Chris Sanders?
15       A.   Yes.
16       Q.   Is that correct?
17       A.   This would have been the
18   order for the console table, and I had
19   attached photos of the pictures from
20   the magazine just to make sure that,
21   you know, I'm on the same page and I
22   get my correct order.
23       Q.   And that was my question.  So
24   it says "Photos included."  That was
25   the photos of the Runyon's ad?

Page 76

1        A.   Yes.
2        Q.   Do you happen to have a copy
3    of this e-mail still?
4        A.   Of this one?
5        Q.   Yeah.
6        A.   Well, this is it.
7        Q.   Well, we got this from
8    Trendily and it didn't have the
9    photographs that were attached --
10       A.   Oh.
11       Q.   -- with it.  So I'm wondering
12   if -- if you would still have a copy
13   with the attachments.
14       A.   Here's the thing.  We send
15   this through kind of like our order
16   system, and I don't know -- it might
17   show -- I don't know if it will
18   actually show the picture.  It might
19   just have a box that says "Attachment."
20   But you might be unable to click on it
21   because I think it only stores data for
22   so long on images before it removes it,
23   but I can definitely go back and look.
24       Q.   If you could, I would
25   appreciate.

Page 77

1        A.   Okay.
2        Q.   Like I said, we got this, but
3    it didn't have the attachments.
4        A.   Sure.
5        Q.   So you were copied on this
6    e-mail?
7        A.   Yes.
8        Q.   And to your knowledge, this
9    was sent from Colt to Chris?
10       A.   Yes, it was.
11       Q.   July 28th, 2017?
12       A.   Yes.
13       Q.   And on the first page there's
14   an order form that says "generated
15   using Lightspeed Retail."  Is that
16   generated by Adobe?
17       A.   Yes.  That's our ordering
18   system that we use to produce the
19   orders to keep track of everything.
20       Q.   And that top one, MJ console
21   table, it says "See attached picture
22   for reference."  Do you see that?
23       A.   Yes.  That would have been
24   what this is referring to, both the
25   pictures, which would have been of that

Page 78

1    console table from the ad.
2              (Exhibit 12 marked.)
3         Q.   So there's three pages here.
4         A.   Okay.
5         Q.   If you would just look
6    through them and I'll ask you if you
7    recognize what's on these pages in
8    Exhibit 12.
9         A.   Okay.
10        Q.   Do you recognize this?
11        A.   Yes.
12        Q.   What do these pages consist
13   of?
14        A.   These are text-messaged
15   conversations between Rahul and me.
16        Q.   Let's go to the second page.
17        A.   Okay.
18        Q.   You said these are texts
19   between you and Rahul?
20        A.   Yes.
21        Q.   It looks like to me that the
22   blue in the text is you and the gray is
23   Rahul; is that correct?
24        A.   That's correct.
25             MR. GREEN:  Objection,

Page 79

1    leading.
2         Q.   (By Mr. Dietrich)  Who is the
3    blue in the text message?  Who is
4    writing that?
5         A.   The blue is me.
6         Q.   Who is writing the gray in
7    the text message?
8         A.   Rahul.
9         Q.   So you say to Rahul, "Do you
10   have this JS console table in your
11   collection?"
12        A.   Yes.  This was the same
13   picture that was in the ad.  It looks
14   like here I probably pulled it off of
15   her website.
16        Q.   And you texted it over to
17   Rahul?
18        A.   Yeah.
19        Q.   And that's his response there
20   below it?
21        A.   "Yes, in production."
22        Q.   That's what he said?
23        A.   Yes.
24        Q.   And then right below that he
25   gave a size and a price?

Page 80

1         A.   That's correct.
2         Q.   Do you know when you sent
3    this to Rahul?
4         A.   I could go back and look on
5    my phone.
6         Q.   Yeah.  It doesn't look like
7    there's a date on this specific one.
8    There are on a couple of the others,
9    but --
10        A.   It would have been right
11   around the same time as that order was
12   placed.  Probably that day.  So --
13        Q.   So looking back at Exhibit
14   11, July 28th, 2017?
15        A.   Where are you -- I don't see
16   a date on there.
17        Q.   I'm looking at the e-mail
18   from Colton to Chris.
19        A.   Oh, yes.  It would have been
20   within two days of that, easy, or
21   possibly same day.
22             MR. GREEN:  Or possibly what?
23        A.   Or possibly that same day.
24        Q.   (By Mr. Dietrich)  So Rahul
25   responded "Size and price," and then

Page 81

1    you ordered it?
2         A.   I asked for an ETA and then I
3    ordered it.
4         Q.   So going to the first page.
5         A.   Uh-huh.
6         Q.   Again, you're the blue and
7    Rahul is the gray text?
8         A.   Yes.
9         Q.   And looks like you sent a
10   photo to Rahul?
11        A.   Yes.
12        Q.   What's that photo of?
13        A.   That's a Jason Scott piece in
14   one of my customer's homes.
15        Q.   Did you take the photo?
16        A.   I did.
17        Q.   Where?
18        A.   At my customer's house.
19        Q.   And you sent it to Rahul?
20        A.   Yes.
21        Q.   And what did you ask him?
22        A.   Well, as of the time I knew
23   that it was a collection of Jason's, I
24   had asked if he was making -- going to
25   be making this piece, because I really

21 (Pages 78 to 81)

Kyle Tanner Dipple                                    6/29/2018

Page 82

1   liked the look of it, and I wanted to
2   sell it.
3       Q.   Did you have a customer
4   specifically asking for that piece?
5       A.   No.  I was just curious.  I
6   was just curious as to how much of
7   this -- you know, what he was going to
8   be making and, you know...
9       Q.   And what did he respond?
10      A.   Again, "Already in
11  production."
12      Q.   What did you understand that
13  to mean?
14      A.   That it was being made, like,
15  in the process of being made.
16      Q.   And you responded, "Nice.
17  You doing any of his beds?"
18      A.   And he said yes, too.
19      Q.   Or by "his," you're
20  referring to Jason Scott?
21      A.   Yes.
22      Q.   And he responded, "Two beds"?
23      A.   Yes.
24      Q.   And you asked, "Can you show
25  me which ones?  I've got a big client

Page 83

1   interested."
2       A.   Yes.  I was working on a job,
3   you know, and I -- they liked the look
4   of carved beds, like ornate.  So I knew
5   that this would be the perfect look for
6   it.
7       Q.   Did the customer refer to
8   Jason Scott at all, or they just --
9       A.   No.
10      Q.   -- like general carved beds?
11      A.   Generally carved and
12  everything.  So I knew this would be
13  who I would ask.
14      Q.   And I don't -- did Rahul ever
15  respond about the beds?
16      A.   He did not.  He did not.
17      Q.   Is this date on this text
18  message August 3rd; is that correct?
19      A.   That is -- yes, that is
20  correct.
21      Q.   That's when you had that
22  exchange with Rahul?
23      A.   Yes.
24      Q.   So going to the last page.
25      A.   Okay.

Page 84

1       Q.   It looks like a series of
2   texts sent August 5th, 2017?
3       A.   Yes.
4       Q.   Again, you're the blue and
5   Rahul is the gray?
6       A.   That's correct.
7       Q.   And you asked Rahul for
8   another MJ dining table?
9       A.   Yes, which was referring to
10  the one that was canceled on that order
11  we just talked about.
12      Q.   So you -- you asked him,
13  "Please send me an invoice and another
14  desk," right?
15      A.   Yes.
16      Q.   And then we saw the invoice
17  for those items?
18      A.   Right.
19      Q.   Or I guess the sales order
20  for those items?
21      A.   Right.  And he had the desk
22  in stock.  We took the desk.  And then
23  we were waiting on the table.  And then
24  all of this blew up.  So I was just,
25  like, I'm out.

Page 85

1       Q.   You canceled it?
2       A.   Yeah, because I didn't want
3   to be part of it.  Well, I am a part of
4   now, I guess.
5       Q.   Did you send these texts to
6   Jason Forsberg?
7       A.   I gave him some of the things
8   that I thought were relevant.  After I
9   knew what happened, I was giving him
10  information that he had requested.
11      Q.   And --
12      A.   I don't think he got all of
13  them.  I just kind of sent things that
14  I thought relevant to what he would
15  want.  I believe these were actually
16  the ones.
17      Q.   The ones that you sent to
18  Jason?
19      A.   I believe so.
20           (Exhibit 13 marked.)
21      Q.   So showing you what's been
22  marked Exhibit 13.  It looks like these
23  are texts between you and Jason
24  Forsberg?
25      A.   Yes.

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                  (800) 246.4950

Kyle Tanner Dipple                                                6/29/2018

Page 86

```
 1        Q.   And looks like you're talking
 2   about these texts from Rahul that we
 3   just looked at?
 4        A.   That's correct.
 5        Q.   And you state that you found
 6   them in your old phone?
 7        A.   Yes.  I got a new phone.
 8        Q.   And these texts that you
 9   sent, do these -- does this refresh
10   your recollection, did you send those
11   texts?
12        A.   Yeah.  These are the ones
13   that I sent --
14        Q.   To Jason?
15        A.   -- to Jason, yes.
16        Q.   Are you familiar with the
17   concept of a manufacturer placing a
18   gallery in a retailer's showroom?
19        A.   I am not at all.  Not with
20   that term.  Maybe --
21        Q.   Is there another term you
22   would use?
23        A.   Placing a gallery?
24        Q.   Well, an area in a showroom
25   that's just for one manufacturer's
```

Page 87

```
 1   products.
 2        A.   We set ours all mixed around.
 3   So we don't have just an assigned area.
 4   So we don't do something like that.
 5        Q.   Have you heard of that
 6   happening on occasion?
 7        A.   I have not.
 8        Q.   Maybe a showcase or something
 9   like that?
10        A.   I'm not really following you.
11        Q.   Well, I'm just thinking of --
12   say, Adobe has your 10,000-square foot
13   showroom.
14        A.   Okay.
15        Q.   And within that showroom, you
16   might have a certain area that's
17   designated for settings of one
18   manufacturer's products.
19        A.   Okay.
20        Q.   Have you seen that happen in
21   other -- in Adobe or other places
22   before?
23        A.   I don't know about other
24   places, but we don't do that.  We kind
25   of spread everything around to make --
```

Page 88

```
 1   we don't do things like that.
 2        Q.   Are you aware of whether
 3   Trendily ever discussed doing something
 4   like that at Adobe?
 5        A.   Well, he had -- not like
 6   that.  What he had discussed was he was
 7   wanting us to drop some furniture lines
 8   and then, you know, carry his product
 9   exclusively and not carry things that
10   would compete with it.
11        Q.   So he -- is that Rahul?
12        A.   Yes.
13        Q.   He asked you to carry more
14   Trendily lines?
15        A.   He wanted to.  He wanted us
16   to carry, like, all of his upholstery
17   and his dining chairs and everything.
18   And we didn't do that.  We had thought
19   about it, but it just didn't seem like
20   it was in our best interest to, so...
21        Q.   You said you -- you referred
22   to Western Heritage earlier.  You're
23   familiar with Western Heritage?
24        A.   Yeah.
25        Q.   Are you aware of whether
```

Page 89

```
 1   Trendily offered them to have a certain
 2   spot in their showroom for MJ
 3   Collection pieces?
 4        A.   I know they had the MJ
 5   pieces, but I don't know -- I don't
 6   know if he offered him a spot for those
 7   pieces exclusively.  I had heard -- I
 8   don't -- that -- I think from either
 9   Rahul or Chris that they were doing,
10   you know, more of a supplying, you
11   know, than with a bunch of consignment
12   pieces.
13        Q.   Are you aware that your
14   father stated to Jason Forsberg in a
15   conversation that Adobe had been
16   offered by Trendily to do this gallery
17   concept before Western Heritage?
18        MR. GREEN:  Objection, form.
19        A.   Yes.  Oh, does that mean I
20   don't answer?
21        Q.   (By Mr. Dietrich)  you can
22   answer now.
23        A.   Well, I don't know if it
24   referred to all of just -- I think it
25   went to his whole line, like all of
```

23  (Pages 86 to 89)

Kyle Tanner Dipple                                                   6/29/2018

Page 90

1  Trendily.  Like Trendily had come in
2  and wanted to, you know, make -- kind
3  of, like, merge, whereas kind of, like,
4  their showroom is kind of like ours,
5  like Adobe Interiors would be the
6  destination for people who would go
7  that would look for Trendily furniture.
8      So it didn't specifically
9  mean just his MJ Collection.  It meant
10 everything.  Sofas, his chairs.  But
11 yeah, it would have included those
12 pieces as well.
13     Q.  The MJ Collection pieces?
14     A.  Yes, absolutely.
15     Q.  And so that -- Trendily did
16 offer that to Adobe?
17     A.  Yes, they did.
18     Q.  To you?  To Jerry?
19     A.  To both.  We both were in --
20 sat with him together when we talked
21 about it.
22     Q.  When about was that?
23     A.  I want to say July, June or
24 July.
25     Q.  2017?

Page 91

1      A.  Yes.  The same year that --
2  yeah, that all this -- yeah.
3      Q.  Yeah, that would be 2017?
4      A.  Right.  I'm sorry, this kind
5  of runs together for me.
6      Q.  I understand.  So they did
7  offer that to Adobe, and you --
8      A.  Uh-huh.
9      Q.  -- did not take them up on
10 that offer?
11     A.  We did not take them up on
12 that offer.
13     Q.  Has Adobe ever tried to have
14 a Jason Scott piece copied somewhere
15 else?
16     A.  No.
17     Q.  Are you aware of your father
18 stating that Adobe tried to have a
19 Jason Scott table copied in Mexico?
20         MR. ETTER:  Objection, form.
21     A.  Do I answer or no?
22     Q.  (By Mr. Dietrich)  You can
23 answer now if you know.
24     A.  No, I am not.
25     Q.  Have you discussed anything

Page 92

1  about Jason Scott with Rahul more
2  recently in 2018?
3      A.  No, I have not talked about
4  it, any of that.
5      Q.  Are you aware of whether
6  Trendily is making any other furniture
7  similar to these MJ Collection pieces
8  but with changed carvings?
9      A.  Yes, they are.  I saw them.
10 I saw pictures, and I went and saw them
11 in person.
12     Q.  Where did you see them?
13     A.  At the Dallas Trade Center,
14 in their showroom.
15     Q.  In Trendily's showroom?
16     A.  Yes, in Trendily's showroom.
17     Q.  What specific pieces are they
18 making?
19     A.  He had a dining table and a
20 buffet, I think.  That's it that I can
21 remember that was -- there was no desk.
22     Q.  No desk?
23     A.  I had asked him, and he said
24 that they were working on one.
25     Q.  In your view, did they look

Page 93

1  similar to the prior MJ Collection
2  pieces?
3      A.  It's the same concept.  I
4  mean, they're -- they've got bases that
5  they're carved, and it's got a top.  I
6  mean, the only thing that's different
7  is the pattern of the carving, from
8  what I could see.
9      Q.  Do you have pictures of these
10 pieces?
11     A.  I didn't.  I didn't take
12 pictures of them.
13     Q.  And they didn't send you
14 pictures?
15     A.  No.  They had showed me
16 pictures.  I just -- I wasn't -- they
17 weren't as pretty as those other
18 pieces, so...
19     Q.  Did you buy any of the new
20 pieces?
21     A.  No, no.  I don't want to
22 do -- we're not doing anything with
23 them because of all of what's going on.
24 I was just -- they wanted me to come
25 and see, and I was, you know, being

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                   (800) 246.4950

Kyle Tanner Dipple                                                6/29/2018

Page 94

1    courteous to go and look at it, what
2    they were offing.
3         Q.   When -- when was that that
4    you took the trip up there?
5         A.   Last week.
6         Q.   Have you ever -- we talked
7    about you contacting Runyon's to buy
8    the console table --
9         A.   Yes.
10        Q.   -- from them.  Have you ever
11   contacted any other retailer to buy a
12   Jason Scott piece?
13        A.   No.
14        Q.   Do you know if your father
15   has ever contacted any other retailer
16   to buy a Jason Scott piece?
17        A.   Not that I know of.
18        Q.   Do you know if --
19        A.   Oh, wait, I'm sorry.
20        Q.   No, go ahead.
21        A.   He did contact a store in
22   Arizona about getting a piece, and I
23   don't think -- I think her name was
24   Lori, possibly.
25        Q.   So a store in Tucson, do you

Page 95

1    know?
2         A.   Yes.  I don't think she --
3    she didn't help us.
4         Q.   What piece were you seeking?
5         A.   I think it was a dining
6    table.
7         Q.   The one that we've seen here
8    or a different dining table?
9         A.   I'm not sure.  Like I said,
10   that was long ago.  Someone had a
11   picture, and they wanted a table like
12   this, and they -- you know, we tried to
13   help them find that table, and after
14   asking people, they said it was a Jason
15   Scott table.  I think it had iron.  It
16   was way different than that.
17        Q.   Way different than the --
18        A.   Yeah.
19        Q.   -- the one Trendily copied?
20        A.   Right.  And I don't think she
21   was going to help us get it, so we
22   ended up just looking for a dining
23   table that was something else she
24   liked.  I'm not sure what she ended up
25   buying.

Page 96

1         Q.   And you said you didn't
2    recall potentially one being copied in
3    Mexico, but that doesn't -- does that
4    ring a bell -- was that table copied in
5    Mexico?
6         A.   I think we had looked at -- I
7    don't think so.  Like I said, I'm not
8    sure because I don't -- I'm not as
9    familiar with that.
10        Q.   And how long ago, about, was
11   that attempt to get one from the Tucson
12   person?
13        A.   Maybe three years ago.
14        Q.   Do you know if Trendily has
15   copied any other Jason Scott pieces
16   besides the desk, the table, and the
17   buffet?
18        A.   Not to my knowledge.
19        Q.   Do you know if Trendily has
20   copied anyone else's furniture designs
21   besides Jason Scott?
22        A.   Well, I mean, I don't -- I've
23   given them pictures, you know.  I could
24   give them a picture of a sofa, but I
25   don't know who made it.

Page 97

1         Q.   Right.  And you've talked
2    about that.
3         A.   Yeah.  But, I mean, everybody
4    does that.
5         Q.   So you sent him a picture of
6    the sofa?
7         A.   Yeah.
8         Q.   And they made --
9         A.   Yeah.  And say, yeah, we can
10   make that.  But, I mean, I -- yeah.
11        Q.   How about instances where --
12   I mean, you talked about sending Rahul
13   a copy of the Runyon's ad.  So how
14   about instances where it wasn't just a
15   picture of something but an actual
16   advertisement that you would send and
17   say --
18        A.   That I sent to him?
19        Q.   Sure.
20        A.   Oh, no, that was the only one
21   that was that way.
22        Q.   The other ones were just
23   photos of pieces?
24        A.   Yes.
25        Q.   To your knowledge, did Jason

email@tobyfeldman.com                  Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                   (800) 246.4950

Page 98

1    Scott Collection -- did Jason Scott
2    Collection filing this lawsuit against
3    Trendily have an effect on Adobe?
4        A.   Have an effect?  No.  I mean,
5    like I said, it was a minimal amount of
6    pieces, you know.
7        Q.   Not necessarily an effect on
8    sales, but, I mean, you said that you
9    were scrambling to get a piece from
10   Runyon's to fill the gap.
11       A.   Well, in that sense, I mean,
12   because I had already -- he had said,
13   yeah, I've got it.  And then I call the
14   customer, I collect the money, and now,
15   all of a sudden, all of this happens
16   and I'm, like, well, I can't get that
17   piece, so what do I do before I call
18   the customer and tell them I'm trying
19   to, you know, save the deal.  So I, you
20   know, back-channeled to try to figure
21   out another way to make it happen.  And
22   that's what I did.
23       Q.   And at this point you say
24   Adobe is not purchasing from Trendily?
25       A.   No.

Page 99

1        MR. DIETRICH:  That's all I
2    have for you.  Thanks for your
3    time.  I'm sure Chuck is going to
4    have some questions for you as
5    well.
6        THE WITNESS:  Okay.
7            EXAMINATION
8    BY MR. GREEN:
9        Q.   Yeah, I do have some
10   questions for you, and some of it is
11   going to be repetitive, and I apologize
12   for that, but sometimes it's kind of
13   hard to follow the testimony.
14       MR. DIETRICH:  And we can
15   take a break if anybody wants one.
16       MR. GREEN:  It might be smart
17   to go ahead and take a five-minute
18   break.
19       THE WITNESS:  Yeah.
20       (Recess taken 11:17 a.m. -
21   11:25 a.m.)
22       (Exhibit 14 marked.)
23       Q.   (By Mr. Green)  Is it okay if
24   I call you Tanner?
25       A.   Yes, that's fine.

Page 100

1        Q.   You have before you Exhibit
2    Number 14, right?
3        A.   Yes.
4        Q.   Can you tell us what that is?
5        A.   That's an invoice for pieces
6    that we bought from Trendily.
7        Q.   Okay.  And the date of the
8    invoice is what?  Or the date of the
9    sales order.  Strike that.  Let me ask
10   this again.
11       You said that Exhibit Number
12   14 was an invoice, but it looks like at
13   the top it says "Sales Order."
14       A.   Yes.
15       Q.   Okay.  And the date of the
16   sales order is April 10 of 2017?
17       A.   That's what the paper says.
18       Q.   Okay.  And it indicates that
19   Adobe was purchasing some pieces of
20   furniture from Trendily, right?
21       A.   Yes.
22       Q.   And that includes the MJ
23   office desk, correct?
24       A.   Correct.
25       Q.   The MJ dining table, correct?

Page 101

1        A.   Correct.
2        Q.   And the MJ sideboard?
3        A.   Does -- I'd have to go back
4    and look.  Did he call that other piece
5    a sideboard as well?
6        Q.   That was going to be my --
7    one of the questions I ask.
8        A.   Because I don't remember it
9    being called that.
10       Q.   The last page of Exhibit
11   Number 1, is that the console or the
12   sideboard?
13       A.   I believe that is the
14   sideboard, yes.
15       Q.   And I've heard from other
16   witnesses here on this case, as we've
17   learned more about the furniture
18   business, that a buffet and a
19   console --
20       A.   Right.
21       Q.   -- and a sideboard are kind
22   of interchangeable.
23       A.   Right.  Yeah, that's right.
24   That's why it gets a little confusing
25   because people use different

Kyle Tanner Dipple                                    6/29/2018

Page 102

1    terminology.
2        Q.   Okay.  But it looks like on
3    Exhibit Number 14, Adobe had -- had
4    made a sales order for one desk, one
5    dining table, and then one sideboard.
6        A.   Yes.
7        Q.   And the MJ -- their
8    designation of the MJ office desk and
9    the MJ dining table and the MJ
10   sideboard is the pieces of furniture
11   that you were shown in Exhibit Number
12   1.
13       A.   Yes.
14       Q.   And it also indicates that it
15   was invoiced in full, correct?
16       A.   Correct.
17       Q.   Is this the first sales order
18   that you-all made for the MJ office
19   desk, dining table, and sideboard?
20       A.   Yes.  It was these three
21   pieces, though I'm not sure about the
22   date exactly, cross-referencing that
23   with mine.
24       Q.   Okay.  Because you had -- do
25   you have a record here that would --

Page 103

1    with us here today?
2        A.   This should be the same as
3    this one.  See, mine -- mine has a
4    different date.
5        Q.   What are you looking at?
6        A.   Well, these would be these
7    pieces right here
8            (indicating).
9            MR. DIETRICH:  What exhibit
10   are you looking at?
11       A.   That's Exhibit Number 10.
12       Q.   (By Mr. Green)  Okay.  And --
13       A.   Which is -- I don't
14   understand how those dates are so
15   different.
16       Q.   When you first started
17   testifying --
18       A.   Okay.  Okay.
19       Q.   Tanner, when you first
20   started testifying today, you were
21   saying you thought you-all made an
22   order for, I'm going to say, the MJ
23   line of furniture, in the fall of 2016,
24   but I kind of got the impression that
25   you're not sure about the day.  I'm

Page 104

1    really trying to see if I can get a
2    better idea of the date.
3            MR. DIETRICH:  Objection,
4        form.
5        A.   Like I said, without having
6    everything in front of me, it's hard
7    for me to know.  I mean, I didn't get
8    to study for this.  Like, y'all are
9    really up to date on it.
10       Q.   (By Mr. Green)  Right.  I
11   understand some -- many months ago, a
12   subpoena was served on you by
13   counsel's -- Mr. Dietrich's office.
14       A.   Right.
15       Q.   And you gathered materials
16   for that.
17       A.   Right.  But, I mean, I didn't
18   study them with the dates and
19   everything.
20       Q.   I understand.  I'm just
21   trying to establish the facts.  You
22   gathered materials and then either
23   produced them to him or gave them to
24   your attorney to produce to them,
25   right?

Page 105

1        A.   Right.
2        Q.   Did you provide copies to
3    Trendily?
4        A.   No.
5        Q.   Did you provide copies to my
6    office?
7        A.   No.  I didn't know I was
8    supposed to.
9        Q.   Did the material that you --
10   that you sent, did it include the
11   invoices, whatever invoices or sales
12   orders y'all would have made for MJ?
13       A.   These are -- on Exhibit
14   Number 10, this is what we gave them.
15       Q.   Is this all you gave them?
16       A.   Yes.  I mean, we did the best
17   we could with finding things.
18       Q.   And I guess I'm trying to get
19   the sequence of events down because
20   that's showing a June 29 of 2017
21   date --
22       A.   Right.
23       Q.   -- on that top one, right?
24       A.   I think -- I mean, it's
25   really -- I mean, this is confusing

email@tobyfeldman.com          Toby Feldman, Inc.              Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES             (800) 246.4950

Kyle Tanner Dipple                                                    6/29/2018

Page 106

1  because they do their things different
2  than us with their invoice and
3  everything.  But this isn't going to be
4  written in stone, like, I'm not going
5  to be held to what I just -- like,
6  this -- what I think is this is the --
7  this is when the order would have been
8  placed, and then this would have
9  been --
10         MR. ETTER:  Use the exhibit
11  numbers for the record.
12         A.  Exhibit Number 14 would be
13  when we placed an order based off of
14  the pictures that we were shown.
15         Q.  (By Mr. Green)  Okay.  That
16  helps.  That helps.
17         A.  And then invoiced in full, I
18  guess, I think that means that we were
19  supposed to pay in full for when they
20  arrived and no terms of, like, net 30.
21         Q.  Okay.  Let me -- let me see
22  if I can summarize it and make sure
23  that I understand as best I can.
24  Exhibit Number 14 is a sales order that
25  documents Adobe ordering the three

Page 107

1  pieces of MJ line furniture from
2  Trendily, right?
3         A.  Yes.
4         Q.  And that's in April -- April
5  10 of 2017 is the date of that sales
6  order.
7         A.  Right.
8         Q.  And it's your -- your
9  understanding now that the invoice that
10  is the first page of Exhibit Number 10
11  that's dated June 29 of 2017 is the
12  invoice that Trendily would have sent
13  to Adobe for the furniture that's
14  referenced in the sales order on
15  Exhibit 14?
16         A.  Yes.  I really don't see
17  these, you know, as much.  Sometimes
18  I'll pull them every now and then for a
19  reference, but it's not what I'm
20  familiar with.
21         Q.  To your knowledge, did Adobe
22  order -- at any one time, did you make
23  an order for three pieces more than
24  once?
25         A.  Well, I ordered -- I did put

Page 108

1  another order in just for a desk and a
2  dining table.
3         Q.  Right.  We're going to talk
4  about that in a second.
5         A.  Okay.
6         Q.  But was there any other time
7  when Adobe ordered each of these three
8  pieces that's referenced in Exhibit
9  Number 14?
10         A.  No, no, no.  This is -- I
11  know it's confusing with the dates, but
12  this is just one -- these are the same,
13  all the same pieces.
14         Q.  Okay.  And so earlier in your
15  deposition when you were saying you may
16  have ordered something in the fall of
17  2016, that probably is this that we're
18  looking at on Exhibit 14; is that
19  correct?
20         A.  Yes.
21         Q.  Because -- because Adobe, to
22  your knowledge, didn't order those
23  three pieces together, only the one
24  time?
25         A.  Right.

Page 109

1         Q.  Now, let's -- let me see if I
2  can -- I'm not as organized as I should
3  be here.
4         (Exhibit 15 marked.)
5         Q.  The exhibit that was just
6  placed before you is Exhibit Number 15.
7         A.  Yes, 15.
8         Q.  Okay.  And Number 15 is a
9  sales order that is -- what's the date
10  on the sales order?
11         A.  8/7/2017.
12         Q.  Okay.  And then if you go to
13  Exhibit Number 10 and look at the
14  second page.
15         MR. ETTER:  That's this one.
16         Q.  (By Mr. Green)  Are you with
17  me?
18         A.  Uh-huh.
19         Q.  This looks like it's the same
20  sales order, but it looks like a
21  cleaned-up copy because there was a
22  dining table that was included on the
23  copy of the invoice that's in Exhibit
24  Number 10.
25         A.  Yes.

28  (Pages 106 to 109)

Kyle Tanner Dipple                                              6/29/2018

Page 110

1       Q.   And Exhibit Number 15 doesn't
2   show that dining room -- that dining
3   table, right?
4       A.   Right.  Theirs does.  This is
5   what we have on file.
6       Q.   Okay.  It does continue to
7   show the office desk, right?
8       A.   Yes.
9       Q.   And that's the one that you
10  said that had already been sold, and
11  you went ahead and bought that one at
12  that time, right?
13      A.   Yes, I bought it at that
14  time.
15      Q.   Okay.  And then the next page
16  of Exhibit Number 10.
17      A.   Okay.
18      Q.   Well, let me back up for a
19  second.  Go back to Exhibit Number 10,
20  the second page of it.  Are you with
21  me?
22      A.   Uh-huh.
23      Q.   This is the sales order with
24  the date of August 7, 2017 --
25      A.   Yes.

Page 111

1       Q.   -- right?  And it shows
2   the -- this is the copy that you-all
3   provided to, I believe, Jason Scott?
4       A.   Yes.
5       Q.   And when I say "Jason Scott,"
6   I believe his last name is Forsberg.
7   But we know who we're referring to.
8   It's easier for me to call him Jason
9   Scott.
10      A.   Yes.
11      Q.   Okay.  So that's who you
12  provided -- you provided that second
13  page of Exhibit -- of Exhibit Number 10
14  to Jason Scott, right?
15      A.   Well, to his attorney.
16      Q.   Okay.  To his attorney.
17      A.   Yeah.
18      Q.   Do you remember when you did
19  that?
20      A.   When we --
21      MR. ETTER:  We'd have to go
22  back and -- I could give you an
23  exact date.
24      Q.   (By Mr. Green)  It was the
25  time period we were talking about a few

Page 112

1   minutes ago where you had provided the
2   documents to your attorney and he
3   provided them to Jason Scott's counsel?
4       A.   Yes.
5       Q.   Okay.  So looking at that
6   sales order that's dated August 7, 2017
7   and it looks like it's a sales order
8   number 202072?
9       A.   Uh-huh.
10      Q.   And it does show that
11  initially there were two different
12  pieces on there, right?
13      A.   Yes, that's correct.
14      Q.   And one of them is the dining
15  table and one of them is the office
16  desk.
17      A.   That's correct.
18      Q.   And you're saying at this
19  point that -- that you canceled the
20  order to the dining table, right?
21      A.   Yes, we did.
22      Q.   Okay.  And went ahead and
23  purchased the desk at that time?
24      A.   Because the desk was
25  available.

Page 113

1       Q.   Right.  Because the desk was
2   available from Trendily at that point
3   in time?
4       A.   Yes.  It was in stock and
5   ready to pick up.
6       Q.   And the dining table was on
7   order or something.  It hadn't arrived
8   yet?
9       A.   Yeah, did not arrive.
10      Q.   Okay.  So you canceled that
11  part of the order?
12      A.   Yes.
13      Q.   And so Exhibit Number 15 that
14  we looked at a second ago just reflects
15  the one remaining piece that had been
16  ordered under sales order 202072?
17      A.   Yes.
18      Q.   Okay.  The last page of
19  Exhibit Number 10, if you turn to that,
20  is a sales order dated August 3rd of
21  2017, right?
22      A.   Right.
23      Q.   And it has a sales order
24  number of 202066?
25      A.   Yes.

email@tobyfeldman.com                Toby Feldman, Inc.              Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES            (800) 246.4950

Page 114

1      Q.   And it shows an order of an
2    MJ console table for $999, right?
3      A.   Right.
4      Q.   And that's X'd out.
5      A.   Right.
6      Q.   It's crossed out, right?
7      A.   That's correct.
8      Q.   And so you canceled your
9    order for that -- for that table?
10     A.   That's right.
11     Q.   All right.  And then below
12   that, the other piece, is the Vancouver
13   club chair, right?
14     A.   Yes.
15     Q.   And I assume you continued to
16   buy that, right?
17     A.   Yes, we did.
18     Q.   And that one -- that has
19   nothing to do with the MJ line
20   furniture.
21     A.   No, that does not.
22     Q.   Okay.  So you said that you
23   canceled that console table and, I
24   believe, the dining table because of
25   the fact that you learned about this

Page 115

1    controversy.
2          MR. DIETRICH:  Objection,
3       form.
4      A.   Well, that and -- yeah.  I
5    mean, yeah, we did.
6      Q.   (By Mr. Green)  Okay.
7      A.   I mean --
8      Q.   And that was the reason,
9    right?
10     A.   Yeah, because of all of this
11   going on.
12     Q.   Okay.
13     A.   I mean, it just wasn't -- I
14   believe that, yeah.
15     Q.   So when did you -- when did
16   you learn about the controversy?
17     A.   I can't put a definite date
18   on it.
19     Q.   Would it have been after you
20   had made the order?  You ordered --
21     A.   When I learned that there was
22   an actual lawsuit?
23     Q.   No.  When did you first learn
24   about the controversy?  Was it -- did
25   you order these pieces, the MJ pieces,

Page 116

1    after --
2      A.   I mean, I know that there was
3    a little bit of a conflict just a
4    little before I canceled them, but I
5    didn't know it was, like, a whole
6    lawsuit conflict until a little bit
7    after, and then I was -- then we
8    canceled all.
9      Q.   Okay.
10     A.   And even Rahul had mentioned
11   he couldn't get these -- he wasn't
12   going to do these pieces.
13     Q.   Okay.  So Rahul had told you
14   that he was not going to sell any more
15   of these pieces anyway?
16     A.   Yes.
17     Q.   And he told you that about
18   the same time that this piece was being
19   canceled, the order that's referenced
20   on Exhibit Number 10, when you talked
21   to him about it?
22     A.   I can't remember if I just
23   canceled that or if that was something
24   that he had stated, because they kind
25   of run together.

Page 117

1      Q.   But it was about the same
2    time?
3      A.   Possibly.
4      Q.   Do you remember which was
5    first, which was second?  I know I'm
6    testing your memory a little bit.
7      A.   Yeah.  That's a long time
8    ago.  Yeah, I can't --
9      Q.   Could they have been
10   simultaneous?
11     A.   I don't know.
12     Q.   Okay.  All right.  Now,
13   when -- how did you first learn there
14   was some kind of controversy?
15     A.   I think I had asked Rahul.
16   If I'm not -- I mean, I just kind of
17   heard it -- I think I just kind of
18   heard it through the -- I couldn't tell
19   you exactly, I mean, where it first
20   started, but I started learning about
21   it and --
22     Q.   Yeah.
23     A.   -- kind of digging on my own
24   and asking.
25     Q.   So you don't remember how you

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                  (800) 246.4950

**Kyle Tanner Dipple**                                    6/29/2018

|  | Page 118 |
|---|---|

1  first learned about it?
2      A.  Not exactly.  Not the very
3  first time.
4      Q.  Do you remember from whom you
5  learned about it?
6      A.  No.
7      Q.  Earlier we were shown Exhibit
8  Number 4.
9      A.  Okay.
10      Q.  And Exhibit Number 4, I
11  believe you said that was the first
12  picture you saw of the MJ dining table.
13      A.  That is correct.
14      (Exhibit 16 marked.)
15      Q.  And I'm going to show you
16  what's been marked as Exhibit 16.  I'll
17  give you a chance to look at it.  Can
18  you tell us what Exhibit 16 is?
19      MR. DIETRICH:  Objection,
20  form, to the extent he's answering
21  any questions about this e-mail.
22      MR. GREEN:  Pardon me?
23      MR. DIETRICH:  I'll object.
24  This is an e-mail from Brumbaugh's
25  to Jason Scott.

|  | Page 119 |
|---|---|

1      Q.  (By Mr. Green)  Have you seen
2  that e-mail before?
3      A.  I have not.
4      MR. GREEN:  Off the record.
5      (Discussion off the record.)
6      Q.  (By Mr. Green)  So Exhibit
7  Number 4, that was -- that was the
8  first time you had seen the MJ table
9  that was -- that was being offered
10  by -- by Trendily?
11      A.  That -- that picture in
12  Exhibit Number 4 is the first time I
13  saw the dining table being offered by
14  Trendily.
15      Q.  Okay.  And you liked it,
16  wanted to offer that --
17      A.  Absolutely.
18      Q.  You have before you Exhibit
19  Number 12?
20      A.  Okay.
21      Q.  And this is the -- a series
22  of a couple of different text
23  exchanges, correct?
24      A.  Correct.
25      Q.  These are between you and

|  | Page 120 |
|---|---|

1  Rahul?
2      A.  That's correct.
3      Q.  The picture at the top of the
4  first page of Exhibit 12.
5      A.  Yes.
6      Q.  Tell us again where it was
7  that -- about that picture, where it
8  came from.
9      A.  That's a picture out of one
10  of my customer's homes that I was -- we
11  were buying -- she was buying new
12  furniture from us and I was out there
13  delivering it, and that was piece that
14  she had had.
15      Q.  Okay.  And tell us about the
16  conversation you had.  Did you have --
17  strike that.
18      Was she asking you if you
19  could -- if you could sell that piece
20  of furniture?
21      A.  She was not.
22      Q.  Okay.  You just saw it, liked
23  it --
24      A.  I saw it, liked it, and
25  noticed it was a similar look.

|  | Page 121 |
|---|---|

1      Q.  Okay.  And did you know it
2  was a Jason Scott piece at that point
3  in time?
4      A.  I did.
5      Q.  Okay.  And --
6      A.  Because I asked the customer
7  about the piece --
8      Q.  Okay.
9      A.  -- and she had made
10  reference.
11      Q.  Now, at that point in time --
12  and I believe the -- we don't know
13  exactly the date of that, right?
14      A.  That's right.
15      Q.  The --
16      A.  Well, I mean, it would have
17  been before August 3rd.
18      Q.  Okay.  But how long before,
19  you don't know?
20      A.  No, not without going back
21  through.
22      Q.  Can you go back through and
23  find out?
24      A.  I no longer have the phone.
25  I have given my phone -- my older phone

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES                  (800) 246.4950

Kyle Tanner Dipple                                              6/29/2018

Page 122

1  to my older brother, and it's wiped.
2      Q.   Okay.  So what's your best
3  guess for how long before that that you
4  would have sent the photograph by text
5  to Rahul?
6      A.   Well, based off of kind of
7  how an iPhone works, it was probably
8  the day before or the same day.  Most
9  times if there is a gap over, I think,
10  like a day or two, it will show another
11  date.
12      Q.   Okay.
13      A.   So this would probably have
14  been either the day before or
15  possibly --
16      Q.   Okay.
17      A.   -- or possibly the same day.
18  I mean, I can't really --
19      Q.   So had you done that before
20  where you see a piece of furniture that
21  you like some place and then photograph
22  it and then send it to somebody to see
23  if they can -- hey, can you make me
24  something like this?
25      A.   Yes, that's very common.

Page 123

1      Q.   And I believe you guys
2  advertise -- Adobe advertises as -- for
3  custom furniture.
4      A.   That's correct.
5      Q.   Custom furniture, right?
6      A.   That's right.
7      Q.   So you-all don't make
8  furniture yourselves?
9      A.   No.
10      Q.   So if someone comes in and
11  they -- they say, hey, can you make me
12  something like this, and shows you a
13  picture of a piece of furniture, you
14  look at it and think, well, who do I
15  know that might be able to make this,
16  and you might send it to them and
17  say --
18      A.   That's correct.
19      Q.   -- can you make that piece of
20  furniture?
21      A.   That's correct.
22      Q.   And that's very common?
23      A.   Very, yes.
24      Q.   To your knowledge, it's not
25  just -- not just Adobe that does that,

Page 124

1  but that's common in the furniture
2  industry?
3      A.   Very common.
4      Q.   When you sent the text that
5  shows the Jason Scott console that's
6  shown on Exhibit 12, when you sent that
7  to Rahul --
8      A.   Uh-huh.
9      Q.   -- did you -- were you aware
10  of this controversy concerning Rahul
11  and Jason Scott at that time?
12      A.   Not of the controversy, no, I
13  was not aware of that.  I was just -- I
14  became more aware that these were --
15  these were pieces that -- from a
16  collection called Jason Scott.
17      Q.   Right.
18      A.   And that -- you know, that I
19  couldn't get, I couldn't obtain, but
20  Rahul was making pieces that were
21  comparable to it, so...
22      Q.   Okay.  And I wanted to make
23  sure that we're -- that we're clear on
24  that.
25      A.   Okay.

Page 125

1      Q.   When you sent the -- the
2  console that's shown on Exhibit Number
3  12 to -- to Rahul and said, hey, can
4  you be -- can you make one of these,
5  you knew at that time that that was a
6  Jason Scott piece that you had
7  photographed, but you were not aware in
8  any way, shape, or form, of any
9  controversy between Trendily or Rahul
10  and Jason Scott at that point in time?
11      A.   Oh, no, not yet.
12      Q.   Okay.  All this happened
13  pretty quickly, though, because just
14  within a couple of days these orders we
15  were looking at earlier were canceled.
16      A.   Right.  Yeah.  I mean, I
17  think -- yeah, I believe, from what I
18  remember, this -- this was very close
19  to that.
20      Q.   Right.
21      A.   Where it all started to
22  really blow up.
23      Q.   Okay.  And in that real short
24  time period, you were asking Trendily
25  if they can make this piece of

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                        NATIONWIDE SERVICES                   (800) 246.4950

Page 126

1  furniture that's shown in Exhibit
2  Number 12, and shortly -- shortly
3  thereafter you learned that there was
4  this controversy, Rahul had told you
5  about the controversy, you had also
6  canceled the order for the other two
7  pieces?
8      A.  Yes.
9      Q.  Okay.  All within just a few
10  days?
11     A.  From what it looks like with
12  the dates, yes.
13     Q.  Right.  Right.  And you
14  didn't attempt to buy any MJ furniture
15  from Rahul after that?
16     A.  Well, I had asked if he had
17  anything, like, in stock, because I had
18  some people calling, but he said he
19  didn't have any.
20     Q.  Okay.  When was that?
21     A.  I think it was shortly after.
22     Q.  Okay.
23     A.  Yeah.
24     Q.  So you knew there was a
25  controversy?

Page 127

1      A.  Right.
2      Q.  He had told you that I can't
3  sell you any more, but you had
4  customers --
5      A.  Well --
6      Q.  -- asking about it -- let me
7  finish my question.
8      A.  Okay.  Okay.
9      Q.  You had customers asking
10  about it, and you called him, hey, do
11  you have this in stock; could you sell
12  me that?
13     A.  Can I ask him a question?
14  Can I ask my counsel?
15     Q.  Sure, you can.  Go ahead.
16     THE WITNESS:  Without -- out
17  of here?
18     MR. DIETRICH:  If you want to
19  take a break, sure, we can step
20  out.
21     THE WITNESS:  Okay.
22     (Recess taken 11:53 a.m. -
23  11:56 a.m.)
24     A.  I'd like to change that
25  answer.  It was Jason Scott had asked

Page 128

1  me to call Trendily and see if they
2  would sell me a piece, because I think
3  he was wanting to know if they had
4  anything else.  And I told him I would
5  call and ask.
6      Q.  (By Mr. Green)  Okay.  When
7  was that?
8      A.  That -- all about this time,
9  I think.  I can't -- I don't know the
10  exact date of it.
11     Q.  Okay.
12     A.  But...
13     Q.  So now let me see if I
14  understand, okay?  I'm going to ask you
15  another question --
16     A.  Okay.
17     Q.  -- that -- and -- strike
18  that.  Before I get to that, let me ask
19  you this question:  The conversation by
20  text that you have that's documented by
21  Exhibit Number 12, and I believe the
22  last date on Exhibit Number 12 is
23  August the 5th, did Jason Scott ask you
24  to send the picture of the console?
25     A.  No, he did not.

Page 129

1      Q.  Okay.
2      A.  No, no.  This was after --
3      Q.  Okay.
4      A.  -- this.
5      Q.  And how long after August 5th
6  was it that -- that Jason Scott asked
7  you to call and see if they'll sell you
8  something else?
9      A.  Possibly September or
10  October, maybe.
11     Q.  Okay.
12     A.  I'd have to go back and -- I
13  need to go back and look.  Or it could
14  have been later than that.
15     Q.  Okay.  If you went back and
16  looked, what would you look at that
17  would tell you that?
18     A.  Just kind of look through the
19  notes of the text conversations --
20     Q.  Okay.
21     A.  -- to try and find -- figure
22  out.
23     Q.  So was it a text conversation
24  where you asked him if he was going to
25  sell anything else?

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES                    (800) 246.4950

Kyle Tanner Dipple                                          6/29/2018

Page 130

1      A.   I believe he asked me over
2  the phone --
3      Q.   Okay.
4      A.   -- if I would do that.  But
5  it's hard because I don't have all the
6  text conversations that I did.  I have
7  an iPad, and sometimes the messages
8  sync from my phone to it.  I'd have to
9  go back and look through there.
10     Q.   Okay.  So let me see if I
11 understand this, then.  You had a phone
12 conversation with Jason Scott.
13     A.   Yes.
14     Q.   And that's when he said,
15 contact Trendily and see if they'll
16 sell you more of the MJ line of
17 furniture?
18          MR. DIETRICH:  Objection,
19 form.
20     Q.   (By Mr. Green)  Correct?
21     A.   Yes.
22     Q.   And your best recollection is
23 that was in September or October?
24     A.   Possibly.  I -- it could have
25 even been later on past that.

Page 131

1      Q.   Okay.
2      A.   I don't feel comfortable
3  putting a date on that at all.
4      Q.   Okay.  But it was -- it
5  was -- it was --
6      A.   It would have been after
7  this --
8      Q.   Yeah, well after that.
9      A.   Like I said, that's asking me
10 --
11     Q.   Okay.
12     A.   A little too hard to
13 remember.
14     Q.   You know it was well after
15 that.  You don't know for sure.
16     A.   I don't know.  I don't know
17 at all.
18     Q.   Okay.  All right.  Now, when
19 you made that inquiry of Trendily, who
20 did you -- how did you make that
21 inquiry?
22     A.   I had asked Chris Sanders
23 from Trendily.
24     Q.   And he said -- he said what?
25     A.   He said no.

Page 132

1      Q.   Okay.  When is the last time
2  you talked with Jason Scott?
3      A.   A while.
4      Q.   Pardon me?
5      A.   It's been a long while.  I
6  had asked him for a -- if I could buy
7  one of his pieces through Runyon's
8  again for a dining table, and she
9  he'd make contact with her and see if
10 he could help, and he responded back
11 that she did not want to help make the
12 transaction.
13     Q.   Okay.  So let me -- let me
14 see if I understand this one.  You were
15 asking -- you called Jason Scott
16 because you had a customer that wanted
17 one of those tables.
18     A.   Yeah, one of the -- what I --
19 one of the dining tables that -- yes,
20 one of the dining tables that we had
21 bought that was like Trendily's.
22     Q.   One that -- was it one
23 that you had thought you had sold when
24 you ordered it from Trendily, or was
25 it --

Page 133

1      A.   No.  Just -- I had a customer
2  come in and, you know, they were just
3  inquiring about it.
4      Q.   They had seen a picture on
5  the website, maybe, or something like
6  that?
7      A.   Yes.  And so I had asked -- I
8  had called Jason to see if I could
9  get -- get the piece through him like
10 we did for the other deal on Exhibit 12
11 on the second page, just like I had did
12 that.
13     Q.   Okay.
14     A.   And he said he would reach
15 out to Bo Runyon and see if that was
16 okay, and she did not want to do that.
17 And that was in text.
18     Q.   Okay.  That was in text?
19     A.   Yes.
20     Q.   Okay.  Your communication
21 with Runyon's?
22     A.   No, with Jason.
23     Q.   Okay.  With Jason.  All
24 right.  You may have already been asked
25 this, but did you try to buy the table,

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES                   (800) 246.4950

Page 134

1  a Jason Scott table, from anyone else
2  other than Runyon's?
3      A.   No.
4      Q.   Yesterday Bill Holland --
5      A.   Oh, I'm sorry.  I'm sorry.  I
6  have asked him before.  That was way
7  before all of this, though.
8      Q.   Okay.
9      A.   Yeah, I had inquired about --
10 about a table.  I don't know which one
11 it was.  That refers back to when --
12 the one about my dad, that table,
13 because I was -- I called Bill Holland.
14 That was a long time ago.
15     Q.   Okay.
16     A.   Looking for a specific table.
17     Q.   Okay.  So just -- that has
18 nothing to do with the MJ line?
19     A.   No, that has nothing to do
20 with the MJ line.
21     Q.   Timing-wise, that has --
22     A.   Timing-wise, way before any
23 of this.
24     Q.   All right.
25     A.   That's really not relevant.

Page 135

1      Q.   So your best recollection,
2  you had called Jason Scott to see if
3  you could get -- if you could buy an
4  MJ -- not MJ -- a Jason Scott table
5  that your customer had seen?
6      A.   Right.
7      Q.   And the one she had seen
8  really was the MJ table.
9      A.   Right.
10     Q.   You knew it was a similar
11 look.
12     A.   Right.
13     Q.   And so you were asking Jason
14 Scott if you could buy one of his
15 tables.  He said call up Runyon's?
16     A.   Yes.  And she would buy it
17 through him, and then she'd mark up a
18 little bit and make a little money and
19 sell it to me.
20     Q.   Yeah, yeah.  Okay.  And that
21 didn't happen?
22     A.   No.  She did not -- from what
23 Jason said, she said she didn't want to
24 do it.
25     Q.   So you never were able to

Page 136

1  supply that customer with that
2  particular table?
3      A.   No.
4      Q.   When that comes up and a
5  customer says, hey, can you get me
6  this, and you can't get that specific
7  piece, do you then try to find -- maybe
8  interest her in a similar --
9      A.   Absolutely.  Anything I can
10 get my hands on to try and satisfy the
11 customer, absolutely.  But, I mean, I
12 can't control whether they're going to
13 be buying from me or not.
14     Q.   Right.  On Exhibit Number 13,
15 there's no date that appears on that,
16 right?
17     A.   No, sir.
18     Q.   This is -- this references
19 the text exchange you had with Jason
20 Scott, right?
21     A.   Yes, that's correct.
22     Q.   And we old guys sometimes
23 have a hard time with some of this
24 technology.  And the only reason you
25 know it's from Jason Scott is because

Page 137

1  it's got his picture -- is that his
2  picture?
3      A.   I remember.
4      Q.   Yeah.  You remember the
5  exchange?
6      A.   Yes.
7      Q.   But is that a picture of
8  Jason Scott?  Have you ever -- have you
9  ever met him?
10     A.   I have not -- never met him.
11 I couldn't tell you who that is.
12     Q.   Okay.
13     A.   That's not how it looks on my
14 phone.
15     Q.   Now, I'm not sure I
16 understood what you were talking about
17 the inquiry related to your father that
18 involved a suggestion by Trendily that
19 if you-all were more of an exclusive
20 dealer of us, you could have a showroom
21 with just Trendily stuff?  What was
22 that about?
23     A.   Oh, they came to us and were,
24 like, wanting to do, like, where we
25 were kind of more exclusively buying

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES                   (800) 246.4950

Page 138

```
 1    from them, and, you know, he would make
 2    our -- you know, kind of be, like --
 3    they had kind of like an exclusive
 4    agreement, hey, he's going to make all
 5    the furniture and he's not going to
 6    sell it to other stores around us, and
 7    he's going to use our showroom kind of
 8    as a -- his showroom, kind of like
 9    share, kind of like joined together,
10    almost.
11        Q.   And that would have been not
12    just MJ line but it would have included
13    others, all of his furniture?
14        A.   Yeah, his upholstery, sofas,
15    chairs.
16        Q.   Similar to the type
17    arrangement, maybe, that Jason Scott
18    may have -- Jason Scott may have with
19    Brumbaugh's or Runyon's, where they
20    have the kind of an exclusive area that
21    they can sell to?
22        MR. DIETRICH:  Objection,
23    form.
24        A.   I'm not sure what their
25    arrangement -- I don't know how they
```

Page 139

```
 1    operate at their stores.
 2        Q.   (By Mr. Green)  So when this
 3    idea was suggested to you, was it by
 4    Chris or Rahul or --
 5        A.   It was by Rahul.
 6        Q.   And do you have a best guess
 7    of when that was?
 8        A.   Last year, summertime.
 9        Q.   Summertime?
10        A.   Yes.
11        Q.   Okay.  And this was before
12    you-all knew of any controversy between
13    them, right?
14        A.   Yes.
15        Q.   And so your decision to not
16    go forward with that, it was based on
17    other considerations?
18        A.   To -- yes.
19        Q.   It had nothing to do with
20    this controversy.
21        A.   Well, I believe it was in
22    June when it was coming about.
23        Q.   Okay.
24        A.   I'm not sure.  I mean, like I
25    said, everything -- I got -- this was
```

Page 140

```
 1    not really important to me to remember.
 2        Q.   Is there -- is there text
 3    messages, e-mails, any other kind of
 4    communication that documents that time
 5    period that you're aware of?
 6        A.   Possibly.
 7        Q.   Is that something that you
 8    have produced to Jason Scott's counsel?
 9        A.   No, because it wasn't -- I
10    mean, I don't know if there was -- I
11    believe I sent him my whole -- pretty
12    much everything that I had
13    conversation-wise.
14        MR. ETTER:  Just for the
15    record, I want to make it clear I
16    sent documents to him.  My client
17    never sent any documents directly
18    to Tom.
19        Q.   (By Mr. Green)  Okay.  You
20    just heard your counsel's statement.
21    Is that true?
22        A.   That's true.
23        Q.   So what general style of
24    furniture would you say the MJ pieces
25    that are shown in Exhibit 1 is?
```

Page 141

```
 1        A.   It falls into a lot of
 2    different styles.
 3        Q.   Like what?
 4        A.   You could call it Rustic
 5    Elegant, you could call it Refined
 6    Rustic.  Some people may refer to it as
 7    Western.  It's kind of the individual's
 8    interpretation of it.
 9        Q.   Okay.  Here this week I've
10    also heard it called Tuscan.
11        MR. DIETRICH:  Objection,
12    form.
13        A.   I mean, like I said,
14    everybody has their own names for
15    stuff.  I mean, there's --
16        Q.   (By Mr. Green)  Or
17    Mediterranean.
18        A.   Yeah, you could call it that.
19        Q.   Or Old World?
20        A.   You could call it that, too.
21    You can call it Traditional.
22        Q.   Any of those descriptions,
23    right?
24        A.   Yeah.  I mean, like I said,
25    everybody -- it's multiple styles.
```

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                        NATIONWIDE SERVICES                    (800) 246.4950

Page 142

1     Q.   But, anyway, when you first
2  saw the table, you liked the style of
3  it?
4     A.   Oh, yes.
5     Q.   And would want Adobe to be
6  able to offer that kind of style?
7     A.   Oh, yes, absolutely.
8     Q.   Yeah.  And, of course, is
9  there only one manufacturer that
10  manufactures furniture that is of that
11  general style?
12         MR. DIETRICH:  Objection,
13     form as to what style.
14     A.   You mean --
15     Q.   (By Mr. Green)  Tuscan,
16  Mediterranean, Old World --
17     A.   Oh, no.  There's --
18         MR. DIETRICH:  I'll object to
19     form again as to whether that's
20     one style or a blend of all the
21     styles.
22     Q.   (By Mr. Green)  We've kind of
23  talked generally just a few minutes ago
24  about trying to put a name on this
25  style, and we came up with about seven

Page 143

1  or eight different words, right?
2     A.   Right.
3     Q.   And the Tuscan, Old World,
4  Mediterranean, I think you said
5  Western, and you had a couple of others
6  that you mentioned, too, that I didn't
7  write those down.
8     A.   Rustic Elegant.
9     Q.   That's the -- that's the
10  style I'm talking about.  Is there more
11  than one manufacturer of furniture
12  that's of that style?
13         MR. DIETRICH:  Objection,
14     form.
15     A.   Yes.  I mean, like I said,
16  it's all up to whoever wants -- how you
17  interpret the look of it.
18     Q.   (By Mr. Green)  Is there more
19  than one manufacturer of furniture in
20  the world that makes teak furniture?
21     A.   Yes.
22     Q.   Of teakwood?  Do y'all have
23  any other teakwood pieces of furniture
24  that y'all offer?
25     A.   Yes, we do.

Page 144

1     Q.   There's more than one
2  manufacturer who offers oak furniture?
3     A.   That's correct.
4     Q.   Mahogany?
5     A.   Correct.
6     Q.   Cherrywood?
7     A.   Correct.
8     Q.   Redwood?
9     A.   Correct.
10     Q.   Pine?
11     A.   Yes.
12     Q.   Cedar?
13     A.   Yes.
14     Q.   Okay.  Is there more than one
15  line of furniture from one manufacturer
16  of furniture that uses carvings as
17  decorative features of its furniture?
18     A.   Yes, several do.
19     Q.   Multiple, right?
20     A.   Multiple, yes.
21     Q.   Is there more than one line
22  of furniture by one manufacturer that
23  uses ironwork as decorative features?
24     A.   Yes.
25     Q.   Is there more than one line

Page 145

1  of furniture by one -- than by one
2  manufacturer -- strike that.
3         Is there more than one line
4  of furniture by one manufacturer that
5  utilizes decorative hardware like
6  hinges and stuff on their furniture?
7     A.   Yes.
8     Q.   Or nail heads?
9     A.   Yes.
10     Q.   Or cabinet or drawer handles?
11     A.   Yes.
12     Q.   More than one manufacturer of
13  furniture that makes dining tables with
14  pedestal bases?
15     A.   Yes.
16     Q.   Or office desks that have a
17  place for someone to sit at the desk
18  and maybe a pencil -- pencil drawer in
19  the middle and drawers on both sides?
20     A.   Yes.
21     Q.   Or of a buffet that can be
22  put up against a wall to hold
23  decorative things on it and -- or maybe
24  one that is designed to go behind a
25  sofa.  There's more than one

email@tobyfeldman.com                Toby Feldman, Inc.                     Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                    (800) 246.4950

Kyle Tanner Dipple                                    6/29/2018

Page 146

1  manufacturer that makes that kind of
2  furniture?
3          MR. DIETRICH:  Objection,
4  form.
5      A.  Yes.
6      Q.  (By Mr. Green)  Right?
7      A.  Yes.
8      Q.  So you've testified earlier
9  about going to the Dallas Trade Center
10 here -- here recently?
11     A.  Yes.
12     Q.  When did you last go to the
13 Dallas Trade Center?
14     A.  Last week, Monday or Tuesday.
15 I think last week, Monday.
16     Q.  Okay.  And Trendily has a
17 space to show its furniture there?
18     A.  Yes.
19     Q.  And did you go look at their
20 furniture there?
21     A.  I did.
22     Q.  And is that when you said
23 that you saw that there were some
24 pieces that had different carvings on
25 them?

Page 147

1      A.  Yes.
2      Q.  Similar -- similar pieces but
3  with different carvings?
4      A.  Just the dining table.  I
5  think there was a buffet as well, but
6  definitely the dining table --
7      Q.  Okay.
8      A.  -- that stuck out to me.
9      Q.  Okay.  And what
10 conversation -- did you talk to one of
11 the Trendily people about it?
12     A.  I talked to Chris and Rahul.
13     Q.  And what conversation did you
14 have about it?
15     A.  That this is a new table.  He
16 said he's changed up the carvings and
17 everything, given it a new look and
18 showed me finish options, like color,
19 lightness or darkness.  I didn't really
20 like it because it was really light.
21 And he had showed me, you know, finish
22 samples where, you know, he's got some
23 kind that are going to be darker and
24 wanted me to order and everything.  I
25 didn't order.  I'm just not -- mainly

Page 148

1  because I'm not comfortable ordering
2  yet.
3      Q.  Okay.  Did you -- did you
4  tell anybody else about what you had
5  seen?
6      A.  I told my dad --
7      Q.  Okay.
8      A.  -- you know, they had nice
9  carved pieces.
10     Q.  Before last week, had you
11 ever seen those pieces --
12     A.  Off pictures.
13     Q.  All pictures?
14     A.  On pictures, yeah.
15     Q.  You had seen pictures of the
16 Trendily table that you were just
17 describing that had the different --
18     A.  Yes.
19     Q.  Where did you see the
20 pictures of it?
21     A.  Chris Sanders had showed them
22 to me.
23     Q.  Okay.  When was that?
24     A.  He came by our showroom, our
25 store.

Page 149

1      Q.  And when was that?
2      A.  Maybe -- I don't know, maybe
3  a month or two before.
4      Q.  Okay.
5      A.  Possibly.  Maybe longer.  I
6  don't know.
7      Q.  Before that had you ever seen
8  it?
9      A.  No.
10         MR. GREEN:  I believe that's
11 all I have right now.  Thank you.
12         MR. DIETRICH:  I just have a
13 couple of follow-up questions.
14         FURTHER EXAMINATION
15 BY MR. DIETRICH:
16     Q.  On the text messages on
17 Exhibit 12, I believe you said that
18 the -- that photo at the top?
19     A.  Yes.
20     Q.  You had said that that, I
21 believe, had, quote, a similar look to
22 Jason Scott pieces; is that right?
23     A.  Yes.
24     Q.  And when we talked about
25 Exhibit 5, the table photo that you had

38 (Pages 146 to 149)

Kyle Tanner Dipple

6/29/2018

Page 150

1  labeled as Jason Scott table?
2      A.  JS.
3      Q.  JS table?
4      A.  Yes.
5      Q.  Which you said meant Jason
6  Scott to you?
7      A.  Right.  That's how I could
8  recall it.
9      Q.  And so you must have before
10 this time seen or familiarized yourself
11 with Jason Scott furniture somehow?
12     A.  I knew -- I knew I didn't --
13 like I said, I had seen, like, a couple
14 of pieces, and from people saying, you
15 know, that's a Jason Scott piece, I
16 could kind of -- you know, I had -- it
17 had a look to it, you know, with the
18 carvings.  And, you know, I -- you
19 know, just like here you can see the
20 similarities in, like, these pieces.
21     Q.  And when you saw this table,
22 did you view it as consistent with that
23 Jason Scott look?
24     A.  This table?
25     A.  Yes.

Page 151

1      A.  Yeah, but I've never seen
2  Jason Scott's actual table of this
3  before.
4      Q.  And I'm not saying you have.
5  But did you view the look of this table
6  as consistent with what you believed
7  was the Jason Scott look?
8      A.  Yes, yes, absolute -- yes.
9      Q.  The new table that you saw
10 last week, would you say do you view
11 that one as consistent with the Jason
12 Scott look?
13     A.  I mean, it's hard for -- I
14 mean, I haven't seen another piece like
15 it.  I mean, I know now this table does
16 because I've actually seen Jason
17 Scott's table of it.  But if Jason
18 Scott -- I don't know if he makes a
19 piece that looks like that one.
20     Q.  It's --
21     A.  I don't know if he has
22 different variations of this.
23     Q.  As far as --
24     A.  I can't tell you.
25     Q.  -- carvings, ornamentation,

Page 152

1  along those things, would you view the
2  new table as consistent with what you
3  believe the Jason Scott look is?
4      A.  Yeah.  Assuming it's carved
5  furniture, I mean, I -- yeah.
6      Q.  And are you familiar with the
7  color of Jason Scott pieces?  I mean,
8  you can see it in your text message
9  there.
10     A.  I mean, yeah, it's really
11 hard because that all depends on your
12 lighting and everything, too.  I don't
13 know about the -- no.
14     Q.  Did the color options -- you
15 said Rahul offered on the new table a
16 darker color option?
17     A.  It was -- it was darker than
18 what was pictured.  He had pulled out
19 like his little sample ring, and it was
20 darker than what was on the floor.  I
21 can't tell you if it's a match to this.
22 That's impossible.
23     Q.  That was my next question.
24     A.  Okay.
25     Q.  Was it similar to what you

Page 153

1  saw in prior Jason Scott pieces?
2      A.  I couldn't tell you, to be
3  honest.
4      Q.  Chuck asked you about a whole
5  bunch of different furniture styles.
6      A.  Okay.
7      Q.  And you said Jason Scott's
8  work could fall into a lot of different
9  styles; is that right?
10     A.  In my opinion, yes.
11     Q.  In your belief, does Jason
12 Scott blend a lot of different styles?
13     A.  Like in his design?
14     Q.  Yes.
15     A.  Yes.  I mean, I see
16 multiple -- I mean, like I said, this
17 is my interpretation.
18     Q.  And that's all I'm asking
19 for.
20     A.  I'm not an expert in this at
21 all.  I do, yeah.  I see multiple
22 styles.
23         MR. DIETRICH:  I don't have
24 any more questions.
25         THE WITNESS:  Okay.

39 (Pages 150 to 153)

Page 154

1        MR. DIETRICH:  Thank you.
2        FURTHER EXAMINATION
3  BY MR. GREEN:
4      Q.   Back to Exhibit Number 5 and
5  also Exhibit Number 3.
6      A.   Okay.
7      Q.   Number 3 is the -- is the
8  picture that you took, correct?
9      A.   That's correct.
10     Q.   And that's of the MJ table?
11     A.   That's correct.
12     Q.   And Exhibit Number 5 was the
13 very first picture you saw of an MJ
14 table.  It looks like the color is
15 different on those two.  It looks like
16 yours is darker.
17     A.   Well, it's to do with
18 lighting and everything.  I mean, you
19 can -- I mean, I can take a picture of
20 a white piece of furniture, and if the
21 lighting is not right, it's going to
22 look gray.
23     Q.   So you can't tell whether
24 it's the same coloring or not?
25     A.   There's no way to.

Page 155

1      Q.   Yeah.
2      A.   I mean, no.
3      Q.   I guess my last question, and
4  this gets back to my earlier reference
5  to technological ignorance sometimes.
6  If you look at Exhibit Number 5.
7      A.   Okay.
8      Q.   And at the top of it, at the
9  very top of it, counsel asked you
10 earlier about it looks like you put it
11 in a file labeled "JS Dining Table"?
12     A.   Yes.
13     Q.   And that was based on your
14 initial, this is of a style, a general
15 style or look that I had seen before --
16     MR. DIETRICH:  Objection.
17     Q.   -- in your mind?
18     A.   Yes.
19     Q.   (By Mr. Green)  To the left
20 of that is a date, it looks like,
21 2014/07.
22     A.   That -- like I said, I don't
23 know how -- this part is not part of
24 what information I get.  This table
25 could have been made -- it could have

Page 156

1  had, like, a time stamp on it, the
2  original photo, and it could have been
3  from, you know, July 2014.  I don't
4  know.  I mean -- or that could have
5  just been, like, the folder that I
6  created.  I don't know all of this,
7  either.
8      Q.   Right.  And I guess --
9      A.   I could have had a folder
10 that was created in 2014 where I was
11 dropping my files into, and this pulled
12 from that file.
13     Q.   Okay.  That was kind of my
14 guess.
15     A.   Yeah.
16     Q.   That's kind of the time
17 period that you first were getting into
18 the furniture business, right?
19     A.   Yeah.  This would have been
20 way before I even knew Trendily.
21     Q.   Yeah.  Okay.
22     A.   Yeah.  That date.
23     Q.   That was my guess.
24     A.   The date is not relevant to
25 the picture.

Page 157

1      Q.   Right.  Okay.  That was --
2  that was my guess.
3      MR. GREEN:  I don't think I
4  have anything further.
5      MR. DIETRICH:  I just have
6  one more looking at these
7  comparison of pictures.
8      THE WITNESS:  Okay.
9      MR. DIETRICH:  And I promise
10 this will just take a second.
11     THE WITNESS:  I'm fine.
12     FURTHER EXAMINATION
13 BY MR. DIETRICH:
14     Q.   The table in Exhibit 5
15 doesn't have nail heads around the
16 bottom of the pedestals, and the table
17 in Exhibit 3 looks like it does.  Do
18 you see that?
19     A.   Oh, wow.  Yes, I do.
20     Q.   Is that something that
21 Trendily would have asked for or just
22 something that you got, to your
23 knowledge?
24     A.   I didn't ask for it.  That's
25 just -- this is the way it came.

email@tobyfeldman.com                 Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                    (800) 246.4950

Page 158

```
 1        Q.   This is the way it was
 2   delivered?
 3        A.   This was the picture I saw,
 4   and then this was what I received.
 5        MR. DIETRICH:  That's all I
 6   have.  Thank you.
 7        MR. GREEN:  We're finished.
 8   Thank you.
 9        (Deposition concluded at
10   12:22 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 159

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF ARIZONA
 3
 4   JASON SCOTT COLLECTION,    §
     INC.,                     §
 5                             §
         Plaintiff,            §
 6   VS.                       §   CIVIL ACTION NO.
                               §   2:17-cv-02712-JJT
 7   TRENDILY FURNITURE, LLC   §
     et al.,                   §
 8                             §
         Defendants.           §
 9
10
11
12             REPORTER'S CERTIFICATION
13               KYLE TANNER DIPPLE
14                 JUNE 29, 2018
15
16
17        I, Janice K. McMoran, RDR, CRR, TCCR, and
18   Certified Shorthand Reporter in and for the State
19   of Texas, hereby certify to the following:
20        That the witness, KYLE TANNER DIPPLE, was duly
21   sworn by the officer and that the transcript of the
22   oral deposition is a true record of the testimony
23   given by the witness;
24        I further certify that pursuant to Federal
25   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
```

Page 159

Page 160

```
 1   as well as Rule 30(e)(2), that the signature of the
 2   deponent:
 3        __X___ was requested by the deponent or a
 4   party before the completion of the deposition and
 5   is to be returned within 30 days from date of
 6   receipt of the transcript.  If returned, the
 7   attached Errata contains any changes and the
 8   reasons therefor;
 9        _____ was not requested by the deponent or a
10   party before the completion of the deposition.
11        I further certify that I am neither counsel
12   for, related to, nor employed by any of the parties or
13   attorneys to the action in which this proceeding was
14   taken.  Further, I am not a relative or employee of any
15   attorney of record in this cause, nor am I financially
16   or otherwise interested in the outcome of the action.
17        Subscribed and sworn to on this the 12th day
18   of June, 2018.
19
20        _____
21        JANICE K. McMORAN, RDR, CRR, TCRR
22        Texas CSR #1959
23        Expiration Date: 12/31/18
24
25
```

41 (Pages 158 to 160)

**Kyle Tanner Dipple**                                                      **6/29/2018**

---

Page 161

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2
 3        I,_____, do hereby certify
 4   that I have read the foregoing pages, and that the
 5   same is a correct transcription of the answers given by
 6   me to the questions therein propounded, except for the
 7   corrections or changes in form or substance, if any,
 8   noted in the attached Errata Sheet.
 9
10   _____
11   KYLE TANNER DIPPLE              DATE
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 163

```
 1   foregoing deposition and hereby affix my signature that
 2   same is true and correct, except as noted above.
 3
 4   _____
 5   KYLE TANNER DIPPLE
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 162

```
 1              E R R A T A
 2   WITNESS: KYLE TANNER DIPPLE    DATE: JUNE 29, 2018
 3   PAGE NO.  LINE NO.  CHANGE    REASON FOR CHANGE
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25        I, KYLE TANNER DIPPLE, have read the
```

email@tobyfeldman.com                    **Toby Feldman, Inc.**                    **Certified WOB**
tobyfeldman.com                           **NATIONWIDE SERVICES**                  **(800) 246.4950**

Dipple

EXHIBIT NO. 7
Janice McGran
CSR, RDR, CRR

















EXHIBIT NO. _____
Janice McMoran
CSR, RDR, CRR
8/3/2017





085

●●●○○ AT&T 📶          3:52 PM          ➚ 19% ▭

adobeinteriors.com



✕

The Remington Table is hand crafted form solid teak wood, accented with beautiful hand carvings.
Dim: 96" x 48"
Custom Sizing Available.

Want more Information?
Email Us at:
info@adobeinteriors.com
or Call/Text 817-294-0053

Remington Dining Table

Dipple
EXHIBIT NO. 4
6/29/18
Janice McMoran
CSR, RDR, CRR

086

EXHIBIT NO.
Janice McCltan
CSR, RDR, CRR

adobeinteriors.com/wp-content/uploads/2014/07/JSDiningTable-Media-Edit.jpg



081



ADOBE Interiors · Timeline Photos



082



Make your home office elegant with this newly arrived hand carved desk! The wonderful iron accents make this a statement piece for you home! Come see everything we can do for you and meet with one of our staff designers to make your home perfect for you and your family !
4651 Bryant Irvin Road,
Ft Worth, TX 76132

Like   Comment   Share

6 Comments   Top Comments

Rachel Hensley Well the quality would denote increase cost. Love this desk. Wish I lived closer
Like · Reply · Jul 11 at 8:25am

ADORE Interiors I was just told something about as bulky and weight as the desk was shipped about about 500.00 but... it can be less if youre not wanting it quickly... or if you find other items... it could be a little higher. Rick
Like · Reply · Jul 11 at 10:07pm

Kelly Hoots Love it
Like · Reply · Page responded privately · Jul 10 at 1:25pm

Jen Harvey McGinghy Shop here as much as I can. LOVE this place!! Just plan to pass the pieces down to your children. It makes the price easier to take. And with this quality, they can pass them on too!
The over sized chairs are my favorite.
Like · Reply · Jul 11 at 12:25pm

Diego Mendoza Jessica Arroyo
Like · Reply · Jul 10 at 7:26pm

Blanca Canastilla Rodriguez Carla Castellanita
Like · Reply · Jul 11 at 1:55pm

Ernise Miller Very expensive, went there, nothing less than 650.00
All very nice very high end.
Like · Reply · Page responded privately · Jul 10 at 5:11pm

Write a comment...


Dimples
EXHIBIT NO. 8
Janice McGehean
CSR, RDR, CRR





ADOBE Interiors · Timeline Photos

083



TRENDILY | FURNITURE LLC

A company of Mi'das Group

2991 CONGRESSMAN LANE
DALLAS, TX 75220
Main : 469-647-2553 Fax : 469-335-9770
Site: trendilyfurniture.com

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/29/2017 | 102926 |

| Bill To | Ship To |
|---------|---------|
| ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132 | ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132<br>817-294-0053 |

| P.O. Number | Terms | Rep | Ship Date | Via | Tracking # |
|-------------|-------|-----|-----------|-----|------------|
| 062917 | Net 30 | CTT | 6/29/2017 | | |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| 1 | 01-5-2-011-39 | M.J. OFFICE DESK<br>72"x36"x31.5"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,699.00 | 1,699.00 |
| 1 | 01-2-3-052-39 | M.J. SIDE BOARD<br>72"x22"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,399.00 | 1,399.00 |
| 1 | 01-2-1-082-39 | M.J. DINING TABLE 96"<br>96"x48"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,899.00 | 1,899.00 |

Dpple

EXHIBIT NO. 10
012G/18

Janice McMoran
CSR, RDR, CRR

| PLEASE INSPECT ALL MERCHANDISE CAREFULLY & MAKE NOTATION OF ANY DAMAGES OR DEFECTS PRIOR TO SIGNING PROOF OF DELIVERY. | **Total** | **USD 4,997.00** |
|---|---|---|
| | Payments | USD 0.00 |
| Claims must be made within 48 hours of merchandise receipt.<br>Unauthorized returns are subject to a 25% restocking fee. | Balance Due | USD 4,997.00 |



A company of Mi'das Group
2991 CONGRESSMAN LANE
DALLAS, TX 75220
Main : 469-647-2553 Fax : 469-335-9770
Site: trendlyfurniture.com

# Sales Order

| Date | S.O. No. |
|------|----------|
| 8/7/2017 | 202072 |

| Name / Address | Ship To |
|----------------|---------|
| ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132 | ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132<br>817-294-0053 |

| P.O. No. | Terms | Rep | Ship Date | Ship Via |
|----------|-------|-----|-----------|----------|
| S/M: STOCK | Net 30 | CTT | 8/7/2017 | |

| Item | Description | Ordered | U/M | Rate | Invoiced | Amount |
|------|-------------|---------|-----|------|----------|--------|
| 01-2-1-082-39 | M.J DINING TABLE 96"<br>96"x48"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1 | ea | 1,899.00 | 0 | 1,899.00 |
| 01-5-2-011-39 | M.J. OFFICE DESK<br>72"x36"x31.5"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1 | ea | 1,699.00 | 0 | 1,699.00 |

*Pd w/ CHK# 1007*

*8-12-17 JH*

| | **Total** | USD 3,598.00 |
|---|-----------|--------------|

JSC00016



**TRENDILY** | FURNITURE LLC

A company of Mi'das Group
2991 CONGRESSMAN LANE
DALLAS, TX 75220
Main : 469-647-2553 Fax : 469-335-9770
Site: trendilyfurniture.com

# Sales Order

| Date | S.O. No. |
|------|----------|
| 8/3/2017 | 202066 |

| Name / Address |
|----------------|
| ADOBE INTERIORS |
| 4651 BRYANT IRVIN RD |
| FORT WORTH, TX 76132 |

| Ship To |
|---------|
| ADOBE INTERIORS |
| 4651 BRYANT IRVIN RD |
| FORT WORTH, TX 76132 |
| 817-294-0053 |

| P.O. No. | Terms | Rep | Ship Date | Ship Via |
|----------|-------|-----|-----------|----------|
| 080117 | Net 30 | CTT | 8/3/2017 | |

| Item | Description | Ordered | U/M | Rate | Backordered | Invoiced | Amount |
|------|-------------|---------|-----|------|-------------|----------|--------|
| 01-1-3-042-... | M.J. CONSOLE TABLE 72" FINISH: #39 FINISH:#39 RECLAIMED TEAK / STANDARD | 1 | ea | 999.00 | 1 | 0 | 999.00 |
| 01-1-7-030 | VANCOUVER CLUB CHAIR GR(3) RED GATOR ON: OB & OA. / GR(2)RED LEATHER ON: IB, IA, IW, SEAT & DECK. NAILHEADS: FRENCH NATURAL SMALL FINISH: WALNUT #12 | 1 | ea | 1,200.00 | 0 | 1 | 1,200.00 |

| | | | **Total** | USD 2,199.00 |
|---|---|---|---|---|

JSC00017

| Vendor SKU | Quantity | Price | Description | UPC/EAN | Manufac SKU |
|---|---|---|---|---|---|
| | 1 | $999.00 | MJ Console Table 72" x 18" x 34" *See attached picture for reference | | TRED |
| | 1 | $1200.00 | SD Vancouver Wing Chair *Caprieze/Salute Red Leather: SC, IB, IA, & *Galapagos Red Leather: OB, OA, AP *No wood trim around base *See attached picture for reference | | TRED |

| | |
|---|---|
| Discount: | $0.00 |
| Other: | $0.00 |
| Shipping: | $0.00 |
| Total: | $2199.00 |

This order was generated using Lightspeed Retail.
We offer free catalog and order integration services to suppliers.
Give us a call: 866-932-1801.

2


Dipple

EXHIBIT NO. 4
6/29/18
Janice McMoran
CSR, RDR, CRR

**chris.sanders0310@outlook.com**

| | |
|---|---|
| **From:** | Colt Dipple <colt@adobeinteriors.com> |
| **Sent:** | Friday, July 28, 2017 4:32 PM |
| **To:** | Trendily; Tanner Dipple; Colt Dipple |
| **Subject:** | Adobe Interiors Purchase Order #395 |
| **Attachments:** | purchase395.csv |

Chris,

Here is the PO with the photos included, I forgot to attach them.

Thanks,

Colton Dipple

### From

**Adobe Interiors**
Account #: TREN
Purchase Order #: 395
Phone: Phone: (817) 294-0053
Email: colt@adobeinteriors.com
4651 Bryant Irvin Rd
Fort Worth, Texas 76132

### To:

**TRENDILY HOME COLLECTION**
Attn: **Chris Sanders**

### Shipping Instructions:

SHIP TO: 3016-A MARQUITA DR. - FORT WORTH, TX 76116

### Note:

TAG: PHILLIPS/TD

Chris,

Here is a PO, let us know if you have any questions.

Thanks,

Colton Dipple

### Order Details

1

 AT&T    12:43 PM    66%


Rhaul




You gonna be making this one too?

Again already in production

Nice!
You doing any of his beds?

Thu, Aug 3, 2:25 PM

Yes 2 bed

Can you show me which ones?
I got a big client interested

    iMessage   

Dipple
EXHIBIT NO.
Janice McMoran
CSR, RDR, CRR

      





‹   **R**   ⓘ

Rhaul



Runyon's Fine Furniture

JULY 11 AT 10:45 PM 🌐

**Do you have this JS console table in you MJ collection?**

Yes in production

Size 72" x 18" x 34" and price $999.00

**Eta on it?**

14-16 weeks

To be safe

    iMessage   

      

 AT&T  9:34 PM   26%

**R**

Rhaul

Sat, Aug 5, 2:01 PM

> Do you have another MJ dining table in stock

Not this minute

I am getting soon though

If you need them, I will order now and save

> Yes please send me an invoice for one MJ table

> And another desk please

Sat, Aug 5, 4:12 PM

Desk we have in stock

> Please send me an invoice. I'll have it picked up next week

    iMessage  

            

JSC00013



**Adobe Tanner**
+12549774234

Runyon's Fine Furniture

Do you have this JS console table in you MJ collection?

Yes in production

Size 72" x 18" x 34" and price $999.00

Eta on it?

14-16 weeks
To be safe

7:13 PM

When did he send you those?

7:15 PM

A   Early August.
Date is on the message

Found them in my old phone
7:16 PM

Are they from raul or the rep?

7:18 PM

A   Rhaul himself   7:18 PM

Enter message   SEND

Dipple
EXHIBIT NO. 13
Janice McMoran
CSR, RDR, CRR

JSC00014