Page 1

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF ARIZONA

Jason Scott Collection, Inc.  )
          Plaintiff            )
                               )
          v.                   ) Civil Action No.
                               ) 2:17-cv-02712-JJT
Trendily Furniture LLC et al. )
          Defendant            )


ORAL DEPOSITION OF

WILLIAM HOLLAND

JUNE 28, 2018




     ORAL DEPOSITION OF WILLIAM HOLLAND, produced as a
witness at the instance of the Plaintiff and duly sworn,
was taken in the above-styled and numbered cause on the
28th day of June, 2018, from 9:55 a.m. to 12:06 p.m.,
before Vanessa P. Pompa, Certified Shorthand Reporter in
and for the State of Texas, reported by computerized
stenotype machine at the offices of REGUS, 1100 NW Loop
410, Suite 700, San Antonio, Bexar County, Texas
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

**William Holland**                              6/28/2018

---

Page 2

```
1                    APPEARANCES
2
3   FOR PLAINTIFF:
4     Mr. Thomas Dietrich
      Mangum, Wall, Stoops & Warden, PLLC
      112 N. Elden St.
5     Flagstaff, Arizona 86001
6   FOR DEFENDANT:
7     Mr. Charles A. Green
      Cowles & Thompson
8     901 Main Street, Suite 3900
      Dallas, Texas 75202
9
    ALSO PRESENT:
10
      William Holland,
11    the Witness; and
12    Vanessa P. Pompa, CSR
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            WILLIAM HOLLAND,
2   having been first duly sworn, testified as
3   follows:
4                  EXAMINATION
5   By Mr. Dietrich:
6      Q.   Good morning.  I already
7   introduced myself but I'm Tom Dietrich
8   working with Jason Scott Collection on
9   this case.  Can you please state your
10  full name for the record.
11     A.   My name is William Holland,
12  H-o-l-l-a-n-d.
13     Q.   And have you ever had your
14  deposition taken before?
15     A.  I have not.
16     Q.   All right.  Well, let me just
17  give you a few ground rules for it.
18  This is the court reporter.  She's
19  gonna be taking down everything that we
20  say.  So if you could please -- I don't
21  think this will be a problem -- but
22  make sure you're loud enough for her to
23  hear, make sure we're not talking too
24  fast, and especially make sure that we
25  don't talk over each other.  If I ask
```

---

Page 3

```
1                     INDEX
2                              PAGE
4   Appearances                 2
5   WILLIAM HOLLAND
6     Examination by Mr. Dietrich     4
7     Examination by Mr. Green      100
8     Re-Examination by Mr. Dietrich   129
9     Re-Examination by Mr. Green    133
10  Reporter's Certification        135
11              EXHIBIT INDEX
12   1  Jason Scott Collection Photos   27
13   2  Trendily Furniture Photos      35
14   3  May 30, 2017 Email to Jason Scott   54
15   4  June 27, 2017 Email to Jason Scott  62
16   5  June 28, 2017 Email to Jason Scott  80
17   6  Nov. 9, 2017 Emai to Jason Scott   89
18   7  June 16, 2018 Email to Lawyer Tom   90
19  REQUESTED DOCUMENTS
20  NONE
21  CERTIFIED QUESTIONS
22  NONE
23
24
25
```

Page 5

```
1   you a question just let me finish, then
2   answer.  And if you're talking I'll let
3   you finish before I ask something else.
4          There may be times where
5   Chuck will interpose an objection
6   between my question to you and your
7   answer.  If he does that just let him
8   say his objection and then you can go
9   ahead and give your answer.  If he
10  objects it doesn't mean you don't
11  answer, it just means you wait for him
12  to finish and then you can answer the
13  question.
14       MR. GREEN:  But the objection
15    should be real short.
16       MR. DIETRICH:  Right.
17     Q.  (BY MR. DIETRICH)  Usually
18  it'll just be something like objection
19  to form.  And if you don't understand
20  one of my questions or one of Chuck's
21  questions, just let us know and we'll
22  try to ask a better one.  If you
23  remember something five or ten minutes
24  down the road and, you know, you want
25  to come back just let me know and we'll
```

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES          (800) 246.4950

**William Holland**                                    6/28/2018

Page 6

```
 1   get that on the record.
 2        Is there any reason to think
 3   that you can't testify truthfully and
 4   honestly here today?
 5        A.   No reason at all.
 6        Q.   Well, then let's get started.
 7   What do you do for a living, Bill?
 8        A.   I'm in the retail home
 9   furnishing business.  I own a store
10   called Hill Country Interiors.
11        Q.   And how long have you owned
12   Hill Country Interiors?
13        A.   About 27 years.
14        Q.   Where is Hill Country
15   Interiors located?
16        A.   1410 North Loop 1604 West,
17   San Antonio, Texas.
18        Q.   Did you start in the
19   furniture business with Hill Country or
20   had you worked in furniture before
21   that?
22        A.   I've worked in furniture
23   before that.
24        Q.   And how long have you worked
25   in furniture overall?
```

Page 7

```
 1        A.   Oh, since I was a kid
 2   starting back in high school.
 3        Q.   And about how many years is
 4   that?
 5        A.   Well, I'm 64.  I started
 6   working part time as a truck driver for
 7   $2 an hour.  So, like, 40 years.
 8        Q.   You said you started working
 9   as a truck driver.  After that where
10   were you working and what did you do?
11        A.   After that?
12        Q.   Yes.
13        A.   I was going to college at the
14   time.  And then I went to work for a
15   company called Certified Leasing
16   Company which was a division of a
17   Fortune 500 corporation.  After that I
18   went to work for another furniture
19   leasing company, office furniture
20   leasing company.  And then I got into
21   the real estate business for several
22   years.  Then I moved to San Antonio and
23   opened up a store.  When we first
24   started it was a little gift shop
25   selling Southwest Santa Fe type things.
```

Page 8

```
 1   And be careful what you pray for, 27
 2   years later it's a 30,000 square foot
 3   store, a brick and mortar store in San
 4   Antonio.
 5        Q.   So that little gift shop was
 6   the start of Hill Country?
 7        A.   Correct.  Our corporate name
 8   is actually Santa Fe Furnishings &
 9   Accessories, Inc.  We're d/b/a Hill
10   Country Interiors.
11        Q.   And how big did you say your
12   showroom is now?
13        A.   The showroom part is 24,000.
14        Q.   But overall it's 30,000?
15        A.   Overall it's 30,000.
16        Q.   What's the other 6000?
17        A.   Warehouse.
18        Q.   I got you.  So what kind of
19   things do you do at Hill Country?
20        A.   I do everything at Hill
21   Country but my primary is -- well, I do
22   everything.  I buy, I sell, I'm in
23   charge of the whole operation.  We do
24   between 3-and-$6 million a year.  Being
25   self employed you're a jack of all
```

Page 9

```
 1   trades, master of all.
 2        Q.   So in selling are you dealing
 3   with customers directly?
 4        A.   I deal with customers
 5   directly, not as -- I don't compete
 6   with my sales people, no.  So I have
 7   sales people that do that but I --
 8   being in business for 27 years we have
 9   a relationship with a lot of customers
10   over those periods of years.  So they
11   always like to come in and -- you know,
12   they might not be buying from me but
13   they're talking to me.
14        Q.   You're talking with them
15   about furniture?
16        A.   Furniture.
17        Q.   You said you're the buyer for
18   Hill Country?
19        A.   I'm the primary buyer, yes.
20        Q.   What does being a buyer for a
21   furniture company entail?
22        A.   It entails going to --
23   sourcing out product, domestic as well
24   as overseas.  It involves going to
25   furniture markets High Point
```

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES              (800) 246.4950

**William Holland**                                         6/28/2018

Page 10

1  specifically twice a year.  Dallas
2  twice a year, Atlanta twice a year.
3  Denver twice a year, Las Vegas twice a
4  year.  Although in the last five or ten
5  years we've kind of narrowed that down
6  to just Dallas twice a year and High
7  Point twice a year.
8      Q.  Can you tell me what -- You
9  mentioned all those locations and I
10  think I have an understanding, but
11  what's happening there when you're
12  going there?
13      A.  We're -- For example, this
14  past weekend I was in Dallas.  It was a
15  small -- it's a summer market.  So you
16  have your manufacturers and your
17  manufacturer sales reps in the
18  showrooms showing their product.  And
19  I'm going there to look to see if those
20  products are a fit for our store.
21      Q.  So you look at product and
22  decide what to buy?
23      A.  Correct.
24      Q.  What is High Point, is that
25  a -- that's a market as well?

Page 11

1      A.  High Point is -- from what I
2  understand it's the largest furniture
3  market not just in the United States
4  but possibly in the world as far as
5  attendance goes.
6      Q.  And it happens twice a year?
7      A.  Twice a year.
8      Q.  And you go to those?
9      A.  I go twice a year every year.
10  I've only missed one market in 17 years
11  maybe.
12      Q.  When you go to High Point
13  what do you do in a day?
14      A.  My day usually starts about 8
15  o'clock in the morning, finishes about
16  8 o'clock at night, including breakfast
17  and dinner.  And we're going from
18  building to building, from showroom to
19  showroom looking for product that would
20  fit into our showroom.
21      Q.  So different, I guess,
22  manufacturers put out product?
23      A.  Thousands of manufacturers
24  are displaying their product at High
25  Point.

Page 12

1      Q.  And you're looking at it all?
2      A.  I'm trying to.
3      Q.  As much as you can see?
4      A.  You can look there every day,
5  I've been there for 17 years, and I
6  still have not seen every showroom and
7  every product.  It's impossible.
8      Q.  Do you know about how many
9  pieces you might look at in a typical
10  day?
11      A.  It depends on how you define
12  looking at but I see thousands and
13  thousands.  But as far as specifically
14  looking at pieces that would go into
15  our showroom or, you know, fit our
16  product, fit our market here in San
17  Antonio, hundreds.
18      Q.  But what is your market here
19  in San Antonio?
20      A.  We're a medium high to high
21  end retailer in San Antonio.
22      Q.  So can you describe that a
23  little bit.  Medium high to high end,
24  is it certain price points?
25      A.  Certain price points.  For

Page 13

1  example, a low end company would be a
2  company such as Rooms To Go.  It's a
3  pretty large national manufacturer, a
4  retailer that people are familiar with.
5  A high end manufacturer or showroom
6  might be -- well, it varies from region
7  to region, but here in San Antonio it
8  might Stowers Furniture, for example.
9  The two large box retailers in San
10  Antonio are not in Dallas or the
11  Phoenix area so I don't think either
12  one of you would be familiar with
13  those.
14      But we're pretty much a
15  medium to high end as far as price
16  point goes.  So, for example, a sofa at
17  Rooms To Go might be 5-or-$600.  A Sofa
18  at Hill Country Interiors might be
19  5-to-$10,000.
20      Q.  Now, in your capacity as an
21  owner of Hill Country do you deal with
22  furniture manufacturers?
23      A.  Absolutely.  Every day.
24      Q.  Are they called vendors,
25  manufacturers, what do you like to use?

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES              (800) 246.4950

**William Holland**                                          6/28/2018

---

Page 14

```
 1          A.  Both manufacturers and
 2   vendors.
 3          Q.  Is that the same thing?
 4          A.  Same thing in my line, yes.
 5   Well, to a certain degree.  I mean, you
 6   do have some manufacturers that
 7   manufacture that you deal directly with
 8   the manufacturer.  You have some
 9   vendors who don't manufacture, they
10   import in.  And you never really
11   actually deal with the person that's
12   actually doing the work or overseeing
13   the work or the owner.  But in my mind
14   vendors and manufacturers are pretty
15   much the same thing.
16          Q.  Are you familiar with the
17   Jason Scott Collection?
18          A.  I am familiar with him.
19          Q.  How?
20          A.  I've been doing business with
21   Jason for about -- I don't know, 15, 16
22   years.
23          Q.  And you've been selling his
24   products in Hill Country?
25          A.  We originally were selling
```

Page 15

```
 1   his product under Santa Fe Furnishings.
 2          Q.  So you've been with him since
 3   the switch over to the name Hill
 4   Country?
 5          A.  Yes.
 6          Q.  How did you first learn about
 7   Jason Scott furniture?
 8          A.  A sales rep that we were
 9   doing business with on a couple of
10   other lines approached us with a
11   catalog -- and we had a really good
12   relationship.  And this was, again, 16,
13   17 years ago -- and he showed me a
14   catalog.  And we bought it just based
15   upon his recommendation.
16          Q.  What was your reaction to
17   seeing the furniture in the catalog?
18          A.  It was different, it was
19   unique and something that I had not
20   seen before.  Again, this was 16 years
21   ago.  So we tried it.
22          Q.  How'd it do?
23          A.  It did real well.  I mean, we
24   weren't -- where we are today and where
25   we were 16 years ago as far as price
```

Page 16

```
 1   points and product lines and exposure
 2   in the market, 16 years ago we were
 3   kind of a small player.  And we kind of
 4   consider us now kind of a large player
 5   in San Antonio.  So it's done real
 6   well.
 7          When we first started out
 8   with Jason we had maybe an 8000, 10,000
 9   square foot showroom.  We probably
10   brought in -- I think our buy-in then
11   was $10,000, which back then was a lot
12   of money.  It's still a lot of money
13   today but back then it was a lot of
14   money.  And so now our showroom is
15   30,000 square foot including the
16   warehouse and so we carry a lot more of
17   his product.
18          Q.  So today how does Jason Scott
19   do for Hill Country?
20          A.  We sell a lot of Jason Scott.
21   It goes in cycles.  Just to kind of --
22   Two weeks ago we just delivered the
23   last part of our most recent large
24   transaction.  It started back in
25   November.  The thing with Jason's
```

Page 17

```
 1   product line is he doesn't stock much
 2   so everything is custom ordered.  So we
 3   had a customer that ordered over
 4   $100,000 worth back in November.  We
 5   just completed the transaction two
 6   weeks ago.  So that kind of gives you
 7   an idea.  At one point before the
 8   furniture market took a hit we were
 9   carrying 40, 50 -- 30 to 40 pieces on
10   the floor at any given time.
11          Q.  Of Jason Scott furniture?
12          A.  Of Jason's.  And now we
13   probably carry about 20 or 30.  But I
14   just happened to look at the inventory
15   report yesterday before I left the
16   office and I think I've probably got
17   about -- I don't know what I have on
18   the floor because I didn't look but I
19   think I've got about 50-or-$60,000
20   ordered from High Point.
21          Q.  To your knowledge how do
22   customers react to Jason Scott
23   furniture?
24          A.  It's always a positive
25   reaction other than the price
```

email@tobyfeldman.com
tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES
Certified WOB
(800) 246.4950

**William Holland**                                            6/28/2018

Page 18

1  sometimes.
2      Q.   Have you spoken with
3  customers about Jason Scott furniture?
4      A.   Oh, sure.
5      Q.   What kind of things do they
6  tell you?
7          MR. GREEN:  Objection to
8  form.
9      A.   They like the product.  They
10 like the feel.  They like the look.  I
11 know I'm a pretty big dealer in Texas
12 for Jason Scott, I know there's several
13 dealers within the state.  There's not
14 anything they don't like about it.
15 Lead time -- you know, if it's a
16 special order they don't like -- you
17 know it's six, seven, eight months, but
18 that just goes with the territory.
19     I personally have never had a
20 problem with one Jason Scott piece in
21 all these years, which is very unusual
22 because whether I'm getting product
23 from overseas or whether I'm getting
24 product from Mexico, I typically will
25 have splitting or cracking on at least,

Page 19

1  you know, ten percent of the pieces.
2      Q.   Does that happen with
3  Jason's?
4      A.   It doesn't happen.  It
5  doesn't happen with Jason.  They do a
6  pretty good job.
7      Q.   In your view he has a good
8  reputation for quality?
9      A.   He has an excellent
10 reputation for quality.
11     Q.   You said there's other Jason
12 Scott dealers in Texas?
13     A.   Yes.
14     Q.   Are there any near Hill
15 Country?
16     A.   You'd have to define near.
17     Q.   Well, can you tell me.  Is
18 there --
19     A.   There was one dealer actually
20 in San Antonio who's gone out of
21 business, John Williams Interiors.
22 There is a small little dealer in
23 Boerne, which is like a suburb of San
24 Antonio.
25     Q.   And how far away is that from

Page 20

1  your store?
2      A.   Drive time probably 30
3  minutes.
4      Q.   Are they a competitor of
5  yours?
6      A.   Yeah, to a certain degree.
7  It's a small little store.  It's a
8  woman that owns it and the reps like
9  her.  So, you know, she probably
10 carries four or five pieces, six
11 pieces.
12     Q.   And you said you have 20 or
13 30 --
14     A.   At least.
15     Q.   -- at a given time?
16     A.   At least.
17     Q.   Are there any other approved
18 dealers around you?
19     A.   Not in San Antonio that
20 I'm -- not in San Antonio.  Not
21 approved dealers.
22     Q.   To your knowledge does Jason
23 Scott limit its dealer network?
24     A.   Absolutely.
25     Q.   Hill Country, are you an

Page 21

1  approved dealer?
2      A.   Absolutely.
3      Q.   All right.  Is it important
4  to you that that limitation is in
5  place?
6      A.   Extremely important.
7      Q.   Why is that extremely
8  important to you?
9      A.   Well, if Jason Scott was on
10 every -- like some manufacturers are,
11 if they're on every street corner
12 that -- the value just would not be
13 there as far as the customers'
14 perception.  It's kind of common sense.
15 I mean it's just not everywhere.  You
16 just can't find it everywhere.
17     I have customers that don't
18 want to wait six, eight, nine months.
19 They'll get on the telephone.  They'll
20 call around and try to find Jason Scott
21 dealers.  But it's such a -- it's a
22 pretty good sized collection so not
23 every store will have every piece.
24 It's just -- it's difficult to find.
25     Q.   So does that exclusivity

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES          (800) 246.4950

**William Holland**                                    6/28/2018

Page 22

```
1   affect your ability to sell it?
2        A.  It affects it in a positive
3   way, yes.
4        Q.  Right.  I mean it drives
5   sales to you?
6        A.  Absolutely.  Absolutely.
7   Yeah, because we're a Jason Scott
8   approved dealer and because we carry an
9   extensive line of inventory, any person
10  that calls Jason Scott or gets ahold of
11  a rep, that rep will refer that
12  customer to me if they're in that area,
13  if they're in our area.
14       Q.  Does Hill Country advertise
15  Jason Scott furniture?
16       A.  Yes, we have.
17       Q.  Where do you do
18  advertisements?
19       A.  Texas Monthly magazine,
20  Cowboys and Indians Magazine as well as
21  some local magazines in San Antonio.
22       Q.  Any TV ads?
23       A.  Not in San Antonio, no.  We
24  don't -- we haven't done TV in a number
25  of years.  I mean, maybe back in 2006
```

Page 23

```
1   and '07 and '08 we probably did some TV
2   advertising with it but that was a long
3   time ago.  TV is not part of my
4   advertising program.
5        Q.  How about social media?
6        A.  Yes.  Social media, yes.
7        Q.  Do you advertise Jason Scott
8   on social media?
9        A.  Yes.
10       Q.  Facebook or where?
11       A.  Facebook.
12       Q.  Cowboys and Indians,
13  that's -- we talked about that before
14  with other folks.  That's a national
15  magazine?
16       A.  It is a national magazine.
17       Q.  How often would you run an ad
18  with Jason Scott in it?
19       A.  I've run ads in that magazine
20  probably a half dozen times over the
21  years.
22       Q.  And any other more local
23  magazines about the same?
24       A.  About the same.
25       Q.  Do you know how much Hill
```

Page 24

```
1   Country pays in a given year to
2   advertise Jason Scott?
3        A.  I don't advertise Jason Scott
4   on a yearly basis, to be honest with
5   you.  An ad -- for example, I could be
6   focusing on a sofa in an ad and maybe
7   there's a Jason Scott piece in the ad.
8   I typically am pretty -- I don't give
9   out manufacturers' names over the
10  telephone to customers that call in.
11  Otherwise the customer from Arizona
12  that calls in hey, who has manufactured
13  that piece?  Oh, it's Jason Scott.
14  Well, they'll find it in Arizona.  In
15  San Antonio I get a lot of calls from
16  Dallas and Houston, for example.  I do
17  a major amount of business in Houston
18  or in Dallas.  In Dallas there's a
19  couple of large retailers that are
20  friends of mine that I know that they
21  also carry that.  So we're pretty
22  exclusive about that kind of thing, not
23  just with Jason Scott but that would
24  happen with any manufacturer especially
25  upholstery.
```

Page 25

```
1        Q.  So in your ad then you don't
2   have Jason Scott?
3        A.  I have.  I have before.
4        Q.  Uh-huh.
5        A.  I don't any more do it that
6   way, no.  I'll -- that's -- that's not
7   a good thing.
8        Q.  So to your knowledge then if
9   the customer is looking at an ad that
10  doesn't have a name in it, what is it
11  to your knowledge that drives that
12  customer to give you a call?
13       MR. GREEN:  Objection, form.
14       Q.  You can answer.
15       A.  There's not a line exactly
16  like Jason Scott that I'm aware of.
17  Usually when you have a product that's
18  in big demand you might see it
19  manufactured by another manufacturer
20  that's similar or whatever.  But they
21  just never have -- I have not seen a
22  product like Jason Scott's in all these
23  years.
24       Q.  So is it the look of the --
25       A.  It's the look, it's the
```

email@tobyfeldman.com
tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES
Certified WOB
(800) 246.4950

**William Holland**                                                   6/28/2018

---

Page 26

1   carvings.  It's the story behind the --
2   the story behind the product.  It's
3   pretty exclusive.  For example, before
4   we got to where we are today I would go
5   and travel to Arizona, New Mexico,
6   Colorado looking for new sources.  One
7   of my favorite stores -- and actually
8   we patterned our store after this
9   store -- is Robb & Stucky's.
10      Q.   In Phoenix?
11      A.   In Phoenix.
12      Q.   Why was that one of your
13  favorite stores?
14      A.   It was awesome.  I just
15  thought it was -- you know, way over my
16  head of course.  You know, a hundred
17  and what, 30,000 square foot store I
18  think it was.  But I just -- I loved
19  the store. I loved the product in the
20  store.
21      Q.   Did you see Jason Scott
22  there?
23      A.   That's when I first saw Jason
24  Scott but I couldn't source it out.  I
25  couldn't locate who the rep was.  I

---

Page 27

1   couldn't locate the manufacturer.  We
2   didn't have social media back then and
3   internet.  I couldn't find it and --
4       Q.   And the rep finally ended up
5   coming to you?
6       A.   One day years later, you
7   know.  And I said oh, I saw that in
8   that store.  I said that's how we --
9   that's how that connected.
10      MR. GREEN:  What was the name
11  of that store?
12      THE WITNESS:  Robb &
13  Stucky's.
14      MR. GREEN:  Robin?
15      THE WITNESS:  Robb, R-o-b-b.
16      MR. GREEN:  Oh, Robb.  Thank
17  you.
18      (Exhibit 1 marked)
19      MR. DIETRICH:  I have some
20  copies right here.
21      MR. GREEN:  Thank you.
22      Q.   I'm showing you what's been
23  marked Exhibit 1.  If you want to take
24  a minute and look through that.
25      A.   Okay.

---

Page 28

1       Q.   Do you recognize each of the
2   furniture pieces in Exhibit 1?
3       A.   I do.  I do.
4       Q.   These are Jason Scott pieces?
5       A.   They appear to be.
6       Q.   Does Hill Country sell each
7   of these pieces?
8       A.   We have sold -- On a regular
9   basis we sold all the pieces with the
10  exception of the first piece.
11      Q.   The desk?
12      A.   Uh-huh.  On a regular basis
13  we sell all those pieces.
14      Q.   Have you sold the desk in the
15  past?
16      A.   Oh, yeah.
17      Q.   And that's the Iron Star
18  desk?
19      A.   Right.
20      Q.   So are you personally
21  familiar with each of these three
22  pieces?
23      A.   I'm familiar with each one of
24  them.
25      Q.   How long has Hill Country

---

Page 29

1   been selling these three pieces?
2       A.   Several years.  The other
3   pieces I carry on a regular basis I
4   probably have on the floor right now.
5   But these are fairly new, you know,
6   they're not -- to my knowledge if my
7   memory serves me correctly these aren't
8   pieces I've been carrying for 15 years
9   because they're -- you know, we get new
10  product all the time, Jason comes up
11  with new product.  I'm guessing over
12  the last five years or so these tables,
13  the dining table, which has been a big
14  hit for us.  Maybe seven at the most.
15      Q.   So you said the dining table
16  has been a big hit?
17      A.   Oh, yeah.  And the Borgota
18  buffet a big hit.  I sell that.  I have
19  that on the floor for sure.
20      Q.   Customers like it?
21      A.   Uh-huh.  More importantly the
22  sales people like it.
23      Q.   Why is that?
24      A.   Sales people sell what they
25  like.  And we don't have anything else

---

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                  (800) 246.4950

**William Holland**                                    6/28/2018

Page 30

```
1   on the floor that's similar to this
2   product line.
3        Q.   In that regard you said
4   earlier that Jason Scott has a unique
5   look?
6        A.   Yes.
7        Q.   I guess can you explain a
8   little bit more about what in your view
9   makes a Jason Scott a Jason Scott.
10       A.   Well, they're solid wood,
11  number one.  And it's made out of teak.
12  So there's quite a mystique to that
13  particular line because I don't carry
14  any other product that has teak, and I
15  don't think many other retailers do as
16  well.  It's more of the Mediterranean
17  Tuscan type look which was a real
18  popular look for many, many, many,
19  many years.  And that's what we
20  actually cut our teeth on.  When we
21  opened our new store back in the early
22  2000s again we were carrying 50, 60
23  pieces at a time just on the floor.
24           And as far as being exclusive
25  to this line, one of the nice things
```

Page 31

```
1   about it is, you know, since there's
2   only just a few stores carrying it in
3   the San Antonio area, at that time we
4   didn't have to discount like we had to
5   in the past.  For example, now retail
6   is a pretty tough business, especially
7   the furniture store business.  We're
8   always having to do sales.  But with
9   Jason Scott we kind of limit it, you
10  know, the sale price, what we discount
11  because it's not really available
12  everywhere.
13       Q.   Are the carvings in this
14  furniture part of what you would view
15  as the Jason Scott look?
16       A.   Oh, absolutely.  Yeah,
17  absolutely.
18       Q.   Anything else that you would
19  say --
20       A.   And the hardware.
21       Q.   The hardware meaning, what,
22  for us non-furniture --
23       A.   The handles.  The -- what am
24  I looking for -- the --
25       Q.   Pulls?
```

Page 32

```
1        A.   Not the pulls, the -- my mind
2   is gone.  I've got a brain freeze here.
3        Q.   It happens in depositions.
4        A.   Yeah, the doors that are
5   attached to the --
6        Q.   The hinges?
7        A.   Yeah, the hinges.
8        Q.   So the design or -- the
9   design of the hinges?
10       A.   Yes.  They're thick, they're
11  heavy.
12       Q.   The three pieces that you're
13  looking at here is the look of those
14  pieces consistent with what you view as
15  the Jason Scott look?
16       A.   Yes.
17           MR. GREEN:  Objection,
18  leading.
19       A.   Yes.
20       Q.   Have you seen anyone else
21  make pieces that have that look like
22  Jason Scott's?
23       A.   On a regular consistent basis
24  or just over the years?
25       Q.   Over the years.
```

Page 33

```
1        A.   I've seen two people attempt
2   to copy this look, yes.
3        Q.   And who's that?
4        A.   One of them is a company by
5   the name of Adora.  They did a very
6   poor job, was doing it over in -- not
7   China but -- I'd have to check to see
8   where she's doing it at.  And the other
9   one is a company called Trendily.
10       Q.   Other than those two, have
11  you seen in your -- going to High Point
12  and looking at furniture --
13       A.   I don't see anything at High
14  Point.  I don't see anything in the
15  major market, no.  It's mostly maybe a
16  smaller market like Dallas or --
17       Q.   In your view is this look
18  unique to Jason Scott then?
19           MR. GREEN:  Objection, form,
20  leading.
21       A.   Yes.
22       Q.   And who would you consider
23  your main competitors here in San
24  Antonio?
25       A.   Stowers and Louis Shanks.
```

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES          (800) 246.4950

**William Holland**                                          6/28/2018

Page 34

1    Q.   Do either of them sell Jason
2  Scott?
3    A.   No.
4    Q.   If they did sell Jason Scott
5  would that affect your business?
6         MR. GREEN:  Objection, form.
7    A.   Yes.
8    Q.   How so?
9    A.   Getting back to exclusivity,
10  getting back to perceived value.  It
11  would -- This product is so popular
12  with my customers that if I -- for
13  example, say I'm carrying 40 pieces on
14  the floor, but the one piece they want
15  I don't have.  If there were other
16  retailers carrying that line they would
17  go -- before they place an order with
18  me for seven months out they would
19  check the other stores locally.
20    Q.   And maybe buy it there?
21    A.   Definitely buy it there.
22    Q.   Just looking at the first
23  picture there the Iron Star desk --
24    A.   Uh-huh.
25    Q.   -- there's this -- well, I

Page 35

1  guess an Iron Star design repeated on
2  it.  Do you see that?
3    A.   Yes.
4    Q.   Are you familiar with that
5  appearing in other Jason Scott
6  furniture?
7    A.   Yes.  I believe it's also on
8  the beds that he makes.
9    Q.   And have you seen that design
10  used by other --
11    A.   No.
12    Q.   -- furniture manufacturers?
13    A.   Just the Star design?
14    Q.   The metal work --
15    A.   No.
16    Q.   -- in that fashion?
17    A.   Like that, no.
18         (Exhibit 2 marked)
19    Q.   Let me show you what's been
20  marked Exhibit 2.  If you want to take
21  a minute you can look at those
22  photographs.  Do you recognize these
23  furniture pieces?
24    A.   Is there more than one piece
25  here?

Page 36

1    Q.   Yes.
2    A.   I recognize them.
3    Q.   Do you know who made them?
4    A.   Well, because I'm here for a
5  deposition yeah, I do know who made
6  them.
7    Q.   Can you explain that a little
8  bit more.
9    A.   Well, I haven't seen all of
10  these in person.  I have seen a couple
11  of the pieces either via pictures
12  through Trendily or actually in the
13  Dallas showroom.
14    Q.   So who made these pieces, to
15  your knowledge?
16    A.   Trendily.
17    Q.   And how do you know that
18  Trendily made them?
19    A.   Because I've had
20  conversations with Rahul as well as the
21  sales rep Chris.
22    Q.   Is there something in these
23  pictures themselves that allows you to
24  identify that these are Trendily
25  furniture?

Page 37

1    A.   Well, the chairs -- some of
2  the other pieces that are in the
3  picture are Trendily items.
4    Q.   But as far as the three
5  pieces we've been talking about, the
6  desk, the table and the buffet.
7    A.   Well, these are the three
8  pieces that actually were offered to me
9  and shown to me as pictures from the
10  sales rep.
11    Q.   By Trendily?
12    A.   Uh-huh.
13    Q.   In your view do they look
14  like Jason Scott pieces?
15    A.   Very close.  Very close,
16  yeah.
17    Q.   Is there anything you can
18  identify as a difference between the
19  appearance of the Trendily pieces and
20  the appearances of the Jason Scott
21  pieces?
22    A.   Not through just looking at
23  pictures, no.
24    Q.   How long have you known or
25  had a relationship with Trendily

William Holland                                                6/28/2018

Page 38

1    Furniture?
2        A.   Quite a few years actually.
3    I started out with Rahul a number of
4    years ago.  It's probably been -- I'm
5    just guessing, but probably eight or
6    ten years.
7        Q.   And who is Rahul?
8        A.   As far as I know he's the
9    owner of Trendily.
10       MR. DIETRICH:  The spelling
11   of that is R-a-h-u-l.  And we'll
12   probably go to his last name as
13   well which is Malhotra,
14   M-a-l-h-o-t-r-a.
15       Q.   So have you know Rahul the
16   whole eight or ten years?
17       A.   Oh, yeah.  I do business with
18   him currently.  I was with him this
19   weekend.
20       Q.   What kind of business does
21   Hill Country do with Trendily?
22       A.   Well, he's a manufacturer as
23   far as I know.  And so we buy --
24   primarily we buy dining room chairs
25   from him but we've bought many, many,

Page 39

1    many, many, many case goods from him
2    over the years.
3        Q.   Case goods has come up
4    before, but can you tell us what a case
5    good is.
6        A.   Things made out of wood.
7    Dining tables, coffee tables, end
8    tables, bedroom furniture.
9        Q.   And you still do business
10   with Trendily?
11       A.   I do.  Pretty much limited to
12   dining room chairs, to be honest with
13   you, but we do some buffets and things
14   with him as well.
15       Q.   Do you talk regularly with
16   Rahul?
17       A.   Define regularly.
18       Q.   How often do you talk with
19   Rahul on a given month or year?
20       A.   As often as I need to.  He
21   takes my calls and I've got his cell
22   number.  I try to do business strictly
23   through his sales rep Chris but, for
24   example, at market this past weekend
25   Chris was there, he's there.  But I've

Page 40

1    known Rahul for a number of years.  And
2    so he is the decision-maker.  So if I
3    need something like I needed this
4    weekend then I talk directly to him.
5        Q.   Chris is that Chris Sanders?
6        A.   It is.
7        Q.   So you talked with Rahul this
8    weekend?
9        A.   I did.  Saturday and Sunday.
10       Q.   And how long have you known
11   Chris?
12       A.   He started with Rahul
13   probably about five years ago.  I
14   didn't know him prior to that.
15       Q.   You've known him for about
16   five years then?
17       A.   About five years -- four or
18   five years, whenever he started with
19   Rahul.
20       Q.   How regularly do you see
21   Chris?
22       A.   We see him on a monthly
23   basis.
24       Q.   Does he call you as well?
25       A.   He calls the office, yes.  He

Page 41

1    doesn't necessarily talk to me but it's
2    either me or my manager.
3        Q.   Does Rahul come down and see
4    you in person?
5        A.   He has before.
6        Q.   You have a good relationship
7    with Rahul?
8        A.   I think I do.
9        Q.   At some point did you become
10   aware of Trendily manufacturing copies
11   of Jason Scott furniture?
12       A.   Yes.  Yes.
13       Q.   When did you first learn
14   about that?
15       A.   You know, I can hardly
16   remember what I had for lunch yesterday
17   so -- in the last three years or so.
18   Two or three years.
19       Q.   And how did you learn about        **FRE 602**
20   Trendily making the copies?
21       A.   Well, a couple of different
22   ways.  You know, I've heard it through
23   the grapevine in our little niche
24   market meaning retailers that are like
25   me in Texas.  Also through the sales

11  (Pages 38 to 41)

William Holland                                          6/28/2018

Page 42

1  rep and also through Rahul.
2      Q.   So the grapevine, you heard
3  it from another furniture retailer?
4      A.   Correct.
5      Q.   Do you know who that was?
6      A.   We talk on a regular ba -- I
7  talk on a regular basis with a lot of
8  them but it could have been Larry
9  Brumbaugh brought up the conversation.
10     Q.   Do you recall anything from
11 that conversation?
12     A.   No, I don't.
13     Q.   But you think Larry told you
14 about this happening?
15     A.   It could have been Larry.
16 You know, I have -- I've been in the
17 business for 27 years.  So whether I'm
18 talking to other store owners or other
19 sales people if I'm visiting their
20 stores or truck drivers or sales reps,
21 you know, it's kind of a you hear a
22 little here, you hear a little there.
23     Q.   Sure.
24     A.   But as far as confirmation
25 goes it's through Chris and/or Rahul.

Page 43

1      Q.   So you said one or the other
2  places you learned about it was the
3  rep.  That was Chris?
4      A.   Correct.
5      Q.   What did you learn from
6  Chris?
7      A.   That they're -- I don't
8  remember exact words -- but knocking
9  off Jason Scott.
10     Q.   Did you have a conversation
11 with Chris about that?
12     A.   A small conversation,
13 pictures, prices, lead times, things
14 like that.  More importantly pricing.
15     Q.   So can you just -- So Chris,
16 was that over the phone or in person?
17     A.   It was in person.  You know,
18 Chris -- they carry -- Rahul carries a
19 pretty extensive line of furniture.
20 And this is just something new that
21 they were getting into.  So it got my
22 attention because I have several -- San
23 Antonio is not a Dallas or Houston.
24 We've got a lot of smaller, for lack of
25 a better word, Mexican stores in town.

Page 44

1  And there's only one or two players --
2  or that I consider players in the San
3  Antonio area, in the suburbs.  So I
4  knew that if this -- you know, if he
5  was pushing this line it was going to
6  go to some of the smaller stores which
7  would be a problem for me as far as
8  price point goes.
9      Q.   What did Chris tell you about
10 pricing?
11     A.   I don't remember the exact
12 dollars but quite a bit less than what
13 I was going to be retailing the product
14 for.
15     Q.   And you said in your view
16 that would go to the smaller stores
17 then?
18     A.   It's gonna be to stores that
19 are not approved Jason Scott dealers.
20     Q.   And how would that be a
21 problem for you?
22     A.   Well, there's some people --
23 say you take 100 people.  Ten people
24 are probably gonna -- they're gonna buy
25 Jason Scott and only Jason Scott

Page 45

1  because of the name.  The other 90 --
2  the other 9 people or 90 people just
3  want the look at a lesser price.
4      Q.   And if a smaller store is
5  selling it for less what did you think
6  would happen?
7      A.   Well, one of two things is
8  gonna happen.  It's gonna cause me -- I
9  mean I really didn't have a choice, I
10 know what's gonna happen.  I'm gonna
11 have to carry both lines because I
12 couldn't carry just Jason Scott alone
13 because I'd get eaten alive.  There's
14 quite a bit of price difference.
15     Q.   So if people were buying the
16 less expensive one that would cut into
17 you carrying Jason Scott?
18     A.   Absolutely.  That was the
19 reason for my interest in this whole
20 thing.
21     Q.   You said Chris showed you
22 pictures?
23     A.   He did show me pictures.
24     Q.   And was that of these three
25 pieces we're looking at here?

12  (Pages 42 to 45)

**William Holland**                                                                 **6/28/2018**

Page 46

1    A.   You know, I don't remember if
2    the desk was -- I really don't
3    remember.  I know that the dining table
4    was one of them but they were starting
5    out, you know, with three pieces or so
6    and --
7        Q.   Did Chris tell you anything
8    else about their plans, Trendily's
9    plans?
10       A.   No, just other than they're
11   starting out with those three pieces.
12   And I just made the assumption that,
13   you know, they would probably expand to
14   other items as well.
15       Q.   And then you say you got
16   confirmation from Rahul?
17       A.   I had a conversation with
18   Rahul at the store once regarding those
19   pieces.
20       Q.   And this was after the
21   conversation with Chris?
22       A.   It actually could have
23   been -- very well even been the same
24   time.  They both came down together.
25   Usually Rahul will come down with

Page 47

1    Chris.
2        Q.   Do you remember what Rahul
3    told you about these pieces?
4        A.   No, other than that they were
5    working on the pieces and he planned
6    on -- Jason Scott's got quite a
7    reputation and not just amongst
8    retailers but amongst manufacturers.
9    And so you walk into these stores and
10   you see 20, 30, 40 pieces in some of
11   these walk in stores like myself or
12   Brumbaugh's or The Arrangement.  It's
13   common sense that, you know, this is a
14   line that could be significant to a
15   manufacturer if they could have a
16   product similar to this or exactly like
17   this.
18       Q.   Did Jason Scott come up in
19   your conversation with Chris and Rahul?
20       A.   Yes.  Oh, yeah.
21       Q.   Who brought up Jason Scott?
22       A.   I'll be honest with you, I
23   don't know if it was Chris or Rahul or
24   myself that used the name first, but in
25   the conversation we all knew what we

Page 48

1    were talking about.
2        Q.   Did they understand in your
3    view that these were copies of Jason
4    Scott?
5        A.   Oh, sure.
6            MR. GREEN:  Objection, form.
7        A.   Sure.
8        Q.   How do you know they
9    understood that?
10       A.   It was discussed that -- if I
11   remember -- hold on a second.
12       Q.   Sure, take your time.
13       A.   Yeah, this was a few years
14   ago so I don't remember the exact
15   terminology.  But in my discussions
16   with Chris and/or Rahul the name Jason
17   Scott came up on a number of different
18   occasions.  Finishes, carvings, things
19   like that.
20       Q.   To your knowledge did they
21   know you were an authorized Jason Scott
22   dealer?
23       A.   They knew I was.
24       Q.   I mean you had Jason Scott
25   pieces on your floor, right?

Page 49

1        A.   Yeah, it's hard -- hard to
2    miss it.
3        Q.   Well, did you ever buy any of
4    the copies from Trendily?
5        A.   No.
6        Q.   Why not?
7        A.   Well, primarily I've got a
8    relationship with Jason.  So as long as
9    there wasn't any -- I'm just gonna use
10   the term knockoffs -- around my store I
11   didn't plan on buying anything but
12   Jason Scott.  But if there was going to
13   be a lesser priced line that's exactly
14   like that then I knew that was gonna be
15   a problem.  So that was the reason for
16   my call to Jason that, you know, I
17   don't know what's going on in Dallas
18   and I don't know what's going on in
19   Fort Worth, in San Antonio it would be
20   a problem.
21       Q.   When you say knockoffs around
22   your store you mean in other --
23       A.   In other stores.
24       Q.   Near yours?
25       A.   Very close to me, yes.

13 (Pages 46 to 49)

email@tobyfeldman.com
tobyfeldman.com                    **Toby Feldman, Inc.**
                                   **NATIONWIDE SERVICES**                    Certified WOB
                                                                              (800) 246.4950

William Holland                                            6/28/2018

Page 50

1    Q.   If there were knockoffs at
2  other stores near you how would that
3  affect you?
4    A.   Well, I wouldn't be -- I
5  wouldn't -- I couldn't sell as much
6  product or get the price I need to get.
7    Q.   On the real Jason Scott?
8    A.   On the real Jason Scott.
9    Q.   And you said at some point
10 you called Jason about this?
11   A.   Yes.
12   Q.   Did you tell him about what
13 Trendily was doing?
14   A.   Uh-huh, or what I had heard
15 that they were doing.
16   Q.   And --
17   A.   I didn't consider it an issue
18 in the beginning until a couple of
19 other stores in the North Texas area
20 were carrying it, stores that I'm
21 familiar with, people that I know.
22 Once I knew they were involved then
23 that was my concern, not for the other
24 stores in North Texas but concern for
25 the product coming down into the South

Page 51

1  Texas area.
2    Q.   What other stores in North
3  Texas did you know of?
4    A.   Primarily Adobe Interiors and
5  Western Heritage.  Those are the only
6  two that I knew of.  Those are the only
7  two large stores in Texas other than
8  the arrangement with Brumbaugh's and
9  myself.  There's a lot of stores --
10 those are the ones I'm familiar with.
11   Q.   Uh-huh.  Adobe and Western
12 Heritage?
13   A.   Adobe Interiors and Western
14 Heritage.
15   Q.   Do you know whether they're
16 authorized Jason Scott dealers?
17   A.   They're not.
18   Q.   So they started carrying the
19 Trendily copies?
20   A.   I never -- you know, I don't
21 go to their stores.  I've only been to
22 Western Heritage once.  And I went to
23 Adobe Interiors once or twice but --
24 twice.  But so I never -- it's been --
25 I never actually went to their stores

Page 52

1  to go look because it didn't bother me,
2  it didn't concern me.  But I heard they
3  did.
4    Q.   You said in your years you've
5  seen two Jason Scott copies or copiers,
6  one being Trendily and one being Adora?
7    A.   Right.  And then I've also
8  heard -- I've seen a piece or two, some
9  pictures that customers have sent me,
10 some pieces out of Mexico but they
11 didn't --
12   Q.   How do, say, Adora copies
13 compare to Jason Scott originals?
14   A.   They didn't.  I actually saw
15 those in the market, the Dallas market.
16   Q.   I mean was it visibly
17 different?
18   A.   It -- Well, the finish was
19 not as nice, the carvings were not as
20 nice, the dimension were out of
21 proportion.
22   Q.   And you said there were other
23 copies made in Mexico?
24   A.   I saw some pictures of some,
25 yes.

Page 53

1    Q.   And what about those, did
2  they look like Jason Scott?
3    A.   No, they were made out of
4  pine.
5    Q.   Different wood?
6    A.   Yeah, a different wood
7  altogether.
8    Q.   A different appearance?
9    A.   Yeah, I mean, you know, you
10 can tell if it's -- you can tell
11 looking at the product made from
12 Mexico -- usually the finish is not as
13 good.
14   Q.   Were Trendily's copies
15 different somehow than those other ones
16 you've seen?
17   A.   The -- I have not -- let me
18 make sure I'm -- I have not actually
19 seen -- if I've seen a Trendily piece
20 I've only -- a knockoff I've only seen
21 one.  So I never actually went to the
22 stores in question that had that
23 product -- from what I understand they
24 had that product on the floor.  So I
25 never have actually touched and felt

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                         NATIONWIDE SERVICES                    (800) 246.4950

William Holland                                      6/28/2018

Page 54

1  that piece.  I've heard that, you know,
2  they're really good pieces.
3       Q.   And you've seen pictures?
4       A.   Oh, I've seen pictures --
5  just what Chris had shown me, yeah.  Or
6  I actually went on the website once.
7  Somebody said hey, there's some pieces
8  on the website, but I think it was
9  actually these pieces if I'm not
10 mistaken.
11      Q.   From those pieces did you get
12 a sense of whether it looked like Jason
13 Scott?
14      A.   It looked like it.  You've
15 got to touch it and feel it and see it.
16      (Exhibit 3 marked)
17      Q.   I'm showing you what's been
18 marked Exhibit No. 3.  If you just
19 want to take a minute and give it a
20 look.  We're gonna go over some of
21 these emails.  And I apologize if the
22 detail is excruciating, but I just want
23 to ask you some questions about the
24 statements in the emails.
25      A.   Yeah, I remember that.

Page 55

1       Q.   So let me ask you --
2       A.   Sure.
3       Q.   -- a question first --
4       A.   Sure.
5       Q.   -- and you just give the
6  answer.
7       A.   Sure.
8       Q.   So do you recognize the email
9  string here in Exhibit 3?
10      A.   Yeah.
11      Q.   And the email at the bottom,
12 it's dated May 24th, 2017, it looks
13 like it's from Jason --
14      A.   Uh-huh.
15      Q.   -- to you?
16      A.   Uh-huh.
17      Q.   Do you recall receiving that
18 email?
19      A.   I do.
20      Q.   And the email above that, May
21 30th, 2017.  Did you send that email to
22 Jason?
23      A.   Uh-huh.
24      Q.   Billh@hillcountryinteriors --
25      A.   Uh-huh.

Page 56

1       Q.   -- is your email address?
2       A.   Uh-huh.
3       Q.   Is that a yes?
4       A.   Yes.
5       Q.   That's one of those that --
6       A.   I'm sorry.  I'm reading and
7  listening at the same time.  Yes.
8       Q.   That's one of those other
9  deposition things is when you say yes
10 or no say yes or no --
11      A.   Okay.
12      Q.   -- not uh-huh or uh-uh.
13      A.   Okay.
14      Q.   It's hard for her to type
15 that down.  Thanks.  So in Jason's
16 email to you he states:  Mark said the
17 Trendily guy called you?
18      A.   Yes.
19      Q.   Do you know what Mark he's
20 referring to?
21      A.   Yes, Mark is the Texas sales
22 rep.
23      Q.   For Jason Scott?
24      A.   Correct.
25      Q.   Did you talk to Mark about

Page 57

1  Trendily calling you?
2       A.   Yes.  Actually -- Yes.
3       Q.   The Trendily guy is that
4  Rahul?
5       A.   You know, I'll be honest with
6  you, I don't know if it was Rahul or
7  Chris.  I was getting pricing on a
8  couple of pieces.  It was probably
9  Chris.
10      Q.   And so going up to the --
11 your email to Jason.
12      A.   Uh-huh.
13      Q.   In the second sentence you
14 stated:  Raul thought that you may be
15 wanting to talk to him according to
16 his --
17      A.   Yeah, I saw -- I saw that.
18 And I'm trying to remember who -- That
19 was an opinion that somebody gave me.
20 Because what I couldn't understand in
21 a -- in my position is if Jason has got
22 copyrights -- if that's the correct
23 word, or exclusivity -- and I can't
24 remember who mentioned that to me but
25 they were under the impression that

email@tobyfeldman.com                 Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                    (800) 246.4950

**William Holland**                                         6/28/2018

---

Page 58

1   maybe Rahul was expecting a call from
2   Jason to maybe offer him some money.
3   Someone had told me that.
4         Q.   So you wrote -- and let me
5   finish reading --
6         A.   Sure, sure.
7         Q.    -- what you wrote here and
8   then I'll ask you about it. Raul
9   thought that you may be wanting to talk
10  to him according to his sources that
11  day you were there and possibly
12  offering him money to not manufacture
13  this collection.  Is that what you
14  wrote?
15        A.   I had wrote that yeah, it's
16  right there.
17        Q.   And do you recall talking
18  with Rahul about Jason Scott --
19        A.   Actually --
20        Q.    -- coming into his warehouse?
21        A.   Actually I don't think
22  that -- I know -- I do remember -- I
23  think Rahul -- yeah, Rahul did talk to
24  me about that.
25        Q.   What specifically did Rahul

---

Page 59

1   say?
2         A.   I think Rahul was a little
3   pissed that Jason came to the shop
4   without declaring who he was.
5         Q.   So Rahul said that --
6         A.   He recognized --
7         Q.    -- Jason came in?
8         A.   Yeah, he said he recognized
9   him. Chris did not recognize him.  I
10  think Jason went in and maybe used
11  another name, I don't know, but he
12  didn't say who he was when he walked in
13  the door.
14        Q.   In the Trendily shop?
15        A.   Correct.
16        Q.   Did Rahul say how he
17  recognized Jason?
18        A.   I think he just recognized --
19  He didn't.  I don't remember if it was
20  maybe out of the catalog.  He knew his
21  face.
22        Q.   And what did Rahul tell you
23  about Jason possibly offering him
24  money?
25        A.   Actually Rahul is not the one

---

Page 60

1   that said that.  Someone else mentioned
2   that to me and I don't remember who
3   that -- who that was.  But he did -- he
4   thought that maybe Rahul was -- Rahul
5   just was expecting a phone call or
6   expecting a contact or expecting some
7   type of communication regarding some
8   money, but Rahul is not the one that
9   told me that.
10        Q.   Do you know who told you
11  that?
12        A.   I don't remember who told me
13  that.
14        Q.   And offering him money to not
15  manufacture this collection.  Which
16  collection are you referring to?
17        A.   The Jason Scott Collection.
18        Q.   The copies?
19        A.   Yes.
20        Q.   So do you think Rahul wanted
21  Jason to pay him to stop copying the
22  furniture?
23             MR. GREEN:  Objection,
24        leading.
25        A.   Actually -- actually I can't

---

Page 61

1   say that.  That was just -- someone had
2   told me that.  And I don't remember who
3   that was.  It could have been a truck
4   driver.  I just don't remember.
5         Q.   And next to that you wrote:
6   His price points are significantly less
7   than your pricing based on two examples
8   he gave me.
9         A.   Right.
10        Q.   And is that what you were
11  talking about earlier, the meeting with
12  Chris and Rahul?
13        A.   Yes.
14        Q.   And that was where you got
15  the pricing information?
16        A.   Correct.  Yeah, I believe I
17  got it from Chris.
18        Q.   Below that you said:  The rep
19  is actually due in our office today.
20        A.   Right.
21        Q.   If I should find anything
22  else, I will email you.
23        A.   Correct.
24        Q.   Is the rep -- is that Chris?
25        A.   That's correct.

---

16 (Pages 58 to 61)

**William Holland**                                    6/28/2018

Page 62

```
 1        Q.  Do you know if he came in
 2   that day?
 3        A.  Do I know if he came in that
 4   day?
 5        Q.  Yes.
 6        A.  I can't say if he did or he
 7   didn't.  I don't really remember.  If
 8   he did come in and I found out anything
 9   that would affect Hill Country
10   Interiors then I probably would have
11   emailed Jason.
12        Q.  I think we may have that
13   email but we will see.
14            (Exhibit 4 marked)
15            (A brief pause had)
16        Q.  Do you have two copies there?
17   Oh, no, that's your prior.  If you
18   would, just take a minute and look over
19   Exhibit 4.
20            (A brief pause had)
21        A.  Okay.
22        Q.  Do you recognize the email
23   string that's in Exhibit 4?
24        A.  I do.
25        Q.  And going back to the second
```

Page 63

```
 1   page you have an email from Jason, it
 2   looks like to you, on June 24th 2017.
 3   Do you see that?
 4        A.  Uh-huh.
 5        Q.  Do you recall getting that
 6   email?
 7        A.  I do.
 8        Q.  Jason is essentially asking
 9   you what's going on with Trendily?
10        A.  Uh-huh.
11        Q.  And you responded:  Can you
12   call me Jason?  right above that.  Do
13   you see that?
14        A.  Uh-huh.
15        Q.  Did you write that to Jason?
16        A.  Uh-huh.
17        Q.  Did you have a phone
18   conversation with Jason after you sent
19   that?
20        A.  I wouldn't doubt if I did.  I
21   mean we talked -- you know, I've got
22   his cell number, he's got mine.
23        Q.  Do you know at this point if
24   you had learned more about what
25   Trendily was doing?
```

Page 64

FRE 802
FRE 602

```
 1        A.  I had heard -- Well, just to
 2   confirm what I put in the email right
 3   here that's what I had learned -- or
 4   that's what I had heard.  Again, I
 5   didn't personally go up to those
 6   stores, so I can't say for sure they're
 7   in there but that's what I heard.
 8        Q.  So you say to Jason -- and
 9   this is at the top of the first page --
10   and we are gonna have to go through
11   this in some detail:  Yes, they are
12   doing many of your items apparently.
13   Are you referring to Trendily?
14        A.  Yes.
15        Q.  And are they copying many
16   Jason Scott items?
17        A.  That was the impression that
18   I had.
19        Q.  Where did you learn that
20   from?
21        A.  You know, I can't -- I don't
22   remember if that was actually from
23   Chris as far as -- not using the word
24   copying, but this is where they were in
25   the Western Gallery -- Western Heritage
```

Page 65

```
 1   Gallery -- or if it was through someone
 2   else.
 3        Q.  Do you know who else you
 4   might have learned it from?
 5        A.  I don't.
 6        Q.  Rahul?
 7        A.  Probably not Rahul.  It
 8   either would have been Chris or maybe
 9   another retailer.
10        Q.  So you state after that:
11   They're actually opening up a 2500 --
12        A.  That's what I'd heard.
13        Q.  -- foot gallery in Western
14   Heritage beginning with 28 different
15   pieces that are on the water.
16        A.  That's what I had heard.
17        Q.  That's pretty specific
18   information about the gallery size and
19   the pieces on the water.
20        A.  Yes.
21        Q.  Who did you hear that
22   information from?
23        A.  I can't say for sure but I
24   believe it was Chris.
25        Q.  What specifically did he tell
```

email@tobyfeldman.com
tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES

Certified WOB
(800) 246.4950

William Holland                                          6/28/2018

Page 66

1      you?
2          A.   Exactly what's in here.
3          Q.   Now, for us people that
4      aren't in furniture regularly --
5          A.   Uh-huh.
6          Q.   -- you said opening up a
7      2500 -- I would imagine you mean square
8      foot --
9          A.   Yes.
10         Q.   -- gallery in Western
11     Heritage?
12         A.   Yes.
13         Q.   What does that mean?
14         A.   Well, Western Heritage -- and
15     again I've only been there one time --
16     they've got a couple of different
17     locations side by side.  So 2500
18     square -- it would be a 2500 square
19     foot area where they'd only have Jason
20     Scott items only in that area to make
21     an impact.
22         Q.   Did they kind of place those
23     in a setting like a bedroom or a dining
24     room?
25         A.   Yes.

Page 67

1          Q.   And is that what happens in a
2      gallery like that?
3          A.   Yes.  You have to have a
4      large enough store to be able to do
5      that and they do apparently.
6          Q.   And so Chris said they were
7      gonna have a gallery just for Jason
8      Scott copies?
9          A.   Correct -- Ah, I don't know
10     if he used the word copies but --
11         Q.   For these pieces?
12         A.   Yes.
13         Q.   And 28 different pieces that
14     are on the water?
15         A.   That's what I'd heard.
16         Q.   Twenty-eight -- copies of 28
17     different pieces or --
18         A.   I don't have the answer to
19     that.
20         Q.   I mean, could it have been
21     28 --
22         A.   It could have been different
23     pieces or it could have been three
24     pieces -- you know, 28 pieces, you
25     know, maybe ten pieces apiece.

Page 68

1          Q.   Okay.  That was my question.
2          A.   Yeah.
3          Q.   So it could have been ten
4      copies of a table and --
5          A.   It could have been.
6          Q.   And eight copies of a desk
7      and ten of something else?
8          A.   Right.
9          Q.   On the water.  What does that
10     mean?
11         A.   Meaning once it's finished --
12     the manufacturing was complete over
13     whatever country it's coming from they
14     put it on a container and put it on the
15     water to the U.S.
16         Q.   Following that you state:
17     Western Heritage has sold 6-8 tables
18     like the one they have on the floor and
19     is on the website.
20         A.   Correct.
21         Q.   Are those the copies of the
22     Sacred Heart dining table?
23         A.   Yes.
24         Q.   Who told you that?
25         A.   You know, I don't remember

Page 69

1      for sure.  I'm assuming that it was
2      probably Chris but I can't tell you for
3      sure.
4          Q.   Do you talk to the owner of
5      Western Heritage?
6          A.   I don't.  Never met him.
7          Q.   Do you know who he is?
8          A.   Tammy and somebody, her
9      husband.  I've only been there one time
10     and they weren't there when I came by.
11         Q.   Is there anywhere else you
12     could have gotten information about
13     Western Heritage selling tables,
14     Trendily tables, other than Chris?
15         A.   Probably Chris or Rahul or a
16     truck driver.
17         Q.   Somebody --
18         A.   Yes.
19         Q.   -- Trendily related?
20         A.   Not necessarily.  There's a
21     couple of local drivers in Texas that
22     deliver to not just us, I'm sure,
23     but -- or us meaning Western Heritage,
24     all these stores.  That's what they do
25     for a living, just use the same truck

18  (Pages 66 to 69)

William Holland                                    6/28/2018

Page 70

```
 1    drivers.  There's two or three truck
 2    drivers that we all use.  And when they
 3    come I'm always asking hey, what's on
 4    the truck, where have you been, who's
 5    doing business, what are they buying,
 6    those kinds of things.
 7        Q.  Getting intel?
 8        A.  Absolutely.
 9        Q.  The next thing you wrote
10    there in that email is:  The two
11    containers on the water are presold
12    have been slightly delayed due to
13    weather.  Do you see that?
14        A.  Uh-huh.
15        Q.  Did that information come
16    from Chris?
17        A.  I don't know who it came from
18    exactly but that's a good possibility.
19        Q.  When a container is presold
20    what does that mean?
21        A.  You know, it can mean a
22    couple of things.  It could mean that
23    the store has committed to buying the
24    two containers, which is -- I'm
25    assuming that's what that meant.
```

Page 71

```
 1    Because it would be very unusual to
 2    have two containers presold to
 3    customers unless you're just doing a
 4    heck of a lot of business and that's --
 5    I guess that's a possibility.
 6        Q.  With Trendily being a
 7    manufacturer would it be more likely
 8    they would presell something to a
 9    retailer rather than an end customer?
10        MR. GREEN:  Objection,
11    leading.
12        A.  I don't think that Rahul
13    would be selling to an end customer.  I
14    think he would be selling to a
15    retailer.
16        Q.  And two containers.  Do you
17    know about how many of these pieces a
18    container would hold?
19        A.  Well, for example, upholstery
20    is about a hundred seats.  But these
21    containers probably -- I'm just
22    guessing, and I just had a container
23    come in the other day from another
24    manufacturer.  It could be any where
25    from -- Jason's stuff is not cheap so
```

Page 72

```
 1    it's probably $60,000 a container maybe
 2    or more.
 3        Q.  And these desks and tables
 4    are certainly bigger than a chair?
 5        A.  Right.
 6        Q.  Can you estimate about how
 7    many pieces you might fit in a
 8    container?
 9        A.  You know, they do about a
10    cube so -- and I've never bought a
11    container.  There's not -- I don't get
12    a discount from Jason for buying the
13    container so I just buy out of the
14    warehouse by the piece.  So I'm not
15    really sure how many pieces of his
16    would fit in a container but I wouldn't
17    be surprised if it was, you know, 50
18    pieces maybe.  And I don't know if
19    they --
20        Q.  And --
21        A.  -- come that way or not -- if
22    they're complete or if they're not and
23    put together in Arizona.  So there's a
24    lot of variables involved there.
25        Q.  And to your knowledge you
```

Page 73

```
 1    were told two containers were coming in
 2    that had already been sold?
 3        A.  Correct.  Yeah, to a
 4    retailer.  Yeah.  And I don't know if
 5    that was just to Western Heritage or if
 6    that was to Western Heritage and Adobe
 7    Interiors but it was one of those two
 8    is what I'd heard.
 9        Q.  And do you think Chris told
10    you that?
11        A.  It could have been.
12        Q.  Or Rahul?
13        A.  I doubt it was Rahul.
14        Q.  So in a more detailed -- with
15    more detailed information like this --
16        A.  This information here was
17    with the pricing and stuff, so it had
18    to come from Trendily which probably
19    was Chris.
20        Q.  I guess that was my question.
21    If you had detailed information from
22    Trendily it seems like you're saying
23    that was more likely to come from
24    Chris?
25        A.  Probably, yeah.
```

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES          (800) 246.4950

**William Holland**                                                     6/28/2018

Page 74

```
 1          Q.   Your next statement there
 2    then is:  He has had a very strong
 3    dealer interest and intends on
 4    increasing his selection at price
 5    points far below JS.  I assume you mean
 6    Jason Scott?
 7          A.   Uh-huh.
 8          Q.   Did somebody tell you that
 9    Trendily had very strong dealer
10    interest?
11          A.   I think that's just common
12    sense.  In other words, those two
13    dealers -- specifically I know Adobe
14    Interiors for sure just because
15    Tanner -- who is the owner's son -- had
16    contacted me once about buying some
17    Jason Scott -- a dining table from me,
18    which I didn't sell to him.
19          MR. GREEN:  Let me stop.  Can
20    you repeat that.  I didn't -- I
21    couldn't hear that.
22          (The record was read as
23    requested.)
24          MR. GREEN:  Thank you.
25          A.   It's a known fact that those
```

Page 75

```
 1    two dealers there, Western Heritage and
 2    Adobe Interiors, very good stores, nice
 3    people, they're not approved Jason
 4    Scott dealers, though.  And so they
 5    would love to get their -- they'd love
 6    to get -- they'd love to be Jason Scott
 7    dealers and/or get Jason Scott
 8    look-alikes.
 9          Q.   And below that -- or you said
10    intends on increasing his selection.
11    Did you mean --
12          A.   Well, they start out with
13    these three pieces here.  As far as I
14    know that's what Chris had told me that
15    that's the three pieces.  And so you
16    can't just do those three -- you know,
17    long term you're not gonna do just
18    those three pieces.  Stores aren't
19    going to put in a gallery of 2500
20    square foot with just three choices.
21          MR. GREEN:  Objection,
22    nonresponsive.
23          Q.   So if a store is going to put
24    in a gallery what did that mean to you?
25          A.   That means the --
```

Page 76

```
 1          MR. GREEN:  Objection, form.
 2          A.   In my opinion that means
 3    there's gonna be quite a few other
 4    pieces coming down the pipeline.
 5          Q.   And you have the pricing
 6    information there, specific prices for
 7    each of these three Trendily pieces?
 8          A.   Yes.
 9          Q.   Where did you get that
10    information from?
11          A.   Chris.
12          Q.   Below that you stated:  I
13    know that his customers will be the
14    smaller dealers or dealers that do not
15    have your line.  You talked about that
16    earlier, right, that's the -- you were
17    concerned with smaller dealers?
18          A.   Yeah, most of the smaller
19    dealers they can't carry Jason Scott
20    even if they could just because Jason
21    Scott's pieces are so large and they're
22    expensive.  But because this is
23    exclusivity in who carries it, it's
24    going to be the smaller dealers that --
25    that carry it.  The exception being
```

Page 77

```
 1    good stores like Western Heritage and
 2    -- you know, there's several good
 3    stores in that Fort Worth area and
 4    there's only one that has a dealership.
 5    And so the other three or four stores
 6    there --
 7          Q.   The dealership with Jason
 8    Scott?
 9          A.   Uh-huh.
10          Q.   So like would it be
11    Brumbaugh's?
12          A.   Brumbaugh's has exclusive --
13    they're exclusive there.  They do a lot
14    of business and the other stores want a
15    piece of that business.
16          Q.   And right next to that --
17    we're almost done with this email.
18          A.   Okay.
19          Q.   -- you state:  Based on the
20    above price examples, this could be a
21    serious issue for Jason Scott dealers
22    at current pricing.
23          A.   Correct.
24          Q.   I understand we've already
25    covered some of this but why did you
```

**William Holland**                                                      6/28/2018

---

Page 78

1  write that?  Why did you feel that this
2  could be a serious issue?
3        A.   Well, for example, that
4  Bogata buffet if that -- if the
5  knockoff is going for $1400 and the
6  Jason Scott original is going for
7  $2000, for example, that's about a
8  $2000 retail difference.
9        Q.   And does that mean that the
10 other stores -- and you've said this --
11 could sit there and sell the knockoff
12 for cheaper?
13       A.   Absolutely.
14       Q.   Did that scare you?
15       A.   Quite a bit.
16       Q.   Why?
17       A.   Because Jason Scott is a
18 pretty good size of my revenue at the
19 store.  That's what separates us
20 from -- you know, stores like mine
21 that's what separates us from other
22 stores is having unique items.
23       Q.   Did you feel like having
24 these knockoffs on the market could cut
25 into your revenue?

---

Page 79

1        A.   Yes.  Well, it would force me
2  to do one of two things.  It would
3  force me to purchase the Trendily
4  collection as well or to drastically
5  cut back my inventory and/or cut back
6  my inventory of the Jason Scott
7  collection.
8        Q.   So it could cause you to buy
9  less Jason Scott --
10       A.   Buy less, yes.
11       Q.   -- if you had those knockoffs
12 out there?
13       A.   Correct.
14       Q.   If it caused you to buy the
15 Trendily collection -- I'm curious --
16 if you had say both these desks on your
17 floor, one price a lot lower than the
18 other, could you feasibly do that?
19       A.   That's a good question.  I'd
20 try.
21       Q.   You said before that nine out
22 of ten people go for the look and maybe
23 one out of ten would go for the name?
24       A.   Yeah.
25       Q.   So if --

---

Page 80

1        A.   That's just my opinion.  You
2  know, by the time somebody purchases a
3  home and they put in the swimming pool
4  and they do the landscaping, when they
5  come to get the furniture if there's a
6  way to cut corners sometimes they'll
7  cut corners.  Maybe not on the pieces
8  that you sleep on or the pieces that
9  you sit on but all your accent pieces.
10 If you've got a piece that looks
11 identical to another piece they might
12 tend to go the lower price point.
13       (Exhibit 5 marked)
14       Q.   So this is one last email on
15 the string that we looked at --
16       A.   Okay.
17       Q.   -- in the last exhibit.
18 Don't worry, I'm not gonna ask you
19 about that whole thing again, but I am
20 gonna ask you about that email at the
21 top.  Do you recognize that email?
22       A.   I do recognize that one.
23       Q.   And did you send that to
24 Jason?
25       A.   Yes.

---

Page 81

1        Q.   And that's June 28th, 2017?
2        A.   Uh-huh.
3        Q.   Jason -- right below that --
4  do you see his email to you?
5        A.   Yes.
6        Q.   Do you recall receiving that?
7        A.   I do.
8        Q.   He asked you a question about
9  whether Trendily understands I have my
10 designs in furniture protected with
11 copyrights.
12       A.   Yes.
13       Q.   Do you see that?
14       A.   Yes.
15       Q.   And you responded:  I asked
16 him that.  Who did you ask?
17       A.   That's Rahul.
18       Q.   So you had a conversation
19 with Rahul about --
20       A.   Uh-huh.
21       Q.   -- copyrights?
22       A.   Not copyrights but I did
23 ask -- well, I guess it would be
24 copyrights.  But I asked how he could
25 not -- you know, is he not concerned

---

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES                   (800) 246.4950

William Holland                                    6/28/2018

Page 82

```
 1   about the legalities involved in
 2   something like that.  And his response
 3   is what I put in the email.
 4        Q.   What did he respond?
 5        A.   He's using a different teak,
 6   not using your name or likeness in his
 7   marketing, et cetera.  And then the
 8   U.S. -- I won't say that he said there
 9   was no protection but in the U.S.
10   that's not enforceable.
11        Q.   You were talking with Rahul
12   specifically about these Jason Scott
13   knockoffs?
14        A.   Just Jason Scott pieces in
15   general.
16        Q.   When did that conversation
17   happen?
18        A.   Well, that's probably the
19   same day that I wrote the email.
20        Q.   And was that in person or by
21   phone?
22        A.   It was in person.
23        Q.   At your store or --
24        A.   At my store.
25        Q.   So Rahul came into your
```

Page 83

```
 1   store.  You talked to him about Jason
 2   Scott copies?
 3        A.   We were talking about a lot
 4   of things.  That's just one of the
 5   things that was in the conversation.
 6        Q.   What else did he say about
 7   the copies Trendily was making?
 8        A.   That was it.
 9        Q.   Did he ever say that he
10   wasn't copying the designs at all?
11        A.   No, he didn't say that.
12        Q.   He said he was using a
13   different teak?
14        A.   Yes.
15        Q.   What kind of -- did he
16   describe that at all?
17        A.   He did have a name for it but
18   I don't remember what the name was.
19   But Jason uses a teak that's indigenous
20   in Bali or that part of Indonesia.  And
21   Rahul manufactures in another country
22   so different teak.
23        Q.   Did Raul acknowledge that the
24   designs of the furniture were the same?
25        A.   No, he -- I don't recall if
```

Page 84

```
 1   we talked about that specifically.  But
 2   if you were sitting here -- I mean,
 3   I've got 40 pieces of Jason Scott
 4   pieces of furniture in my store.  So if
 5   we're talking about Jason Scott it's
 6   common sense that we're just talking
 7   about Jason Scott pieces.
 8        Q.   Is there any doubt in your
 9   mind that Rahul knew that he was
10   copying Jason Scott?
11        MR. GREEN:  Objection, form.
12        A.   There's no doubt in my mind.
13        Q.   Did you believe what Rahul
14   told you?
15        A.   In regards to the legalities?
16        Q.   The enforceability or not
17   enforceability.
18        A.   I really didn't know because
19   I just sell furniture for a living.
20   And, of course, I see this -- being so
21   close to Mexico I see this kind of
22   thing all the time.  Typically it's in
23   one month and gone the next month and
24   that's the end of the story.  This one
25   just seemed to be going on and on and
```

Page 85

```
 1   on and --
 2        Q.   So at this point you've
 3   got -- Rahul has told you Jason can't
 4   enforce protection over his designs?
 5        A.   He didn't think it was
 6   enforceable in the United States, no.
 7        Q.   You've been told that Western
 8   Heritage is opening a full gallery of
 9   Jason Scott knockoffs?
10        A.   That's what I heard.
11        Q.   And that there's gonna be 28
12   other pieces coming in?
13        A.   Uh-huh.
14        Q.   Yes?
15        A.   Yes.
16        Q.   And that the pricing of those
17   Trendily pieces is a lot lower than
18   Jason Scott?
19        A.   At least on those three
20   pieces, yes.
21        Q.   And from what you've seen in
22   the photos the quality is good?
23        A.   Yes.
24        Q.   And you've heard that as
25   well?
```

22 (Pages 82 to 85)

**William Holland**                                    **6/28/2018**

Page 86

1      A.   Yes.
2      Q.   How did all those things make
3   you feel about continuing in business
4   with Jason Scott?
5      A.   Well, as I said, I knew our
6   relationship was gonna be changing if
7   other stores are gonna be carrying
8   Jason Scott knockoffs, for lack of a
9   better word.
10      Q.   Did --
11      A.   I have a big investment in
12   Jason Scott as a retailer because of
13   the advertising, because of the number
14   of pieces we have on the floor, the
15   length of our relationship.  So it was
16   concerning to me.  I knew Trendily had
17   already -- Chris had already gone out
18   and talked with, for example, Calamity
19   Janes, which is the other dealer in
20   Boerne, Texas.  And she carries Jason
21   Scott, a few pieces, you know,
22   several -- four or five pieces.  I've
23   never even been in to her store to be
24   honest with you, but I know her, I've
25   met her a couple of times.  But I've

Page 87

1   heard that's how many pieces she
2   carries in the store.  And she's taken
3   a few sales from me every now and then.
4   But I knew that Chris -- I heard that
5   Chris had even approached her about
6   carrying the Trendily product.
7      Q.   And you said you could see
8   your relationship with Jason Scott
9   changing if these knockoffs spread.  Do
10   you see significantly reducing orders
11   to Jason Scott?
12           MR. GREEN:  Objection, form.
13      A.   Of course.
14      Q.   Are you aware that around
15   August last year the knockoffs got
16   pulled from the market?
17      A.   I probably heard that.  Like
18   I said a few moments ago, I wasn't even
19   sure that I actually even saw a
20   piece -- as a matter of fact, I'm not
21   sure I even saw a piece at market.  I
22   heard there was a piece there at one
23   time.
24      Q.   Oh, market is a place?
25      A.   Market meaning Dallas.

Page 88

1      Q.   Oh, okay.
2      A.   In the World Trade Center.
3      Q.   Is that at Trendily's place?
4      A.   At Trendily's place, yeah.  I
5   never saw -- You know, the market is in
6   June.  The two main markets they're
7   open -- the two markets that retailers
8   actually come and visit is typically
9   January and June.  So that's not to say
10   that I didn't go in August to do
11   something else there and maybe go up
12   and visit or whatever, but I don't
13   recall.  To my knowledge I can't recall
14   ever seeing a piece in his showroom.
15      Q.   So when I say market, sorry,
16   I meant market more broadly.
17      A.   Oh, okay.
18      Q.   That the pieces got taken off
19   the market.
20      A.   Yeah, you know, I did hear
21   that.  And I don't know who I heard it
22   from.  But I heard, for example, Adobe
23   Interiors promptly backed away pretty
24   quickly once attorneys got involved
25   but, again, that's hearsay.

Page 89

1           (Exhibit 6 marked)
2      Q.   I'll show you what's been
3   marked Exhibit 6.  It looks like an
4   email that you sent to Jason?
5      A.   Uh-huh.
6      Q.   Do you recognize that?
7      A.   I do.
8      Q.   Did you send it to Jason on
9   September 23rd, 2017?
10      A.   Yes.
11      Q.   And you're ordering more
12   Jason Scott in this email, right?
13      A.   Right.
14      Q.   And you state in the email:
15   Your line seems to have really picked
16   up down here.  Do you see that?
17      A.   Uh-huh.
18      Q.   And to your knowledge was
19   this after the knockoffs were pulled
20   off the market?
21      A.   I'm not sure there's a
22   relationship there.  Jason Scott's
23   pieces, like a lot of pieces, go in
24   cycles.
25      Q.   Uh-huh.

23 (Pages 86 to 89)

William Holland                                              6/28/2018

Page 90

1      A.   I may not sell a Jason Scott
2  piece for two weeks, then I may have
3  one person come in and buy ten pieces,
4  but that's the reason for that comment.
5      Q.   Did you notice any effect on
6  sales after the knockoffs went away?
7      A.   Not in San Antonio.  I didn't
8  have the issue with knockoffs in San
9  Antonio at this time.  I was just
10 covering my base because if they
11 were -- if what I heard was true, you
12 know, from Rahul and Chris as well as
13 other retailers, truck drivers going
14 into the North Texas area, if it was
15 gonna be coming down this way then I
16 knew that -- you know, I was just
17 trying to prepare.
18      (Exhibit 7 marked)
19      Q.   This is a more recent email,
20 Exhibit 7.  If you would just take a
21 minute and look at it.
22      A.   Uh-huh.
23      Q.   Do you recognize this email
24 string?
25      A.   Oh, yeah.

Page 91

1      Q.   At the bottom Jason is asking
2  you -- And this is April 16th, 2018?
3      A.   Uh-huh.
4      Q.   -- about Trendily Furniture
5  and mentions that you called him
6  yesterday.  Do you see that?
7      A.   Say it again, please.
8      Q.   Jason writes: Do you know
9  who has seen the photos of the Trendily
10 items that they are trying to change up
11 the carving that you called me about
12 yesterday?
13      A.   Okay.
14      Q.   Do you see that?
15      A.   Uh-huh.
16      Q.   Did you call Jason?
17      A.   You know, I don't recall.  If
18 he said I did I probably did.
19      Q.   Do you recall calling Jason
20 from the High Point point market?
21      A.   I do recall.
22      Q.   And why did you call him from
23 High Point?
24      A.   I probably ran into somebody
25 there that -- some more information.

Page 92

1  See, I just thought this thing was
2  blown over, to be honest with you,
3  because I hadn't heard from Jason.  I
4  hadn't heard anything from Chris.  I
5  hadn't heard anything about anything.
6  As a matter of fact, I think I may have
7  mentioned that to you on the telephone
8  that I was -- I was going what the
9  heck.
10      Q.   And here you are.
11      A.   Here we are a frickin' year
12 later.  And I thought for sure this had
13 just died and gone away.
14      Q.   Right.
15      A.   So someone at market must
16 have talked to me about carvings and
17 things like that.  And so apparently
18 Jason was saying that I guess Tanner
19 had given him some information.  And I
20 don't know Tanner.  I know his dad, met
21 him a couple of times.  Tanner's a
22 great guy from what I understand, but
23 Tanner's also the guy that, you know,
24 tried to buy some Jason Scott pieces
25 from me a while back.  And so I just --

Page 93

1  I'm just at the point where you know
2  what, I wouldn't trust anybody.
3      Q.   So is that Tanner Dipple?
4      A.   I don't know the last -- This
5  is the last name, yes.
6      Q.   From Adobe?
7      A.   Uh-huh, from Adobe.
8      Q.   Do you know what his dad's
9  name is?
10      A.   Jerry, I believe.
11      Q.   So you wrote back to Jason:
12 I wouldn't trust Tanner.  He's the one
13 that tried to buy d/t from me a while
14 back --
15      A.   Dining table.
16      Q.   Dining table.  When did that
17 happen?
18      A.   Oh, gosh, I'm not -- about
19 12, 15 months ago.  It's been a while.
20      Q.   And what happened there with
21 Tanner trying to buy a dining table?
22      A.   Actually he was very nice.
23 He just called one day just asking if a
24 had a certain dining table in stock.
25 And, you know, he was just trying to

email@tobyfeldman.com        Toby Feldman, Inc.          Certified WOB
tobyfeldman.com              NATIONWIDE SERVICES         (800) 246.4950

William Holland                                    6/28/2018

Page 94

1    sell it to -- he had a customer that
2    had a need for it.  And the only -- the
3    only dealer up in that area is Larry
4    Brumbaugh.  And I've got a good
5    relationship with him so -- and I
6    wouldn't sell one to another retailer
7    anyway that was not an approved dealer.
8    I've traded things for people with
9    other dealers, you know, sold back and
10   forth occasionally.  Very seldom
11   actually.  Most of the dealers once
12   they get their pieces they don't wanna
13   trade back and forth but I've done it
14   before in the past, but not with a
15   non-dealer.
16       Q.  Was this a Sacred Heart
17   dining table, do you recall?
18       A.  I don't recall.
19       Q.  If he's gonna buy it from you
20   they have a customer that they're gonna
21   resell it to?
22       A.  Right.
23       Q.  You wrote then to Jason about
24   Tanner:  He is the one that was on the
25   text with another friend of mine.  I

Page 95

1    believe/think he has seen the
2    carvings... possibly in person?
3        A.  Right.
4        Q.  What carvings are you talking
5    about there?
6        A.  Jason Scott carvings.  I
7    don't know what -- I don't remember
8    what pieces but --
9        Q.  Are these new pieces of
10   furniture or the same pieces that we've
11   talked about?  And we're in the spring
12   of 2018.
13       A.  I couldn't tell you that.
14   Maybe just talking about carvings in
15   general.
16       Q.  Have you heard anything about
17   Trendily making new versions of the
18   Jason Scott copies?
19       MR. GREEN:  Objection, form.
20       A.  Apparently I had heard that
21   they were going to do some things that
22   were gonna be different, that would be
23   a little bit different from Jason's,
24   yeah.
25       Q.  In a new version?

Page 96

1        A.  In a new version, yeah.  I
2    was not under the impression they were
3    even still continuing to manufacture
4    Jason Scott pieces.  Like I said, I
5    thought this thing had died and gone to
6    heaven.
7        Q.  And do you know who you heard
8    about the new versions from?
9        A.  It was on that email I had
10   seen on somebody's phone at High Point.
11       Q.  Do you know who?
12       A.  I do know but I'm not gonna
13   give that name --
14       Q.  All right.
15       A.  -- because he doesn't have
16   anything to do with any of this.
17       Q.  So you see --
18       A.  He's another manufacturer.
19       Q.  Understood.  You saw
20   photographs of Trendily furniture?
21       A.  I don't know if I saw
22   photographs or just emails.
23       Q.  Regarding Trendily's new
24   manufacturing?
25       A.  Yes.  And if you'll read

Page 97

1    there it says I believe or I think that
2    he has seen the carvings... possibly
3    in person.
4        So that's the reason I said I
5    didn't actually see the carvings on
6    the -- on the telephone, I just read
7    some stuff in an email.
8        Q.  And that's Tanner who you
9    think has seen them in person?
10       A.  Yeah, could have.
11       Q.  Okay.  Other than Tanner
12   approaching you about the table, have
13   any other retailers tried to buy Jason
14   Scott --
15       A.  No.
16       Q.  -- from you?
17       A.  No.
18       Q.  Are you aware of Trendily --
19   you have a fairly long history with
20   them?
21       A.  Uh-huh.
22       Q.  Are you aware of Trendily
23   copying anyone else's furniture --
24       A.  Yeah, I think that's kind
25   of --

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES          (800) 246.4950

William Holland                                            6/28/2018

Page 98

```
1          Q.   Let me finish before --
2          A.   Okay.
3          Q.   Are you aware of them copying
4     anyone else's furniture besides Jason
5     Scott?
6          A.   Manufacturers such as Rahul
7     from time to time -- for example, say
8     you got a special order of six
9     barstools from a manufacturer like
10    Hancock & Moore barstools.  Say they're
11    $2000 apiece cost and you've got an
12    order of six barstools.  Maybe you get
13    a manufacturer such as Rahul or someone
14    else to do it for maybe $1200 cost.  So
15    that's -- you know, there may be some
16    changes in those kinds of things.  In
17    other words, a lot of manufacturers
18    won't do any customizations at all.  So
19    if you've got a -- if you want the
20    barstool to be three inches higher or
21    four inches wider or you don't want
22    nailheads then you try to find a
23    manufacturer that will do that for you.
24         Q.   And has Rahul done that for
25    Hill Country in the past?
```

Page 99

```
1          A.   One time.
2          Q.   And how did --
3          A.   And actually it wasn't even
4     really for me.  He had manufactured --
5     he showed me a barstool -- or no, Chris
6     showed me a barstool that was -- that I
7     kind of liked.  Actually I haven't sold
8     them, I still have them in the store.
9     So I think it's a Hancock & Moore
10    barstool actually and I still haven't
11    sold them, so poor choice on my part.
12         Q.   But Trendily copied a Hancock
13    & Moore barstool?
14         A.   Supposively.  I hadn't even
15    seen the barstool before with Hancock &
16    Moore.  I just liked the concept.  I
17    think in conversation he said yeah,
18    it's a Hancock & Moore barstool that
19    they knocked off for so and so.  And I
20    said okay, let me try it.
21         Q.   Chris said that?
22         A.   Uh-huh.
23         Q.   Are you aware of Trendily
24    copying any other furniture designs?
25         A.   Not me specifically but it's
```

Page 100

```
1     just general knowledge.  That's kind
2     of -- it's not unusual for that to
3     happen in the marketplace, whether it
4     be a small player like Rahul or a large
5     manufacturer.
6          Q.   Is there general knowledge
7     that Trendily is someone that does that
8     copying?
9          A.   Oh, I don't want to use the
10    word copying but I said he'll do some
11    customizations for you.
12         MR. DIETRICH:  That's all the
13    questions I have for you but I
14    would imagine Chuck probably has
15    some so thank you.
16         MR. GREEN:  I do have a few
17    questions for you, Mr. Holland.
18         THE WITNESS:  Can we take a
19    break for just one second?
20         MR. GREEN:  That's a good
21    idea.
22         (Recess from 11:27 to 11:32)
23         EXAMINATION
24    By Mr. Green:
25         Q.   Mr. Holland, I have just a
```

Page 101

```
1     few questions for you before we end our
2     deposition.  It sounds like the
3     furniture business is like a lot of
4     other businesses, if you've been in it
5     a long time you have access to lots of
6     individuals who are also in the
7     business and you get rumors going
8     around about different things all the
9     time?
10         A.   Of course.
11         Q.   And in this case I'm not sure
12    I'm a hundred percent clear.  Have you
13    actually seen one of these --
14         A.   I have not.
15         Q.   Let me finish the question.
16         A.   Okay.
17         Q.   That's what I thought you
18    were gonna say --
19         A.   Okay.
20         Q.   -- but let me finish the
21    question.  You haven't actually seen
22    any of these Trendily manufactured
23    pieces that are being called the Jason
24    Scott knockoffs?
25         A.   In person, no.
```

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                         NATIONWIDE SERVICES                   (800) 246.4950

**William Holland**                                      6/28/2018

Page 102

```
1      Q.   Okay.  You've seen some
2  pictures?
3      A.   Pictures.
4      Q.   Okay.  And from the pictures
5  you've seen they look like quality
6  furniture?
7      A.   Yeah.
8      Q.   Yeah.  And you said earlier
9  that there had been -- you'd seen other
10 attempts from Dora?
11     A.   Adora.
12     Q.   Adora?
13     A.   Uh-huh.
14     Q.   Okay.  Is that a company --
15     A.   It's a --
16     Q.   -- located where?
17     A.   Well, she's located in
18 Dallas --
19     Q.   Okay.
20     A.   -- but I can't remember what
21 country.  I think it -- it's either
22 Egypt or China or something, I don't
23 remember.
24     Q.   Okay.  And you've seen --
25     A.   I've seen one of her -- a
```

Page 104

```
1  different understanding about some of
2  the issues we're dealing with here,
3  about whether there's protection for
4  copyrights or different intellectual
5  property?
6          MR. DIETRICH:  Objection,
7  form.
8      A.   I guess there could be.
9      Q.   Yeah.  Has that been your
10 experience?
11         MR. DIETRICH:  Objection,
12 form.
13     A.   I don't think I have the
14 experience in that area to really
15 answer yes or no.
16     Q.   Okay.  I guess another area
17 that you would encounter, being in the
18 furniture business a long time, is that
19 you deal with sales people all the
20 time, right?
21     A.   Absolutely.
22     Q.   And just like any other
23 business, when you get into visiting
24 with salesmen there's puffing sometimes
25 involved, exaggeration, right?
```

Page 103

```
1  couple of her pieces in the Dallas
2  market center, yes.
3      Q.   What about this term
4  knockoffs.  What generally does that
5  mean?
6      A.   Well, knockoff to me means a
7  replica of the original piece.
8      Q.   And so you see knockoffs
9  frequently in the furniture business,
10 right?
11     A.   I do.
12     Q.   Yeah.  It's common -- Is it
13 more common in some parts of the world
14 than it is here in the United States?
15     A.   What do you mean by that?
16     Q.   Well, do you find -- because
17 you mentioned Mexico a couple of times,
18 that there would be a Mexican copy that
19 the quality wasn't the same.  But has
20 that been your kind of experience?
21     A.   The majority of the times the
22 knockoffs or copies are probably done
23 in other countries, yes.
24     Q.   Okay.  And other countries --
25 in other countries they may have a
```

Page 105

```
1      A.   Oh, of course.
2      Q.   You expect that, right?
3      A.   By the sales people and the
4  manufacturers.
5      Q.   And so if the sales person
6  tells you that it's just selling like
7  crazy then he's trying to help sell the
8  product to you, right?
9      A.   Yes.
10         MR. DIETRICH:  Objection,
11 form.
12     A.   Of course.
13     Q.   Yeah.  So you don't take --
14 you don't take what they tell you about
15 that as being the gospel truth?
16     A.   No.
17         MR. DIETRICH:  Objection,
18 form.
19     Q.   Right?
20     A.   No, I don't.
21     Q.   And you take it with a grain
22 of salt?
23     A.   Yes.
24     Q.   Always have, right?
25         MR. DIETRICH:  Objection,
```

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com              NATIONWIDE SERVICES          (800) 246.4950

William Holland                                                    6/28/2018

Page 106

```
 1        form.
 2        A.   Yes.
 3        Q.   But probably the longer
 4   you're in the business the more that's
 5   true?
 6        A.   Yes.
 7        Q.   Is it true that there's some
 8   products generally that you've seen in
 9   your experience that may get less
10   expensive with time because
11   manufacturing improvements allow them
12   to manufacture it less expensively?
13        MR. DIETRICH:  I'll object to
14     the form.
15        A.   If it's a domestic product
16   not very often.
17        Q.   Okay.  Maybe there's a
18   distinction between a non-domestic.
19   Explain to me what you're thinking.
20        A.   Products -- the majority in
21   my opinion -- The majority of the
22   products manufactured in the U.S. are
23   more expensive than the products
24   manufactured overseas.
25        Q.   Okay.  And so it may not be
```

Page 107

```
 1   uncommon to have an overseas
 2   manufacturer be able to manufacture a
 3   product and do it at a lower cost?
 4        A.   Absolutely.
 5        Q.   Yeah.  And I guess this is
 6   not talking about furniture but just
 7   sometimes there's innovations in
 8   products like LED lights?
 9        A.   Correct.
10        Q.   And you've seen LED light
11   bulbs that a few years ago were very
12   expensive and now they're reasonable in
13   cost price, right --
14        A.   Yes.
15        Q.   -- whether it's because the
16   manufacturing processes overseas or
17   because other developments in
18   technology have you seen similar type
19   instances in furniture over the years?
20        MR. DIETRICH:  Objection,
21     form.
22        A.   I would think so.
23        Q.   The Jason Scott line of
24   furniture that you've handled for a
25   long time is high end furniture?
```

Page 108

```
 1        A.   Yes.
 2        Q.   Quality furniture?
 3        A.   Yes.
 4        Q.   And the buyers who buy it
 5   have to have the means to pay high end
 6   prices?
 7        A.   Correct.
 8        Q.   You've been talking about the
 9   fact that there's exclusive dealerships
10   in the sense that you -- like, for
11   instance, in San Antonio are you the
12   only one that handles JS products?
13        A.   Currently -- to my knowledge
14   currently in San Antonio, specifically
15   San Antonio.
16        Q.   Do you have a written
17   agreement with Jason --
18        A.   No.
19        Q.   -- Jason Scott?
20        A.   No.
21        Q.   Sometimes you get frustrated,
22   it sounds like, at the slow production
23   time that it takes to get Jason Scott
24   products from the manufacturing
25   facilities to your showroom?
```

```
 1        A.   It's a challenge.
 2        Q.   Yeah.  If there was a quicker
 3   production process would you be able to
 4   sell more of his tables, products or
 5   furniture?
 6        MR. DIETRICH:  Objection,
 7     form.
 8        A.   Probably.  The benefit is not
 9   so much more production.  The benefit
10   is -- for example, today I placed an
11   order let's say for $50,000 worth of
12   Jason Scott product based upon buying
13   habits and what I have currently in
14   stock.  Seven months down the road
15   those buying habits have changed and my
16   stock has changed but I committed to X
17   number of pieces.  But fortunately
18   Jason Scott's product is so much in
19   demand that I've only canceled one
20   order in my entire life with Jason.
21   But furniture companies across the
22   United States -- since one-third of all
23   furniture stores have gone out of
24   business the last five or six years,
25   Jason has had some cancelations.  And
```

email@tobyfeldman.com                  Toby Feldman, Inc.                      Certified WOB
tobyfeldman.com                       NATIONWIDE SERVICES                    (800) 246.4950

William Holland                                                      6/28/2018

Page 110

1  so it behooves people like me who like
2  to buy right out of a current stocklist
3  that I can just get in a week or two.
4      Q.  Right.  The quicker the
5  turnaround for production the better
6  off it is for you as a retailer?
7      A.  Sure.  Sure.
8      Q.  Have you had conversations
9  with Jason Scott before about is there
10 any way you can speed up the process?
11     A.  Not with Jason, no.
12     Q.  And I guess the fact if you
13 have slower production, that that in
14 itself can help with the exclusivity of
15 the product?
16     A.  Well, I'm not sure who it
17 helps but it's a pretty exclusive
18 product as it is --
19     Q.  Right.
20     A.  -- so --
21     Q.  Is part of that reason
22 because you can only get it in one
23 spot, one place?
24     A.  No, I think the reason for
25 the exclusivity -- although that

Page 111

1  probably doesn't hurt -- but I think
2  the exclusivity is just the story
3  behind the product.  I think it's the
4  quality, I think it's the carvings.
5  There's just not any other product like
6  it that I'm familiar with.
7      Q.  Right.  So that's what I'm
8  talking about --
9      A.  Yeah.
10     Q.  -- the exclusive -- the
11 exclusivity of it is related to the
12 fact that you can only get it at one
13 place, right --
14         MR. DIETRICH:  Object to the
15 form.
16     Q.  -- at Jason Scott?
17     A.  That specific product yeah,
18 you can only get it at Jason Scott.
19     Q.  And only a limited number of
20 pieces are made?
21     A.  No, the pieces are unlimited
22 but it just takes time to get 'em.
23     Q.  Yeah, okay.  So if you
24 wanted -- I saw in one of these emails
25 you made an order of 20 or said you

Page 112

1  were about to order 20 pieces?
2      A.  Uh-huh.  That's actually a
3  small order.
4      Q.  Yeah, okay.  What would be a
5  big order?
6      A.  Six to eight months ago I
7  placed an order for about one hundred
8  and something thousand.
9      Q.  Uh-huh.  When you say 20
10 pieces that's 20 pieces of furniture,
11 right?
12     A.  (Witness nods head).
13     Q.  And when you say a one
14 hundred --  you said $100,000?
15     A.  Uh-huh.  20 pieces might be
16 20-to-$30,000.
17     Q.  Uh-huh.  And that's different
18 kind of pieces, we're not talking about
19 the bigger tables and stuff like that?
20     A.  We're just talking every
21 piece you've got.
22     Q.  Yeah.
23     A.  Coffee tables, end tables,
24 bedroom furniture.
25     Q.  I'm gonna show you the -- and

Page 113

1  let's compare side by side.  Let's use
2  the exhibits.  So you're looking at
3  your exhibits.
4      Exhibit No. 1 is the Jason
5  Scott pictures of his pieces, correct?
6  Do you have that?
7      A.  Uh-huh.
8      Q.  The Iron Star desk.  And then
9  if you flip into it -- I believe that's
10 the -- what is that?
11     A.  Bogota buffet.
12     Q.  Okay.  And you carry that one
13 too, right?
14     A.  I do.
15     Q.  And then the last one is
16 the --
17     A.  Yes.
18     Q.  -- the table, right?
19     A.  Yes.
20     Q.  The Sacred Heart table?
21     A.  Yes.
22     Q.  And then you testified
23 earlier that Exhibit 2 shows pictures
24 of the pieces of furniture that were
25 made by Trendily, right?

29 (Pages 110 to 113)

**William Holland**                                                    6/28/2018

<table>
<tr><td valign="top">

Page 114

1     A.   Correct.
2     Q.   And that's because -- that's
3  based on really you having seen
4  pictures before, you've never actually
5  seen the furniture yourself, right?
6     A.   That's correct.
7     Q.   If you look at the first
8  picture or first page of each of the
9  Exhibits 1 and 2.
10     A.   Uh-huh.
11     Q.   It's showing the desk, right?
12     A.   Correct.
13     Q.   And the picture here on
14  Exhibit No. 2, the Trendily one, you
15  see the part where I'm pointing to on
16  the Trendily desk?
17     A.   Uh-huh.
18     Q.   And there's a circular carved
19  area on the Jason Scott version, right?
20     A.   Yes.
21     Q.   They're different aren't
22  they?
23     A.   They are.
24     Q.   And the iron work that you
25  see on there, the scrolled iron work,

</td><td valign="top">

Page 116

1  form.
2     A.   In the photograph it appears
3  that way.
4     Q.   And if you look at the
5  nailheads that are on it they look
6  different too, don't they?  They look
7  like they're bigger.
8         MR. DIETRICH:  Objection,
9  form.
10     A.   I'm not sure.
11     Q.   Does it look to you like the
12  tabletop on the Jason Scott version
13  might be a little bit thicker?
14     A.   I couldn't tell.  It's one of
15  those things where you have to touch
16  and feel and see it in person.
17     Q.   Unfortunately the best we've
18  got right now are the pictures that
19  we're looking at.  Still looking at the
20  table, the bottom part of the pedestal
21  has nailheads on the Jason Scott
22  version, right?
23     A.   Correct.
24     Q.   And it does not on the
25  Trendily version, correct?

</td></tr>
<tr><td valign="top">

Page 115

1  is similar but it's different on the
2  two pieces.  Do you see that?
3     A.   Right.
4     Q.   And then if you flip into the
5  picture a little bit, let's look at the
6  table, any one of those.  Can you just
7  look at the pictures of the table.
8  Exhibit No. 2 has a picture of a table
9  that we're looking at now, correct?
10     A.   Uh-huh.  Yes.
11     Q.   And you're looking at -- on
12  Exhibit No. 1 -- a Jason Scott table
13  there too, right?
14     A.   Correct.
15     Q.   Does it look to you like
16  the -- I don't know what they call
17  this --
18     A.   The apron?
19     Q.   Yeah, is that the apron
20  underneath it?
21     A.   Uh-huh, yes.
22     Q.   The apron is a little
23  thicker, wider on the Trendily piece,
24  isn't it?
25         MR. DIETRICH:  Objection,

</td><td valign="top">

Page 117

1     A.   Correct.
2     Q.   And it's hard to tell from
3  these pictures, and if you can't let me
4  know, but the carving is similar but if
5  you look at it it's not identical?
6     A.   Correct.
7         MR. DIETRICH:  I'll object to
8  form on that one.
9     Q.   Can you tell much about the
10  comparison of color from the two
11  photographs -- from the Exhibit 1
12  photographs and the Exhibit 2
13  photographs?
14     A.   No, you can't.
15     Q.   And is that because really
16  the Exhibit 1 photographs aren't
17  showing true color?
18         MR. DIETRICH:  Objection,
19  form.
20     A.   I don't know.  I just know
21  that that looks like a photograph or
22  something that is printed off on a
23  laser jet or something so you can tell
24  the lighting is different.
25     Q.   Okay, that's fair enough.

</td></tr>
</table>

email@tobyfeldman.com                 Toby Feldman, Inc.                  Certified WOB
tobyfeldman.com                       NATIONWIDE SERVICES                (800) 246.4950

**William Holland**                                      **6/28/2018**

---

Page 118

1    But you understood from talking I think
2    with -- I don't know if it was Rahul or
3    Chris -- but the wood is different.
4    They use an India teak wood --
5        A.   That's what I heard.
6        Q.   -- on the Trendily piece,
7    right?
8        A.   That's what I heard.
9        Q.   And the teak wood that is
10   used on Jason Scott is from Indonesia?
11       A.   Indonesia.
12       Q.   If we talk about furniture
13   generally we're looking at the Jason
14   Scott desk.  And it's got a functional
15   desktop that can be used for work -- as
16   a work surface, right?
17       A.   Correct.
18       Q.   It's got a place where the
19   legs go, you can sit at the desk,
20   right?
21       A.   Yes.
22       Q.   It's got drawers and stuff
23   that have functional use, right?
24       A.   Yes.
25       Q.   Those are all functional

---

Page 119

1    items that relate to the product's
2    utility, right?
3        A.   Correct.
4        Q.   There are certain carvings on
5    these products that has the effect of
6    increasing the price?
7        A.   Correct.
8           (Cell phone rings)
9           MR. GREEN:  Do you need to
10   take a break?
11          THE WITNESS:  No, this is my
12   daughter so I've got to take this
13   call.
14          (Recess from 11:50 to 11:51)
15       Q.   Earlier in the deposition you
16   said that you had some kind of -- when
17   you first started with buying Jason
18   Stone furniture that you had -- Jason
19   Scott furniture, I'm sorry, that you
20   had like a $10,000 buy in?
21       A.   You've got to remember that's
22   16 years ago so I think I did spend
23   $10,000 -- maybe $10,000.
24       Q.   That's to start off the
25   relationship --

---

Page 120

1        A.   Correct.
2        Q.   -- that you need to buy a
3    certain amount of furniture?
4           MR. DIETRICH:  Objection,
5    form.
6        A.   I don't remember if that was
7    a prerequisite then.  I just remember
8    that I did buy $10,000.
9        Q.   Okay.
10       A.   Which back then $10,000 might
11   as well have been a million.
12          (A brief pause had)
13       Q.   Can you get Exhibit No. 3?
14   It's the April 30th email.  The portion
15   at the top --
16       A.   Uh-huh.
17       Q.   -- that top part of the email
18   where it says:  Raul thought that you
19   may be wanting to talk to him according
20   to his sources that day you were there
21   and possibly offering him money to not
22   manufacture this collection.
23       A.   Uh-huh.
24       Q.   I forgot.  Was that something
25   that someone else had told you that

---

Page 121

1    Rahul said or that wasn't --
2        A.   I don't remember if they said
3    that was what Rahul said or that was
4    just their opinion that concerned that
5    comment.
6        Q.   But that information came
7    from someone else?
8        A.   Somebody else.
9           MR. DIETRICH:  Objection,
10   form, misstates testimony.
11       Q.   Let's go to Exhibit No. 4.
12   This is the June 27th and 26th and 24th
13   email thread.
14       A.   Okay.
15       Q.   Take a look at it so you'll
16   recall which one we're talking about.
17   Someone had told you that Western
18   Heritage was thinking of a 2500 foot --
19   square foot gallery for these Trendily
20   pieces, correct?
21       A.   Correct.
22       Q.   Now, at first you said you
23   didn't remember who said that.  Later
24   on you said it might have been Chris.
25       A.   Uh-huh.

---

email@tobyfeldman.com                    Toby Feldman, Inc.              Certified WOB
tobyfeldman.com                        NATIONWIDE SERVICES              (800) 246.4950

William Holland                                                    6/28/2018

Page 122

1    Q.   You don't really remember
2  which of those is correct on that
3  information up there, right?
4    A.   I don't.
5    Q.   Now, later on you do have
6  pricing information.
7    A.   Correct.
8    Q.   Do you know what the cost --
9  what your cost would be on a Jason
10 Scott version of the buffet table?
11   A.   I don't know.
12   Q.   More than $1399?
13   A.   Yes.
14   Q.   I think you used an example
15 of $2000 or so.
16   A.   That's probably a pretty
17 close guess.
18   Q.   Yeah.  And then how about the
19 desk?
20   A.   You know, the desk to be
21 honest with you is not one of my
22 favorite pieces so I have no idea on
23 that.
24   Q.   Okay.
25   A.   The dining table -- which is

Page 123

1  one of my favorite pieces -- I don't
2  know the -- it's only an eight foot
3  table so I -- and I typically carry
4  larger pieces than that.  So I don't
5  know.  I can't give you a cost
6  comparison on that.
7    Q.   Okay.  The Sacred Heart
8  dining table --
9    A.   Yes.
10   Q.   -- that you carry is like a
11 120 inch?
12   A.   Yeah, we do a lot of ten --
13 we do a lot of ten and 12 foot.
14   Q.   Okay.
15   A.   I mean we've special ordered
16 the eight foots before but I don't put
17 it in the store.
18   Q.   Go to Exhibit No. 5.
19   A.   Okay.
20   Q.   This is the one where you are
21 exchanging emails with Jason Scott
22 about Trendily's reaction on the
23 legalities of the question --
24   A.   Okay.
25   Q.   -- right?

Page 124

1    A.   Yes.
2    Q.   And I wasn't sure as I was
3  listening to you of the information
4  that you were giving Jason about
5  Rahul's viewpoints.  Was that based
6  upon you hearing it from Rahul or was
7  it from someone else?
8    A.   That was Rahul.
9    Q.   Okay, it was Rahul on this
10 occasion.  And you make the statement
11 that you're not knowledgeable about the
12 legalities of these kind of things?
13   A.   That's correct.
14   Q.   You've been in the business
15 for 27 years, right?
16   A.   That's correct.
17   Q.   Okay.  And you don't know
18 whether that's the same case with Rahul
19 or not, right?
20   A.   I don't know.
21   Q.   Okay.  I want to go back just
22 a second to the Exhibit No. 4, the
23 previous email we were talking about.
24 When I was talking to you at the first
25 part of my questioning I was asking you

Page 125

1  questions about puffing by salesmen --
2    A.   Uh-huh.
3    Q.   -- that Western Heritage has
4  sold six to eight tables.
5    A.   Uh-huh.
6    Q.   And, of course, we've already
7  established you don't remember exactly
8  where that information came from,
9  right?
10   A.   Correct.
11   Q.   One of the possibilities was
12 Chris.  But if Western Heritage never
13 purchased from Trendily more than five
14 pieces, they certainly couldn't have
15 sold six to eight, right?
16   A.   Right.
17         MR. DIETRICH:  Objection,
18   form.
19   A.   Correct.
20   Q.   Back again on number 6.
21 We've kind of --
22   A.   Okay.
23   Q.   Back again on number 6 you
24 made the statement in your email at the
25 top that business had picked up on

email@tobyfeldman.com                Toby Feldman, Inc.              Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES            (800) 246.4950

Page 126

1    Jason Scott stuff in the San Antonio
2    area about that time period, right?
3       A.  Uh-huh.  Uh-huh.
4       Q.  Is that yes?
5       A.  Yes.  Sorry.
6       Q.  That's common over the times
7    that you've represented and sold Jason
8    Scott furniture that there's cycles in
9    the business like any other business,
10   right?
11      A.  Yes.
12      Q.  And it remains -- his
13   business remains strong now?
14      A.  Yes.
15      Q.  Your sales of Jason Scott
16   pieces remains strong now, right?
17      A.  Correct.
18      Q.  And from your perspective
19   there's been no impact whatever on your
20   sales --
21      A.  That's correct.
22      Q.  -- from the Trendily
23   knockoffs, if they're knockoffs?
24      A.  That's correct.
25      Q.  Okay.  Turn to Exhibit No. 7

Page 127

1    just for a second.
2       A.  Okay.
3       Q.  This is the April of 2018 --
4       A.  Okay.
5       Q.  -- email.  If I understand
6    what you were saying earlier, while you
7    were at High Point -- a High Point show
8    you talked to some other manufacturer
9    who was giving you the information that
10   is in this email?
11      A.  Correct.
12      Q.  It's not from your personal
13   knowledge?
14      A.  No.
15      Q.  And you haven't seen
16   photographs or anything else of
17   carvings?
18      A.  No.
19      Q.  You've seen no emails?
20      A.  That's correct.
21      Q.  You mentioned -- I was a
22   little bit concerned -- confused about
23   when you were talking about Trendily's
24   location in Dallas and whether or
25   not -- is it at the -- is it at the

Page 128

1    market or -- does he show stuff at the
2    market?
3       A.  Yes.  Actually I don't
4    recall -- I can't remember the last
5    time I was even at Trendily's corporate
6    office or warehouse office.  It's been
7    a number of years.  It's probably not
8    even the same place where I went and
9    saw him ten or 15 years ago.
10      Q.  Do you remember where it was
11   then?
12      A.  You know, if I remember
13   correctly -- You're talking about his
14   warehouse?
15      Q.  Yeah, I guess.  Does he have
16   an office in addition to a warehouse
17   or --
18      A.  You know, I think his office
19   and warehouse is in the same place.
20   But I think when I saw it -- and again
21   this was a long time ago I think -- I
22   want to say Arlington but I could be
23   dead wrong.  I know he's not there now
24   but I've never been to his office.
25      Q.  You are not aware of Trendily

Page 129

1    attempting to sell these pieces that
2    we've been talking about since what,
3    August of 2017?
4       A.  No.
5       MR. GREEN:  That's all I
6    have.  Thank you.
7          (12:02)
8          RE-EXAMINATION
9    By Mr. Dietrich:
10      Q.  I just have a couple more
11   follow-up questions.  We'll get you
12   back to your daughter here in just a
13   sec.
14      A.  No big deal.  Do me a favor,
15   keep me here all day.
16      Q.  I don't want to be here all
17   day so -- I want to go back to Exhibit
18   3.
19      A.  Okay.
20      Q.  I'm now a little confused.
21      A.  Okay.
22      Q.  It was my understanding that
23   you said Rahul himself told you that
24   Jason had come into the Trendily store?
25      A.  He has told me that, yes.

email@tobyfeldman.com          Toby Feldman, Inc.              Certified WOB
tobyfeldman.com                NATIONWIDE SERVICES             (800) 246.4950

William Holland                                                6/28/2018

---

Page 130

1      Q.   You have heard that from
2  Rahul?
3      A.   Uh-huh.  Into the Trendily
4  office, not his -- not in the market
5  but at his warehouse.
6      Q.   What specifically did Rahul
7  tell you?
8      A.   That -- As I said a few
9  moments ago, Jason -- he was miffed
10 that Jason had come into the warehouse
11 acting like he was a potential
12 retailer.
13     Q.   And Rahul, did he say that he
14 recognized Jason?
15     A.   He did.
16     Q.   And I believe you said Chris
17 was there too?
18     A.   Chris was there too.  Chris
19 didn't recognize -- Chris didn't know
20 who he was.
21     Q.   And did Rahul tell you
22 anything more about that meeting?
23     A.   No, except that Jason left.
24     Q.   Chuck asked you if you had a
25 written agreement with Jason Scott on

---

Page 131

1  exclusivity.
2      A.   Uh-huh.
3      Q.   And you don't?
4      A.   I don't.
5      Q.   Do you have a verbal promise
6  from Jason?
7      A.   No.
8      Q.   But he doesn't -- he
9  maintains your exclusivity, right?
10     A.   Yeah, I mean, he -- I don't
11 know if Jason makes that decision or
12 Mr. Mark makes that decision.  That's
13 not to say there can't be other dealers
14 in the city that has it but just not
15 next door.
16     Q.   And that has been kept with
17 you?
18     A.   Yeah, actually it's been
19 enforced.  They sold to a dealer in
20 another city with the understanding --
21 in another city with the understanding
22 you can't just put it in San Antonio.
23 And sure enough, you know, within 48
24 hours it was in the store next door to
25 me.

---

Page 132

1      Q.   Jason Scott was in the store
2  next door to you?
3      A.   No, the product, his
4  collection.  They sold the Jason Scott
5  collection to a store in Austin who
6  also happens to have a store next door
7  to me.  So they sold it to the one in
8  Austin with the understanding that you
9  cannot put it into the San Antonio
10 store.  You can put it into the Houston
11 store or you can put it in the Austin
12 store.  And in 48 hours it was in the
13 San Antonio store.
14     Q.   Okay.
15     A.   So they yanked the product
16 line from him.
17     Q.   Jason Scott yanked the
18 product line?
19     A.   Mark did anyway.
20     Q.   And it got out of the store
21 in San Antonio?
22     A.   Yes.  Yes.
23     Q.   You were asked some questions
24 about India teak versus Indonesian
25 teak.  Yes?

---

Page 133

1      A.   I don't know the difference
2  but --
3      Q.   That was my question.  Do you
4  know if there's any difference at all
5  between --
6      A.   I have no idea.
7      Q.   Do you know if there's any
8  difference in the finish -- in the look
9  of a finished product made out of one
10 teak or the other teak?
11     A.   I don't.
12     Q.   And you had heard from others
13 that Trendily's copies looked like
14 Jason Scott's original --
15         MR. GREEN:  Objection,
16 leading.
17     A.   I heard that they were pretty
18 darn close and would eventually get
19 there.
20         MR. DIETRICH:  I don't have
21 any more questions.
22         (12:05)
23         RE-EXAMINATION
24 By Mr. Green:
25     Q.   Tell me again who Mark is.

---

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES              (800) 246.4950

**William Holland**                                                6/28/2018

Page 134

1        A.   Mark is just a sales
2    representative for Texas that -- Mark
3    Williamson that reps the Jason Scott
4    line for Jason.
5        Q.   Okay.  Mark Williamson?
6        A.   Right.
7        Q.   And so when you order
8    product -- Jason Scott product do you
9    do it through Mark?
10       A.   I do it both ways.  Sometimes
11   through Mark, sometimes through Jason,
12   sometimes through Jason's wife.  It
13   depends on how important it -- but
14   sometimes I just put all three of their
15   names on there.
16            MR. GREEN:  All right, thank
17   you, that's all. I appreciate your
18   time.
19            MR. DIETRICH:  That is all.
20   Thank you for your time.
21            THE WITNESS:  Absolutely.
22            (Proceedings concluded at
23   12:06 p.m.)
24
25

Page 136

1        Mr. Thomas Dietrich, 1 Hour, 35 Minutes
2        Mr. Charles A. Green, 0 Hours, 30 Minutes
3        That pursuant to information given to the
4    deposition officer at the time said testimony was taken,
5    the following includes counsel for all parties of
6    record:
7        Mr. Thomas Dietrich - Attorney for Plaintiff;
8        Mr. Charles A. Green - Attorney for Defendant;
9        I further certify that I am neither counsel for,
10   related to, nor employed by any of the parties or
11   attorneys to the action in which this proceeding was
12   taken, and further that I am not financially or
13   otherwise interested in the outcome of the action.
14        Further certification requirements pursuant to Rule
15   30 of FRCP will be certified to after they have
16   occurred.
17        Certified to by me this 10th day of June, 2018.
18
19
20            Vanessa P. Pompa
              Texas CSR 2670 - Expires 12-31-19
21
22
23
24
25

Page 135

1            UNITED STATES DISTRICT COURT
                     FOR THE
2              DISTRICT OF ARIZONA
3    Jason Scott Collection, Inc.  )
         Plaintiff          )
4                           )
         v.         ) Civil Action No.
5                   ) 2:17-cv-02712-JJT
     Trendily Furniture LLC et al. )
6        Defendant       )
7
8
9        REPORTER'S CERTIFICATION
         DEPOSITION OF WILLIAM HOLLAND
10           JUNE 28, 2018
11
12       I, VANESSA P. POMPA, Certified Shorthand Reporter
13   in and for the State of Texas hereby certify
14   to the following:
15       That the Witness, William Holland, was duly
16   sworn by the officer and that the transcript of the oral
17   deposition is a true record of the testimony given by
18   the witness;
19       That examination and signature of the witness
20   to the deposition transcript was waived by the witness
21   and agreement of the parties at the time of the
22   deposition; That the original deposition was delivered
23   to Mr. Thomas Dietrich;
24       That the amount of time used by each party at
25   the deposition is as follows:

35  (Pages 134 to 136)

# JASON SCOTT COLLECTION
## ...it takes a village





## DSK-IRONSTR-DRGN / IRON STAR DESK W/ DRAGONFLY LEGS
## 72" X 36" X 31"



EXHIBIT
1 Holland
6-28-18 vp
PENGAD 800-631-6989



# JASON SCOTT COLLECTION

...it takes a village



**BF-BOR / BORGOTA BUFFET 83"x 24"x40"**





# JASON SCOTT COLLECTION
## ...it takes a village





**TBL-SAC / SACRED HEART DINING TABLE / SIZE SHOWN - 120"x 48"x 31"**
**(custom sizes available)**



JASON SCOTT COLLECTION
...it takes a village

TBL-SAC / SACRED HEART DINING TABLE





EXHIBIT

J Holland

6-28-18

PENGAD 800-631-6989













**Friday, December 1, 2017 at 4:49:38 PM Mountain Standard Time**



-------------------------- Original Message --------------------------
Subject: RE: Trendily
From:    "Bill Holland" <Billh@hillcountryinteriors.com>
Date:    Tue, May 30, 2017 10:00 am
To:      "Jason Scott" <jason@jasonscottcollection.com>
-----------------------------------------------------------------------

Good morning Jason,

I have been out of the country and today is my first day back into the
office. Raul thought that you may be wanting to talk to him according to
his sources that day you were there and possibly offering him $$$ to not
manufacture this collection. His price points are significantly less than
your pricing based on two examples he gave me.

The rep is actually due in our office today. If I should find anything
else, I will email you.

Bill Holland

-----Original Message-----
From: Jason Scott [mailto:jason@jasonscottcollection.com]
Sent: Wednesday, May 24, 2017 2:53 PM
To: Bill Holland
Subject: Trendily

Bill
Mark said the Trendily guy called you.  Something about that they think I
owe them money?  Im confused.  What did they say?



Thank you,

Jason Scott
Jason Scott Collection



Friday, December 1, 2017 at 4:53:14 PM Mountain Standard Time



-------------------------- Original Message --------------------------
Subject: RE: Trendily
From:    "Bill Holland" <Billh@hillcountryinteriors.com>
Date:   Tue, June 27, 2017 12:19 pm
To:      "Jason Scott" <jason@jasonscottcollection.com>
-----------------------------------------------------------------------

Jason,

Yes, they are doing many of your items apparently. They are actually
opening up a 2500' gallery in Western Heritage beginning with 28 different
pieces that are on the water. Western Heritage has sold 6-8 tables like
the one they have on the floor and is on the web site. The 2 containers on
the water are presold have been slightly delayed due to weather. He has
had a very strong dealer interest and intends on increasing his selection
at price points far below JS. For example, the three items on the web site
are priced as follows:

Bogota Buffett 72" 1399.00

Desk 1699.00

Dining table/Sacred Heart 96" 1899.00

I personally have not seen a piece in person, but WH wouldn't be placing a
gallery within the store if it wasn't close enough in quality to JS. I
know that his customers will be the smaller dealers or dealers that do not
have your line. Based on the above price examples, this could be a serious
issue for JS dealers at current pricing.

Bill Holland

-----Original Message-----
From: Jason Scott [mailto:jason@jasonscottcollection.com]
Sent: Monday, June 26, 2017 8:18 PM
To: Bill Holland
Subject: RE: Trendily

Also do you know if Trendily are doing more than the 3 items on their
website?



Thanks
Jason

Can you call me Jason? If out of country, I will email you the
information. Let me know.

Bill Holland

-----Original Message-----
From: Jason Scott [mailto:jason@jasonscottcollection.com]
Sent: Saturday, June 24, 2017 4:52 PM
To: Bill Holland
Subject: Trendily

Bill
Mark called me and said Trendily has containers of sold Jason Scott
knockoffs and the owner isnt worried about it.  Whats going on?   I know
Western Heritage is selling it and Adobe.  Do you know any other
stores and did you get his prices?

Thank you,

Jason Scott
Jason Scott Collection

Thank you,

Jason Scott
Jason Scott Collection

Thank you,

Jason Scott
Jason Scott Collection

Friday, December 1, 2017 at 4:53:57 PM Mountain Standard Time



-------------------------- [ Original Message -------------------------
Subject: RE: Trendily
From:   "Bill Holland" <Billh@hillcountryinteriors.com>
Date:   Wed, June 28, 2017 8:06 am
To:     "Jason Scott" <jason@jasonscottcollection.com>
------------------------------------------------------------------------

I asked him that. He says that in the US that there is no protection. He
claims he is using a different teak and not using your name or likeness in
his marketing, etc. Jason, I am not knowledgeable of the legalities, I'm
just relaying what info I have to you as I have a stake/investment in this
from a retailer point of view.

-----Original Message-----
From: Jason Scott [mailto:jason@jasonscottcollection.com]
Sent: Tuesday, June 27, 2017 4:49 PM
To: Bill Holland
Subject: RE: Trendily

Doesn't this company understand that I have my designs and furniture
protected with copyrights?

Jason,

Yes, they are doing many of your items apparently. They are actually
opening up a 2500' gallery in Western Heritage beginning with 28
different pieces that are on the water. Western Heritage has sold 6-8
tables like the one they have on the floor and is on the web site. The
2 containers on the water are presold have been slightly delayed due
to weather. He has had a very strong dealer interest and intends on
increasing his selection at price points far below JS. For example,
the three items on the web site are priced as follows:

Bogota Buffett 72" 1399.00

Desk 1699.00

Dining table/Sacred Heart 96" 1899.00

I personally have not seen a piece in person, but WH wouldn't be
placing a gallery within the store if it wasn't close enough in
quality to JS. I know that his customers will be the smaller dealers
or dealers that do not have your line. Based on the above price
examples, this could be a serious issue for JS dealers at current pricing.

Bill Holland



EXHIBIT
5 Holland
6-28-18  VP

JSC00074 Page 1 of 3

-----Original Message-----
From: Jason Scott [mailto:jason@jasonscottcollection.com]
Sent: Monday, June 26, 2017 8:18 PM
To: Bill Holland
Subject: RE: Trendily

Also do you know if Trendily are doing more than the 3 items on their
website?

Thanks
Jason

 Can you call me Jason? If out of country, I will email you the
 information. Let me know.

 Bill Holland

 -----Original Message-----
 From: Jason Scott [mailto:jason@jasonscottcollection.com]
 Sent: Saturday, June 24, 2017 4:52 PM
 To: Bill Holland
 Subject: Trendily

 Bill
 Mark called me and said Trendily has containers of sold Jason Scott
 knockoffs and the owner isnt worried about it.  Whats going on?  I know
 Western Heritage is selling it and Adobe.  Do you know any other
 stores and did you get his prices?


 Thank you,

 Jason Scott
 Jason Scott Collection



Thank you,

Jason Scott
Jason Scott Collection



Thank you,

Jason Scott

Jason Scott Collection


Thank you,

Jason Scott
Jason Scott Collection