UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| JASON SCOTT COLLECTION, INC., an Arizona corporation, Plaintiff, | * | |
| VS. | * | Case No. 2:17-cv-02712-IJT |
| TRENDILY FURNITURE, LLC, a Texas limited liability company, TRENDILY HOME COLLECTION, LLC, a Texas limited liability company, RAHUL MALHOTRA, an individual, JOHN DOE CORPORATIONS 1-10, and JOHN DOES 1-10, Defendants. | * | |

****************************************************

ORAL DEPOSITION OF
RAHUL MALHOTRA
JULY 27, 2018

****************************************************

Job No. 11418
Reported by:
Christy R. Sievert, CSR, RPR

DEPOSITION of RAHUL MALHOTRA, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 27th day of July, 2018, from 9:23 a.m. to 2:42 p.m., before Christy R. Sievert, CSR, RPR, in and for the State of Texas, reported by machine shorthand, at the offices of Cowles & Thompson 901 Main Street, Suite 3900, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



A P P E A R A N C E S

FOR THE PLAINTIFF:
MR. THOMAS E. DIETRICH
Mangum, Wall, Stoops & Warden, PLLC
112 North Elden Street
Flagstaff, Arizona 86001
Phone: 928-779-6951
E-mail: tdietrich@mwswlaw.com

FOR THE DEFENDANTS:
MR. SIM ISRAELOFF
Cowles & Thompson
901 Main Street, Suite 3900
Dallas, Texas 75202
Phone: 214-672-2000
E-mail: sisraeloff@cowlesthompson.com

ALSO PRESENT:
JASON SCOTT
RAJ MALHOTRA



I N D E X


PAGE

Appearances.................................. 3

Exhibits.................................. 5-6

Proceedings.................................. 7

RAHUL MALHOTRA:

Examination by Mr. Dietrich................. 7

Changes and Signature.................. 267-268
Reporter's Certification................ 269-270




E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 9 |
| Exhibit 2 | Invoices WH001 - 002 | 104 |
| Exhibit 3 | Sacred Heart Dining table JSC00100 | 111 |
| Exhibit 4 | Iron Star Desk | 113 |
| Exhibit 5 | Photographs | 117 |
| Exhibit 6 | Reporter's Transcript of Proceedings Preliminary Injunction Hearing | 126 |
| Exhibit 7 | Defendant's Response to Plaintiff's First Set of Requests for Admission | 140 |
| Exhibit 8 | Text messages JSC00011 - 00013 | 157 |
| Exhibit 9 | Text messages B004 - 019 | 176 |
| Exhibit 10 | E-mail correspondence 7-19-18, Re: Fw: Adobe Interiors Purchase Order #395 JSC00169 - 00173 | 198 |
| Exhibit 11 | Invoices B020 - 024 | 201 |
| Exhibit 12 | Trendily Furniture, LLC Inventory Item QuickReport as of December 31, 2017 | 211 |
| Exhibit 13 | Website screenshot MJ Collection | 218 |
| Exhibit 14 | Photograph | 248 |
| Exhibit 15 | Photograph | 252 |

EXHIBITS
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16 | Photographs | 257 |



PROCEEDINGS
RAHUL MALHOTRA
having been first duly sworn, testified as follows:

EXAMINATION
BY MR. DIETRICH:

Q. Good morning, Mr. Malhotra.
A. Good morning.
Q. Can I call you "Rahul"?
A. Yes.
Q. Is that pronouncing it right?
A. That's correct.
Q. Can you state your full name for the record, please?
A. Rahul. Last name Malhotra.
Q. So my name is Tom Dietrich. We just met a second ago, but I represent Jason Scott Collection, Inc., in this case.
Have you ever had your deposition taken before?
A. Never.
Q. So let me give you a few ground rules for that. This is the court reporter. She's going to take



down everything that we say, so I would ask you to please speak loudly enough to -- for her to hear us, and also, slowly enough for her -- just not too fast. And try not to interrupt me when I'm asking a question, and I will try not to interrupt you when you're giving your answer.
If you can, please, when you're answering, use "yes" or "no" rather than "uh-huh" or "huh-uh." It just makes for a cleaner record. And rather than shaking your head or nodding your head, give a verbal "yes" or "no" response.
If you don't understand a question that I've asked, just let me know, and I'll try to ask a better one. And if you remember something five or ten minutes down the line that you want to -- goes back to a question that I asked earlier, just let me know, and we can get that on the record.
Is there any reason to think that you can't testify fully and



truthfully today?
A. No.
Q. And do you understand that we have requested and this is called a Rule 30(b)(6) deposition today, as well as a deposition of yourself personally?
A. Yes.
Q. And that is a 30(b)(6) deposition of Trendily Home Collection, LLC, and Trendily Furniture, LLC. Do you understand that?
A. Yes.
(Exhibit No. 1 marked.)
BY MR. DIETRICH:
Q. And I'm showing you what's been marked Exhibit 1 to this deposition. Do you recognize this notice?
A. Yes, I do.
Q. Have you seen the topics --
A. I did.
Q. -- that start on page 5 of this notice?
A. Yes, I did.
Q. You've reviewed them?

A. Yes, I did.
Q. And are you prepared to testify --
A. Yes, uh-huh.
Q. -- to them? Did you do any preparation --
MR. ISRAELOFF: Wait until he finishes his sentence. You're starting to answer before he's quite finished. Just let him finish fully.
BY MR. DIETRICH:
Q. Did you do any preparation for today's deposition?
A. Just normal.
Q. What's normal preparation?
A. Normal means I have this questionnaire, so let me go for a test. You read those questions, that's what I did.
Q. Did you review any documents in preparation for --
A. I did some --
Q. Let me -- let me finish my question. I know it's hard, and I know



sometimes you may know what the answer is before I'm done. But for her sake, please let me finish what I'm asking before you give your answer. Okay?
A. Okay.
Q. So what documents did you review in preparation for today's deposition?
A. There's a -- there's a Point 8, you asked me total cost of goods, and you asked me what the total revenue of dividends. I did that research for you, what total numbers were. And then you asked me a customer list who had bought those products. I researched that for us. And pretty much that's it.
Q. On Topic 8, what specific documents did you review?
A. All the sales orders.
Q. Anything else on that topic for total cost of goods?
A. Are we jumping on that topic?
Q. No, I'm just asking generally what specific documents you looked at.



A. Just researched my books. I have a software called QuickBooks. I'm sure everyone has that accounting software. So I just researched my accounting software. That's all I did.
Q. That's what I was getting to.
A. Yeah, yeah, I -- yes. There's no -- yeah. There's a record. So I just went to the record to get the information what you asked me on this topic.
Q. And you said that's in QuickBooks format?
A. Yes. Yes. Yes.
Q. So we have two Trendily companies that are defendants in the lawsuit, Trendily Furniture and Trendily Home Collection. What's the difference?
A. Trendily Furniture is hundred percent wholesale, business to business, my -- from my company to stores. And then I have Trendily Home Collection, which is mostly with designers. We have a showroom here in



Dallas, and that's where the Trendily Home Collection is situated.
And the business Trendily Home Collection does is only designer. So that's -- Designer, different business. And Furniture is wholesale business, all stores, like Bill Holland, Hill Country, like Calamity, like Brumbaugh, like Western Heritage. Those are my customers under Trendily Furniture.
Q. And who -- what kind of designers are you selling to for Trendily Home Collection?
A. Just as I -- just ASID members. Designers are like just interior designers. ASID members. And they have their own companies, and they don't have a storefront. They go into a house, they do -- they're basically decorators. I call them designers because they have a degree. They are ASID members.
Q. What is ASID?
A. I think it's some -- ASID,

Page 14

some -- some -- like some designers, they do interior designing course, they get that degree. And, basically, they are more decorators than -- I treat them as a designer because they are decorating. They come into a house and say, you know, "I'm going to turn this corner into a gorgeous piece, gorgeous area." So that's what they do.
Q. And Trendily Home Collection sells to those people that are designers?
A. Trendily Home Collection, yes.
Q. Do both companies sell the same products?
A. Actually, no. Trendily Home Collection has other lines as well, other than Trendily. So Trendily Furniture is a line, one of the lines at Trendily Home Collection. But Trendily Home Collection has about ten or 11 more lines on the floor. Like, we don't make chandeliers, lighting. We have a lighting company. We have

Page 15

accessories company. We have some, you know, flooring company. So we get those pieces from different companies, and they're all mixed up on the floor. Like a store. Like you walk into a store, they have multiple lines. So...
Q. So Trendily --
A. It's like a store.
Q. Trendily Home Collection sells other non-Trendily products?
A. Trendily Home Collection does, yes.
Q. In the course of this, I happened to see Chris Sanders has an e-mail address that's trendilyhomecollection.com. But I understand that he's a rep for Trendily Furniture.
A. Uh-huh (affirmative response).
Q. Is there any reason someone might have a --
A. Yeah.
Q. -- Home Collection e-mail address versus Trendily Furniture?

Page 16

A. Yes. The reason why I said that, because the Trendily Home Collection is a domain, actually. We had a domain before -- we still have a domain trendilyfurniture.com. But mostly, people, when we talk to them -- because we have this retail, this location, the designer place -- we're talking Trendily Home Collection -- people see us as Trendily Home Collection. So that's why we have that domain, and we are using that domain. And that domain is here. So we use that domain. That's why every e-mail address, me -- my e-mail address, rahul@trendilyhomecollection. Chris@trendilyhomecollection. So that's -- that's why we have Trendily Home Collection. But they're two separate companies.
Q. Right. So who owns Trendily Furniture?
A. 80 percent is my ownership.
Q. And who owns the other 20 percent?

Page 17

A. 15 is my dad, 5 is my wife.
Q. And what's your dad's name?
A. Raj.
Q. Malhotra?
A. Middle name is Kumar, K-u-m-a-r. K-u-m-a-r.
Q. And his last name is Malhotra?
A. Yes.
Q. And 5 percent is your wife?
A. Yes.
Q. And what's her name?
A. Ekta. E as in Edward, K as in kite, T as in Tom, A as in America. Ekta.
Q. And who's primarily responsible for the operation of Trendily Furniture? Is that you?
A. Obviously, yes.
Q. Who owns Trendily Home Collection, LLC?
A. Mainly Ekta. She's major shareholder in Trendily Home Collection.
Q. How much does she own?

Page 18

A. She owns 51.
Q. And who owns the other percentages?
A. I own the other percentage.
Q. You own 49 percent?
A. Yes. That's correct.
Q. Who has primary control over operations of Trendily Home Collection?
A. Only me and my wife, both, equal.
Q. How long has -- well, strike that. Which Trendily business -- which Trendily company was in business first?
A. Trendily Furniture.
Q. And when did it start doing business?
A. 2008.
Q. When did Trendily Home --
MR. R. MALHOTRA: '08.
A. 2008.
BY MR. DIETRICH:
Q. I'm sorry, I don't want to have any other input from somebody else.
A. No, you -- you asked me --

Page 19

you asked me a question, which is a very general question. If I said 2007 or 2008, it's not going to change. It's in the books, when I started this company.
Q. I understand that. But as we go down the line, I want to hear from you.
A. Yeah, I got it.
Q. If your father is going to be another designee in this deposition, that's fine, I can ask him questions. But for now, I just ask Mr. -- Mr. Senior Malhotra to not provide answers. I'm not trying to trick you.
A. No, I respect you're saying, and we follow that, please. Okay.
Q. So when did Trendily Home Collection start?
A. I don't know exactly what year, but it was way after 2008. I don't know the exact year Trendily was started, but it was, like -- roughly, to give you an idea, four or five years back. Yeah.

Page 20

Q. And throughout this deposition, I might just refer to "Trendily." And do you understand and is it okay with you if that just refers to the Trendily companies together?
A. Like I said, they're two different companies. If you call them together, that's your perception, that's your saying. But to me, they're two separate companies. They have two separate books. They're not together. They have separate bank accounts. Trendily Home Collection is my customer. In my Trendily Furniture books, Trendily Home Collection is my customer. So my point is, you can say that. You've been saying that in all your paperwork, that Trendily one. It's not. But they're two separate companies. But if you want to call them, that's your perception, that's not mine.
Q. If I happen to refer to "Trendily," I would ask that you let me know which company you're talking about

Page 21

if you give a response. Do you understand that?
A. Yeah. If you call it "Trendily and Trendily Home," that would separate that.
Q. Okay.
A. If we just said "Trendily Home," then I'll know you're coming from Trendily Home side. And if you just said "Trendily," I'll understand it's Trendily Furniture.
Q. What do you do for Trendily Furniture?
A. What do I do? I am -- I operate the whole business. I run the whole branch. This is our branch. So I run the whole branch.
Q. When you say it's a branch, do you have other branches --
A. No.
Q. -- elsewhere?
A. No. This is a -- okay. Our main company is in India, called Mi'Das Exports. Trendily Furniture is a branch of Mi'Das Exports in USA.

Page 22

Q. Does Mi'Das have branches in other countries?
A. No.
Q. So you said you do the -- all the operations?
A. In U.S.
Q. In the U.S.?
A. Uh-huh (affirmative response).
Q. Who is in control of operations in India?
A. Mostly my dad.
Q. And what kind of things do you do in a typical day?
A. Typical day, like --
Q. For Trendily Furniture.
A. My day starts with, you know, my e-mails, phones, customers, you know, topics. Sales. Basically, I'm here not because of my production. I'm here because of my sales. My production is in India. So what I do majorly on my day, the majority of work I do here, is all sales. And then to get to run those sales, you have to

Page 23

have office staff, you have to have admin, you have to have all your things in place to run the place of business. That's what I do.
Q. Do you do any furniture design?
A. I'm not a designer.
Q. Does Trendily Furniture have other employees?
A. Employees, yes. Oh, yes.
Q. How many?
A. I have about six or seven.
Q. What do those employees do for Trendily Furniture?
A. I have upholsterers. They do upholstery. I have a carpenter. You know what he do. He makes my frames here. I do upholstery also. And my upholstery frames are all made here in United States, because all the frames -- I have a carpenter that makes all my frames.
And then I have a dispatcher. I have a order enter person, who enters all the orders, who receive multiple

Page 24

orders in a day. Several. So then we have to process them in our system, in our QuickBooks. Because everything goes into my QuickBooks. Nothing is handwritten or off the record. Everything is in record. Because when the order comes in, it goes into my QuickBooks. And then there's a person who enters that. So I have an employee there to do that job for me.
Q. Do you have any designers employed by Trendily Furniture?
A. No.
Q. Do you have any sales reps that are employed by Trendily Furniture?
A. No.
Q. Does Trendily Home Collection have separate employees?
A. They don't have any employees.
Q. No employees of Trendily Home Collection?
A. No. No.
Q. So do any of your companies

Page 25

employ any furniture designers?
A. No.
Q. Now, with regard to sales reps, I know you have sales reps working for your companies. Are they contractors?
A. Yes, they're contractors. They're on 1099.
Q. Do they have written contracts?
A. Yes.
Q. Have you provided those to us in this litigation?
A. No one asked me.
Q. But you do have written contracts?
A. I can find you one if you need.
Q. And how many sales reps does Trendily -- and I'll say either company -- contract with?
A. Trendily have only one active sales rep at this minute.
Q. Is that Chris Sanders?
A. Yes.

Q. You have no other sales reps?
A. Not this minute.
Q. How about in 2017, did you?
A. Maybe two or three.
Q. Who were they?
A. These sales reps, what they do is, they rep multi lines, and when they're multi-line reps, they switch places, they switch companies, they switch products, because they're a multi-line rep. And they're not my employees. They are contractors, 1099. So they can go from this company to this company in a week. So we had a lot of sales -- sales reps at one point, but it didn't work out. So we just have one right now, which is Chris Sanders. And he has his own company, CTT, like others.
Q. Right. But I don't think that answered my question. My question was, in 2017, who were your sales reps other than Chris Sanders? What were their names?
A. I think there was a Darra



Dikes.
Q. Anybody else?
A. (Nods head affirmatively.)
Q. "No"?
A. Best of my knowledge, I don't think. Maybe somebody we have, but not active. You know, for you to take my line, if you're -- a sales rep, for instance, just to give you an example, and you've got my line, you have my catalog, you have my swatches, but you don't turn the orders in, you're sitting on it, if you're sitting on that line, what do you call him? You call him your sales rep, or you call him -- what do you call him? So that's what I -- I don't know exact number, because people -- if they have my catalog, but they're not turning in orders, for me, they're inactive. They're not active. I call active people when they send me orders every day. That's what I call them active.
Q. But you had written contracts with other people?



A. I do.
Q. And how many written contracts do you have right now with sales reps?
A. I don't know.
Q. Five? Ten?
A. Like I said, I don't -- I don't -- I don't have that number in front of me right now.
Q. How about in 2017, do you know how many written contracts you had with reps?
A. Like I said, I don't have that record right here.
Q. Now, Darra Dikes was an employee, not a contractor, right?
A. She was a contractor.
Q. Didn't you testify before in this case that she was an employee?
A. Oh, she -- okay. Okay. I'll tell you right now why -- why she was -- she was a contractor, but why she had that employee name tag on her name, because when she came to work for me last year -- she only work for a



month.

When she came to work for me, she worked for a company called Old Hickory Tannery, OHT. When she met me, I thought, being a business person, that she's going to bring a lot of business on the plate. A lot of orders going to come from her site. So I talk to her and I said, "I can give you flat commission." That's how I do with every sales rep.

So she said that, "In the beginning, I might not have enough amount, commission. So if you could help me with some salary, something to hold on to, like a retainer."

So I said, "Okay." So she said, "Help me six months to have some kind of retainer so that I'm not going home empty, I have some money coming every month in my account."

I said, "I'll talk to my superiors and get back to you." Then I get back to her and said, "Okay. I can give you $2,000 as a retainer, and then

you can start making commission from" -- because I already -- I had a full plate. So when she came to work for me, I told her that, "I'm going to share this with you, but in return, I want you to also give me new accounts, new business."

She didn't perform. Months she stayed. We did another meeting in a month, and I said, "Darra, you are eating my money. You're not giving me what I need." And she was taking -- so she got -- she was desperate to give me business. Everyone is desperate to, you know, get business to have -- you know, establish for a company she's working.

So she took Chris to a lot of places that will never, ever buy Trendily. Never, ever. Like somebody is selling a table which is a very contemporary with a metal, steel store with all contemporary look. If I go into that store, it's not going to sell there, because that product doesn't fit



in that store, what I carry.

So she took Chris to those stores, which disappoint me. And I said, "Wasting time." So we did a meeting, almost a month. I said, "Darra, I need to give you a target."

She said, "What target?" I said, "You have all your own sales, so I have to give you target. If you open certain amount of accounts every month, then I will share what I have with you. If you don't give me business what I have -- what I -- what I -- I'm going for, new business you have to bring me, if you don't bring me that business, then, I don't know, I cannot give you the retainer or I cannot entertain the way we talked earlier."

Next day -- she said, "Okay. I'll think about it. And I think I can do it." Next day, she came to my office and she quit. She said, "I don't think this is the right fit for me," and this and that. "And I will keep doing what I'm doing, you know,



with Neiman Marcus," and all that.

I said, "Okay. No hard feelings." And she left. Yeah. So that's how she was not employed, but kind of. Because that's what we agreed.

MR. ISRAELOFF: I need to take a short break for a minute.

MR. DIETRICH: Sure. Off the record.

(Break taken, 9:48 a.m. to 9:49 a.m.)

BY MR. DIETRICH:

Q. Does Trendily have a written contract with Darra Dikes?

A. I have to check.

Q. Can you do that, please? You don't know?

A. I don't know.

MR. ISRAELOFF: We'll take that under advisement as far as making agreements.

BY MR. DIETRICH:

Q. But you don't know if you had a written contract with Darra Dikes?



A. I'm not hundred percent sure on that.

Q. Because your testimony is, she was an independent contractor. Is that right?

A. Say that again.

Q. You just said a minute ago that she was an independent contractor.

A. Yeah, she was. Yes, uh-huh.

Q. So --

A. But like I said, if there was a written paperwork between her and me, we don't know. Or company, we don't know.

Q. How does a sales rep for Trendily get paid?

A. Commission.

Q. Just straight commission?

A. Just straight commission.

Q. Does Trendily pay any of their expenses?

A. No.

Q. What does a sales rep do?

A. What they do? Sell. That's what their job is.

Q. And how, in your experience, do they do that?
A. Their job is to bring us orders. Their job is to go visit dealers over whatever territories they have. They have to cover those territories. They have to visit those dealers. So that's how they do their marketing.
Q. And you reference "territories." What territories does Trendily sell in?
A. We have lot of territories.
Q. Where?
A. We have Texas. We have other states as well.
Q. What other states does Trendily sell to?
MR. ISRAELOFF: Clarify which -- if there's any difference between the two companies, clarify what states go to what companies, if there's any difference.
A. Yeah, state-wise, I don't know exactly. We have customers all



over the nation. And exactly -- like I said, Trendily is the only person who works for us right now, this minute. And he's Texas, Oklahoma. He does Texas, Oklahoma. So we might have customers in different states, but like I said, they -- we don't have sale reps other than Chris. So there is no territory, no -- in terms you're asking me what other sales rep that carry those territories, I have no other sales reps. Only Chris Sanders.
BY MR. DIETRICH:
Q. You said you have customers around the nation?
A. I do.
MR. ISRAELOFF: Again, please make clear in your answer which company when you say "I do."
A. Trendily -- I'm talking about Trendily.
BY MR. DIETRICH:
Q. Trendily Furniture?
A. Furniture.
Q. Trendily Home Collection, you



said they just sell -- it just sells to designers?
A. Or decorators.
Q. Is that only in Texas, or is that designers in other locations as well?
A. They can be on the phone. And the phone comes from any other state. We don't mind.
Q. So both companies sell outside of Texas?
A. Yes.
Q. Who is Trendily Furniture's biggest customer?
A. I have to -- all -- all customers are big. All my customers, they do a lot of Trendily business. All active customers. So there is -- it's hard to say who is number one and who is number two. It's hard to say that.
Q. Well, let's say who are the top three that purchase the most from Trendily? And I'll say Trendily Furniture.



A. I'll say Brumbaugh's, Larry Brumbaugh, which is Brumbaugh's in Aledo. Then I have Bill Holland, which is Hill Country Interiors. Then I have Western Heritage, which is in Weatherford.
Q. What about Trendily Home Collection, who are the biggest customers by sales to Trendily Home Collection?
A. No, there is no biggest customer in Trendily Home Collection because we work with decorators, and decorators are not stocking dealers. So their business is off and on. So there is no big customer to us say on the record.
Q. So with Trendily Home Collection, I mean, is it just -- you have a designer, and they might need a couch, and they call you and say, "Hey, do you have this couch?"
A. Exactly.
Q. And if I understand correctly, even if Trendily Home

Page 38

Collection sells a Trendily Furniture piece, Trendily Furniture sells that piece to Trendily Home Collection first?
A. That is correct.
Q. And you have a record of all those sales?
A. I do.
Q. Do you have any kind of -- and I'll say it with regard to Trendily Furniture. I think primarily, we're going to be talking about Trendily Furniture throughout this deposition, but I'll try to clarify if need be. Does Trendily have any exclusivity agreements with its dealers?
A. Not really.
Q. Do you offer any kind of protection where you might not sell to somebody who's close to one of the big dealers you mentioned?
A. When we make dealers, we're not going to open a dealer next door. We protect them up to 50 miles on radius. So if someone above 50 miles

Page 39

or close to 50 miles, we -- we look at that from the sales standpoint, and then you make decision. But there's no such set law that we have that we follow, no. We are -- we want sales like every other company.
Q. But this 50-mile radius protection, what is that?
A. It can go up and down. Like I said, we -- we anticipate that we should not open dealer next to a dealer already carrying Trendily, because that -- your line is on -- in competition with the same store. So we do that, but again I said, if -- it's all sales. Every single company you will come across, they're after sales, including Amazon, including everybody. So that's what we are after. We -- we -- we don't have a set law of protection that we protect you. But we look at the numbers. We look at how we can grow better. Is this way better or that way better? So that's what we do.
Q. What are the main types of

Page 40

products that Trendily makes?
A. There's a vast variety. What are you asking?
Q. And that's fine, you can ask me back if you don't understand what I'm asking. You said Trendily makes upholstered goods, yes?
A. We do. Yes, we do.
Q. And are you familiar with the term "casegoods"?
A. Oh, yes, I do.
Q. What does that term mean to you?
A. Casegoods is all made of wood.
Q. So does Trendily make casegoods?
A. No, we make both upholstery and casegood.
Q. Are there any other kinds of furniture that Trendily makes?
A. No.
Q. Does Trendily do more business in upholstery or cased goods?
A. 50/50.

Page 41

Q. Are you familiar with the term "SKU"?
A. SKU? A SKU number, like item numbers?
Q. Yes.
A. Uh-huh (affirmative response).
Q. And if I refer to that, it means kind of a -- each separate item is a SKU, right?
A. Uh-huh (affirmative response).
Q. How many SKUs does Trendily manufacture?
A. Hundreds.
Q. Over 200?
A. I don't have the specific number. Hundreds.
Q. Who does the manufacturing for Trendily?
A. Casegoods?
Q. You said upholstery -- well, let's start with upholstery. That's made here in the U.S.; is that right?
A. That's correct.

Q. So who makes Trendily's upholstery?
A. Trendily itself.
Q. So you have a manufacturing facility here in the U.S.?
A. Uh-huh (affirmative response).
Q. "Yes"?
A. Yes. Yes.
Q. I'm just -- rather --
A. No, no.
Q. -- than "uh-huh," I am --
A. Yeah. Yes.
MR. ISRAELOFF: Wait until he finishes his question.
BY MR. DIETRICH:
Q. So I might do that if you say "uh-huh" or "huh-uh," I might say "yes" or "no." And that's -- I'm not --
A. Like I said, this is --
Q. -- trying to --
A. This is not what I do every day. This is my first deposition. So I might make mistakes. I might go, you know, in detail, but --



Q. And that is fine. It's --
A. But it's all true. That's what I care.
Q. That's what I care as well.
A. Yes.
Q. So you have a factory here that makes upholstery?
A. Yes.
Q. And where's that factory located?
A. Same as the warehouse is, 2991.
Q. In Dallas?
A. Yes.
Q. And you have manufacturing employees?
A. I do.
Q. How many employees do you have that do manufacturing work?
A. I just said I have five, six employees total. I have upholsterer, a carpenter. So, yeah.
Q. Okay. So I didn't know if you had more in your factory, or those were it.



A. I'm a small, tiny company. I'm not a big...
Q. So let's talk about casegoods. The casegoods are made in India?
A. Yes.
Q. And where are they made?
A. Our factory in India, Mi'Das --
Q. And where --
A. Mi'Das Exports.
Q. Where is that factory located?
A. Jaipur.
Q. And your father operates that factory; is that right?
A. That's correct.
Q. How employees do you have in your factory in Jaipur?
A. I don't know.
Q. Do you have an approximation?
A. I don't want to guess, because that's -- that's not what I do.
Q. Hundreds? Fewer?
A. I don't know.



Q. Casegoods are made in your factory, and then they are shipped to the U.S.; is that right?
A. Yes, that's correct.
Q. How are they shipped?
A. In a container.
Q. And who handles the shipping?
A. Some freight company.
Q. Is it Mi'Das that arranges the shipping?
A. Not really.
Q. Is it you?
A. We just go to a forwarder, and forwarder plans it for us, sends us a container to fill it.
Q. That's my question. So a forwarder will send a container to the factory?
A. Exactly.
Q. You'll fill it with furniture. It will get on a ship. Is that right?
A. That's correct, yeah.
Q. And it will come over to where?

A. The container cannot fit in a plane, so it has to come on a ship.
Q. Right.
A. There's no other way.
Q. That would be a big plane.
A. Exactly.
Q. So it comes across the ocean. Where does it go?
A. To the port.
Q. Where?
A. Houston.
Q. And then what happens when a -- when a container of furniture gets to Houston?
A. Then from Houston, it comes in a truck.
Q. To Dallas?
A. Yes.
Q. Do you have a warehouse here?
A. Yes.
Q. And where is your warehouse located?
A. 2991 Congressman Lane, Dallas, Texas, 75220.
Q. In general, how long does it



take to manufacture a casegood?
A. There's a cycle of six months from start to finish.
Q. And what comes at the start? What's the first thing that happens?
A. A PO from a customer.
Q. So they send you a PO. And then what do you do with that PO?
A. Process that PO.
Q. What does -- what does that mean? What do you do with it?
A. When the PO comes in, we enter into our QuickBooks every single order, and that would create a sales order. Then they visit the sales order to see if this piece is in stock or it's custom, because everything custom, it comes from India.
So then the order is processed, enter a purchase order to the factory, and then the factory produces it, puts it on a container. We get it here. It's a six-month process.
Q. So that whole process from



putting an order in to getting it back takes about six months?
A. Rough. Approximate, yeah.
Q. Yeah, I understand.
A. Some can be faster, some can be even slower. It depends.
Q. And you said all your custom furniture is made in India?
A. Yes.
Q. Who is involved with the design of your products?
A. Customers.
Q. How is a customer involved with the design of Trendily products?
A. Because I deal with who I'm going to sell the product, not you, not him. It will be a customer, correct? I will sell the product to the customer. So who is the judge? Customer. Customer makes the call.
Q. I guess I'm a little confused. You said you have hundreds of different pieces of furniture that you sell.
A. No, you're talking about



custom. You're in custom right now. You said custom pieces, correct?
Q. I don't think I did, but -- so let's just --
A. No, you're talking if a custom -- "If it's custom, it has to come from India?" I said yes. Then you asked me the next question right after that. Same thing.
Q. All right. I understand that now. So let's take just -- does Trendily come up with new pieces that it makes at some -- on some occasions? You have --
A. Give me one more time. I'm -- you're confusing me. You said custom pieces.
Q. Okay. Let's --
A. Yeah. Tell me -- tell me again what you're asking.
Q. You said you have hundreds of different type of -- different products.
A. Yeah, published. Published product, yes.

Q. How did you come up with the designs for those products?
A. Journaling. Like just journal?
Q. "Journal"?
A. Yeah. Like every table has four legs. Every table has top. Every chair has four legs. So it's pretty easy. It's not -- it's not computer science.
Q. But you have different types of tables and chairs and desks, right?
A. Yeah.
Q. With different design features?
A. Yeah.
Q. My question is, who came up with those design features?
A. Us. We came up with such designs.
Q. And who is "us"?
A. "Us" means us, Trendily.
Q. You personally, or --
A. You could say I, personally. Yes, you can say that.



Q. Well, I want to know what the answer is. I don't want to say --
A. Because you -- you -- you're asking me things that basically it's -- it's a common sense. If I have products in my line, different products, every table has four legs. Like I said before, every table has two pedestals. So you tweak it little bit here and there. Because you have to sell. Every company makes so many different products. Why? Because they want to sell. That's why we have so many SKUs, because we want to sell.
Q. So you said you might tweak a design a little bit to make it look different?
A. You can say that.
Q. Well --
A. Because you -- your questions are -- the point is, what you're asking me, you start with custom. And I said customs come from India. When you said, "Who designs the furniture?" I said it's in my line. And every table



has four legs or two pedestals, and every -- if you look at all the tables from other people, they're selling the tables or chairs or buffets, they have similarity, because they're all going to stand on a floor. You're not going to hang a table on a wall. You put that on a floor so it will have some base to go under, right? That's what I said.
MR. ISRAELOFF: May I?
MR. DIETRICH: Sure, you can interject if you'd like.
MR. ISRAELOFF: I think he's trying to ask you who designed your published products.
A. Us. I said us.
BY MR. DIETRICH:
Q. Right. And --
MR. ISRAELOFF: He's asking which specific person within your company designed them.
A. It's me. There is no person -- are you asking we have designers? I said we have no



designers.
BY MR. DIETRICH:
Q. Right. And that's why I'm curious as to who is doing these design tweaks. Is it you?
A. Me.
Q. And how do you do that? Do you draw it out?
A. Yes, I do draw it out.
Q. You draw it out?
A. Uh-huh (affirmative response).
Q. On paper?
A. Yeah.
Q. And do you send those drawings to India?
A. Yes.
Q. Do you -- how do you send them to India?
A. Via -- via e-mail or via text. Depends.
MR. DIETRICH: Thank you, Sim. We're getting somewhere.
BY MR. DIETRICH:
Q. And you said earlier, you're

not a designer of furniture.
A. I'm not.
Q. But you are the one that does these, say, tweaks to your published products?
A. Means -- means the -- changing?
Q. Yes.
A. Yes. I do that, yes.
Q. Do you ever develop whole -- completely new products?
A. I do.
Q. And do you follow the same process, you draw it out?
A. Yes, I draw it out. Yes, I do.
Q. And you e-mail or text it to India?
A. Yes.
Q. How about now for a custom piece, how -- how is the process different? What's the process for manufacturing a custom piece?
A. First of all, custom piece needs a drawing. It's custom.



Q. And does that come from the customer?
A. Custom -- and custom doesn't have to be a design. It is more like a size, how long they want, how high they want, how deep they want.
Q. So do you generally -- I mean, you just talked about the dimensions of a piece. If you're talking about size, is that -- you're saying somebody looks at a Trendily published piece and says, "Can you make this in a custom size?"
A. Yes.
Q. And then they'll send you the dimensions?
A. Exactly.
Q. How do you get the dimensions otherwise, if you're just making a piece of furniture? Are there standard dimensions?
A. Standard dimensions.
Q. What's a standard dimension for a table?
A. 84.



Q. 84 long?
A. (Nods head affirmatively.)
Q. How about width, is there a standard width?
A. No.
Q. How about for a desk, is there a standard size for a desk?
A. It can go from -- there's no standard for desk. Desk can be longer. People want desk in their house, someone want desk in their office, somebody want desk in the conference room. So there is no set.
Q. No set standard for a desk?
A. No.
Q. Do you have involvement personally in the manufacturing process, or do you mostly just send those drawings over to India, and they get made?
A. Yes, I just send the drawings to India. Just the information to India, what I need. And then India does all the part.
Q. And does anybody else besides



you have authority to request manufacturing a new product?
A. Say it again, the question again, please.
Q. You obviously have authority to request that India manufacture a new product, right?
A. Yes.
Q. Does anybody else at Trendily have that authority?
A. No. No.
Q. And you said -- your communications with the factory in India, are those either e-mail or text?
A. That's correct.
Q. Are you familiar with the Jason Scott Company? Or Jason Scott Collection?
A. I am -- I know, yeah. I know this now. I know Jason Scott Collection now.
Q. Before the lawsuit, were you familiar with the Jason Scott Collection?
A. When I got my first letter.

Q. And before you got the first letter, did you have any familiarity or knowledge of the Jason Scott Collection?
A. Not really. Not really.
Q. You didn't have any knowledge of Jason Scott Collection generally?
A. No.
Q. You said Brumbaugh is a customer of Trendily?
A. Yes.
Q. How long has Brumbaughs been a customer?
A. I have to check what was their first day of -- date of order they started. But they're active, an active customer.
Q. And have they bought things from Trendily for years?
A. More than years.
Q. More than years?
A. Uh-huh (affirmative response).
Q. Have you ever been inside Brumbaughs?



A. A few times. Not really.
Q. A few times or not really?
A. Few times.
Q. Were you aware that Brumbaugh sold Jason Scott Collection furniture?
A. No.
Q. You never saw it on the floor there?
A. I didn't pay attention. That's none of my business what they have on the floor. I only care about what I have to offer, what my company has to offer. That's what I always went for.
Q. And you said Hill Country in San Antonio, they're a customer of Trendily?
A. Yes, they are.
Q. And have you ever been down to Hill Country's store?
A. Several times.
Q. And did you ever know that Hill Country sold Jason Scott Collection furniture?
A. No.



Q. So before you got the first letter, your testimony is, you didn't know about Jason Scott Collection?
A. Yes, that is correct.
Q. Now, I'm going to -- I'm going to ask you some questions about the MJ Collection furniture, which obviously is why we're here. I'm going to refer to them -- that furniture likely as the "MJ Collection." Now, I want to get information from you about the entire time that that furniture was being designed and produced, maybe even before it had the name "MJ Collection," but I'm still going to call it by that name. Do you understand?
A. Yes.
Q. So how did those MJ Collection pieces -- and I'm referring to the table, the desk, and the buffet. How did those come about?
A. If I remember correctly, it was sometime in September of 2016. Like I said, I don't go to customers very often. We have sales rep. They



do. Sometimes they have invited us, like me, to come with the sales rep. So I was invited by Western Heritage in one of the meetings. And I was there with Chris.
And luckily, like today, my dad is here from India visiting me. He's not here for this. He is visiting me because we are on vacation. So same thing happened in 2016, September, he was here. So we all three went to Western Heritage. And normally, Ron is not a buyer there. There's a person named Ron McBee. He's not a buyer there, but he inputs whenever needed. So --
Q. He -- I'm sorry, you said he what?
A. He's not a buyer at Western Heritage. Ron doesn't buy furniture. There are other people in the company, they buy furniture. Ron inputs.
Q. Imports?
A. Inputs. Inputs in between -- he inputs --

Page 62

Q. Oh, inputs.
A. Inputs --
Q. Got you.
A. -- what needs to be purchased. "Yeah, we can buy that. We can do that." But he's not the final yes or nay on it. Do you follow?
Q. I do.
A. Okay. So --
Q. So you had a meeting at Western Heritage?
A. Yes.
Q. You, Chris, and Raj --
A. Yes.
Q. -- were present?
A. Yes.
Q. Who did you meet with?
A. I started with Tammy. Tammy is Ron's ex-wife.
Q. What happened at that meeting?
A. Just normal meeting. We always do upholstery, sofa, recliners, dining chairs, you know, all kind of products we sell to them. We were

Page 63

discussing, and Ron just came in and he said, "Can you make this?" And that was a dining table.
So I said, "There's nothing new on this table. It is a pretty common table. There are more similar tables all day in the market." So --
Q. You said that to Ron?
A. Yeah, yeah, yeah, I said to Ron.
Q. And he said, "Can you make this?" And you have your hand up like he's showing you something. What was he showing you the table on? On his phone?
A. On his phone. And then he -- and then I think -- because when I left that place, if I remember correctly, I left that place with three -- three pages.
Q. Well, let's start -- let's start -- let's go back to your meeting. Ron shows you the table on the phone.
A. Yes.
Q. Say, "Can you make this?"

Page 64

A. Yes.
Q. What happens then?
A. Then I said, "Yes, I can make this table." He said, "Can you print him the copy?" I said, "I want a printout." So he sends to his computer, I guess, I don't know. But I got a printout. And then I don't know if he stayed there or he left or something happened, I don't know, but I left that place with three photos in my hand, and that was the desk, the buffet, and the dining table. So I left with three pictures in my hand. And dad was flying back in, I think --
Q. Let me -- let me stop you there.
A. Yes.
Q. Ron showed you the table on his phone.
A. Uh-huh (affirmative response).
Q. He gave you a printout of that photo?
A. Yes.

Page 65

Q. Where did you get the other photos from, the desk and the buffet?
A. Like I said, I don't know if Ron stayed there for the whole time or Ron just said, "I want this dining table" and he left, and then Tammy said, "Rahul, I think I need to get this desk," "I think I need to get this buffet," or some salesperson came and said, "You know, if Rahul is making this table, we need to get this buffet and desk done too." So I don't know who gave me those, but I left that place with three pictures that day.
Q. And so you remember Ron showing you the table and printing that out, but you don't know where you got the other two photos from?
A. No, I got from them. I got from them.
Q. But you don't know who gave them to you?
A. No. Because they were -- when we go to their store, there -- it's a sales meeting. And if you ever

been to one of those sales meetings, that is the most crowded conversation, because they're putting together fabrics, leathers, and it's so much input. "Oh, I like this. I like that." So much distraction. So I don't know exactly who, but I left that place with those three pictures.
Q. So you left -- your testimony is, you left Western Heritage with three pictures of the desk, the table, and the buffet?
A. Yes.
Q. And did anybody tell you where those pictures came from?
A. No.
Q. So you -- you just got three pictures of three pieces of furniture?
A. Yes.
Q. And then what happened?
A. Then the process. Then goes to India for production.
Q. So the pictures -- and I want to make sure we're clear here. You -- you drove out of Western Heritage.



Your testimony is, you had three pictures with you, right?
A. No sizes.
Q. No sizes on the pictures?
A. No sizes.
Q. Just pictures of furniture?
A. Just pictures. No name, no sizes, just a -- just a photo.
Q. So what happened next with the pictures?
A. We sized them.
Q. What does that mean?
A. We -- we look at the piece, and then we size it that how long we think this piece will be. "On, let's -- I think this much, and this much high, this much deep." And then --
Q. No, let me -- I'm interested in that.
A. I know you are.
Q. Where did that take place, the sizing?
A. Here.
Q. In your warehouse?



A. Yeah. Here in my office.
Q. So you and who -- who did that? Who looked at the pictures and decided what size it --
A. It was -- it was me.
Q. And you did that just by eyeballing it, by looking at it?
A. I've been doing this for long enough, so it's pretty easy. When you do that much, you -- you -- you know. So it was -- it was my experience that -- I sized it.
Q. And you did that with all three pieces?
A. Yes.
Q. So you came up with sizes?
A. Yes.
Q. And so you have sizes and you have photos?
A. Photos.
Q. What do you do with those things?
A. Send to India. My dad was here.
Q. How did you send them to



India?
A. By hand.
Q. Just gave them to your dad?
A. Yes.
Q. You didn't e-mail anything?
A. No.
Q. You didn't text it?
A. He was here. Like I said, my dad was there. And he's the one who's going to do the production in India, so he just took those pictures with him by hand.
Q. Where did -- where were the sizes?
A. On the pictures. I handwrote them.
Q. You wrote them on --
A. Yeah. I wrote the size on those pictures, yes.
Q. And then your dad took those pictures to India?
A. Yes, that is correct.
Q. Where are those pictures today?
A. I don't know.

Page 70

Q. Do you have any record whatsoever of those pictures?
A. No.
Q. Is that a common thing to get a picture from a customer and be asked to make that?
A. Very common practice. Very common practice in this industry.
Q. Does Trendily do that a lot?
A. Not a lot, but sometimes. Because we have -- we sell our product what we have published on a price list. That's where our business mainly is.
Q. Is in the published --
A. Published, yes.
Q. But you --
A. What you see on my website, what you see in my catalog, what you see on my price list, that's what my main business is. That's what I do every day.
Q. But then you do --
A. But in between, if someone --
Q. -- custom work?
A. Yes. In between, if someone

Page 71

says, "I have a customer. I have a custom order," this and that, "and I need" -- you know, "Can you make this for me? I need this long, this deep," and that. Then we do that. Otherwise, that's not my main business. My main business is what I have on my website, what I have in my catalog.
Q. And in -- as part of that process, if you get a photograph, do you ever do any kind of check for intellectual property protections on that design?
A. Now I do. Now I do.
Q. Now you do?
A. I do, yes. But like I said, I'm not born here. I'm not raised here. I did my schooling, my college, everything in India. So I am like no knowledge of copyright. Zero. And from my experience in the past, what I've heard from other people saying, that there is no such copyright law or act that applies to furniture. So I just didn't pay attention.

Page 72

Q. So you didn't do any check with regard to those pictures you got from Western Heritage?
A. Yes. No, I didn't do any -- any check on them, no.
Q. And --
A. For me -- for me, it was -- for me, it was a picture to look at it and size it and make it. That's it.
Q. And is it because of this lawsuit that you now do some kind of check for IP protection?
A. No, not because of this lawsuit. Because now I realize, when I start searching, researching, that this is really a copyright, is really a law in this country that protects someone's, you know, designs. Then I research and I said, "Yes, you know, we -- we didn't do our homework right."
So now I do. Not because of lawsuit. Because I want to be always right. Because I never in my life had any situation that I have to go to a court or have to be in a jail or have

Page 73

to be in any circumstances that I don't belong there, and I'm there because of my mistake. So that's why I check now, because -- I made this a practice not because of lawsuit, because of I want to be a good person. I want to walk straight with my head straight, not like this. That's why.
Q. Whose decision was it to call these pieces the MJ Collection?
A. Good question. We came up with this name because we have a company called Mi'Das Exports, and then we have -- Jaipur is my city where the Mi'Das Export is. So we came up with "MJ," Mi'Das Jaipur. That's how we came with "MJ."
Q. That was my next question, is how did you -- why did you name it MJ. So thank you.
A. Yeah.
Q. So let's go back. You sent your pictures over to India. They had the dimensions on them. Were there any designers in India that had any

involvement with that production?
A. No designers.
Q. So you had manufacturers in India that --
A. No. We have carpenters.
Q. Carpenters. Thank you for -- and I don't know what they were called --
A. We don't have manufacturers.
Q. You have --
A. We have carpenters.
Q. You have carpenters in India.
A. Exactly.
Q. And how did they make these pieces? What was the processes?
A. By their -- by their -- I think they have third eye.
COURT REPORTER: I'm sorry?
A. I think they have a third eye.
BY MR. DIETRICH:
Q. A third eye?
A. No, they have a third eye to do that. Because I'm not a carpenter. You're not a carpenter. They are. So



they have that vision when they see a picture with the size on it. So they have that eye and they have that vision that tells them that, you know, "I'm going to make it like this."
Q. And they look at the pictures --
A. Yes.
Q. -- and they made the product?
A. They look at -- they look at the piece and the size, what America is -- is asking for. They look at the size, they look at the picture, then it's all their decision how they're going to -- what door size will be, what drawer size will be, what -- how much will be the carving part, how much will be this, how much will be that. It's all based on their vision, their recommendation.
Q. And these MJ pieces, obviously they have a lot of carving on them?
A. Yes.
Q. The carving, they would have



to look at the photograph to determine what to carve, right?
A. Yes. Yeah, they're looking at a picture, but -- they're looking at a picture with where the carving is going, where the door is going, where the drawer is going. So, yes, they look at those pictures, yes, and then the size, which I handwrite it. Yes.
Q. And they use that to make the furniture?
A. Exactly.
Q. So after the furniture pieces are built, it's finished; is that right? Is there a finish applied to the outside of the furniture?
A. Yes.
Q. And did that happen in India?
A. In India.
Q. Who -- finishes come in different colors, right?
A. Yes, it does.
Q. Does Trendily offer different colors of finish?
A. I do.



Q. Did you make a selection of finish for the MJ Collection pieces?
A. Say it again.
Q. Sure. Who selected what kind of finish would go on the MJ Collection pieces?
A. We select the finish.
Q. When you say "we," who is "we"?
A. "We" is Trendily. If I say "I" on this testimony, I'm not "I." I'm Trendily. If I say "we," again, it's Trendily. Because if I make decision, it's on behalf of my company. So if I say "I," it's Trendily. If I say "we," it's Trendily.
Q. I understand that. But I actually want to know who specifically selected the finish. So when you say "I," I want you to mean you, Rahul Malhotra. If it was somebody else, I want you to tell me who that was.
A. The finish was selected by me. I selected the finish.
Q. And so the finish is then

Page 78

applied in India?
A. Yes.
Q. Is there any other part to the process, the manufacturing process that happens in India?
A. Not really.
Q. So it's finished. It's then loaded into a container, shipped over to the U.S.?
A. Yes.
Q. It comes to your warehouse in Dallas. What happens after the furniture gets to your warehouse? Is it -- is it -- is it disassembled for shipping, and then reassembled, or not?
A. No, it's -- it came off the container. And if it's a sold piece, it goes to the customer. If it's a stock, it's going into -- it goes into my warehouse.
Q. So how about for these MJ Collection pieces, was there any kind of preparation or other process you did once it got to Dallas?
A. No, not really.

Page 79

Q. Is there any kind of drying time or anything required for the wood?
A. There is. There is.
Q. There is?
A. Uh-huh (affirmative response).
Q. And --
A. Not after you make the furniture. It is before. But it's lumber. Then there is a process. But after it's not lumber, it's a part of furniture, no, you don't have to.
Q. And that brings up a good point. The MJ Collection was made out of teak; is that right?
A. Not really.
Q. It wasn't made out of teak?
A. No.
Q. What was it made out of?
A. Reclaimed.
Q. Reclaimed what?
A. Reclaimed wood.
Q. What kind of wood?
A. Reclaimed wood can be sol, can be acacia, can be mango, can be

Page 80

teak. When we get reclaimed wood, there is no such set thing that we have teak or we have sol or we have acacia or we have mango. It can be mixture of all the woods. So that's why it's reclaimed wood, it's not hundred percent teak. Because there will be two, three planks of teak in there or eight planks of mango in there or four planks of acacia in there or two planks of sol in there. So there's no -- there is no such scale that we filter those. They all come in a truck mixed, and it's reclaimed wood.
Q. So you don't do anything to separate out the --
A. No.
Q. -- teak --
A. No, we don't.
Q. Let me finish my question. Okay? You don't do anything to separate out the teak wood from the other woods?
A. No, we don't.
Q. And did you do anything to

Page 81

try to make the front pieces of the furniture out of teak while the others, say the back of the drawer, might be something else?
A. No. There is no such filter.
Q. Didn't you advertise that MJ Collection furniture as being made out of reclaimed teak?
A. We -- I don't think so. If we said that, then -- then we did. But I don't -- I don't hundred percent recollect. Because we didn't -- we didn't have MJ for longer period. Now, we had it for a few months, so I don't know what we said.
But you ask me now was it a teak. I said no, it was a reclaimed wood. And there are teak on there. There's a piece made -- there is a teak wood somewhere, which I don't know, because it's all mixed. It's a reclaimed wood.
Q. Who selected the pricing for the MJ pieces?
A. What price?

Q. Well, let's start with the table.
A. What price? Sales price, you're talking about, or purchase price, you're talking about?
Q. The Trendily price to a retailer.
A. Now you're clear. So Trendily price to a retailer. No, we just look at the piece and we come up with a number that how much we have spent on that piece, what's my cost, what's my expenses on it, and then we'll look at the number and we come up with that price.
There is a set formula to do that. It's not just, you know, I can throw a number at dealer, "I will charge you this much." No. He's going to look at the, you know, size and the detail what we have on that piece, then he will agree to the price yes or no.
Q. You said there's a formula for pricing?
A. Yes.



Q. Is that a Trendily formula?
A. It's a Trendily formula, yeah, you can call it. It's my -- it's my set margin and it's my set expense, what I make. Because you know that there's a dollar fluctuation almost every day, and there is a freight -- freight fluctuation every month. Every month, freight changes. The sea freight is not standard. They will charge you this much, and that will be for a year, no. It changes every month. And the dollar changes every day, every hour. So we don't have a set law for that. But when we look at the piece, we look at the number, we look at the cost, look at the investment, what we have made on that piece, shipping cost, warehousing cost, then my margin, then we come up with a number.
Q. So you have an amount of margin that's built into that formula?
A. Like I said, there is no set law. There is no set percentage that I



have to make, no.
Q. No, I understand. You said --
A. Yeah, yeah.
Q. -- you have a Trendily formula.
A. Trendily formula means we -- we look at the -- we -- we look at all those factors that built into that piece to make it, like how much wood involved, how much labor involved, how much shipping involved, what was the freight when that piece left India.
Q. I understand that. What's the margin that Trendily -- that's built into your formula? What's that number?
A. It's -- it's not set on every piece. It's different on pieces. Every piece has -- like dining chairs, I cannot sell -- I'm just giving you one example.
Q. Sure.
A. Like dining chair, I cannot sell dining chair for more margin,



because we're a quantity business. So I have to --
Q. You sell more chairs?
A. Yeah. Make less money on it. So it's -- there's no set law that applies to every piece, no.
Q. Did you have any conversations with Raj about these MJ pieces while they were being designed or built?
A. When he was here, yes.
Q. But other -- when he was in India, any conversations with him then?
A. I'm sure we did. Because he's my dad. We talk almost every day.
Q. By -- any by e-mail or text?
A. I don't think so. Because we normally talk on FaceTime.
Q. How about Chris Sanders, did you have any conversations with him when these pieces were in production?
A. I don't think so.
Q. So you talked about giving the photos to your father. He went back to India. Did you ever tell him

to make any differences in the final product furniture from what was in the photos?
A. It will be different. Even though we have a picture, if you're making out of a picture, I don't have the templates. So it will not be same.
Q. So your answer, though, did you communicate in any way to your father to make it different in some regard? No, right? You did not?
A. When customer gave me a picture, this is what they want. So if something I have in front of me -- do you follow me what I'm saying?
Q. You want to give the customer what they want.
A. Exactly. Exactly. But I have another line to say on that topic. That -- did I have a template with me? Did I have exact measurement or we have the same craftsman, same person who carved for Jason carved for Trendily? That's not true.
Q. And I didn't say that. My



question --
A. Yeah, yeah. I'm just saying that if you -- I want to add that line to that because it will be different because I'm looking at this picture and I'm looking at from a different angle than someone else will look at that picture.
Q. I understand that.
A. So everyone -- somebody will notice the nose, somebody will notice the eyes, somebody will notice the forehead, somebody will notice arm. So that's why I'm saying that. Yes, we have a picture, we look at the picture, we have the size, which I sized it, and now my carpenters are looking at it, how much this we want, how much the doors we want. So...
Q. When you sized it, did you pick standard sizes?
A. Yes, I did.
Q. And what do you mean by that? You picked a standard size for each piece?



A. Yeah. Yes.
Q. For the table, did you pick a standard size for that?
A. I did.
Q. And what -- what's a standard size for a table? I know you said it's -- actually, I don't recall what size you said the standard --
A. There are -- there are two sizes, mainly, people buy the dining table, that -- that quality of table. It's 84 and 96. So those are best sellers, because 84 is pretty much table that can fit in any, you know, dining room area. 96 is little -- 12 inches more to it, but it's still a standard because it -- it does fit in that place easy and -- so 84 and 96 is pretty standard.
Q. How about the width, did you pick a standard width?
A. Minimum is -- of that table is that long. The minimum is, like, 42. And it can vary from 42 to 44 to 46. I don't remember what was MJ. But



I remember for that table long, 84, people want to be 42 inches minimum wide.
Q. And for the desk, I believe you had testified earlier, there wasn't really a standard size for a desk?
A. Yeah, there's no standard size for a desk.
Q. So you just eyeballed it and picked a size?
A. Yes, I look at the picture and I just -- you know, just resize in my head that -- if we have panels, how many panels and how much overhang, and I came with a number.
Q. And the buffet?
A. Same thing.
Q. There's no standard size?
A. No standard. There can be -- buffets 96 inches long, 72, 78, 84. Depends.
Q. So how many -- strike that. How many of each piece were made at first, after you got the photos from Western Heritage and sent them over to

India?
A. One of each.
Q. And they were shipped back over. Did you sell those to Western Heritage?
A. Because they came for Western Heritage. All three from India came from -- for Western Heritage.
Q. I understand that. But did you sell those to Western Heritage?
A. Yes.
Q. And at some point, then, you decided to continue making those pieces, right?
A. When we delivered those three pieces to the Western Heritage, they call me and said, "Man, this is awesome. So can you -- are you bringing more of those?"
And I said, "I have not started anything on those pieces because I wanted you to look at these three samples first, you look at those sizes, you like the sizes, you like the design, you like all stuff we have



done. Now you said you like it, I will put them in production." So I -- then I did five of each.
Q. Do you recall the date when you delivered the first three pieces to Western Heritage?
A. I think March.
Q. So that would be 2017, then?
A. March of 2017.
Q. Did you receive any photographs of those pieces before that date?
A. From India?
Q. Yes.
A. Just over the phone. Just from the FaceTime.
Q. So you --
A. Yeah, my dad took the phone from his office, "Rahul, let me show you what we have done," and he showed me, "Look at this."
And I said, "Yeah, I like it." There were no stain on it. I remember those pictures, like, in my head.



And then he said, "Once I'm finished, I will show you those." So, yes.
Q. But no photographs sent to you?
A. No. No. Not even -- not even I send it -- because I never got anything from India, and I didn't send anything to Western Heritage as well, because...
Q. So you said you sold the first three to Western Heritage, and then you decided to make five of each piece after that?
A. Yes.
Q. And did you make five of each of those pieces?
A. Yes. In India.
Q. And were those five -- those -- so those were 15 pieces, total?
A. (Nods head affirmatively.)
Q. Were those all shipped over to the United States?
A. Yes.



Q. Were they sold?
A. Sold to about four dealers.
Q. All 15 pieces?
A. No. Eleven.
Q. Eleven were sold, and that left four?
A. Yes.
Q. What happened to those four?
A. I have them in my warehouse.
Q. Which one -- which pieces are those four?
A. Which one?
Q. Are -- the four that are in your warehouse now, are they desk, tables, buffets? Which ones?
A. Yeah, I -- I don't have that number. But I know there are four pieces, and those are in my stock. I think there's a buffet and some desk. I don't know. We have to check. But they are -- I have total 15 pieces. Of that, 11 we delivered; and four, we have in my custody.
Q. When you decided to go into production of the MJ pieces, at some

Page 94

point did you discuss them with Adobe Interiors?
A. Yes, Adobe Interiors. I remember Adobe Interiors, yes.
Q. Was that the next customer for these pieces following Western Heritage?
A. I don't remember that. But he was -- he was -- he bought MJ.
Q. And when you say "he," who are you talking about?
A. Tanner. Tanner Dipple is -- they have different people on their floor, but Tanner is -- is my contact.
Q. You communicated with Tanner?
A. Yeah, yeah. Me or Chris. Most the time Chris. I don't do that much with him. But Chris and he do, yes.
Q. How do you communicate with Tanner, usually?
A. Normally via phone.
Q. Do you text with him?
A. Sometimes when he's in rush, when he is -- if he has a customer on

Page 95

the floor, he needs some answers pretty quick, then he text me.
Q. Do you use text for business commonly?
A. I do.
Q. Do you know if Chris does?
A. He does, yes.
Q. Do you text with Chris?
A. Oh, yes, all the time. Oh, my God. Full-time. Yeah.
MR. DIETRICH: I don't know how long we've been going. This may be a good time for a short break. Let's take a five-minute break.
MR. ISRAELOFF: All right.
(Break taken, 10:52 a.m. to 11:05 a.m.)
BY MR. DIETRICH:
Q. We talked about you -- you sold the first three MJ pieces to Western Heritage.
A. Yes.
Q. And then you decided to make five more of each type.

Page 96

A. (Nods head affirmatively.)
Q. At that point, had you developed a plan for sales of the MJ Collection?
A. Not really.
Q. Did you have an idea of what types of customers you would target with those pieces?
A. Not really.
Q. Did you have any customers in mind that you thought you would want to sell those pieces to?
A. Not really.
Q. Did you discuss those pieces with Chris?
A. In what?
Q. In those early stages of --
A. No. No. He's not involved in -- no. He's only involved in the sales part.
Q. Did you discuss sales of those pieces with Chris at that time after you had sold them to Western Heritage and were thinking about going into production of the other -- of more

Page 97

pieces?
A. Not really.
Q. Did you ever prepare any kind of sales pitch regarding the MJ Collection pieces?
A. That's -- that's the salespeople's call, not my call, to -- how to pitch. They have to pitch everything what they have in their bag. So if they had MJ at one point in their bag, they pitch MJ. If they had other lines in their bag, they pitch other lines. So it's their pitching, how to pitch to the customer to -- to have them buy it. Because it's new. No one has seen it. So that's why.
Q. Do you give them any information to help them with their pitch or anything to say in their pitch?
A. No. They just ask what are the sizes, what's the price. Price is the -- the leading, you know --
Q. Driver?
A. -- driver on any sales pitch.



email@tobyfeldman.com
tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES
Certified WOB
(800) 246.4950

Price is what people are after. They don't care -- brand is -- is not what they're after. They're after a good price. They want a good piece that they can sell it and pay their bills.
Q. Is price the driver of sales to end customers as well?
A. I don't know that part, because I'm not -- I'm not a retailer.
Q. You don't sell to end customers?
A. No. Trendily Home Collection does. Not me. "Me" means Trendily Furniture.
Q. Well, Trendily Home Collection sells to designers, right?
A. Yeah. And then they also have their markups on their -- on it. So we don't sell retail, no. The answer is "no."
Q. None of the Trendily companies sell at retail to -- me, if I wanted to buy a piece of furniture --
A. You would have to go to my Trendily Home Collection. If you want



to buy, you have to go to Trendily Home Collection or have to bring a designer on board to buy from us.
Q. Right. If I'm not a designer, can I still go to Trendily Home Collection?
A. You can go to Trendily Home Collection and you can -- you say, "I can buy," and they'll go -- they'll make that decision based on, you know, the merits of yours, how -- like, you are a real customer or you are -- I don't know. So I -- we -- we don't have a set thing to say on that, because there is no such thing.
But Trendily Home Collection sees mostly designers. And nowadays, people, they shop for themselves, they call themselves designers or decorators. So it's hard to differentiate between a end customer and a designer, because both have the same name. They come to us -- showroom and say, "I am decorator," "I am a designer."



Q. And you don't verify that in any way?
A. Maybe they are just buying for themselves. I don't know. So that's -- that's -- we ask -- if they want us to -- to -- like, to verify them, we don't -- we don't verify them, no. We just -- we just go by their, you know -- they're paying for everything what they're buying, so...
Q. Do you have a different markup for selling products through Trendily Home Collection than you do through Trendily Furniture?
A. I do.
Q. A higher markup?
A. Oh, yes. Yes.
Q. And you said you had a showroom, right?
A. Yes.
Q. And that's Trendily Home Collection showroom?
A. That is correct.
Q. Did you ever have MJ Collection pieces in that showroom?



A. Just for display.
Q. But not to sell?
A. We didn't do any business.
Q. That was my question. Did you ever sell any MJ Collection pieces out of your showroom?
A. No. Zero.
Q. You only sold to retailers?
A. Yes.
Q. Did you only target retailers with your sales?
A. Again, that was not the plan to target retailers or designers, no. We just came with three pieces, and customer said they're good. I put five/five of each in production. That's it.
Q. Are you familiar with the concept of a manufacturer placing a gallery or a showroom inside of a retailer's space? And I'm asking you if you're familiar with it?
A. Give me one more time.
Q. Say an area inside of a retailer's big showroom that might just

Page 102

be for Trendily products.
A. No, I don't think so.
Q. Did you ever discuss anything like that with Western Heritage?
A. No, no, never. Never.
Q. Did you ever discuss any kind of gallery or showroom with Adobe?
A. No, never.
Q. Did you ever discuss turning Adobe into a Trendily -- a fully Trendily showroom?
A. I don't recall.
Q. So you may have?
A. I don't know.
Q. You said you know Bill Holland at Hill Country Interiors?
A. I do.
Q. Did you ever talk about the MJ Collection with Bill?
A. Not that I remember.
Q. Did you ever talk about Jason Scott with Bill?
A. I don't remember. I don't think so.
Q. Do you know of a store called

Page 103

Coyote Candle in Lubbock, Texas?
A. Ben?
Q. Right. Do you know Ben?
A. Uh-huh (affirmative response).
Q. His last name is Aufill?
A. Uh-huh (affirmative response).
Q. "Yes"?
A. Yes, that's correct.
Q. Did you ever discuss the MJ Collection pieces with Ben?
A. Never.
Q. Did you ever show him the pieces?
A. Never.
Q. Isn't it true, he came to your showroom, and you showed him the MJ --
A. No.
Q. -- Collection pieces?
A. He never came to my showroom.
Q. Did he ever come to your warehouse?
A. I don't remember.

Page 104

Q. So he might have?
A. I don't remember.
Q. So you never met with Ben to talk about -- and talked about the MJ Collection pieces?
A. I don't remember that. I never did. I never did any conversation with Ben on MJ Collection. Never.
(Exhibit No. 2 marked.)
BY MR. DIETRICH:
Q. I'm showing you what's been marked Exhibit 2. Do you recognize those documents?
A. Both of them, yes.
Q. What are they?
A. These are my invoices.
Q. These are created by Trendily Furniture?
A. That's correct.
Q. Is there a computer system that creates these?
A. QuickBooks.
Q. These are prepared in QuickBooks?

Page 105

A. Yeah. Yes. QuickBooks prepare all invoicing. All the sales orders and invoices are in my QuickBooks.
Q. So these two documents are called invoices?
A. Yes.
Q. And you reference sales orders. And we just talked a little bit about how -- what order those go in, but is a sales order the first thing that gets credited?
A. Yes. The first tab is sales order.
Q. Is a sales order.
A. Yes.
Q. And?
A. We acknowledge -- sales order, in other words, is an acknowledgment of a PO from my customer.
Q. The customer sends you a PO?
A. Yes.
Q. And Trendily creates a sales order?
A. Acknowledge we got their PO.

Page 106

Q. And you send that sales order back to that customer?
A. Yes.
Q. And then you either make or get the furniture?
A. Like I said before, if it's in stock, it goes to the invoice level. If it's not in stock, it goes to a purchase order level for India to produce.
Q. And then you send the purchase order to India?
A. Based on the sales order.
Q. Was there ever a purchase order sent to India for that first -- these first three items from Western Heritage?
A. No, because they never -- they never gave me a purchase order. It was just three pieces.
Q. Just the photos?
A. Just the photos, to make.
Q. That was my question. I didn't know if you would still generate a purchase order.

Page 107

A. No. But they didn't -- they didn't say, "I'll buy it." They said, "We want this piece if you can do it." And I didn't even give them the price. Nothing was given. Just the photos were given to me. We sent those to India, and no purchase order was created, nothing was -- and then we -- then at some point, I think we created, because we have to invoice them for these three pieces.
Q. If you look at the second page --
A. Yeah, it is. So that's what I said. This is from April. So somewhere in March, we created a sales order for them, or somewhere in January. I don't remember what time. But it was somewhere in there, we created a purchase order -- a sales order for them, and then we invoiced them when the pieces actually came.
Q. And your testimony previously in this case was that you received those pieces in the U.S. around

Page 108

January 2017?
A. Uh-huh (affirmative response).
Q. Is that accurate?
A. I have to check that. I think -- I don't have the document to say yes again. But if I said that, then I'm sure, yes.
Q. So then you invoiced them here in April 2017. And that's that second page of this exhibit, right?
A. I think -- I think the January was the date when it left India. There are five -- six weeks involved in the transit. India is not Mexico. India is overseas. It takes almost 45, 50 days to get the product here. So if I said in my testimony before, January, that meant they left India in January. I received them in March. I deliver them in April, on 3rd of April.
Q. Do you recall ever getting any photographs of those pieces after they were done, taken at the factory in

Page 109

India?
A. Like I said, no. Dad just showed me on FaceTime because we are -- we talk very often, because that's my working site. Factory is my working site. So -- and we are very connected with that, because we create POs here, and they work on the POs in India. So it's a direct connection. And like I said from the beginning, they are connected. So we talk every day. Every single minute when he wakes up -- you know, India is eight, nine hours ahead of us. When India wakes up, he calls me, "What's your progress today? What's your..." this and that. And then he -- he's in the factory, he show me the pieces. That's it.
Q. So you created this -- this invoice here, the April 3rd, 2017, invoice. And then I assume Western Heritage paid. Did he bill them out?
A. Yeah.
Q. On -- are the prices accurate on here?

Page 110

A. That's correct.
Q. And these are the --
A. All three -- for all three prices are correct.
Q. Are the dimensions -- these state the dimensions for each of the products.
A. Yes.
Q. Do you see that?
A. Uh-huh (affirmative response).
Q. Are those dimensions accurate for each of the products?
A. To my knowledge, yes.
Q. So you have 96 by 48 by 31 for the dining table?
A. Yeah.
Q. Does that sound accurate to you for the Trendily table?
A. Yes. I think, yes.
Q. And 72 by 36 by 31 1/2 for the desk?
A. Yes.
Q. And that sounds accurate to you for the desk?

Page 111

A. Uh-huh, yes, that's correct.
Q. And these are the dimensions you came up with by eyeballing the photographs?
A. Exactly. Exactly.
Q. Have you ever seen a Jason Scott catalog?
A. Never.
(Exhibit No. 3 marked.)
BY MR. DIETRICH:
Q. I'm showing you what's been marked Exhibit 3. I'll represent this is a copy from the Jason Scott catalog. Do you see it says "Sacred Heart Dining Table" at the bottom, with dimensions on it, right?
A. Uh-huh (affirmative response).
Q. Can you read those dimensions?
A. 96 by 40 by 31.
Q. Exactly the same as the MJ dining table, isn't it?
A. I did a great job.
Q. You did.

Page 112

A. I did a great job.
Q. To the inch.
A. Wow. To the inch. Because -- okay. The last inch, 31, is -- every dining table is 31 inches tall, irrespective. Every dining table width is from 42 to 48 or 46. I said that before in my testimony, that minimum is 42, can go 44, can go 46, can go 48. But there are some standards. A 96-inch is also a standard. So I'm -- I'm pretty close, yeah.
Q. You did say that. You're more than close. You are to the inch, dead on.
A. Actually, two sizes are pretty standard. 96 and 31, they are pretty standard.
Q. But the width, you did say it was 42 to 48.
A. Minimum -- minimum is 42. I have some tables in my line that are 42, 44, 46. 48, also, I have some in my line. So it -- it can -- it depends

Page 113

how bulky the table is, how big that table is. Then we look at the size and the scale of the table, and we think, this table handles -- can handle 48, 46 inches' worth. So I did a good job.
Q. You had never seen this dimension of Jason Scott table before?
A. First time. I'm looking at this first time.
Q. And you picked it to the inch for your own table?
A. Yeah. So I didn't waste my time in what I've done in 10, 12 years. So I -- I'm good at what I do, actually.
Q. I --
A. You can ask my customers.
Q. I guess so.
A. My customers will confirm that I'm good at -- good at what I do.
(Exhibit No. 4 marked.)
BY MR. DIETRICH:
Q. I think you know where we're headed with this, but --
A. Yeah.

Q. -- if you would take a look at Exhibit 4, this is a copy of Jason Scott's catalog for the Iron Star desk.
A. Uh-huh (affirmative response).
Q. And --
A. Now we have a difference in the size.
Q. We do, of half an inch?
A. Half an inch. Yes.
Q. And --
A. I see it.
Q. This is the desk that the MJ desk is based off of, right?
A. Similar. We have a different design.
Q. Right.
A. Our carving is different.
Q. I understand that. But this is the desk that you adapted, in your words, to make the MJ desk?
A. I don't know.
Q. Well, you state that in your interrogatory answers. So I can show you that, if you'd like.



A. No, no. What -- say it again.
Q. You stated that you adapted this desk to make the MJ desk, and you stated that in your interrogatory answers.
A. And I said that I don't know -- now, this picture has the name on it. Has the size on it. Everything is there. But that's not what I got.
Q. Yeah, I understand that.
A. I just got this. Or something else. Maybe not -- maybe not this picture. Something else. I don't remember.
Q. I understand.
A. But -- yeah. So what is the question?
Q. The photograph of this desk is the one that you adapted to make the MJ desk. You've already stated that in your interrogatory answers, so I'm just clarifying that with you.
A. Yeah, so -- but I didn't know the name.



Q. I'm not -- I'm not asking if you knew the name.
A. So the -- so this picture -- how I know this picture is the same picture I got from Western Heritage?
Q. Oh, I'm not saying it is.
A. I can't testify that, because I don't know.
Q. I'm not saying it is. I'm saying it's the same desk in the picture that was in the picture that you got from Western Heritage.
A. I don't think so. I don't think so. Why? Because your carving in this desk is different than Trendily carving. You can check that. You can check that.
Q. No, I understand that. It has the same ironwork, has the same legs, has the same --
A. Check -- check the -- check the carving on the centers right here.
Q. I get where you -- yes, I see that.
A. It's different. Ours is



different.
Q. I understand that.
A. Yeah.
Q. So you --
A. So I don't think we got Jason Scott picture. We got someone else picture. Do you follow what I'm saying?
Q. I follow what you're saying, but it contradicts what you've said before under oath. So I'm just --
A. What did I say under oath?
Q. -- going to ask you a question about that.
A. Okay.
Q. You think you got a picture of a different desk?
A. Uh-huh (affirmative response). This is different carving. If you have my -- do you have my copies? If you have my copy...
(Exhibit No. 5 marked.)
BY MR. DIETRICH:
Q. I'm showing you what's been marked as Exhibit 5.

A. Yes.
Q. These are photographs of Trendily's desk --
A. Yes.
Q. -- to start off. Do you see that?
A. I see that. And I see the difference in the carving.
Q. You see the difference in the carving in the center piece between the iron designs. That's what you're talking about, right?
A. Yes, I am.
Q. And you see the similarities in the iron designs imbedded on the desk?
A. It's similar, but it's not the same. Because our -- our center diamond is bigger. Yours is very small. They look same, but they're not same. You can look at those detail right there.
Q. So you think the center diamond in the iron is -- is slightly bigger in your version?



A. My version is bigger. And that carving doesn't match.
Q. How many imbedded iron stars are there across each desk?
A. Based on the -- the length, if -- if the desk is 84 inches long?
Q. No, I'm talking about in these pictures.
A. I see 12.
Q. Well, there's six across, right?
A. Yeah.
Q. And there's six across on yours, aren't there?
A. Yeah. Because this is 72-inch desk, that's why. If I make this desk 84-inch, then it will be 14.
Q. But you didn't make it 84 inch, you made it --
A. Because we'd already made a standard 72-inch. Like I said earlier, the desk, they can go from any size to any size, depend where you go to put this desk. Are you going to put that desk in your house? Are you going to



put that desk in your office? That's why.
Q. Your testimony earlier was that there wasn't a standard size for a desk.
A. No, I said that there's no standard -- I just said again, there's no standard size. But when we look at the picture, the picture tells you -- every picture of furniture, they talk to you. If you have that ability to read what picture says, you can see, Oh, it looks like this much, looks like this much, looks like this much. So if I would be -- if I would have the sizes -- how would the size -- mine is 31 1/2, and yours is 31?
Q. So --
A. Because I didn't -- I never got those pictures. I got the pictures what Western Heritage gave me, with no name on it, no size on it. I'm saying again, it's just my idea of putting size on it.
Q. Oh, I understand that. The



desk in Exhibit 4, this desk...
A. Yes.
Q. That's similar to the desk in the photo you got from Western Heritage, right?
A. No.
Q. It's not.
A. It's similar.
Q. Similar. I'm not saying exactly the same. I'm saying similar.
A. Yes, exactly.
Q. It's similar?
A. Similar, yes. Similar.
Q. And you eyeballed that photo and came up with dimensions?
A. That's correct.
Q. And your dimensions for the length are 72 inches, and that's exactly the same as the Jason Scott desk, right?
A. Yes.
Q. And your dimensions for the width are 36 inches, and that's exactly the same as the Jason Scott desk?
A. Because I already have desk

in my line with the same size.
Q. The same size?
A. Uh-huh (affirmative response).
Q. 72 by 36?
A. Uh-huh (affirmative response). So I just went off that size.
Q. Oh, I thought you eyeballed it.
A. I -- who eyeballed the first desk? I eyeballed it. Second time, I eyeballed it. So I'm the one who's eyeballing the desk, what I see in front of me. So I size it at first point or second point, but I size it.
Q. And the height, you're right, Jason Scott's is 31, Trendily's is 31 1/2. So a half inch difference.
A. Yes.
Q. And you're saying you never saw the dimensions of the Jason Scott furniture?
A. Never. Never.
Q. You just came up with that



purely by coincidence?
A. By coincidence. That's my experience.
Q. So you got your MJ pieces into production. And if you would just look through Exhibit 5. It's the photos. Do you recognize all of the furniture in Exhibit 5?
A. Yes, I do.
Q. Are those Trendily pieces?
A. All Trendily pieces.
Q. MJ Collection pieces?
A. MJ Collection pieces.
Q. Who did you offer -- and when I say "you," I mean you, Rahul. Who did you offer to sell the MJ Collection pieces to?
A. Clarify.
Q. What customers did you go to and pitch these pieces?
A. I didn't go to any customer.
Q. Ever?
A. I did, but not for MJ to pitch. I don't -- I don't recall that I've -- that's Chris job. Chris do



that.
Q. You never talked to a single customer about the MJ pieces?
A. I might have. I might have. If -- if someone came to my showroom during market, I'm -- I might have done because I'm there.
Q. Just in your showroom at market, not out at any other customer's location?
A. Maybe. I don't -- maybe.
Q. Do you recall which customers those were?
A. Like I said, if I did, I don't remember who the customers were. I don't know. But that's not my job. So it's not like yes, I did that. No.
Q. No, I think you said earlier that your job -- a lot of your job was sales, right?
A. Yes, to -- to look for the sales, not go get the sale. I have people to do that for me. I don't have to go get the sale. Sale come to me, then I'm on top of it. So I do -- I



monitor sales, but I -- I don't have to leave my office and do the sales call. I'm not a sales rep.
Q. So you say look for the sales, that's what you do?
A. I monitor the sales. "Look" means I monitor the sales. I monitor my sales, and I am on top of that part.
Q. Do you direct your sales reps to any particular customers?
A. If someone calls the office, want to see Chris tomorrow, my job is to relay that message to Chris: "Chris, that customer wants to see you tomorrow."
And he says, "I am not in town. I will be" -- either same day or next day or whenever he's available.
Q. Do you ever say, "Hey, Chris, you should go over to Brumbaugh's and sell this?"
A. Not really, I can think of. We do a lot of stuff, you know, in a day. So...
Q. Did you ever pitch the MJ

Collection furniture to Sally Brumbaugh?
A. Never.
Q. Did you recall testifying earlier in this case that you did?
A. I don't think I testify that, because I never did. No one did, actually. And if you actually look at Sally Brumbaugh deposition, she said the same thing, that "Trendily never came to us to -- to push on MJ." Because we never did. And that's one of your deposition. She confirmed it.
Q. Well, I know. But I'm curious as to why you testified that you did?
A. When did I testify?
Q. At the preliminary injunction hearing in this case.
A. What did I say? If you could bring that up, I can tell you what I meant.
Q. Yeah, that's what I want to do.
(Exhibit No. 6 marked.)



BY MR. DIETRICH:
Q. So this is a copy of your section -- your testimony from the preliminary injunction hearing. I asked you this is on page -- the bottom of page 68: "Mr. Malhotra, you agree you sold MJ Collection pieces to Adobe and Western Heritage, right?"
Your answer: "I offered to every customer. I offered to Country Interiors, Bill Holland, I offered to Sally Brumbaugh." Do you see that?
A. "I offered to every customer. I offered to Hill Country -- offered to Country Interiors, Bill Holland, I offered to Sally Brumbaugh."
Q. Did I read that correctly?
A. Yeah. But like I said, we never -- we never pitch MJ Collection to any of Jason Scott dealers. Like, when I came to know about this thing, the -- the -- this is the letter you sent me first. Then I came to know that this piece belongs to Jason Scott.
Q. But you testified in court



already that you pitched it to Sally, who was a Jason Scott customer.
MR. ISRAELOFF: Object to form.
BY MR. DIETRICH:
Q. You can answer. Right? You testified to that? And you testified that you pitched it to Bill Holland, who is also a Jason Scott customer?
MR. ISRAELOFF: Object to form. Asked and answered.
A. But both of them have testified I never pitched them. So when I was taking all my customers' name that, "Mr. Malhotra, you agree you sold MJ pieces to Adobe and Western Heritage?"
I said, "I offered to every customer. I offered to Hill Country, Bill Holland, I offered to Sally" -- maybe I didn't understand the question right, because this answer doesn't belong to this question. The question you asked me --
///



BY MR. DIETRICH:
Q. I would agree with that.
A. The pieces to -- and we were on the phone. So your question is, "Have you sold these pieces to Adobe and Western Heritage?" What the -- I was thinking that I answered this question. And this is wrong answer, I would say. Because Sally said that in her deposition that we never -- and that's true. That was your --
Q. I'm just trying to figure out what the difference is. You said you did, and now you're saying you didn't.
A. No, I didn't do it. I didn't do it.
Q. And Bill Holland?
A. I didn't do it.
Q. You didn't ever pitch the MJ --
A. Never pitched -- never pitched to Bill Holland. Never.
Q. So I guess I want to find out, and I'm still not really clear, did you ever personally pitch the MJ

Page 130

Collection to anybody?
A. I don't recall.
Q. You may have?
A. I may have. I don't know. It's been more than a year now. I don't remember.
Q. And in your testimony at the hearing and in your discovery responses, you stated that customers themselves referred to Jason Scott in meetings with you about the MJ Collection?
A. No, I never said that. I said if they do -- you asked me a question -- I remember that. You asked me a question in that hearing that -- "Have you compared this product to Jason Scott?" I said -- "Have you compared or your sales rep compared that to Jason Scott?"
My answer was, I never did. If my customer, in their head, they did, that's not -- I cannot control them. I cannot control your mind. I cannot control his mind. So what do

Page 131

you think looking at this piece, that's your perception, that's your thought processes on that piece, not mine. So if I said that, I said that in that context, not in -- that I met dealers and I pitched MJ, no. I don't remember if I've been to dealers to pitch MJ. No, I don't think so. Chris did. And you already know about the Bo. So...
Q. Sure. How about Shawn Beach, did you meet with Shawn Beach and talk about the MJ Collection?
A. Shawn Beach -- Shawn Beach, Calamity. Calamity Jane's, she's in Boerne. And normally, I don't go to customer meetings. That's Chris job. I think that I was there with Chris. And we didn't have a plan to see Calamity, because I was there for another big meeting. And I was talking to that dealer --
Q. Sorry to interrupt. You said you did have a plan to see Calamity or did not?
A. I did not have a plan to see

Page 132

Calamity.
Q. You were there in San Antonio --
A. I was there in San Antonio to do another customer meeting, which was very much more important than Calamity, seeing Calamity, because Calamity is a -- is a small customer.
Q. Sure.
A. It's not huge. So I was there. I remember we finished our meeting earlier than normal time. We always take full -- pretty much full day of dealer, because we have to talk about things and put order together and do that and do this.
And then Chris called or she called, I don't know. But Chris came to me, said, "We have to see Calamity."
And I said, "She's that late up there?" "Yeah, she's there." "Okay." Normally, people don't see after 5:00.
Stores don't want to see us after 5:00. And I'm positive it was

Page 133

sometime after 5:00 or 5:00.
Q. And you don't how that meeting got arranged?
A. No, I don't know. Because I was -- Chris was in my car with me. So I drove my car. Chris was with me. I remember that part. And then Chris said, "We have to go to see Calamity."
I said, "Okay. Is she -- she's available, like, this late?"
"Yeah. She's ready for us." We went there. And that's all I remember.
And then Chris did the talking. That's his job. And I was there, "Hey, Shawn, how are you?" and all that kind of -- greet each other. And that's all I remember.
Q. And you don't remember talking about the MJ pieces with her?
A. Not at all.
Q. Did you review her deposition testimony, Shawn Beach?
A. I did. I did.
Q. Did you see where she stated



email@tobyfeldman.com
tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES
Certified WOB
(800) 246.4950

that you did talk about these pieces with her?
A. Okay. I'm going to -- I'm going to tell you this: Why somebody will take her -- she's in her store, right? She's not in someone else stores. And I will tell Shawn, "Come to corner. I want to talk to you"? Why will someone take her to the corner and pitch MJ? She's in her store. People are gone. She's the only person there. She can say whatever she want to say, but why will -- on her testimony, why will someone take a store owner to a corner? I'm hiding from Chris? No. Chris knows same thing what I know. So point is, why she said that? That's -- I don't know. You have to find out. That's your testimony, that's her deposition.
Q. Okay. She --
A. Same thing -- I'm sure she called us to come see -- she was making a -- it was a plot. It was a trap, like Bo Runyon did. You know what Bo



Runyon did. You have a recording of that.
Q. Let's -- we'll get to that Bo in a sec.
A. Okay. Yeah. Okay. So I just want to tell you that it can be a trap. Because why will someone take a store owner to a corner when everything is public? Nobody is there to listen. Customers are not there. So why will I take her to the corner? That's false. I object that, because that -- that never happened.
Q. I will state, your testimony at the preliminary injunction hearing was that you contacted her to come over.
A. Contacted her to come over where?
Q. To come over to Calamity Jane's.
A. Say that again.
Q. Maybe it was you or Chris, but it was that --
A. See, you're not clear.



Q. You contacted --
A. How can you put words in my mouth if you're not clear? You need to first do your homework, then you come and talk to me on that, because you don't that. Because I remember, I didn't say anything. If Chris did, then he's -- that's his job.
Q. Well, you're saying it's a plot. But your testimony at the --
A. A plot because she invited us. She said --
Q. Let me ask my question, and then you can answer. Okay?
A. Yes. Yeah, go ahead.
Q. Your testimony at the preliminary injunction hearing was that you, Trendily, contacted Shawn and asked to come over to Calamity Jane's that day. Does that sound accurate?
A. No, that's not accurate.
Q. So you did not testify accurately?
A. Read my answer.
Q. "Like I said" -- this is your



testimony. "Like I said, we were in the area and we called. We don't go without notice to the dealer that we are coming, so we called, and she invited us and we went there, me and Chris." Did I read that correctly?
A. Yes. That's what I just -- what I said before, that I don't know if she invited us or Chris -- but I was informed by Chris that, "We are going to see Calamity today." That's what I just said. And I'm still correct on that. Because I don't know. She -- and she invited that -- confirms that I said that, that she invited us. We don't go -- like, I'm not going to show up without notice. Or Chris will not show without notice. So if she called Chris or Chris called, I don't know that part. But Chris told me that, "We are going to see Calamity today." That's all I remember.
Q. You said right here --
A. That's what I said in my testimony.

Q. -- "we called," you called her.
A. "We call" means -- whenever I said "we," it's Trendily. So Trendily is -- representative is Chris. If Chris called, I said "we." It applies to either Trendily or Chris. You can apply either way.
Q. No, I get that.
A. But that -- but I don't call customers that, "I want to see you," because that's Chris accountant. Chris calls the account. I'm just a -- just like my dad sitting here, watching what you're doing.
Q. Okay. Listen to me. You are saying that there was some kind of plot involving Shawn Beach?
A. Because she said --
Q. Let me finish.
A. -- I took her to the corner.
Q. Let me finish. Okay? We're going to be a lot faster and we're going to be able to go home at some point today if I can finish my



question, and then you can state your answer.
MR. ISRAELOFF: Object to form.
MR. DIETRICH: I don't know if that was actually a question.
BY MR. DIETRICH:
Q. But you're saying there was some sort of plot. But "we," meaning you or Chris, I understand that. You were the ones that contacted Shawn and got the invite to come over to her store. That's your testimony.
A. When I said "we," I don't know the part if Chris called her or she called Chris. But she invited us to come over. That's what the testimony says.
Q. And you said twice in your sentence here, "we called" and "so we called." Right? So you called her.
A. I didn't call her.
Q. Chris called her?
A. That's what I'm saying. I don't know that part. If I said "we"



called, means we called or she called.
Q. If you don't know that part, why did you testify to it?
A. Let me -- I told you, this is -- everything is new to me. That day when I was in injunction hearing, that was first time I'm talking to a judge. My hands were like this, shaking. Today also, I'm shaking, but I'm just thinking that everything is truth and same. It's not gong to change. It's going to be same. So you can tweak it either way, but it's going to be the same answer. She called or I called. We don't remember. But we were there. I remember that.
(Exhibit No. 7 marked.)
BY MR. DIETRICH:
Q. I'm showing you Exhibit 6.
A. 7.
Q. 7, I'm sorry, which is "Defendant's Response to Plaintiff's First Set of Requests for Admission." Have you reviewed this document?
A. Not yet.



Q. Did you review it when it was provided to us in discovery?
A. These are my answers, but, like I said, I haven't read this. You asked me have I read this paper.
Q. Yes.
A. Not -- not -- this is from when? What day was this paper? Sometime last year?
Q. April --
A. No, April -- 5th of April.
Q. Of 2018.
A. I got it. So if you ask me something on this, I have to read this paper, because I don't...
Q. Did you review this for accuracy before it was sent out?
A. I'm sure I did.
Q. Let me go to Request for Admission No. 9. This is on page 4. The request reads, "Admit that customers to whom you pitched or offered to sell the MJ Collection recognized those pieces as being similar to Jason Scott furniture."

Page 142

The response is, "Admit that is what they said, but unable to admit or deny if they were being truthful or were saying so for other reasons." Do you see that?
A. Uh-huh (affirmative response). And who are "they"?
Q. That's my question to you. This is your discovery response.
A. So "they" is the customers.
Q. Right. Who are "they"?
A. The customers.
Q. Which ones?
A. No name. This is just a line saying that they -- if -- you asked -- your question: "Admit that customers to whom you pitched or offered to sell MJ Collection recognized those pieces as being similar to Jason Scott."
"Admit that is what they said, but unable to admit or deny if they were being truthful or saying -- or saying so for -- for other reasons."
And that's what I just said. "Other reasons" are: A trap, like --

Page 143

can I say something on extravaganza? Can I say that?
Q. Well, I want to first -- you specifically say here that you admit that customers said that those pieces were similar to Jason Scott furniture. That is what your --
A. Yeah. I just -- I --
Q. -- statement is.
A. I said --
Q. I want to know what customers said that, what specific customers.
A. If you think you -- you -- your question has no name on it. Did you put any name on it: Admit that Calamity Jane's -- you didn't put Calamity Jane's here.
Q. That's -- I'm here asking you --
A. That's what I'm saying.
Q. I want --
A. You asked me -- you asked me --
COURT REPORTER: One at a time. One at a time.

Page 144

A. When they had a customer name, you -- on your question, you have a customer. So I don't know. If customer compares my -- those three pieces on the website, who is looking at it, who is talking about it, I don't know. I'm not Google. So my question is, I don't know. Who were they? But if you say so that customer compared it, if someone did and you have a testimony of customers that said this is like Jason Scott, then it's their thinking, their decision, their -- their topic, not my topic.
BY MR. DIETRICH:
Q. So you're not willing to tell me what customers referred --
A. I don't have the --
Q. -- to Jason Scott --
A. -- names, because -- I don't have those names, because I don't know. Like I said, I never, never until today, pitched my product as Jason Scott product. Never. Not even Chris. And you have testimony from Bo Runyon,

Page 145

you have the recording. And any recording, Chris said that? "This is Jason Scott"? She's putting words in his mouth over and over again. "Do this look like Jason Scott? Do that --"
Q. Okay. Stop. That's not my question.
A. I'm just saying that --
Q. I understand. And I --
MR. ISRAELOFF: You just need to answer his question.
A. The question -- is yes. Yes. I'm just carried away. I'm back. Sorry.
BY MR. DIETRICH:
Q. I understand this is -- can be emotional.
A. No, it's not emotional. It's all business.
Q. Let's keep it business.
A. Yes.
Q. So I'm not interested in what you said to customers. I understand your testimony is that you, Rahul, or


email@tobyfeldman.com tobyfeldman.com
Toby Feldman, Inc. NATIONWIDE SERVICES
Certified WOB (800) 246.4950

Chris did not mention Jason Scott to customers. I want to know which customers mentioned Jason Scott to you.
A. Do you have Bo Runyon name on it? She did.
Q. Who else?
A. I don't remember. I remember Bo Runyon because it's on paper. It's on paper. I remember Bo now. She never bought a piece. She never bought anything. And that's why I call that a setup.
Q. Any other customers?
A. I don't recall.
Q. Did Western Heritage -- did anybody from Western Heritage ever mention Jason Scott to you?
A. No, never.
Q. Did anybody from Adobe ever mention Jason Scott to you?
A. To Chris, maybe.
Q. Do you have knowledge of that?
A. I'm not sure. I cannot comment on Chris. I don't know. We



share some text messages, Adobe, Tanner, and I, and we both had some conversation there. And if you'll read my text side and his text side, in my text side, I never said in my conversation anywhere "Jason Scott" or "JSC" or whatever you want to call it.
Q. And he referenced it to you, though, right?
A. If he said -- that's what I'm saying. If he said, it's there. So if you have that name and you have Bo Runyon's name comparing that to Trendily comparing that to Jason Scott, then you already have the names. Why are you asking me the question? Because you already have two names.
MR. ISRAELOFF: Don't worry about that. Just answer his questions as he asks them.
BY MR. DIETRICH:
Q. I'm asking the question because I want to know the answer.
A. Because I don't know the answer.



Q. It was in your discovery response. That's why I'm asking the question.
A. Okay.
Q. So you said you sold 11 MJ pieces?
A. That's correct.
Q. What was Trendily's total revenue on the MJ Collection pieces?
THE WITNESS: Can I look at my numbers, Sim?
MR. ISRAELOFF: Yes.
A. Can you ask me the question again, please?
BY MR. DIETRICH:
Q. Sure. What was Trendily's revenue on the MJ Collection pieces?
A. 18,789.
Q. 18,789?
A. Yes.
Q. What was Trendily's profit on the MJ desk?
A. I don't have a -- I don't have an individual number. But do you mean -- you need to be clear on profit.



There are two kind of profits, gross or net. What profit are you talking about?
Q. Let's start with gross profit.
A. The gross profit on the total sale was $13,405.
Q. Thirteen thousand...
A. 405. 13405.
Q. And what was your net profit on the total?
A. 9,100.
Q. $9,100?
A. That's correct.
Q. What are you looking at to get these numbers?
A. My homework. You asked me this topic.
Q. And you looked in QuickBooks for that?
A. Yes. Yes.
Q. Did you produce any QuickBooks information to us in this case?
A. I think I -- I think I did.

I'm not sure. We have to revisit that if we have or we haven't, but I think we did.
Q. Okay. So you were selling the desk for $1,699? That's on Exhibit 2, the Western Heritage invoices.
A. Put them in order so I don't have to... These are.
Q. There you go.
A. Yeah, I got it. No. 4, No. 3, and 2. Okay. I'm looking at it right now.
Q. Right. So your desk price is $1,699?
A. 1,699.
Q. And that's the price that you charged to retailers?
A. Can I...
Q. I'm happy to take a break if you need one.
A. No. I just had a little, you know, cough in my throat.
Yes, I'm back.
Q. Do you know what your gross profit was on -- per piece, so on the



desk itself?
A. No, I didn't get that. I didn't get that. But I did research the total of what, you know, pieces we sold, the -- the total revenue, and then I did the gross. I did get you the net. And then that's all you requested.
Q. So that's what you have in your --
A. Yeah.
Q. -- chart there?
A. Uh-huh (affirmative response).
Q. Is Trendily profitable today?
A. Without expenses, paying all salaries, all this, I have to check what my -- because I haven't closed my last year yet.
Q. How much did Trendily make in sales in 2017?
A. "Make" means?
Q. What was Trendily's revenue in 2017?
A. You want the total sale?



Q. Yes.
A. You need to be clear on that, because there are different things in the -- so "total revenue" means total sale?
Q. Right.
A. Last year?
Q. Yes.
A. I have to check. I cannot comment on that.
Q. Do you have an approximation?
A. I don't want to guess. It's a legal document, so I don't want to guess.
Q. How much did you personally take home in salary from Trendily last year?
A. I'm not on salary.
Q. How are you paid?
A. I get paid whatever is left over.
Q. And how much did you take home from Trendily last year, in 2017?
A. I have to check.
Q. You don't know how much you



made?
A. It fluctuates, because I am self-employed. I don't -- I'm not -- I don't work for a salary. I have no hourly rates. I don't -- I have to work over the weekends as well, Saturday, Sundays, if I have to. So I have to check. And my numbers goes up and down every year because it depends -- what is left over, that's my money to take home.
Q. Do you do that at the end of the --
A. End of the year, yes.
Q. Is your year-end at the end of the calendar year?
A. Yes, yes.
Q. So you got your take-home money in January 2018?
A. Whatever is left.
Q. Right.
A. But I don't -- I don't take -- what we do is, I do withdrawals in between. How will I eat? How will work if I don't withdraw? So I do

withdrawals. And my withdrawals are not fixed. It can go from anywhere to anywhere. Depends how much I'm in need. That's it. But that all goes against my leftover at the end.
Q. Your leftover at the end?
A. Yes.
Q. So how much money did you make last year from Trendily?
A. Like I said, I didn't close the last year. My last year is not closed yet. I'm on extension. I don't have my year closed yet.
Q. But I thought you said you got your leftover payment in January of 2018 after the year closed.
A. Like I said, there is no set date to get the money from the company. We withdraw every month for my expenses, for my needs, for my family. I have kids. I have wife. So I cannot -- I cannot give you a number, because I don't know the number.
Q. Does your wife draw a pay from Trendily?



A. No, she doesn't.
Q. How about Trendily Home Collection?
A. She doesn't.
Q. She doesn't draw any money from the Trendily companies?
A. Trendily Home Collection is in loss.
Q. So your wife doesn't draw any money at all from Trendily?
A. No.
Q. Does she have any control over Trendily's business?
A. Not really.
Q. At some point, you decided to add more different pieces to the MJ Collection line, right?
A. Not really, to be honest.
Q. I only want you to be honest.
A. I'm honest. Not really.
Q. Not really?
A. Not really.
Q. That's sort of an equivocal response. Did you ever have plans to add more pieces to the MJ line?



A. Say that again.
Q. Did you ever have plans to add more pieces to the MJ line?
A. No plans.
Q. Did you ever --
A. Not then, not now. No plans.
Q. Did you ever discuss adding more pieces to the MJ line with anyone?
A. Not discuss. It's a text message between me and Tanner. And Tanner Dipple, if you look at his text messaging to me -- you asked me the same thing when I was in injunction hearing, and my answer was that this was just -- if I said, "Yes, yes," these were just sales pitches. Because we are on receiving end. We're not stores. We are on a receiving end. We don't have a store to -- to offer our product. We only have these stores to offer our product, so we have to talk. And every -- you go to a car dealer, he will tell you about that car. Company who's making that car doesn't even know that much features we have in our car,



but that salesperson knows, because he has to sell it. He has to actually sell it. That's how he makes his living.
So same thing. He came to me, he showed me the picture. I don't want to throw him back. I don't want to discard it. But I did discard when I got those -- you know, notices. I said, "No, we cannot do this now."
Q. Well, you discarded when you got sued, not when you got the notices, right?
A. I don't know. I have to check. But I think it was in between. My text messaging was somewhere, I don't know, maybe June, July. I'm not sure. You have dates.
MR. DIETRICH: Is this 8?
COURT REPORTER: Yes.
(Exhibit No. 8 marked.)
BY MR. DIETRICH:
Q. So I'm showing you what's been -- what's been marked Exhibit 8. Do you recognize these text messages?

Page 158

A. I do.
Q. These are between you and Tanner, right?
A. That's correct. Tanner Dipple at Adobe Interiors.
Q. Right. And you said you texted with Tanner pretty often?
A. Not really. Not really.
Q. But you did text with him here?
A. Yeah. Because this -- when I saw these right before the injunction hearing, the picture was clear to me that this was a trap.
Q. You think this was a trap too?
A. A hundred percent. A hundred percent. Because if -- you read his text and read my text. You added this exhibit last minute on the injunction hearing. He was in a flight. I didn't -- he e-mailed me, said, "Rahul, look at your e-mail. They added something new."
And I look and said, "Oh, my

Page 159

God." I'm reading those text messages, I said, "Shit. It was a setup." It was a setup.
Q. And these are your texts, right?
A. That's what I'm saying, it was a setup. He's doing same thing what Bo did. Read his text and read mine.
Q. Just answer my questions. Okay?
A. Okay.
Q. Listen to my question and give me the answer.
A. Uh-huh (affirmative response).
Q. These are your texts with Tanner?
A. I said yes before.
Q. You didn't produce these texts to us in this case, did you?
A. I didn't produce these texts, no, I didn't.
Q. Why not?
A. Because we don't keep text

Page 160

messages.
Q. Why not?
A. Because we have a policy. In my company, I have a policy of 30 days. Above 30 days, no text message. Delete it. Gone.
Q. Delete it from everyone's phone in the company?
A. Every phone in the company.
Q. And you didn't change that policy at all when you got the cease and desist letters in this case, did you?
A. No, we didn't -- no, we didn't change. Why would we change?
Q. And you didn't change it at all when you got sued in this case, did you?
A. No, we didn't change.
Q. Do you still delete every text message every 30 days?
A. Every 30 days. I don't do that. My phone does for me.
Q. Oh, sure.
A. Yeah, you have to -- you have

Page 161

to select. I have a smartphone. You have to select how much -- how many days you want that message in your folder. So it's 30 days.
Q. And you selected 30 days?
A. It's my company policy.
Q. And you created that policy?
A. I created that policy.
Q. And you have the power to change that policy?
A. I can change that policy, but I will not change that policy, because that's -- that's perfect policy.
Q. And as a result, these texts got deleted from your phone?
A. Because they were not in my phone.
Q. Because of your policy?
A. Exactly.
Q. And any other texts that you might have had relating to this case got deleted from your phone?
A. I don't recall.
Q. Of course, because they're gone.

A. If you can produce them, then I'll testify. But if there's nothing, then there's nothing.
Q. I don't have them, because they're gone.
A. I'm sorry. I'm sorry.
Q. So let's turn back to these texts.
A. Yes.
Q. You got a photo from Tanner, and he said, "You gonna be making this one too, right?" And he said that to you?
A. Yeah.
Q. And you remember getting that photo?
A. Everything is on that paper.
Q. Yeah.
A. Yeah.
Q. So you got the photo?
A. Uh-huh, he send me a photo. He -- that's his -- he sent me the photo. That's his text, and that's my reply.
Q. The gray is your reply?



A. The gray is my reply, correct.
Q. And you said, "Again already in production."
A. Yes.
Q. What did you mean by that?
A. Sales pitch. I just answered that question before you pulled this exhibit. I told you that we are in sales business. We have to talk -- I gave you example of a car dealer. If a car salesperson -- he will talk more about that product than the company talks about it, because he has to sell it.
So this is just merely a sales pitch. I testified that before, I'm testifying again. Because this was never produced. This was never even put into production. Nothing. These are just a sales pitch. Because he's not an active customer. He's not an active customer. He tried to buy Trendily, so we -- once he showed an interest, we got excited. Like today,



also, I got excited a few occasions because -- because things that you're trying to say, that's not true, so I have to -- I should not --
Q. Okay, okay. Stop there. This was not true. It was not in production. You lied to Tanner, right?
A. I lied to Tanner, that is correct. It's a sales pitch. I already testified that. Yes.
Q. And Tanner responded, "Nice. You doing any of his beds?"
And you replied, "Yes. Two bed." Do you see that?
A. Yeah, I see that.
Q. What did you understand Tanner to mean when he said "his beds"?
A. "Nice. You're doing any of these beds?" What date these texts are? Can you give me that?
Q. August --
A. August -- August 3. Yeah. So August 3.
Q. You knew this to mean Jason Scott beds, right?



A. Did I said? Did I said?
Q. You didn't say whose beds.
A. Did I say? No, I didn't say.
Q. You --
A. Yeah, I said, "Yes. Two bed."
Q. All right. And you seem to know who he was talking about, right?
A. I don't know. I'm just saying that -- look, you asked me over and over again the same question five times, different angles. My answer is same from the day one. I don't know if they're comparing that to someone else. If someone --
Q. Stop, stop. That's not my question. Tanner said, "You doing any of his beds?" And you didn't respond, "Whose beds?" or "What beds?" or "What designer are you talking about?" You just responded, "Yes. Two bed." You knew who Tanner was talking about.
A. Maybe. Maybe he just called me before this text, and we talked about some beds or talked about

Page 166

something else.
Q. Did that happen?
A. I don't know. That's what I'm saying. That -- I don't know. This is one -- one year old. I just remember that I replied to his text. And if I said something on the record you have a copy here, then it's sales pitch. It's a sales -- it's a sales pitch, because he was not active customer of us, and then he showed interest, we got excited. That's all it is.
Q. Let's go to the next -- the next page. So you have a photo that Tanner sent you from Runyon's Fine Furniture. Do you see that?
A. Uh-huh (affirmative response).
Q. And Tanner says, "Do you have this JS console table in you MJ Collection?" Do you see that?
A. Yes.
Q. And you responded, "Yes. In production." Right?

Page 167

A. Yes.
Q. What did you think Tanner meant by "JS"?
A. Okay. August 3. And when was your first desist letter came to me?
Q. I believe your testimony is, you received it May, 2017.
A. That's correct. So May comes before or August comes before?
Q. Sure.
A. Which month comes before?
Q. You tell me.
MR. ISRAELOFF: Just answer his question.
A. So we -- by this -- by this moment, we already know what we're dealing with.
BY MR. DIETRICH:
Q. So you knew Tanner was referring to the Jason Scott console table, right?
A. If he said it, yes. If he said. I didn't say. He said.
Q. But you knew what he was

Page 168

talking about?
A. Yeah, because now I have the desist letter from you in the month of May, and then July. So I know who is he talking about.
Q. And in response, you said, "Yes. In production." Right?
A. Yeah.
Q. And -- and you already had a size and a price for that console table, didn't you?
A. Do you have -- do you have a -- do you -- do you have a gap between these two texts?
Q. No.
A. Then maybe -- maybe I text this six hours later. Maybe I text him three hours later. Do you have a time when this was given and when this was given?
Q. No. The text got deleted.
A. But you have copy.
Q. I have a copy on paper, but your texts are gone.
A. No, no. When I reply to him,

Page 169

there is a time block -- there's a time log on text messages, what time you text and what time you got reply. So from here to here, it's not two minutes. It's four hours or three hours. I took time to look at that piece, size it in my head like I was -- I always do that, and I did the size and I came with the price. That's how I do the size and the price.
Q. Even though you'd gotten two cease and desist letters from Jason Scott at this point?
A. Because -- I told you earlier, when you didn't provide me the copyright copies at the first desist letter, I didn't know how serious this is. And I told you that I don't live -- I live here now, but I didn't born here. I don't know the jurisdiction. I don't know the legality of things what you guys do here. I come from a different -- I didn't school here, I didn't college here. I come from India. My

Page 170

background is India. So when I got your first letter, there was no copyright, you know, copies in it.
Q. Let's stop there. You agree, by this point, in August, you had gotten two cease and desist letters from Jason Scott, yes or no?
A. Yes. From Jason Scott, yes.
Q. Yes. And after that, you're responding to this question from Tanner, which you know is concerning a Jason Scott console table, with, "Yes. It's in production," and you get a size and a price, right? Yes or no?
A. Yes. Yes. It's right there.
Q. And Tanner asks what's the time of arrival on it, and you say, "14 to 16 weeks," right?
A. Yes.
Q. And that's consistent with the manufacturing time frame you gave earlier, right?
A. Yes.
Q. So go to the next page. This is August 5th. And Tanner asks for

Page 171

another MJ dining table in stock.
A. This is not the same date.
Q. Right. I see the date at the top. The prior ones were August 3rd. This is a couple of days later, correct?
A. Yes.
Q. Tanner asks for a dining table. You tell him, "If you need them, I will order now and save," correct?
A. Yes.
Q. So you were willing, in August of 2017, to go manufacture another dining table, an MJ table, for Tanner, right?
A. Doesn't say that. The text says, "I am getting soon."
Q. So you had more coming in?
A. Do you have a -- do we have a record of that?
Q. You said it, not me.
A. I said it because it was a sales call. You're trying to get -- you're trying to pull things out of

Page 172

nothing.
Q. Just -- just stop.
A. Because --
Q. I'm --
A. I told you in the beginning -- let me complete.
Q. Sure.
A. I told in the beginning, all these text messages were a trap, which I couldn't see it. I keep answering him, considering -- considering him to being active customers, I can get him back. But did I do this? Did I bring more pieces in? Did I make this console? Did I make this thing? That is what true.
Q. You sent Tanner an invoice for the console, right?
A. Not invoice. Not invoice.
Q. A sales order?
A. Sales order. And that is canceled. Look at the sales order. He crossed it. Because -- because someone called -- someone called him that we cannot do this console. And do you

Page 173

know what he said to me on the phone? I remember that conversation. He said to me on the phone that, "Can you not change the carving and do it?"
I said, "I'm not going to do this. I'm -- all MJ is stopped."
"Can you just change the carving on it?" "No," I said, "I cannot do it." I remember that, because he pushed me to get -- he said, "I have the money from customer." And I said, "I cannot do this. I'm sorry."
Q. I understand --
A. Then I -- then he canceled it.
Q. Okay.
A. On his paperwork what you submitted, not me submitted, you submitted.
Q. I understand.
A. I'm just saying that it is a trap. There is no other word for it. It's a trap for me to testify that I did this, I did that. We have to go to the ground to see if actually this

Page 174

console came, if this dining table came.
Q. Hey, we took Tanner's deposition. Your attorney had plenty time to ask him if it was a trap. What evidence at all do you have that this was a trap?
A. I'm just -- this is my --
Q. Just a guess?
A. Just my guess. I just said that. This is my guess that -- because he -- okay. If we -- this was not a trap, why he use this text not in the beginning, right before our injunction hearing? That tells us -- we're not -- we have brain God has given us. So we can use that and tell that this is a trap. And like Bo Runyon, what Bo did --
Q. You know what, let's --
A. We'll be talking about Bo.
Q. We'll get to Bo. But my question is, why didn't you produce this, like you're required to under the court rules?

Page 175

A. What I didn't produce?
Q. The text messages.
A. Because I didn't have those in my phone.
Q. There we go.
A. Yeah. They were gone. Remember, I told you I have a policy of 30 days.
Q. I --
A. It's gone.
Q. I know you told me.
A. Yeah.
Q. So Tanner asked you to send an invoice for one MJ table and another desk. You said, "Desk we have in stock."
A. Uh-huh (affirmative response). From those five -- from the five pieces we got.
Q. Yes.
A. Yeah.
Q. And that was an MJ desk?
A. Yes.
Q. And you sold that desk to Adobe, right?

Page 176

A. Yes, I did, because I have them in stock. Sure.
Q. August 2017?
A. August 2017, that is correct.
Q. After we agree you'd gotten two cease and desist letters from Jason Scott?
A. Yes. That is true.
(Exhibit No. 9 marked.)
BY MR. DIETRICH:
Q. I'm showing you Exhibit 9. If you would take just a minute and look through these. These are more texts between you and Tanner, right?
A. Yes.
Q. Do you recognize these texts?
A. I have to read -- if you come to the point, what I am to read on this.
Q. Sure.
A. What is your question?
Q. You don't have any dispute that these are texts between you and Tanner, right?
A. I cannot say right now,

Page 177

because I haven't read all the text.
Q. Why don't you look through them and answer that question, then.
A. Okay.
(Reviews document.)
Q. We can break it up. Let's start with the first page.
A. You're giving me a lot of pages to read, which have never been produced before, right?
MR. ISRAELOFF: Have these been produced before?
MR. DIETRICH: Yes, they have. They've been produce to your office.
A. All of these?
BY MR. DIETRICH:
Q. Yes.
A. I haven't seen them.
Q. So the first -- the first page is between you and Tanner regarding MJ Collection pieces. And your response to him -- he asks about the price on the table, and you respond, "You have to buy all three

Page 178

pieces." Do you see that? In the middle of the page. And then you also respond with a price on the dining table.

A. I have to check all the -- what three pieces I'm talking about, because he had a chaise -- there's a -- right here, for the chaise. So there was a chaise and there was a chair -- there was a chaise, there was a club chair, and I think the third piece was the desk, I guess. But I don't know. I have to check that, what three pieces I'm talking about.

Q. Right. And --

A. But they're -- they're all different pieces, not all MJ.

Q. Not all MJ?

A. No, no.

Q. That was my question. I didn't know if there was some rule that you had to buy all three or not?

A. No, no.

Q. You would sell a single MJ piece?

Page 179

A. All week.

Q. You would sell whatever you could sell?

A. Yeah.

Q. Going the second page.

A. Yes, sir.

Q. You have some pictures. And this goes on for several pages.

A. Uh-huh (affirmative response).

Q. And on three pages back in this exchange, there's a July 10th, which must be 2017. Do you see that?

A. Uh-huh (affirmative response).

Q. Do you recall having these texts with him?

A. I think, yes, he had a issue with -- I remember. He had a issue with -- someone dropped the desk, and he had a issue that space opened up. And you can see here.

Q. He says the desk warped, right?

A. He's a customer. You don't

Page 180

know that? Customer is always right. That's what policy applies here. The customer is always right. He's the boss.

Q. So he --

MR. ISRAELOFF: Just answer his question. His question was, "He was the customer?" Just answer --

THE WITNESS: No, no. He said the customer said the table is warped.

MR. ISRAELOFF: Did they say it?

THE WITNESS: On the text.

MR. ISRAELOFF: Then that's the --

THE WITNESS: It's not --

MR. ISRAELOFF: Okay. That's the answer. Don't go to all the other stuff. Just wait until he asks another question.

THE WITNESS: He asked me to read this.

MR. ISRAELOFF: I understand.

Page 181

But he gets to ask a little question.

THE WITNESS: Okay.

MR. ISRAELOFF: Don't go beyond. Let him ask the next question.

THE WITNESS: Okay.

MR. ISRAELOFF: It will go a lot easier.

BY MR. DIETRICH:

Q. It will go a lot quicker, yeah.

A. Okay.

MR. ISRAELOFF: Just to limit your answer to what he does ask.

THE WITNESS: Okay.

MR. ISRAELOFF: Even if you want to sell him more, just answer his question.

BY MR. DIETRICH:

Q. Do you -- do you recall getting this complaint from Tanner?

A. Yeah, I do.

Q. Did you receive any other complaints about any of the MJ

furniture from anybody?
A. I don't recall.
Q. You may have or may not?
A. I don't know.
Q. And that goes up to this day, because I know there are customers out there somewhere with an MJ piece of furniture in their house. Do you recall receiving any complaints?
A. No, I don't. Can we take a quick break?
Q. Sure.
MR. DIETRICH: Off the record.
(Break taken, 12:28 p.m. to 1:25 p.m.)
BY MR. DIETRICH:
Q. Welcome back, Rahul.
A. Welcome back.
Q. If you would, go to the -- the photograph of the Trendily desk.
A. What was that exhibit number?
Q. I think it may be -- there you go. 5?
A. 5.



Q. I believe you referred to the circular design in between the iron stars being different between that -- this desk and the Jason Scott desk?
A. (Nods head affirmatively.)
Q. "Yes"?
A. Yes.
Q. I need a verbal "yes," not a head nod. Who created this design in the middle of the iron stars here?
A. Who created?
Q. Yes.
A. That was in -- that was in the picture.
Q. This design was in the picture you got?
A. Uh-huh (affirmative response).
Q. And you copied that design?
A. We made the same piece. So if you see my desk like this, the copy I -- the paper I got from Western Heritage, that had the same thing.
Q. And the same for the other features of the desk?



A. Yeah. I didn't change a word there. I sent -- like I said, we sent the picture to India, and it's...
Q. And they copied the picture?
A. They saw the picture and they made the piece out of that picture.
Q. Your -- your testimony at the preliminary injunction hearing about the visit to Calamity Jane's -- my question to you was, "Did you know at the time that Calamity Jane's is an authorized Jason Scott dealer?"
And your response was, "She alerted that."
A. She alerted that when we were there.
Q. When you were there, she told you she was a Jason Scott dealer?
A. Yeah. Yes. Didn't I say that before?
Q. No. No, you didn't.
A. It's on the testimony. It says "yes."
Q. Right. So --
A. She -- she alerted that.



Yes.
Q. So you did talk to Shawn Beach?
A. No. Shawn Beach -- "she alerted" means she's there. On her testimony, she said she took me -- I took her to the corner.
Q. I'm asking -- I'm --
MR. ISRAELOFF: Just answer the question.
BY MR. DIETRICH:
Q. Just say on the question. I understand how you feel about this. But she told you she was a Jason Scott dealer?
MR. ISRAELOFF: Can we see the testimony, please?
A. Yeah, we have to see that.
BY MR. DIETRICH:
Q. Yes. It's page 70.
A. Which exhibit?
Q. The exhibit --
MR. ISRAELOFF: 6.
BY MR. DIETRICH:
Q. -- is 6.

A. Page?
Q. Page 70 at the top. And we already got into the whole thing about who called who, so I don't want to repeat that.
A. Okay.
Q. But your statement about what -- "She alerted that" --
A. Yeah. When -- I'm sure when Chris showed her the pictures of our MJ Collection, I'm sure she -- she said that.
Q. And that was during the meeting where you were there?
A. Yes.
Q. So we were back on Exhibit 9. I just want to get those couple of things out of the way. This was the text exchange between you and Tanner, the longer one. And I'm -- I don't think the pages are numbered. Oh, they are at the top. It's B009.
A. Yes.
Q. You got a text from Tanner with the table. That's Trendily's MJ



table?
A. That's correct.
Q. And below that, Tanner says, "Yes. I think we are going to feature it in Cowboys and Indians magazine." Do you see that?
A. I see that.
Q. Are you familiar with Cowboys and Indians?
A. Not really.
Q. Do you know what it is?
A. It is a magazine.
Q. Do you know how broadly it's distributed?
A. (Shakes head negatively.)
Q. "No"?
A. No, I don't know.
Q. Does Trendily ever advertise in Cowboys and Indians?
A. Never.
Q. Does Trendily advertise at all?
A. Not at all.
Q. I mean, you have a website, right?



A. Our customers are -- they know our product. That's all we do.
Q. So do you spend any money at all, and "you" meaning the whole Trendily, both companies --
A. I do, yeah.
Q. Do you spend money on advertising?
A. Website is advertisement. I have website. I have an app from RepZio. So we -- we have stuff that we -- we spend money every month, but not like ad in magazine. Like I said, I'm not a big shot. I'm not -- I'm a very small company, and so we don't have budget for that.
Q. And did you ever advertise any of the MJ Collection other than just putting them on your website?
A. No, I didn't.
Q. Could you go to the page B011?
A. Yes.
Q. Just look at the date down there at the bottom. It's July 27th,



and this must be 2017.
A. Uh-huh (affirmative response).
Q. Because you're discussing the MJ Collection. And then on the following page, there's a question from Tanner, "What type of wood is the MJ Collection made out of? Mango?" I think he meant to say, "Acacia?" Do you see that?
A. Uh-huh (affirmative response).
Q. And what did you respond?
A. "Reclaimed teak."
Q. Indian teak?
A. "Reclaimed teak. Indian teak."
Q. And, now, based on your testimony, that was not true, right?
A. What I said, I said it's reclaimed wood, consists of teak, acacia, mango. When we get reclaimed wood, there is no -- there is no filter, like, they will only send me teak, will only send me mango. So we

Page 190

said -- we said reclaimed teak because it has teak in it too. It has mango wood in it too. It has acacia in it too.
So that's -- when you asked me, I give you the exact answer. When my customer's asking me, that's my secret. Why would I tell him what wood I'm using? That's my secret. I don't tell my customers what I do, how I -- how many coats I do, how many finishing I do, those kind of things.
Q. And looking at the next page, B013, there's texts -- and we covered these already, but they're dated August 5th, about Tanner ordering a dining table and a desk, right?
A. Yes.
Q. So you're -- Trendily is --
A. He's not ordering. He's asking me --
Q. He's asking you --
A. -- "Do you have another MJ dining table in stock?"
Q. And Trendily is still selling

Page 191

these products as of August 5, 2017, right?
A. From my text, it appears, yes.
Q. Yes. And that's after you got not one, but two cease and desist letters from Jason Scott?
A. That is correct.
Q. And one of those had the copyright registrations attached to it, didn't it?
A. Yeah. Yes. The July 1 had the copyrights, yes.
Q. Right. And you testified that you got that July 1st, 2017?
A. Uh-huh, yeah. I already said that. I mean, I -- did you read my testimony at the injunction that --
Q. I did.
MR. ISRAELOFF: Wait for his next question.
A. Okay. Next question.
BY MR. DIETRICH:
Q. And that's accurate, right?
A. Okay.

Page 192

Q. Because you testified truthfully at the injunction hearing?
A. Yeah. That's what I'm saying.
Q. And you got that letter July 1st, 2017?
A. That's correct, yes.
Q. Thank you. The next page, B014, you text Tanner, just looks like not following up on anything, that, "We hired Darra. She started this week." Do you see that?
A. Yes.
Q. So is that accurate? Darra started with Trendily, I guess, just before August 5th, 2017?
A. August. I told you she worked for one month.
Q. Right. And you said she joined as a sales manager in the company?
A. Yes, I said that. Yes.
Q. Is that correct?
A. That is kind of correct.
Q. And you already explained

Page 193

that situation, right?
A. I did that, yes. In detail. I did that, yes.
Q. You talk about OHT just below that, who I assume must be Old Hickory Tannery. Is that -- is that right?
A. Where?
Q. At the very bottom.
A. Yes, I see it.
Q. Did -- did Old Hickory go out of business or something at some point?
A. Yes, they are. They're in process of closing.
Q. They're in process now of closing?
A. They've been process for last three years. They had no money. I don't have to go into that, actually. Why we have to talk about that? OHT is Old Hickory Tannery.
Q. I'm just asking you about your personal knowledge, which we can go into. But your knowledge is that they're closing?
A. Yes. My knowledge, they're

closing, yes.
Q. So when Chris Sanders says he's a rep for OHT right now, what -- what do you take that to mean?
A. What I take from that? Because he's helping them to close the business.
Q. I just want to know what you know about that.
A. Yeah. I just know that because he's helping Bill, the owner at OHT, to sell his leather fabric leftovers. And that's what he's doing.
Q. I got you.
A. Yeah.
Q. Next -- next page, B015, this is August 9th, 2017. And you state to Tanner, "Your MJ desk is ready as of now. Do you still have the MJ credenza on the floor? I have one left in stock in case you need." Do you see that?
A. Yes.
Q. Did I read that correctly?
A. Uh-huh (affirmative response).



Q. So you were -- you had the MJ desk ready to go, right?
A. From 15 pieces.
Q. Sure. And you had one more credenza. Do you mean sideboard or buffet?
A. Yeah.
Q. And so you still had one of those left in case --
A. Yes, I had one left.
Q. In case Adobe wanted it?
A. Yes. I have two of them, actually.
Q. Today you have two of them?
A. I have two sideboards. Two or one. I have to check. Again, I'm -- I have four pieces total, and I'm not sure what they are, but they're desk and buffets. Quantity-wise, I have to check.
Q. Moving forward a couple of pages, B017, Tanner asks you if you can order an MJ desk with a different finish. Do you see that?
A. Uh-huh (affirmative



response).
Q. And your response at first is, "No. We are not offering any other finish on this MJ Collection," right?
A. We are on which page?
Q. Page 017.
A. Yeah, I'm looking at it, yes. "No. We're not offering any other finish on this MJ Collection," yes.
Q. Do you recall Tanner asking for this?
A. Yes, uh-huh. I remember, yes.
Q. And on the next -- next page, you asked, "They want dark?"
And Tanner says, "Yes. A custom finish." And you state, "If they pay 20 percent up charge, we can do that in India." Do you see that?
A. Yeah. That's correct.
Q. Is that correct?
A. Yeah, that is correct.
Q. So you can change the color of the MJ pieces, correct?
A. Yeah. Do you see that? "20



percent up charge." If someone pays -- if someone pays 20 percent up charge, I can change, because I have 30, 40 finishes in my line.
Q. And you could do it darker if you wanted?
A. Because I have darker finish already in my line.
Q. And there wasn't -- I mean, you could do that to the MJ pieces? There was no reason that you couldn't?
A. Yeah. But I do with all my pieces. Every piece in my line doesn't have to stick with the finish what we are showing. It can be any finish.
Q. And actually, on the next page, 019, you state at the very top, "We can match the finish."
A. We can -- "We can match the finish" means we can match -- match the finish he is showing here.
Q. The darker finish?
A. The darker finish, yeah.
Q. I have an exhibit for you.
MR. DIETRICH: And I forget

which number we're on.
COURT REPORTER: 10.
(Exhibit No. 10 marked.)
BY MR. DIETRICH:
Q. So I'm showing you what's been marked Exhibit 10. And this is a purchase order from Adobe to Trendily. Have you ever seen this before?
A. From Colt Dipple to Chris.
Q. Correct.
A. Uh-huh (affirmative response).
Q. Dated July 28th, 2017?
A. I don't know if he submitted the order with this copy, because the order was not submitted with this copy. We created a sales order. And I think we produced that to you already, the copy of the sales order. This is a document before sales order.
Q. Right.
A. So I haven't seen this before.
Q. How would you have created the sales order if you hadn't seen this



first?
A. Because Chris has a RepZio app -- not Chris. Trendily has a RepZio app, and the RepZio app allows sales person to order from that app. So if I'm not wrong, the order was created by Chris from his app. He has a user name and a password for his app. So I haven't seen this before. Maybe he sent him a copy. But he didn't submit this copy, but he actually created -- went ahead and created a PO for them. Sometime the customer doesn't provide a PO. We create, on our app, the PO, and then that PO goes to sales order.
Q. And this -- this PO came from Adobe to Trendily, right?
A. From Adobe to Trendily.
Q. On the second page, it says, "This order was generated using Lightspeed Retail." Is that something that Trendily uses?
A. No, we don't use that.
Q. It's on the -- on the second



page.
A. Yeah, that's their -- we don't use that Lightspeed.
Q. So this would mean it came from Adobe?
A. Like I said, customer send the PO to Chris. But Chris didn't submit this to us. He created -- he went ahead and created a PO on our app.
Q. On RepZio?
A. On RepZio. That's what we have in our system. That's we have already given you a copy of sales order.
Q. If -- if I want to create a sales order on RepZio --
A. There's no sales order on RepZio.
Q. A purchase order.
A. Purchase order.
Q. If I wanted to create a purchase order on RepZio, and I'm selling a certain piece of furniture, is there a list that I pick from? How do I select what piece of furniture I



want on that purchase order?
A. There are -- there are list of pieces there in different categories. They can go under "Categories" and pull the piece from that particular category. But I don't know how he did that, because if you see this table, console, that console has no SKU number. Do you see a number there? There is no item number to this. Can you see the PO? There's no item number. There's no UPC number or there's no SKU number.
Q. So on this document, there's no SKU?
A. Yeah, the order he sent to me, because he doesn't know the SKU number, because we never created that piece. But when Chris submits the order, we put in our sales order. And you have a copy of that. We already given you a copy.
Q. Right. And so I guess -- and we can look at that too.
(Exhibit No. 11 marked.)

BY MR. DIETRICH:
Q. So looking at this first page here, this is the sales order for these two pieces, right?
A. That is correct.
Q. And this was corrected in Trendily's system?
A. Uh-huh (affirmative response).
Q. And is this created in QuickBooks or RepZio, or are they connected somehow?
A. QuickBooks.
Q. QuickBooks. And there is an item number -- it says "MJ console table" at the top.
A. Yeah.
Q. And there is an item number there.
A. Uh-huh (affirmative response).
Q. Who created the item number for that console table?
A. Our system. Whatever number was next available for the console



category, that's what given to this console table.
Q. Who entered the MJ console table into the system?
A. The person who enters all the orders.
Q. So let's say you start with this e-mail purchase order from Adobe.
A. Say again?
Q. Let's start with this e-mail purchase order from Adobe, Exhibit 10. They send it to Chris. I want to know how this works. They sent the purchase order for the MJ console table and the Vancouver wing chair, they sent it to Chris. Somebody then took that and entered it into QuickBooks for Trendily?
A. Like I said, this -- this e-mail you are showing me, I have not seen this.
Q. Sure.
A. Why I've not seen this is because the order was created by Chris on the RepZio app. So when he created



that order, then we entered in our system, in our QuickBooks, and that's where the number was given.
Q. Does Chris enter it into QuickBooks or somebody else?
A. No, someone else. Chris --
Q. So RepZio --
A. -- does this on the website.
Q. That's what I thought, but I wanted to make sure.
A. Yeah. Chris -- RepZio is not my QuickBooks. RepZio --
Q. And it sends --
A. -- is an app. Huh?
Q. It sends the data to QuickBooks?
A. No, no, no.
Q. It sends it to a person?
A. It send e-mail. It sends e-mail to the -- to the person who enters the order. So she prints, and then she enters it.
Q. And that happened with regard to the MJ console table?
A. Console table? I hope so.



Q. And you --
A. I'm not --
Q. I mean, you have it right here. It has an item number. It's on the sales order.
A. Yeah, we -- whoever entered the order put that number. Because whatever the next number is available under the category, that console category, that is given to this piece.
Q. And you had a dimension for that table and a price for that table, right?
A. Where are the dimension? I don't see dimension.
Q. The dimension is in your text to Tanner. You state the dimension and the price.
A. Yeah, my text says -- yes.
Q. Right. And the dimension, it also says 72 inches --
A. Yeah, because --
Q. -- on the sales order, right?
A. Yeah, because --
MR. ISRAELOFF: Wait until he

finishes.
BY MR. DIETRICH:
Q. It says 72 inches on the sales order, right?
A. Yes.
Q. And the dimension is also the same in the purchase order that came from Adobe, right? 72 by 18 by 34?
A. That is correct.
Q. So everybody agreed on the dimension for this table, right? Yes? There's no disagreement. You all know what you're talking about?
A. But what are you --
THE WITNESS: I'm not getting his point. I'm trying to understand what --
BY MR. DIETRICH:
Q. We're going to get to my point. Why don't you just answer my question. There's no disagreement about --
A. If I don't understand your question, how will I answer?
Q. Is there any disagreement



about the size of this table?
A. Size of this table for -- from which point?
Q. From Adobe and from Trendily.
A. From Adobe to Trendily, 72-inch, yeah. It says on my sales order, it says on this PO, which I'm seeing now. So, yeah, it's the same -- same size, 72 inches.
Q. And the price is the same, right?
A. Price is the same as my text. I don't see a price here. Yeah, I see a price. Okay. Yes. From my text.
Q. So Trendily was going to make this console table, wasn't it?
A. If I did a sales order -- if I did a sales order, enter in my system -- does it say what date it is?
Q. It does.
A. It does. So we entered this order on this date. But then later, don't you see it's canceled?
Q. I do. But I'm worried about this date. This is August 3rd, 2017.



A. Uh-huh (affirmative response). Before the lawsuit, yes.
Q. Right.
A. Yeah.
Q. And after the cease and desist letters?
A. I already said that several times. Yes. Yes.
Q. And this -- did you ever think that Adobe would rely on what you were saying?
A. Say that again.
Q. Well, you -- you've sent them a sales order. You took their purchase order for this piece. And what you said before was, "That's just sales talk."
A. Sales talk on what?
Q. On this.
A. You -- don't you have -- don't you have other sales orders for desk -- for tables for Adobe?
Q. I do.
A. It was sales talk when we got started, but then he start buying.



Q. Ah, so this is past sales talk. This is manufacturing talk. Or --
A. This is not manufacturing talk. This is sales talk, but it -- if he comes back to me and say, "I want that chair, I want that desk, I want this," we have them in stock. We already got five of each pieces.
Q. But he came to you about the console table, right?
A. Yeah. And I -- and I -- on my text, I said that. On my text, it says that, yes: This is your size and this is your price.
Q. And even after -- and I'm not disputing the fact that you stopped selling this stuff after we filed the lawsuit. I'm not disputing that. Tanner came back to you after you stopped selling this stuff and said, "Can I please have this console table?" Right?
A. Actually, what do you mean by "stop"? That's what I want to -- can

you clarify that?
Q. Well, we'll get there. But Tanner came back to you and said, "I need this console table. I already sold it to a customer." Right? You testified to that earlier.
A. Yeah. Exactly. And then --
Q. So he relied on what you told him here, that you were going to provide this console table?
A. Yeah. I -- it's in my paperwork. Yes, I did.
Q. Do you know who makes the chairs? You got this photograph from Runyon's --
A. No, I didn't --
Q. -- in this -- in this purchase order? Do you know who makes those chairs?
A. I haven't seen this picture, the one you're showing. We have a chair in our line called Vancouver, and that is exactly the same. You can go to my website and look at it.
Q. Have you heard of a company



called Massoud?
A. I did, yeah.
Q. Did you copy those chairs from Massoud?
A. No. I'm not a copy cat.
(Exhibit No. 12 marked.)
BY MR. DIETRICH:
Q. I am showing you what's been marked Exhibit 12. And I want to understand what this is and how to read it, so I'll ask you some questions about it. What -- do you recognize the documents on this page?
A. I do. This is from my QuickBooks.
Q. And the first page you have, is that for the MJ sideboard?
A. It doesn't say.
Q. Under -- on the right-hand side, the right-hand column, does it say?
A. Yes, yes, yes, I see it now.
Q. It says "sideboard"?
A. Yes.
Q. And on the top left, it says,



"On hand as of 12/31/2017." Do you see that?
A. On hand --
Q. Or 2016. My apologies.
A. Yeah.
Q. And then it has all these entries under it. Were those -- I guess -- if you'll just help me understand what these entries mean. Your testimony is, you didn't have any of these in 2016, right?
A. No way.
Q. And then the first date there is a -- on this column is a bill. It says March 17th, 2017. Do you see that?
A. That's correct.
Q. For Mi'Das Exports?
A. Yes.
Q. What does that line mean?
A. Okay. You asked me two questions.
Q. Sure.
A. Can I answer the first one?
Q. Yes, you can.



A. You asked me that on hand as of 12/31/2016. "You didn't have pieces in 2016?" That was your question. The question is, yes, there was no pieces in there back then.
If you look at -- if you look at the line -- do you have a -- that paper? As of 12/31, the stock is zero.
Q. That's on the right-hand --
A. Yes.
Q. The quantity is zero?
A. Yeah. So -- so on -- on 12/31/16, we had zero pieces. The first day we got those pieces in our stock was 3/17, and that comes from Mi'Das Exports.
Q. So this is recording -- I see. This is recording one.
A. Yes.
Q. And then down below, you have a quantity of five. Is that the five other ones that you --
A. Five other ones that came from India. So we total got six buffets so far. So when you see the

Page 214

bill, that bill is to pay, and invoice is to collect. So invoice the customer, bill received from Mi'Das Exports to pay.
Q. Okay. I understand that better now. I didn't know if one -- if -- didn't know if you sold five to one customer.
Are you familiar with a company called Waller Rustic Furniture?
A. I do.
Q. Did you ever speak to anybody at Waller about the MJ Collection?
A. Not really.
Q. It's more of a yes-or-no question, not a "not really" question.
A. No.
Q. "No," you didn't?
A. To Waller?
Q. Yes.
A. No. No.
Q. How about Dennards, do you know them?
A. I know them.
Q. Did you --

Page 215

A. I -- I didn't pitch. I didn't talk to them.
Q. Didn't talk to them about --
A. No.
Q. -- the MJ Collection?
A. No, no.
MR. ISRAELOFF: Wait until he finishes his question.
BY MR. DIETRICH:
Q. I know that sometimes I ask them a little slowly.
A. That's fine. I just...
Q. So I know you're --
A. Today's Friday. I'm just -- you know, I'm just...
Q. So you have another one here called Auer Haus, A-u-e-r H-a-u-s. Do you see that?
A. Yes, I see that.
Q. And did you ever pitch the MJ Collection to Auer Haus?
A. Never. Not me.
Q. And it says -- it shows here at the bottom -- the second-to-bottom line is an invoice to Auer Haus, and

Page 216

then just below that, there's a credit memo to Auer Haus.
A. Because the fourth piece that came back is from Auer Haus.
Q. That was my --
A. We called every dealer to return the pieces. Every dealer. That, "If you have MJ, return it. I'll give you the money back." Only Auer Haus returned the piece. Others said no. And I cannot control that part. So...
Q. Which dealer said, "No, we won't return it"?
A. I guess everybody. Adobe and -- Western Heritage had the pieces. Adobe had the pieces. And I don't know about -- I don't know the exact answer on that. But I did call everybody that I want those pieces back, and Auer Haus returned it.
Q. And I have another question on this page for you. The middle line that says, "On purchase order as of 12/31/2016," and you have a purchase

Page 217

order there that's for Adobe Interiors.
A. Look at the date.
Q. I do see the date, so I'm just --
A. Yeah. We canceled -- you see that --
MR. ISRAELOFF: Wait until he asks a question.
BY MR. DIETRICH:
Q. I do see the date. The date in line with it is 4/11/2017, but it's under that category of, "On purchase order as of 12/31/2016." So can you clear that up for me?
A. Yeah. It is -- the purchase order, this number, 1862 -- if you remember, I told you that we -- after these three pieces were received, now we have the names, price, everything for those three pieces. We send five/five, those pieces we received from India, purchase order to India for five/five pieces. So when Adobe bought that piece in April -- that's the date, 4/11. So same day, we don't have those

pieces in stock. We send a PO to India. And later, we received five of each. So from those five of each, there was sales order attached to it.
Q. All right. Okay. That's helpful. Thank you.
Did you ever offer or did Adobe ever submit a purchase order for any MJ Collection piece in 2016?
A. No.
Q. Now, your original meeting with Western Heritage was in 2016?
A. September.
Q. Of 2016?
A. Yes. When there was no piece, only a picture. Only a photo, yes.
(Exhibit No. 13 marked.)
BY MR. DIETRICH:
Q. Did you ever receive any reports from anyone on how your customers were reacting to the MJ pieces?
A. When you say "report," what do you mean?



Q. Did anybody ever tell you how customers were reacting to seeing an MJ piece?
A. They just like the price.
Q. So somebody -- I mean, you did get a report --
A. No, I'm just saying that if someone liked it, liked it because it's a nice piece, nice quality, at a nice price. That's what I'm saying.
MR. ISRAELOFF: Listen to his question. He asked if someone reported to you anything. Listen to his question.
A. To me personally?
BY MR. DIETRICH:
Q. Right, to you. I mean, you are in control of Trendily. You had your sales reps out there selling. I assume your reps call to tell you things. You said you talked to Mark -- or not Mark -- Chris a lot via text or phone.
A. Uh-huh (affirmative response).



Q. I -- do -- sales reps, I would imagine, from time to time tell you how certain products are selling. Is that right?
A. They do. But like I said, this was the -- this was not the only product I had.
Q. I understand.
A. So I was -- I wasn't --
Q. My question --
A. -- desperate -- okay. I have answer.
Q. Okay.
A. I was not desperate to get answer on how my -- these three pieces are doing because I already had my line, and I'm -- I'm concerned what we have already in our line. This was a new thing to add in the line. So we -- I don't think I talked to Chris about that. The answer is no.
Q. Okay. That -- and it was specifically about the MJ Collection, not the other stuff in your line? I mean, I know you said this is a new --



these are new pieces in your line?
A. Uh-huh (affirmative response).
Q. These were new at this time?
A. This stayed on the website for very few -- I would say about a month or so.
Q. I'm asking -- I just happened to hand you this.
A. Because you're asking me on this website?
Q. No.
A. Okay.
Q. No. I'm just asking you generally, in 2017, the MJ Collection was new to Trendily?
A. Yes.
Q. It's not a trick question. It's a new --
A. I'm just thinking --
Q. It's a new product in your line?
A. Yes. Go ahead.
Q. Correct?
A. Uh-huh, yes.

Q. And I didn't know if you might be curious as to how it was doing sales-wise?
A. I don't -- I don't -- I don't recall if -- we have so many things to do. We -- oh, my God, no. I don't -- I don't recall. No. The answer is no.
Q. Before you introduced the MJ Collection, how far in the past had you introduced other new products in the Trendily line?
A. Very often. We do that almost on monthly, daily basis. I have right now several new pieces coming in. We do that all the time.
Q. So how many -- you said several new pieces coming in?
A. Uh-huh (affirmative response).
Q. What kind of pieces are those?
A. Casegoods.
Q. Table? Desk? What?
A. Table, desks, consoles, coffee tables, end tables. We -- we --



we add pieces in pretty much every category.
Q. And who designs those pieces?
A. I'm the one -- I'm sending those pictures to India that I need something, you know.
Q. And where are you getting the pictures from?
A. I'm getting the pictures from what I see, what I like.
Q. Are these photographs or drawings?
A. These are just -- photograph? I don't know. Just pictures, just photos. Can be I saw something, you know, in a magazine, I got inspired, it's a nice console. We're going to get something from that, you know, and then get something from the other piece, and then fusion it, make a new piece out of it. That's how all I do.
There's -- there's a -- there's alphabets A, B, C -- A to Z. And you make your name out of those alphabets, I'll make my name out of the



alphabets. So there is a set alphabet available for you to pick from. That's what I do. I pick my things from alphabets, what I need to make, and then I send that to India.
Q. And do you send --
A. It's pretty simple.
Q. Do you send that by e-mail?
A. Sometimes e-mail. Sometimes, you know, we use WhatsApp -- use WhatsApp. Or sometimes I just -- I do, yeah.
Q. Do your WhatsApp messages get deleted after a certain time?
A. Yes, I do.
Q. What's the time period for deletion there?
A. I think it's same, 30 days. I don't keep forever.
Q. Do other people at Trendily use WhatsApp?
A. No.
Q. Just you?
A. Just me.
Q. How long have you been using



WhatsApp?
A. I don't use WhatsApp between my business. My WhatsApp is merely my family. And I only -- only talk to my family on WhatsApp. But if -- you asked me how I send. So I -- if -- if -- I might send a picture to Dad through WhatsApp. That's what I just said. But that's not my engine. That's not my way of communication to India. My way of communication to India is POs, you know, to them. Their communication is a invoice, what is coming on the next container. That's what -- all e-mail we do. Mainly it's e-mail.
Q. Do you send photographs with a PO?
A. If it's custom, yes. I do have to, yes.
Q. So it's not an automated thing in QuickBooks where it's just a spreadsheet going. It can be photographs sent with a PO to India?
A. Yeah, whenever -- whenever my

sales order says, "Please see a photo attached," that means it's a custom order, and it has to be, you know, made as per specification. And not all the time photos go. Majority of time, drawings go. We make drawing on a paper, and we send that drawing to India: This is what I want. This is how long the placement. This is -- I want this, that.
Q. Is that you making the drawing on paper?
A. Yes, I -- I do make drawings, yes.
Q. Does anybody else here?
A. No. I do good art. I do good drawings.
Q. And I'm asking about WhatsApp. You said you use WhatsApp with your family members, but it happens that many of your family members are involved in the Trendily business.
A. But like I said, that's not my 100 percent -- or that's not the --



the thing I use to send things to India. Maybe -- it's a family. If he -- if he sends me something through WhatsApp, I'm not going to say, "Can you please e-mail me?"
Q. You might respond in WhatsApp?
A. I might respond and say, "Yeah, it looks good," or something like that. Do you follow me what I'm saying?
Q. I do. But those get deleted after 30 days?
A. I think so, yes. Like I said, I don't use WhatsApp in my business at all. Not with my employees, not with anybody.
Q. And I think I did ask, and I don't think I got an answer. How long have you been using the WhatsApp application?
A. I don't know.
Q. Years?
A. No idea. No idea.
Q. If you would now take a look



at -- I forget which number this last exhibit was, now that we've --
A. This is 13.
Q. 13. If you would take a look at Exhibit 13.
A. Oh, I thought you were giving me another. Okay.
Q. We haven't had a chance to talk about this one yet. Are these snapshots of Trendily's website?
A. They are, yes.
Q. And --
A. Look how awful the pictures are.
Q. And I understand they're not there anymore. But at one time, these photographs were on Trendily's website, correct?
A. That is correct.
Q. And you -- you mentioned the quality of the photographs, but I will ask you about them. On the second page, there's a copy of -- a photograph of the MJ office desk, correct?
A. Yes.



Q. Where was this photograph taken?
A. In my showroom.
Q. In your showroom?
A. Uh-huh (affirmative response).
Q. In Dallas?
A. In Dallas.
Q. Who took this photo? Do you know?
A. I don't know. They're from phone.
Q. And --
A. I can tell you that much. These are taken from the phone. You can tell from the quality of the photo.
Q. I see that you refer in the name, it's -- it says "Finish No. 39." Do you see that?
A. I see that.
Q. Is that just a -- what is Finish No. 39?
A. I have 39 finishes. I actually have more than 40. So I have that many finishes in my line. So this

is one of our finish.
Q. Just refers to the type of finish?
A. Yes.
Q. And then it states "reclaimed teak"?
A. Yes.
Q. And we've talked about today, that's not completely accurate, right?
A. Okay. Reclaimed teak here is the finish. Every finish we have has a name. We call it weatherboard, we call it nutmeg, we call it walnut, we call it granite, we call it antique black. So this 39 number is -- we call that finish "reclaimed teak." That's a finish number and name.
Q. I understand. So the finish -- the full name of the finish for this color -- this furniture is "Finish No. 39, reclaimed teak"?
A. You got it. That's correct.
Q. But you told Tanner it was made out of reclaimed teak?
A. Again, I said -- I gave you



the honest answer today. It's a reclaimed wood -- mixture of all the woods. And there is a teak in there too.
Q. But when you have "reclaimed teak" on your website, it's referring to the color of the finish, not the type of wood?
A. Exactly. Exactly. That is true. That is correct.
Q. Is there anywhere on your website that says that?
A. Need to say -- say it again. I didn't catch that.
Q. Is there anywhere on your website that says, when you're stating "reclaimed teak" in all of these product names, you mean the color?
A. I don't know -- I don't know -- we have finishes shown on our website. So if you go there, you will see the finish -- I don't know if they say the name or number there. But all my customers, they have swatches. Everyone has a swatch. And every



swatch I have, on the backside, it has the name and number to it.
Q. And why is this color called "reclaim teak"?
A. Because teak has that color tone. What finish I have is reclaimed teak finish. That's why we call it reclaimed teak.
Q. Now, after you got the cease and desist letters with the copyright registrations attached, did you talk to anyone about copyrights in furniture?
A. Sim.
Q. And I don't want to have information about your conversation with your lawyer. So let's say aside from Sim, did you talk to anyone else about copyrights in furniture?
A. I don't think so.
Q. Did you ever talk to Bill Holland about furniture copyrights?
A. No.
Q. About any kind of intellectual property protection for furniture?



A. No. I don't recall that.
Q. So when you say, "I don't recall," that's different from, "No, I didn't."
A. That is a no. When I say that, that means no.
Q. Well, I'm going to keep asking you --
A. Yeah, yeah, yeah. Because you're asking, and I think that -- when I -- I should say no. No.
Q. Yes. If the answer is "no," you should say "no," not, "I don't recall."
A. Yes. No, Tom.
Q. Thank you. So we have established you're -- you've continued to sell MJ Collection furniture up to about mid-August 2017, before you got served with a lawsuit. At the point that you got served with the lawsuit, what did you do?
A. The day I got served the lawsuit?
Q. Just in general as regards

the MJ Collection.
A. Stopped everything.
Q. And tell me what you did --
A. To stop that?
Q. -- to stop it.
A. The day I received the package, Chris was in the office that day. And normally he's not there, but he was there today -- like, that day when I received the package to collect his commission check. So I said, "Chris" -- we talked about that. We talked about when I received the desist letter. We talk about a little bit.
But when I received the lawsuit, then I said, "Stop it. If you are pitching" -- I already told him not to pitch. I already told him, when I got the desist letter, that stop pitching. But when they are with a dealer, when they are with a customer, it is just, you know, a continuation communication that goes step by step, one to one, one to two, one to two. Like, they ask you something, you



answer something.
Q. Let me stop you there. I want to stop you there. You said you talked about the cease and desist letter with Chris?
A. Not actually, like, "I received a letter" or something, no. But I kind of told him that we cannot sell this product.
Q. But -- so -- and we have your text messages much later, in August, where you are selling the MJ Collection products.
A. I'm not selling. Remember, I told you, my text message with Adobe, with Tanner, they are more a sales calls. And then when I received the package, that day we stopped completely. India stopped when I received the first letter. So there is -- that's why there is no production. There's no more pieces. And as soon as the lawsuit was filed, I received the package, we stop completely. And we -- we start looking



for attorney.
Q. India stopped when you got which letter?
A. The first letter.
Q. In May?
A. Yes.
Q. You told India to stop manufacturing?
A. I did.
Q. How did you tell them?
A. Via phone. Like I said, we talk first time every day.
Q. I thought we looked at records showing you sold the furniture well after that time.
A. Because we have 15 coming in. I have 15 pieces coming in. India and here -- remember, I told you in the beginning, there's six-month process. And you agreed that 14 to 16 weeks, you said that means it takes that long to get that piece. So they're two ends.
Q. So you told India to stop why?
A. Because you send me the



letter. I -- I don't know where this is going to go. Do you follow me?
Q. Yeah, I do.
A. I mean, that's -- that's why there's no production, there's no pieces.
Q. But you didn't respond at all to the request --
A. Because I was -- like I said, I was not -- I was not in hundred percent confidence that this is just merely a letter to -- to -- you know, to -- to threaten me or something or really serious. And you didn't put the certificates in there. So I was kind of in the mind frame of, I don't know, but we'll stop production and we'll see what happens. But those 15 pieces were already in transit. I couldn't stop them. They were on the container.
Q. Do you have any record whatsoever that you asked India to stop production after our first letter?
A. All three pieces.
Q. You have no written record

that you asked to stop?
A. I can -- but I -- we talk every day, so this is not -- this is not like --
Q. It's a yes-or-no question.
A. No.
Q. So then you got the second cease and desist letter. And we have your texts. Your -- you said -- you called it a sales call. My question, you were still selling the MJ products into August 2017, right?
A. Because we -- yeah. Because I have 15 pieces coming in.
Q. Right. And you were still selling them?
A. If I have a stock left, yes. We -- 15 pieces -- remember, I told you in the beginning that we have 15 pieces somewhere connected to the sales orders for Adobe or Western Heritage. But some pieces are not sold. They were extra coming. And we have to -- so we have to sell it because they're coming. They're already on the container.



Q. Did you under- --
A. But -- yes. Go ahead.
Q. Did you understand that it infringes a copyright to sell an infringing piece, not just to make one?
A. That's what I said, that if I would have acted on those -- the cease and desist letter, it would be at a different table today. I didn't act. That's why.
Q. And so let's go to when you did act, and that was when you got the lawsuit. You said you -- Chris was in your office then?
A. That day, yes.
Q. And what did you tell Chris?
A. I said, "We stop MJ."
Q. And did --
A. "It's a copyright infringement."
Q. Did you tell anybody else?
A. I'm not sure that Darra was there, but I think I stop everybody.
Q. And that's my question. Did you stop -- well, were there any other



reps that even knew about the MJ Collection?
A. No. No.
Q. Chris and Darra?
A. Chris, Darra, yeah.
Q. And you stopped them both?
A. Yes.
Q. Was Darra there? How did you stop Darra?
A. I don't remember.
Q. And did you take any other action after that with regard to the MJ Collection?
A. Other actions, I called every dealer, "I want those pieces back. There's a lawsuit. There's a copy infringement thing. So it's a litigation. I want all the pieces back." And that's all that came back with -- one customer came back with a piece.
Q. And then -- so you got one back from a customer, and you had not sold three? Is that right?
A. That's correct.



Q. So four remained, total?
A. Yes.
Q. And those are --
A. Out of 15.
Q. Out of 18?
A. Fifteen.
Q. Well, you had the first three that you sold to Western Heritage.
A. Uh-huh (affirmative response).
Q. And then 15 more that you made after that.
A. Uh-huh (affirmative response).
Q. "Yes"?
A. Yes. And out of those 15, we have four in stock.
Q. Correct.
A. Correct.
Q. So 18, total, were made.
A. Uh-huh (affirmative response).
Q. Right?
A. Yes.
Q. Four are in your warehouse?

Page 242

A. That's correct.
Q. Now, you were in your warehouse in May 2017 when Jason Forsberg came in, right?
A. In May?
Q. Well, do you recall being in your warehouse when Jason Scott --
A. Yeah, I remember --
Q. -- Forsberg came in?
A. Yeah, I remember him walking in. Yeah.
Q. What happened when he walked in?
A. I think he came in August.
Q. I'll ask you, when do you think --
A. I'm not sure what day. But I think he came sometime between those letters and the lawsuit, somewhere in there. So he walked into my office. He came as a customer.
Q. And it was to your warehouse?
A. Yes.
Q. And what happened?
A. He came to my warehouse. And I was not at the door. Someone else opened the door. And he tried to buy a product. He said, "I saw your pieces at Western Heritage, and my wife" -- actually, "My wife saw your pieces at Western Heritage, and I want to spend money with you." $100,000, I remember, he throw at the person who was at the door.

So -- and my -- my desk is like this, and there's a door right there. So he walks in towards my -- first, Chris -- I think Chris was there. First, Chris came, and then he's behind Chris walking to my door, walking to my office door. And I look at his face, I said, "I know this person. I've seen his face somewhere. I know this person." Then I said, "You're Jason Scott from Jason Scott Collection." Because I did recognize him.
Q. How did you recognize him?
A. Because we received the letter from you, I guess the first letter, that's when I came to know about Jason Scott. So I did research that, "Who is this company? And who is this attorney" -- you -- "that's sending me a letter and he's addressing all these pieces?" So I did research him. And my research took me to his photo, because he's celebrity. He has a photo on his website, and people know him. So that's how I came to know he's Jason Scott.

And then once I -- once I was confirmed, I asked him to leave.
Q. And you believe this was after you got the first cease and desist letter?
A. Somewhere in there. Somewhere in there.
Q. You don't think it was before that first letter came out?
A. I have to check. I don't -- I don't recall exact date, what day he showed up.
Q. Well, it's kind of important, because you're saying you found out who he was by research that you did after you got the first cease and desist letter.
A. Somewhere there. That's what I'm thinking. It was after first, I think. I'm not hundred percent sure on that, because --
Q. Was there any other --
A. -- I don't go to his office. He came to my office.
Q. Is there any other way you would have known who Jason was?
A. No.
Q. Your testimony is, you'd never heard of Jason Scott Collection before you got the first cease and desist letter?
A. That is correct.
Q. Is Trendily making any new carved-type furniture?
A. We always make carved furniture.
Q. Well, furniture with --
A. We are selling it online.
Q. -- detailed carving?

A. Yeah, we have detailed carving pieces.
Q. Are you familiar with the Amir collection?
A. Uh-huh (affirmative response).
Q. What is that?
A. That is also casegood pieces, like other pieces. If you look at my -- there's a -- we have a lot of carved pieces in my line.
Q. Is the Amir collection made out of teak?
A. No.
Q. What -- what pieces are in the Amir collection?
A. There's several.
Q. Can you tell me one?
A. That's irrelevant, I think.
MR. ISRAELOFF: Go ahead and answer. You can still answer.
A. Ten, 12 pieces, maybe.
BY MR. DIETRICH:
Q. What types?
A. Casegoods. All casegoods.



Q. I understand that. Tables? Desks? Chairs?
A. You know the casegoods, what the casegoods look like, so yes.
Q. Why don't you tell me what different pieces are in the Amir collection.
A. Casegoods.
MR. ISRAELOFF: Can you list the types of casegoods?
A. Dining table, buffet, console, coffee table, end table. Dining table, already talked about.
MR. R. MALHOTRA: Bed.
A. We have a bed. Sorry. Bed, night stands, dresser.
BY MR. DIETRICH:
Q. Are those -- do those --
A. Dining chair. Dining chair.
Q. I'm sorry to interrupt. Any more?
A. I don't think so.
Q. Do each of those pieces have detailed carvings on them?
A. Like my other pieces? Yes.



They do have carving on them, yes.
Q. Who designed the carvings on the Amir collection?
A. Me.
(Exhibit No. 14 marked.)
BY MR. DIETRICH:
Q. Taking a look at Exhibit 14, is this a table in the Amir collection?
A. Yes.
Q. Dining table?
A. Uh-huh (affirmative response).
Q. And are you -- is it your testimony that you created all of the designs for the carvings on this table?
A. Yes.
Q. And how did you create those designs?
A. How did I create those designs?
Q. Yes.
A. "Create designs," means -- what do you mean by "create designs"? Like --
Q. Did you draw them on paper?



A. I'm not a -- I told you I'm not a artist. I'm not a designer. Didn't I tell you before that I'm not a designer, I'm not a artist?
Q. But you said you created these designs --
A. Yeah, I created these designs, but with my -- with my thoughts, how to put together a table with two legs or four legs. So I did that.
Q. Right. But you can see this has pretty detailed carvings on the pedestal legs.
A. Everything --
Q. Can you just answer my question? We're going to --
A. Yes. Okay.
Q. -- go a lot faster.
A. Okay.
Q. We're trying to finish up here.
A. Okay.
Q. I'm not trying to trick you.
A. Okay.

Q. Just listen to my question and answer it.
A. Okay. Go ahead.
Q. There's pretty detailed carvings on the legs of this table.
A. Yes.
Q. Did you create the design for those carvings?
A. I incorporated them. I incorporated them, make a dining table out of it. Maybe this was a pillar. I call -- I incorporate that to a leg for dining table.
Q. And you did that?
A. I did that.
Q. Nobody else?
A. Nobody else.
Q. That's my question.
A. Yes. I did that, yes. Big yes.
Q. Did you draw them out?
A. I -- some, I draw them out. Some, I have to put together, like, cuttings and make a table out of it, make a thing out of it. Yes, I did.



And it's all -- I can call it my creation.
Q. And then you sent it to India?
A. I send it to India.
Q. Via e-mail?
A. No. Again, my dad was here.
Q. Oh, okay. So you just gave him a --
A. All these, yes. And --
Q. What did you give him in that case?
A. What did I give him?
Q. You said you incorporated it, you might have photos.
A. Yeah, I -- yeah, I gave him all those pictures with all those -- you know, like, we put this carving there, we put this thing there, then all that pieces and those papers went to India for production.
Q. Did you adapt or change this table specifically because of the Jason Scott copyright on the Sacred Heart dining table?



A. Question again?
Q. Did you change this table from the MJ dining table to this design specifically because of the copyright on the Jason Scott Sacred Heart dining table?
A. No, that's not true.
(Exhibit No. 15 marked.)
BY MR. DIETRICH:
Q. I'm showing you what's been marked Exhibit 15. Who makes this table?
A. I don't know. I have similar in my line.
Q. You do?
A. Similar.
Q. But not the same?
A. Not -- this is not my picture.
Q. Is it your table?
A. I just said this is not my picture, this is not my table.
Q. Oh, I know you said it's not your picture. I just --
A. It's not my table either.



It's not my picture, it's not my table. Yeah.
Q. Are you familiar with a company called Green Gables?
A. They do have something to do -- I'm not sure about. I think I heard the name Green Gables. I think I did, yes.
Q. Did you ever copy any Green Gables furniture?
A. I said that before, I'm not a copy cat. I don't copy pieces.
Q. Did you ever use any Green Gables furniture designs to produce your own furniture?
A. How can I comment on that? I don't know. My answer is no.
Q. No?
A. No.
Q. You said you have a table similar to this.
A. Like I said, similar to that. And there might be you show me another picture of that they might have, and then say, "You have that in your line?"

But answer is no, because I didn't -- I didn't go and copy Green Gables. No, I didn't.
Q. My question wasn't necessarily whether you went and copied them, but did you use their design to create your own design?
A. I don't think so. This table -- this table -- there are maybe ten companies with similar design out in the market. A lot of people from Mexico do that. Lot of people from India do that. Lot of people make them here in the United States. So this is not a unique piece. We can talk like, "Oh, this is someone's design." No. It's a common piece. Everyone has it. Yeah. So there's no name on it. It's -- there are --
Q. Right.
A. There are some pieces of wrought iron. There are several out in the market.
Q. Have you sold any Amir collection pieces?



A. I did.
Q. How many?
THE WITNESS: Do I have to answer that?
BY MR. DIETRICH:
Q. If you know.
MR. ISRAELOFF: We'll consider that confidential, if you don't mind.
MR. DIETRICH: I don't.
THE WITNESS: Yeah, yeah.
BY MR. DIETRICH:
Q. How many?
A. I have to check. But we did sell, yes.
Q. Ten? 20? 50?
A. I have to check. You didn't ask me about -- there's no topic about Amir, so I didn't know you'd -- you know, I --
Q. I understand.
MR. ISRAELOFF: That's okay. Listen to the --
BY MR. DIETRICH:
Q. I'm asking for your personal



knowledge, which I'm entitled to ask for. You obviously know that you did sell some pieces in that line. So my question was: How many? If you know.
A. Maybe ten, 12, or more. I don't know. I don't have exact number.
Q. That's fine. Did you ever photograph any Jason Scott piece of furniture?
A. Jason Scott piece?
Q. Yes.
A. Photograph?
Q. Yes.
A. No.
Q. Have you ever contacted any retailer asking to buy a Jason Scott piece from them?
A. Never.
Q. Have you ever asked anyone to photograph a Jason Scott piece?
A. Never.
Q. Have you ever asked anyone to contact a retailer to buy a Jason Scott piece from them?
A. Say it again.



Q. Have you ever asked anyone to contact a retailer to buy --
A. No. No, no, no. No. I'm a manufacturer. I don't have to do that. No.
(Exhibit No. 16 marked.)
A. Yes.
BY MR. DIETRICH:
Q. This first page here of Exhibit -- we're on 16 now. Is this a Trendily piece?
A. This is a Trendily piece? This is -- this is not a Trendily piece.
Q. It's not?
A. No.
Q. That sure looks like your father there in the mirror taking the picture.
A. Uh-huh (affirmative response).
Q. Whose piece is it, then?
A. This is a factory in India. This picture was photographed in India.
Q. Right.

A. And -- and someone, I think, invited my dad to see what they sell so if Trendily can help them to sell product in USA. So my dad was there taking pictures to send me if I can give him some business. He was broke. He said someone, you know, just destroy him, so he was not in a good financial condition, so he requested my dad to visit the factory and see if Rahul can sell some product. So he's taking those pictures in the factory.
Q. I see.
THE WITNESS: You went to this factory.
BY MR. DIETRICH:
Q. How about the second page, is -- is that a Trendily piece?
A. It's one of a kind. It is -- we bought this. It's a one of a kind.
Q. Oh.
A. Yeah, these are one-of-a-kind piece.
Q. You bought it from whom?
A. From outside factory in



India.
Q. Oh, so Trendily didn't make this?
A. No. All -- all the pieces -- back then, we were not, but now we are. Back then, we were not making those pieces inside the factory. We were outsourcing them, like other companies.
Q. And now you are making this piece?
A. Similar, yeah.
Q. Is it made out of teak?
A. No. Reclaimed.
Q. Just reclaimed wood?
A. Reclaimed wood.
Q. And it has iron pulls on it, the hardware?
A. It can have iron pulls, it can have handle, it can have anything.
Q. This one has metal iron pulls?
A. I see it, yeah.
Q. And carvings?
A. Yeah, uh-huh.
Q. This isn't adapted from a



Jason Scott piece, is it?
A. I don't think so, no. No.
Q. So you can make a -- this is a buffet, isn't it?
A. Uh-huh (affirmative response).
Q. So you can make a buffet with carvings and iron pulls without adapting it from a Jason Scott design, right?
A. This -- this -- this kind of piece go on the internet. You will find --
MR. ISRAELOFF: Listen to his question.
BY MR. DIETRICH:
Q. It's a yes-or-no question.
A. You will find almost 200 pieces. Because these are one of a kind, and that's --
MR. ISRAELOFF: Hold on. His question was, are you able to make a piece like this without adapting from Jason Scott? Are you?
A. Oh, yes. Yes.



MR. ISRAELOFF: Okay. Stop there.
BY MR. DIETRICH:
Q. That's what I'm asking.
A. Yes.
Q. So on this next page, is this a Trendily table?
A. It's in my showroom. Yes. It's not -- again, it came from India. Yes, it is my table. Yes, I can say that.
Q. This is a Trendily table?
A. It's on my floor.
Q. In Dallas?
A. Yes.
Q. Is it teak?
A. No.
Q. Is it reclaimed wood?
A. Yes.
Q. Which might have teak in it?
A. Might have teak in it, yes.
Q. And it has metal on it?
A. Yes, it does.
Q. It's not adapted from Jason Scott, is it?

A. No. No.
Q. So this next -- next page, is this a Trendily piece?
A. It came -- yes, it is a Trendily piece. It came from India. Yes.
Q. And is this a buffet?
A. Sideboard. Yeah, buffet, you can call it. It's more like a sideboard.
Q. And it's got lots of carvings on the front, on the doors?
A. It's not called carving. It's the cutting. There's a -- there's a mirror in the back. There's a mirror in the back.
COURT REPORTER: I'm sorry?
A. There's a mirror, mirror. M-i-r-r-o-r, mirror. There's a mirror in the back.
BY MR. DIETRICH:
Q. Isn't -- aren't these wood carvings, though?
A. No, it's not called wood carving. It's wood cutting. You cut



those holes in the wood, and then you put mirror in the back.
Q. And going to the next page, this is similar, but a little bit different from the one we saw earlier, the buffet. Is this a Trendily piece of furniture?
A. Again, it's one of a kind. We bought it from India, and we -- yeah, it's one of a kind. Yes.
Q. It's not -- not copied from Jason Scott, is it?
A. No. No. No way. No.
Q. It's got metalwork on it?
A. These doors are old doors, actually. These are --
MR. ISRAELOFF: Hold on, hold on. His question was, does it have metalwork on it?
A. It has some metalwork. It has some wood. It does.
BY MR. DIETRICH:
Q. Has some nailheads on it, looks like?
A. On the front panels, yeah.



Yes.
Q. So you can make a buffet with metalwork and carvings and nailheads without adapting it from a Jason Scott design, right?
A. Yeah. Yeah. There are -- you can use metal on any piece anywhere.
Q. And the last -- the last one, is that a Trendily piece?
A. Yeah. That's my -- what's the name? I forgot. But, yes, that's my piece. Yes.
Q. And it's got carvings on it?
A. Uh-huh (affirmative response).
Q. Metal hardware?
A. Every piece has a metal hardware.
Q. And it's not copied from a Jason Scott, is it?
A. No. This -- I have that in my line for more than -- I don't know. It's long enough.
Q. Is this a buffet?



A. Yes.
Q. Again, different kind of buffet, with carvings --
A. Yeah, different kind of buffet.
Q. -- and metalwork that --
A. No metalwork, but just hardware. No metalwork.
Q. And you can -- you can make that without copying a Jason Scott design, right?
A. Yeah. No, no, no, we can -- we can -- we can do anything with the wood and with the metal. It doesn't have to have a copy of Jason Scott, no.
MR. DIETRICH: I don't have any more questions for you.
THE WITNESS: Okay.
MR. ISRAELOFF: Hold on a second. I want to clarify one or two things.
When you were talking about dealers and territories, you said you had customers all over the nation, right? Did you have any

customers of the MJ pieces in the state of Arizona?

THE WITNESS: Nobody.

MR. ISRAELOFF: That's all I have. Thank you.

(Deposition concluded at 2:42 p.m.)



CHANGES AND SIGNATURE

RAHUL MALHOTRA JULY 27, 2018

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |
| | | | |



SIGNATURE

I, RAHUL MALHOTRA, have read the foregoing deposition, or have had it read to me, and hereby affix my signature that same is true and correct, except as noted above.

______________________________

RAHUL MALHOTRA



UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

JASON SCOTT COLLECTION, INC., an Arizona corporation, Plaintiff,

VS. Case No. 2:17-cv-02712-JJT

TRENDILY FURNITURE, LLC, a Texas limited liability company, TRENDILY HOME COLLECTION, LLC, a Texas limited liability company, RAHUL MALHOTRA, an individual, JOHN DOE CORPORATIONS 1-10, and JOHN DOES 1-10, Defendants.

REPORTER'S CERTIFICATION
DEPOSITION OF RAHUL MALHOTRA
JULY 27, 2018

I, CHRISTY R. SIEVERT, CSR, RPR, in and for the State of Texas, hereby certify to the following:

That the witness, RAHUL MALHOTRA, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that the signature of the deponent was requested by the deponent or a party and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any

changes and the reasons therefor;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 15th day of August, 2018.

______________________________
CHRISTY R. SIEVERT, CSR, RPR
Texas CSR 8172
Expiration Date: 12/31/2018

WH001

TRENDILY | FURNITURE LLC

A company of Mi'das Group
2991 CONGRESSMAN LANE
DALLAS, TX 75220
Main : 469-647-2553 Fax : 469-335-9770
Site: trendilyfurniture.com

# Invoice

| Date | Invoice # |
|---|---|
| 6/30/2017 | 102901 |

| Bill To | Ship To |
|---|---|
| WESTERN HERITAGE<br>1525 FORTWORTH HWY<br>WEATHERFORD, TX 76086 | WESTERN HERITAGE<br>1535 FORT WORTH HWY<br>WEATHERFORD, TX 76086<br>817-594-4051 |

| P.O. Number | Terms | Rep | Ship Date | Via | Tracking # |
|---|---|---|---|---|---|
| S/M: STORE | Full Payment b... | CTT | 6/30/2017 | CUSTOMER PICKUP | |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 2 | 01-2-1-082-39 | M.J. DINING TABLE 96"<br>96"x48"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,899.00 | 3,798.00 |

Exhibit 2
Malhotra
Christy R. Sievert, CSR, RPR

PLEASE INSPECT ALL MERCHANDISE CAREFULLY & MAKE NOTATION OF ANY DAMAGES OR DEFECTS PRIOR TO SIGNING PROOF OF DELIVERY.

Claims must be made within 48 hours of merchandise receipt. Unauthorized returns are subject to a 25% restocking fee.

| | |
|---|---|
| Total | USD 3,798.00 |
| Payments | USD 0.00 |
| Balance Due | USD 3,798.00 |

WH002

TRENDILY | FURNITURE LLC

A company of Mi'das Group
2991 CONGRESSMAN LANE
DALLAS, TX 75220
Main : 469-647-2553 Fax : 469-335-9770
Site: trendilyfurniture.com

# Invoice

Pd all together Chk # 14582 19175.00

| Date | Invoice # |
|---|---|
| 4/3/2017 | 102653 |

| Bill To | Ship To |
|---|---|
| WESTERN HERITAGE<br>1525 FORTWORTH HWY<br>WEATHERFORD, TX 76086 | WESTERN HERITAGE<br>1535 FORT WORTH HWY<br>WEATHERFORD, TX 76086<br>817-594-4051 |

| P.O. Number | Terms | Rep | Ship Date | Via | Tracking # |
|---|---|---|---|---|---|
| S/M: FLOOR | Full Payment b... | CTT | 4/3/2017 | CUSTOMER PICKUP | |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | 01-5-2-011-39 | M.J. OFFICE DESK<br>72"x36"x31.5"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,699.00 | 1,699.00 |
| 1 | 01-2-3-052-39 | M.J. SIDE BOARD<br>72"x22"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,399.00 | 1,399.00 |
| 1 | 01-2-1-082-39 | M.J. DINING TABLE 96"<br>96"x48"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,899.00 | 1,899.00 |
| | | 2100<br>5100 | 1400<br>4200 | 1500<br>4500 |

PLEASE INSPECT ALL MERCHANDISE CAREFULLY & MAKE NOTATION OF ANY DAMAGES OR DEFECTS PRIOR TO SIGNING PROOF OF DELIVERY.

Claims must be made within 48 hours of merchandise receipt. Unauthorized returns are subject to a 25% restocking fee.

| | |
|---|---|
| Total | USD 4,997.00 |
| Payments | USD 0.00 |
| Balance Due | USD 4,997.00 |

JASON SCOTT COLLECTION

...it takes a village



TBL-SAC / SACRED HEART DINING TABLE 96" x 48" x 31"

( custom sizes available )



Exhibit 3

Malhotra

Christy R. Sievert, CSR, RPR

JASON SCOTT COLLECTION
...it takes a village





DSK-IRONSTR-DRGN / IRON STAR DESK W/ DRAGONFLY LEGS

72" X 36" X 31"

Exhibit 4
Malhotra
Christy R. Sievert, CSR, RPR



Exhibit 5
Christy R. Sievert, CSR, RPR




PRICE
$








LONDON
PRICE

AT&T 12:43 PM 66%

R

Rhaul



You gonna be making this one too?

Again already in production

Nice!
You doing any of his beds?

Thu, Aug 3, 2:25 PM

Yes 2 bed

Exhibit 8
Malhotra
Christy R. Sievert, CSR, RPR

Can you show me which ones?
I got a big client interested

iMessage

USC00011

AT&T 12:43 PM 66%

Rhaul



Runyon's Fine Furniture

JULY 11 AT 10:45 PM

Do you have this JS console table in you MJ collection?

Yes in production

Size 72" x 18" x 34" and price $999.00

Eta on it?

14-16 weeks

To be safe

iMessage

USC00012

AT&T 9:34 PM 26%

5

R

Rhaul

Sat, Aug 5, 2:01 PM

Do you have another MJ dining table in stock

Not this minute

I am getting soon though

If you need them, I will order now and save

Yes please send me an invoice for one MJ table

And another desk please

Sat, Aug 5, 4:12 PM

Desk we have in stock

Please send me an invoice.
I'll have it picked up next week

iMessage

B804

2:04

R

Rhaul

Can you send someone to pick up by Friday or Saturday. We are closed the whole next week.

For the chaise?

And MJ

Price still the same on the MJ Table? 2,000?

You have to buy all 3 pieces. I have your PO on them

Dining table is $1899.00

I'll have to talk to Philip and see if they will have room for all Everything.
They are picking up other stuff for us too

Ok

Let me know

I will.
I also need to see if he can pick

iMessage

Exhibit 9
Malhotra
Christy R. Sievert, CSR, RPR

B005

2:05

1

R

Rhaul



I know your on vacation so this can wait till you get back. The MJ desk has issues. The top is warped...

It is not wrapped. Someone drop the desk

iMessage

2:05

R
Rhaul

It's not loose. It's very tightly attached.
Just the back side is warped up.
You can see it that the wood has pulled from the nails

Now I see it



iMessage

2:06

R

Rhaul



We will try and fix it with clamps.
Sometimes it will go back down

Put some wood glue first

And then clamp it

Just want to show you in case we can't fix it.
Yes we will put glue too.

Will call you on Monday

Okay sounds good. Thank you

Mon, Jul 10, 8:58 AM

We got the desk top fixed. Screwed it down so there shouldn't be any problems.

Awesome

iMessage

2:06

Rhaul

Btw next time make a MJ dining table can you make them at 30" height and not 32...
standard dining height is 30"
We had to cut it down

Mon, Jul 10, 2:45 PM

Do y'all want to do the re make on the big sofa?

Mon, Jul 10, 4:10 PM

Fax the drawing when you can

pdf
2017_07_10 16-16-26.pdf

Leather is the crocodile brown copper.
Fabric is provided by us

Ok

I faxed and text it to you

iMessage

2:07

Rhaul



Damn good looking table!

Small enough to answer and big enough to produce

That's my table awesome

Do you have more photos

I know small companies are better... I agree

Yes I think we are gonna feature it in cowboys and Indians magazine

Yes I got one of the desk

I like the chairs I

iMessage

2:07

Rhaul

I like the chairs I

Too

Yes they complement the table well

Chair from whom ??

I like it

Ronny makes them

Very nice Italian frame.
Old Hickory Tannery use to sell the frame

Ok these are the frames you were talking I got it now

You bought these chair frame from OHT

I remember that now

Yes I got about 200 chair frames

Wow

iMessage

2:07

Rhaul



Your desk.

Wow

You need to design my website

My cost to design please

I would love to do that but I just don't have the time... I'm already working 7 days a week at an average of 10 hours a day lol

Thu, Jul 27, 3:28 PM

iMessage

2:08

Rhaul

Eta on it?

14-16 weeks

To be safe

Ok

Fri, Jul 28, 4:16 PM

I am writing the PO or you are sending one ??

Mon, Jul 31, 2:48 PM

What type of wood is the MJ collection made out of? Mango? Acaia?

Reclaimed teak

Indian teak

Oh wow okay. That's awesome

Thu, Aug 3, 12:40 PM



iMessage

2:09

Rhaul

Yes 2 bed

Can you show me which ones? I got a big client interested

Thu, Aug 3, 3:53 PM

Ok

Sat, Aug 5, 2:01 PM

Do you have another MJ dining table in stock

Not this minute

I am getting soon though

If you need them, I will order now and save

Yes please send me an invoice for one MJ table

And another desk please

Sat, Aug 5, 4:12 PM

Desk we have in stock

Please send me an invoice

iMessage

2:09

Rhaul

Sat, Aug 5, 4:12 PM

Desk we have in stock

Please send me an invoice.
I'll have it picked up next week

Got it

Thank you!

We hired Darra. She started this week

That's a good move.
She is a good Rep

She joined as a Sales manager in the company

Will control entire sale from all 50 states

You could take over Old Hicks client base since there gone

That's great!

Yes our goal is to fill that big hole OHT left

iMessage

B613

2:10

Rhaul

Sweet!
Yes they did!

Wed, Aug 9, 2:08 PM

Hey Tanner, little change on pick up. Please plan Monday afternoon pick up. Our main seamstress is on vacation this week and the ottoman need some correction. Your MJ desk is ready as of now. Do you still have the MJ credenza on floor. I have one left in stock, in case you need......also I can swap the consignment pieces with new like I got 2 sectional, if you want them.

Wed, Aug 9, 4:33 PM

You got the photos ?

Yes I told chris that I don't think they would sell here.
Light colors are not working for us... I know they are hot colors right now but we just don't have the customer base for it...

iMessage

2:11

Rhaul

Fri, Aug 11, 11:31 AM

I have arrangements made for the custom sofa and MJ desk on Friday the 18th.
Will that work?

Yes we are ready on Monday

I know but my customer is only home on the weekends to receive the sofa.

Friday is fine with us

Thank you!

Fri, Aug 11, 2:45 PM

Next week I can give you the 4 pieces you ordered and cancelled, on consignment. 2 tufted chair and 1 club chair and 1 ottoman.

And you are sending back those 3 pieces on your floor back to us on the same truck ??

iMessage

2:11

Rhaul

Fri, Aug 11, 5:14 PM

Okay yes, I'll be sending them up to bring back to you. They will have a check too

Sat, Aug 12, 10:17 AM

Is it possible to order a MJ desk with no stain or sealer?

I don't think so

Okay well can I order one with a different finish?

No we are not offering any other finish on this MJ collection

You have your own paint shop. You can dark the color

Okay.
I know but it's hard to stop down the desk with all the carvings and Iron

They want dark ??

iMessage

B618

2:11

Rhaul

They want dark ??

Yes a custom finish

If they pay 20% up charge. We can do that in india



What is the finsh called that you have on it now

Okay I will let my customer know

iMessage

2:11

R

Rhaul

We can match the finish

Tue, Aug 15, 8:21 AM

Okay I will let my customer know

Can my guys pick up tomorrow? They are bringing you the consignment pieces, and picking up the sofa and desk.
They will not have room for the other sofa you want to give us on consignment. I am working on scheduling another day for pick ups

Yes, we can do that

Tue, Aug 15, 1:59 PM



iMessage

B020

TRENDILY | FURNITURE LLC

A company of Mi'das Group

2991 CONGRESSMAN LANE
DALLAS, TX 75220
Main : 469-647-2553 Fax : 469-335-9770
Site: trendilyfurniture.com

# Sales Order

| Date | S.O. No. |
|---|---|
| 8/3/2017 | 202066 |

| Name / Address |
|---|
| ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132 |

| Ship To |
|---|
| ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132<br>817-294-0053 |

| P.O. No. | Terms | Rep | Ship Date | Ship Via |
|---|---|---|---|---|
| 080117 | Net 30 | CTT | 8/3/2017 | |

| Item | Description | Ordered | U/M | Rate | Backordered | Invoiced | Amount |
|---|---|---|---|---|---|---|---|
| 01-1-3-042-... | ~~M.J. CONSOLE TABLE 72"<br>FINISH: #39 FINISH:#39<br>RECLAIMED TEAK<br>STANDARD~~ | 1 | ea | 999.00 | 1 | 0 | ~~999.00~~ |
| 01-1-7-030 | VANCOUVER CLUB CHAIR<br>GR(3) RED GATOR ON: OB & OA. /<br>GR(2)RED LEATHER ON: IB, IA, IW,<br>SEAT & DECK.<br>NAILHEADS: FRENCH NATURAL<br>SMALL<br>FINISH: WALNUT #12 | 1 | ea | 1,200.00 | 0 | 1 | 1,200.00 |

Canceled per Rhcul
-purchased item
through Runyons

**Total** ~~USD 2,199.00~~

$1200

Exhibit 11
Malhotra
Christy R. Slevert, CSR, RPR

B022

TRENDILY | FURNITURE LLC

A company of Mi'das Group
2991 CONGRESSMAN LANE
DALLAS, TX 75220
Main : 469-647-2553 Fax : 469-335-9770
Site: trendilyfurniture.com

# Sales Order

| Date | S.O. No. |
|---|---|
| 8/7/2017 | 202072 |

| Name / Address | Ship To |
|---|---|
| ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132 | ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132<br>817-294-0053 |

| P.O. No. | Terms | Rep | Ship Date | Ship Via |
|---|---|---|---|---|
| S/M: STOCK | Net 30 | CTT | 8/7/2017 | |

| Item | Description | Ordered | U/M | Rate | Invoiced | Amount |
|---|---|---|---|---|---|---|
| 01-2-1-082-39 | M.J. DINING TABLE 96"<br>96"x48"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1 | ea | 1,899.00 | 0 | 1,899.00 |
| 01-5-2-011-39 | M.J. OFFICE DESK<br>72"x36"x31.5"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1 | ea | 1,699.00 | 0 | 1,699.00 |

pd w/ CHK# 1007
8-12-17 JM

| | |
|---|---|
| **Total** | USD 3,598.00 |

B023

TRENDILY FURNITURE LLC

A company of Mi'das Group
2991 CONGRESSMAN LANE
DALLAS, TX 75220
Main : 469-647-2553 Fax : 469-335-9770
Site: trendilyfurniture.com

# Invoice

| Date | Invoice # |
|---|---|
| 6/29/2017 | 102926 |

| Bill To |
|---|
| ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132 |

| Ship To |
|---|
| ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132<br>817-294-0053 |

| P.O. Number | Terms | Rep | Ship Date | Via | Tracking # |
|---|---|---|---|---|---|
| 062917 | Net 30 | CTT | 6/29/2017 | | |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | 01-5-2-011-39 | M.J. OFFICE DESK<br>72"x36"x31.5"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,699.00 | 1,699.00 |
| 1 | 01-2-3-052-39 | M.J. SIDE BOARD<br>72"x22"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,399.00 | 1,399.00 |
| 1 | 01-2-1-082-39 | M.J. DINING TABLE 96"<br>96"x48"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1,899.00 | 1,899.00 |

PLEASE INSPECT ALL MERCHANDISE CAREFULLY & MAKE NOTATION OF ANY DAMAGES OR DEFECTS PRIOR TO SIGNING PROOF OF DELIVERY.

Claims must be made within 48 hours of merchandise receipt.
Unauthorized returns are subject to a 25% restocking fee.

| | |
|---|---|
| Total | USD 4,997.00 |
| Payments | USD 0.00 |
| Balance Due | USD 4,997.00 |

B024

TRENDILY | FURNITURE LLC

# Sales Order

| Date | S.O. No. |
| --- | --- |
| 4/10/2017 | 201856 |

A company of Mi'das Group
2991 CONGRESSMAN LANE
DALLAS, TX 75220
Main : 469-647-2553 Fax : 469-335-9770
Site: trendilyfurniture.com

| Name / Address | Ship To |
| --- | --- |
| ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132 | ADOBE INTERIORS<br>4651 BRYANT IRVIN RD<br>FORT WORTH, TX 76132<br>817-294-0053 |

| P.O. No. | Terms | Rep | Ship Date | Ship Via |
| --- | --- | --- | --- | --- |
| S/M: STOCK | Net 30 | CTT | 4/10/2017 | |

| Item | Description | Ordered | U/M | Rate | Invoiced | Amount |
| --- | --- | --- | --- | --- | --- | --- |
| 01-5-2-011-39 | M.J. OFFICE DESK<br>72"x36"x31.5"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1 | ea | 1,699.00 | 0 | 1,699.00 |
| 01-2-1-082-39 | M.J. DINING TABLE 96"<br>96"x48"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1 | ea | 1,899.00 | 0 | 1,899.00 |
| 01-2-3-052-39 | M.J. SIDE BOARD<br>72"x22"x31"<br>FINISH:#39 RECLAIMED TEAK<br>STANDARD | 1 | ea | 1,399.00 | 0 | 1,399.00 |
| | | | | | **Total** | USD 4,997.00 |

7:20 PM
01/24/18

# TRENDILY FURNITURE LLC
## Inventory Item QuickReport
As of December 31, 2017

| | Type | Date | Num | Name | Memo | Qty | U/M |
|---|---|---|---|---|---|---|---|
| **Inventory** | | | | | | **0.00** | |
| **01-2-3-052-39** | | | | | | | |
| **On Hand As Of 12/31/2016** | | | | | | **0.00** | |
| | Bill | 03/17/2017 | 181/2016-2017 | MIDAS EXPORTS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 1.00 | ea |
| | Invoice | 04/03/2017 | 102653 | WESTERN HERITAGE | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -1.00 | ea |
| | Bill | 06/29/2017 | 186/2017-2018 | ADOBE INTERIORS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 5.00 | ea |
| | Invoice | 06/29/2017 | 102926 | ADOBE INTERIORS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -1.00 | ea |
| | Invoice | 07/13/2017 | 102878 | WALLER RUSTIC FURNITURE | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -1.00 | ea |
| | Invoice | 07/25/2017 | 102835 | DENNARDS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -1.00 | ea |
| | Invoice | 07/31/2017 | 102912 | AUER HAUS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -1.00 | ea |
| | Credit Memo | 09/12/2017 | 102912R | AUER HAUS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 1.00 | ea |
| Tot On Hand As Of 12/31/2017 | | | | | | 2.00 | ea |
| **On Purchase Order As Of 12/31/2016** | | | | | | **0.00** | |
| | Purchase Order | 04/11/2017 | 1852 | ADOBE INTERIORS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| Tot On Purchase Order As Of 12/31/2017 | | | | | | 0.00 | ea |
| **On Sales Order As Of 12/31/2016** | | | | | | **0.00** | |
| | Sales Order | 01/27/2017 | 201731 | WESTERN HERITAGE | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| | Sales Order | 04/10/2017 | 201856 | ADOBE INTERIORS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| | Sales Order | 05/08/2017 | 201916 | DENNARDS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| | Sales Order | 05/31/2017 | 201944 | WALLER RUSTIC FURNITURE | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| | Sales Order | 06/26/2017 | 201992 | AUER HAUS | M.J. SIDE BOARD 72"x22"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| Tot On Sales Order As Of 12/31/2017 | | | | | | 0.00 | ea |
| Total Inventory | | | | | | 2.00 | ea |
| **TOTAL As Of 12/31/2017** | | | | | | **2.00** | **ea** |

Exhibit 12
Malhotra
Christy R. Sievert, CSR, RPR

7:22 PM
01/24/18

# TRENDILY FURNITURE LLC
## Inventory Item QuickReport
As of December 31, 2017

| | Type | Date | Num | Name | Memo | Qty | U/M |
|---|---|---|---|---|---|---|---|
| **Inventory** | | | | | | **0.00** | |
| **01-5-2-011-39** | | | | | | | |
| **On Hand As Of 12/31/2016** | | | | | | **0.00** | |
| | Bill | 03/17/2017 | 181/2016-2017 | MIDAS EXPORTS | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | 1.00 | ea |
| | Invoice | 04/03/2017 | 102653 | WESTERN HERITAGE | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | -1.00 | ea |
| | Bill | 06/29/2017 | 186/2017-2018 | ADOBE INTERIORS | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | 5.00 | ea |
| | Invoice | 06/29/2017 | 102926 | ADOBE INTERIORS | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | -1.00 | ea |
| | Invoice | 07/13/2017 | 102878 | WALLER RUSTIC FURNITURE | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | -1.00 | ea |
| | Invoice | 08/11/2017 | 103006 | ADOBE INTERIORS | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | -1.00 | ea |
| Tot On Hand As Of 12/31/2017 | | | | | | 2.00 | ea |
| **On Purchase Order As Of 12/31/2016** | | | | | | **0.00** | |
| | Purchase Order | 04/11/2017 | 1852 | ADOBE INTERIORS | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | 0.00 | ea |
| Tot On Purchase Order As Of 12/31/2017 | | | | | | 0.00 | ea |
| **On Sales Order As Of 12/31/2016** | | | | | | **0.00** | |
| | Sales Order | 01/27/2017 | 201731 | WESTERN HERITAGE | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | 0.00 | ea |
| | Sales Order | 04/10/2017 | 201856 | ADOBE INTERIORS | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | 0.00 | ea |
| | Sales Order | 05/31/2017 | 201944 | WALLER RUSTIC FURNITURE | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | 0.00 | ea |
| | Sales Order | 08/07/2017 | 202072 | ADOBE INTERIORS | M.J. OFFICE DESK 72"x36"x31.5" FINISH:#39 RECLAIMED TEAK | 0.00 | ea |
| Tot On Sales Order As Of 12/31/2017 | | | | | | 0.00 | ea |
| Total Inventory | | | | | | 2.00 | ea |
| **TOTAL As Of 12/31/2017** | | | | | | **2.00** | **ea** |

7:18 PM
01/24/18

# TRENDILY FURNITURE LLC
## Inventory Item QuickReport
As of December 31, 2017

| | Type | Date | Num | Name | Memo | Qty | U/M |
|---|---|---|---|---|---|---|---|
| **Inventory** | | | | | | **0.00** | |
| **01-2-1-082-39** | | | | | | | |
| **On Hand As Of 12/31/2016** | | | | | | **0.00** | |
| | Bill | 03/17/2017 | 181/2016-2017 | MIDAS EXPORTS | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 1.00 | ea |
| | Invoice | 04/03/2017 | 102653 | WESTERN HERITAGE | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -1.00 | ea |
| | Bill | 06/29/2017 | 186/2017-2018 | ADOBE INTERIORS | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 5.00 | ea |
| | Invoice | 06/29/2017 | 102926 | ADOBE INTERIORS | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -1.00 | ea |
| | Invoice | 06/30/2017 | 102901 | WESTERN HERITAGE | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -2.00 | ea |
| | Invoice | 07/13/2017 | 102878 | WALLER RUSTIC FURNITURE | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -1.00 | ea |
| | Invoice | 07/25/2017 | 102835 | DENNARDS | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | -1.00 | ea |
| Tot On Hand As Of 12/31/2017 | | | | | | 0.00 | ea |
| **On Purchase Order As Of 12/31/2016** | | | | | | **0.00** | |
| | Purchase Order | 04/11/2017 | 1852 | ADOBE INTERIORS | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| Tot On Purchase Order As Of 12/31/2017 | | | | | | 0.00 | ea |
| **On Sales Order As Of 12/31/2016** | | | | | | **0.00** | |
| | Sales Order | 01/27/2017 | 201731 | WESTERN HERITAGE | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| | Sales Order | 04/10/2017 | 201856 | ADOBE INTERIORS | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| | Sales Order | 05/08/2017 | 201916 | DENNARDS | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| | Sales Order | 05/31/2017 | 201944 | WALLER RUSTIC FURNITURE | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| | Sales Order | 06/12/2017 | 201975 | WESTERN HERITAGE | M.J. DINING TABLE 96" 96"x48"x31" FINISH:#39 RECLAIMED TEAK STANDARD | 0.00 | ea |
| Tot On Sales Order As Of 12/31/2017 | | | | | | 0.00 | ea |
| Total Inventory | | | | | | 0.00 | ea |
| **TOTAL As Of 12/31/2017** | | | | | | **0.00** | **ea** |

Secure https://www.trendilyhomecollection.com/categories/438555/mj-collection/products

Apps Gmail AZ Ct. App. D1 Google Maps AZ Statutes AZRCP TTB COLA Day Calculator Westlaw LII FRCP Other Bookmarks

TRENDILY | Home Collection

Register Login

Home Shop Flipbooks Documentation Coverings Wood Treatments Nail Heads Contact About Us




All STOCK FINISH | All ACCENT COLOR | All SHIP DETAILS | All ADDITIONAL DETAILS | All SHIPS W/ # DRAWERS

Showing 3 Products



2-1-082-39

MJ Dining Table 96" # 39 Recl...



2-3-052-39

MJ Sideboard Finish # 39 Recl...



5-2-011-39

MJ Office Desk Finish # 39 Re...

JSC00062

Exhibit 13
Malhotra
Christy R. Sievert, CSR, RPR



JSC00063

## MJ Office Desk Finish # 39 Reclaimed Teak

5-2-011-39

**Qty Available:** 0
**Dim:** 72x36x31.5
**Case Qty:** 1
**Net Wt:** 0

Login for details

TRENDILY | Home Collection

Register

search...

Home Shop Flipbooks Documentation Coverings Wood Treatments Nail Heads Contact About Us



JSC00064

## MJ Office Desk Finish # 39 Reclaimed Teak

5-2-011-39

**Qty Available:** 0

**Dim:** 72x36x31.5

**Case Qty:** 1

**Net Wt:** 0

Login for details



JSC00065

## MJ Dining Table 96" # 39 Reclaimed Teak

2-1-082-39

**Qty Available:** 0
**Dim:** 96x48x31
**Case Qty:** 1
**Net Wt:** 0

Login for details

Register

search...

TRENDILY | Home Collection

Home Shop Flipbooks Documentation Coverings Wood Treatments Nail Heads Contact About Us



JSC00066

## MJ Dining Table 96" # 39 Reclaimed Teak

2-1-082-39

**Qty Available:** 0

**Dim:** 96x48x31

**Case Qty:** 1

**Net Wt:** 0

Login for details

TRENDILY | Home Collection

Register

search...

HOME / CATEGORIES / MJ COLLECTION / MJ DINING TABLE 96" # 39 RECLAIMED TEAK



# MJ Dining Table 96" # 39 Reclaimed Teak

2-1-082-39

**Qty Available:** 0

**Dim:** 96x48x31

**Case Qty:** 1

**Net Wt:** 0

Login for details

JSC00067

TRENDILY | Home Collection

HOME / CATEGORIES / MJ COLLECTION / MJ SIDEBOARD FINISH # 39 RECLAIMED TEAK



2-3-052-39

4 Doors & 2 Drawer

**Qty Available:** 0

**Dim:** 72x22x31

**Case Qty:** 1

**Net Wt:** 0

Login for details

TRENDILY | Home Collection

Register

search...

HOME / CATEGORIES / MJ COLLECTION / MJ SIDEBOARD FINISH # 39 RECLAIMED TEAK



# MJ Sideboard Finish # 39 Reclaimed Teak

2-3-052-39

4 Doors & 2 Drawer

**Qty Available:** 0

**Dim:** 72x22x31

**Case Qty:** 1

**Net Wt:** 0

Login for details

JSC00069

TRENDILY | Home Collection

Register

search..

HOME / CATEGORIES / MJ COLLECTION / MJ SIDEBOARD FINISH # 39 RECLAIMED TEAK



JSC00070

## MJ Sideboard Finish # 39 Reclaimed Teak

2-3-052-39

4 Doors & 2 Drawer

**Qty Available:** 0
**Dim:** 72x22x31
**Case Qty:** 1
**Net Wt:** 0

Login for details