Page 1

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF ARIZONA
3
JASON SCOTT COLLECTION, INC.,    )
4           Plaintiff,    )
5    vs.                     ) CIVIL ACTION
                              ) NO.
6                            ) 2:17-CV-
TRENDLY FURNITURE, LLC, ET AL,   ) 02712-JJT
7                            )
         Defendants.     )
8
9  *****************************************************
10      VIDEOTAPED ORAL DEPOSITION OF
11           RON MCBEE
12          July 26th, 2018
13 *****************************************************
14
15
16
17        ANSWERS AND VIDEOTAPED DEPOSITION of RON
18 MCBEE, taken at the instance of the Defendants, on the
19 26th of July, AD, 2018, in the above-styled and
20 numbered cause at the offices of Jerry's Chevrolet,
21 3118 Fort Worth Highway, Weatherford, Texas, before Wes
22 R. Perryman, a Certified Shorthand Reporter in and for
23 the State of Texas, pursuant to the Federal Rules of
24 Civil Procedure and the provisions stated on the
25 record.

Page 2

1
2
3
4         A P P E A R A N C E S
5
6
APPEARING FOR THE PLAINTIFF:
7
8    MR. THOMAS E. DIETRICH
     Mangum, Wall, Stoops & Warden, PLLC
9    112 North Elden Street
     Flagstaff, Arizona 86001
10   tdietrich@mwswlaw.com
11 APPEARING FOR THE DEFENDANTS:
12   MR. SIM ISRAELOFF
     Cowles & Thompson, P.C.
13   901 Main Street, Suite 3900
     Dallas, Texas 75202
14   sisraeloff@cowlesthompson.com
15
16
ALSO APPEARING:  Mr. Jason Scott Forsberg
17        Mr. Michael Barnes, Videographer
18
19
20
21
22
23
24
25

Page 3

1            I N D E X
2  1.   Appearances                    2
3  2.   The Witness:  RON MCBEE
4       EXAMINATION BY MR. ISRAELOFF       4
5       EXAMINATION BY MR. DIETRICH       34
6       RE-EXAMINATION BY MR. ISRAELOFF    65
7       RE-EXAMINATION BY MR. DIETRICH     71
8  3.   Signature Page                    77
9  4.   Reporter's Certificate            79
10
11           E X H I B I T S
12  Ex #                      Pg   Ln
13
14  Deposition Exhibit 1, Photo      43   24
15  Deposition Exhibit 2, Photo      45    4
16  Deposition Exhibit 3, Photo      45   17
17  Deposition Exhibit 4, Photo      47   23
18
19
20
21
22
23
24
25

Page 4

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  On the record at 10:00
3  o'clock.  Today is Thursday, July 26th, 2018.  This is
4  the videotaped deposition of Ron McBee.  This is the
5  beginning of tape one, volume one.  Will counsel please
6  state their appearances and any agreements for the
7  record?
8        MR. DIETRICH:  Tom Dietrich from Mangum,
9  Wall, Stoops & Warden for the plaintiff, Jason Scott
10 Collection, Inc.
11       MR. ISRAELOFF:  Sam Israeloff with Cowles
12 & Thompson for the defendants.
13            ***
14       RON MCBEE,
15 the witness hereinbefore named, being first duly
16 cautioned and sworn to tell the truth, the whole truth
17 and nothing but the truth, testified under oath as
18 follows:
19       EXAMINATION
20 BY MR. ISRAELOFF:
21   Q.  Good morning.
22   A.  How you doing?
23   Q.  Mr. McBee, would you please state your name?
24   A.  Ron McBee.
25   Q.  Mr. McBee, what do you do, sir, for a living?

Ron McBee

2 (5 - 8)

## Page 5

1   **A.   I own a furniture store.**

2   **Q.   What's your furniture store's name?**

3   **A.   Western Heritage Furniture.  Western Heritage**

4   **Furniture and Accessories, and one's a design center.**

5   **Q.   Where is Western Heritage?**

6   **A.   It's 1525 Fort Worth Highway, Weatherford,**

7   **Texas.**

8   **Q.   And that's west of Fort Worth.**

9   **A.   Yes, sir.**

10   **Q.   How long have you been in the furniture**

11   **business?**

12   **A.   Twenty years.  Twenty-one.**

13   Q.   How did you get into the furniture business?

14   **A.   In Weatherford there wasn't -- there was only**

15   **like a couple of furniture stores, and I was in western**

16   **furniture, and Weatherford became cutting horse capital**

17   **of the world, and all these cutters and cowboys moved**

18   **to Weatherford, and there wasn't a western store, and I**

19   **opened one up.**

20   Q.   Was it just furniture or other things?

21   **A.   Accessories, toiletries and iron goods, you**

22   **know, just everything, plates, silverware.  I had**

23   **everything.  I called it the Western Wal-Mart.**

24   Q.   All right.  Was that successful?

25   **A.   Yes.**

## Page 6

1   Q.   Do you still have that along with the

2   furniture store?

3   **A.   Oh, yes.**

4   **Q.   Let me ask you, if I could, a little bit about**

5   **the furniture business since you have been in it for 21**

6   **years now.  Are you familiar with the Jason Scott**

7   **Collection --**

8   **A.   Yes.**

9   **Q.   -- of furniture?**

10   **A.   Uh-huh.**

11   **Q.   How do you know about that company?**

12   **A.   I purchase furniture from Jason.**

13   **Q.   About how long did you stock Jason Scott**

14   **furniture?**

15   **A.   I'm not going to exactly remember the year.**

16   **Three or four, five years.**  The years go by so fast.

17   I'm sorry.  I can tell you why I didn't handle it,

18   because my friend and competitor purchased a group to

19   where he would be the main distributor of it.  So Jason

20   had to go around the surrounding areas and allow Larry

21   Brumbaugh to be the main distributor because he agreed

22   to buy a certain volume a year.

23        MR. DIETRICH:  I'll object as

24   nonresponsive.

25   Q.   (BY MR. ISRAELOFF)  How is it that it came to

## Page 7

1   pass that you are no longer selling Jason Scott

2   furniture?  Go ahead and explain that again, please.

3   **A.   Oh.  It's just because -- I mean, it's**

4   **understandable.  Larry was asked if he would be a main**

5   **distributor of it, you know, and buy a certain amount a**

6   **year, and I couldn't -- I couldn't -- I couldn't.  I**

7   **mean, I'm smaller volume.**

8   Q.   So --

9   **A.   So I just backed out, I mean, you know, and**

10   **they started -- Larry started handling it all.**

11   **Q.   So the territory went to Mr. Brumbaugh?**

12   **A.   Yes.**

13   Q.   Okay.  Is that something that happens in the

14   furniture industry?

15   **A.   Well, that's the first time it's happened to**

16   **me.  I don't know.  I mean, I'm in Weatherford.  So**

17   **it's not like I'm in a big area of furniture.**

18   **Q.   Until the territory was given to a larger**

19   **dealer, were you an approved dealer for Jason --**

20   **A.   Yeah.**

21   **Q.   -- Scott furniture?**

22   **A.   Yeah, no problems.**

23   Q.   What did you have to do to become approved?

24   **A.   I just met his representatives, I think, at a**

25   **market, a furniture market, I believe.  It's where**

## Page 8

1   **suppliers that build stuff go.  Oh, there's North**

2   **Carolina, Dallas, Vegas, Atlanta, and that's where**

3   **furniture makers go and take their products.**

4   **Q.   During the time that you were a dealer for**

5   **Jason Scott furniture were there ever any disputes**

6   **between you and the Jason --**

7   **A.   None.**

8   **Q.   -- Scott company?**

9   **A.   I'm going to be honest, it's the best**

10   **furniture I ever had.  Best furniture I ever had.  The**

11   **best furniture I've ever seen made.**  I mean, there's

12   no -- it's the best -- I brag about how drawers open

13   and close so well without me having to do anything to

14   them and sand on them or do anything to it.

15   Q.   Okay.

16   **A.   I mean, honestly.**

17   Q.   Appreciate that.  But for our record I will

18   object as nonresponsive.

19        The furniture business -- I'm not in the

20   furniture business.  I don't know how it works.  Can

21   you give us a general idea of how you go about selling

22   customers on furniture from your store?  Just kind of

23   walk us through a typical scenario.  How would a

24   customer come in and then how do they typically look

25   around and make decisions in your experience?

Page 9

1   A.   Well, you just ask them kind of what their --
2   what their decor is they're looking for, the design of
3   their room they are working on.  So, you know, my
4   decorator -- I have a decorator/designer lady, and then
5   my other salespeople, they just go from there, walking
6   around.  Say they want a dining table, pick a table.
7   And you just show them what you have.
8             Then you can go to your catalogs.  Or
9   they might have saw something -- nowadays they see it
10  on line.  They see a picture on line, so they will have
11  it on their phone and show you --
12  Q.   What do you do --
13  A.   -- what they are looking at, like off of
14  Pinterest or something.
15  Q.   What do you do when a customer shows you a
16  picture on their phone and says --
17  A.   You try to go match it in the catalogs.
18            THE REPORTER:  I need you to wait until
19  he finishes his question, please.
20            THE WITNESS:  Oh, okay.
21            THE REPORTER:  Thank you.
22            THE WITNESS:  You bet.
23  Q.   (BY MR. ISRAELOFF)  What are some of the other
24  brands of furniture that you currently carry?
25  A.   Oh, Hooker, Bradington Young.  Oh, gosh.  Oh,

Page 10

1   my Lord, I can't think of all of them.
2   Q.   Are there many?
3   A.   Oh, yeah.
4   Q.   All right.  Now, in some types of products
5   like cell phones, for example, we all know that people
6   have very strong brand preferences.  They know they
7   want an Apple --
8   A.   Uh-huh.
9   Q.   -- or they want Genesis --
10  A.   Uh-huh.
11  Q.   -- or whatever.
12  A.   Yes, sir.
13  Q.   Is it quite that same way in the furniture
14  business, that people come into your store and say, "I
15  want to see only Hooker furniture"?
16            MR. DIETRICH:  Objection, form.
17  Q.   (BY MR. ISRAELOFF)  In your experience.
18  A.   Not anymore.
19  Q.   All right.
20  A.   In years past, they did.  Not -- it's changed.
21  Q.   What happens today that's different than years
22  past?
23  A.   Even the richer people, they used to spend
24  more money for the higher line products.  Now they
25  don't seem to care for -- it doesn't really matter to

Page 11

1   them.  I think that's about the only way to put it.
2   Q.   Do you advertise by brand?
3   A.   No, sir.
4   Q.   In your experience do other furniture stores
5   typically advertise?  Let me just go to a different
6   subject.
7   A.   Okay.
8   Q.   Let me skip ahead a little bit.
9   A.   Okay.
10  Q.   Do you get customers that come into your store
11  and say, "I need something like this picture and can
12  you make it for me?"  Does that happen?
13  A.   Yes.
14  Q.   What do you do in circumstances like that?
15  A.   Well, if I've got a picture I've got some
16  people -- I've got a man who makes stuff in Juarez.
17  He's got some builders.  We build it there.  India.
18  Well, quite a bit of places now, this same guy.
19  Q.   Do you -- do you have to get permission from
20  whoever made the piece of furniture in the picture?
21  A.   Half the time we never know for sure.  I mean,
22  because it's just a picture off of a cell phone, and I
23  run a copy of it on -- on my copy machine.  I get that
24  size piece of paper of it.  And that's about all I go
25  off of.

Page 12

1   Q.   And do you send that paper to somebody to make
2   the piece of furniture?
3   A.   Yes.
4   Q.   The picture?
5   A.   Yeah.  Yes, sir.
6   Q.   All right.  Is that something that you're
7   familiar with that other furniture stores do that they
8   take orders for customers?
9   A.   In western lines.
10  Q.   What other stores are you aware of that will
11  take orders based on a picture someone brings in?
12  A.   Rios, Out South Down West (sic), most likely
13  Larry.  Brumbaugh's, I'm sorry.  Adobe.  Adobe does it
14  a lot.
15  Q.   Brumbaugh's will take orders for custom-made
16  pieces of furniture --
17            MR. DIETRICH:  Objection.
18  Q.   (BY MR. ISRAELOFF)  -- from pictures, as far
19  as you know?
20            MR. DIETRICH:  Objection, form,
21  foundation.
22  A.   Oh, yeah.  I mean, it's Mexico furniture.
23  Q.   (BY MR. ISRAELOFF)  Okay.  How do you know
24  that Brumbaugh's will take orders?
25  A.   Oh, I mean, I've heard just from customers.  I

Page 13

1   mean, when you've been in business against Larry -- I
2   mean, Larry's been in business 50 -- 55 years.  So, I
3   mean, you just -- I mean, he's a friend, like I said.
4   I know him.
5       Q.  Have you ever talked to him about some
6   occasion in which --
7       A.  And I've seen his product.  I'm sorry.  I've
8   seen the product.  You know, I go in his store, so I
9   know.  Basically both might have the same guy over in
10  Mexico making it.
11      Q.  Do you know whether the Jason Scott Company
12  was aware that at least your furniture store also took
13  orders?
14      A.  Oh, I don't know.  I never had spoke with
15  anybody particular about it.
16      Q.  Do you have any understanding about whether
17  you're doing anything at all wrong when you take an
18  order over a photo and send it to a guy in Mexico to
19  make it?
20      A.  No.
21      Q.  Is that something that's been done in the
22  furniture industry, as far as you know?
23      A.  My total 20 years.
24      Q.  Okay.  Have you ever in your 20 years heard of
25  somebody complaining that a furniture store made a copy

Page 14

1   by sending a picture down to a manufacturer somewhere?
2       A.  No.  No.  Me.
3       Q.  Okay.  When a customer comes into your store
4   you described how they might be telling you what sort
5   of decor they have, what they are looking for, the
6   design they are looking for and so on.  In your
7   experience are the customers in today's time just
8   looking for brand?
9           MR. DIETRICH:  Objection, form,
10  foundation.
11      A.  No, no.  It did happen just last week for the
12  first time.  I can't remember the last time it was
13  until last week.
14      Q.  (BY MR. ISRAELOFF)  Do you have any experience
15  in your 20 years in this business about furniture being
16  copyrighted?
17      A.  No, not until this.
18      Q.  Until this case, you mean.
19      A.  True.
20      Q.  Have you ever heard of furniture being
21  copyrighted in the past 20 years in your experience?
22      A.  No.  But I would suspect China -- the China
23  furniture, which is a whole different ball game, would
24  be, I would guess.  That would just be a guess,
25  speculation.

Page 15

1       Q.  What is China furniture?
2       A.  It's all molded.
3       Q.  Oh, molded furniture.  We are not talking
4   about wood.
5       A.  Those picture frames there (indicating), those
6   are all molded.
7       Q.  All right.  Aside from those that you're
8   guessing about, you had not ever heard of wood
9   furniture being copyrighted in your 20 years in the
10  business?
11      A.  (Witness shakes head.)
12      Q.  All right.  When you take an order for a piece
13  of furniture based on a photograph and you send it out
14  to be made, is that kind of furniture order made by
15  machine or some other way?
16      A.  Okay.  I'm going to tell you what I think
17  about it, because you finally asked me a question.
18  Look, there's nothing against anybody -- it's handmade.
19  And if I asked y'all all to write down your signatures
20  15 times, they are not all going to match.  Y'all can
21  write y'all's names 15 times, and I bet you they are
22  not going to match.
23      Q.  So you're saying that if --
24      A.  So I'm saying that I'm not against Jason or
25  whoever is copying furniture.  When it is a handmade

Page 16

1   piece off of a picture, because I've went to Mexico --
2   I'm just picking Mexico, not Indonesia people.  But
3   they use hand tools, and they don't have a template to
4   lay out, because it's off a piece of paper that I've
5   got a grainy photograph, and they lay out a leaf or --
6   this is a diamond cut on this table here.  And they
7   hand carve, and their hands are worse than my hand
8   right here with this pad of mine.  They are bad
9   looking.
10          Well, they've got the dimension right,
11  and that's about all they've got, I mean, because it's
12  hand done.  If I asked y'all also -- I put the water
13  bottle in the middle of the table and told y'all,
14  "Y'all have a piece of paper.  Draw it," I guarantee
15  you y'all aren't going to draw it the same.
16          MR. DIETRICH:  I will object as
17  nonresponsive.
18      A.  And that's all I will say about handmade
19  furniture.  That's why molded furniture isn't -- I
20  don't think it's as attractive in a home.  I don't like
21  Chinese furniture because it's molded furniture.
22  Handmade is handmade.  No.  I feel no two pieces are
23  going to be exactly -- exactly the same.
24          MR. DIETRICH:  Object as nonresponsive.
25      Q.  (BY MR. ISRAELOFF)  So that is how a

Page 17

1  made-to-order piece of furniture is handmade in your
2  experience?
3      A.  In my opinion.
4      Q.  Well, that's in your practice, in your
5  experience too.  Right?
6          MR. DIETRICH:  Objection, form,
7  foundation.
8      A.  Yeah.
9      Q.  (BY MR. ISRAELOFF)  Because an objection has
10  been made, let me ask the same question in a slightly
11  different way.  If a piece of furniture is placed on
12  order with you through a photograph and you send the
13  photograph to somebody in Mexico or India to make it
14  and you want to make more than one of those things,
15  that piece of furniture, will each one of those pieces
16  be exactly the same since they are handmade?
17      A.  I'm going to say no.
18      Q.  Explain that again, if you would.  Why are
19  they not the same?
20      A.  They are hand -- they are hand done.  I
21  mean -- they are handmade.  I mean, they are not molded
22  pieces.  So there's no tracing.  I mean, somebody that
23  actually builds it, a manufacturer, might know, but
24  tracing paper, when I build something, I just -- you
25  know, you're drawing out a leaf or you're drawing out a

Page 18

1  star, when I used to do a lot of star furniture.  And
2  you're drawing a star out, and how you have to carve a
3  star, they are just not going to be the same.  I mean,
4  it's human being.
5          You can even have the same man doing the
6  same carving, which they are that way, I'm sure, there
7  will be similarities, but that's what makes it special,
8  that it's handmade.
9      Q.  When you take an order for a piece of
10  furniture based on a photograph, do you know based on
11  that photograph what kind of wood the first piece was
12  made of?
13      A.  No.
14      Q.  When you send the photograph to Mexico or
15  India to make that piece, do you tell them what kind of
16  wood you want it to be made of?
17      A.  Well, if they can find -- in Mexico your main
18  wood's going to be pine.  I mean, you're going to know
19  that.  It's going to be pine, which isn't a good wood.
20  And they use some mesquite.  Other parts a lot use
21  teak, other -- when you get away from Mexico.
22      Q.  Does it matter in your experience whether the
23  piece of furniture that is made to look like one in a
24  photo is made out of a particular kind of wood?
25      A.  If the people -- if they request it, you know,

Page 19

1  the folks request it.  Truthfully, I haven't really had
2  just like somebody come in and say they want -- like
3  that's in question, I had -- I can't remember what it
4  was.  The photo I had.  I wasn't trying to get it for a
5  customer, actually.  I was just trying to get the look
6  built, whether it be out of -- I can't remember some of
7  the names in the other countries of the woods.  But
8  they are hard woods, other than pine.  Because I don't
9  really like pine that much, but that's what I get from
10  Mexico mainly.
11          But this in question, I wasn't trying
12  to -- for a certain person's name to get this thing.  I
13  just said, "Hey, I would like to try and get it."  So
14  it doesn't matter if it matches the exact photograph.
15  I don't really care.  Because I know it won't
16  because -- that's what I'm sitting here saying.  I'm an
17  artist, so I know somebody can't draw the exact same.
18          I mean, that's what I've done my whole
19  life.  I mean, I was in construction and now furniture
20  and all this.  But I actually have been drawing --
21  that's all I've done my whole life.
22      Q.  All right.  Let me ask you this.  I'm not sure
23  if I may have asked this before.  In your 21 years
24  experience when people show you a picture and say, "We
25  want you to send this out and have it made for us," in

Page 20

1  your experience how often do people say, "And I want it
2  made out of a particular wood"?
3      A.  Not on a request from a customer.  Request
4  between me -- I'm going to use this other gentleman,
5  Danny, Danny that I have done -- you know, in Mexico.
6  I might say, "Can you get this done in Mesquite?"  But
7  not really from a customer just, you know, coming in
8  personally saying.
9      Q.  Now, we have heard that Trendly made some
10  pieces of furniture that were similar to Jason Scott
11  pieces.
12      A.  Uh-huh.
13      Q.  And we have heard that that came about from
14  you.
15      A.  Off of a picture.
16          MR. DIETRICH:  Objection, form,
17  foundation.
18      Q.  (BY MR. ISRAELOFF)  Could you explain how it
19  was that you requested from Trendly to make some
20  pieces of furniture?
21          MR. DIETRICH:  Objection, form,
22  foundation, leading.
23      A.  Okay.
24          MR. ISRAELOFF:  Let me finish the
25  question, please, before you object.

## Page 21

1      MR. DIETRICH:  Well, he's answering so
2   fast I'm trying to get the objection in when I think
3   you're about done and --
4      THE WITNESS:  I'm sorry.
5      MR. DIETRICH:  -- before he answers.  So
6   I'm doing my best.  But I apologize for interrupting.
7      THE WITNESS:  Want me to go ahead?
8      MR. ISRAELOFF:  Me too.
9   Q.  (BY MR. ISRAELOFF)  Let me start over.
10  A.  Okay.
11  Q.  Can you explain how it was that you ordered
12  pieces of furniture from Trendily that are accused of
13  copying -- now being accused of copying Jason Scott
14  pieces?
15     MR. DIETRICH:  Objection.
16     MR. ISRAELOFF:  How did that happen?
17     MR. DIETRICH:  Objection, form,
18  foundation, leading.
19  A.  They were there -- him and his rep was there
20  with my decorator/designer lady, and they were ordering
21  a sofa and some chairs for a customer, and I got this
22  picture sent to me off my phone and asked me if I
23  could -- if there's any way I could get this piece
24  made.
25        And he was there, and so I printed -- I

## Page 22

1   asked him before I -- because I really hadn't had much
2   hard furniture from him besides sofas and chairs and
3   stuff.  So I asked him while he was there, "If I
4   printed this out could you -- since you started on all
5   this wood furniture" -- I mean, he had already been
6   doing it.  It's just I didn't have a lot of it.  Some
7   consoles and bookcases maybe.  That's about it.
8        But he said, "Yeah, let me -- just print
9   it off for me, and I will check and see."  So I ran a
10  copy of it off on my printer and gave it to him, and
11  that was the conversation that day.
12  Q.  (BY MR. ISRAELOFF)  Wait.  Who is the person
13  you were talking with and gave --
14  A.  Rahul, the Trendily man.
15  Q.  Okay.
16  A.  And his rep.  I can't remember his rep's name.
17  Q.  What else happened in terms of how it came to
18  be that you ordered some pieces of furniture?  I
19  believe there were three pieces total, three styles.
20  How did that continue?
21     MR. DIETRICH:  Objection, form,
22  foundation and leading.
23  A.  Okay.  So that conversation that day, that was
24  the end of it.  Well, then months later he said he got
25  some pieces in that he built, and I was going to pick

## Page 23

1   up -- roughly I would go about every two weeks to pick
2   up sofas or chairs, dining chairs, whatever.  And he
3   said he got some of those pieces in.  And he showed me
4   some pictures.  And when I went I purchased some of
5   them, and I brought them back.
6   Q.  (BY MR. ISRAELOFF)  Do you remember what the
7   name of the pieces were?
8   A.  Oh, what they were?  A dining table and a desk
9   and sofa table maybe, sofa table.
10  Q.  Could that also be called a buffet?
11  A.  Okay.  It was a buffet, wasn't a sofa table.
12  I couldn't remember.
13  Q.  Were those the same pieces of furniture you
14  had asked him based on your --
15  A.  Well -- what was the piece I actually showed
16  him?  I think it was a dining table.  I think it was a
17  dining table.  I mean, it happened so much, I'm sorry,
18  I can't remember.  Because, like I said, we do it so
19  much in Mexico furniture that I don't -- I think it was
20  a dining table that day.  I didn't even know he went
21  ahead and was doing other pieces by his guys in India.
22  I didn't know.
23        Because there's other companies that --
24  over the 20 years that's had some similarities that
25  said, "Hey, I've got this."  And when they come to show

## Page 24

1   their products or I go to their warehouses, they've got
2   pieces, and I've bought before.
3   Q.  Mr. Malhotra has testified that he made the
4   three pieces that are involved in this lawsuit based on
5   the pictures that you gave him.
6   A.  Okay.
7   Q.  Is that correct?
8   A.  That's correct.
9   Q.  All right.
10     MR. DIETRICH:  Objection, form,
11  foundation and leading.
12  Q.  (BY MR. ISRAELOFF)  At any rate, did you
13  request to purchase some of these three pieces that
14  Trendily made?
15  A.  Yes.
16  Q.  And how many did you purchase?  Do you
17  remember?
18  A.  To my knowledge, two dining tables, the buffet
19  and a desk, to my knowledge.  I think that's about it.
20  Q.  Was any of them delivered to the original
21  customer that had sent you those first pictures?
22     MR. DIETRICH:  Objection, form,
23  foundation, leading, misstates testimony.
24  A.  Okay.  To my knowledge, no.
25  Q.  (BY MR. ISRAELOFF)  What happened to that

Page 25

1 initial request, the photo you had?

2     A.  Well, it -- they only had asked me if I could

3 see if I could do it, and then I in turn talked to

4 Rahul because he just happened to be there.

5     Q.  Okay.

6     A.  Now, I didn't -- I don't think I ever got it

7 back to those people.  But somebody else did purchase

8 something from me that I think brought this issue up.

9     Q.  All right.  When you bought these three pieces

10 of furniture from Trendily, how did you find them in

11 terms of quality?

12     A.  Well, they were built very well.  The best --

13 the best -- look, there's -- I'm sorry.  I don't know

14 how y'all want me to do -- I'm going to be honest.  I

15 told y'all already, and I don't try to hurt either one

16 of y'all, there's nobody going to make that furniture

17 as well as Jason Scott.  It's just not going to be made

18 that way.  I don't know why.

19         This was the closest as far as how the

20 operation of the doors and the drawers -- if y'all

21 don't -- y'all just wouldn't understand.  Sorry.  The

22 hardware didn't look as good.  There's nothing against

23 Rahul.  But it was -- that's why -- I can understand

24 somebody being upset and all that.  But it won't ever

25 look like a Rolls-Royce.  It's just not going to do it.

Page 26

1     Q.  So the furniture --

2     A.  So I don't understand.  Because it does not

3 look like a Rolls-Royce.

4     Q.  Let me ask it this way.  Is the furniture that

5 you bought from Rahul from Trendily -- are you saying

6 it doesn't look like actual Jason Scott furniture?

7     A.  No, no, it don't.  I mean, not -- resemblance,

8 yes.  But his qualities and simi -- no.  The hardware,

9 how the drawers function and the doors shut and catch

10 and all that.  I mean, it's just -- over 20 years I've

11 seen that done four or five different times.  Okay?

12 And I can name only a couple of companies.  A Chinese

13 lady over in Dallas.

14     Q.  Let me ask it in the form of a separate

15 question, because I think you're going on to another

16 topic.  Have you seen other companies make furniture

17 similar to Jason Scott?

18     A.  Yes.

19     Q.  All right.  Tell us what you've seen in your

20 experience.

21     A.  Danny Miller tried to -- because he's out

22 of -- he's everywhere now besides Mexico, and they

23 tried to build furniture out of teak, and there's a

24 technique to curing it properly, and they failed

25 miserably.

Page 27

1         And a lady out of Dallas, a Chinese lady,

2 I can't remember her name, Industrial Boulevard, they

3 tried.  I have a piece in my store, but -- they got the

4 crack and the curing of the teak down okay, but, again,

5 it's just not the quality of the drawers, the hardware,

6 doesn't come close to the craftsmanship of the

7 hardware, the forging of it, similarities,

8 similarities.

9     Q.  Are there any others that you have seen --

10     A.  Oh, in 20 years, I can't -- those are the only

11 two that come quick to my mind.

12     Q.  What else could you identify as differences

13 between the Trendily pieces and the Jason Scott pieces?

14 You've mentioned a couple.  Are there any other

15 differences?

16     A.  No.  It's the best.  I mean, it's -- it's the

17 best.  I mean, as far as the curing of the wood where

18 it won't -- where it won't have to be filling it every

19 month and you sell the product and it cracks in the

20 people's home.

21     Q.  Were the Trendily pieces different than the

22 Jason Scott pieces in terms of the hand carvings all

23 being unique like you were describing earlier?

24         MR. DIETRICH:  Objection, form, leading.

25     A.  Again, I'm not trying to just run that in the

Page 28

1 ground.  You know, when your hand -- when it's hand

2 done, as far as your eye seeing a leaf pedestal, carved

3 leaf pedestal, or, oh, a rope look on the edge of a

4 table, you know, you're going to see that's what the

5 general look is supposed to be.  But it being

6 exactly -- because it's hand done.  I mean -- but your

7 general eyes are going to -- you know, you're going to

8 see it's a leafed pedestal, like I said, or a

9 rope-edged top or, what have you, like that.

10     Q.  (BY MR. ISRAELOFF)  Who is Rios?

11     A.  Rios.  It's a western furniture store in North

12 Side, Fort Worth, down in the stockyards.

13     Q.  Has -- to your knowledge, has Rios ever made

14 furniture similar to Jason Scott pieces?

15     A.  Oh, I wouldn't -- I would be stepping -- I

16 wouldn't know exactly on that one.

17     Q.  All right.

18     A.  I'm sorry.  They're my competition.  I just

19 know they get other products that I have made.  It just

20 happens if you draw something on paper and send to it

21 somebody, it only lasts for a month or so and then they

22 knock it off.

23     Q.  When you sold the pieces of furniture that you

24 bought from Trendily, did any of those customers, to

25 your knowledge, say, "Oh, that looks like Jason Scott"?

Page 29

1   A.  No, not to my knowledge.

2   Q.  Have you ever had experience with any customer

3   confusion over who made the piece of furniture --

4   A.  No.

5   Q.  -- that you got from Trendily?

6          MR. DIETRICH:  Objection, form.

7   Q.  (BY MR. ISRAELOFF)  When -- when did you hear

8   about the lawsuit that was filed by Jason Scott against

9   Trendily?

10  A.  Has it been a year?  Like I said, it goes by

11  so fast.  Has it been a year?  I can't remember.

12  Q.  How did you hear about the lawsuit?

13  A.  Man, I can't remember if it was Rahul or

14  somebody actually came inside the store.  It was one of

15  the two.  I can't remember exactly how.

16  Q.  Did you --

17  A.  I'm sorry.

18  Q.  -- still have any of the Trendily pieces when

19  you heard that this lawsuit had been filed?

20  A.  Yes.

21  Q.  What happened to those pieces?

22  A.  I -- it's still there.  I mean, I didn't do

23  anything.

24  Q.  I mean, are they still out on your sales floor

25  being offered up for sale?

Page 30

1   A.  No, there's no dining tables, I know, for

2   sure.  Console -- I don't think there's a console for

3   sure.  There might be the desk.  Because I have the

4   console that D-A-O -- I'm sorry, D-A-O-'s the name of

5   that Chinese lady, Korean lady, from Dallas.  Because

6   I've got one of hers.  I've got a console sitting

7   there.  I remember that.

8   Q.  A Chinese --

9   A.  I know you're not asking about that, but I'm

10  just saying similarity looking pieces.

11  Q.  All right.  Let me ask that as a separate

12  question.

13  A.  Okay.

14  Q.  So a lady in Dallas named Dao, D-A-O, has

15  produced for you a console that looks similar to one of

16  the Jason Scott pieces?

17  A.  Yes.  I didn't request it.  She just -- she

18  tries to stay in business, and she reproduces or

19  produces new pieces of furniture all the time and then

20  comes around and shows me pictures or brings it in the

21  back of her trailer.

22  Q.  Did Mr. Malhotra from Trendily ask you to take

23  any remaining pieces of this furniture off the sales

24  floor so --

25  A.  He did.

Page 31

1   Q.  All right.  And did you --

2   A.  No.

3   Q.  -- do that?

4   A.  No.

5   Q.  Why not?

6   A.  Because I paid for it.  And here y'all know

7   how my -- I'm very hardheaded about this.  Handmade

8   furniture, guys.  I'm sorry.  It's handmade.  Y'all

9   can -- again, y'all can write your names 15 times and

10  you're not going to match your name.  It's the same way

11  in making this furniture.

12          And so when I pay $3,000 for something,

13  I'm not taking it off my floor.  If it was a Chinese

14  piece of furniture that's molded, I got you.  But when

15  it's handmade furniture, not going to do it.  Nobody's

16  going to tell me to do it, and I'm not going to do it.

17  Even my sister, my mom, my dad, a good guy like Jason,

18  I'm not going to do it, man.  It doesn't match.

19  Q.  What do you mean "it doesn't match"?

20  A.  It is handmade.

21  Q.  So you're saying it doesn't match the Jason

22  Scott pieces?

23  A.  No.  Similarities.  You can't make it exactly

24  the same unless you've got a template.  And the

25  furniture of furniture -- you go buy a piece of

Page 32

1   furniture -- you go buy a piece of Jason Scott

2   furniture and you set it in front of the guy's face and

3   he walks over there and he pulls dimensions off of

4   every leaf and he lays it on a piece of wood, that's

5   the only way you're going to get it exact.

6   Q.  And that's not the way you ordered these --

7   A.  No.

8   Q.  -- pieces from Trendily, --

9   A.  No.

10  Q.  -- was it?

11  A.  It's not how anybody does the furniture unless

12  Jason's people do it for their own selves.  I don't

13  know how they do it, how he produces his furniture.

14  Q.  And because you feel like these pieces that

15  you have on your sales floor are not exact, is that why

16  you still have them offering -- offered for sale?

17  A.  To my knowledge, there's only one piece.  I

18  mean, I would have to walk through.  I mean, I remember

19  the DAO piece, and maybe the desk is sitting over in

20  one of the stores, and that's all.

21  Q.  But is that the reason that you're going to

22  sell it is because you don't think it's a match?

23          MR. DIETRICH:  Objection, form,

24  foundation.

25  A.  True.

## Page 33

1  Q.  (BY MR. ISRAELOFF)  All right.

2  A.  The only handmade furniture, I say -- that

3  means from Mexico or from -- as long as it's handmade.

4  I mean, it's, you know, just like artwork.  Somebody

5  drew it, something off of a Remington.  That's a famous

6  artist, and they tried to reproduce a Remington by

7  hand-drawing it.  Same thing.

8  Q.  And you think that's fair?

9  A.  Well, I mean, if it's got "Joe Jones" wrote

10  under the signature, because it ain't going to look

11  like a Remington, and I get bronzes reproduced,

12  Remington bronzes, and they don't look like the

13  originals because they can't do it just right.

14  Q.  So if it's a handmade piece of furniture you

15  think it's fair to sell it even if it's similar to a

16  Jason Scott.

17  A.  I do.

18  Q.  All right.

19  A.  Because I'm giving him kahootas

20  (phonetically), because it's the best furniture made.

21  They can't knock Jason's quality off.  I mean, I'm not

22  mad at anybody.  What I'm saying -- but I'm telling you

23  he's got the best furniture in the market.  I've been

24  in it 21 years.  And whatever his secret is and how

25  good his craftsmen are, they can't -- they are not

## Page 34

1  going to knock it off.  I know why he's upset.  I can

2  understand.  But he's running his own self down because

3  he's really that good.

4  Q.  So you don't consider the Trendily pieces to

5  be --

6  A.  No.

7  Q.  -- knockoffs.

8  A.  No, no.

9  Q.  All right.

10  A.  No.  Go ahead.

11  Q.  Mr. --

12  A.  I would much rather have his furniture.

13  Q.  Sure.  Mr. McBee, that's all the questions I

14  have for you.

15  A.  Okay.

16      MR. ISRAELOFF:  I appreciate very much

17  you coming in.

18      THE WITNESS:  Okay.

19      MR. DIETRICH:  You're not done yet.

20      THE WITNESS:  Okay.

21      MR. DIETRICH:  I have some questions for

22  you.

23          EXAMINATION

24  BY MR. DIETRICH:

25  Q.  Did you tell -- well, let's start with this.

## Page 35

1  I want to clear this up.  You said that the first time

2  this copy came about you had a customer approach you

3  with a photograph?

4  A.  He shot it to my phone.

5  Q.  So a customer had a picture of what?

6  A.  Really, I'm being honest, it's either a

7  dining -- I think it was a dining table.  And you can't

8  see where it's at or whose -- I mean, if it's a dining

9  table, you don't have much room in your phone.  But I

10  really believe -- I really believe it was a dining

11  table.

12  Q.  So a customer and --

13  A.  I can't remember the name.

14  Q.  You and I talked on the phone --

15  A.  Right.

16  Q.  -- back in February.

17  A.  Uh-huh.

18  Q.  And that was what you told me.  You said a

19  customer had a picture of a dining table --

20  A.  Right.

21  Q.  -- on their phone.  Does that sound right to

22  you?

23  A.  Shot it to my phone.  Right.

24  Q.  They sent it to your phone.

25  A.  Uh-huh.

## Page 36

1  Q.  You put it on your computer?

2  A.  Yes.

3  Q.  Is that still on your computer today?

4  A.  No, no.  I told you -- yeah, I don't even

5  keep -- on my phone here, I don't keep pictures of all

6  the stuff I get.

7  Q.  No problem.  You printed it out.  You showed

8  that to Rahul?

9  A.  Yes.

10  Q.  That one picture.

11  A.  Well, first I showed him my picture.  It was

12  that day I was there, and I showed him off my little

13  phone and said, you know, "Do you think your guys" --

14  like I don't know their quality or how they could even

15  -- if they could go off of their beaten path, let's

16  say, of what I've seen him make.  And he says, "Yeah,

17  send me a picture and let me see."  So I printed him a

18  picture and went on about my way.

19  Q.  You printed up a picture of the dining table

20  out.

21  A.  Uh-huh.

22  Q.  Yes?

23  A.  Yes.

24  Q.  And gave it to Rahul?

25  A.  Yes.

Page 37

1    Q.   And then your testimony was that at some point
2    a couple of months later --
3    A.   Yeah.
4    Q.   -- he called you?
5    A.   True.  Yes.
6    Q.   And you went and saw him?
7    A.   Well, I was picking up furniture there
8    already.
9    Q.   Over at Trendily's warehouse?
10   A.   Yes, in Dallas.
11   Q.   And at that point you saw two more pieces of
12   furniture, the desk and the buffet?
13   A.   True.
14   Q.   Did you ever give Rahul photographs of the
15   desk and the buffet?
16   A.   No.
17   Q.   How did the --
18   A.   Not to my -- only that one picture it's all I
19   had for sure.
20   Q.   You gave him a picture of the dining table.
21   A.   Right.  True.
22   Q.   And he came back to you with the dining
23   table --
24   A.   And the --
25   Q.   -- and the desk and the buffet.  Right?

Page 38

1    A.   True.
2    Q.   Did he tell me you how he came --
3    A.   No.
4    Q.   -- to make the desk and the buffet?
5    A.   No, sir.  No.
6         THE REPORTER:  I'm going to ask you one
7    more time, just please wait until he finishes.
8         THE WITNESS:  I'm sorry.  I'm like
9    carrying a conversation.  I apologize.
10   Q.   (BY MR. DIETRICH)  No.  It's okay.  And I will
11   try to catch you.  If you --
12   A.   That's all right.
13   Q.   -- if you say uh-huh or huh-uh, I might just
14   ask can you say yes or no.  So that time when you went
15   out to Trendily you saw all three pieces there, and you
16   made a decision to purchase some of them?
17   A.   True.
18   Q.   And did you bring them back to Western
19   Heritage then?
20   A.   True.
21   Q.   Was that one of each of the three pieces?
22   A.   Yes.
23   Q.   And did you put them on the Western Heritage
24   floor?
25   A.   In the design center.  One in -- yes, I did.

Page 39

1    Q.   Did you already have them presold to a
2    customer or --
3    A.   No.
4    Q.   -- not?
5    A.   No.  That's why I said, that original picture
6    didn't really go.  It wasn't a sold piece.
7    Q.   So that original customer that showed you the
8    photo of the table never ended up buying the table.
9    A.   Not that original customer.
10   Q.   Did you ask -- when you showed Rahul the photo
11   of the table, did you ask for any particular dimension
12   of that table?
13   A.   Probably Tammy and the design -- might
14   have said an eight foot or a 10 foot, just common,
15   seven, eight and 10.  But no.  Just something common
16   that would sell better than others.
17   Q.   What are common table dimensions, if you can
18   say?
19   A.   Oh, okay.  This way.  44, 42 inches.
20   Q.   Wide?
21   A.   Yeah, wide.  I'm sorry.
22   Q.   That's all right.  And length?
23   A.   Eight feet.  I mean --
24   Q.   Is there a common height?
25   A.   Oh, golly.  I'm not good at that.

Page 40

1    Q.   I just want to know what you know.
2    A.   33.
3    Q.   33?  That's okay.  Did you -- Mr. Israeloff
4    asked you about kinds of wood.  Did you ask
5    Mr. Malhotra for a particular type of wood to make that
6    table from?
7    A.   That day -- I thought about that.  That day, I
8    don't think that ever came up.  But I told them -- I
9    did tell them a hardwood in that area, that I was
10   already familiar with Danny making some teak stuff and
11   D-O-A (sic) trying, and, you know, Danny failed because
12   of the curing.  So I imagine it did come up later on
13   about teak or a hardwood, not a soft wood.
14   Q.   Came up between you and Rahul?
15   A.   Most likely.  Because I thought about that
16   that day.  I didn't really say anything about wood
17   type, but -- I'm not really good, familiar, with the
18   Indonesia, India, their common -- their woods they have
19   there.  Only Mexico woods.
20   Q.   When you gave Rahul the photo of the table,
21   did you ask him to make any modifications to what was
22   in that photograph?
23   A.   No, I really didn't.  I just -- there wasn't
24   anything particular.  Anything will sell.  So I
25   didn't --

Page 41

1    Q.  Did you ask for any changes to what was in
2  that photograph?
3    A.  No.  Just handed that photocopied picture.
4  That's it.
5    Q.  And asked, "Can you make this?"
6    A.  "Can you see?"  And he said, "I will check.  I
7  will see."  And that was the last -- the last.  That
8  was it.  Because sometimes it takes -- like I said, it
9  can take up to four months sometimes.  You never know.
10    Q.  So was it your goal to have the end product
11  look like what was in the photo?
12    A.  Honestly, being honest, it never -- never is
13  going to come to my knowledge out like that.  So I
14  don't ever voicely (sic) say that.  Back in the western
15  stuff there was a bucking horse in the center of a
16  table or some stars on the corners.  But, no, not on
17  this new -- these looks, I don't ever really commonly
18  ask for anything certain.
19    Q.  So I think we -- your testimony is, and I will
20  agree with you, that a handmade furniture -- not each
21  piece is going to look exactly the same.  Right?
22    A.  No, sir.
23    Q.  They can look similar, though, can't they?
24    A.  They can look similar.
25    Q.  And when you gave the photograph to Rahul you

Page 42

1  didn't ask for any differences in what you were --
2    A.  No.
3    Q.  -- asking him to build.
4    A.  No, I didn't ask for any differences.
5    Q.  So you wanted it to look like what was in the
6  photo.
7    A.  Yes, sir.
8    Q.  When you went to Trendily and saw those three
9  pieces, did you recognize them as similar to Jason
10  Scott?
11    A.  I did.
12    Q.  Did you say anything to Rahul about that?
13    A.  No.  I said it looked good.  I'm going to be
14  honest.
15    Q.  And I understand.  I am just asking for what
16  happened.
17    A.  I'm just going to be honest.  Yeah, looked
18  good.
19    Q.  You said they looked good.  Did you ever
20  mention to Rahul that they looked like Jason Scott?
21    A.  The similarities, yes.
22    Q.  You did mention that to him?
23    A.  Most likely I did.
24    Q.  What did he --
25       MR. ISRAELOFF:  Object, responsiveness.

Page 43

1    A.  I mean, I'm not --
2       MR. ISRAELOFF:  Speculation.
3    A.  I can't remember exactly, but I'm sure I did.
4  I mean --
5    Q.  (BY MR. DIETRICH)  And what did he say back to
6  you?
7    A.  Even I said D-O-A (sic), you know, looks
8  similar.
9    Q.  Do you recall what Rahul said back to you when
10  you mentioned Jason Scott?
11    A.  Always proud of his builders being good
12  craftsmen, you know.  I mean...
13    Q.  To your knowledge, did he know that these
14  pieces were similar to Jason Scott?
15    A.  I would have to be kind of lying to you if I
16  knew he had seen any Jason.
17    A.  I don't want you to lie.  I just want to
18  know --
19    A.  No, no, no. no.
20    Q.  -- from your knowledge what --
21    A.  What I'm saying is not to my knowledge,
22  because I don't know that he's ever got -- I know,
23  because I've had the products.
24       (Deposition Exhibit 1 marked.)
25    Q.  (BY MR. DIETRICH)  Mr. McBee, if you could

Page 44

1  take a look at what's been marked Exhibit 1 to your
2  deposition.  Can you tell me who made this table, if
3  you know?
4    A.  I don't know.  It's not Jason Scott, I don't
5  think.  You might be tricking me, but I don't think
6  it's Jason Scott.  And I don't know.  No, I don't know
7  who did it.
8    Q.  Does it look like the Trendily table?
9    A.  The nail -- the nails don't look quality.  The
10  bolt nails don't look really good quality.  I mean,
11  it's what I can tell.  Now, who built it?  You're not
12  going to tell me?
13    Q.  Does it look similar to the Trendily table
14  that you ordered?
15    A.  Okay.  Similarities.  Similarities, you can
16  say yeah.  But as far as the quality of those nails and
17  stuff, it don't look -- it don't look good.  That's --
18  but that's a long distance away.  But -- I'm going to
19  say it's not Jason Scott, because on the side he left a
20  gap in the wood right here, and I never had any
21  furniture with gaps in the wood from him.
22    Q.  Is that similar to the table that you ordered
23  from Trendily?
24    A.  Yeah, the look, the similarities of the
25  pedestals and the top, yeah.

## Page 45

1    Q.   Are the carvings similar to the one you
2    ordered from Trendily?
3    A.   Yeah, they look similar.  They do.
4         (Deposition Exhibit 2 marked.)
5    Q.   (BY MR. DIETRICH)  Can you take a look at
6    Exhibit 2?  Is this buffet similar to the one that you
7    ended up buying from Trendily?
8    A.   Similar.  This isn't Jason Scott's.
9    Q.   It's not Jason Scott's?
10   A.   Nah.  No way.
11   Q.   Do you believe it's Trendily's?
12   A.   I would be shocked, but -- I would be shocked.
13   It might be, but I would be shocked.  Look at the
14   bottom -- the bottom of the cabinet.  The molding's all
15   cracked up.  Bad quality on the -- bad quality on the
16   bottom all the way across the front.
17        (Deposition Exhibit 3 marked.)
18   Q.   (BY MR. DIETRICH)  Would you take a look at
19   Exhibit 3?  Is that similar to the desk that you ended
20   up purchasing from Trendily?
21   A.   Yeah, I think so.  I can't remember the
22   medallion in the center of the cross.  It might be.  I
23   just can't remember the center one.
24   Q.   Do you recall whether the desk that you
25   purchased from Trendily had similar iron designs in it?

## Page 46

1    A.   Similar iron, yes, similar iron.
2    Q.   Have you ever seen iron designs like that
3    anywhere else in that shape?
4    A.   Mexico uses a lot of iron.  That's basically
5    the only place I get anything with iron in it, and they
6    have the swirl cuts, I mean, the end rolls in the doors
7    of armoires and stuff.  But being exact -- mainly it
8    would be in the doors of an armoire.
9    Q.   So embedded in a desk like this?
10   A.   No, I haven't.  I can't say I've seen it on a
11   desk.
12   Q.   You saw it in the Trendily version?
13   A.   Yes.
14   Q.   Do you know who made this desk?
15   A.   That's what I'm saying, I don't -- I can't
16   remember the medallion.  You got me on that one.  I
17   don't see bad -- I don't see any bad things.
18   Q.   Does it look like the one you bought from
19   Trendily?
20   A.   I think so.
21   Q.   What -- you said you still have --
22   A.   That would be the only thing I still have, I
23   believe.  That's all.
24   Q.   That was my question.  The desk you may still
25   have on the floor at Western Heritage?

## Page 47

1    A.   Possibly.  That's the only thing.
2    Q.   And the others you sold?
3    A.   Yeah.  They're not there.  Gone.
4    Q.   Gone because they got sold or --
5    A.   Oh, got --
6    Q.   -- because Rahul took them back?
7    A.   No, no.  Sold.
8    Q.   Sold.
9    A.   Yeah.  I mean, it was only one.  Like I said,
10   one piece.
11   Q.   Do you recall how much your asking retail for
12   the desk is?
13   A.   Now, you got me on that.  I can't remember.
14   Q.   How about --
15   A.   I honestly can't remember.
16   Q.   How about the other pieces, the table and the
17   buffet?
18   A.   I'm sure it was five -- five grand.  I mean,
19   I'm just figuring what I spent for them, I believe.
20   Four, four or five.
21   Q.   For each of those pieces?
22   A.   Retailed out.
23        (Deposition Exhibit 4 marked.)
24   Q.   (BY MR. DIETRICH)  I'm showing you Exhibit 4.
25   Is that the Trendily buffet at Western Heritage?

## Page 48

1    A.   Uh-huh.
2    Q.   Yes?
3    A.   I believe it -- I don't know it's Trendily,
4    but I think so.
5    Q.   And that's Western Heritage's floor?
6    A.   I believe.  Looks like it.
7    Q.   Looks from the price like it's --
8    A.   3499 or --
9    Q.   I was thinking 3999.
10   Q.   Okay.  3900?
11   Q.   Does that sound accurate to you --
12   A.   Yeah.
13   Q.   -- as far as what you charged?  Does that
14   sound accurate to you?
15   A.   That's probably about right.
16   Q.   So just under $4,000 --
17   A.   Uh-huh.
18   Q.   -- for the buffet?
19   A.   Yeah.  And we take -- like Larry takes 40
20   percent off.  We take 30 percent off right off the bat.
21   So we probably sold it for three grand, 2800, somewhere
22   in there.
23   Q.   Okay.  So 3999 is sticker.
24   A.   (Witness nods head.)
25   Q.   And then --

Page 49

1   A.  I've been in the car business.
2   Q.   And then you take some off to sell it?
3   A.  Uh-huh.
4   Q.   So what would you figure you sold it for?
5   3,000?
6   A.  Yeah.  Yes, sir.
7   Q.   Let me just look here in my notes for a
8   second.
9   A.  Uh-huh.
10   Q.   In Mr. Israeloff's questions to you, I think
11   you said you would complain sometime about someone
12   making furniture from photos?
13   A.  Oh, it happens all the time.  Yes.
14   Q.   So you would complain about that?
15   A.  Yeah.  That's what I said a while ago, I was
16   the only one that complained.
17   Q.   Yeah.  That was what you said.
18   A.  To my knowledge, uh-huh.
19   Q.   Were you thinking of something specific when
20   you said that --
21   A.  No.
22   Q.   -- or just generally?
23   A.  You draw up something and send it to -- Danny
24   takes mainly -- been some beds lately.  You've got a
25   couple of months before they are knocked off in the

Page 50

1   world.
2   Q.   And you also said something about something
3   happened last week about a brand or --
4   A.  Uh-huh.
5   Q.   -- something?  What happened last week?
6   A.  They came in and asked for a Jason Scott
7   piece.
8   Q.   Somebody came into Western Heritage?
9   A.  Uh-huh.
10   Q.   And asked for Jason Scott?
11   A.  Uh-huh.  I sent them to Larry.
12   Q.   You did?  You sent them to Brumbaugh's?
13   A.  I sure did.  Because she had purchased a piece
14   from me five years ago.  She had a piece in her home.
15   Had to be five years.  The years, again, go by me.
16   But -- and she said I purchased -- I explained, "Go to
17   Larry.  Don't waste your time going anywhere else, to
18   save your driving and your calling on the phones.  Just
19   go up to Larry up there, and they can -- if they don't
20   have it on the floor, they are the distributor of it,
21   and they can get it."
22   Q.   Do you have any Jason Scott catalogs?
23   A.  No.
24   Q.   Did you ever back when you were --
25   A.  One.

Page 51

1   Q.   -- a seller?
2   A.  One small bit.  I don't know if it was when
3   he -- well, I don't know how long he's been doing it.
4   So I'm feeling it was an old one, original kind of
5   catalog, because -- you know, as he would produce new
6   items, you know, he would send a picture to you or you
7   would get them from -- from maybe the markets.  But it
8   was thin then.  I mean, that was a long time ago.
9   Q.   You don't have that catalog anymore?
10   A.  Oh, no, no, no.  Nah.
11   Q.   Do you know how long ago you got rid of it?
12   A.  When you -- I think Tammy and -- they threw it
13   in the trash when we couldn't have -- because we throw
14   catalogs away religiously.  But probably after we got
15   told that we was going to have to -- you know, Larry
16   was going to take over, and they just trashed it
17   because they don't have room for all of them.
18   Q.   You said you don't advertise by brand?
19   A.  No.
20   Q.   No?
21   A.  No.  Look in the magazine.
22   Q.   And I'm just asking you for a no because he
23   can't real get --
24   A.  No, no, no.
25   Q.   He's taking everything down.

Page 52

1   A.  I don't do -- I do some in magazines, and I
2   don't do brand.
3   Q.   Why don't you advertise by brand?
4   A.  It's just -- so much competition.  You could
5   go with Hooker or some big companies and they would pay
6   you sometimes for it.  But I've just never -- I've
7   never been that big to where I could -- we just run an
8   ad for Western Heritage Design Center.
9   Q.   So if you advertise by brand would that allow
10   a customer to go shop around then?
11   A.  Yeah, yeah.  I mean, if they call us on the
12   phone and ask -- like I said, it just doesn't happen
13   like it used to, like "Do you handle Hooker furniture?
14   Bradington Young?"  It just doesn't happen like that
15   hardly anymore as it used to back in the day.
16   Q.   So what attracts a customer?  Is it the look?
17   A.  You've got to grab them just by the look or
18   the price.  Now really it's the price, even on the
19   upper echelon people that's got money.  It's still just
20   the price.
21   Q.   A lower price is important?
22   A.  Now it is.
23   Q.   Do you ever text message with Rahul as part of
24   your business?
25   A.  Oh, yeah.

Page 53

1   Q.   Yes?

2   A.   We do.  Checking on our customers, sofas and

3   the dining chairs and all that.  Like I say, that's our

4   number one thing with him.

5   Q.   Is text or --

6   A.   No.  Is finding out about our customers,

7   personal things.

8   Q.   But you do text with him for business?

9   A.   Uh-huh.

10  Q.   Do you text with Chris Sanders?

11  A.   Who is that?

12  Q.   That's Trendily's rep.  I thought you had

13  mentioned him earlier.

14  A.   I can't remember.

15  Q.   But maybe you didn't remember his name.

16  A.   I tell you, I can't remember his name,

17  honestly.

18  Q.   Do you know who Chris is?

19  A.   Yeah, now I do.  But, no, I haven't ever

20  texted with him.  But Debby most probably has, my

21  designer.

22  Q.   Do you ever recall texting with Rahul about

23  these pieces --

24  A.   No.

25  Q.   -- that you got from him?

Page 54

1   A.   Only when -- no, no, no.

2   Q.   You started to say only when this --

3   A.   No.  After he said I'm -- you know, during the

4   process of the lawsuit.  Nothing in particular.  Just

5   if any texting was done it was about that.  Or I was on

6   the phone.  I think I was just talking to him on the

7   phone.  Because he answers his phone pretty easy.

8   Q.   But you think you might have texted him about

9   the lawsuit or something related to it?

10  A.   Maybe.  I mean -- but I don't -- I didn't ever

11  text him about is the furniture going to be -- being

12  made or anything.  Because, like I said, after I give

13  him that picture, you just forget about it and go on.

14  Q.   Did he ever send you any photos of these

15  furniture pieces as they were being made or --

16  A.   No.

17  Q.   -- during the production process?

18  A.   No.  Didn't even keep up with any of that.

19  Didn't know.

20  Q.   Did you discuss your deposition here today

21  with Rahul or his attorney?

22  A.   No.  No.  They just -- everybody asked where I

23  would like to go, and I called to see if I could have

24  this room.

25  Q.   It's a good room.  So you didn't talk to Sim?

Page 55

1   A.   Huh-uh.  I mean, he called on the phone to

2   tell me about this.

3   Q.   Did you talk about your testimony at all?

4   A.   No.

5   Q.   Did you tell him --

6   A.   I'm going to tell you -- I'm going to be -- I

7   say this to anybody.  I'm sorry if somebody gets

8   offended with me.  The same thing I told you I told him

9   on this one thing.  What am I going to say?  If you

10  write out your name 15 times, you're not going to match

11  it.

12  Q.   I understand.

13  A.   You put the water bottle in the middle of the

14  table, tell all y'all to draw it, y'all aren't going to

15  draw it the same.  I'm going to say that to whoever

16  wants to call it, especially Trump.  You're not going

17  to copy it.  And I would probably tell him just like I

18  told you.  I will tell Jason the same thing.  I don't

19  care how good he is.  I'm sorry.  I'm going to stick to

20  that, because I've drawn all my life.

21  Q.   I understand that, and your testimony is that

22  you can't make them exactly the same.  Right?

23  A.   Y'all can prove me wrong.

24  Q.   No.

25  A.   Go ahead.  I want to see it.

Page 56

1   Q.   That's what I'm saying.  That's what you said,

2   you can't make them exactly the same.

3   A.   That's right.

4   Q.   But you can make them with similarities.

5   A.   You sure can.  Sure.  Anybody can.

6   Q.   We sent you a subpoena for some documents a

7   few months ago.

8   A.   Yeah (indicating).

9   Q.   Probably before that one.

10  A.   Okay.

11  Q.   Asking you to send records to us.

12  A.   Oh, yeah.  Yeah.

13  Q.   That was when I talked to you on the phone.

14  A.   Right, right.

15  Q.   Did you ever talk to Rahul about that

16  subpoena?

17  A.   No, not like -- no.  I might have said I

18  thought I was supposed to go meet at a office.

19  Remember I got confused over that?

20  Q.   Yeah.  And we talked about that.

21  A.   Right.  And that's all.  If anything was said,

22  that was it.

23  Q.   How long have you known Rahul?

24  A.   Trendily Furniture?  Eight years maybe, seven,

25  eight.

Page 57

1    Q.   And does Western Heritage buy a substantial
2  amount of furniture from Trendily?
3    A.   Oh, yeah.  I mean, sofas and dining chairs and
4  stuff and recliners.
5    Q.   Do you know about how much per year?
6    A.   Oh, my Lord.  No.  I mean -- oh, gosh, no.  I
7  mean, a sofa is 25 to three grand, so dining chairs are
8  300 apiece.  So, I mean, golly.
9    Q.   Did you ever talk with Rahul about opening a
10  Trendily showroom or a gallery in Western Heritage?
11   A.   No.
12   Q.   Like a space where you would just have
13  Trendily pieces?
14   A.   No.  I just spread it out throughout the
15  store.  I don't go for that.  I've lost one customer --
16  company over that.
17   Q.   And I am not saying it happened.  But did you
18  ever discuss it with --
19   A.   No.
20   Q.   -- Rahul or with Chris?
21   A.   Not me, no.
22   Q.   Your wife works for Western Heritage too?
23   A.   Oh, yeah.  We are divorced, but we are
24  business partners, yeah.
25   Q.   Is that Tammy?

Page 58

1    A.   Uh-huh.
2    Q.   Do you e-mail at all with Rahul?
3    A.   Probably -- I'm sure.  Like -- I'm trying --
4  yeah, I'm sure I do, check on stuff.
5    Q.   Do you recall whether you e-mailed him at
6  all --
7    A.   Oh, no, no.
8    Q.   -- about these pieces (indicating)?
9    A.   No.  It would just be people's orders.
10   Q.   Are you aware of Trendily copying any
11  furniture other than Jason Scott?
12   A.   No.  But since you asked, I laughed a while
13  ago because it's funny.  It's sofas and dining chairs.
14  Look at all the similarities in sofas.  Go in a store
15  and look.
16   Q.   So there's --
17   A.   Can you imagine them getting into this?
18   Q.   There's not really any carvings on a sofa
19  usually.
20   A.   No.  But they are using the same tapestries,
21  nails, the shapes, the arm rolls, the legs.  I mean --
22  I mean, you've got -- Massoud in Dallas also against
23  Rahul, Trendily.  You've got Massoud I buy from,
24  Trendily I buy from, both customer companies, building
25  these sofas, look similar.  That word.

Page 59

1    Q.   That actually brings up an interesting
2  question.  Have you ever known Trendily to copy any
3  product from Massoud?
4    A.   Not verbally, but you looking as I'm a buyer,
5  I just said it.  I mean, you see it.  I'm looking
6  around -- you see it.  Don't verbally know it, no.
7    Q.   No.  But visually with --
8    A.   You can see --
9    Q.   -- Trendily.
10   A.   Well, no, not just with Trendily.  What if
11  Massoud knocked off Trendily because they are close to
12  the same showroom in Dallas?  I mean, this gets to be
13  crazy when you go to markets walking around looking at
14  somebody else's design of the back of the sofa, you
15  know.
16        The recliners, mechanisms they are using.
17  They are both using the same mechanisms.  Come on.  I
18  mean, you know.  It just gets crazy.  But that's not
19  seen as well as a carved piece of furniture.  Okay?
20  That's why.  A carved piece of furniture, more art.
21  You see the artwork in it.  You see my point?
22   Q.   I do.
23   A.   Okay.
24   Q.   Are you aware of whether Trendily ever started
25  producing other types of furniture that were copied

Page 60

1  from Jason Scott designs?
2    A.   No.
3    Q.   For instance, that console table that was
4  similar to the dining table?
5    A.   I don't believe -- I don't think I got one.  I
6  mean, I -- I saw it in this picture, but I don't
7  think -- I don't believe I got one.  You might can
8  prove me wrong.  I can't really remember.
9    Q.   No, I'm not trying to trick you on what you
10  got.
11   A.   No.  I'm just trying to tell you the truth.
12  Some things are just --
13   Q.   And I understand it was a little while ago.
14   A.   Yeah.  And then I stopped.
15   Q.   Did you ever talk to Rahul about producing
16  other --
17   A.   Nothing.
18   Q.   -- besides these three?
19   A.   Never, never.  No.
20   Q.   You said -- I believe it was Rahul that
21  contacted you to get -- you said you wouldn't take the
22  furniture off your floor.
23   A.   Yeah.
24   Q.   You kept the desk.
25   A.   I'm telling you, they asked me to.

Ron McBee

## Page 61

1  Q.  Who asked you to?

2  A.  **Rahul was the first one I can remember, for**

3  **sure.**

4  Q.  By phone or --

5  A.  **Yeah.  He called me.**

6  Q.  And what did he say?

7  A.  **He was nice about it.  I mean, he asked me if**

8  **I minded taking it off.**

9  Q.  And you said, "Yeah, I do."

10  A.  **"Yeah, I do."  I mean, I put out that money,**

11  **you know.  Because I didn't do it hurting anybody.  I**

12  **mean, this happens all the time.  So I'm just used --**

13  **when I buy, I spend my money, you know, it's a lot of**

14  **money you spend for a certain square footage of your**

15  **floor it's going to sit on.  Look how much room this**

16  **dining table takes right here.  You know how much they**

17  **lease that square footage out for?**

18  Q.  I don't.  How much?

19  A.  **My God, 25 bucks a square foot.  Some places**

20  **more.  Dallas -- you know how much Adobe pays for their**

21  **building?  I think they are involved in this.  30,000 a**

22  **month for that building.  So a dining room this size,**

23  **it's a big deal.**

24  Q.  Because it takes up room on your floor.

25  A.  **Yeah.**

## Page 62

1  Q.  Do you know Bill Holland at Hill Country

2  Interiors?

3  A.  **I don't know him.  I know the store because**

4  **he's, again, competition and a great store, my**

5  **viewpoint.**

6  Q.  Who are your competitors in your area here?

7  A.  **In Weatherford?  Well, I'm in the normal**

8  **furniture.  I say normal furniture now, because I'm**

9  **handling Ashley and stuff like that.  So I've got**

10  **Willhite's, which is only a half mile from me, and**

11  **Furniture Your Way, which is only two blocks from me**

12  **who handles the Mexico furniture.**

13  **Now, the big real competitor is Larry,**

14  **who is 30 miles from me to the east.  And then you go**

15  **40 -- 40 miles, I guess, is Adobe.  And 40 miles to the**

16  **opposite, northeast, is Rios.  Out South Down West**

17  **(sic), Hemispheres.**

18  Q.  You said you had Jason Scott -- a piece of

19  furniture similar to Jason Scott you got from Dao,

20  D-A-O?

21  A.  **Yeah.**

22  Q.  Is that Adora?

23  A.  **That's her.  She changes her name like water.**

24  Q.  That's Adora?

25  A.  **Uh-huh.**

## Page 63

1  Q.  How does the quality of the Adora copy compare

2  to the quality of the Trendily copy?

3  MR. ISRAELOFF:  Object as to form.  He

4  didn't say it was a copy.  He never said it was a copy.

5  He objected repeatedly that it wasn't an exact copy.

6  MR. DIETRICH:  Just your form objection

7  on the record.  I understand you object to form.  I'm

8  trying to use the best phrase that I can do.

9  A.  **It's similarities.  And --**

10  Q.  (BY MR. DIETRICH)  I will ask the question.  I

11  appreciate the explanation, Sim.

12  How does a piece of furniture made by

13  Adora that is similar to Jason Scott compare

14  qualitywise to the piece of furniture from Trendily

15  that is similar to Jason Scott?

16  A.  **Okay.  The hardwares don't match.  It's the**

17  **same of any of the three.  There's no cracking.  So got**

18  **the process of drying the wood.**

19  Q.  Trendily has no cracking.

20  A.  **Well, no.  Well, even Adora's not cracking.**

21  Q.  Okay.

22  A.  **They are different.  But it would probably be**

23  **a toss-up on their craftsmanship finally, of hers, the**

24  **doors.  I didn't have to do any sanding on the doors.**

25  **I didn't have to do anything to the drawers.  The**

## Page 64

1  **hardwares don't match of any of the three.**

2  **I don't like the stain color on the**

3  **Adora, but -- they are real dark.  That's another**

4  **thing.  You know, the colors aren't exactly -- the**

5  **waxing processes or whatever he might use, "he" being**

6  **Jason.  I like the quality of their staining better.**

7  **I don't know.  They are equal.  They are**

8  **running neck and neck.  And I can't remember price**

9  **line.  So I'm at a loss.  I'm sure it's close.**

10  Q.  You think Trendily and Adora --

11  A.  **Yeah.**

12  Q.  -- are similar in quality.

13  A.  **I'm sure they are just a toss-up, honestly.**

14  Q.  And neither are as good a quality as Jason

15  Scott?

16  A.  **No.**

17  Q.  Just to clarify, you referred to a Larry as

18  one of your competitors.  You mean Brumbaugh?

19  A.  **Brumbaugh's.  I'm sorry to say again.  I'm**

20  **just used to it.**

21  Q.  It's all right.  Have you ever contacted

22  another retailer to try and buy a Jason Scott piece?

23  A.  **No.**

24  Q.  Has Rahul or Chris more recently contacted you

25  to buy carved wood furniture?

## Page 65

1    A.   Now, say it again.  I'm sorry.

2    Q.   Has Rahul or Chris -- we can take a break,

3  change tape.

4         THE VIDEOGRAPHER:  End of tape one.  Off

5  the record at 11:18.

6         (Discussion off the record.)

7         THE VIDEOGRAPHER:  Back on the record at

8  11:20 for the start of tape number two, the videotaped

9  deposition of Ron McBee.

10   Q.   (BY MR. DIETRICH)  Other than the table that

11 we talked about here, have you ever asked anyone else

12 to copy or make a piece similar to a Jason Scott piece?

13   A.   No.

14   Q.   Do you know if the Adora furniture piece is

15 made out of teak?

16   A.   I believe it is.

17        MR. DIETRICH:  I don't have any more

18 questions for you.  Thank you.

19        RE-EXAMINATION

20 BY MR. ISRAELOFF:

21   Q.   I need to follow up on just a few, if you

22 don't mind.

23   A.   No.

24   Q.   If Rahul's recollection was that you gave him

25 pictures of all three of these pieces of furniture,

## Page 66

1  could that be correct, or how firm is your memory on

2  which way it happened?

3    A.   Yeah, Debby could even --

4         MR. DIETRICH:  I will object to form,

5  foundation and leading.  He's already testified on this

6  several times.

7    A.   Debby could have actually -- I mean, it could

8  have been Debby and Tammy after I finished.  Wasn't

9  getting it for a customer.  I mean, we didn't have any

10 pictures.  But that could have had a similar -- there's

11 a Hooker piece that looks like the buffet.  There's a

12 Peru piece that looks like the buffet, as a matter of

13 fact, the design.  They could have gave them that and

14 said, "You make it out of the same stuff you are going

15 to make that dining table out of."  I mean, I'm just

16 winging it here.  I don't know for a fact.

17   Q.   (BY MR. ISRAELOFF)  Sure.  So you're saying

18 that other people with Western Heritage --

19   A.   Yes.

20   Q.   -- might have given --

21   A.   Oh, I'm sorry.

22   Q.   -- Rahul pictures of pieces similar to the

23 Jason Scott piece.

24        MR. DIETRICH:  Objection, form,

25 foundation, leading, calls for speculation.

## Page 67

1    A.   Yes.

2    Q.   (BY MR. ISRAELOFF)  Okay.  When you were being

3  shown these pictures, numbers one and two, you

4  immediately said, "That's not a Jason Scott piece,"

5  even from this faraway picture.  Do you recall that?

6    A.   Yes.

7    Q.   Are you able to tell if something is a Jason

8  Scott piece by comparing it?

9    A.   I believe I can.

10   Q.   So you would not be confused if you saw a

11 piece sitting in front of you on the showroom -- you

12 would not be confused into thinking that you were

13 buying a genuine Jason Scott piece, would you?

14        MR. DIETRICH:  Objection, form.

15   A.   Not me.

16   Q.   (BY MR. ISRAELOFF)  All right.

17   A.   Because all I have to do is open one drawer.

18   Q.   Sure.  You said something in passing that

19 within a couple of months everybody's copying new

20 designs.  Did I hear that right?

21   A.   True.

22   Q.   So in the furniture industry is it just that

23 common that when a new design comes out other companies

24 are making similar designs within a couple of months?

25   A.   You say companies, yes.  But it's kind of like

## Page 68

1  builders.

2    Q.   Builders.

3    A.   Yeah.

4    Q.   When you were asked about somebody that came

5  into your store and asked for a Jason Scott piece, you

6  didn't show them to the Trendily piece and say, "Well,

7  there's one."  Is it?

8    A.   No.  They even -- where I actually confronted

9  the lady, she was standing by the Adora piece, when I

10 confronted her she was kind of looking at it, and I

11 said, "That's not Jason Scott."  I remember.  I don't

12 have it anymore.  And that's actually where we were

13 standing, and I said, "You'll need to go to

14 Brumbaugh's, honestly, ma'am."

15        And she said, "Well, I purchased a piece

16 from you."  That's where -- this all confronted right

17 there in front of that.  And I said, "No.  You just

18 save your driving time and just go there, because he

19 can get you whatever you need.  Because he's the main

20 distributor of it now."

21   Q.   Do you know if that lady was actually a prior

22 customer trying to buy Jason Scott, or was she just

23 testing you?

24   A.   You never know.  I can't remember, see.  Look,

25 I'm having a hard time remembering.  The years fly by.

Page 69

1  Q.  Sure.
2  A.  And this lady -- to say she actually did.  I'm
3  sure, because she came in the store just looking for
4  Jason Scott.  I mean, verbally.  You've asked me --
5  Q.  You say people don't do that anymore.
6  A.  Do that anymore.  So that's why it stands out
7  in my head.  It was so weird that this has happened and
8  she asked that one particular name just last week, you
9  know.
10  Q.  So it only happens while this lawsuit is
11  pending.
12  A.  Isn't it weird?  I mean -- and asking that
13  name.
14  Q.  All right.  Let me ask you this.  Have you
15  ever tried to pawn off a Trendily piece as something
16  made by Jason Scott?
17  A.  No, no, no.  Huh-uh.
18  Q.  Did I hear you say that the finish and the
19  color or the waxing on the Trendily pieces is also
20  different than the Jason Scott finish?
21  A.  Yeah.  Everybody -- I don't know.  They got
22  their own brands maybe or how they put it on,
23  techniques of how they do it, and it's just -- it's
24  just different, I mean, the qualities, the feel of it.
25  Q.  You said that you had spoken with Mr. Dietrich

Page 70

1  some time ago when he called you on the phone.  Right?
2  A.  Chris?  What's his name?  Oh, Dietrich.  I'm
3  sorry.
4  MR. DIETRICH:  Tom.  It's okay.
5  A.  Yes, we spoke.
6  Q.  (BY MR. ISRAELOFF)  All right.
7  A.  It's been like a year now.
8  Q.  And you explained to him what you have
9  explained to us already about how handmade pieces
10  are --
11  A.  Yes.
12  Q.  -- different.
13  A.  Uh-huh.
14  Q.  And did you tell him that you just didn't
15  understand why there's this lawsuit going on?
16  A.  I did.
17  Q.  And did you tell him that, for example, if you
18  just put a cloverleaf in the center of one of the iron
19  pieces it would be a completely different design?
20  A.  I did.
21  Q.  What was his reaction to you?
22  A.  True.
23  Q.  He said that was true.  Let me just bring all
24  this together for a minute.  You have in the past
25  purchased Trendily pieces of furniture like we've been

Page 71

1  looking at and sold them, some of them, to the public.
2  Right?
3  A.  True.
4  Q.  Knowing what you know, that they were similar
5  to Jason Scott pieces, do you think you did anything
6  wrong?
7  A.  No, no, because they were made by Trendily.
8  Q.  And, by the same token, do you think Trendily
9  did anything wrong by making pieces similar to Jason
10  Scott pieces and offering them to you for sale?
11  A.  Well, I'm going to say no because I'm so
12  adamant about how all this is done all the time.
13  So no.
14  Q.  All right.  Thank you very much.
15  MR. DIETRICH:  I have just a couple of
16  follow-ups based on that.
17  THE WITNESS:  No problem.
18  RE-EXAMINATION
19  BY MR. DIETRICH:
20  Q.  Mr. Israeloff proposed a scenario where
21  someone else at Western Heritage might have given other
22  photos to Rahul.  You said you didn't know.
23  A.  (Witness nods head.)
24  Q.  Is that correct?
25  A.  That's correct.

Page 72

1  Q.  You have no idea if anybody else, Tammy or
2  anyone else, gave Rahul photos?
3  A.  I would be -- I can't -- no.  I mean, I only
4  had that one to start this thing off.  I don't know
5  anything.
6  Q.  And that's what you told me on the phone, and
7  that's what you're testifying today.
8  A.  I know.
9  Q.  You only had that one photo of a table.
10  A.  (Witness nods head.)
11  Q.  Yes?
12  A.  Yes.  Sorry.  I -- you know.
13  Q.  That's true.  And you gave that one photo to
14  Rahul.
15  A.  Yes.
16  Q.  You said you wouldn't be confused about the
17  furniture pieces, and you said if you had the
18  opportunity to open a drawer you wouldn't be.  Is that
19  right?
20  A.  In my opinion.  I can tell his stuff, Jason
21  Scott stuff.
22  Q.  And that has something to do with the quality.
23  If you open a drawer you know that it pulls smooth,
24  that it works right?
25  A.  But it's hardware.

Page 73

1    Q.   The hardware on the drawer.

2    A.   The touch of his hardware.

3    Q.   So if you're just looking at it without the

4  opportunity to go open a drawer, might you think that

5  something else is Jason Scott or --

6    A.   You know, it's unfair, because -- I mean, in

7  the furniture business.  Now, the public could be

8  fooled possibly.  But I look for his -- how he doesn't

9  have -- how the wood matches.  He does inlaid, yes, but

10 they all match.

11         MR. ISRAELOFF:  Object.

12    A.   I mean, he lays them in there.

13         MR. ISRAELOFF:  Object, nonresponsive.

14    Q.   (BY MR. DIETRICH)  Is it your view that the

15 public could be confused between Jason Scott and

16 somebody else?

17         MR. ISRAELOFF:  Object, form, and lack of

18 knowledge, foundation.

19    A.   Similarities again.

20    Q.   (BY MR. DIETRICH)  With similarities.

21    A.   Yeah.  Similarities become involved, you know.

22 In something like the carving.

23    A.   Or the craftsmanship.

24    Q.   The lady that came in asking for Jason Scott

25 last week, was she asking for a specific piece of

Page 74

1  furniture or any --

2    A.   She never -- she never got to that.  It was in

3  front of that buffet, the Adora, D-O-A, and she really

4  didn't say.  She really didn't finally tell me.  She

5  just said piece, pieces, that she purchased.  And I

6  just tried to make it easy on her.  She still didn't

7  leave.  She stayed -- I think she stayed an hour and a

8  half.

9         But I just thought I would save her time

10 and say where it was at and, you know, not to travel to

11 Dallas or trying to shop the area, you know, for the

12 price line.  But she still stayed.  But she didn't

13 really specifically say what piece.

14    Q.   Mr. Israeloff asked if you pointed her to the

15 Trendily piece and said, "Hey, that's a Jason Scott" or

16 something --

17    A.   No, I didn't.

18    Q.   -- along those lines.  She didn't say, "I

19 wanted that."  Correct?

20    A.   No, no, no.  She didn't really say a word.  I

21 just told her -- I guess if -- you know, I could have

22 waited to see if she said a desk.  But, no, I just told

23 her where Jason Scott was located now.

24         And it's unusual -- it would be me

25 catching her, to be honest with you, because I'm out in

Page 75

1  the shop working.  And I happened to be in there.  It

2  was weird I actually talked to somebody.

3    Q.   When you sold Jason Scott did you talk to

4  customers about it?

5    A.   (Witness nods head.)

6    Q.   Just for the record --

7    A.   I did.

8    Q.   -- is that a yes?

9    A.   I did.

10    Q.   What were customers' reactions to Jason Scott?

11    A.   Well, after I finished -- after I finished, I

12 mean, they loved it.  But showing them -- showing them

13 the craftsmanship and the quality lines of it and

14 stuff.

15         MR. DIETRICH:  I don't have any more

16 questions for you.

17         MR. ISRAELOFF:  We are done.  Thank you,

18 sir.

19         THE WITNESS:  You bet.  You bet.

20         THE VIDEOGRAPHER:  End of tape two and

21 the deposition.  Off the record at 11:32.

22         (Discussion off the record.)

23         MR. ISRAELOFF:  Go on the record.  As I

24 understand it, you've been described, Mr. McBee, that

25 you have the right to review the written transcript,

Page 76

1  make corrections, and you wish to waive that

2  opportunity.  Is that right?

3         THE WITNESS:  Yes.

4         MR. ISRAELOFF:  All right.  Thank you.

5         (Signature of the witness waived by

6  agreement of counsel and the witness.)

7                        ***

Page 77

1        CHANGES AND SIGNATURE

2   WITNESS NAME:  RON MCBEE

3   DATE OF DEPO:  July 26th, 2018

4   PAGE      LINE      CHANGE        REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Page 78

1        CHANGES AND SIGNATURE (Cont'd)

2   PAGE      LINE      CHANGE        REASON

3   _____

4   _____

5   _____

6   _____

7   _____

8        I, RON MCBEE, have read the foregoing
    deposition and hereby affix my signature that same is
9   true and correct, except as noted above.

10  _____

11        RON MCBEE

12  THE STATE OF _____ )

13  COUNTY OF _____ )

14        Before me,_____, on this
    day personally appeared RON MCBEE, known to me (or
15  proved to me under oath or through _____
    (description of identity card or other document) to be
16  the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they executed
17  the same for the purposes and consideration therein
    expressed.

18        Given under my hand and seal of office
19  this _____ day of _____, _____.

20

21        NOTARY PUBLIC IN AND FOR
          THE STATE OF
22        MY COMMISSION EXPIRES:_____

23

24

25

Page 79

1   COUNTY OF DALLAS   )

2   STATE OF TEXAS      )

3        I, Wes R. Perryman, certified shorthand

4   reporter in and for the State of Texas, do hereby

5   certify to the following:

6        That the witness, RON MCBEE, was duly sworn by

7   the officer and that the transcript of the oral

8   deposition is a true record of the testimony given by

9   the witness;

10       I further certify that pursuant to FRCP Rule

11  30(f)(1) that the signature of the deponent:

12       _____ was requested by the deponent or a party

13  before the completion of the deposition and returned

14  within 30 days from date of receipt of the transcript.

15  If returned, the attached Changes and Signature Page

16  contains any changes and the reasons therefor;

17       __X___ was not requested by the deponent or a

18  party before the completion of the deposition.

19       I further certify that I am neither attorney

20  or counsel for, nor related to or employed by, any of

21  the parties to the action in which this deposition was

22  taken.

23       Further, I am not a relative or employee of

24  any attorney or counsel employed by the parties hereto,

25  or financially interested in the action.

Page 80

1        Given under my hand and seal of office on

2   this, the 7th day of August, A.D., 2018.

3

4

5

6

7        Wes R. Perryman, CSR
         Texas CSR No. 1021
8        Expiration Date: 12/31/2018
         Lexitas - Dallas Firm Reg. No. 459
9        6500 Greenville Avenue, Suite 445
         Dallas, Texas 75206
10       (214) 373-4977

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





EXHIBIT

3

PENGAD 800-631-6989



JSC00035

