Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA


JASON SCOTT COLLECTION,        §
INC.,                          §
                               §
        Plaintiff,             §
VS.                            §    CIVIL ACTION NO.
                               §    2:17-cv-02712-JJT
TRENDILY FURNITURE, LLC        §
et al.,                        §
                               §
        Defendants.            §




ORAL DEPOSITION OF
BONITA "BO" RUNYON
Fort Worth, Texas
Wednesday, June 27, 2018
9:54 a.m.




Reported By:
Janice McMoran, CSR, RDR, CRR
Job No.: 11365

Page 2

```
 1
 2            ORAL DEPOSITION OF BONITA "BO" RUNYON,
 3    produced at the instance of the Plaintiff, in the
 4    above-styled and numbered cause on the 27th day of
 5    June, 2018, at 9:54 a.m., before Janice K.  McMoran,
 6    RDR, CRR, and Certified Shorthand Reporter in and for
 7    the State of Texas, reported by realtime stenographic
 8    means, at Law Offices of Matthew Bobo, PLLC, 4916 Camp
 9    Bowie Blvd., Fort Worth, Texas, pursuant to notice and
10    subpoena, and in accordance with the Federal Rules of
11    Civil Procedure.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            A P P E A R A N C E S
 2
 3    ON BEHALF OF THE PLAINTIFF:
 4      MANGUM, WALL, STOOPS & WARDEN, PLLC
        112 North Elden Street
 5      Flagstaff, Arizona 86001
        (928) 779-6951
 6        BY:  THOMAS E. DIETRICH, ESQ.
            tdietrich@mwswlaw.com
 7
 8
 9
10    ON BEHALF OF THE DEFENDANTS:
11      COWLES & THOMPSON
        901 Main Street, Suite 3000
12      Dallas, Texas  75202
        (214) 672-2000
13        BY:  CHARLES A. GREEN, ESQ.
            cgreen@cowlesthompson.com
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                 I N D E X
 2                                         PAGE
 3    WITNESS:  BONITA "BO" RUNYON
 4       Examination by Mr. Dietrich.................6
         Examination by Mr. Green...................53
 5       Further Examination by Mr. Dietrich........114
 6    Reporter's Certification......................168
 7    Acknowledgment of Deponent....................170
 8    Errata........................................171
 9
10
11            EXHIBIT INDEX
12    EXHIBIT
      NUMBER      DESCRIPTION          IDENTIFIED
13
14    EXHIBIT 1 - Pictures of Jason Scott Collection
                  furniture pieces....................21
15
16    EXHIBIT 2 - Pictures of Trendily furniture
                  pieces..............................27
17    EXHIBIT 3 - E-mail dated August 15, 2017 to
                  Runyon's Furniture from Chris
18                Sanders with Dropbox link...........50
19    EXHIBIT 4 - E-mail dated August 16, 2017 to
                  Chris Sanders from Bo Runyon.........52
20
      EXHIBIT 5 - Declaration of Bo Runyon.............61
21
22    EXHIBIT 6 - Transcript of Trendily Recording
                  08-15-17 Excerpt....................94
23    EXHIBIT 7 - Picture taken at Runyon's of Jason
                  Scott furniture piece...............121
24
25
```

Page 5

```
 1            EXHIBIT INDEX (CONTINUED)
 2    EXHIBIT
      NUMBER      DESCRIPTION          IDENTIFIED
 3
 4    EXHIBIT 8 - Picture taken at Runyon's of
                  Jason Scott console.................124
 5
      EXHIBIT 9 - Picture taken at Runyon's of
 6                Jason Scott Casa Bonita dining
                  room table, chairs, side chairs,
 7                and buffet..........................125
 8    EXHIBIT 10- Picture taken at Runyon's of
                  Jason Scott bed frame...............127
 9
      EXHIBIT 11- Picture taken at Runyon's of
10                Jason Scott buffet/cabinet...........128
11    EXHIBIT 12- Picture taken at Runyon's of dining
                  table and chairs (not Jason Scott).. 130
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

email@tobyfeldman.com              Toby Feldman, Inc.              Certified WOB
tobyfeldman.com                  NATIONWIDE SERVICES               (800) 246.4950

Bonita "Bo" Runyon                                    6/27/2018

Page 6

```
 1           Bonita "Bo" Runyon
 2        BONITA "BO" RUNYON,
 3  having been first duly sworn, testified as
 4  follows:
 5           EXAMINATION
 6  BY MR. DIETRICH:
 7     Q.  Good morning.
 8     A.  Good morning.
 9     Q.  Can you please state your
10  full name for the record?
11     A.  Yes.  It's Bonita -- I go by
12  Bo --
13     Q.  Uh-huh.
14     A.  -- Runyon.
15     Q.  And I'm Tom Dietrich.  We've
16  talked on the phone.  I represent Jason
17  Scott Collection in this case.
18     A.  Okay.
19     Q.  And have you ever had your
20  deposition taken before?
21     A.  No.
22     Q.  So just a couple of basic --
23  a few basic ground rules.  Janice is
24  the court reporter.  She's taking down
25  everything that we say.  So it's
```

Page 7

```
 1           Bonita "Bo" Runyon
 2  helpful that we not talk too fast --
 3     A.  Okay.
 4     Q.  -- and not talk over each
 5  other.  When you answer a question, do
 6  it verbally, "yes" or "no."  No head
 7  nods or "uh-huh," "huh-uh" --
 8     A.  Okay.
 9     Q.  -- it's kind of hard to take
10  down.  So yeses or noes.  If you don't
11  understand one of my questions, just
12  let me know, and I'll try to ask it
13  better.
14     A.  Okay.
15     Q.  And if you remember something
16  five or ten minutes down the road about
17  what we talked about, just let me know
18  and we can go back and get that on the
19  record.
20     A.  Okay.
21     Q.  Is there any reason to think
22  that you wouldn't be able to testify
23  fully and truthfully today?
24     A.  No.
25     Q.  What do you do for a living?
```

Page 8

```
 1           Bonita "Bo" Runyon
 2     A.  I sell very high-end
 3  furniture.
 4     Q.  Do you own a store?
 5     A.  I do.
 6     Q.  And what store is that?
 7     A.  Runyon's Fine Furniture.
 8     Q.  Where is Runyon's located?
 9     A.  In Roanoke, Texas.
10     Q.  How long have you owned
11  Runyon's Furniture?
12     A.  20 years.
13        MR. GREEN:  How long?
14        THE WITNESS:  20.
15     Q.  (By Mr. Dietrich)  Okay.  Did
16  you work in the furniture industry
17  before you owned Runyon's?
18     A.  No.
19     Q.  That was your first foray
20  into furniture?
21     A.  I've been in the furniture
22  business a while.  But as far as
23  Runyon's, it's been about 20 years.
24     Q.  And did you start Runyon's?
25     A.  I did.
```

Page 9

```
 1           Bonita "Bo" Runyon
 2     Q.  So what kind of things do you
 3  do at Runyon's?
 4     A.  I place and sell furniture.
 5  I go to homes and decorate and sell
 6  furniture.  And I buy all the
 7  furniture.  I make all the purchases.
 8     Q.  You're the buyer?
 9     A.  Uh-huh.
10     Q.  What does being a buyer for a
11  store like yours consist of?
12     A.  Buying unique pieces of
13  furniture that not everybody is going
14  to see.  I work with a lot of local
15  artisans, you know, and make sure that
16  I buy, you know, very unique pieces of
17  furniture.
18     Q.  And how big is Runyon's
19  store?
20     A.  About 10,000 square foot.
21        MR. GREEN:  Can you speak up
22  just a little bit?  I'm old and
23  hard of hearing.
24        THE WITNESS:  Okay.  All
25  right.
```

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES               (800) 246.4950

**Bonita "Bo" Runyon**                                                    6/27/2018

---

Page 10

1          Bonita "Bo" Runyon
2      MR. DIETRICH:  Thank you.
3      Q.   (By Mr. Dietrich)  Do you
4   also personally sell furniture?
5      A.   I do.
6      Q.   And do you deal with
7   customers?
8      A.   I do.
9      Q.   Frequently?
10     A.   Yes.  Every day.  Daily.
11     Q.   Now, Runyon's, that's a
12  retailer of furniture?
13     A.   Yes.
14     Q.   And from whom do you buy the
15  furniture?
16     A.   From whom do I buy from?  I
17  buy from Jason Scott, a lot from Jason
18  Scott.  Casa Bonita.  We do a lot of
19  custom.  So I buy through -- we do
20  custom upholstery through Home Trend --
21  I'm sorry, not Home Trend.  Massoud,
22  Paul Roberts, King Hickory.
23         MR. GREEN:  Can you go over
24      those again?  I'm writing them
25      down as fast as I can.

---

Page 11

1          Bonita "Bo" Runyon
2      THE WITNESS:  Yes.  I buy all
3   my upholsteries from -- it's
4   custom through Massoud, King
5   Hickory, Paul Roberts, and Old
6   Hickory Tannery.  And I deal with
7   a few local companies as well.
8         MR. GREEN:  Thank you.
9      Q.   (By Mr. Dietrich)  So those
10  companies you just talked about, those
11  are the manufacturers?
12     A.   Yes, sir.
13     Q.   And you're kind of acting as
14  a go-between?  You go to them, and then
15  you bring their goods to the customers?
16     A.   Yes.
17     Q.   And have you been doing that
18  the whole 20 years that you've had
19  Runyon's?
20     A.   No.  I've been doing that for
21  about -- about eight years through
22  those companies.
23     Q.   But whether with those
24  companies or not, have you been doing
25  those tasks the whole 20 years with

---

Page 12

1          Bonita "Bo" Runyon
2   Runyon's?
3      A.   Yes.
4      Q.   So you did mention Jason
5   Scott Collection?
6      A.   Uh-huh.
7      Q.   Runyon's carries Jason Scott?
8      A.   Uh-huh, for about five years.
9      Q.   When did you first learn
10  about Jason Scott furniture?
11     A.   Probably about six years ago.
12     Q.   And how did you learn about
13  it?
14     A.   I saw a piece of it at one of
15  my client's homes, and I was very
16  impressed with it because I've never
17  seen any furniture that looked like
18  that.  And with my store, it's very
19  high end, very upscale.  So I contacted
20  who -- who made it.
21     Q.   Was that -- did you talk to
22  Jason Forsberg?
23     A.   I talked to Mark, a sales rep
24  for Jason, because he wanted to come
25  out to my store first and to make sure

---

Page 13

1          Bonita "Bo" Runyon
2   that my store would represent his
3   product well.
4      Q.   And did Mark come out to your
5   store?
6      A.   He did.
7      Q.   Did you have a conversation
8   with him about Jason Scott?
9      A.   Absolutely, yes.
10     Q.   And how did that go?
11     A.   I picked up the line.
12     Q.   So -- I'm sorry, go ahead.
13     A.   It went very well.  I picked
14  up the line.
15     Q.   And is Runyon's an authorized
16  Jason Scott dealer?
17     A.   I am.
18     Q.   So did you start selling
19  Jason Scott furniture after that?
20     A.   I did.
21     Q.   And did you personally sell
22  it to customers?
23     A.   Yes.
24     Q.   How, in your experience, did
25  customers react to the Jason Scott

---

4  (Pages 10 to 13)

**Bonita "Bo" Runyon**                    6/27/2018

---

Page 14

```
 1            Bonita "Bo" Runyon
 2  furniture?
 3       A.   They love it.  It's -- it's
 4  furniture that a lot of my clients have
 5  never seen anything like it.  And a lot
 6  of my clients, they like it so much
 7  that they furnish their whole home with
 8  it because it's furniture that you're
 9  not going to see everywhere.  And it's
10  like a collector's item to them.
11            MR. GREEN:  Object,
12  nonresponsive.  Time out for a
13  second.  Every now and then we
14  make objections.  She's got to
15  record those, and they can be
16  taken up later with the Court.  So
17  I'm not trying to -- to interrupt
18  the thing.  I just have to protect
19  the record is the reason we're
20  doing that.  So...
21       Q.   (By Mr. Dietrich)  You can go
22  ahead and answer after he states his
23  objection.
24            MR. GREEN:  Yes.
25       Q.   (By Mr. Dietrich)  Which you
```

Page 15

```
 1            Bonita "Bo" Runyon
 2  already did, that's fine.
 3            MR. GREEN:  Yeah.  You're
 4  doing great.
 5       Q.   (By Mr. Dietrich)  In your
 6  experience, does Jason Scott furniture
 7  have a certain look?
 8       A.   Absolutely.
 9       Q.   Can you describe that?
10       A.   It has a look that I've never
11  seen with any other manufacturer or any
12  other company.  The craftsmanship is
13  amazing.  The carving on it is just
14  something I've never seen before until
15  Jason Scott.  The coloring, it's
16  very -- it has a very distinctive
17  color.  A customer can come in my store
18  and they can spot his pieces, because
19  it's got a very distinctive look to it.
20       Q.   So what --
21            MR. GREEN:  I'm going to
22  object to nonresponsive, part of
23  that answer.
24       Q.   (By Mr. Dietrich)  What were
25  customers' reactions to seeing Jason
```

Page 16

```
 1            Bonita "Bo" Runyon
 2  Scott furniture?
 3            MR. GREEN:  Object to the
 4  form of the question.
 5       Q.   (By Mr. Dietrich)  You can
 6  answer.
 7       A.   They love it.  They fall in
 8  love with it.  They're like, oh, my
 9  goodness, that's a piece of
10  furniture -- that's quality furniture.
11  And, again, they see it as an heirloom
12  piece of furniture because it's just
13  like no other furniture.
14       Q.   In your view, do customers
15  view it differently than the other
16  furniture that you carry?
17            MR. GREEN:  Objection, form.
18       A.   Absolutely.  Yes, they do.
19       Q.   (By Mr. Dietrich)  Is that
20  due to its uniqueness?
21       A.   Yes.
22            MR. GREEN:  Same.
23       Q.   (By Mr. Dietrich)  Is Jason
24  Scott an important line for Runyon's?
25       A.   Yes.
```

Page 17

```
 1            Bonita "Bo" Runyon
 2       Q.   Why is that?
 3       A.   Because it's furniture --
 4  it's furniture you're not going to see
 5  any -- you know, everywhere.
 6       Q.   Do you sell a significant
 7  amount of Jason Scott?
 8       A.   I do.  I do.
 9       Q.   So just talking moneywise, is
10  it an important line for Runyon's?
11       A.   Absolutely.
12       Q.   Can you estimate in an
13  average year how many pieces you might
14  sell of Jason Scott furniture?
15       A.   Oh, my.  Well, just recently
16  I sold, like, 10 pieces in the last
17  eight weeks.  I can't estimate how
18  many.  A lot.
19       Q.   A lot each year?
20       A.   Oh, yeah.  Yeah.
21       Q.   You said Runyon's is an
22  authorized dealer?
23       A.   Yes, sir.
24       Q.   Of Jason Scott?
25       A.   Yes.
```

---

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                          NATIONWIDE SERVICES                   (800) 246.4950

**Bonita "Bo" Runyon**                                                      6/27/2018

Page 18

```
 1              Bonita "Bo" Runyon
 2      Q.   To your knowledge, does Jason
 3   Scott limit its dealer network?
 4      A.   On who he sells to?
 5      Q.   Right.
 6      A.   Yes.
 7      Q.   Do you know of any other
 8   approved dealers nearby to Runyon's?
 9      A.   I do.
10      Q.   And who is that?
11      A.   Brumbaugh's and The
12   Arrangement.
13      Q.   Is it important to you that
14   Jason Scott does limit its authorized
15   network?
16      A.   Absolutely.
17           MR. GREEN:  Objection,
18   leading.
19      Q.   (By Mr. Dietrich)  Why is
20   that important to you?
21      A.   It's very important to me
22   because my store is based on uniqueness
23   and richness and upscale furniture.  So
24   it's very important to me that my
25   clients don't see it everywhere.
```

Page 19

```
 1              Bonita "Bo" Runyon
 2      Q.   Does Runyon's advertise Jason
 3   Scott furniture?
 4      A.   We do.
 5      Q.   How and where do you
 6   advertise it?
 7      A.   TV.
 8           MR. GREEN:  Pardon me?
 9           THE WITNESS:  TV.
10           MR. GREEN:  TV.
11           THE WITNESS:  Yes.
12      A.   Television commercials.
13   Cowboys & Indians.  And then a couple
14   of other kind of high-end magazines,
15   local high-end magazines.
16      Q.   (By Mr. Dietrich)  Cowboys &
17   Indians is a magazine?
18      A.   Yes, sir.
19      Q.   Is that a national magazine?
20      A.   It is.
21      Q.   How commonly does Runyon's
22   advertise, say, on TV for Jason Scott?
23      A.   We're on commercials every
24   day.  I mean, there's a commercial
25   every day, on several times a day, on
```

Page 20

```
 1              Bonita "Bo" Runyon
 2   Fox News.  I'm not sure of all the
 3   different channels, but we advertise
 4   every day.
 5      Q.   And those ads have Jason
 6   Scott pieces in them?
 7      A.   Yes.
 8      Q.   How much does Runyon's pay to
 9   advertise in this fashion per year,
10   say?
11      A.   I do not know because I do
12   not do the advertising.  My husband
13   does.
14      Q.   Do you know if it runs into
15   the thousands of dollars?
16      A.   Oh, yes.
17      Q.   Many thousands of dollars?
18      A.   Yes.
19      Q.   Could you get us those
20   advertising numbers, costs if we came
21   back for them?  We don't need to ask
22   your husband right now, but --
23      A.   Yes.
24      Q.   -- if we came back for them
25   later?
```

Page 21

```
 1              Bonita "Bo" Runyon
 2      A.   Yes.
 3           (Exhibit 1 marked.)
 4      Q.   So I'll show you what's been
 5   marked Exhibit 1 --
 6      A.   Okay.
 7      Q.   -- to your deposition.
 8      A.   Yes.
 9      Q.   And if you can take a minute
10   and just look through all the pages.
11      A.   (Witness complies.)
12      Q.   Do you recognize the
13   furniture pieces shown in Exhibit 1?
14      A.   Yes.
15      Q.   Are they the Jason Scott
16   pieces?
17      A.   Absolutely.
18      Q.   Does Runyon's sell each of
19   these pieces, the desk, the buffet, and
20   the table?
21      A.   Yes, I do.  I sell -- the
22   desk is a great seller.  I do very well
23   with the Borgata buffet.  The
24   craftsmanship is amazing.
25      Q.   How about the table?
```

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES               (800) 246.4950

**Bonita "Bo" Runyon**                                                      6/27/2018

---

Page 22

Bonita "Bo" Runyon

1
2    A.   Oh, I do-- yes.  I can't keep
3    the table in stock.
4         Q.   So it's correct, then, you
5    are personally familiar with --
6         A.   Yes.
7         Q.    -- each of these pieces?
8         A.   Yes.
9         Q.   Do you know how long you've
10   been selling each of these pieces at
11   Runyon's?
12        A.   For about five years.
13        Q.   So the whole time you've --
14        A.   Yes.
15        Q.    -- been in business with
16   Jason Scott?
17        A.   Yes, sir.
18        Q.   Are these specific --
19             MR. GREEN:  Are these what?
20             MR. DIETRICH:  I was just
21   waiting for her to --
22             MR. GREEN:  Okay.  I'm sorry.
23        A.   I just heard that and I'm
24   like...
25        Q.   (By Mr. Dietrich)  It sounded

---

Page 23

Bonita "Bo" Runyon

1
2    like your answer was yes before, but
3    are these specific Jason Scott pieces
4    good sellers?
5         A.   Oh, yes, absolutely.  They're
6    my best sellers.
7         Q.   These are the best selling --
8         A.   Uh-huh.
9         Q.    -- Jason Scott pieces?
10        A.   I do very well with all of
11   his pieces, but these pieces are
12   very -- I do very well with.
13        Q.   All right.  And are these
14   pieces consistent with the Jason Scott
15   look that you described earlier?
16        A.   Oh, yes.  Oh, absolutely.
17        Q.   Can you elaborate on that a
18   bit?
19        A.   Well, the carving is amazing.
20   The texture of the wood.  The color.
21   Just the uniqueness of it.  Just very
22   beautiful.
23        Q.   And we will talk in a minute
24   about Trendily, but other than
25   Trendily, have you ever seen anybody

---

Page 24

Bonita "Bo" Runyon

1
2    make copies of these pieces?
3         A.   I've seen some knock-offs of
4    maybe what the piece looked like, looks
5    like.
6         Q.   Sure.
7         A.   But it never -- they're not
8    even close, except for the Trendily.
9    That's the first time I've ever seen
10   anybody knock off Jason Scott so well.
11             MR. GREEN:  Objection,
12   form -- or nonresponsive.
13        Q.   (By Mr. Dietrich)  So you
14   have seen other companies try to copy
15   Jason Scott?
16        A.   Yes.  But not ever have they
17   ever come close to it.
18        Q.   Where is Runyon's located?
19        A.   In Roanoke, Texas.
20        Q.   Who do you consider to be
21   your main competitors?
22        A.   Brumbaugh's and The
23   Arrangement.
24        Q.   How about just competitors in
25   general, not for Jason Scott, but are

---

Page 25

Bonita "Bo" Runyon

1
2    there other furniture retailers around
3    or nearby?
4         A.   Not -- no, because I do such
5    a high-end sell.  You know, my store is
6    very high end, which is ranked up there
7    with Brumbaugh's and The Arrangement.
8         Q.   Are you familiar with Adobe
9    Interiors?
10        A.   Oh, yes, Adobe, yes.
11        Q.   Do you consider them a
12   competitor?
13        A.   Yes.  Yeah.
14        Q.   Are you familiar with Western
15   Heritage?
16        A.   I am.
17        Q.   Do you consider them a
18   competitor?
19        A.   Yes.  Forgot them.
20        Q.   Do you know if Jason Scott
21   sells to either Adobe or Western
22   Heritage?
23        A.   He does not.
24        Q.   Do you believe the fact that
25   he doesn't sell to them has an effect

---

7  (Pages 22 to 25)

Bonita "Bo" Runyon                                          6/27/2018

Page 26

1          Bonita "Bo" Runyon
2  on your business?
3          MR. GREEN:  Objection,
4  leading.
5      A.  I'm sorry?
6      Q.  (By Mr. Dietrich)  It may be
7  a bad question.  You said to your
8  knowledge Jason doesn't sell to Adobe
9  or Western Heritage?
10      A.  Correct.
11      Q.  Is that beneficial to your
12  own business?
13          MR. GREEN:  Leading.
14      A.  Yes.
15      Q.  (By Mr. Dietrich)  And how
16  so?
17      A.  Because they don't sell the
18  Jason Scott.
19      Q.  Customers have to come to
20  you?
21      A.  Yes.
22      Q.  If there were Jason Scott on
23  their floor, would that affect
24  Runyon's?
25          MR. GREEN:  Objection, form.

Page 27

1          Bonita "Bo" Runyon
2      A.  Probably, yes.
3      Q.  (By Mr. Dietrich)  Could
4  customers go there and buy it?
5      A.  Customers that live in the
6  area, yes.
7          (Exhibit 2 marked.)
8      Q.  If you would take a minute
9  and look through what's been marked
10  Exhibit 2 to your deposition.  Do you
11  recognize these furniture pieces?
12      A.  They look like Jason Scott.
13      Q.  Do you know -- and you've
14  reviewed all the pages?
15      A.  Uh-huh.
16      Q.  Do you know who made these
17  pieces?
18      A.  If I didn't -- I would say
19  Jason Scott, at first glance.
20      Q.  Are you familiar --
21      A.  I would say Jason Scott
22  because they're -- no one else makes
23  furniture like that.
24      Q.  Are you familiar with a
25  company called Trendily?

Page 28

1          Bonita "Bo" Runyon
2      A.  I am.
3      Q.  How do you know of Trendily?
4      A.  I have purchased furniture
5  from them in the past.
6      Q.  What kind of furniture did
7  you purchase from them?
8      A.  Dining room chairs, dining
9  room tables, upholstered accent chairs
10  and sofas, a few beds here and there.
11      Q.  Do you know Rahul Malhotra?
12      A.  I do.
13      Q.  Who is he?
14      A.  He is the owner of Trendily.
15      Q.  Have you done business with
16  him in the past?
17      A.  I have.
18      Q.  Have you had issues with
19  Rahul in the past?
20      A.  I have.
21      Q.  What kind of issues did you
22  have with Rahul?
23      A.  That they sell to everyone,
24  and they don't deliver in a timely
25  manner.  But they sell to everyone.  At

Page 29

1          Bonita "Bo" Runyon
2  one point I saw some of their furniture
3  on Wayfair, or one of my assistants saw
4  some of their dining room chairs on
5  Wayfair.
6      Q.  And what's Wayfair?
7      A.  It's an online retail
8  business, I guess.  I don't do it, so I
9  don't know for sure.  Very low prices.
10      Q.  Was there some reason they
11  shouldn't have been selling to Wayfair,
12  to your knowledge?
13      A.  Because they're a wholesaler.
14      Q.  What does that mean just for
15  us regular people that aren't in
16  furniture?
17      A.  Right.  Well, they're selling
18  the -- like, the dining room chairs,
19  they were selling them at a very low
20  price.  They were selling them for what
21  a wholesaler would pay for them.  And
22  then the -- you know, I retail.  So
23  when I'm seeing their product on
24  Wayfair for what I'm paying for -- you
25  know, for what I'm paying for it, it's

email@tobyfeldman.com          Toby Feldman, Inc.              Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES            (800) 246.4950

**Bonita "Bo" Runyon**                                              6/27/2018

---

Page 30

```
 1              Bonita "Bo" Runyon
 2    not good business.
 3         Q.   So then I can go on Wayfair
 4    and buy it --
 5         A.   Right.
 6         Q.   -- for that price?
 7         A.   Exactly.
 8         Q.   And not pay the markup that
 9    you add to it?
10         A.   Right.
11         Q.   I got you.
12         A.   Yeah.
13         Q.   Are you familiar with Chris
14    Sanders?
15         A.   I am.
16         Q.   Who is Chris?
17         A.   He represents and works for
18    Trendily.
19         Q.   How long have you known Mr.
20    Sanders?
21         A.   A couple of years.
22         Q.   How long have you known Mr.
23    Malhotra?
24         A.   Three to four years.
25         Q.   At some point did you become
```

Page 31

```
 1              Bonita "Bo" Runyon
 2    aware that Trendily was offering copies
 3    of Jason Scott furniture for sale?
 4         A.   Yes.
 5         Q.   How did you become aware of
 6    that?
 7         A.   Chris called me and said he
 8    had a new line that he wanted to
 9    introduce me to.  It was a line that
10    looks like -- it's a Jason Scott
11    knock-off.
12         Q.   So Chris contacted you about
13    that line?
14         A.   Yes.
15         Q.   And do you recall when that
16    happened?
17         A.   I don't recall.  Last year.
18         Q.   Do you recall summer, spring,
19    some -- about what time?
20         A.   Probably around this time.
21    What is this, June, July?  It's been
22    about a year ago.
23         Q.   So about June or July of
24    2017?
25         A.   Yes.
```

Page 32

```
 1              Bonita "Bo" Runyon
 2         Q.   And what specifically, if you
 3    recall, did he tell you over the phone
 4    about these products?
 5         A.   That it would be a product
 6    that I would be interested in.
 7         Q.   Did he refer to Jason Scott?
 8         A.   He did.
 9         Q.   Do you -- what did he say?
10         A.   I'm sorry.  I don't recall
11    the exact words.  It's been a while.
12         Q.   But he did refer to Jason
13    Scott in that call?
14         A.   Yes, he did.
15         Q.   And what, if anything, came
16    out of that call with Mr. Sanders?
17         A.   I had told him to come to my
18    store and show me what he has, show me
19    the product.  He sent me an e-mail,
20    also, showing me pictures of what --
21    what the items looked like.  And that's
22    when I said, okay, come -- come meet
23    with me, show me what you've got.  I'd
24    like to see more and know more about
25    it.
```

Page 33

```
 1              Bonita "Bo" Runyon
 2         Q.   Did you at some point tell
 3    Jason Forsberg about this --
 4         A.   I did.
 5         Q.   -- proposed meeting?
 6         A.   Yes.
 7         Q.   Why did you tell Jason?
 8         A.   Because I've never seen a
 9    knock-off that looked so close to his,
10    and I was concerned.
11         Q.   Why were you concerned?
12         A.   Because Trendily sells to
13    everyone.  They're not selective on
14    their -- on who they sell to.  And I
15    was concerned because now I'm going to
16    have a product that's going to be
17    everywhere or -- you know, Jason
18    knock-off and it's going to be
19    everywhere, which makes the value and
20    the quality or the value of it less
21    important.
22         Q.   Did you think that could
23    affect Runyon's sales?
24         A.   Oh, absolutely.
25         Q.   How so?
```

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES              (800) 246.4950

**Bonita "Bo" Runyon**                                    6/27/2018

Page 34

                    Bonita "Bo" Runyon
1
2        A.   Because he would sell it
3    everywhere.  He would sell it to a
4    store five minutes -- five miles from
5    my store, which is a lower-end store.
6    And, yeah, I was very concerned.
7        Q.   In your experience with
8    customers, you said you were concerned
9    about him selling to a store five miles
10   from your store --
11       A.   Uh-huh.
12       Q.   -- that's a lower-end store.
13       A.   Uh-huh.
14       Q.   Would customers potentially
15   go there and buy it instead of coming
16   to Runyon's to buy a real Jason Scott?
17       A.   Yes, I would think so,
18   because then the lower-end stores would
19   advertise that they're carrying Jason
20   Scott look-alikes.
21       Q.   So you talked to Jason about
22   this proposed meeting?
23       A.   Yes.
24       Q.   Did he ask you to record
25   audio of the meeting?

Page 35

                    Bonita "Bo" Runyon
1
2        A.   Yes.
3        Q.   Did you agree to do that?
4        A.   I did.
5        Q.   And did the meeting take
6    place?
7        A.   It did.
8        Q.   And do you recall where --
9    where did the meeting happen?
10       A.   At my store.
11       Q.   Was it out on the floor or in
12   a conference room or what setting?
13       A.   No, it was out on the floor.
14       Q.   Do you recall who all was in
15   the meeting?
16       A.   It was Chris and Deidre.
17           MR. GREEN:  Pardon me?
18       A.   I think that was her name.
19   Chris and Deidre.
20       Q.   (By Mr. Dietrich)  Does Dara
21   ring a bell?
22       A.   Dara.  Thank you.  It's been
23   a while, I'll tell you.  Dara, myself,
24   one of my sales representatives at the
25   time, which was Robin.  And then my

Page 36

                    Bonita "Bo" Runyon
1
2    assistant was little -- her name was
3    Ann.
4        Q.   Is that Little Bo?
5        A.   Yes, that's Little Bo.  But
6    she goes by Ann.  And I believe that
7    was all.  I don't think there was
8    anyone else in the meeting.
9        Q.   Now, Chris is from Trendily?
10       A.   Yes.
11       Q.   Who is Dara?
12       A.   She also works for Trendily.
13       Q.   Do you recall when that
14   meeting took place?
15       A.   Around this time last year,
16   June, July, August area.
17       Q.   After your phone call from
18   Chris?
19       A.   Yes.  Yes.
20       Q.   Did you record audio of the
21   meeting?
22       A.   Yes.
23       Q.   And how did you do that?  How
24   did you record the audio?
25       A.   With my cell phone, my

Page 37

                    Bonita "Bo" Runyon
1
2    iPhone.
3        Q.   Did you use a particular app?
4        A.   Just the recording app icon
5    that's on my phone.
6        Q.   And where was your phone
7    located during the meeting?
8        A.   On the -- I believe it was on
9    the coffee table.
10       Q.   And were you-all --
11       A.   Yes.
12       Q.   -- around the coffee table?
13       A.   Yes.  I set my phone down
14   when I'm talking to reps and just leave
15   it there.
16       Q.   And did you record the whole
17   meeting with the Trendily reps?
18       A.   I believe so.
19       Q.   What did you do with the
20   recording afterwards?
21       A.   I sent it, I think, to either
22   you or Jason.  I can't remember.
23       Q.   Did you make any edits or
24   alterations to the recording before you
25   sent it?

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                   NATIONWIDE SERVICES                   (800) 246.4950

Bonita "Bo" Runyon                                6/27/2018

---

Page 38

1              Bonita "Bo" Runyon
2      A.  No.  No.  I wish I could have
3  because I was -- I was pretty hickey in
4  it.  But no.
5      Q.  So during the meeting did the
6  subject of the Jason Scott copies made
7  by Trendily come up?
8      A.  Yes.
9      Q.  Who brought up those
10 furniture pieces, if you remember?
11     A.  I did.  That was what the
12 meeting was all about.  And to see
13 other pieces as well, but that was my
14 main interest.
15     Q.  And in your call with Chris
16 before, had he expressed that to you
17 that that was what the meeting was
18 about?
19     A.  Yes.
20         MR. GREEN:  Objection,
21 leading.
22     Q.  (By Mr. Dietrich)  Did -- did
23 the Trendily reps talk about the Jason
24 Scott copies?
25     A.  Yes.

---

Page 39

1              Bonita "Bo" Runyon
2      Q.  What did they say about those
3  furniture pieces?
4      A.  They were just saying --
5  because I have Jason Scott on my floor.
6  I had -- I had -- on that day I had
7  this desk on my floor as well.  So they
8  were just showing me how similar and
9  all, you know, the craftsmanship on
10 their pieces compared to Jason Scott.
11 It was -- it was pretty -- it was
12 pretty unbelievable.  I was --
13     Q.  So you had the real Jason
14 Scott pieces on your floor --
15     A.  Yes.
16     Q.  -- at that time?
17     A.  Yes.
18     Q.  And your meeting was on the
19 floor.
20     A.  Yes.
21     Q.  Is there any way that the
22 Trendily folks could have not seen that
23 Jason Scott?
24     A.  No.
25     Q.  And they specifically talked

---

Page 40

1              Bonita "Bo" Runyon
2  about it?
3      A.  Yes.
4      Q.  Did -- did you see
5  photographs of the copies?
6      A.  Yes.
7      Q.  Did the Trendily people show
8  you those?
9      A.  Yes.
10     Q.  And is that the copies that
11 we've seen today:  the desk, the
12 buffet, and the table?
13     A.  Yes.
14     Q.  Did you recognize that that
15 furniture looked like Jason Scott?
16     A.  Oh, yeah.
17         MR. GREEN:  Objection,
18 leading.
19     A.  Yes.
20     Q.  (By Mr. Dietrich)  Did you
21 say anything to the Trendily
22 representatives about that?
23     A.  Yes.
24     Q.  What did you say to them?
25     A.  I said, this looks like a

---

Page 41

1              Bonita "Bo" Runyon
2  Jason Scott, or it's very similar.  I
3  mean, it's so similar that I wouldn't
4  know any better that this isn't a Jason
5  Scott piece, by looking at it.  I was
6  impressed, very impressed.
7      Q.  What did they respond when
8  you said that it looked like Jason
9  Scott?
10     A.  They said that it's -- they
11 said it's similar.  And I want to go,
12 okay, well, it's more than similar.
13 But they used the word that it was
14 similar.
15     Q.  And did they say anything
16 else with regard to how it compared to
17 Jason Scott?
18     A.  No.  They said it was the
19 same -- it was teak, you know, the
20 same, teak.  You know, the
21 craftsmanship is, you know, very
22 similar to the Jason Scott.  Of course,
23 me looking at it, I'm going, it's more
24 than similar, really.  I've never seen
25 anybody have a Jason Scott look --

---

11  (Pages 38 to 41)

Bonita "Bo" Runyon                                    6/27/2018

```
 1              Bonita "Bo" Runyon
 2   knock-off like that.  That was -- I
 3   wouldn't have known better.  I would
 4   have thought that that was a Jason
 5   Scott for sure.
 6        Q.   So we looked at Exhibit 2
 7   earlier.
 8        A.   Uh-huh.
 9        Q.   This exhibit (indicating).
10        A.   Uh-huh.
11        Q.   And you said that you
12   believed that was Jason Scott
13   furniture?
14        A.   Yes.
15        Q.   Would it surprise you to
16   learn that that's Trendily furniture?
17        A.   Yes.
18        Q.   Does that -- obviously, you
19   said that looked like Jason Scott to
20   you.
21        A.   Oh, yeah.
22        Q.   Did the Trendily reps talk
23   about pricing of their furniture in the
24   meeting with you?
25        A.   They did.
```

```
 1              Bonita "Bo" Runyon
 2        Q.   Do you recall how their
 3   pricing compared to Jason Scott's
 4   pricing?
 5        A.   A lot less.
 6        Q.   Trendily's prices were a lot
 7   less?
 8        A.   Yes.  Trendily's pricing was
 9   a lot less.
10        Q.   Did you have any reaction to
11   that?
12        A.   I did.
13        Q.   And what was that?
14        A.   It was, like, okay, well, I
15   could sell this for a whole lot less
16   and probably sell more of it, but then
17   I was concerned because I'm thinking,
18   okay, now I'm going to have the lower
19   end stores selling these Jason Scott
20   knock-offs, you know, which would hurt
21   the sales of my Jason Scott, because I
22   like -- I like the Jason Scott and I
23   like Jason.  So I wouldn't, you know --
24   I was considering, you know, the
25   purchase -- you know, the purchase of
```

```
 1              Bonita "Bo" Runyon
 2   the Trendily, but at the end of the
 3   day, I wouldn't go that way.
 4        Q.   Did Trendily say how the
 5   knock-offs were selling?
 6        A.   Very well.
 7        Q.   They said they were selling
 8   very well?
 9        A.   Very well, yes.  They had a
10   container on the water and it was all
11   sold.  So I wouldn't get any pieces
12   probably for several -- you know, could
13   be, like, eight weeks.  Eight to twelve
14   weeks before I could receive any of the
15   pieces because all the pieces that were
16   on the water at that time were sold.
17        Q.   That was what Trendily told
18   you?
19        A.   Yes.
20        Q.   And they were talking
21   specifically about these knock-off
22   pieces?
23        A.   Yes.  Yes.
24        Q.   Do you know -- you had seen
25   the photographs of the knock-offs at
```

```
 1              Bonita "Bo" Runyon
 2   that point?
 3        A.   Uh-huh.
 4        Q.   And did you know essentially
 5   how -- what their size was?
 6        A.   No.
 7        Q.   And you knew from looking at
 8   Jason Scott furniture about how big
 9   each piece is; is that right?
10        A.   I'm sorry?
11        Q.   You knew about how big each
12   piece is?
13        A.   Yes.
14        Q.   Did you have an estimation of
15   about how many pieces fit in a
16   container coming over?
17        A.   I don't, no.  I have no idea.
18        Q.   Is it Trendily's told you, if
19   I have this correctly, they were
20   selling these copies at much lower
21   prices?
22        A.   Yes.
23        Q.   And they were trying to sell
24   those copies to you?
25        A.   Yes.
```

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES                  (800) 246.4950

Bonita "Bo" Runyon                                      6/27/2018

Page 46

1              Bonita "Bo" Runyon
2        Q.   Could you feasibly have
3    carried both the copies and Jason Scott
4    Collection at your store?
5        A.   I could.
6        Q.   How would that --
7        A.   But.
8        Q.   -- affect customers?
9             MR. GREEN:   Objection, form.
10       A.   I'm not sure.
11       Q.   (By Mr. Dietrich)  Well, I'm
12   just wondering if you have -- let's say
13   the desk, the Iron Star desk.
14       A.   Uh-huh.
15       Q.   If you have the Jason Scott
16   Iron Star desk at your store and the
17   Trendily version of the Iron Star desk
18   at your store priced much lower, how
19   would a customer -- how would a
20   customer, in your experience -- would
21   you be able to sell both of those
22   things next to each other?
23            MR. GREEN:   Objection, form.
24       A.   I could, but I wouldn't,
25   because I'm pretty -- I'm loyal to

Page 47

1              Bonita "Bo" Runyon
2    Jason Scott.  But I was interested in
3    knowing what Trendily -- their price
4    point and the craftsmanship of what
5    they were doing that looked so much
6    like Jason Scott, that I was concerned
7    because I knew that that desk and
8    pieces of furniture could be then down
9    at the lower-end furniture stores and
10   them selling it for a lot less.  And
11   the customers wouldn't know any
12   difference.  So of course they're going
13   to go there and purchase it for a lot
14   less than, you know -- and not buy from
15   Runyon's.
16            MR. GREEN:   Objection,
17            nonresponsive.
18       Q.   (By Mr. Dietrich)  In your --
19   in your experience with customers, if
20   this piece were for sale at a lower
21   price at a lower-end store, they may go
22   there and buy that instead?
23       A.   Yes.
24            MR. GREEN:   Objection, form.
25       Q.   (By Mr. Dietrich)  In your 20

Page 48

1              Bonita "Bo" Runyon
2    years -- well, in your five years with
3    being a Jason Scott dealer, have you
4    ever seen Jason Scott knock-offs of the
5    quality that Trendily produced?
6        A.   No, I have not.
7        Q.   Were Trendily's different
8    somehow than the other knock-offs that
9    you said you had seen?
10       A.   Yes.
11       Q.   How were they -- how were
12   Trendily's different than the other
13   copies?
14       A.   Oh, the other copies -- the
15   color, Trendily, the coloring was the
16   Jason Scott color.  The craftsmanship
17   and carving on it, the carving is like
18   no one else could do.  The uniqueness.
19   You can just tell quality and
20   craftsmanship, you know, with Jason
21   Scott's pieces.
22       Q.   And Trendily's --
23       A.   And Trendily's was --
24       Q.   -- came close to that?
25       A.   Yes, it did.  Like I said, I

Page 49

1              Bonita "Bo" Runyon
2    was -- I was very impressed.
3        Q.   In that meeting, did the
4    Trendily reps talk about plans
5    regarding any other Jason Scott pieces?
6        A.   They did.
7        Q.   What specifically did they
8    say about that?
9        A.   The round tables, like the --
10   that they said that the round --
11   because I had several pieces on my
12   floor.  The round tables with the base
13   as shown on the rectangular table of
14   Jason Scott's.
15       Q.   So, like, the Sacred Heart
16   table but --
17       A.   Yes.
18       Q.   -- with a round top?
19       A.   Yes.
20       Q.   What did they say about that?
21       A.   They said that those -- that
22   was -- they were going to be -- it was
23   coming, like they were going to be
24   doing many other pieces that were Jason
25   Scott knock-offs.

13  (Pages 46 to 49)

Bonita "Bo" Runyon                                              6/27/2018

Page 50

1              Bonita "Bo" Runyon
2         Q.   And Trendily was going to be
3    making copies of many other Jason Scott
4    pieces?
5         A.   Yes.
6         Q.   How did you feel about that?
7         A.   I wasn't happy about it.  I'm
8    thinking, okay, this isn't good.
9         Q.   Not good because why?
10        A.   Not good because they're
11   going to be selling to everyone.  I
12   mean --
13        Q.   Did you think that could hurt
14   your sales of Jason Scott?
15        A.   Oh, absolutely.  Absolutely.
16        (Exhibit 3 marked.)
17        Q.   So showing you what's been
18   marked Exhibit 3.
19        A.   Uh-huh.
20        Q.   And starting with the e-mail
21   from Chris.
22        A.   Uh-huh.
23        Q.   Looks like an e-mail from
24   Chris to Runyon's Fine Furniture?
25        A.   Okay.

Page 51

1              Bonita "Bo" Runyon
2         Q.   Do you see that?
3         A.   Yes.
4         Q.   Did you receive this e-mail?
5         A.   I did.
6         Q.   Chris sent it to you?
7         A.   Yes.
8         Q.   And that's Chris Sanders?
9         A.   Yes.
10        Q.   August 15th, 2017?
11        A.   Okay.  Yes.
12        Q.   Does that sound right as far
13   as when you received it?
14        A.   Yes.
15        Q.   And he states in the e-mail,
16   "Here is the Dropbox link.  I will have
17   answers to your other questions
18   tomorrow."
19        A.   Yes.
20        Q.   Do you see that?
21        A.   Yes.
22        Q.   Was -- to your knowledge, was
23   your meeting with him the day after you
24   got this e-mail?
25        A.   I don't -- I don't recall if

Page 52

1              Bonita "Bo" Runyon
2    it was after or before my meeting.
3         Q.   Could you look -- and just
4    below that, there's a link to a Dropbox
5    file.
6         A.   Yes.
7         Q.   Did you look at the Dropbox
8    file?
9         A.   I did.
10        Q.   And did you seek out -- what
11   was in the Dropbox file?
12        A.   It was an older furniture
13   line, but my main interest was I wanted
14   to see the Jason knock-offs and then,
15   like, a bed.
16        Q.   Were the Jason Scott
17   knock-offs in that file?
18        A.   Yes.
19        Q.   You saw photographs in there?
20        A.   Yes.
21        Q.   And did you then send this
22   e-mail to Jason Scott?
23        A.   Yes.
24        (Exhibit 4 marked.)
25        Q.   I'm showing you what's been

Page 53

1              Bonita "Bo" Runyon
2    marked Exhibit 4.  If you just want to
3    take a second to read over it.
4         Do you recognize this e-mail?
5         A.   I do not.
6         Q.   Do you recall --
7         A.   Oh, oh, I'm sorry.  Wait.
8    Yeah.  Yes, I do.  I do recall.  I'm a
9    slow reader.
10        Q.   Okay.
11        A.   Yes, I did send that, yes.
12        Q.   You sent this to Chris
13   Sanders?
14        A.   Correct.  Yes, yes.
15        Q.   And it was a day after the
16   Dropbox e-mail from Chris?
17        A.   Yes.
18        Q.   Did you discuss this e-mail
19   with Jason before you sent it?
20        A.   I don't recall if I did or
21   not, honestly.
22        Q.   And you're asking for more
23   information on the Trendily knock-offs?
24        A.   Yes.
25        Q.   Did you ever get a response

14 (Pages 50 to 53)

Bonita "Bo" Runyon                                      6/27/2018

Page 54

```
1              Bonita "Bo" Runyon
2   to this e-mail?
3       A.   Not by e-mail, but by phone.
4       Q.   And who called you?
5       A.   Chris.
6       Q.   And what did he tell you?
7       A.   He said that they were very
8   similar.  The scale and everything, I
9   would be very pleased with the scale
10  and everything.
11      Q.   That the scale of the
12  Trendily copies was similar to Jason
13  Scott?
14      A.   Yes.  The scale and the
15  carving and the craftsmanship of it, I
16  would be very pleased with it.
17      Q.   And he told you that over the
18  phone?
19      A.   Yes.
20      Q.   Have you ever had an instance    FRE 802
21  where a customer bought a Trendily copy
22  instead of a Jason Scott original?
23      A.   Yes.
24      Q.   Can you talk about that?
25      A.   It happened several times.
```

Page 55

```
1              Bonita "Bo" Runyon
2   It was -- the purchase was made at
3   Adobe.
4       Q.   Several times with the same
5   customer or different customers?
6       A.   Different customers.
7       Q.   And what did they end up
8   buying?
9       A.   Dining room -- a dining
10  room -- a dining room table.  The --
11      Q.   The Sacred Heart table?
12      A.   Yes.  Thank you.  Sacred
13  Heart table.
14      Q.   The Trendily version of that?
15      A.   Yes.
16      Q.   And they made those purchases
17  at Adobe?
18      A.   They did.
19      Q.   How did you learn about that
20  happening?
21      A.   My customer told me, because
22  they ended up buying -- I don't recall
23  what they ended up buying from me.  I
24  don't know if it was dining room chairs
25  or -- I can't remember.  But they told
```

Page 56

```
1              Bonita "Bo" Runyon
2   me that they went over there and bought
3   it, bought the table, and they were a
4   lot less, which I was like
5   (indicating).
6       Q.   You were surprised?
7       A.   Yes.  And I wasn't happy
8   about it.
9       Q.   Did they -- had they
10  previously looked at the Jason Scott
11  table at Runyon's?
12           MR. GREEN:  Objection, form.
13      A.   Yes, I believe so.  Yes.
14      Q.   (By Mr. Dietrich)  And they
15  then went to Adobe and bought the
16  Trendily versions?
17      A.   Uh-huh.
18      Q.   Yes?
19      A.   Yes.  I'm sorry.
20      Q.   It's okay.
21      A.   Yes.
22      Q.   It happens.
23      A.   I was just looking at it
24  and -- yes.
25      Q.   And that happened more than
```

Page 57

```
1              Bonita "Bo" Runyon
2   once?
3       A.   Yes.  It happened a couple of
4   times last year, that I was aware of.
5       Q.   And were those both with the
6   table?
7       A.   Yes.  I believe so, yes.
8       Q.   You testified at the
9   preliminary injunction hearing in this
10  case, right?
11      A.   Uh-huh.
12      Q.   Yes?
13      A.   Yes.
14      Q.   And that was in October 2017?
15  Does that sound right?
16      A.   Yes.
17      Q.   Are you aware that an
18  injunction issued that barred Trendily
19  from selling the copies and required
20  that they pull those pieces from the
21  market?
22      A.   Yes.
23      Q.   You are aware that that
24  happened?
25      A.   Yes.
```

email@tobyfeldman.com            Toby Feldman, Inc.            Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES          (800) 246.4950

**Bonita "Bo" Runyon**                                      6/27/2018

Page 58

1              Bonita "Bo" Runyon
2       Q.   After that injunction issued
3   in 2017, did you notice any effect on
4   the sales of Jason Scott pieces?
5       A.   I don't recall.
6       Q.   Did you notice any effect of
7   the fact that the knock-offs were no
8   longer on the market?
9       A.   Yes.
10      Q.   What was that effect?
11      A.   They -- I had Adobe calling
12  me asking me if I would buy -- if they
13  could buy a Jason Scott table from me
14  because they had a sale before they
15  were pulled.  And I believe I agreed to
16  sell them a table.
17      Q.   So Adobe -- somebody from
18  Adobe contacted you to buy Jason Scott?
19      A.   Yes.  Adobe called -- Tanner
20  from the -- Tanner from Adobe contacted
21  me and asked if I could -- I don't know
22  if it was a table or if it was the -- I
23  think it was a table.  I cannot
24  remember.  But if I would sell it to
25  them.  And I said no, that's -- send

Page 59

1              Bonita "Bo" Runyon
2   them -- send me the sale.  So yeah.
3       Q.   Have you had requests like
4   that before?  I mean -- strike that.
5            Adobe, they are a retailer as
6   well?
7       A.   Yes.
8       Q.   Was it, to your
9   understanding, their intention to buy a
10  Jason Scott table from you and resell
11  it to a customer?
12           MR. GREEN:  Objection,
13  leading.
14      A.   Yes.
15      Q.   (By Mr. Dietrich)  And why do
16  you think they were coming to you to
17  buy the Jason Scott table at this
18  point?
19           MR. GREEN:  Objection, form.
20      A.   Because they had been
21  advertising it on their website, the
22  Trendily table on their website.
23      Q.   (By Mr. Dietrich)  So to your
24  understanding, then, did they intend to
25  replace the Trendily table they

Page 60

1              Bonita "Bo" Runyon
2   advertised with the Jason Scott table?
3           MR. GREEN:  Leading,
4   objection.
5       A.   No.  I believe it was a sale
6   that they made while they had the
7   Trendily knock-off.  It might have
8   been, you know, a down payment or
9   something.  So at the time of when they
10  needed the table for the customer, I
11  guess, they needed a -- you know, they
12  needed the product.  They needed --
13  because I guess at that time they
14  weren't able to get the knock-off, the
15  Trendily knock-off.  So to save the
16  sale, they asked me if I would sell
17  them a dining room table.
18      Q.   (By Mr. Dietrich)  So they
19  had a gap that they needed to fill with
20  the table?
21      A.   Yes.
22      Q.   And originally that table was
23  the Trendily table?
24      A.   Yes.
25      Q.   But they were calling you to

Page 61

1              Bonita "Bo" Runyon
2   fill that gap with a Jason Scott table?
3       A.   Right, yes.
4       Q.   In the past have any other
5   retailers approached you to try and buy
6   a Jason Scott piece to resell?
7       A.   No, not that I recall.
8       Q.   Do you recall signing a
9   declaration in support of Jason Scott's
10  injunction request?
11      A.   I do.
12           (Exhibit 5 marked.)
13      Q.   (By Mr. Dietrich)  So showing
14  you what's been marked Exhibit 5.  Is
15  this a copy of your declaration?
16      A.   Yes.
17      Q.   Did you sign it?
18      A.   I did.
19      Q.   Did you review it for
20  accuracy before you signed it?
21      A.   Yes.  I hope so.  Yes.
22      Q.   So turn -- looking at
23  paragraph 4, it states, "Jason Scott's
24  designs are unique and different from
25  any other manufacturer in the furniture

16  (Pages 58 to 61)

Bonita "Bo" Runyon                                                    6/27/2018

Page 62

```
1              Bonita "Bo" Runyon
2  industry."
3     A.  Yes.
4     Q.  "Jason Scott has created its
5  own unique style that is recognizable
6  not only to the furniture retail
7  industry but also to end consumers."
8     Did I read that right?
9     A.  Yes.
10    Q.  Is that accurate?
11    A.  Yes.
12    Q.  Can you explain that?
13    A.  Well, he only sells to
14 high-end furniture stores, and his
15 pieces are very unique and different
16 from any other manufacturer.
17    Q.  In your experience -- you
18 said you have 20 years or more than 20
19 years of experience in the furniture
20 industry?
21    A.  Yes, uh-huh.
22    Q.  And you do all the buying for
23 Runyon's?
24    A.  Uh-huh.
25    Q.  Do you go out there and look
```

Page 63

```
1              Bonita "Bo" Runyon
2  at a lot of different furniture?
3     A.  Yes.
4     MR. GREEN:  Objection,
5  leading.
6     A.  Yes.
7     Q.  (By Mr. Dietrich)  And, to
8  your knowledge, you've said several
9  times now Jason Scott's designs are
10 different?
11    A.  Yes.
12    Q.  In paragraph 5 it states,
13 "The Sacred Heart dining table, Iron
14 Star desk, and Borgata buffet
15 incorporate the highly ornate carvings
16 and decorative design elements that I
17 have come to associate with Jason
18 Scott."
19    Did I read that correctly?
20    A.  Yes.
21    Q.  Is that accurate?
22    A.  Yes.
23    Q.  And I believe you've said
24 already in this deposition, but can you
25 just tell me -- those pieces that we've
```

Page 64

```
1              Bonita "Bo" Runyon
2  talked about, they have that Jason
3  Scott look?
4     A.  Yes.
5     MR. GREEN:  Objection, form.
6     Q.  (By Mr. Dietrich)  Is that
7  what you're referring to here?
8     A.  Yes.
9     MR. GREEN:  Objection, form.
10 Leading.
11    Q.  (By Mr. Dietrich)  In
12 paragraph 7, it states, "Manufacturers
13 that copy Jason Scott pieces and
14 retailers that carry those pieces cause
15 confusion and harm to consumers and the
16 Jason Scott brand, as those copies
17 leave the impression that Jason Scott
18 has lowered its quality of standards
19 and has begun to produce cheaper
20 quality furniture."
21    Did I read that correctly?
22    A.  Yes.
23    Q.  Is that accurate?
24    A.  Yes.
25    Q.  Can you just tell us why that
```

Page 65

```
1              Bonita "Bo" Runyon
2  appears to be the case from your
3  perspective?
4     A.  Well, the price point is one
5  I -- the price point on Jason
6  Scott's -- the true Jason Scott pieces
7  are going to be more than the
8  knock-offs.  So the people that are
9  buying the knock-offs are, you know,
10 lowering the value of and the -- the
11 uniqueness of his pieces.
12    Q.  Are you aware of whether
13 Trendily has copied any other Jason
14 Scott pieces besides the desk, the
15 buffet, and the table?
16    A.  Just whenever I asked Chris
17 if there were going to be other pieces,
18 he said that the round -- because I
19 sell a lot of round tables -- that the
20 round dining room tables would be --
21 that they would be knocking off the
22 round dining room tables as well.
23    Q.  And how about more recently,
24 have you --
25    A.  No.
```

email@tobyfeldman.com            Toby Feldman, Inc.              Certified WOB
tobyfeldman.com                NATIONWIDE SERVICES             (800) 246.4950

Bonita "Bo" Runyon                                                    6/27/2018

Page 66

1           Bonita "Bo" Runyon
2      Q.   -- seen any Trendily pieces
3   lately?
4      A.   No.
5      Q.   Do you still do business with
6   Trendily?
7      A.   No.
8      Q.   To your knowledge, has
9   Trendily copied anyone else's furniture
10  besides Jason Scott?
11     A.   Yes.  They copied --
12     Q.   That was going to be my next
13  question.
14     A.   Yes.  They copied Paul
15  Roberts, Massoud.  They actually --
16  Rahul wanted to buy a chair and a half
17  that Massoud had done so that he could
18  make it.
19     Q.   So --
20     A.   So he could copy it.  He
21  wanted to buy the Massoud chair and a
22  half from me at my -- at cost so that
23  he could make it, remake it.
24     Q.   He talked to you about that?
25     A.   Yes.  He said he liked it and

Page 67

1           Bonita "Bo" Runyon
2   he wanted to, you know, make it,
3   because he wanted my business.  He
4   wanted to -- so instead of me buying
5   from Massoud, he wanted me to buy it
6   from him.
7      Q.   When did that conversation
8   happen, about?
9      A.   I don't recall.  Some -- I
10  don't know if it was last year.  Last
11  year or the year before.  I'm not sure.
12     Q.   Within the last couple of
13  years?
14     A.   Yes.
15     Q.   And, again, I'm not in
16  furniture.  A chair and a half, what is
17  that?
18     A.   It's a chair -- it's a big,
19  oversized chair with a chaise on it,
20  connected to it.  A big lounger-type
21  chair.
22     Q.   Did he buy it from you?
23     A.   No.
24     Q.   Did you offer it -- did you
25  agree to sell it to him?

Page 68

1           Bonita "Bo" Runyon
2      A.   No.
3      Q.   Do you know if Trendily
4   actually did copy that chair?
5      A.   I don't.
6           MR. DIETRICH:  I don't have
7   any other questions for you at
8   this time.  Thank you.
9           THE WITNESS:  You're welcome.
10          MR. DIETRICH:  Chuck will
11  probably have some questions for
12  you.
13          MR. GREEN:  Yeah, I have a
14  few.
15             EXAMINATION
16  BY MR. GREEN:
17     Q.   You stated fairly early in
18  your testimony that you've had the
19  Runyon's furniture store in Roanoke for
20  five years but you've been in the
21  furniture business for 20 years, right?
22     A.   Yes.
23     Q.   And during that five-year
24  period where you've had Runyon's, have
25  you carried Jason Scott furniture --

Page 69

1           Bonita "Bo" Runyon
2           MR. DIETRICH:  I'm sorry.  Go
3   ahead.
4           MR. GREEN:  Did I -- okay,
5   wait.
6           MR. DIETRICH:  I think that
7   misstates testimony.
8           MR. GREEN:  I'll clarify.
9           MR. DIETRICH:  I'll object.
10          MR. GREEN:  Yeah, I think I
11  said it wrong.
12     Q.   (By Mr. Green)  You've been
13  in the furniture business 20 years as
14  Runyon's Furniture.
15     A.   Uh-huh, yes.
16     Q.   All right.  And I
17  misstated -- that five-year period I
18  was talking about was the five-year
19  period that you have been selling Jason
20  Scott furniture --
21     A.   Yes.
22     Q.   -- correct?  So prior to that
23  you didn't sell Jason Scott furniture.
24  You sold other kinds of furniture.
25     A.   Yes.

18  (Pages 66 to 69)

Page 70

```
 1              Bonita "Bo" Runyon
 2      Q.   But high-end furniture as
 3  well?
 4      A.   No.  I opened in Roanoke a
 5  little over six years ago.
 6      Q.   Okay.  Maybe I was right.
 7          MR. DIETRICH:  Maybe.
 8      Q.   (By Mr. Green)  Why don't you
 9  tell us about that again, your
10  furniture history leading up to the
11  opening of your store in Roanoke.
12      A.   Well, I've been in the
13  business over 20 years.  We had a
14  Runyon's -- we've been Runyon's Fine
15  Furniture or Runyon's Furniture for
16  over 20 years.
17      Q.   Okay.  Did you have another
18  location before your Roanoke?
19      A.   Yes.
20      Q.   And where was that?
21      A.   In Fort Worth.
22      Q.   Okay.  Where in Fort Worth?
23      A.   At Haltom City, 820 and 377.
24      Q.   Okay.  And so six years ago
25  you opened the location in Roanoke?
```

Page 71

```
 1              Bonita "Bo" Runyon
 2      A.   Yes.
 3      Q.   Did you close the one in
 4  Haltom City?
 5      A.   After a year.
 6      Q.   Okay.  And do those stores
 7  differ in the type of furniture they
 8  carry?
 9      A.   Yes.
10      Q.   How so?
11      A.   My original store in Fort
12  Worth was Ashley's type -- it was an
13  Ashley furniture store.
14      Q.   Okay.
15      A.   We carried a lot of Ashley
16  furniture, which is a very low-end
17  furniture.
18      Q.   Okay.
19      A.   A lot of import.  When I
20  opened up my store in Roanoke a little
21  over six years ago, I was determined
22  and didn't want to do anything like my
23  other store.  I wanted to be high end,
24  unique --
25      Q.   Why is that?
```

Page 72

```
 1              Bonita "Bo" Runyon
 2      A.   Because the low-end furniture
 3  stores is very competitive and a lot of
 4  work.  And --
 5      Q.   You had to sell more pieces?
 6      A.   Yes, yes.
 7      Q.   Lower profit margin?
 8      A.   Yes.
 9      Q.   You had to work harder to
10  make money?
11      A.   Yes.
12      Q.   And you said earlier that
13  you -- that you first learned that
14  Trendily was -- was -- I think you were
15  asked, was copying Jason Scott
16  furniture about the time you talked
17  with Chris.
18      A.   Yes.
19      Q.   He called you up and wanted
20  to come make a sales call, basically?
21      A.   Yes.
22      Q.   And you agreed to that,
23  right?
24      A.   Yes.
25      Q.   But in that conversation, the
```

Page 73

```
 1              Bonita "Bo" Runyon
 2  subject of the Jason Scott look-alike
 3  came up.
 4      A.   Yes.
 5      Q.   The Jason Scott question came
 6  up during that conversation?
 7      A.   Yes.
 8      Q.   Okay.  And -- and you asked
 9  him to send you pictures of it, of what
10  they were going to offer on that?
11      A.   Yes.
12      Q.   And that -- that Dropbox link
13  that he sent you in our Exhibit 3 shows
14  that that was on August the 15th of
15  2017, right?
16      A.   Yes.
17      Q.   That link, I believe you
18  said, included other items of Trendily
19  furniture --
20      A.   Yes.
21      Q.   -- right?  But it also
22  included the ones that they were trying
23  to sell that had been called the Jason
24  Scott knock-offs?
25      A.   Yes.
```

Page 74

```
 1              Bonita "Bo" Runyon
 2       Q.   Okay.  Did it include any
 3   other than the three pieces that you've
 4   talked about so far:  the table, the
 5   desk, and the buffet?
 6       A.   I'm sorry?
 7       Q.   Did the -- what we've been
 8   calling Jason Scott knock-offs that
 9   were being offered by Trendily at that
10   time that was your understanding and
11   they sent you the pictures, did they
12   include pictures of any other Jason
13   Scott pieces other than those three?
14       A.   No.
15       Q.   Okay.  And when you talked to
16   them, you asked were they going to
17   offer others, and --
18            MR. DIETRICH:  Objection.
19       Q.   -- that's when they said the
20   round table?
21            MR. DIETRICH:  Form.
22       A.   Yes.
23       Q.   (By Mr. Green)  So how
24   soon -- this e-mail with the Dropbox
25   link is on the 15th.  Is that -- was
```

Page 75

```
 1              Bonita "Bo" Runyon
 2   that right after he came to the store
 3   and met with y'all or right before?
 4       A.   I don't recall.
 5       Q.   But it was very close --
 6   either right before or right after?
 7       A.   Yes, sir.
 8       Q.   Would it be the same day?
 9       A.   I don't recall.
10       Q.   Okay.  Would it -- would it
11   refresh your memory if the transcript
12   that was made of the -- of the
13   recording of the meeting that took
14   place says that it was on the 15th?
15       A.   Okay.  So it was the night,
16   then.  It must have been the night
17   after we met.
18       Q.   Okay.  So did he come -- did
19   they come to your office early in the
20   morning?
21       A.   It wasn't early.  I think --
22   it seems like it was around afternoon.
23       Q.   Okay.  And so this -- this
24   e-mail that he sent with the Dropbox
25   shows that it was sent at 10:00 o'clock
```

Page 76

```
 1              Bonita "Bo" Runyon
 2   in the morning.  You've got a copy of
 3   that, too, right, Exhibit Number 3?
 4       A.   Is that this one?  Yes.
 5       Q.   The e-mail from Chris Sanders
 6   to Runyon's Fine Furniture was on
 7   August 15th, at 10:00 in the evening,
 8   okay?  10:00 in the evening.
 9       A.   Yes.
10       Q.   Okay.  So that -- the
11   meeting, then -- it helps explain it.
12   The meeting was earlier that day.  He
13   told you he would send you a Dropbox
14   with photographs, and he did that later
15   that evening?
16       A.   Yes.
17       Q.   Okay.  And then you forwarded
18   that same e-mail with the same link to
19   the Dropbox to Jason Scott?
20       A.   Yes.
21       Q.   Right?
22       A.   Yes.
23       Q.   Okay.  E-mail always kind of
24   has -- it confuses some of the old guys
25   because it looks like the e-mail to
```

Page 77

```
 1              Bonita "Bo" Runyon
 2   Chris Sanders that was forwarding the
 3   Dropbox link to you was at 10:00 p.m.,
 4   and then it shows that you forwarded
 5   the Trendily e-mail to Jason Scott at
 6   9:53 p.m.
 7            MR. DIETRICH:  I can clear
 8       that up if you like.  That's an
 9       Arizona time/Texas time
10       difference, and this was produced
11       by Jason.  So the 9:53 would be
12       Arizona time.
13            MR. GREEN:  Okay.
14       Q.   (By Mr. Green)  So maybe we
15   understand that.  Does that make sense
16   to you?
17       A.   Yeah.  Yes.
18       Q.   Okay.  So do you know what
19   the redacted portion at the top is
20   that's blacked out on this exhibit?
21       A.   No.
22       Q.   Okay.  So -- so we have our
23   sequence correct, it's your testimony
24   that you first learned that -- that
25   Trendily was offering Jason Scott
```

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                  (800) 246.4950

**Bonita "Bo" Runyon**                                      6/27/2018

Page 78

```
 1              Bonita "Bo" Runyon
 2  knock-offs about August 15th, when
 3  Chris called you by telephone, and then
 4  that followed up with a meeting, right?
 5       A.   Yes.
 6       Q.   And then he sent you the
 7  Dropbox link, and you, within the hour,
 8  forwarded that to -- to Jason Scott,
 9  correct?
10       A.   Yes, yes.
11       Q.   Okay.  I'm using Jason Scott.
12  That's his full name is Jason Scott --
13  or do you know his last name?
14       A.   Forsberg.
15       Q.   Forsberg.  So there's no
16  confusion, if I call him Jason Scott,
17  you know who I'm talking about?
18       A.   Yes.
19       Q.   That's the trade name that he
20  uses, right?
21       A.   Yes.
22       Q.   Okay.  So the -- the
23  affidavit that was marked as Exhibit
24  5 -- you have a copy of that, right?
25       A.   Yes.
```

Page 79

```
 1              Bonita "Bo" Runyon
 2       Q.   Who sent you the affidavit?
 3       A.   Who sent me the affidavit?
 4       Q.   Yes, yes.  Someone sent you
 5  an affidavit, and you signed it, had it
 6  notarized, and sent it back, right?
 7       A.   Yes.
 8       Q.   You didn't -- you didn't have
 9  it notarized.  It's not notarized,
10  right?
11       A.   Right.
12       Q.   So you signed it and sent it
13  back?
14       A.   I signed it and sent it back.
15       Q.   Okay.  Who sent it to you?
16       A.   I believe it was --
17            THE WITNESS:  Would it have
18  been you, Tom?
19            MR. DIETRICH:  It could have
20  been me or Jason.
21            Q.   (By Mr. Green)  Well,
22  let's -- let's just get our testimony
23  and not Mr. Dietrich's testimony.
24       A.   Okay.  All right.
25       Q.   Do you believe that he's the
```

Page 80

```
 1              Bonita "Bo" Runyon
 2  one that sent it to you?
 3       A.   I don't recall.
 4       Q.   Do you -- did you talk to him
 5  before about it?
 6       A.   I'm sure I did.
 7       Q.   Okay.  And do you know how
 8  many times you talked to him about it?
 9       A.   I don't recall.
10       Q.   Okay.  So he sent you an
11  e-mail that is -- I take it he sent you
12  the declaration by e-mail, the form for
13  it?
14       A.   Yes.  I -- I'm guessing, yes.
15       Q.   Okay.  And so this is what he
16  wanted you to sign, and you signed it
17  and returned it, correct?
18            MR. DIETRICH:  Objection,
19  form.
20       A.   I'm sorry --
21       Q.   (By Mr. Green)  Exhibit
22  Number 5 --
23       A.   Yes.
24       Q.   -- that's in front of you,
25  right?
```

Page 81

```
 1              Bonita "Bo" Runyon
 2       A.   Yes.
 3       Q.   That you signed, correct?
 4       A.   Yes.
 5       Q.   And you signed it on the 21st
 6  of July --
 7       A.   Uh-huh.
 8       Q.   -- of 2017, right?
 9       A.   Yes.
10       Q.   And he sent it to you, and
11  you made no changes to it, right?
12            MR. DIETRICH:  Objection,
13  form.
14       A.   Yes.
15       Q.   (By Mr. Green)  And you
16  signed it and sent it back?
17       A.   Yes.
18       Q.   So the document you received
19  was in the language of the attorney who
20  sent it to you, correct?
21            MR. DIETRICH:  Objection,
22  form; foundation.
23       A.   It was my statement.
24       Q.   (By Mr. Green)  You didn't --
25  did you tell him this -- this is the
```

21 (Pages 78 to 81)

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                          NATIONWIDE SERVICES                   (800) 246.4950

Page 82

1          Bonita "Bo" Runyon
2    information you gave him in your
3    telephone call with him?
4          A.   Apparently, yes.
5          Q.   And so that's what -- that's
6    the testimony that you gave to him,
7    right?  Your description?
8          A.   Yes.
9          Q.   So he's just using your
10   words?
11         A.   Yes.
12         Q.   That's your testimony?
13         A.   Yes.
14         Q.   Would it surprise you that
15   there are declarations of other people
16   that has the exact same words?
17              MR. DIETRICH:  Objection,
18         form; foundation.
19         A.   It wouldn't surprise me.
20         Q.   (By Mr. Green)  It wouldn't
21   surprise you?  So you think that they
22   used the exact same words when they
23   were describing it to counsel, and he
24   wrote up the exact same affidavit, and
25   y'all said it in the exact same words?

Page 83

1          Bonita "Bo" Runyon
2              MR. DIETRICH:  Objection,
3         form; foundation.
4          Q.   (By Mr. Green)  Is that what
5    you're telling us?
6              MR. DIETRICH:  Argumentative.
7          A.   This is my statement.  This
8    is what I'm saying.  I don't know what
9    everybody else is saying.
10         Q.   (By Mr. Green)  But it's your
11   testimony here today that -- that you
12   gave this exact information to counsel
13   by telephone, he typed it up as your
14   words, sent it to you, and you signed
15   it, right?
16         A.   These are my words, yes.
17         Q.   Okay.  And you have no
18   explanation for, I guess, then, that
19   there would be other witnesses who
20   signed declarations and they are word
21   for word the same except for
22   identifying who you are and how long
23   you've been in the business?
24              MR. DIETRICH:  Objection,
25         form; foundation.

Page 84

1          Bonita "Bo" Runyon
2          A.   I would not know.
3          Q.   (By Mr. Green)  You don't
4    know how that happened, right?
5          A.   No.
6          Q.   Okay.  Now, so that tells us
7    that your testimony about when you
8    heard about Trendily selling these
9    knock-off pieces of Jason Scott really
10   is not true.  It wasn't in August.  You
11   heard about it in July, right?
12              MR. DIETRICH:  Objection,
13         form; foundation, argumentative.
14         Q.   (By Mr. Green)  Is that not
15   right?
16         A.   I'm sorry.  I don't
17   understand your question.
18         Q.   Okay.  When you talked with
19   counsel -- and you believe it was Tom
20   Dietrich, right, that you talked to?
21         A.   Yes.
22         Q.   Is that right?
23         A.   Yes.
24         Q.   Okay.  When you talked -- and
25   you knew that he represented Jason

Page 85

1          Bonita "Bo" Runyon
2    Scott?
3          A.   Uh-huh.
4          Q.   And when you talked to him,
5    he told you that they were worried that
6    Trendily was making copies of the
7    furniture, right?
8              MR. DIETRICH:  Objection,
9         form; foundation.
10         A.   I'm sorry?
11         Q.   (By Mr. Green)  He told you
12   at that time that Jason Scott was
13   concerned that he had learned that
14   Trendily was making what he's calling
15   Jason Scott knock-off pieces, right?
16              MR. DIETRICH:  Objection,
17         form; foundation.
18         A.   Who told me?
19         Q.   (By Mr. Green)  Counsel told
20   you that, right?
21              MR. DIETRICH:  No.
22         Objection, form; foundation.
23         A.   Repeat the question.  The
24   date, you're kind of confusing me.
25         Q.   (By Mr. Green)  Okay.  Well,

22  (Pages 82 to 85)

Page 86

```
 1              Bonita "Bo" Runyon
 2     let's -- you talked on the telephone
 3     before you received what's been marked
 4     as Exhibit 5, the declaration of Bo
 5     Runyon, right?
 6        A.   Yes.
 7        Q.   You talked with him on the
 8     phone.  He's sending you a description
 9     of the Jason Scott line and
10     manufacturers that copy Jason Scott
11     pieces.  And I'm asking you:  Is it
12     true that when he called you, he told
13     you that they were concerned about
14     there was someone who was knocking off
15     Jason Scott pieces?
16        A.   No.
17        Q.   Okay.
18        A.   I called him with the concern
19     that the Jason Scott pieces were
20     being --
21        Q.   So you called him before July
22     21st?
23        A.   I don't recall dates.
24        Q.   Okay.  We know about --
25        A.   That's been a very long time.
```

Page 87

```
 1              Bonita "Bo" Runyon
 2     So I don't recall --
 3        Q.   But we know about -- we know
 4     about -- about the December -- strike
 5     that.
 6             We know about the August 15
 7     meeting that you had, and you said that
 8     you had called Jason and told him that
 9     you were going to have that meeting
10     before it took place, right?
11        A.   Yes.
12        Q.   That's in August.  And I'm
13     asking you, isn't it true that when
14     you -- when you filled out the -- and
15     signed the declaration of Bo Runyon,
16     Exhibit Number 5, that before you
17     signed that, you already knew that
18     Jason Scott was claiming that there
19     were knock-off pieces of his furniture
20     being made by Trendily?
21             MR. DIETRICH:  Objection,
22        form; foundation.  Her testimony
23        is that the call with Chris
24        Sanders --
25             MR. GREEN:  Hey, Counsel?
```

Page 88

```
 1              Bonita "Bo" Runyon
 2     Hey, stop, stop, please.  You can
 3     make your objection.  I don't want
 4     you messing with the testimony.
 5     Okay?  You know that's not right.
 6     Don't do it.  Okay?  We won't have
 7     any problems.  Just don't do that.
 8     You make your objections --
 9             MR. DIETRICH:  Let's just
10        state what the testimony was.
11             MR. GREEN:  You can make your
12        objections, but make your
13        objection for the record, and the
14        judge can rule on those later like
15        it's properly done.  Okay?
16        Q.   (By Mr. Green)  So did you
17     follow my last question?  Let me ask it
18     again.
19        A.   Okay.
20        Q.   Isn't it true that when you
21     talked with Mr. Dietrich before he sent
22     you the declaration of Bo Runyon, that
23     you had -- in that conversation, he
24     told you that Jason Scott was concerned
25     that there were knock-offs of his
```

Page 89

```
 1              Bonita "Bo" Runyon
 2     furniture being made by Trendily?
 3     Isn't that true?
 4        A.   I was concerned that
 5     knock-offs were being made by Trendily.
 6        Q.   Okay.  When did you first
 7     talk with Jason Scott about a Trendily
 8     problem, these knock-offs?  Was it
 9     right before this August 15 meeting?
10        A.   I honestly do not know.
11        Q.   Okay.  So your testimony now
12     is -- was there some other way you
13     learned about the Trendily knock-offs?
14        A.   It's -- I don't know the
15     dates.
16        Q.   Okay.
17        A.   I'm sorry.  It's been a very
18     long time.  I don't know.
19        Q.   So when -- you do know that
20     you called Jason Scott and told him you
21     were going to have a meeting with Chris
22     Sanders, who you've said is the
23     Trendily sales rep?
24        A.   Yes.
25        Q.   Okay.  And Jason Scott said,
```

**Bonita "Bo" Runyon**                                      6/27/2018

---

Page 90

```
 1                Bonita "Bo" Runyon
 2    that's great, why don't you record the
 3    meeting.
 4            MR. DIETRICH:  Objection,
 5        form.
 6        Q.  (By Mr. Green)  Right?
 7            MR. DIETRICH:  Foundation.
 8        A.  He asked if I could record it
 9    when I had my meeting.
10        Q.  (By Mr. Green)  He suggested
11    that you record it, right?
12        A.  Yes.
13        Q.  And have you ever recorded a
14    meeting before with somebody?
15        A.  No.
16        Q.  Okay.  Did you ask him
17    whether or not it was legal to do that?
18        A.  No.
19        Q.  Did you call Mr. Dietrich and
20    ask him whether or not it was legal to
21    do it?
22        A.  No.
23        Q.  Did you know that there are
24    some states where it would be illegal
25    to -- strike that.  Let me go at it a
```

Page 91

```
 1                Bonita "Bo" Runyon
 2    different way.
 3            You said earlier when they
 4    came in the morning or the next day to
 5    visit --
 6        A.  Uh-huh.
 7        Q.  Let me strike that and start
 8    that question over again.
 9            When Chris Sanders and Dara
10    came to your place of business to meet
11    and have the discussion that -- that
12    you've testified to and eventually
13    leads to him sending you the link to
14    the Dropbox -- you know the occasion
15    I'm talking about, right?
16        A.  Yes.
17        Q.  That's the meeting that you
18    recorded, right?
19        A.  Yes.
20        Q.  And you said that you set the
21    phone on the table, and y'all were
22    sitting around the table talking,
23    right?
24        A.  Yes.
25        Q.  And did you tell him you were
```

Page 92

```
 1                Bonita "Bo" Runyon
 2    recording it?
 3        A.  No, I did not.
 4        Q.  Okay.  And so did you know
 5    that in some states that's illegal to
 6    record a conversation with someone
 7    without them knowing it?
 8            MR. DIETRICH:  Objection,
 9        form; foundation.
10        A.  I didn't know that.
11        Q.  (By Mr. Green)  I'm not
12    saying it's illegal in Texas, but did
13    you know that in some states that's
14    illegal?
15        A.  No.
16            MR. DIETRICH:  Same
17        objection.
18        Q.  (By Mr. Green)  Did you ask
19    Jason Scott if that was legal if you
20    did that?
21        A.  No.
22        Q.  Okay.  And you didn't call
23    counsel to ask him if it was legal?
24            MR. DIETRICH:  Objection,
25        form.
```

Page 93

```
 1                Bonita "Bo" Runyon
 2        A.  I have a bad memory, so I
 3    thought it would be a great thing to do
 4    is record my message, also, because I
 5    could never remember.
 6        Q.  (By Mr. Green)  Okay.  So you
 7    went into this meeting with Jason --
 8    with Chris Sanders with the intent of
 9    leading him into discussing the Jason
10    Scott pieces, right?
11            MR. DIETRICH:  Objection,
12        form; foundation --
13        A.  I was interested in the --
14            MR. GREEN:  -- misstates
15        testimony.
16        A.  -- Jason Scott.
17            (Court reporter admonition.)
18        A.  I was very interested in
19    meeting him regarding the Jason Scott.
20        Q.  (By Mr. Green)  Okay.  You
21    didn't have a genuine interest in Jason
22    Scott's -- strike that.
23            You didn't have a genuine
24    interest in the furniture that Trendily
25    was offering you at that point in time,
```

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES                  (800) 246.4950

Page 94

```
 1              Bonita "Bo" Runyon
 2    did you?
 3         A.  I'm sorry?
 4         Q.  You didn't have a genuine
 5    interest in that.  You were trying to
 6    get information from him to help Jason
 7    Scott, right?  That's why you were
 8    recording it.
 9         A.  I was interested in the Jason
10    Scott and also other items, too, but
11    mainly Jason Scott.
12         Q.  Right.  Now, when you talked
13    with -- strike that.
14              (Exhibit 6 marked.)
15         Q.  You've just been handed
16    Exhibit Number 6, which is a transcript
17    of the Trendily recording on August 15,
18    2017.  Do you see that?
19         A.  Yes.
20         Q.  And it says it's an excerpt,
21    at the top?
22         A.  Yes.
23         Q.  Have you seen this before?
24         A.  Yes.
25         Q.  And when did you see it?
```

Page 95

```
 1              Bonita "Bo" Runyon
 2         A.  I don't know.  I've seen it,
 3    but I don't know when I've seen it.
 4         Q.  Was it -- you saw it before
 5    you went down to -- before you
 6    testified at the injunction hearing,
 7    right?
 8         A.  What injunction hearing?
 9         Q.  Didn't you say earlier that
10    you testified at a preliminary
11    injunction hearing in this case?
12         A.  What would that be?  I don't
13    know.  I don't recognize the --
14         Q.  Did you testify earlier in
15    this case before today?
16         A.  On a phone conversation?
17         Q.  Was it --
18              MR. DIETRICH:  It was
19    telephonically.
20         A.  So is this what we're talking
21    about, then?
22         Q.  (By Mr. Green)  Yeah.
23         A.  Okay.
24         Q.  I mean, you testified by
25    phone -- counsel asked you earlier
```

Page 96

```
 1              Bonita "Bo" Runyon
 2    about it.  You testified by phone at a
 3    preliminary injunction hearing, right?
 4         A.  Okay.  Yes, yes.  I'm sorry,
 5    I don't recognize terms.
 6         Q.  But you remember that, right?
 7         A.  Yes.
 8         Q.  And you had seen Exhibit 5
 9    before -- or 6 -- Exhibit 6, the
10    transcript of your meeting with Chris
11    Sanders, you had seen it before that?
12         A.  At one point, yes.
13         Q.  Okay.  Now, I'm just going to
14    go through -- I wanted to ask you a
15    couple of things about this.  If you
16    would go over to page 4, the bottom of
17    page 4.  Do you see the very last line
18    says, "The dining room table is 96 by
19    48."
20              Do you see that?
21         A.  Yes.
22         Q.  Okay.  That's a different
23    size than -- than the Jason Scott
24    dining room table that we've talked
25    about, right?
```

Page 97

```
 1              Bonita "Bo" Runyon
 2         A.  I don't know.
 3         Q.  It's shorter, correct?
 4              MR. DIETRICH:  Objection,
 5    form; foundation.
 6         A.  There are several different
 7    sizes.
 8         Q.  (By Mr. Green)  Okay.  And
 9    did he tell you the cost -- the
10    wholesale cost of the table?
11         A.  Yes.
12         Q.  And what -- what price did he
13    tell you about?
14         A.  1899.
15         Q.  And what is the wholesale
16    cost of the Jason Scott version of that
17    table?
18         A.  I don't recall.
19         Q.  Can you tell me approximately
20    what it -- I know you won't be able to
21    get it exact, but what is your best
22    guess, having handled his furniture for
23    five years, six years?
24         A.  I don't recall.  I don't make
25    my tags when it's --
```

email@tobyfeldman.com
tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES

Certified WOB
(800) 246.4950

**Bonita "Bo" Runyon**                                          6/27/2018

Page 98

1           Bonita "Bo" Runyon
2       Q.   Is your cost -- would it cost
3   you more to buy the dining room table
4   from Jason Scott than it would have
5   been if it was being offered for sale
6   at that time by Trendily?
7       A.   Yes.
8       Q.   Okay.  But you don't know how
9   much more?
10      A.   No.  I'm sorry.
11      Q.   He -- he mentions that the --
12  the table is reclaimed teak, right?
13      A.   Yes.
14      Q.   And it's Indian teak, right?
15      A.   Yes.
16      Q.   That's different from the
17  Jason Scott table.
18          MR. DIETRICH:  Objection,
19  form; foundation.
20      Q.   (By Mr. Green)  Correct?
21      A.   I don't believe so.
22      Q.   Is it your -- where do you
23  think the Jason Scott furniture was
24  made?
25      A.   In a village in South

Page 99

1           Bonita "Bo" Runyon
2   America.  I can't tell you the name
3   because I can't even pronounce it.
4       Q.   Was it made in Indonesia?
5       A.   In one of the villages.  I
6   believe in one of the villages outside
7   of Indonesia.
8       Q.   Okay.  And is it your
9   understanding they bring Indian
10  teakwood into Indonesia to make the
11  table?
12          MR. DIETRICH:  Objection,
13  form; foundation.
14      A.   I don't know.
15      Q.   (By Mr. Green)  So you don't
16  know whether it's the same teakwood or
17  not, right?
18      A.   No.
19      Q.   Okay.  And then down -- if we
20  go on down the transcript there, y'all
21  are discussing the table a little bit.
22  And Dara says, but theirs -- but it's
23  different from theirs.  It's not the
24  same.  Right?  Do you see that?
25      A.   Uh-huh, yes, I see that.

Page 100

1           Bonita "Bo" Runyon
2       Q.   Okay.  It's the same scale
3   but it has a little different look is
4   what she said, right?
5       A.   Yes.
6       Q.   Then if you go over to the
7   next page, page 6.
8       A.   Uh-huh.
9       Q.   And about midway, you say,
10  it's really pretty -- it's similar.
11  It's pretty similar, right?
12      A.   Uh-huh, yes.
13      Q.   You said it was similar,
14  correct?
15      A.   Uh-huh, yes.
16      Q.   And Chris agreed, yeah, it's
17  similar, right?
18      A.   Yes.
19      Q.   And then y'all looked at the
20  sideboard, correct?
21      A.   Yes.
22      Q.   And the sideboard is the
23  buffet?
24      A.   Yes.
25      Q.   Is that your understanding?

Page 101

1           Bonita "Bo" Runyon
2       A.   Yes.
3       Q.   They called it a sideboard.
4   I think y'all call it a buffet or a
5   console.
6       A.   Yes, we --
7       Q.   Are those two terms
8   interchangeable, the console and
9   buffet?
10      A.   They both can be used.
11      Q.   I mean, in your mind --
12  educate us.  We're not in the furniture
13  business.  Is there a difference
14  between a console and a buffet?
15      A.   No.
16      Q.   Okay.  And then I've never
17  seen the term "sideboard."  Have you
18  seen that term used before?
19      A.   Yes.
20      Q.   And is it kind of the same
21  type piece of furniture?
22      A.   Yes.
23      Q.   Is there a difference between
24  what someone in the furniture business
25  would think of as sideboard as opposed

email@tobyfeldman.com                Toby Feldman, Inc.              Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES            (800) 246.4950

Bonita "Bo" Runyon                                          6/27/2018

Page 102

1                 Bonita "Bo" Runyon
2     to a buffet as opposed to console?  Is
3     there a difference?
4         A.   No.
5         Q.   Okay.  Just different words
6     to call the same type furniture?
7         A.   Yes.
8         Q.   The -- the wood of the
9     sideboard was teak as well, right?
10        A.   Yes.
11        Q.   And that, of course, would be
12    Indian teak, correct?
13             MR. DIETRICH:  Objection,
14    form; foundation.
15        A.   That's what they stated in
16    the beginning.
17        Q.   (By Mr. Green)  Right.
18        A.   Yes.
19        Q.   So that would be your
20    understanding, correct?
21        A.   Yes, that would be my
22    understanding, yes.
23        Q.   And then over on the next
24    page, they give you a price for -- for
25    the side -- the sideboard piece, right?

Page 103

1                 Bonita "Bo" Runyon
2         A.   Yes.
3         Q.   And that was 1399?
4         A.   Yes.
5         Q.   Okay.  Do you know whether
6     it's the same size as the buffet
7     offered by Jason Scott?
8         A.   There's many -- there's
9     several different sizes.
10        Q.   Okay.  Well, we've got a
11    picture of Jason Scott's furniture that
12    was identified earlier.
13        A.   Uh-huh.
14        Q.   Exhibit 1, right?
15        A.   Uh-huh, yes.
16        Q.   And it has a picture of the
17    Borgata buffet.  And do you know
18    whether the -- the sideboard that Chris
19    Sanders showed you pictures of was the
20    same size as the Borgata buffet?
21        A.   I'm assuming it was.
22        Q.   Do you know -- don't assume.
23        A.   Uh-huh.
24        Q.   Do you know?  One way or the
25    other, do you know?

Page 104

1                 Bonita "Bo" Runyon
2         A.   Repeat the question.
3         Q.   Yeah.  Do you know, was the
4     sideboard -- you saw pictures of it --
5         A.   Uh-huh, uh-huh.
6         Q.   -- that Chris showed you on
7     August 15th.  Do you know if it was the
8     same size as the Borgata buffet that is
9     listed in -- or shown in Exhibit 1?
10        A.   I believe it was.
11        Q.   And did you ever see it?
12    Have you ever seen any of these
13    Trendily pieces that we've been talking
14    about?
15        A.   Yes.
16        Q.   Seen physically the furniture
17    itself?
18        A.   I've seen the dining room
19    table.
20        Q.   Where did you see the dining
21    room table?
22        A.   At the -- oh, the store in
23    Western Heritage.
24        Q.   At Western Heritage?
25        A.   Yes.

Page 105

1                 Bonita "Bo" Runyon
2         Q.   When did you see that?
3         A.   Sometime last year.
4         Q.   Do you remember when last
5     year?
6         A.   No.
7         Q.   And you saw the dining room
8     table.  Have you ever seen the
9     sideboard?
10        A.   I don't think so, no.
11        Q.   So -- but your testimony is
12    today that you think it's the same size
13    as the Borgata buffet that we're seeing
14    in Exhibit 1, right?
15        A.   Yes.  But that was my e-mail
16    that I sent to Chris on Exhibit 4,
17    wanting him to kind of specify the --
18    the sizes and the scale, because yes,
19    the picture looks exactly like Jason
20    Scott, but there's been knock-offs not
21    to this scale, not to the point where
22    it looks exactly like Jason Scott, but
23    there's been pictures, and it comes in
24    and it's not -- nothing even close.
25        Q.   Okay.

                          27 (Pages 102 to 105)

Bonita "Bo" Runyon                                              6/27/2018

Page 106

```
 1              Bonita "Bo" Runyon
 2      A.  So that's why I was asking
 3  Chris to verify the -- the scale of the
 4  dimensions and everything.
 5      Q.  You've never seen the
 6  Trendily sideboard that is similar to
 7  the Borgata buffet.  You've never seen
 8  it, right?
 9      A.  Not in person, no.
10      Q.  And has anyone ever given you
11  the dimensions of it?
12      A.  That's why I was asking.
13      Q.  You didn't ask about
14  dimensions there.  Did you ever get the
15  dimensions of the piece of furniture?
16      A.  I don't recall.
17      Q.  Okay.  So do you know whether
18  it's the same size?
19      A.  I don't recall.
20      Q.  Okay.  You don't know?
21      A.  I don't know.
22      Q.  Okay.  The dining room table,
23  do you know whether the version that
24  you saw of the dining room table at
25  Western Heritage, which it's your
```

Page 107

```
 1              Bonita "Bo" Runyon
 2  understanding that was a piece of
 3  furniture made by Trendily, right?
 4      A.  Yes.
 5      Q.  That looks similar to the
 6  Jason Scott Sacred Heart dining table,
 7  correct?
 8      A.  It looked a lot like Jason
 9  Scott.
10      Q.  Okay.
11      A.  If I didn't know Jason Scott,
12  you know --
13      Q.  Okay.
14      A.  -- I would not know any
15  different.
16      Q.  So looking at Exhibit 1,
17  which has the Jason Scott furniture
18  shown on it that you identified
19  earlier, it shows the size of the table
20  was 120 by 43 by 31, right?
21      A.  Yes.
22      Q.  Do you know what the
23  dimensions of the table at Western
24  Heritage were?
25      A.  It was a large table, but,
```

Page 108

```
 1              Bonita "Bo" Runyon
 2  no, I didn't --
 3      Q.  It wasn't as long as that
 4  one, was it?
 5          MR. DIETRICH:  Objection,
 6      form.
 7      Q.  (By Mr. Green)  It wasn't the
 8  same size, was it?
 9      A.  I do not know.
10      Q.  So, again, just like with the
11  sideboard, you can't tell us that they
12  were the same size because you haven't
13  really -- you just don't know that,
14  right?
15      A.  I do not know.
16      Q.  Okay.
17      A.  It seems like I asked him
18  those questions, but it's been a while,
19  so I can't recall if I -- what the
20  sizes were.
21      Q.  All right.
22      A.  I know at one point I did ask
23  for the dimensions, but I can't
24  remember what they were.
25      Q.  Okay.  Flip over to -- to
```

Page 109

```
 1              Bonita "Bo" Runyon
 2  page 9 in the statement.  And here
 3  he's -- y'all are talking now about the
 4  desk, correct, about two-thirds of the
 5  way down?
 6      A.  Yes.
 7      Q.  And the desk, he gave you a
 8  cost for that?
 9      A.  Yes.
10      Q.  At 1699?
11      A.  Yes.
12      Q.  And that's the wholesale
13  price.  That's the price you would have
14  had to pay for it if you were going to
15  buy it, right?
16      A.  Through Trendily, yes.
17      Q.  And you -- and you say it
18  looks like a desk that you had up
19  front, right?
20      A.  Yes.
21      Q.  And on the next page Chris
22  tells you that there's a difference in
23  the size, right?
24      A.  Yes.
25      Q.  Yeah.
```

28 (Pages 106 to 109)

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                     NATIONWIDE SERVICES               (800) 246.4950

Page 110

1            Bonita "Bo" Runyon
2       A.   He says, "I believe it's 72
3   inches."
4       Q.   Did you ask -- did you ask
5   Chris how they were able to manufacture
6   the furniture and have it look similar
7   to the Jason Scott piece -- pieces?
8       A.   Repeat the question.
9       Q.   Did you ask him how they were
10  able to make the furniture and have it
11  look like the Jason Scott piece?
12  You've talked about the unique carving
13  on it.
14      A.   No, I don't recall.  I mean,
15  I don't think I asked him how it was
16  made.  Or how -- I asked him how it was
17  made, but I didn't ask him what
18  technique, I don't think.
19      Q.   What did you ask him about
20  how it's made?
21      A.   Well, I mean, as far as the
22  wood and where it was made and stuff
23  like -- and -- yeah.
24      Q.   And your information from
25  that was Indian teak and it was made in

Page 111

1            Bonita "Bo" Runyon
2   India, correct?
3       A.   Yes, I think so.
4       Q.   Is it your understanding that
5   Rahul Malhotra's father runs a
6   manufacturing facility in India?
7       A.   Yes.
8       Q.   And they were the ones that
9   made -- made the furniture?
10      A.   Yes.
11      Q.   Pardon me here.  I'm looking
12  for --
13      A.   Chris did state a size on
14  that desk on page 10.
15      Q.   Okay.
16      A.   He said that the desk is 72
17  inches.
18      Q.   Okay.
19      A.   He believed the desk was 72
20  inches.
21      Q.   Okay.
22      A.   That's the same size as the
23  desk that I had on my floor.
24      Q.   Okay.
25           MR. GREEN:  Why don't we --

Page 112

1            Bonita "Bo" Runyon
2   let's take just few minutes'
3   break.  I'm looking for something,
4   and there's no reason for us all
5   to sit here and --
6           MR. DIETRICH:  Okay.
7           MR. GREEN:  Let's take five
8   minutes.
9           (Recess taken 11:30 a.m. -
10  11:33 a.m.)
11      Q.  (By Mr. Green)  Turn with me
12  on the transcript of the meeting you
13  had with Chris Sanders on Exhibit
14  Number 6.  Turn over to page 7.  And
15  just to kind of preface, you mentioned
16  it earlier, you-all had talked a little
17  bit about availability of product, and
18  he had mentioned that there was a
19  container on the water, which is a ship
20  bringing a container of furniture, and
21  that the furniture that was in that
22  container probably was already sold,
23  right?
24      A.   Yes.
25      Q.   And if you look down to

Page 113

1            Bonita "Bo" Runyon
2   page -- the bottom of page 7, there is
3   a couple of -- there's an exchange
4   between you and Chris.  And he's saying
5   that -- that --
6       A.   Oh, okay.
7       Q.   -- I can call the owner and
8   he and I can talk, and I can find out
9   when it's coming in, which ones are
10  allotted for, and if there are some
11  that are allotted for yet.  Is that
12  fair?  I think he's saying he's going
13  to check and see what the status of
14  that is, right?
15      A.   Yes.
16      Q.   And they never sold you
17  any -- any furniture, right?  He never
18  called back to say, hey, it's
19  available, I can sell it to you now,
20  right?
21      A.   No, I don't believe so.
22      Q.   Okay.  And do you know how
23  many pieces of the Trendily furniture
24  that's been talked about as the Jason
25  Scott knock-off, do you know how many

email@tobyfeldman.com            Toby Feldman, Inc.            Certified WOB
tobyfeldman.com              NATIONWIDE SERVICES            (800) 246.4950

Bonita "Bo" Runyon                                      6/27/2018

Page 114

```
 1            Bonita "Bo" Runyon
 2   were sold?
 3        A.  I do not.  According to what
 4   they're saying here, it looks like it
 5   was hot, hot, hot.
 6        Q.  Do you know how many were
 7   sold?
 8        A.  No, sir.
 9        Q.  Your worry -- your worry from
10   a furniture owner's standpoint, you
11   have a high-end furniture business,
12   right?
13        A.  Yes.
14        Q.  The furniture that you sell
15   is -- is good furniture?
16        A.  Yes.
17        Q.  And it's expensive.
18        A.  Yes.
19        Q.  And not just anybody can
20   afford to buy the furniture that you
21   carry.
22        A.  Correct.
23        Q.  And that would include the
24   Jason Scott furniture.
25        A.  Yes.
```

Page 115

```
 1            Bonita "Bo" Runyon
 2        Q.  And so your fear was that --
 3   that someone would like the fact that
 4   Trendily was offering a similar piece
 5   of furniture -- the table, the desk, or
 6   the buffet -- and offering that to
 7   retailers at a lower price, right?
 8   That wasn't a very good question.  Let
 9   me try that one again.
10        A.  Okay.
11        Q.  Let me try that again.  Your
12   concern was that -- that if Trendily
13   was able to offer that table or the
14   desk or the console at a significantly
15   lower price than Jason Scott was able
16   to offer it to retailers like Runyon's,
17   that then the retail price for those
18   would be less.
19        A.  Yes.
20        Q.  Yeah.  And so the concern was
21   that customers would buy the less
22   expensive piece of furniture that looks
23   just as good.
24        A.  That looks like a Jason Scott
25   piece, yes.
```

Page 116

```
 1            Bonita "Bo" Runyon
 2        Q.  Did -- and that was your
 3   concern?
 4        A.  Yes.
 5        Q.  I guess it would -- it would
 6   lower the income level of the potential
 7   customers for that type of furniture.
 8        MR. DIETRICH:  Objection,
 9   form.
10        Q.  (By Mr. Green)  In other
11   words, they didn't cost as much, and so
12   there would be more people -- out of
13   the universe of furniture shoppers,
14   there would be more people who could
15   afford it if it's offered at a lower
16   price.
17        A.  Yes.
18        Q.  That was -- that was your
19   worry, right?
20        MR. DIETRICH:  Objection,
21   form; foundation.
22        A.  Yes.  But if someone comes in
23   my store and they're interested, I'm
24   going to sell them furniture.  I'll
25   sell them a Jason Scott piece.  But my
```

Page 117

```
 1            Bonita "Bo" Runyon
 2   clientele, they want Jason Scott.
 3        Q.  (By Mr. Green)  Right.  But
 4   if they -- they may want a Jason Scott
 5   piece, but if they can't afford it,
 6   they can't buy it, right?
 7        A.  Yes.
 8        Q.  Have you ever had that
 9   happen?  Someone comes in and says,
10   boy, I like that piece of furniture,
11   but I can't afford it?
12        A.  Occasionally, yes.
13        Q.  Okay.  Just looking at the
14   exhibits that have been -- that you've
15   looked at already, Exhibit Number 1 are
16   photographs of the Jason Scott
17   collection, correct?
18        A.  Yes.
19        Q.  And the first -- the first
20   piece that's on it -- on it is the
21   desk, right?
22        A.  Yes.
23        Q.  And then Exhibit 3 is a
24   picture of the desk, also, correct?
25        A.  Yes.
```

email@tobyfeldman.com                Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                  (800) 246.4950

Bonita "Bo" Runyon                                    6/27/2018

Page 118

1          Bonita "Bo" Runyon
2      Q.   And just looking at it, I
3   noticed they each have the iron --
4   ironwork in it, right?
5      A.   Yes.
6      Q.   The scrolling of it?
7      A.   Yes.
8      Q.   Do you see it?  And the
9   scrolling is similar but it's also
10  different, isn't it?
11     A.   It appears to be a little
12  different.
13     Q.   Yeah.  It is different.  And
14  then if you look at --
15         MR. DIETRICH:  Objection,
16  form.  I would just go back and
17  say this is -- I believe you're
18  looking at Exhibit 2, not 3, as
19  far as the Trendily copies.
20         MR. GREEN:  Okay.
21         MR. DIETRICH:  You had said
22  Exhibit 3.
23         MR. GREEN:  Okay.  Yeah.
24  Thank you.  Thank you.
25     Q.   (By Mr. Green)  And that's

Page 119

1          Bonita "Bo" Runyon
2   what you were looking at, right?
3      A.   Right.  Page 2, yes.
4      Q.   All right.  So we talked
5   about the ironwork, right?  And then
6   look at this piece on the Jason Scott,
7   this carving circle right there.  Do
8   you see that?
9      A.   Yes.
10     Q.   And then you look over at the
11  Trendily piece on Exhibit 2.  They're
12  different, aren't they?
13     A.   They appear to be a little
14  different.
15     Q.   Yeah, they're different,
16  right?  The color is different,
17  correct?
18     A.   I can't tell.  It appears to
19  look just like the color of a Jason
20  Scott piece in my store.
21     Q.   Okay.  So the Exhibit 1 that
22  shows the Jason Scott furniture that
23  was introduced earlier --
24     A.   Yes.
25     Q.   -- it doesn't really show the

Page 120

1          Bonita "Bo" Runyon
2   color in a fair way.  Would that be
3   fair?
4          MR. DIETRICH:  Objection,
5   form.
6      A.   In the picture in -- yes.
7      Q.   (By Mr. Green)  I'm not sure
8   that we're communicating there.  The
9   furniture showed on Exhibit 1 that you
10  earlier testified was Jason Scott
11  furniture and --
12     A.   Yeah.
13     Q.   It says it at the top of the
14  page, right?  Does that color
15  accurately show what the furniture
16  looked like?
17     A.   No, but I know what the --
18  yeah, no.
19     Q.   Because clearly it's
20  different -- the color is different
21  between the furniture shown in Exhibit
22  2 and the furniture shown in Exhibit 1,
23  correct?
24     A.   Yes.  But when I take a
25  picture of a Jason Scott piece in my

Page 121

1          Bonita "Bo" Runyon
2   store, it looks like that on my camera,
3   on my phone.
4      Q.   It looks like -- it looks
5   like what?
6      A.   The Exhibit 2.
7      Q.   Okay.
8      A.   This -- this is just really
9   for me.  All these pictures are so
10  deceiving, though.  This is actually
11  too yellow and this doesn't show, so
12  the pictures are very deceiving.
13         MR. GREEN:  Can you mark
14  that, please?
15         (Exhibit 7 marked.)
16     Q.   (By Mr. Green)  You've been
17  handed Exhibit Number 7, right?
18     A.   Yes.
19     Q.   Do you recognize that
20  picture?
21     A.   Yes.
22     Q.   And tell us what that is.
23     A.   It's a Jason Scott piece.
24     Q.   Do you know where it's taken?
25     A.   In my store.

31  (Pages 118 to 121)

Bonita "Bo" Runyon                                                        6/27/2018

| Page 122 |
|---|

1              Bonita "Bo" Runyon
2        Q.   Okay.  And that picture is on
3   your website, right?
4        A.   I believe so, yes.
5        Q.   Okay.  Does that picture
6   accurately show the color of the
7   furniture?
8        MR. DIETRICH:  Objection.
9   This piece or all the furniture?
10       Q.   (By Mr. Green)  I asked this
11  piece, the one we're looking at, does
12  it show the color?
13       A.   No, that's not -- I mean,
14  that's not a good picture.
15       Q.   The one from your website?
16       A.   Yeah.
17       Q.   Okay.  Is this the color
18  of -- is this the look -- strike that.
19       Does Exhibit 7 -- that shows
20  a piece of Jason Scott furniture from
21  your collection at Runyon's, right?
22       A.   Yes.
23       Q.   And is that the look of Jason
24  Scott furniture in terms of the color?
25       A.   That's a very simple piece.

| Page 123 |
|---|

1              Bonita "Bo" Runyon
2   That's a different -- it's not the
3   carved collection of Jason Scott.
4        Q.   Okay.  Okay.  Answer my
5   question about the color.  Is that the
6   color that is the look of Jason Scott?
7        MR. DIETRICH:  Objection,
8   form.
9        Q.   (By Mr. Green)  Is it the
10  same?
11       A.   The picture doesn't do it any
12  justice whatsoever.
13       Q.   It may not do it
14  justice, but if -- is that the same
15  look as the other furniture that you --
16  that you sell?
17       MR. DIETRICH:  Objection,
18  form.
19       Q.   -- of Jason Scott?
20       A.   No, this is not the look,
21  because my other pieces are more --
22  more ornate and more carving.
23       Q.   Okay.  That one doesn't have
24  carvings, does it?
25       A.   No.

| Page 124 |
|---|

1              Bonita "Bo" Runyon
2        (Exhibit 8 marked.)
3        Q.   You've been handed Exhibit
4   Number 8, right?
5        A.   Yes.
6        Q.   Can you identify what's shown
7   in Exhibit Number 8?
8        A.   Jason Scott console.
9        Q.   Okay.  And that's the table
10  in the background?
11       A.   Yes.
12       Q.   I say "table," you said
13  "console."  Is that -- is there a
14  difference?  It's a -- is that a narrow
15  table that fits up against a wall, a
16  console?  Is that what you're talking
17  about?
18       A.   Yes.
19       Q.   Is that color typical of the
20  Jason Scott line?
21       A.   Yes.  The picture doesn't do
22  it any justice, though.
23       Q.   It may look even better, but
24  that's the color of it, right?
25       A.   Yes.

| Page 125 |
|---|

1              Bonita "Bo" Runyon
2        MR. DIETRICH:  Objection,
3   form.
4        Q.   (By Mr. Green)  And --
5        (Exhibit 9 marked.)
6        Q.   You've been handed Exhibit
7   Number 9.  Can you tell us what's shown
8   in Exhibit Number 9?
9        A.   The Casa Bonita dining room
10  table and two Jason Scott chairs, side
11  chairs, and a buffet.
12       Q.   Okay.  Let me back up.
13       A.   Console.
14       Q.   Let me back up and take them
15  one at a time.  The Casa Bonita dining
16  room table, that's the table that's
17  shown in the picture, right?
18       A.   Yes.
19       Q.   Is that a Jason Scott piece?
20       A.   No.
21       Q.   Okay.  Who manufactured that
22  piece of furniture?
23       A.   Casa Bonita.  It's from Peru.
24       Q.   Okay.  And it has -- looks
25  like it has carving on the top and --

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                          NATIONWIDE SERVICES                  (800) 246.4950

Bonita "Bo" Runyon                                            6/27/2018

Page 126

1              Bonita "Bo" Runyon
2       A.   There's no carving.  It's
3   just painting.
4       Q.   Okay.  Just painted, all
5   right.  And then the chairs are Jason
6   Scott chairs?
7       A.   Yes.
8       Q.   Okay.  And the color of those
9   chairs, is that typical of the Jason
10  Scott look for the color of their
11  furniture?
12      A.   Yes.  But, again, the picture
13  doesn't do it justice.
14      Q.   Right.  And then to the -- to
15  the right in the picture, there is a --
16  is that a console?
17      A.   A buffet.
18      Q.   A buffet?
19      A.   Yes.
20      Q.   Which is the same thing,
21  right?
22      A.   Yes.
23      Q.   Is that a Jason Scott buffet?
24      A.   It is.
25      Q.   It's different from the one

Page 127

1              Bonita "Bo" Runyon
2   we looked at that was in Exhibit Number
3   1, right?
4       A.   Yes.
5       Q.   That was a different buffet,
6   but -- there's one made by hand, right?
7       A.   Yes, sir.
8       Q.   And it has some carving on
9   it, on the front?
10      A.   Yes.
11      Q.   Great.  Is the color of that
12  piece typical of the Jason Scott look?
13          MR. DIETRICH:  Objection,
14  form.
15      A.   They're all the same color.
16      Q.   (By Mr. Green)  Pardon me?
17      A.   They're all the same color.
18  That's what distinctly -- but these
19  aren't good pictures when it comes to
20  the coloring part of it.
21          (Exhibit 10 marked.)
22      Q.   You've got now Exhibit Number
23  10 in front of you, right?
24      A.   Yes.
25      Q.   And this is a picture of --

Page 128

1              Bonita "Bo" Runyon
2   is it a Jason Scott bed frame?
3       A.   Yes.
4       Q.   And it's -- there's two end
5   tables that are shown.  Are they Jason
6   Scott pieces as well?  Can you tell?
7       A.   No.
8       Q.   No, you can't tell, or no,
9   they are not?
10      A.   No, they are not.  I can't
11  tell if this one is, but the one on the
12  left is not a Jason Scott.
13      Q.   Okay.  There's -- there's a
14  piece of furniture that's on -- to the
15  right of the photograph, and you're not
16  sure about whether that's a Jason Scott
17  piece or not, right?
18      A.   That's correct.
19      Q.   Okay.  Does the bed, is that
20  typical of the color of the Jason Scott
21  furniture?
22      A.   Yes.
23          (Exhibit 11 marked.)
24      Q.   Okay.  You've been handed
25  Exhibit Number 11.  And this is another

Page 129

1              Bonita "Bo" Runyon
2   picture that shows a Jason Scott piece
3   of furniture, correct?
4       A.   Yes.
5       Q.   What is that one that we're
6   looking at?
7       A.   I would call it a buffet.
8       Q.   A different --
9       A.   A cabinet.
10      Q.   A differently styled one than
11  the ones we've seen so far, right?
12      A.   Yes.
13      Q.   It has carving on it of
14  different sorts.
15      A.   Yes.
16      Q.   And it's typical of the color
17  of the Jason Scott line.
18      A.   Uh-huh.
19      Q.   And then kind of in the lower
20  left-hand corner is just a corner of a
21  photograph -- of a piece of
22  furniture --
23      A.   Yes.
24      Q.   -- that shows in the
25  photograph, right?

                              33 (Pages 126 to 129)

Page 130

1            Bonita "Bo" Runyon
2       A.   Yes.
3       Q.   Can you tell from that little
4    corner whether it's a Jason Scott
5    piece?
6       A.   It is.
7       Q.   Okay.
8            (Exhibit 12 marked.)
9       Q.   Okay.  In front of you is
10   Exhibit Number 12, right?
11      A.   Yes.
12      Q.   And it shows a table and some
13   chairs.  Do you recognize the
14   photograph?
15      A.   Yes.
16      Q.   From your store?
17      A.   Yes.
18      Q.   Okay.  And that is -- that's
19   not a Jason Scott table, right?
20      A.   That is not.
21      Q.   And they are not Jason Scott
22   chairs, right?
23      A.   No.
24      Q.   They each have -- the chairs
25   have intricate carving all over them,

Page 131

1            Bonita "Bo" Runyon
2    right?
3       A.   Yes.
4       Q.   And they have -- are these
5    nail -- nail heads along --
6       A.   Yes.
7       Q.   What do you call those?
8       A.   Nail heads.
9       Q.   Okay.  And so nail heads are
10   also used on some of the Jason Scott
11   furniture as well, right?
12      A.   Yes.
13      Q.   But that's used on a lot of
14   different kinds of furniture, correct?
15      A.   Yes.
16      Q.   And on the high-end
17   furniture, you run across a lot of
18   furniture that has carving.
19      A.   No.
20      Q.   Not a lot?  Some?
21      A.   Some.
22      Q.   Yeah, some.  Some of the
23   other pieces, manufacturers that you
24   carry have carving on the furniture,
25   right?

Page 132

1            Bonita "Bo" Runyon
2       A.   Most of my pieces are -- the
3    carving -- Jason Scott's pieces are the
4    carved -- are the ones with more
5    carving and more ornate.
6       Q.   Yeah.  They may have more
7    carving, but, like, for instance, the
8    picture that we're looking at, Exhibit
9    Number 12, shows those chairs, and
10   there is lots of carving all over those
11   chairs, right?
12      A.   There is some carving, yes.
13      Q.   And who is the manufacturer
14   of those chairs?
15      A.   Casa Bonita, I believe.  I
16   believe those are Casa Bonita.
17      Q.   So does that mean that
18   they're from Peru?
19      A.   I believe so, yes.  Yes.
20   These could be -- these are import.
21   I'm not real sure if they're Casa
22   Bonita or not.  So I never really --
23   I've never gone and researched exactly
24   where those chairs are from.
25      Q.   Yeah.

Page 133

1            Bonita "Bo" Runyon
2       A.   I think they're Casa Bonita.
3       Q.   Let's look just for a second
4    at the -- at the Sacred Heart dining
5    table that is shown in Exhibit Number
6    1.
7       A.   Okay.
8       Q.   Okay?  And this is a Jason
9    Scott piece of furniture, right?
10      A.   Yes.
11      Q.   The color shown, just from
12   what we've looked at, it may not be a
13   completely accurate representation of
14   the color.
15      A.   Yes.
16      Q.   Is that fair?
17      A.   That's fair.
18      Q.   And you notice -- let's go
19   ahead and get out Exhibit Number 2,
20   also, which has a picture of the
21   Trendily table, correct?
22      A.   Yes.
23      Q.   The carving on the -- it's a
24   pedestal table, right?
25      A.   Yes.

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                          NATIONWIDE SERVICES                  (800) 246.4950

Page 134

```
1              Bonita "Bo" Runyon
2         Q.   It has two pedestal bases?
3         A.   Yes.
4         Q.   Those are structural,
5    right --
6         A.   Yes.
7         Q.   -- that hold up?  That's
8    their function?
9         A.   Yes.
10        Q.   The tabletop, obviously, is
11   the -- the top of the table, that has
12   the function of making it useful as a
13   table, correct?
14        A.   Yes.
15        Q.   Okay.  The Jason Scott
16   version has these nail heads across --
17   these nail -- strike that.
18             The Jason Scott version on
19   Exhibit 1 has the nails at the bottom
20   part of the pedestal bases, right?
21        A.   Yes.
22        Q.   And if you look at the -- at
23   the Trendily version, it does not, on
24   Exhibit 2.
25        A.   It does not.
```

Page 135

```
1              Bonita "Bo" Runyon
2         Q.   And if you look at the
3    carving, the carvings are similar but
4    they're not exactly the same, right?
5         MR. DIETRICH:  Objection,
6    form.
7         A.   They appear to be exactly,
8    from what I can see.
9         Q.   Just looking at the two
10   tables, do you know if the -- if the
11   nails that were used on the Trendily
12   piece are the same as the ones used in
13   the Jason Scott?
14        A.   Do I know if they're the same
15   nail used?
16        Q.   Yes.
17        A.   I do not know.
18        Q.   Because it looks like they
19   have a different look.  They look
20   bigger in the Trendily version.  Does
21   that -- do you agree with that?
22        A.   Well, the pictures are kind
23   of a different distance.  So I really
24   can't say for sure if they're the same
25   or not.
```

Page 136

```
1              Bonita "Bo" Runyon
2         Q.   Okay.  And does it look to
3    you, also, that the tabletop on the
4    Jason Scott version, it's a little
5    thicker?
6         A.   I can't tell that by the
7    picture.
8         Q.   If the nail heads are the
9    same size, then the top on the Jason
10   Scott Collection would be -- would be a
11   thicker tabletop.  Agree?
12        MR. DIETRICH:  Objection,
13   form.
14        A.   I can't say that for sure,
15   based on the picture.  I've seen it in
16   person, and it appeared to look exactly
17   like --
18        Q.   But you didn't see them side
19   by side, right?
20        A.   No, I did not.
21        Q.   Okay.  We know they have a
22   similar appearance.
23        A.   Yes.
24        Q.   I'm just trying to go to the
25   details on it.
```

Page 137

```
1              Bonita "Bo" Runyon
2         A.   Yes.
3         Q.   And just from looking at the
4    picture -- and looking at pictures is
5    not perfect, but if you look at the
6    size of the -- of the nail heads, I
7    know you're not sure that they're the
8    same, but if they were the same, then
9    the -- the tabletop is thicker on
10   the -- the Jason Scott version.
11        MR. DIETRICH:  Objection.
12        Q.   (By Mr. Green)  Agreed?
13        MR. DIETRICH:  Objection,
14   form.
15        A.   I can't say that for sure
16   because the pictures -- when you take
17   pictures, one, you're taking at a
18   picture looking down at the table, and
19   one you're looking up at the table.
20        Q.   (By Mr. Green)  Right.
21        A.   So I can't --
22        Q.   No.  And similarly if we
23   switched the assumption and the nail
24   heads are different, then the nail
25   heads are different, right?
```

Page 138

```
 1          Bonita "Bo" Runyon
 2          MR. DIETRICH:  Objection,
 3   form.
 4      A.   Again, the picture, you
 5   can't -- I'm looking at a picture --
 6      Q.   (By Mr. Green)  Either way,
 7   you can't tell whether the thickness of
 8   the tabletop is the same, correct?
 9      A.   I can't tell because, again,
10   one picture you're looking down at the
11   table, and the other picture, the
12   Trendily table, you're -- we're looking
13   up.
14      Q.   Right.
15      A.   The Trendily picture, we're
16   looking up --
17      Q.   I agree with you it's not a
18   perfect comparison.
19          THE REPORTER:  Wait, wait,
20   wait.
21      Q.   I agree with you it's not a
22   perfect comparison.
23          THE REPORTER:  You're going
24   to have to let her finish before
25   you jump in.
```

Page 139

```
 1          Bonita "Bo" Runyon
 2          MR. GREEN:  Right.  I get
 3   impatient sometimes.
 4      Q.   (By Mr. Green)  Now, let's
 5   look at the kind of the carved skirt
 6   underneath the tabletop.  Do you see
 7   that?
 8      A.   Yes.
 9      Q.   Just from the picture -- and
10   the picture may not be perfect, but
11   from just looking at the picture, the
12   Trendily version looks like it's
13   thicker, correct?
14          MR. DIETRICH:  Objection,
15   form.
16      A.   I can't say that for sure.
17   Again, the pictures are taken at a
18   different, you know -- again, the Jason
19   Scott photo is looking down at the
20   table, and the Trendily table is
21   looking up at the table.
22      Q.   (By Mr. Green)  Okay.  But --
23   so you don't agree that just from --
24   poor as the picture may be, the
25   comparison may be, just going from that
```

Page 140

```
 1          Bonita "Bo" Runyon
 2   alone, that the skirt looks thicker on
 3   the Trendily version?
 4      A.   Because --
 5          MR. DIETRICH:  Hold on.
 6   Again, let me state my objection
 7   before I --
 8          THE WITNESS:  Sorry.
 9          MR. DIETRICH:  It's okay.
10   It's a hard process, but I'll
11   object to form again.
12      Q.   (By Mr. Green)  Okay.  Now
13   you can answer.  Do you remember what
14   it was?
15      A.   No.  Sorry.
16      Q.   That's okay.  That's okay.
17   That happens sometimes.
18          I understand the picture,
19   that they're taken from slightly
20   different angles, but it still looks to
21   me -- and you tell me if you agree --
22   that it looks like, from comparing the
23   picture of the Trendily skirt, carved
24   skirt underneath the top, that it looks
25   like it's thicker than the one on Jason
```

Page 141

```
 1          Bonita "Bo" Runyon
 2   Scott.  Do you agree with that?
 3      A.   Because of how the picture is
 4   taken, it -- looking up at the table,
 5   yes, you see more of the bottom of
 6   the -- the carving.
 7      Q.   Right.  Do you kind of see a
 8   corner -- a corner of it -- I'm
 9   pointing to the corner -- the right
10   corner of the Jason Scott table that's
11   nearest the camera.
12      A.   Uh-huh.
13      Q.   Because it shows a far
14   corner, also, on the right, correct?
15      A.   Yes.
16      Q.   This right corner, can you
17   get a feel for the thickness of the
18   underskirt from that, and then looking
19   at the -- the corner of the Trendily
20   version, doesn't it look like the
21   Trendily's underskirt is a little
22   thicker?
23          MR. DIETRICH:  Objection,
24   form.
25      Q.   (By Mr. Dietrich)  Like,
```

email@tobyfeldman.com                Toby Feldman, Inc.                Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES              (800) 246.4950

Bonita "Bo" Runyon                                          6/27/2018

Page 142

1               Bonita "Bo" Runyon
2   wider.
3        A.   This photo is looking up at
4   the table.  So I'm not comparing -- the
5   Jason Scott table, we're just looking
6   at it from the top of the table.  So I
7   can't tell.
8        Q.   So you -- I'm sorry.  Go
9   ahead.
10       A.   I know what this table looks
11  like in person, and that lip is very
12  thick underneath.  This is not a good
13  picture of that dining room table.  It
14  doesn't show the thickness of the
15  pieces.
16       Q.   Okay.  And the one you're
17  talking about is Exhibit 1 --
18       A.   Yes.
19       Q.   -- to the deposition that
20  shows the -- in this case the -- the
21  Sacred Heart dining table, right?
22       A.   Yes.
23       Q.   So you can't tell from those
24  pictures whether the dimensions are the
25  same all the way around, right?

Page 143

1               Bonita "Bo" Runyon
2        A.   Correct.
3        Q.   And you can't tell whether
4   the carving is the same all the way
5   around.
6             MR. DIETRICH:  Objection,
7        form.
8        Q.   (By Mr. Dietrich)  It looks
9   similar, but you can't tell.
10       A.   The Trendily table, again,
11  the photo is being taken looking up at
12  the table, so I don't think it's a fair
13  comparison.
14       Q.   Right.  And so because of
15  that, you can't really say -- just like
16  with the dimensions, you can't say, no,
17  that's -- that's different or it's
18  exactly the same.
19             MR. DIETRICH:  Objection,
20       form.
21       A.   It looks exactly the same.  I
22  just can't answer the thickness because
23  of the picture, the way the picture is
24  taken.  But at glance, it looks exactly
25  like a Jason Scott table.

Page 144

1               Bonita "Bo" Runyon
2        I should have had breakfast
3   before I came in here.
4        Q.   (By Mr. Green)  We'll be
5   finished shortly.  Earlier counsel
6   asked you if it would be possible for
7   Runyon's to handle both lines of the
8   furniture, the Jason Scott and the
9   Trendily versions of the furniture that
10  we were just talking about, and you
11  said, I believe, that you could but you
12  wouldn't want to.  How would you -- how
13  could you handle both of them?
14       A.   I wouldn't be able to,
15  actually.
16       Q.   Let's look at Exhibit Number
17  4, which is your -- the August 16, 2017
18  e-mail that you sent to Chris at
19  Trendily.  Do you see that?
20       A.   Yes, sir.
21       Q.   This is August 16th.  We know
22  that the day before, on August 15th,
23  was when Chris Sanders and Dara came to
24  Runyon's and y'all visited about the
25  Trendily pieces of furniture, right?

Page 145

1               Bonita "Bo" Runyon
2        A.   Yes.
3        Q.   And that's also the same day
4   that they sent you the Dropbox link,
5   correct?
6        A.   Yes.
7        Q.   And when you would access
8   that link, it would -- it was
9   photographs of the furniture offered by
10  Trendily.
11       A.   Yes.
12       Q.   All of their lines.
13       A.   Yes.
14       Q.   So it included the three
15  pieces we've been talking about, but it
16  included all their other furniture,
17  too.
18             MR. DIETRICH:  Objection,
19       form.
20       A.   I believe so, but I'm not
21  sure because I didn't look.
22       Q.   (By Mr. Green)  Okay.
23       A.   I wasn't interested in the
24  other pieces except for the few that we
25  had discussed that day.

email@tobyfeldman.com                    Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                         NATIONWIDE SERVICES                    (800) 246.4950

Page 146

```
 1              Bonita "Bo" Runyon
 2      Q.   Okay.  Had you -- had you --
 3   that makes sense, but had you -- you
 4   said at one point you carried some
 5   Trendily furniture.
 6      A.   Yes.
 7      Q.   Did I hear you whether you do
 8   or don't now?
 9      A.   I do not.
10      Q.   Okay.  If we go back to
11   talking about this e-mail, when you
12   were sent the -- the Dropbox link to
13   the -- that shows the Trendily
14   furniture, you then sent that to Jason
15   Scott, correct?
16      A.   Yes.
17      Q.   And that was in the evening,
18   like, you got the -- the e-mail from
19   Chris, I believe, at 10:00 o'clock or
20   so in the evening, and then you sent --
21   sent it pretty quickly to Jason --
22   Jason Scott, and he got it around 10:00
23   or so --
24      A.   I believe so, yes.
25      Q.   -- Mountain time or Pacific?
```

Page 147

```
 1              Bonita "Bo" Runyon
 2      MR. DIETRICH:  Arizona.
 3   We're Arizona time.
 4      MR. GREEN:  Oh, really?
 5      MR. DIETRICH:  Yeah.  We
 6   don't do Daylight Savings Time, so
 7   it's a different system
 8   altogether.
 9      THE WITNESS:  Oh, wow, that's
10   interesting.
11      MR. DIETRICH:  It's easy on
12   us.
13      THE WITNESS:  Right.
14      MR. GREEN:  It never changes.
15      MR. DIETRICH:  Yeah.
16      MR. GREEN:  But does make it
17   kind of challenging to know your
18   time.
19      Q.   (By Mr. Green)  Anyway, so
20   you sent it that night to Jason Scott,
21   correct?
22      A.   Yes.
23      Q.   Now, did you talk to him that
24   night?
25      A.   I don't recall.
```

Page 148

```
 1              Bonita "Bo" Runyon
 2      Q.   Did you talk to him the next
 3   morning?
 4      A.   I don't recall.
 5      Q.   Did -- did Jason Scott ask
 6   you to send this e-mail the next day?
 7      A.   I don't recall if I did it on
 8   my own or if I was asked.  But these
 9   were questions that I would -- I would
10   have -- that I wanted to ask.
11      Q.   So you don't remember whether
12   Jason Scott suggested that you send
13   this e-mail; is that correct?
14      A.   Yes.
15      MR. GREEN:  Ms. Runyon, I've
16   finished.  I'll pass the witness.
17   Thank you.
18      MR. DIETRICH:  I have a few
19   more questions, but I won't keep
20   you too long because I know
21   everybody is ready for lunch.
22      FURTHER EXAMINATION
23   BY MR. DIETRICH:
24      Q.   You had testified earlier
25   when we were talking that Chris Sanders
```

Page 149

```
 1              Bonita "Bo" Runyon
 2   had called you in June or July 2017?
 3      MR. GREEN:  Objection to
 4   form.
 5      A.   Yes, somewhere around there.
 6      MR. GREEN:  That's a
 7   misstatement.
 8      Q.   (By Mr. Dietrich)  Is that
 9   your testimony?
10      A.   Yes.
11      Q.   That he called you in June or
12   July of 2017?
13      MR. GREEN:  Objection,
14   leading.
15      A.   Yes.  It was around that
16   area, yes.
17      Q.   (By Mr. Dietrich)  And was
18   that -- strike that.
19      At that time you said Chris
20   mentioned the copies on the phone with
21   you?
22      MR. GREEN:  Leading.
23      A.   Yes.
24      Q.   (By Mr. Dietrich)  Is that
25   when you first learned of Trendily
```

email@tobyfeldman.com          Toby Feldman, Inc.          Certified WOB
tobyfeldman.com               NATIONWIDE SERVICES          (800) 246.4950

Page 150

```
1            Bonita "Bo" Runyon
2    making copies?
3        A.  I believe so.
4        Q.  And you didn't meet with
5    Chris the next day after that call, did
6    you?
7        A.  No.
8        Q.  There was some time period
9    between that phone call and your
10   meeting?
11       A.  Yes.
12       Q.  You saw a bunch of
13   photographs of mostly Jason Scott
14   pieces?
15       A.  Yes.
16       Q.  That Trendily's attorney
17   showed to you?
18       A.  Yes.
19       Q.  Your statements were that the
20   photographs don't do the pieces
21   justice.
22           MR. GREEN:  Leading.
23       A.  Yes.
24       Q.  (By Mr. Dietrich)  Can you
25   explain why they don't do the pieces
```

Page 151

```
1            Bonita "Bo" Runyon
2    justice?
3        A.  Well, the coloring is -- you
4    know, it's not true color on any of the
5    photos.  And they're just -- they're
6    just more beautiful in person -- in
7    person.  They're very stunning.
8        Q.  To me the photographs look
9    pretty fairly well resolutioned.  Would
10   you agree?
11       A.  Yeah.  Yes.  I mean, for a
12   photo, yes.
13       Q.  Compared to, say, Exhibit 2,
14   that appears -- Exhibit 2 of the
15   Trendily furniture looks like possibly
16   a higher quality photograph.
17           MR. GREEN:  Leading.
18       A.  Yes.
19       Q.  (By Mr. Dietrich)  And is it
20   your testimony that the coloration of
21   Exhibit 2 is like the coloration of
22   Jason Scott furniture?
23           MR. GREEN:  Leading.
24       A.  I'm sorry.  The question one
25   more time?
```

Page 152

```
1            Bonita "Bo" Runyon
2        Q.  (By Mr. Dietrich)  I believe
3    you said this earlier, but that the
4    color of the furniture in Exhibit 2, is
5    it like the color of the furniture that
6    Jason Scott makes?
7            MR. GREEN:  Objection,
8    leading; form.
9        A.  Yes, with a glare because of
10   the flash, but yes.
11       Q.  (By Mr. Dietrich)  If you --
12   and I don't know if you have these
13   marked the way I do, but Exhibits 9 and
14   10.  Do you have those in front of you?
15   9 has a table with Jason Scott chairs?
16       A.  Yes.
17       Q.  10 has a Jason Scott bed?
18       A.  Yes.
19       Q.  When I look at the chairs, I
20   see the Iron Star metalwork design.  Do
21   you see that?
22       A.  Yes.
23       Q.  And that is the same as the
24   design on the Iron Star desk, isn't it?
25       A.  Yes.
```

Page 153

```
1            Bonita "Bo" Runyon
2            MR. GREEN:  Objection,
3    leading.
4        Q.  (By Mr. Dietrich)  Is that
5    the same design as the one on the Iron
6    Star desk?
7            MR. GREEN:  Leading.
8        A.  Yes.
9        Q.  (By Mr. Dietrich)  All right.
10   And I see that same design repeated on
11   the bed in Exhibit 10.  Do you see
12   that?
13       A.  Yes.
14       Q.  Is that the same design
15   that's on the Iron Star desk?
16       A.  Yes.
17       Q.  All right.  And it seems that
18   design is a bit of a theme in Jason's
19   work, then.
20           MR. GREEN:  Leading.
21       A.  Yes.
22       Q.  (By Mr. Dietrich)  Have you
23   seen a metalwork design like that on
24   other manufacturers' furniture?
25       A.  No, other than the Trendily
```

email@tobyfeldman.com          Toby Feldman, Inc.               Certified WOB
tobyfeldman.com              NATIONWIDE SERVICES              (800) 246.4950

Bonita "Bo" Runyon                                    6/27/2018

Page 154

1            Bonita "Bo" Runyon
2   desk.
3         MR. GREEN:  Nonresponsive.
4         MR. DIETRICH:  How is that
5   nonresponsive, if I might ask?
6         MR. GREEN:  It's not.  I
7   overrule my objection.
8         MR. DIETRICH:  Okay.
9         MR. GREEN:  I was debating
10   whether to withdraw it after I
11   said it, but yeah, it's not.
12       Q.  (By Mr. Dietrich)  So the two
13   places where you've seen that design
14   are Jason Scott's originals and
15   Trendily's copies?
16       A.  Yes.
17       Q.  Now, do you remember when --
18   just a couple of minutes ago, Chuck
19   asked you about the two tables,
20   Trendily's and Jason Scott's, whether
21   they were the same or not.
22       A.  Yes.
23       Q.  And you said they appeared to
24   be exactly the same.
25         MR. GREEN:  Objection,

Page 155

1            Bonita "Bo" Runyon
2   leading.
3       A.  Yes.
4       Q.  (By Mr. Dietrich)  And this
5   probably wouldn't be reflected on the
6   record, but did you then see Chuck
7   inspect Exhibits 1 and Exhibits 2 to
8   try to find differences in those two
9   tables?
10       A.  Yes.
11         MR. GREEN:  Objection,
12   leading.
13       Q.  (By Mr. Dietrich)  And it
14   seemed like it took about two minutes,
15   in my estimation.  Does that sound
16   right?
17         MR. GREEN:  Objection,
18   leading.
19       Q.  (By Mr. Dietrich)  That does
20   sound right?
21       A.  Seems like it, yes.
22         MR. GREEN:  Objection,
23   leading.
24       Q.  (By Mr. Dietrich)  And then
25   after that, he came back and he just

Page 156

1            Bonita "Bo" Runyon
2   asked you whether the nail heads looked
3   bigger and whether the tabletop was
4   slightly thicker, right?
5       A.  Yes.
6       Q.  He looked at --
7         MR. GREEN:  Objection,
8   leading to that last question.
9       Q.  (By Mr. Dietrich)  And he
10   looked at both those exhibits again
11   after you got done with the questioning
12   about the nail top -- the nail heads in
13   the tabletop.
14       A.  Yes.
15         MR. GREEN:  Objection, form
16   and leading.
17       Q.  (By Mr. Dietrich)  And then
18   he put those exhibits down and didn't
19   ask you any more questions about
20   differences, did he?
21         MR. GREEN:  Objection,
22   leading.
23       A.  Yes.  No, he didn't ask me
24   any difference or any more questions.
25       Q.  (By Mr. Dietrich)  If you

Page 157

1            Bonita "Bo" Runyon
2   would go to Exhibit 6, this is the
3   transcript.  On the first page, Chris
4   says to you -- and this is in the
5   transcript -- "I have a container
6   coming the middle of September, around
7   September 15th.  I have a container
8   coming in and I might have some on
9   there."
10         Do you see that?
11       A.  Yes.
12       Q.  Does that accurately --
13   accurately reflect your conversation as
14   you recall it?
15       A.  As I recall, yes.
16       Q.  And did you understand that
17   container -- what did you understand
18   that container might have in it?
19       A.  Some tables, some extra
20   tables, dining room tables.
21       Q.  The Jason Scott copies?
22       A.  Yes.
23       Q.  If you go to page 6, towards
24   the top, Chris in the transcript says,
25   "All of this stuff that I'm showing you

email@tobyfeldman.com                    Toby Feldman, Inc.                         Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                      (800) 246.4950

**Bonita "Bo" Runyon**                                            6/27/2018

Page 158

```
1              Bonita "Bo" Runyon
2   is hot, hot, hot."
3              Do you see that?
4         A.   Yes.
5         Q.   Does that accurately
6   reflect --
7         A.   Yes.
8         Q.   -- what Chris told you, to
9   your recollection?
10        A.   Yes.
11        Q.   What did you think he meant
12  by that?
13             MR. GREEN:  Objection, form.
14        A.   That they're selling a bunch
15  of Jason Scott knock-offs.
16        Q.   (By Mr. Dietrich)  And just
17  below that in the middle of the page,
18  it looks like you're talking about the
19  table, and you say, "That's really
20  pretty similar.  It's similar, it's
21  pretty similar."  And Chris responds,
22  "Yeah, it is similar."
23             Do you see that?
24        A.   Yes.
25        Q.   Does that accurately reflect
```

Page 159

```
1              Bonita "Bo" Runyon
2   your conversation with Chris?
3         A.   Yes.
4         Q.   Going to page 7, towards the
5   top -- and it looks like you're talking
6   about the sideboard here, the Borgata
7   buffet copy, Chris says, "One of the
8   things it shows is that Trendily's
9   capabilities" -- you say "uh-huh."
10  Chris says, "-- are just continually
11  improving and getting better and better
12  and better."  And you ask, "How much is
13  that piece?"  And Chris continues,
14  "There's really nothing that we can't
15  do at this stage."
16             Do you see that?
17        A.   Yes.
18        Q.   Does that accurately reflect
19  your conversation with Chris?
20        A.   Yes.
21        Q.   What did you take that to
22  mean, that "there's really nothing we
23  can't do at this stage"?
24             MR. GREEN:  Objection, form.
25        A.   That their pieces are going
```

Page 160

```
1              Bonita "Bo" Runyon
2   to get better and better and more
3   pieces coming.
4         Q.   (By Mr. Dietrich)  More like
5   Jason Scott's pieces?
6              MR. GREEN:  Objection,
7   leading.
8         A.   Yes.  More of Jason Scott
9   knock-offs.
10        Q.   (By Mr. Dietrich)  Down at
11  the bottom of this page, Dara says,
12  "The last couple of containers have
13  sold out just like that."  Chris says,
14  "Well, they've been sold before they
15  even got here."
16        A.   Uh-huh.
17        Q.   And Dara repeats, "Before
18  they even got here."
19             Do you see that?
20        A.   Yes.
21        Q.   Does that accurately reflect
22  your conversation?
23        A.   Yes.
24        Q.   What containers were they
25  talking about, to your understanding?
```

Page 161

```
1              Bonita "Bo" Runyon
2              MR. GREEN:  Objection, form.
3         A.   Jason Scott knock-offs.
4         Q.   (By Mr. Dietrich)  When they
5   said "sold before they even got here,"
6   what did you understand that to mean?
7         A.   That they're selling a bunch
8   of the Jason Scott knock-offs.
9         Q.   Before they get --
10        A.   Yeah, before they even --
11        Q.   -- to shore or where?
12        A.   Before they even arrive to
13  the shore.
14        Q.   If you turn to the middle of
15  page 9, now you're talking about the
16  desk.  And it looks like you've just
17  seen a photograph of Trendily's desk,
18  and your reaction is, "Oh, my gosh, now
19  that looks like it.  That looks like
20  Jason Scott."  And Chris says, "Yeah."
21             Do you see that?
22        A.   Yes.
23        Q.   Does that accurately reflect
24  your conversation with Chris?
25        A.   Yes.
```

email@tobyfeldman.com               Toby Feldman, Inc.                    Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES                   (800) 246.4950

Bonita "Bo" Runyon                                     6/27/2018

Page 162

```
 1            Bonita "Bo" Runyon
 2      Q.   Did you have that desk, the
 3   Jason Scott desk, on your floor right
 4   then?
 5      A.   I did.
 6      Q.   Is there any way Chris could
 7   have missed seeing that desk?
 8      A.   Not at all.
 9            MR. GREEN:  Objection, form.
10      Q.   (By Mr. Dietrich)  Well, you
11   say right below that, chuckling,
12   "Doesn't it look like the desk in
13   front?"  Robin says, "Oh, boy, it does.
14   Oh, wow, it does."  You asked the
15   price, and Chris says, "Uh-huh."
16            Do you see that?
17      A.   Yes.
18      Q.   So you're referring to that
19   desk on your floor right then, aren't
20   you?
21            MR. GREEN:  Objection,
22   leading.
23      A.   Yes.
24      Q.   (By Mr. Dietrich)  And does
25   that accurately reflect what your
```

Page 163

```
 1            Bonita "Bo" Runyon
 2   conversation was?
 3      A.   Yes.
 4      Q.   That part of the transcript.
 5      A.   Yes.
 6      Q.   Going to page 10, toward the
 7   bottom you ask if he, meaning Jason,
 8   comes in here and he was to see
 9   something like that, like, would I get
10   in any type of trouble, or is what kind
11   of feeling on that?  Chris responds,
12   "Here's how I view that.  You would
13   probably -- you might get in trouble
14   with him because he might say, why are
15   you purchasing that if you're buying
16   from me?"
17            Do you see that?
18      A.   Yes.
19      Q.   Does that accurately reflect
20   your conversation with Chris?
21      A.   Yes.
22      Q.   What did Chris tell you about
23   whether -- what did he respond to your
24   concern that Jason might be concerned
25   about buying these from Trendily?
```

Page 164

```
 1            Bonita "Bo" Runyon
 2            MR. GREEN:  Objection,
 3   leading.
 4      A.   That he probably wouldn't
 5   sell to me anymore.
 6      Q.   (By Mr. Dietrich)  Chris
 7   acknowledged that.
 8      A.   Yes, Chris did acknowledge
 9   that.
10      Q.   Turning to page 11 in the
11   middle, you say to Chris, "Now, that's
12   the best craftsmanship of a Jason Scott
13   knock-off that I've seen.  I've never
14   seen anything that looked that way or
15   looked that good or close."
16            Is that an accurate
17   reflection of what you told Chris?
18      A.   Yes.
19      Q.   Did he jump in and say,
20   "Whoa, this isn't a Jason Scott
21   knock-off"?
22      A.   Well --
23            MR. GREEN:  Objection,
24   leading.
25      A.   No, he did not.
```

Page 165

```
 1            Bonita "Bo" Runyon
 2      Q.   (By Mr. Dietrich)  At any
 3   point did Chris ever say to you, "No,
 4   these aren't copies of Jason Scott"?
 5      A.   No, he did not.  He was proud
 6   of the fact that they were Jason Scott
 7   knock-offs.
 8            MR. GREEN:  Nonresponsive.
 9   Objection.
10      Q.   (By Mr. Dietrich)  Going to
11   page 12, Chris in the transcript
12   states, "Yeah, that's the goal.
13   Basically, it's just -- it blew up on
14   us.  You know what I mean?"  And you
15   say, "Right."  Chris says, "Yeah, it
16   went so fast that we couldn't keep up,
17   but now we understand, you know, what
18   the need is."  And you say, "Right."
19   And Chris says, "We can handle it.  We
20   can handle anything.  It's just
21   sometimes you might not be prepared for
22   the response."
23            Does that part of the
24   transcript accurately reflect your
25   conversation with Chris?
```

email@tobyfeldman.com                Toby Feldman, Inc.              Certified WOB
tobyfeldman.com                    NATIONWIDE SERVICES            (800) 246.4950



Page 166

```
 1              Bonita "Bo" Runyon
 2    A.   Yes.
 3    Q.   What did you take what he
 4  told you to mean?
 5    MR. GREEN:  Objection, form.
 6    A.  I'm sorry.
 7    Q.  (By Mr. Dietrich)  Well, he
 8  says it just blew up on us and it went
 9  so fast we couldn't keep up.  What did
10  you understand him to be talking about?
11    MR. GREEN:  Objection, form.
12    A.   That they're selling a lot of
13  the Jason Scott knock-offs.
14    Q.   (By Mr. Dietrich)  And just
15  below that, Dara states in the
16  transcript, "We have about 15 other
17  pieces in the works that we're doing."
18         Do you see that?
19    A.   Yes.
20    Q.   Does that accurately reflect
21  what Dara told you?
22    A.   Yes.
23    Q.   And 15 of what other kind of
24  pieces?
25    A.   Jason Scott.
```

Page 167

```
 1              Bonita "Bo" Runyon
 2    Q.   Copies?
 3    A.   Yes, Jason Scott copies.
 4    MR. DIETRICH:  I don't have
 5  any more questions.  Thank you.
 6    MR. GREEN:  We are finished.
 7  Thank you.
 8    (Deposition concluded at
 9  12:24 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 168

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF ARIZONA
 3
 4  JASON SCOTT COLLECTION,   §
    INC.,                     §
 5                            §
            Plaintiff,        §
 6  VS.                       §   CIVIL ACTION NO.
                              §   2:17-cv-02712-JJT
 7  TRENDILY FURNITURE, LLC   §
    et al.,                   §
 8                            §
            Defendants.       §
 9
10
11
12          REPORTER'S CERTIFICATION
13            BONITA "BO" RUNYON
14              JUNE 27, 2018
15
16
17    I, Janice K. McMoran, RDR, CRR, TCCR, and
18  Certified Shorthand Reporter in and for the State
19  of Texas, hereby certify to the following:
20    That the witness, BONITA "BO" RUNYON, was duly
21  sworn by the officer and that the transcript of the
22  oral deposition is a true record of the testimony
23  given by the witness;
24    I further certify that pursuant to Federal
25  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
```

Page 169

```
 1  as well as Rule 30(e)(2), that the signature of the
 2  deponent:
 3    __X___ was requested by the deponent or a
 4  party before the completion of the deposition and
 5  is to be returned within 30 days from date of
 6  receipt of the transcript.  If returned, the
 7  attached Errata contains any changes and the
 8  reasons therefor;
 9    _____ was not requested by the deponent or a
10  party before the completion of the deposition.
11    I further certify that I am neither counsel
12  for, related to, nor employed by any of the parties or
13  attorneys to the action in which this proceeding was
14  taken.  Further, I am not a relative or employee of any
15  attorney of record in this cause, nor am I financially
16  or otherwise interested in the outcome of the action.
17    Subscribed and sworn to on this the 11th day
18  of June, 2018.
19
20    _____
21    JANICE K. McMORAN, RDR, CRR, TCRR
22    Texas CSR #1959
23    Expiration Date: 12/31/18
24
25
```

email@tobyfeldman.com                  Toby Feldman, Inc.                  Certified WOB
tobyfeldman.com                      NATIONWIDE SERVICES                 (800) 246.4950

Page 170

ACKNOWLEDGMENT OF DEPONENT

1
2
3          I,_____, do hereby certify
4    that I have read the foregoing pages, and that the
5    same is a correct transcription of the answers given by
6    me to the questions therein propounded, except for the
7    corrections or changes in form or substance, if any,
8    noted in the attached Errata Sheet.
9
10    _____
11    BONITA "BO" RUNYON                    DATE
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 172

1              I, BONITA "BO" RUNYON, have read the
2        foregoing deposition and hereby affix my signature
3        that same is true and correct, except as noted above.
4        _____
5              BONITA "BO" RUNYON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 171

1              E R R A T A
2    WITNESS: BONITA "BO" RUNYON      DATE: JUNE 27, 2018
3    PAGE NO.  LINE NO.  CHANGE      REASON FOR CHANGE
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25

44  (Pages 170 to 172)

# JASON SCOTT COLLECTION

### ...it takes a village





## DSK-IRONSTR-DRGN / IRON STAR DESK W/ DRAGONFLY LEGS
### 72" X 36" X 31"



Runyon

EXHIBIT NO. 7
6/27/18
Janice McMoran
CSR, RDR, CRR



# JASON SCOTT COLLECTION
### ...it takes a village



**BF-BOR / BORGOTA BUFFET 83"x 24"x40"**





# JASON SCOTT COLLECTION
### ...it takes a village



**TBL-SAC / SACRED HEART DINING TABLE / SIZE SHOWN - 120"x 48"x 31"**
**(custom sizes available)**



JASON SCOTT COLLECTION
...it takes a village

TBL-SAC / SACRED HEART DINING TABLE





Bunyon
EXHIBIT NO.
Janice McMoran
CSR, RDR, CRR













**Friday, December 1, 2017 at 11:48:13 AM Mountain Standard Time**



-------------------------- Original Message --------------------------
Subject: Fwd: Trendily
From:   "Bo Runyon" <runyonsfinefurniture@yahoo.com>
Date:   Tue, August 15, 2017 9:53 pm
To:     "jason@jasonscottcollection.com" <jason@jasonscottcollection.com>
------------------------------------------------------------------------


Sent From Bo Runyon IPhone

Begin forwarded message:

   From: Chris Sanders <chris@trendilyhomecollection.com>
   Date: August 15, 2017 at 10:00:02 PM CDT
   To: "runyonsfinefurniture@yahoo.com" <runyonsfinefurniture@yahoo.com>
   Subject: Trendily

   Here is the Dropbox link. I will have answers to your other questions
tomorrow.

   https://www.dropbox.com/sh/j1bl7s9u1u0l3rl/AAAE_hmA01WrmhptGLq3lX0za?dl=0

   Thanks,

   Chris Sanders
   Trendily Furniture
   2991 Congressman Lane
   Dallas, TX 75220
   P: 214-529-3263 ~ F: 469-335-9770
   www.trendilyhomecollection.com


Thank you,

Jason Scott
Jason Scott Collection



### DECLARATION OF BO RUNYON

1.     My name is Bonita (Bo) Runyon. I am over 18 years of age and competent to attest to the matters set forth in this Declaration. The facts set forth here are made on my personal knowledge.

2.     I have more than 20 years of experience in the furniture industry. I am the owner of Runyon's Fine Furniture, a retailer of fine furnishings located in Roanoke, Texas.

3.     We have been purchasing Jason Scott Collection furniture for approximately 5 years. I am personally familiar with the Sacred Heart Dining Table, Iron Star Desk, and Borgota Buffet pieces designed and manufactured by Jason Scott, as well as other Jason Scott pieces.

4.     Jason Scott's designs are unique and different from any other manufacturer in the furniture industry. Jason Scott has created its own unique style that is recognizable not only to the furniture retail industry but also to end consumers. Jason Scott furniture is collectable—consumers often collect Jason Scott furniture and have acquired many pieces of Jason Scott furniture over the years.

5.     The Sacred Heart Dining Table, Iron Star Desk, and Borgota Buffet incorporate the highly ornate carvings and decorative design elements that I have come to associate with Jason Scott. It is those original decorative designs that lead me to believe those pieces were manufactured by Jason Scott, and not a different company.

6.     To my knowledge, to purchase Jason Scott furniture for retail, dealers must go to Jason Scott. No one else is authorized to sell Jason Scott furniture wholesale.

7.     Manufacturers that copy Jason Scott pieces, and retailers that carry those pieces, cause confusion and harm to consumers and the Jason Scott brand, as those copies leave the impression that Jason Scott has lowered its quality of standards and has begin to produce cheaper quality furniture.

1


Runyon

EXHIBIT NO. 3

Janice McMoran
CSR, RDR, CRR

8.     I make this Declaration under penalty of perjury under the laws of Texas and the United States, this 21st day of July, 2017.

*(Bonita (Bo) Runyon)*

Runyons





Runyon

EXHIBIT NO. 9

Janice McMoran
CSR, RDR, CRR

Runyons



