1  Thomas E. Dietrich (#031299)
2  FORTRESSGC, PLLC
   1811 N. Turquoise Dr.
3  Flagstaff, AZ 86001
   Tel. 520.404.1713
4  tom@fortressgc.com

5  *Attorneys for Plaintiff Jason Scott Collection, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Scott Collection, Inc.,<br><br>             Plaintiff,<br><br>v.<br><br>Trendily Furniture LLC,<br>*et al.*<br><br>             Defendants. | Case No. CV-17-02712-PHX-JJT<br><br>**JASON SCOTT COLLECTION, INC. POST-TRIAL CLOSING BRIEF**<br><br>Hon. John J. Tuchi<br>United States District Court Judge<br><br>**Trial Date**: June 23-24, 2020<br>**Courtroom**: 505, 401 W. Washington St., Phoenix, AZ 85003 |

The evidence here proves: (a) Jason Scott's trade dress is widely recognized and known among retail and end customers; (b) Defendants intentionally copied Jason Scott's trade dress; and (c) no end customer could have told the difference between Jason Scott's originals and Defendants' knockoffs. Ruling in Jason Scott's favor is consistent with Ninth Circuit law and in-circuit opinions applying that law.

**I.  Ninth Circuit Case Law Supports Ruling for Jason Scott**

    **A.  *Cosmos Jewelry* Provides a Template for the Court to Follow**

Defendants are wrong in arguing this would be the nation's first court to find trade dress infringement in these circumstances. In *Cosmos Jewelry Ltd. v. Po Sun Hon Co.*, 470 F. Supp. 2d 1072 (C.D. Cal. 2007), after a bench trial, the court held the defendants infringed plaintiff's trade dress in its flower jewelry designs and awarded damages plus attorneys' fees and costs. *Id*. at 1087-88. The court found secondary meaning based on an 11-year term of use, regional advertising, and the designs winning awards. *Id*. at 1086. The court also found "strong proof of secondary meaning" in the evidence that: (a) experienced jewelry store owners mistook the defendants' copies for the plaintiff's designs when presented with photos of each; (b) store owners testified that, until they saw defendants' copies, they had never seen similar jewelry with the same general look and design features to plaintiff's designs; and (c) a store owner testified people asked for plaintiff's jewelry by name. *See id*. at 1080, 1086 (quoting *Thomas Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 296 (7th Cir. 1998) ("the state of mind of the dealers is important in determining if secondary meaning exists.")).

In finding a likelihood of confusion, the *Cosmos* court held the following factors weighed "strongly" in plaintiff's favor: "(1) given the years of use and heavy promotion of its plumeria designs, [plaintiff's] mark is strong; (2) the parties' goods are highly related and sold in the same market; (3) distributors of the goods have been actually confused between the competing designs; (4) the marketing channels—print media, in-flight magazines, in-store displays—are almost identical; (5) the goods are proximate in price range; and (6) the creation of additional pieces by either side will create more-not less-

confusion." *Id*. at 1086-87. The evidence in *Cosmos* is comparable to the evidence here and shows ruling in Jason Scott's favor is in alignment with Ninth Circuit law.

### B.   Defendants Ignore Ninth Circuit Precedent on Likelihood of Confusion

At trial, Defendants argued likelihood of confusion could only be based on point-of-sale confusion. Not so. In the Ninth Circuit, liability can also be based on likely initial interest or post-sale confusion. "We recognize a brand of confusion called 'initial interest' confusion, which permits a finding of a likelihood of confusion although the consumer quickly becomes aware of the source's actual identity and no purchase is made as a result of the confusion." *Interstellar Starship Services, Ltd. v. Epix Inc.*, 184 F.3d 1107, 1110 (9th Cir. 1999); *Adidas-Salomon AG v. Target Corp.*, 228 F.Supp. 2d 1192, 1211 (D. Or. 2002). "Initial interest confusion allows the infringer to improperly benefit from the goodwill that has developed in a mark.' *Adidas-Salomon*, 228 F.Supp. 2d at 1212.

Further, "[t]he law in the Ninth Circuit is clear that 'post-purchase confusion,' i.e. confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act." *Id*. (quoting *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 854 (9th Cir 2002)); *see also Levi Strauss Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding of infringement can be based on confusion of non-purchasers, such as those who simply observe the purchaser wearing the accused article of clothing). "Post-sale confusion occurs when consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product." *Adidas-Salomon*, 228 F.Supp. 2d at 1212. "[P]ost-sale confusion is equally relevant to a claim of trade dress infringement as it is to trademark infringement." *Id*. at 1213 (quoting *Payless ShoeSource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 989-90 (Fed Cir 1993)). For example, the Federal Circuit in *Payless* noted "[p]ost-sale observers may be unaware that Payless and Reebok shoes are sold in different stores or at different prices, yet their confusion may be detrimental to Reebok." *Payless*, 998 F.2d at 990; *see also Karl Storz*, 285 F.3d at 854 ("Post-sale confusion . . . may be no less injurious to the trademark owner's reputation than

confusion on the part of the purchaser at the time of sale."). For post-sale confusion, the similarity of the products is the most important factor. *Payless*, 998 F.2d at 990; *Adidas-Salomon*, 228 F.Supp. 2d at 1213. Ignoring initial interest and post-sale confusion would be reversible error. *See Payless*, 998 F.2d at 989-90.[1]

**II.     The Evidence Proves Defendants Infringed Jason Scott's Trade Dress**

"Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). It is irrelevant that Jason Scott's trade dress is not registered, as Section 43(a) of the Lanham Act "protects against infringement of unregistered marks and trade dress . . . ." *Brookfield Comms.*, 174 F.3d at 1047 n.8; *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989) ("Trade dress protection is broader in scope than trademark protection") Defendants stipulated to nonfunctionality [Dkt. 96-1 at 2], leaving at issue secondary meaning and likelihood of confusion.

**A.     Jason Scott's Trade Dress Has Secondary Meaning**

Trade dress has acquired secondary meaning when customers mentally "associate the design features with a particular producer." *Adidas Am., Inc. v. Skechers United States, Inc.*, 890 F.3d 747, 754 (9th Cir. 2018). "Factors courts consider in determining secondary meaning include: (1) whether actual purchasers associate the dress with the source; (2) the degree and manner of advertising by the party seeking protection; (3) the length and manner of use of the dress; and (4) whether the use by the party seeking protection has been exclusive." *Cosmos*, 470 F. Supp. 2d at 1086. In addition, "[p]roof of exact copying, without

---

[1] Defendants' reliance on *Gibson Guitar Corp. v. Paul Reed Smith Guitars*, 423 F.3d 539 (6th Cir. 2005) is misplaced. The Sixth Circuit does not to have a history of recognizing initial interest and post-sale confusion. *See Payless*, 998 F.2d at 989 (listing circuits that allow finding liability based on confusion of consumers other than direct purchasers). *Gibson* also repeatedly states it involves only a trademark claim, not trade dress. 423 F.3d at 543 n.1, 548 n.10. That court found "[t]he distinction between trademark and trade dress is particularly important, given the posture of this case," where all trade dress claims had been dismissed and the district court, confusing trade dress and trademark law, had improperly expanded the scope of the trademark at issue. *Id*. at 546-48, 548 n.10. *Gibson* thus not binding and explicitly has no bearing on trade dress claims.

any opposing proof, can be sufficient to establish secondary meaning." *Transgo, Inc. v. Ajac Trans. Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985) (citing *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 557-58 (9th Cir. 1960)); *Clicks Billiards*, 251 F.3d at 1264. Even where courts have not inferred secondary meaning based on copying alone, that fact remained highly probative. *See Adidas Am.*, 890 F.3d at 755 ("Proof of copying strongly supports an inference of secondary meaning."); *Lisa Frank, Inc. v. Impact Intern., Inc.*, 799 F. Supp. 980, 992 (D. Ariz. 1992) (same).

### 1. Jason Scott's use has been lengthy, continuous, and exclusive

Defendants stipulated Jason Scott's trade dress has been used continuously and exclusively since 2004. [Dkt. 96-1 at 2] The Patent & Trademark Office accepts as prima facie evidence of secondary meaning proof that a mark has been used in commerce substantially exclusively and continuously for "five years before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f). Jason Scott's use far exceeds that five-year term. It also exceeds the 11 years of use found to support secondary meaning in *Cosmos*. 470 F. Supp. 2d at 1086. The undisputed long term of continuous and exclusive use by Jason Scott strongly supports finding secondary meaning. *See id*.

### 2. Defendants intentionally copied Jason Scott's trade dress

It is undisputed that Defendants copied every element of Jason Scott's trade dress, copying as closely as possible from photos. [Malhotra Depo. 86:8-18, 183:19-184:6, 230:8-232:8] That establishes Defendants deliberately copied Jason Scott's trade dress, which is enough to infer secondary meaning. *See Clicks Billiards*, 251 F.3d at 1264.

There is also evidence Defendants knew they were copying Jason Scott's trade dress from the start. At trial, Jason Forsberg testified he visited Trendily's warehouse on May 22, 2017, where Mr. Malhotra recognized him as "Jason Scott" and kicked him out. [Trial Transcript ("Tr. Trans.") 116:16-126:6; Malhotra Depo. 243:10-22] Mr. Forsberg's credit card statement supports his testimony on the date of the visit—which was two days before Jason Scott sent its first cease-and-desist letter. [Exs. 36 at 3; 11] Mr. Malhotra thus recognized Mr. Forsberg as "Jason Scott" before receiving a letter from Jason Scott.

1    That conclusion is bolstered by emails between Mr. Forsberg and Bill Holland of Hill Country. [Ex. 12] In an email sent May 24, 2017, Mr. Forsberg reached out asking about Mr. Holland's message that he had discussed Jason Scott with someone from Trendily. *Id*. On May 30, 2017, Mr. Holland replied that he had been out of the country but that, regarding Mr. Forsberg's visit to the warehouse, Mr. Malhotra had "thought that you may be wanting to talk to him according to his sources **that day you were there** and possibly offering him $$$ to not manufacture this collection." [Ex. 12 (emphasis added)] Mr. Holland testified this referred to his discussion with Mr. Malhotra about recognizing Mr. Forsberg at the Trendily warehouse. [Holland Depo. 55:8-56:4, 58:4-59:15, 129:22-130:23] Mr. Holland, who talked with Mr. Malhotra about the issue, had "no doubt in my mind" that Mr. Malhotra knew he was copying Jason Scott. [Holland Depo. 83:23-84:12]

Other evidence supports that Mr. Malhotra had preexisting knowledge of Jason Scott furniture. The parties share two of the same largest customers—Brumbaugh's and Hill Country—and Mr. Malhotra had been to both stores. [Malhotra Depo. 36:22-37:6, 58:24-59:4; Brumbaugh Depo. 34:13-16; Holland Depo. 41:3-5] Mr. Forsberg testified at trial that Brumbaugh's floor was around 80 percent Jason Scott pieces and Hill Country's was nearly 40 percent Jason Scott. [Tr. Trans. 127:4-16, 129:15-23] Chris Sanders—Trendily's exclusive sales rep—learned of Jason Scott just months after starting his job by walking the floors at these retailers. [Sanders Depo. 35:14-36:24, 37:9-38:4] Mr. Malhotra's claim that he had no clue about Jason Scott until he got the first letter is not credible; he would have had to have walked those sales floors with his eyes closed.

Mr. Malhotra's allegation that Mr. Forsberg came to Texas again sometime in June or July 2017 is without evidentiary support and is internally inconsistent. He claims Mr. Forsberg used a fake name at the warehouse because Mr. Forsberg knew Mr. Malhotra did not know him. [Tr. Trans. 357:5-13] But if Jason Scott had indeed sent Defendants a letter beforehand, would it not make sense for Mr. Forsberg to expect that Defendants knew who he was? Mr. Malhotra also failed to preserve security camera footage he claimed would have documented Mr. Forsberg's visit. [Tr. Trans. 379:10-25] That warrants an adverse

inference against Defendants. In total, the evidence shows that—just like every other witness—Mr. Malhotra knew of Jason Scott, and he copied Jason Scott to exploit a known market. That provides even stronger support for a finding that Jason Scott's trade dress has secondary meaning. *See Audio Fidelity*, 283 F.2d at 558 ("There is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.").

### 3. Retail and end customers recognize Jason Scott trade dress

The evidence here establishes that every single industry participant (other than, allegedly, Mr. Malhotra) recognized Jason Scott's trade dress. Every retail customer—Sally Brumbaugh, Bo Runyon, Bill Holland, Shawn Beach, and Claudia LeClair—testified Jason Scott's trade dress was unique and strongly associated with Jason Scott. [*See, e.g.*, Tr. Trans. 241:24-25, 243:19-244:10] Retail competitors Ron McBee and Tanner Dipple also recognized Jason Scott's trade dress as unique, as did Trendily's sales rep, Chris Sanders. Jason Scott's trade dress is so recognizable that when Mr. Dipple first saw Trendily's knockoff table, he knew it looked like a Jason Scott even though he had never seen the original Jason Scott table. [Dipple Depo. 50:2-52:11] There was no question whether the three pieces in issue came from some other manufacturer; they were recognizably "Jason Scott." [Tr. Trans. 246:7-20; Holland Depo. 29:6-32:16; Beach Depo. 16:14-21; Brumbaugh Depo. 27:4-31:6, 72:25-74:5; Runyon Depo. 15:5-16:21, 23:13-22] These pieces also contained unique design elements Jason Scott used on other pieces in the Jason Scott Collection line. [Tr. Trans. 246:21-247:14] The state of mind of retailers supports secondary meaning. *Cosmos*, 470 F.Supp. 2d at 1080, 1086; *Panduit*, 138 F.3d at 296.

There is also strong evidence that end customers recognized Jason Scott trade dress. Retailers testified customers would "often" ask for Jason Scott furniture by name. [Tr. Trans. 252:6-11; Brumbaugh Depo. 18:11-20, 84:20-85:9] Customers knew Jason Scott furniture by the unique look and the brand's story. [Tr. Trans. 252:6-20; Beach Depo. 15:13-14 ("People that see Jason Scott usually know what it is."); Holland Depo. 25:25-26:2] Customers seek out Jason Scott furniture. [Holland Depo. at 21:17-24, 34:4-21] Many customers buy multiple Jason Scott pieces. [Tr. Trans. 252:9-11, 308:23-309:2] Testimony

establishes that Jason Scott has a following among end consumers—so-called "furniture groupies for Jason"—that is comparable to the famous Stickley furniture brand. [Tr. Trans. 310:2-16] End customers often recognized Mr. Forsberg as the face of Jason Scott and asked to take photos with him and autograph their Jason Scott furniture. [Tr. Trans. 43:14-45:16, 91:12-92:8] In its 23 years in existence, Jason Scott has created a strong brand through its unique trade dress that retailers and end customers recognize as coming from Jason Scott. That is strong proof of secondary meaning. *See Cosmos*, 470 F.Supp. 2d at 1086.

### 4. Retailers broadly advertise Jason Scott brand and trade dress

Far from showing retailers hide who created Jason Scott furniture, the evidence proves retailers tout the brand to customers in stores and in advertising. Retailers are trained on the Jason Scott story and brand and often use those elements in sales conversations with end customers. [Tr. Trans. 87:9-88:17, 305:11-25] Mr. Forsberg has done many speaking engagements at retail stores, where he shares the Jason Scott story and designs with end customers. [Tr. Trans. 90:6-94:7] Those engagements were often advertised beforehand in local and national magazines and elsewhere, using his photo and the "Jason Scott" name together with photos of Jason Scott furniture. [Tr. 90:6-94:7, 252:21-253:24] Ms. LeClair testified Fiesta Furnishings frequently used the Jason Scott name and Mr. Forsberg's photo in ads. [Tr. Trans. 248:10-19] Other retailers have done the same. [Tr. Trans. 220:19-221:5, 229:9-230:17; Holland Depo. 22:14-21, 25:1-3]

Fiesta also advertised Jason Scott by name on its social media pages and in email blasts to customers and previously in television ads. [Tr. Trans. 248:20-250:4] Currently and before 2017, Fiesta put information about incoming Jason Scott shipments on its website and sent email blasts to customers about such shipments because they would sell out so quickly. [Tr. Trans. 250:5-251:3] Fiesta also had a video playing the Jason Scott story on repeat in its showroom and a Jason Scott catalog on hand for customers' perusal. [Tr. Trans. 251:9-252:5] Thus, while retailers may not use Jason Scott's name in every ad, they clearly educate customers in the store about Jason Scott's brand and there is never any secret that Jason Scott's furniture originates from Jason Scott. [Tr. Trans. 251:4-6, 254:5-10] This

evidence of advertising and brand recognition supports finding secondary meaning. *See Cosmos*, 470 F.Supp. 2d at 1086.

### 5. Jason Scott has won awards and received media coverage

Receiving unsolicited media coverage and winning awards for product designs support secondary meaning. *See id.*; *Adidas Am.*, 890 F.3d at 754; *Lisa Frank*, 799 F. Supp. at 993. Both are in evidence here. Jason Scott has received significant media coverage of its designs and brand in national and regional magazines, which was unsolicited. [Tr. Trans. 85:25-87:8; Ex. 4] Mr. Forsberg has also won awards, including being named a Master of the Southwest, for his unique designs. [Tr. Trans. 95:16-96:25; Ex. 4 at 5] Overall, the evidence in the record proves Jason Scott's trade dress is unique to Jason Scott and widely recognized by retailers and end customers. Jason Scott has thus met its burden of proving secondary meaning. *See Cosmos*, 470 F.Supp. 2d at 1086.

### B. Likelihood of Confusion Between Virtually Identical Pieces is Clear

A likelihood of confusion exists when customers are likely to assume a product is associated with a source other than its actual source because of similarities between the products' trade dress. *Fuddruckers*, 826 F.2d at 845. "This factor turns on whether a reasonably prudent consumer would be confused about the source of the goods bearing the marks." *Adidas Am.*, 890 F.3d at 755. As noted, likelihood of confusion can be found based on likely initial interest, point-of-sale, or post-sale confusion. *See Adidas-Salomon*, 228 F.Supp. 2d at 1211-13; *Payless*, 998 F.2d at 989-90. While *Sleekcraft* sets out eight factors courts can consider, "only a subset of the *Sleekcraft* factors are needed to reach a conclusion as to whether there is a likelihood of confusion." *Adidas Am.*, 890 F.3d at 756. "[I]n some cases it may be unnecessary to undertake an extended analysis to infer confusion, *e.g.*, where there is no difference between the marks of directly competitive goods/services." *Adidas-Salomon*, 228 F.Supp. 2d at 1210-11.

Defendants have stipulated that Jason Scott's trade dress has been sold continuously and exclusively since 2004; the parties are direct competitors selling to the same customers in the same marketing channels; and the parties' trade dress is very similar. [Dkt. 96-1 at 3]

Those stipulations alone would permit finding a likelihood of confusion. *See Fuddruckers*, 826 F.2d at 846 ("the products and marketing channels of the parties were nearly identical, so a finding by the jury that the marks were very similar would have been sufficient to support a verdict for Fuddruckers on this issue."). Other evidence bolsters that conclusion.

### 1. Copying strongly supports likelihood of confusion

"[C]ourts almost unanimously presume a likelihood of confusion based on a showing of intentional copying." *Fuddruckers*, 826 F.2d at 846. "A showing that the defendant intended to adopt the plaintiff's trade dress is . . . entitled to great weight because a defendant is presumed able to accomplish this purpose." *Clicks Billiards*, 251 F.3d at 1266. As described, it is undisputed that Defendants intentionally copied Jason Scott's trade dress in order to produce knockoffs that they stipulate are "very similar." Mr. Malhotra even chose a special stain for his copies to make them look like the reclaimed teak that Jason Scott's pieces are actually made of. [Malhotra Depo. 229:21-232:8] The undisputed evidence of copying is entitled to great weight in favor of Jason Scott.

It is also important that Defendants copied multiple pieces in the Jason Scott Collection line. "The likelihood of confusion is compounded where the similarities extend across several products in a product line." *Lisa Frank*, 799 F. Supp. at 997; *see also Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, 57 F.Supp. 3d 1203, 1225 (C.D. Cal. 2014) ("similarities across several products in a product line can 'compound' confusion"). By copying not one but three Jason Scott pieces—all from a product line with a cohesive look and feel—Defendants sought to create their own line in competition with Jason Scott's. That significantly increased the likelihood that customers—on seeing multiple knockoffs together—would be confused as to their origin. *See Lisa Frank*, 799 F. Supp. at 997.

### 2. Relevant actual confusion has been demonstrated

Jason Scott need not offer evidence of actual consumer confusion. "The failure to prove instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *Brookfield Comms., Inc. v. West Coast Ent.*

*Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979). "Instances of actual confusion in the marketplace are often difficult to find, particularly where, as here, the sales volume of the accused product is small and the marketing is thin." *VIP Prods., LLC v. Jack Daniel's Props., Inc.*, 291 F. Supp. 3d 891, 906 (D. Ariz. 2018). Here, where 14 knockoffs were sold, a dearth of actual confusion evidence from end consumers is "unnoteworthy" and should not weigh against Jason Scott.

Both *Cosmos* and *Sleekcraft* recognized, however, that confusion among industry participants supports finding a likelihood of confusion. *See Cosmos Jewelry*, 470 F.Supp. 2d at 1086; *Sleekcraft*, 599 F.2d at 352. Jason Scott has introduced evidence that Bo Runyon, Sally Brumbaugh, and Shawn Beach—all retail store owners with decades of experience in furniture—believed Trendily's knockoffs were real Jason Scott pieces. [Beach Depo. 15:23-17:14-17; Brumbaugh Depo. 37:6-17, 39:11-41:18; Runyon Depo. 27:8-23, 42:6-21, 119:15-20] Ron McBee thought photos of real Jason Scott pieces were Trendily's copies. [McBee Depo. 44:22-45:3, 45:18-46:20] Even Chris Sanders—Defendants' own rep—believed photos of real Jason Scott pieces to be of Trendily pieces. [Sanders Depo. 48:21-51:7] This evidence of actual confusion among those in the trade is even more substantial than that found to "weigh strongly" in the plaintiff's favor in *Cosmos*. 470 F.Supp. 2d at 1086-87. Further, there is testimony from witnesses with decades of experience in furniture that there is no way an end consumer could have distinguished between Jason Scott's pieces and the knockoffs. [Tr. Trans. 274:14-21, 282:11-19, 311:21-312:7; Brumbaugh Depo. 39:25-40:4] This should lead the Court to the obvious conclusion that there is a high likelihood of confusion. That is particularly true with regard to post-sale confusion, where the similarity of the parties' products is the primary consideration and the products here are virtually identical, down to the measurements of the drawers. *See Adidas-Salomon*, 228 F.Supp. 2d at 1213.

**3.      End customers have no special expertise in furniture**

The only other factor that Defendants have not stipulated in Jason Scott's favor is purchaser sophistication. "In assessing the likelihood of confusion to the public, the

standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. "Although the wholly indifferent may be excluded, the standard includes the ignorant and the credulous." *Id*. Jason Scott stipulated that purchasers exercise a high degree of care [Dkt. 96-1 at 3], as both parties' furniture costs several thousand dollars. *Sleekcraft*, 599 F.2d at 353 ("when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely.").

However, Jason Scott never agreed that end customers have special expertise in furniture design, and the evidence shows they do not. [Tr. Trans. 93:10-94:16, 244:14-16, 315:16-23] The situation here is not akin to cases involving purchasers such as surgeons and university researchers. *See Intersteller*, 184 F.3d at 1110 ("customers are sophisticated industry and university researchers" purchasing goods costing tens of thousands of dollars); *Karl Storz*, 285 F.3d at 854 (surgeons were relevant purchasers). And even in those cases, the Ninth Circuit found the plaintiff could *still* prove trade dress infringement through other *Sleekcraft* factors. *See Intersteller*, 184 F.3d at 1111-12; *Karl Storz*, 285 F.3d at 854. As Mr. Williamson aptly put it at trial, Jason Scott customers often "have disposable income that allows them to afford expensive furniture [but] [w]hether or not that translates into sophisticated, two different things." [Tr. Trans. 315:21-23] While end consumers can be expected to use a higher degree of care here than when buying vodka or Barbie dolls, there is no evidence that they have specialized expertise that might allow them to detect minute differences in the parties' virtually identical trade dress.

There is no evidence in the record to dispute that customers were likely to have initial interest confusion between the parties' trade dress, which allowed Defendants to improperly benefit from Jason Scott's goodwill. *See Adidas-Salomon*, 228 F.Supp. 2d at 1212. Further, there is zero possibility an average consumer could distinguish a Trendily knockoff from a Jason Scott original outside the context of a furniture store, such as in someone's dining room. That strongly supports finding post-sale confusion. *Id*.; *Karl Storz*, 285 F.3d at 854. And post-sale confusion here would be particularly injurious, where Jason Scott has an excellent reputation for quality while Defendants' knockoffs were made of lower quality

wood and already showing defects. [Malhotra Depo. 79:13-80:24; Depo. Ex. 9 (warped MJ desk)]. Jason Scott has therefore met its burden of proving likelihood of confusion.

A last point on liability: Defendants' belated unclean hands defense is meritless. "In the Ninth Circuit, what is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts." *Slep-Tone Entm't Corp. v. Granito*, CV 12-298 TUC DCB, at *4 (D. Ariz. July 22, 2013); *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 932 (9th Cir. 2014) (same). Jason Scott acquired its trade dress through lengthy and exclusive use, not inequitable conduct. The defense therefore must be rejected. *See id*. Further, in visiting Trendily's warehouse and asking Ms. Runyon to record her meeting with Trendily, Mr. Forsberg was not doing anything untoward; he was investigating a dire threat to his business using legal means. *Cf. MAG Instrument, Inc. v. JS Prods., Inc*., 595 F. Supp. 2d 1102, 1110 (C.D. Cal. 2008) (cases where unclean hands defense was permitted had "clear evidence of wrongdoing by the plaintiff" including bribery of a witness and falsification of evidence). Defendants' unclean hands argument is thus baseless.

### III. Jason Scott is Entitled to Damages, Enhancement, and Fees

Jason Scott has met its burden of proving liability and is entitled to damages, a treble damages enhancement, and an award of attorneys' fees and costs under the Lanham Act.

#### A. Damages From Loss of Customer and Foregone Price Increase

Section 1117 allows recovery of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Defendants' net profits are stipulated at $19,995, [Dkt. 96-1 at 3], which should be awarded to Jason Scott together with the costs of suit.[2] Defendants argue Jason Scott can only recover for harm to its goodwill and must present expert testimony. That is incorrect. "The district court assesses 'any damages sustained by the plaintiff' in the same manner as in tort damages: the reasonable foreseeable harms caused by the wrong." *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012). "Section 1117 demands neither empirical quantification

---

[2] While an award of only Defendants' profits would be duplicative of Jason Scott's copyright damages, the amount can and should be trebled to $59,985 as explained below, with the duplicative amount deducted from the total award.

nor expert testimony to support a monetary award of actual damages . . . ." *Id*. at 1113. Rather, "[u]pon proving causation, the plaintiff's evidentiary burden relaxes considerably." *Id*. A plaintiff must present sufficient evidence to "draw reasonable inferences and make a fair and reasonable assessment." *Id*. "To the extent there is not mathematical precision [in damages calculations], Defendants bear the risk of such imprecision." *Binder v. Disability Group, Inc*., 772 F. Supp. 2d 1172, 1179 n. 6 (C.D. Cal. 2011).

Jason Scott has introduced evidence that it lost Coyote Candle as a customer because of Defendants' infringement. Defendants pitched and sold knockoffs to a nearby competitor in Lubbock, Hat Creek Interiors. [Tr. Trans. 143:22-144:2; Sanders Depo. 77:3-4] And Jason Scott had to disclose Coyote Candle's owner, Ben Aufill, as a witness against his explicit wishes, because Defendants forced a lawsuit. [Tr. Trans. 143:13-19] As a result, exactly as threatened, Mr. Aufill stopped buying from Jason Scott. [Tr. Trans. 144:10-145:1] Based on Coyote Candle's average yearly sales over 2013-2016 ($59,899) multiplied by Jason Scott's 75 percent profit margin, the loss of this customer caused Jason Scott to lose profits of $44,249 per year, and a total of $132,747 over three years. [Tr. Trans. 145:2-147:25; Ex. 23] Defendants do not dispute these calculations but merely offer a story contrived in Mr. Malhotra's head to counter the text messages from Coyote Candle's owner proving his intent to stop buying Jason Scott. But the evidence shows Jason Scott rarely lost retailers and the loss of Coyote Candle was directly traceable to Defendants' infringement.

The evidence also establishes Defendants' infringement—centered in Texas, Jason Scott's largest market—caused Jason Scott to be unable to implement a needed price increase in 2017. [Tr. Trans. 148:1-152:21, 312:8-313:21] Jason Scott's past price increases averaged between four and eight percent per piece. [Tr. Trans. 148:23-149:20] Here, Jason Scott seeks damages of $59,203, which are the profits Jason Scott would have made if it had been able to apply a three percent increase to its sales from the second half of 2017 ($581,000) and 2018 ($1.4 million). [Tr. Trans. 68:6-12] Given that past price increases never resulted in decreased sales [Tr. Trans. 150:2-10], and Jason Scott still has not increased prices, damages based on a three percent increase applied to 1.5 years' sales is

fair and reasonable. These losses—$132,747 lost in Coyote Candle profits and $59,203 lost from the foregone price increase—were foreseeable results of Defendants targeting the exact same retail base with lower-priced knockoffs.

### B. The Court Should Award an Enhancement of Treble Damages

The Court has discretion under § 1117(a) to award up to treble damages "to address a variety of undercompensated harm, including where there is difficulty assessing damage, and where lost profits are insufficient to address the on-going harm." *OmniGen Research, LLC v. Wang*, No. 6:16-cv-268, 2017 WL 5505041, at *17-18 (D. Or. Nov. 16, 2017); *Binder*, 772 F.Supp. 2d at 1182-83 (enhancement where "there is a potential harm from lingering misimpressions that is unlikely to be fully captured by lost profits."). It "is proper to also consider that enhancing damages would advance the cause of deterring Defendants and others similarly situated from repeating the type of unfair and deceptive behavior." *OmniGen*, 2017 WL 5505041 at *18; *PepsiCo v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999) (§ 1117 "confers authority on the court to treble defendant's profits in the event that compensatory damages are inadequate to deter future infringing conduct.").

The evidence here shows Defendants' actions had an outsized impact—threatening to severely distort the market for Jason Scott furniture, robbing Jason Scott of its story of uniqueness, and gaining esteem as the only other manufacturer capable of making quality Jason Scott copies. The monetary value of those impacts is difficult to calculate, but the story is now widely known to Jason Scott's biggest customers. [Tr. Trans. 128:13-137:7] Defendants also ignored two cease-and-desist letters and planned to produce many more knockoffs, until the lawsuit stopped them. There is value in deterring such blatant infringement. The Court should therefore treble actual damages under § 1117(a).

### C. This is an "Exceptional Case" Warranting an Award of Fees

The Court can award reasonable attorneys' fees "in exceptional cases," which is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *SunEarth, Inc. v. Sun Earth Solar*

*Power Co., Ltd.*, 839 F.3d 1179, 1180-81 (9th Cir. 2016). This is a "case-by-case exercise of [the Court's] discretion, considering the totality of the circumstances" based on a preponderance the evidence. *Id*. Willful conduct is a sufficient predicate for an award of fees under § 1117(a). *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003). *Cosmos* awarded fees where the "Defendant was aware of the strength of Plaintiff's trade dress and designed and marketed his jewelry to capitalize on this strength in a high-demand market." 470 F.Supp. 2d at 1088. A defendant's continued infringement after receiving cease-and-desist letters also supports finding a case "exceptional." *See San Diego Comic Convention v. Dan Farr Prod.*, No. 2018 WL 4078639, *8 (S.D. Cal. Aug. 23, 2018) (continued use of mark after receipt of cease-and-desist letter and failure to reach out to the mark owner were "factually and legally unreasonable"); *Craters & Freighters v. Daisychain Enters.*, No. C-09-04531, 2010 WL 11484728, *11 (N.D. Cal. March 3, 2010).

Jason Scott had no choice but to file this lawsuit—Mr. Malhotra deliberately copied Jason Scott's "hit" products; tried to steal away Jason Scott customers; ignored two cease-and-desist letters; told Hill Country's owner that Jason Scott could not stop the copying; then told Tanner Dipple at Adobe that Trendily was copying many more Jason Scott pieces. Evidence shows Defendants' infringement was knowing and willful, and it posed an existential threat to Jason Scott's business. [Tr. Trans. 72:20-74:2, 152:22-154:18] Retailers believe this suit is necessary to protect their investment in Jason Scott. [Tr. Trans. 313:22-314:6] Defendants forced Jason Scott fight for a preliminary injunction at significant expense merely a litigation tactic. [10/25/17 Trans. at 108:17-109:21] The record also shows Mr. Malhotra deleted relevant text messages from his and Chris Sanders' phones. Public policy favors a fees award, as small companies like Jason Scott could not otherwise afford to protect their valuable intellectual property from copy artists like Defendants.

## Conclusion

The evidence described here and admitted at trial proves Defendants infringed Jason Scott's trade dress. The Court should therefore award Jason Scott the proven actual damages, treble enhanced damages, and its attorneys' fees and costs.

RESPECTFULLY SUBMITTED this 9th day of July, 2020.

By /s/ Thomas E. Dietrich

Thomas E. Dietrich
FortressGC, PLLC
1811 N. Turquoise Dr.
Flagstaff, AZ 86001

*Attorneys for Plaintiff Jason Scott Collection, Inc.*

1  I hereby certify that on July 9, 2020, I electronically submitted the attached document
2  to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of
3  Electronic Filing to the following CM/ECF registrant:

Brandon Leavitt
Leavitt & Eldredge Law Firm
4204 SW Green Oaks Blvd., Ste. 140
Arlington, TX 76017
tel. 214.727.2055
brandon@uslawpros.com

*Attorneys for Defendants*