**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Scott Collection Incorporated,<br><br>              Plaintiff,<br><br>v.<br><br>Trendily Furniture LLC, *et al.*,<br><br>              Defendants. | No. CV-17-02712-PHX-JJT<br><br>**ORDER** |

After holding a bench trial on June 23 and 24, 2020 (Docs. 115-16, 122-23), the Court now provides its Findings of Fact and Conclusions of Law. In this Order, the Court will also resolve Plaintiff's Motion to Enforce Court's Order and for Sanctions (Doc. 126), to which Defendants filed a Response (Doc. 127) and Plaintiff filed a Reply (Doc. 128).

**I.     BACKGROUND**

In this dispute between furniture manufacturers, Plaintiff Jason Scott Collection Inc. ("JSC") sued Defendants Trendily Furniture, LLC, Trendily Home Collection, LLC (collectively, "Trendily"), and Rahul Malhotra, alleging Defendants intentionally copied Plaintiff's designs for a dining table, desk, and buffet, and raising claims of copyright infringement, trade dress infringement, and unfair competition.

Jason Scott Forsberg—Plaintiff's founder, owner, and furniture designer—began creating furniture from reclaimed teak in Indonesia in 1998. His first furniture line—the Jason Scott Collection—features large-scale furniture adorned with intricate wood carvings and decorative metal. The furniture at issue—the Sacred Heart Dining Table, Iron

Star Desk, and Borgota Buffet (the "JSC Pieces")—is part of this collection. Mr. Forsberg testified that he independently created all the furniture designs using inspiration from everything around him. Mr. Forsberg designed the JSC Pieces in 2003, and Plaintiff, an Arizona corporation, has sold them to furniture retailers continuously since 2004. The JSC Pieces have been featured in print and television advertisements, online, and in trade show displays. Plaintiff only sells to authorized furniture retailers.

Trendily also manufactures and sells furniture and is based in Dallas, Texas. Mr. Malhotra is a Trendily owner and has operational control over its business. Mr. Malhotra makes decisions about which pieces of furniture Trendily will manufacture in its factory, located in India. In September 2016, Mr. Malhotra sent photos of the JSC Pieces to Trendily's factory and directed the factory to produce copies for sale by Trendily.

In a prior Order (Doc. 86), the Court granted summary judgment to Plaintiff on its copyright infringement claim, ordering Defendants to pay Plaintiff $19,995 in damages, refrain from selling any infringing products, and destroy the remaining infringing products. The Court dismissed as moot Plaintiff's unfair competition claim to the extent it sought an order requiring labelling of Defendants' infringing products. As for Plaintiff's trade dress infringement claim, the Court found that a genuine dispute of material fact remained as to whether the look of Plaintiff's products has acquired secondary meaning such that customers can identify the products' source by their look—an essential element of trade dress. The Court held a bench trial on Plaintiff's trade dress infringement claim on June 23 and 24, 2020. (Docs. 122-23, Transcript ("Tr.").) In conjunction with the bench trial, the parties filed Trial Memoranda (Docs. 97, 100), Proposed Findings of Fact and Conclusions of Law (Docs. 98, 101), and Post-Trial Briefs (Docs. 124, 125).

**II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    **A.    Legal Standard for a Trade Dress Infringement Claim**

The Lanham Act creates a cause of action for a party that is injured by another's use of "any word, term, name, symbol, or device, or any combination thereof . . . which is likely to cause confusion, or to cause mistake . . . as to the origin . . . of his or her goods[.]"

15 U.S.C. § 1125(a)(1)(A). The statute provides protection for trade dress—the "total image of a product." *Millennium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1126 (9th Cir. 2016) (citing *Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 n.3 (9th Cir. 1998)). "Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). The Lanham Act protects against unfair competition through trade dress infringement even if the trade dress is not registered with the United States Patent and Trademark Office. *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046-47 n.8 (9th Cir. 1999) (citing section 43(a) of the Lanham Act). "Trade dress protection is broader in scope than trademark protection, both because it protects aspects of packaging and product design that cannot be registered for trademark protection and because evaluation of trade dress infringement claims requires the court to focus on plaintiff's entire selling image, rather than the narrower single facet of trademark." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989) (citing J. McCarthy, Trademarks and Unfair Competition § 8:1, at 282-83 (2d ed. 1984)).

To sustain a claim for trade dress infringement, a plaintiff must prove: (1) the trade dress is nonfunctional; (2) the trade dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) the defendant's product creates a likelihood of customer confusion. *Clicks Billiards*, 251 F.3d at 1258. Here, the parties do not dispute that Plaintiff's trade dress is nonfunctional, so the Court is tasked with examining whether Plaintiff has proven the remaining two issues.

**B.     Secondary Meaning**

A plaintiff must show that its trade dress has acquired secondary meaning— "a mental recognition in buyers' and potential buyers' minds that products connected with the [trade dress] are associated with the same source." *Japan Telecom v. Japan Telecom Am.*, 287 F.3d 866, 873 (9th Cir. 2002). "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity,

manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999). "[W]hen . . . the relevant market includes both distributors and ultimate purchasers, the state of mind of dealers is important in determining if secondary meaning exists." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 295 (7th Cir. 1998).

### 1.     Intentional Copying

First, Plaintiff has shown that Defendants intentionally copied the look of Plaintiff's furniture pieces, which in this instance is substantial evidence of the secondary meaning of Plaintiff's trade dress. "Proof of copying strongly supports an inference of secondary meaning." *Adidas America, Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 755 (9th Cir. 2018). "When [copying] has been established, the inference is usually plain that the imitator intends such a result." *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 557-58 (9th Cir. 1960). In other words, "[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Id.* at 558.

Here, the evidence shows that in September 2016, Mr. Malhotra had a meeting with Ron McBee, owner of Western Heritage Furniture in Weatherford, Texas, one of Trendily's retail customers. Mr. McBee gave Mr. Malhotra printouts of photographs of Plaintiff's dining table, desk, and buffet and asked Mr. Malhotra to manufacture the furniture for Western Heritage. Mr. Malhotra sent the photographs to Trendily's factory, and carpenters there copied the photographs and then produced copies of the JSC Pieces. Mr. Malhotra named the resulting furniture (the "Accused Pieces") the "M.J. Collection." The Accused Pieces are nearly identical imitations of the JSC Pieces. The M.J. Dining Table is a copy of JSC's Sacred Heart Dining Table, the M.J. Desk is a copy of JSC's Iron Star Desk, and the M.J. Side Board is a copy of JSC's Borgota Buffet. Mr. Malhotra then proceeded to sell the Accused Pieces.

Mr. Forsberg first became aware of the Accused Pieces in December 2016 when Sally Brumbaugh, co-owner of Plaintiff's largest dealer, Brumbaugh's Furniture in Fort Worth, Texas, asked Mr. Forsberg why he was selling furniture to her competitor. Ms. Brumbaugh and Mr. Forsberg initially mistook the furniture as being the JSC Pieces but later learned they were the Accused Pieces. On May 15, 2017, Mr. Forsberg registered copyrights in the JSC Pieces for "[d]ecorative sculptural designs on furniture." On May 24, 2017, Mr. Forsberg's counsel sent a cease and desist letter to Mr. Malhotra, and on June 27, 2017, Mr. Forsberg's counsel sent a second cease and desist letter to Mr. Malhotra and attached copies of the Certificates of Registration for the JSC Pieces' copyrights. Mr. Malhotra received both cease and desist letters but continued to sell the Accused Pieces until Plaintiff filed this lawsuit.

Defendants point out that Mr. Malhotra testified it is common practice in the furniture industry to copy furniture designs and that he was not familiar with Plaintiff before he received the first cease and desist letter in May 2017. Defendants thus argue that Mr. Malhotra could not have intentionally imitated Plaintiff's products or capitalized on Plaintiff's goodwill if he did not know who Plaintiff was. This assertion is belied by the evidence, however.

At trial, the Court heard evidence that Plaintiff and Defendants share two of the same largest customers—Brumbaugh's Furniture and Hill Country Interiors, both in Texas—where Plaintiff's products make up approximately 80 percent of the showroom floor at Brumbaugh's and 40 percent of the showroom floor at Hill Country. Mr. Malhotra testified he has been to both stores, and Chris Sanders, Trendily's exclusive sales representative, testified he knew of Plaintiff within months of starting his job, including by seeing Plaintiff's product on the showroom floors of these shared retailers. The only reasonable inference is that Defendants were familiar with Plaintiff's products at the time they copied them. Indeed, all of the furniture retailers and sales representatives testified that Plaintiff is well-known in the market, and it strains credulity that Mr. Malhotra—whose companies operate in the same market—did not know of Plaintiff.

Likewise, Mr. Malhotra's testimony that he did not know who Mr. Forsberg was before receiving the cease and desist letter is not credible in view of evidence that he recognized Mr. Forsberg and kicked him out of Trendily's warehouse before the letter was sent. Bill Holland, of Hill Country Interiors, spoke with Mr. Malhotra and wrote in an e-mail to Mr. Forsberg that Mr. Malhotra "thought that you may be wanting to talk to him according to his sources that day you were there and possibly offering him $$$ to not manufacture this collection." (Trial Ex. 12.)

In sum, Plaintiff has shown by a preponderance of the evidence that Defendants knew who Plaintiff was when they intentionally copied Plaintiff's furniture. As other courts have found in similar circumstances, the Court finds "no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Audio Fidelity*, 283 F.2d at 558.

### 2.     Other Factors

The Court's finding that Plaintiff's trade dress has the requisite secondary meaning such that Defendants intentionally capitalized on Plaintiff's goodwill by copying the precise look of Plaintiff's products is bolstered by evidence of the exclusivity, manner, and length of use of Plaintiff's trade dress; advertising and display at trade shows; Plaintiff's established place in the high-end furniture market; and recognition of the trade dress by retail and end customers of high-end furniture. At trial, Plaintiff produced evidence that the JSC Pieces have a unique look, have been continuously manufactured and sold since 2004 under Plaintiff's mark, and have been prominently displayed at trade shows. Mr. Forsberg has made numerous presentations to customers at retail stores, and the presentations were advertised under Plaintiff's mark with photographs of the furniture. Retailers have also used the JSC Pieces in social media and e-mail blasts, identifying it by Plaintiff's mark. And Mr. Forsberg has won numerous design awards for his furniture, including Master of the Southwest. All of these facts are proof of secondary meaning. *See Cosmos Jewelry Ltd. v. Po Sun Hon Co.*, 470 F. Supp. 2d 1072, 1080, 1086 (C.D. Cal. 2007).

The retailers and sales representatives who testified in this case, at deposition and trial, all recognized Plaintiff's furniture pieces by their look. Defendants essentially argue that it is only the opinions of end customers of the furniture that matter, not retailers. The Court disagrees. The opinions of retailers are relevant in ascertaining whether a product's look identifies its source. *See Thomas & Betts Corp.*, 138 F.3d at 295. Indeed, the retailers and sales representatives who testified work with and sell high-end furniture as a profession, and the Court thus gives weight to their opinions. Moreover, as Plaintiff pointed out at trial, if an exclusive retailer of a product sees a copy of the product—which the retailer recognizes by look—in the window of another furniture store, the retailer may believe it has lost exclusivity. That is what Ms. Brumbaugh testified happened with respect to Plaintiff's furniture when she saw Defendants' copies. Retailers such as Ms. Brumbaugh also testified that end customers often ask for Plaintiff's furniture by name. By contrast, Defendants produced no convincing evidence that knowledgeable customers in Plaintiff's market of high-end furniture cannot identify the furniture by its look.

The evidence also shows that Plaintiff's mark is widely associated with Mr. Forsberg's story—that he met his wife in Indonesia and their son was born there; the furniture is hand-carved in a small Indonesian village; Plaintiff is the largest employer in the village, employing 175 to 200 people at a time; and Mr. Forsberg has funded a school and provided electricity to the village, among other facts. Based on this evidence, Defendants argue that customers associate Plaintiff with Mr. Forsberg's story more than anything else. But in the context of trade dress, the question is whether customers associate the look of Plaintiff's furniture with Plaintiff, that is, whether the look of the JSC Pieces identifies its source. Plaintiff has provided ample evidence of that through the means identified above. If anything, the evidence of Mr. Forsberg's story, which Defendants ask the Court to focus on, bolsters the amount of goodwill on which Defendants sought to capitalize by precisely copying Plaintiff's furniture. The story does not negate the association of the look of the JSC Pieces with their source—Plaintiff. For all of these

reasons, Plaintiff has demonstrated that its trade dress has acquired a secondary meaning such that it serves a source-identifying role.

### C. Likelihood of Customer Confusion

Under the third element of a trade dress infringement claim, a plaintiff must demonstrate customers are likely to assume a product comes from a source other than its actual source due to the similarity of trade dress between the product and another. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987). "Likelihood of confusion in the trade dress context is evaluated by reference to the same factors used in the ordinary trademark context: strength of trade dress, similarity between plaintiff's and defendant's trade dress, evidence of actual confusion, marketing channels used, type of goods and likely degree of purchaser care, and the defendant's intent in selecting its trade dress." *Vision Sports*, 888 F.2d at 616 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)). "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). Hence, "in some cases it may be unnecessary to undertake an extended analysis to infer confusion, *e.g.*, where there is no difference between the marks of directly competitive goods/services." *Adidas-Salomon AG v. Target Corp.*, 228 F. Supp. 2d 1192, 1211-12 (D. Or. 2002) (internal quotations omitted).

For the purpose of trade dress infringement, customer confusion can occur at the initial interest, point-of-sale, or post-sale stages of customer exposure to the accused product. A customer can be confused as to the source of a product at the initial interest stage even if "the consumer quickly becomes aware of the source's actual identity and no purchase is made as a result of the confusion." *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1110 (9th Cir. 1999). And "post-sale confusion occurs when consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product." *Adidas-Salomon*, 228 F. Supp. 2d at 1212.

Here, the question of whether the evidence demonstrates customer confusion between the overall impression of the Accused Pieces and JSC Pieces is not a close call

due to the identity between the designs. Defendants admittedly, intentionally, and precisely copied the JSC Pieces in look, color, size, and detail. As Plaintiff points out, the likelihood of confusion is compounded by the fact that Defendants copied multiple furniture pieces, creating their own line of copies of the JSC Pieces. *See Lisa Frank, Inc. v. Impact Int'l*, 799 F. Supp. 980, 997 (D. Ariz. 1992). In the context of secondary meaning, the Court already discussed the strength of Plaintiff's trade dress arising from the length and breadth of its use in the high-end furniture market. And the evidence shows the great overlap of marketing channels for Defendants' and Plaintiff's products.

As for evidence of actual customer confusion, this dispute began with actual confusion among retailers in the high-end furniture business, including that of Ms. Brumbaugh, questioning why the JSC Pieces were in a competing store when they were in fact the Accused Pieces, and Mr. Forsberg's own confusion. Other retailers, including Bo Runyon and Shawn Beach, also testified they believed the Accused Pieces were real JSC Pieces. The fact that professionals in the high-end furniture business could not tell the difference between the trade dress of the Accused Pieces and JSC Pieces strongly implies that ordinary customers could not, and Defendants provided no evidence to the contrary. For all of these reasons, the Court finds Plaintiff's evidence clearly demonstrates a likelihood of customer confusion, and having demonstrated all of the elements of its trade dress infringement claim, Plaintiff is entitled to judgment that Defendants are liable for trade dress infringement for the manufacture and sale of the Accused Pieces.

### D. Damages

#### 1. Unclean Hands

As a threshold damages issue, Defendants argue that Plaintiff engaged in misconduct that should bar recovery for trade dress infringement, citing the proposition that "the doctrine of unclean hands 'bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who

has dirtied his hands in acquiring the right presently asserted.'" (Doc. 124 at 18 (quoting *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989)).)

As allegations of misconduct, Defendants first assert that Plaintiff acted improperly by seeking judicial recognition of unregistered trade dress in this lawsuit and by waiting to register its copyrights until Mr. Forsberg found evidence they were infringed. (Doc. 124 at 18-19.) As the Court stated above, section 43(a) of the Lanham Act protects against unfair competition through trade dress infringement even if the trade dress is not registered with the United States Patent and Trademark Office. *Brookfield Commc'ns.*, 174 F.3d at 1046-47 n.8. And as the Court stated in its summary judgment Order (Doc. 86 at 5 n.3), if a certificate of copyright registration is made within five years of the first publication of a work, it "shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). If the copyright registration occurred more than five years after the first publication, a court has discretion to choose what evidentiary weight to give to the certificate of registration. *Id.* Because Plaintiff's copyright registration occurred more than five years after the first production of the JSC Pieces, the Court exercised its discretion to consider the certificate of registration as well as other evidence pertaining to copyright validity. There was nothing improper about Plaintiff bringing an action to enforce its copyright and trade dress rights, even if late-registered or unregistered. Defendants' assertion thus lacks merit.

Second, Defendants point out that Mr. Forsberg testified that he violated his own conscience in the way he obtained evidence against Defendants in this case, which constitutes unclean hands. (Doc. 124 at 18-19.) Specifically, Defendants contend that Mr. Forsberg's acts of investigating Defendants' infringement by allegedly going to Defendants' warehouse incognito and by asking a retailer to record a conversation with Mr. Malhotra were untoward. Even if these acts constituted unclean hands, they are not the kind of acts contemplated under the doctrine because they were not acts in the acquisition of the right Plaintiff presently asserts. Plaintiff acquired the copyright and trade dress rights through years of work and use. Indeed, the very case Defendants cite for the doctrine of

unclean hands concludes the same. *Dollar Sys.*, 890 F.2d at 173 (finding that the alleged misconduct was not related to right asserted); *see also Slep-Tone Entm't Corp. v. Granito*, No. CV-12-298-TUC-DCB, 2013 WL 3816737, at *2 (D. Ariz. July 23, 2013) ("In the Ninth Circuit, what is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts." (internal quotations omitted)). Defendants' invocation of the unclean hands doctrine thus fails.

### 2. Defendants' Profits

For prevailing on a claim of trade dress infringement, the Lanham Act provides "the plaintiff shall be entitled, . . . subject to the principles of equity, to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). At summary judgment, the Court already awarded Plaintiff damages constituting Defendants' profits in conjunction with Plaintiff's copyright infringement claim, and the parties agree that the same would not be available again for Plaintiff's trade dress infringement claim. Plaintiff points out that Defendants' profits should be included in any calculation of treble damages, which the Court will discuss further below.

### 3. Plaintiff's Reasonably Foreseeable Damages

With regard to the second type of damages Plaintiff is entitled to under section 1117(a),

> The district court assesses "any damages sustained by the plaintiff" in the same manner as in tort damages: the reasonably foreseeable harms caused by the wrong. . . . The trier of fact must distinguish between proof of the *fact* of damages and the *amount* of damages because a [trade dress] holder is held to a lower standard in proving the exact amount of actual damages. In measuring harm to goodwill, a [trier of fact] may consider a plaintiff's expenditures in building its reputation in order to estimate the harm to its reputation after a defendant's bad acts. Upon proving causation, the plaintiff's evidentiary burden relaxes considerably. To support a [trier of fact's] actual damages award, there need only be substantial evidence to permit the [trier of fact] to draw *reasonable inference* and make a *fair and reasonable assessment*.

*Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012) (internal quotations omitted) (emphasis in original). Plaintiff contends that its reasonably foreseeable damages from Defendants' targeting of the same retail market with lower-priced copies of Plaintiff's products and the resulting litigation arose from two sources, the loss of Plaintiff's business account with furniture retailer Coyote Candle and Plaintiff's inability to increase the price of its furniture beginning in 2017. (Doc. 125 at 12-14.)

### a. Coyote Candle

Coyote Candle is a furniture retailer in Lubbock, Texas, and customer of both Plaintiff and Trendily, and its involvement in this lawsuit centers on its owner, Ben Aufill. Brian Forsberg, Jason's brother, was Plaintiff's furniture delivery driver in Texas, and over a period of years delivering Plaintiff's furniture to Coyote Candle, Brian developed a close personal friendship with Mr. Aufill. By 2017, Trendily had produced the Accused Pieces and Western Heritage—which has never been a customer of Plaintiff—placed the Accused Pieces in its store in Weatherford, Texas, for sale. Brian testified that Mr. Aufill mentioned to him that somebody had knocked off Plaintiff's furniture and another retailer was selling it, and while Brian did not pay too much attention at first, in May 2017, he stopped at a Motel 6 in Weatherford between deliveries and had a hunch that he should check out Western Heritage in case it was the store Mr. Aufill had mentioned.

After he saw the Accused Pieces at Western Heritage, he texted photos to his brother Jason, and the brothers were both extremely upset. Jason asked Brian to find out who made the Accused Pieces, and Brian asked Mr. Aufill, who responded by text message that it was Trendily. (Tr. at 279; Trial Ex. 22.) Earlier in May 2017, Mr. Aufill sent Brian a text saying that he would stop buying Plaintiff's products if Brian mentioned that Mr. Aufill tipped him off about the knockoffs. (Tr. at 280; Trial Ex. 22 (Brian: "Can you tell me the name of the company and owner of guy knocking off Jason in India." Mr. Aufill: "I'll tell you but…..you [sic] if you mention my name I'll come kick your ass and stop buying Jason Scott and no more Tex mex tacos at the race car shop!").) Brian also testified that, after he disclosed to Jason that Mr. Aufill said it was Trendily, Brian did not do another delivery

of Plaintiff's furniture to Coyote Candle up to the time he retired as delivery driver in September 2018, and he lost his friendship with Mr. Aufill.

Plaintiff argues that, because of Mr. Aufill's involvement in informing Plaintiff that Defendants copied the JSC Pieces, Plaintiff lost its business with Coyote Candle. Defendants counter that (1) Defendants did not gain business with Coyote Candle in Plaintiff's place, so they are not liable for any loss in Plaintiff's business; (2) the loss of business was likely due to a decrease in demand for high-end furniture in the Lubbock market due to decreasing gas prices; and (3) Mr. Malhotra testified that when he asked Mr. Aufill a week before the trial if he stopped ordering from Plaintiff "because of Trendily," Mr. Aufill laughed and said he had just ordered a piece from Plaintiff in the last week (Tr. at 352).

Defendants' first argument is beside the point; Plaintiff asserts that it lost its business with Coyote Candle because of Mr. Aufill's necessary involvement in the dispute arising from Defendants' infringement, and not because Defendants stole Plaintiff's business with Defendants' infringing furniture.[1] Defendants' second point is speculative and not supported by any evidence, economic or otherwise. Plaintiff has produced actual evidence of Mr. Aufill's intent not to buy from Plaintiff again because of the disclosure of his name in conjunction with this lawsuit—which would never have occurred but for Defendants' infringement—and that evidence is not countered by Defendants' speculative, unsubstantiated economic evidence. Plaintiff's position is bolstered by evidence that, over the course of its business history, it has rarely lost customers.

Defendants' third argument goes more to the amount of damages than foreseeability. Plaintiff provided evidence that, between 2013 and 2016, it had average annual profits in the sale of furniture to Coyote Candle of $44,249, and it has not had business with Coyote Candle from May 2017, when Brian revealed to Jason that Mr. Aufill

---

[1] The Court finds little merit in Defendants' argument that Plaintiff could have chosen not to include evidence of Mr. Aufill's text messages in this case and proven its case through other evidence, thereby preserving its relationship with Mr. Aufill. The information from Mr. Aufill was precisely how the Forsberg brothers initially discovered Defendants were infringing.

had tipped him off, until the trial in mid-2020. (Tr. at 145-47; Trial Ex. 23.) With regard to foreseeability, Defendants' act of producing and selling precise copies of the furniture of Plaintiff, who operates in the same market and shares some of the same customers, foreseeably leads to placing the shared customers in a difficult position—as Mr. Aufill was placed—and damaging the business relationships—as Plaintiff's relationship with Coyote Candle was damaged. Plaintiff has therefore demonstrated that it is more likely than not that its loss of the Coyote Candle business was a foreseeable result of Defendants' infringement and the ensuing lawsuit resulting from Defendants' decision not to comply with the cease and desist letters.

As for the amount of damages, Plaintiff's evidence satisfactorily demonstrates its request for lost annual profits of $44,249 over three years, totaling $132,747.

### b.     Price Increase

Plaintiff also asserts it suffered damages as a result of Defendants' infringement by not increasing its prices under the threat of copies of its furniture on the market. As evidence, Plaintiff points to Mr. Forsberg's testimony that he used his discretion not to implement a price increase until the end of this litigation. (Tr. at 148-54.) Mr. Forsberg consulted with his regional salesperson, Mr. Williamson, in coming to that decision. (Tr. at 151-52.) Mr. Williamson testified that, in 2017, he advised Mr. Forsberg that "if there was any possible way for him to put [a price increase] off for a while, that would be in everyone's best interest given the knock-offs that were out there floating around until we were able to find a resolution on that." (Tr. at 313.)

Problematically, although Mr. Forsberg is in a sense testifying as to his business judgment in not increasing the prices of his furniture during the pendency of this litigation, there is little in the way of corroborating evidence that the market would not have supported a price increase. Mr. Forsberg's decision not to do so, in and of itself, is not sufficient for the Court to find that the lack of a price increase was a foreseeable result of Defendants' infringement. As Defendants point out, Plaintiff obtained an injunction on Defendants' production of the Accused Pieces in 2017 (Doc. 39), and other evidence shows retailers

were satisfied that Plaintiff was enforcing its copyright and trade dress protections through this litigation. The Court thus finds that Plaintiff has failed to demonstrate causation with regard to its request for damages resulting from the lack of price increases for its furniture.

### 4.     Treble Damages Enhancement

Section 1117(a) allows a court to enhance the damages arising from infringement, up to three times the actual damages, "according to the circumstances of the case." 15 U.S.C. § 1117(a). Courts have applied the enhancement "to address a variety of undercompensated harm, including where there is difficulty in assessing damage, and where lost profits are insufficient to address the on-going harm," or to "advance the cause of deterring Defendants and others similarly situated from repeating the type of unfair and deceptive behavior." *OminGen Research, LLC v. Wang*, 2017 WL 5505041, at *17-18 (D. Or. Nov. 16, 2017). Here, the Court does not find the damages assessed serve to undercompensate Plaintiff for the harm caused, and the injunctive relief and money damages awarded are sufficient to deter Defendants and others from similar behavior. Accordingly, the Court declines to enhance the damages under section 1117(a).

### 5.     Attorneys' Fees

Section 1117(a) also provides that Plaintiff is entitled to recover attorneys' fees "in exceptional cases." 15 U.S.C. § 1117(a). A court determines if a case is exceptional in this context by considering the "totality of the circumstances" and evaluating if the case is "one that stands out from others with respect to the substantive strength of the party's litigating position (considering both the governing law and facts of the case) or the unreasonable manner in which the case was litigated." *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 180-81 (9th Cir. 2016).

The evidence shows that Defendants intentionally and precisely copied Plaintiff's furniture designs. After Plaintiff sent Defendants cease and desist letters, Defendants continued to pitch the Accused Pieces to their retail customers and displayed the Accused Pieces in their Dallas showroom and on their website. Defendants only ceased manufacturing the Accused Pieces after they were served with Plaintiff's Complaint in this

lawsuit on August 16, 2017. By that time, Defendants had manufactured a total of 18 Accused Pieces (six of each item) and had sold six M.J. Dining Tables, four M.J. Office Desks, and five M.J. Side Boards.

Defendants have repeatedly argued that furniture manufacturers copy other furniture designs all the time. This is certainly no defense to copyright and trade dress infringement, which the Court has found Defendants engaged in by precisely copying every aspect of the JSC Pieces. In evaluating whether this case is exceptional, the Court must consider that Defendants' copying was willful, *see Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003), and that it continued after Plaintiff sent two cease and desist letters, *see San Diego Comic Convention v. Dan Farr Prods.*, 2018 WL 4078639, at *8 (S.D. Cal. Aug. 23, 2018). And, as the Court will discuss below, Defendants have resisted compliance with the Court's injunction requiring the destruction of the remaining Accused Pieces. For all these reasons, the Court finds this is an exceptional case warranting an award of reasonable attorneys' fees under section 1117(a).

### 6. Damages Summary

In sum, in addition to the lost profits of $19,995 the Court already awarded in the summary judgment Order and Defendants apparently already paid, and the injunctive relief set forth in the summary judgment Order, Plaintiff is entitled to $132,747 in damages for Defendants' trade dress infringement. Plaintiff is also entitled to an award of reasonable attorneys' fees provided it files an Application for Attorneys' Fees in compliance with the Local Rules.

### III. COMPLIANCE WITH THE COURT'S PRIOR INJUNCTION

Plaintiff also filed a Motion to Enforce Court's Order and for Sanctions (Doc. 126), which Defendants oppose (Doc. 127). In these briefs, the parties dispute the meaning of "destroy" in the Court's Order granting Plaintiff summary judgment on its copyright infringement claim, in which the Court said "Defendants must destroy any Accused Products in their possession." Defendants have proposed to sand down or disassemble the infringing furniture, and Plaintiff argues that neither proposal constitutes destruction.

The Court is of course no expert in furniture, construction or destruction, but the Court agrees with Plaintiff that "destroy" means render inoperable and injure beyond repair. Sanding down a piece of furniture does render it inoperable, and neither does disassembling it if it can simply be reassembled. Thus, neither of the methods of destruction suggested by Defendants is sufficient.

Assuming the destruction dispute is still ongoing, the Court will now order that Defendants either destroy—render completely inoperable and beyond repair—the furniture in the presence of a witness representing Plaintiff, or allow Plaintiff to take custody of the furniture to destroy it, in which instance a witness for Defendants may be present for the destruction. Because final judgment will only now be entered in this lawsuit, the Court declines to sanction Defendants in the form of Plaintiff's attorneys' fees for having to file the Motion to Enforce Court's Order.

**IT IS THEREFORE ORDERED** finding Plaintiff is entitled to judgment on its trade dress infringement claim and awarding Plaintiff $132,747 in damages plus reasonable attorneys' fees. Within 21 days of the date of this Order, Plaintiff may file an Application for Attorneys' Fees in compliance with the Local Rules.

**IT IS FURTHER ORDERED** granting in part and denying in part Plaintiff's Motion to Enforce Court's Order and for Sanctions (Doc. 126). Within 28 days of the date of this Order, Defendants shall destroy the remaining Accused Pieces by rendering them inoperable and beyond repair, and Defendants shall either permit a witness representing Plaintiff to be present for the destruction or give the Accused Pieces to Plaintiff for destruction, in which event a representative of Defendants may be present for the destruction. Plaintiff's request for attorneys' fees in conjunction with this Motion is denied.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment, as follows, and close this case: Judgment is granted in favor of Plaintiff and against Defendants on Plaintiff's copyright infringement claim, and Defendants are ordered to pay $19,995 in damages to Plaintiff. Defendants are permanently enjoined from selling any Accused Products in the future and must destroy the Accused Products in their possession.

Judgment is also granted in favor of Plaintiff and against Defendants on Plaintiff's trade dress infringement claim, and Defendants are ordered to pay $132,747 in damages plus reasonable attorneys' fees to Plaintiff. The Court dismisses as moot Plaintiff's unfair competition claim to the extent it sought an order requiring labelling of Defendants' infringing products.

Dated this 8th day of March, 2021.

Honorable John J. Tuchi
United States District Judge